**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Judge Berman

**'08 CV**

Civil Action No.

---

HINDS COUNTY, MISSISSIPPI on behalf of itself and all other similarly situated State and municipal entities,

        Plaintiff,

    v.

WACHOVIA BANK N.A..; AIG FINANCIAL PRODUCTS CORP.; AIG SUNAMERICA LIFE ASSURANCE CO.; BEAR, STEARNS & CO., INC.; FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.; FINANCIAL SECURITY ASSURANCE, INC.; FINANCIAL GUARANTY INSURANCE COMPANY; GE FUNDING CAPITAL MARKET SERVICES, INC.; TRINITY FUNDING CO., LLC; GENWORTH FINANCIAL INC.; NATIXIS S.A. F/K/A IXIS CORPORATE AND INVESTMENT BANK; JP MORGAN CHASE & CO.; LEHMAN BROTHERS INC.; MERRILL LYNCH & CO, INC.; MORGAN STANLEY; NATIONAL WESTMINSTER BANK PLC; PIPER JAFFRAY & CO.; SOCIÉTÉ GÉNÉRALE SA; UBS AG; XL ASSET FUNDING COMPANY LLC; XL LIFE INSURANCE & ANNUITY, INC.; NATIXIS FUNDING CORP. F/K/A CDC FUNDING CORP.; INVESTMENT MANAGEMENT ADVISORY GROUP, INC.; BANK OF AMERICA N.A; CDR FINANCIAL PRODUCTS; FELD WINTERS FINANCIAL LLC; WINTERS & CO. ADVISORS, LLC; FIRST SOUTHWEST COMPANY; GEORGE K. BAUM & CO.; KINSELL NEWCOMB & DE DIOS INC.; PACKERKISS SECURITIES, INC.; SHOCKLEY FINANCIAL CORP.; SOUND CAPITAL MANAGEMENT, INC.; CAIN BROTHERS & CO., LLC; and MORGAN KEEGAN & CO., INC.

        Defendants.

---

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



1

## NATURE OF CASE

1.      This case involves a conspiracy among Defendants to fix, raise, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives (as defined below) sold in the United States and its territories.

2.      The United States Department of Justice's Antitrust Division, the Internal Revenue Service, and the Securities and Exchange Commission are investigating industry-wide collusive practices in the two-hundred year old municipal bond industry.  A grand jury investigation currently is being conducted by the Antitrust Division in the United States District Court for the Southern District of New York.  Approximately thirty large commercial and investment banks, insurance companies, and brokers have been subpoenaed, and the offices of three brokers have been raided by the Federal Bureau of Investigation.  Numerous employees and former employees of various Defendants recently received letters notifying them that they are regarded as targets of the grand jury investigation concerning antitrust and other violations regarding contracts related to municipal bonds.

3.      According to published reports, Defendant Bank of America has been conditionally accepted into the Antitrust Division's amnesty program, in connection with which there was disclosure of information regarding the conspiracy described below and the promise to provide full and complete cooperation to the Antitrust Division and the Class.  The inevitable and practical result of this illegal conduct affected the market prices of municipal derivatives.

4.      Plaintiff brings this action to seek civil redress for injuries suffered as a result of the conspiracy on behalf of itself and all state, local and municipal government entities and their agencies, that purchased Municipal Derivatives in the United States and its territories directly

from one or more of the Provider Defendants (as defined below) and/or through one or more

Broker Defendants (as defined below) in the period from January 1, 1992 through December 31,

2006 (the "Class Period"). At all relevant times, Defendants issued and/or sold Municipal

Derivatives. During the Class Period, Defendants agreed, combined, and conspired with each

other to fix prices, and to rig bids and allocate customers and markets, of Municipal Derivatives

sold in the United States and its territories. As a result of that unlawful conduct, Plaintiff and the

Class (as defined in this Complaint) paid artificially inflated effective prices for these contracts,

including the ancillary fees and other costs and expenses related thereto, and therefore have

suffered injury to their business and property.

## JURISDICTION AND VENUE

5.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys'

fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by

reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16

of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton

Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class

Period the Defendants resided, transacted business, were found, or had agents in this District, and

because a substantial portion of the affected interstate trade and commerce described herein is

and has been carried out in that District.

## PLAINTIFF

8.      Plaintiff Hinds County, Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant and/or through at least one Broker Defendant during the Class Period.

## DEFENDANTS

9.      The entities listed below are collectively referenced herein as "Provider Defendants."

10.     Provider Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, AIG Financial issued and sold Municipal Derivatives to members of the Class.

11.     Provider Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class.

12.     Provider Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Bear Stearns issued and sold Municipal Derivatives to members of the Class.

13.     Provider Defendant Financial Security Assurance Holdings, Ltd. ("FSAHL") is a New York corporation with its principal place of business in New York, New York.  During the Class Period, FSAHL issued and sold Municipal Derivatives to members of the Class.

14.     Provider Defendant Financial Security Assurance, Inc. ("FSAI") is a New York corporation with its principal place of business in New York, New York.  During the Class

4

Period, FSAI issued and sold Municipal Derivatives to members of the Class. FSAI and FSAHL are referred to collectively herein as "FSA."

15.     Provider Defendant Financial Guaranty Insurance Company ("FGIC") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, FGIC issued and sold Municipal Derivatives to members of the Class.

16.     Provider Defendant Trinity Funding Co. LLC ("GE Trinity"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a New York limited liability corporation with its principal place of business in New York, New York. During the Class Period, Trinity issued and sold Municipal Derivatives to members of the Class.

17.     Provider Defendant GE Funding Capital Market Services, Inc. ("GE Funding"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the Class.

18.     Provider Defendant Genworth Financial Inc. ("Genworth Financial") is a Delaware corporation with its principal place of business in Richmond, Virginia. During the Class Period, Genworth Financial issued and sold Municipal Derivatives to members of the Class.

19.     Provider Defendant Natixis S.A. f/k/a IXIS Corporate and Investment Bank ("IXIS") is a French corporation with its principal place of business in Paris, France. During the Class Period, IXIS issued and sold Municipal Derivatives to members of the Class.

5

20.     Provider Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

21.     Provider Defendant Lehman Brothers Inc. ("Lehman Brothers" is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class. Lehman Brothers is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

22.     Provider Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

23.     Provider Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

24.     Provider Defendant National Westminster Bank plc ("NatWest") is a public limited company with its principal place of business in London, England.   During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class.  NatWest is a subsidiary of Royal Bank of Scotland.

25.     Provider Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.

26.     Provider Defendant Société Générale SA ("Société Générale") is a French corporation with its principal place of business in Paris, France.  During the Class Period, Société Générale issued and sold Municipal Derivatives to members of the Class.

27.    Provider Defendant AIG SunAmerica Life Assurance Co. ("SunAmerica") is an Arizona corporation with its principal place of business in Los Angeles, California. During the Class Period, SunAmerica issued and sold Municipal Derivatives to members of the Class.

28.    Provider Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business in Zurich, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

29.    Provider Defendant Wachovia Bank N.A. ("Wachovia") is a national chartered banking association with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.

30.    Provider Defendant Security Capital Assurance Inc. ("Security Capital Assurance") is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. During the Class Period, Security Capital Assurance issued and sold Municipal Derivatives to members of the Class.

31.    Provider Defendant XL Asset Funding Company LLC ("XL Asset Funding") is a limited liability company with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Asset Funding issued and sold Municipal Derivatives to members of the Class.

32.    Provider Defendant XL Life Insurance & Annuity, Inc. ("XL Life Insurance") is a subsidiary of XL Life & Annuity Holding Co. with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to members of the Class. XL Asset Funding and XL Life Insurance are referred to collectively herein as "XL."

## BROKER DEFENDANTS

33.    The entities listed below are collectively referred to herein as "Broker Defendants."

34.    Broker Defendant Natixis Funding Corp. f/k/a CDC Funding Corp. ("CDC") is a New York corporation with its principal place of business in New York, New York. During the Class Period, CDC acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants. CDC also functioned on some deals as a Provider, and to the extent it did so, is also referenced herein as one of the Provider Defendants.

35.    Broker Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania. During the Class Period, IMAGE acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

36.    Broker Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business in Beverly Hills, California. During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

37.    Broker Defendant Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business in Sherman Oaks, California. During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

38.     Broker Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business in Los Angeles, California. During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

39.     Broker Defendant First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas. During the Class Period, First Southwest acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

40.     Broker Defendant George K. Baum & Co. ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri. During the Class Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

41.     Broker Defendant Kinsell Newcomb & De Dios Inc. ("Kinsell") is a California corporation with its principal place of business in Carlsbad, California. During the Class Period, Kinsell acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

42.     Broker Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporation, with its principal place of business in Delray Beach, Florida. During the Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

48.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## DEFINITIONS AND BACKGROUND

### Municipal Bonds

49.    Municipal bonds are issued by states, cities, and counties, or their agencies (collectively "issuers") to raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants. The issuer typically uses proceeds from a bond sale to pay for capital projects or for other purposes for which it cannot or does not desire to pay immediately with available funds.

50.    Because of the tax-exempt status of most municipal bonds, investors usually accept lower interest payments than on other types of borrowing. This makes the issuance of bonds an attractive source of financing to many government entities, as the borrowing rate available in the open market is frequently lower than what is available through other channels.

51.    Municipal bonds bear interest at either a fixed or variable rate of interest. The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span at least several years.

52.    In order for municipal bonds to maintain their tax-exempt status. Internal Revenue Service regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

53.    Municipal bond proceeds typically are put into three types of funds to serve their purpose within the anticipated life of the project. The largest fund is known as the project fund or construction fund and, as its name implies, is used to pay for the construction or public works project at hand. The two smaller funds are administrative in nature, and ensure that the project fund is adequately funded and that the investors recoup their investment. The debt service fund, or "sinking fund," contains the money used to make principal and interest payments on the bond. The payments out of this fund usually are due semi-annually, although the principal portion of the payment may only be due annually. The debt service reserve fund ensures that if unforeseen contingencies occur, debt obligations can still be paid.

54.    Because municipal bonds typically are used to fund multi-year projects, most of a given bond's proceeds cannot or need not be spent in one lump sum. Rather, the proceeds are spent at regularly set intervals, and are invested to earn interest until they are put to use for their stated purpose.

55.    The municipal bond industry is extremely large. Approximately $385 billion worth of municipal bonds was issued in 2006 according to the Securities Industry and Financial Markets Association. The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

## Municipal Derivatives

56.    The investment vehicles in which issuers invest their bond proceeds until they are ripe for use are known as Municipal Derivatives.  Municipal Derivatives is an umbrella term that refers to a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings while they are waiting to be spent for their given purposes.

57.    Municipal Derivatives are provided by highly rated insurance companies and large commercial and investment banks, and they typically are sold to government entities. Municipal derivatives are a particularly favored form of investment in the municipal bond industry because they are considered safe and reliable investment vehicles.

58.    When government entities desire to purchase municipal derivatives, they frequently will engage a broker to obtain the best possible price for such derivatives either by arranging an auction among multiple issuers of municipal derivatives or otherwise.

59.    Municipal Derivatives are grouped generally into two categories, pertaining either to (a) the investment of bond proceeds, or (b) the bond's underlying interest rate obligations. The former category of Municipal Derivatives is known broadly as Guaranteed Investment Contracts, while the latter category of Municipal Derivatives includes instruments such as Swaps, Options, Collars, and Floors.

60.    A Guaranteed Investment Contract, commonly known as a GIC, is an investment agreement, secured by a contract with a financial institution (i.e., provider), which guarantees a fixed rate of return and a fixed date of maturity.  GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a company agrees to guarantee a fixed or variable rate of interest or a future

payment that is based on an index or similar criteria that is payable at a predetermined date on monies that are deposited with the company.[1] The types of investment agreements that the Internal Revenue Service generally references as GICs are: (a) Forward Purchase or Forward Delivery Agreements; (b) Repurchase Agreements or Collateralized GICs; (c) Unsecured or Uncollateralized GICs; and (d) Advance Refunding Escrows.

61.    A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds. Issuers (i.e. municipalities and other entities authorized to issue bonds) can request bids based on rate of return or on upfront payments, although the latter is the norm. This is an agreement wherein the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. Forward contracts are generally entered into in the over-the-counter markets. A forward may be used for any number of purposes. For example, a forward may provide for the delivery of specific types of securities on specified future dates at fixed yields for the purpose of optimizing the investment of a debt service reserve fund. A forward also may provide for an issuer to issue and an underwriter to purchase an issue of bonds on a specified date in the future for the purpose of effecting a refunding of an outstanding issue that cannot be advance refunded.

62.    A Repurchase Agreement or Collateralized GIC is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an

---

[1] Interest rates for Municipal Derivatives typically are calculated pursuant to LIBOR or BMA rates. LIBOR refers to the London Interbank Offered Rate, the standard rate for quoting interbank lendings of Eurodollar deposits, while BMA refers to the Bond Market Association Index.

agreed-upon rate of return. This is known as a collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

63.    An Unsecured or Uncollateralized GIC does not involve associated securities and functions like a savings account. It is used most often for construction or project funds. In the bidding process, the issuer sets forth a proposed draw down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period. These agreements typically have terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties for not meeting deadlines, such as construction benchmarks.

64.    An Advance Refunding Escrow is when the proceeds of the refunding issue (a bond issued to refund an outstanding bond) are deposited into an escrow account for investment in an amount sufficient to pay the principal of and interest on the issue being refunded on the original interest payment and maturity dates.

65.    A Swap is a type of investment agreement frequently used with respect to interest rate obligations. It is the sale of a security and the simultaneous purchase of another security for purposes of enhancing the investor's holdings. A swap may be used to achieve desired tax results, to gain income or principal, or to alter various features of a bond portfolio, including call protection, diversification or consolidation, and marketability of holdings. There are several types of swaps: (a) floating-for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-rate) swap, where the two are based on different indices (i.e., LIBOR or BMA).

66.    An Option is one of two types: a Put Option or a Call Option. A Put Option is a provision in a bond contract where the investor has the right, on specified dates after required

notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price (usually par value). A Call Option is a transaction where the issuer repays to the holder of an outstanding security the principal amount thereof (plus, in certain cases, an additional amount representing a redemption premium) as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date (often referred to as the "call").

67.    A Collar is an agreement entered into by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. It is used typically on variable rate debt, the maximum and minimum interest rates that establish a range within which the rate of interest to be paid on the debt must remain, regardless of whether the method for determining the variable rate would otherwise provide for a rate of interest above the maximum interest rate or below the minimum interest rate.

68.    A Floor (also known as an interest rate floor), typically used as part of an interest rate collar for variable rate debt, is an agreement whereby the issuer agrees to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference between the interest rate floor and the actual lower rate on the debt. It is used typically on variable rate debt, the minimum interest rate that can be paid on the debt, regardless of whether the method for determining the variable rate would otherwise provide for a lower rate of interest.

69.    The municipal bond industry is very large. A substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

16

70.     The Municipal Derivatives industry is relatively concentrated.  On information and belief, there are no more than 20 major providers of Municipal Derivatives in the United States.  With respect to GICs in particular, an article from The Bond Buyer, the preeminent trade publication for the municipal bond industry, placed the number of "major dealers" throughout the United States at 10 to 12.  On the other hand, the same publication places the number of issuers in the tens of thousands.

71.     In a competitive marketplace, providers would be expected to compete against each other for issuers' business on the basis of the highest rate of return for Municipal Derivatives that they could earn for issuers, subject to Internal Revenue Service rules that prevent issuers from generally engaging in arbitrage.

## IRS Rules and Regulations

72.     Internal Revenue Service rules and their corresponding regulations prevent issuers from earning arbitrage (i.e., profit) off of their tax-exempt bond proceeds, subject to certain exceptions.  *See* Internal Revenue Code § 148(a) (stating that tax-exempt bonds can become "arbitrage bonds" and become taxable if any portion of the proceeds are used directly or indirectly to acquire investments that have yields greater than the yield on the underlying bond); *see also* Internal Revenue Code §§ 148(c), (d) and (e) (enumerating exceptions to this principle).  Specifically, the yield from the municipal derivative cannot exceed the bond's yield by 0.001%, or it will be deemed arbitrage.  In addition, providers cannot divert arbitrage earnings, meaning that they cannot "burn" an otherwise arbitrage yield by charging the issuer a higher fee and reducing the yield by the amount of the fee in order to comply with the rules.

73.    The purpose of the rules and regulations governing arbitrage is to limit issuers'
ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds
at higher, non-tax exempt rates. The rules and regulations, therefore, require all profits made on
tax exempt bond investments to be rebated to the IRS, absent an exception.

74.    Another group of IRS regulations sets forth the procedure for establishing the fair
market value of GICs. *See* Treasury Reg. § 1.148-5(d)(6). These regulations govern the bidding
process for GICs, and there is a rebuttable presumption that a fair price is obtained for GICs
procured in compliance with these regulations. Key regulations include the following:

    (a)    The bid specifications must be in writing;

    (b)    The bid specifications must be timely forwarded to potential providers;

    (c)    The bid specifications must contain all material terms (*i.e.*, the term
directly or indirectly affects yield);

    (d)    The bid specifications must state that by submitting a bid, the potential
provider is representing that it has not consulted with other potential
providers, that its bid was not submitted solely as a courtesy bid, and that
the bid was determined without regard to an agreement with another issuer
or other person;

    (e)    The bid specifications must be commercially reasonable;

    (f)    There must be a legitimate business purpose for all terms in the bid
specifications other than solely to increase the price or reduce the yield;

    (g)    The bid specifications must contain a reasonably expected draw down
schedule;

(h)    All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

(i)    The issuer must receive at least three bids from solicited providers.

75.    The winning bid is the bid with the highest yielding bona fide offer net of broker fees. Broker fees usually are listed in the bid specifications. The winning provider must certify that administrative costs (such as bond counsel fees and broker fees) are paid to third parties on behalf of the issuer. In addition, the issuers must keep records of all bids for a minimum of three years after the last outstanding bond from the bid has been paid.

76.    The intent and purpose behind the Internal Revenue Service's safe harbor regulations is to provide a fair, competitive, and transparent process for issuers to obtain the best possible price for tax-exempt Municipal Derivatives. But due to the concerted effort of Defendants during the Class Period to conspire to fix prices and rig bids and customers and markets – as opposed to competing – this laudable goal was not realized.

## FACTUAL ALLEGATIONS

77.    The Department of Justice's Antitrust Division, the Internal Revenue Service, and the Securities and Exchange Commission are all conducting investigations into industry-wide collusive practices in the Municipal Derivatives Industry. The investigations of the IRS and the Antitrust Division are discussed in more detail below.

### Internal Revenue Service Investigation

78.    The IRS was the first agency to launch an investigation. Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in

taxes by engaging in abusive arbitrage devices. The IRS was concerned that some GIC providers were overcharging issuers for GICs and other investment products. This would artificially lower, or "burn," investment yields below the bond yield. The spread between the investment and bond yields was then passed to the provider, rather than rebated to the IRS as required by the federal tax laws.

79.     Several settlements have resulted from the IRS's investigation into abusive arbitrage devices. On February 7, 2007, Defendant Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities. In addition, Broker Defendant George K. Baum & Co. settled allegations with the IRS that it illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. According to relevant documents, Bank of America provided the GIC, on at least one of the Baum transactions targeted by the IRS, a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc. Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant, hidden payment to Baum.

80.     In addition to the regulations concerning arbitrage, the IRS regulations governing GIC bidding – as well as the federal antitrust laws – also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing and bid-rigging and kickbacks. Indeed, in January 2005, the IRS's office of tax exempt bonds said that it found pervasive evidence of bid-rigging for GICs.

## Antitrust Division Investigation

81.    In light of these revelations, the Antitrust Division of the Department of Justice commenced its own investigation in the bid-rigging in the Municipal Derivatives markets. For the better part of two years, the Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives.

82.    On November 15, 2006, the Federal Bureau of Investigation raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital Management.

83.    Following the FBI raids, the Broker and Provider Defendants were served with subpoenas. The subpoenas sought detailed information from the companies dating back to 1992, including organizational charts, lists of directors and officers, employees' birth dates and home addresses, calendars and appointment books, travel and expense records, telephone records, and all records relevant to the awarding of bids.

84.    On December 11, 2006, prosecutors based out of the Antitrust Division's New York field office that were tasked with investigating the alleged bid-rigging brought their case to a federal grand jury sitting in the Southern District of New York.

## The U.S. Department of Justice Grants Conditional Amnesty to Bank of America

85.    On February 9, 2007, Bank of America, the second largest U.S. bank, announced that it was cooperating with the DOJ's investigation into bidding practices in the municipal bond business in exchange for leniency as part of the DOJ's amnesty program. The DOJ's

21

investigation has since been expanded to include other types of Municipal Derivatives in

addition to GICs.

86.    On February 9, 2007, Bank of America issued a press release and stated the

following:

> Bank of America Corporation has entered a leniency agreement
> with the United States Department of Justice in Connection with
> the Department's investigation into bidding practices in the
> municipal derivatives industry.  This amnesty grant was as a result
> of the company voluntarily providing information to the
> Department before the Department began its investigation, as well
> as the company's continuing cooperation.
>
> The amnesty agreement provides that, in return for the company's
> continuing cooperation with the Justice Department's
> investigation, the Justice Department will not bring any criminal
> antitrust prosecution against the company in connection with
> matters that the company reported to the Justice Department.
>
> . . .
>
> In addition, in a matter involving the Internal Revenue Service
> (IRS), Bank of America has agreed to a $14.7 million settlement
> with the IRS relating to the company's role in providing
> guaranteed investment contracts and other agreement in connection
> with certain "blind pool" bond transactions.

87.    On February 12, 2007, Bond Buyer reported that "[s]ources said that key

derivatives officials at the bank were on 'administrative leave,' including Dean Pinard, who had

managed the bank's derivatives department in Charlotte, N.C., and had recently moved to New

York City.  One colleague said Pinard, who could not be reached, "was on administrative leave

with no date for returning."  The Bond Buyer also reported that "When the criminal investigation

was announced in November, attorneys representing several firms approached the [Justice

Department] and were told amnesty was no longer available.".

88.    On February 28, 2008, Bank of America, in its SEC Form 10k at page 123, stated
the following:

> Municipal Derivatives Matters
>
> The Antitrust Division of the U.S. Department of Justice (DOJ),
> the SEC, and the IRS are investigating possible anticompetitive
> bidding practices in the municipal derivatives industry involving
> various parties, including BANA, from the early 1990s to date.
> The activities at issue in these industry-wide government
> investigations concern the bidding process for municipal
> derivatives that are offered to states, municipalities and other
> issuers of tax-exempt bonds. The Corporation has cooperated, and
> continues to cooperate, with the DOJ, the SEC and the IRS. On
> February 4, 2008, BANA [Defendant Bank of America] received a
> Wells notice advising that the SEC staff is considering
> recommending that the SEC bring a civil injunctive action and/or
> an administrative proceeding "in connection with the bidding of
> various financial instruments associated with municipal securities."
> BANA intends to respond to the notice. An SEC action or
> proceeding could seek a permanent injunction, disgorgement plus
> prejudgment interest, civil penalties and other remedial relief.
>
> On January 11, 2007, the Corporation entered into a Corporate
> Conditional Leniency Letter (the Letter) with DOJ. Under the
> Letter and subject to the Corporation's continuing cooperation,
> DOJ will not bring any criminal antitrust prosecution against the
> Corporation in connection with the matters that the Corporation
> reported to DOJ. Civil actions may be filed. Subject to satisfying
> DOJ and the court presiding over any civil litigation of the
> Corporation's cooperation, the Corporation is eligible for (i) a limit
> on liability to single, rather than treble, damages in certain types of
> related civil antitrust actions, and (ii) relief from joint and several
> antitrust liability with other civil defendants.

### Numerous Press Accounts and Company Filings Detail the Extent of the Government's Investigations

89.    On January 6, 2005, The Bond Buyer reported the following:

> The heightened concerns about GIC transactions come as
> regulators have obtained evidence showing that bid rigging is
> much more prevalent in the municipal market than believed.

"It looks like bid rigging is wider and more pervasive than we thought," said Charles Anderson, field operations manager for the IRS' tax-exempt bond office . . .

"I think the investigation is broadening at this point," said Mark Scott, director of the tax-exempt bond office, who also declined to provide any specific details.

. . .

With as many as 20 IRS investigations of GIC bid rigging ongoing in the municipal market, the agency has increasingly found over the past year that some firms are providing so-called courtesy bids, or unrealistic bids, for GICs.

. . .

"When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided," Scott said.

These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," Scott said. "We have seen transactions where the winning bid is the only bid high enough to make the deal work."

. . .

"That's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse,'" [the IRS's Scott] said. "It's hard to say how widespread the problem is, but there is a significant problem out there at this point."

. . .

The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

90.    On November 16, 2006, the Bloomberg news agency ("Bloomberg") reported the

following:

U.S. law enforcement agents seized documents from three brokers and subpoenaed companies including bond insurers and **General**

24

**Electric Co.** in a criminal investigation of whether banks and financial firms conspired to rig bids for investment deals done with local governments.

The probe by the U.S. Justice Department centers on guaranteed investment contracts, which municipalities buy to hold bond money until funds are needed to pay for projects. The contracts are what banks and brokers used to invest at least $7 billion of proceeds from bonds issued by local governments across the U.S.; that money was never spent to benefit the public, according to an Oct. 4 Bloomberg news report.

"'There's a lack of transparency in the whole market,' said Dan Veres, executive vice president of Grant Street Group, a Pittsburgh-based firm that conducts guaranteed investment contract auctions on its Web site. "'It is ripe for abuse, the whole process.'"

Federal Bureau of Investigation agents searched **CDR Financial Products** of Beverly Hills, California, said Laura Eimiller, a spokeswoman for the FBI in Los Angeles, without providing further details.

**CDR** had a secret agreement with the provider of a guaranteed investment contract for bonds issued in 1999 by an authority in Gulf Breeze , Florida, Bloomberg News reported on Oct. 4. The deal allowed **CDR** to increase its fees if none of $220 million in bond proceeds was used for its intended purpose – affordable housing.

In an e-mailed statement, **CDR** confirmed it was asked to provide documents to the Justice Department. The firm, which says it has handled almost $160 billion of transactions including guaranteed investment contracts as a financial adviser and a broker, said it is cooperating fully with investigators.

. . .

**Financial Security Assurance Holdings Ltd.,** a unit of Brussels-based financial services company **Dexia SA**, yesterday said it was subpoenaed by the Justice Department.

**FGIC Corp.,** a New York-based bond insurer, also received a Justice Department subpoena, Brian Moore, a spokesman for the company, said today. Moore said **FGIC**, a former unit of Fairfield, Connecticut-based **General Electric**, had exited the

25

guaranteed investment contract business in 2003 when **GE** sold the
company. The outstanding contracts remained with **GE**.

...

**GE** also received a subpoena as part of the U.S. probe, said GE spokesman
Russell Wilkerson.

**Security Capital Assurance Ltd.**, a Bermuda-based bond
insurance unit of **XL Capital Ltd.**, today said a unit received a
grand jury subpoena from the antitrust division of the U.S.
Attorney's Office for the Southern District of New York. **XL
Capital** also said a unit received a subpoena from the U.S.
Securities and Exchange Commission related to a probe of
guaranteed investment contract brokers, without specifying the
subsidiary.

Federal investigators took documents yesterday from **Investment
Management Advisory Group Inc.**, a broker of guaranteed
investments contracts and a municipal derivatives adviser based in
Pottstown, Pennsylvania, said Gene Grabowski, a spokesman for
the firm, known as **IMAGE**.

"**IMAGE** received a subpoena from the antitrust division of the
U.S. Department of Justice and the company is cooperating fully
with the authorities,' the firm said in a written statement last night.
"It is our understanding that subpoenas have been issued to
numerous other firms and that the investigation is industry wide ..
. .

Today, a third guaranteed investment contract broker, Eden Prarie,
Minnesota-based **Sound Capital Management Inc.**, said federal
investigators seized documents from the firm and also served a
subpoena for more documents.

. . .

The actions by the Justice Department show that an investigation
into how banks compete for the right to reinvest money raised in
the $2 trillion tax-exempt bond market has expanded beyond the
IRS. The IRS has been looking into whether brokers awarded the
work to favored banks, potentially boosting the cost of the
investment agreements and depriving the federal government of
tax revenue.

The Justice Department is conducting an "investigation of anticompetitive practices in the municipal bond industry," said spokeswoman Kathleen Bloomquist.

The IRS's office of tax-exempt bonds said in January 2005 that it found pervasive bid-rigging for guaranteed investment contracts.

. . .

**CDR's** handling of investment bids for the city of Atlanta has already come under scrutiny. The IRS last year told officials from Atlanta that the city may have overpaid for a $453 million guaranteed investment contract from **Bank of America Corp.** in an auction run by **CDR**. The contract was for money raised by a 1999 water and sewer bond.

A **Bank of America** employee who bid for the Atlanta bond work, Doug Campbell, was fired after disclosing that he paid $57,393 to **CDR** for transactions in which it played no role.

The employee said in internal e-mails that the payments were made to bolster his relationship with **CDR**. Campbell also wrote that he made similar payments to another broker of guaranteed investment contracts, Los Angeles-based **Winters & Co.**, and **PaineWebber Inc.**, now a unit of Zurich-based **UBS AG** and a rival bidder for investment contracts.

. . .

Charles Anderson, manager of field operations for the IRS's tax-exempt bond division, told bond lawyers in May that the agency is investigating cases where providers of guaranteed investment contracts paid kickbacks to the brokers who evaluated their bids for the agreements . . .

The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. According to documents obtained from the authority, the IRS said it was concerned about quarterly payments made by Paris-based **Societe Generale**, France's third-biggest bank, to **CDR**, which structured the transaction and evaluated bids for the investment agreement.

New York-based **Financial Security Assurance** was one of the four that bid for that contract, the records show.

27

On Nov. 10, **George Baum & Co.**, a Kansas City, Missouri-based investment bank settled allegations that bidding was rigged in the selection of a guaranteed investment contract provider for a $150 million loan pool underwritten by **Baum** in 1999 and issued by the Illinois Development Finance Authority.

. . .

The IRS settlement with **Baum** covered more than $2 billion of such deals between 1997 and 2001. **Baum**, which agreed to pay the IRS an undisclosed amount, didn't admit or deny wrongdoing.

91.    On November 17, 2006, The Bond Buyer reported the following:

[N]ine firms – including GIC brokers, insurance companies, and broker dealers – confirmed they had received subpoenas from the U.S. Department of Justice's antitrust division.

The Securities and Exchange Commission's separate, parallel civil investigation of bid-rigging also came to light yesterday as **Financial Security Assurance Holdings, Ltd.** and **First Southwest Securities** announced they had received subpoenas from the SEC. In the criminal probe, a third GIC broker, **Sound Capital Management**, disclosed yesterday that the Federal Bureau of Investigation had raided its Eden Prarie, Minn., offices.

Industry sources say 20 to 25 firms were served with subpoenas Wednesday. Nine have announced them or confirmed they were received: **IXIS Corporate & Investment Bank, CDR Financial Products, Investment Management Advisory Group Inc., Financial Guaranty Insurance Co., Kinsell Newcomb & De Dios Inc., XL Capital Assurance, Inc., First Southwest Securities, FSA,** and **Sound Capital**.

The **Sound Capital** raid came as the FBI also raided the offices of **CDR** and **IMAGE** Wednesday.

Knowledgeable sources said three other firms have been served with subpoenas from the Justice Dept., but those either would not comment or could not be reached: **Société Générale, George K. Baum & Co.,** and **Feld Winters Financial LLC**.

. . . .

28

Sources say that several government officials are aware of recorded phone conversations suggesting firms colluded with each other. These recordings have been crucial evidence in the investigations, they say.

88.    On December 7, 2006, Bloomberg reported the following:

The first-ever antitrust probe of the municipal bond market is roiling an industry that states and cities depend on to finance everything from garbage trucks to schools.

U.S. Justice Department prosecutors subpoenaed more than a dozen banks and insurers three weeks ago, seizing documents from three brokers in a search for evidence of bid rigging. Lawyers say it's the biggest criminal investigation of the almost 200-year-old market, where municipalities have more than $2 trillion of debt outstanding.

. . .

**JPMorgan Chase & Co.,** the third largest bank in the U.S., **American International Group Inc.,** the world's largest insurance company, and **Financial Security Assurance Holdings Ltd.,** a unit of Brussels-based financial services company **Dexia SA,** are among the companies that received subpoenas.

. . .

The Justice Department asked for information from as far back as 1992, including files on guaranteed investment contracts and other financial products, such as derivatives. A derivative is a financial contract whose value is derived from tradable securities or linked to events such as interest-rate changes.

. . .

"The way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be," said Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association. "And it's certainly possible that when you don't have transparency you can have abuses."

[Charlie] Anderson [manager of field operations for the IRS's tax-exempt bond division] says regulators "think we have evidence of bid rigging." Local governments are required to pay as taxes any

profits they get by borrowing at low tax-exempt rates and investing in higher-yielding securities.

The IRS probe shows that investment contracts were sold at below market rates, Anderson said. That means lower returns for municipalities and less tax revenue for the IRS, he said.

"People were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal," said the IRS's Anderson.

89.    On February 9, 2007, the Bloomberg news agency reported the following:

**Bank of America** provided the guaranteed investment contract on at least one of the **Baum** transactions targeted by the IRS, a $100 million issue sold by **Rural Enterprises of Oklahoma, Inc.**, bond documents show. **Rural Enterprises of Oklahoma, Inc.** disclosed in July 2003 that a "significant," hidden payment was made by **Baum** to the provider of the investment agreement.

90.    On May 18, 2007, the Bloomberg news agency reported the following:

**Bear Stearns Cos., UBS AG, Piper Jaffray Cos., Wachovia Corp.** and four other banks said they were subpoenaed as part of a U.S. investigation of Wall Street's sales of investments and derivatives to local governments.

The disclosures were contained in quarterly filings that bond underwritings made with the California treasurer . . .**Cain Brothers, George K. Baum & Co., Morgan Keegan & Co.** and **JPMorgan Chase & Co.** also said they were contacted by U.S. regulators.

"These subpoenas were issued as part of a broad, industry-wide investigation," New York-based **Bear Stearns** wrote in a filing with the California treasurer's office.

. . .

The disclosures also offer evidence that the U.S. investigation involves more than the bidding practices for investment contracts. Five of those subpoenaed reference derivatives, a fast-growing and

lucrative business for banks seeking to help governments lock in future interest rates and guard against swings in borrowing costs.

**UBS** and **Bear Stearns** both said that investigators sought information on derivatives sold to municipal borrowers as well as information related to guaranteed investment contracts, which local governments frequently buy with the proceeds of bond sales.

**Morgan Keegan & Co.**, another subpoenaed firm, also notes that the SEC sought information on a bond and derivative transaction the Memphis, Tennessee-based firm handled. **Wachovia**, based in Charlotte, North Carolina, said the two regulators are looking at "competitive bid practices in the municipal derivatives market."

**UBS**, the second-largest underwriter on municipal bonds in the U.S. after Citigroup Inc., said it was subpoenaed in November by both the antitrust unit of the Justice Department and the SEC.

"The two subpoenas concern **UBS's** conduct relating to derivative transactions entered into with municipal bond issuers, and to the investment of proceeds of municipal bond issuances," **UBS** said in its filing."

91.    On February 28, 2008, the Reuters news agency reported the following:

**Wachovia Corp** (WB.N: Quote, Profile, Research) on Thursday said two employees in its main banking unit are targets of a U.S. Department of Justice probe into competitive bidding in the municipal derivative markets.

In its annual report filed with the U.S. Securities and Exchange Commission, the company said the department notified the **Wachovia** Bank employees in November that they were targets, and that the employees are on administrative leave. **Wachovia** said the Department of Justice and the SEC both believe that certain **Wachovia** employees engaged in improper conduct on some competitively bid transactions.

92.    On February 29, 2008, Bond Buyer reported the following:

Two employees of **Wachovia Bank NA** in Charlotte, N.C. have been notified by the U.S. Justice Department that they are targets of a grand jury investigation regarding antitrust and other violations involving contracts related to municipal bonds, according to regulatory information obtained by The Bond Buyer.

The two employees – Jay Saunders and Martin McConnell – worked in the derivatives marketing department at the bank, but were put on administrative leave after receiving written notifications that they were targets on the grand jury investigation.

Saunders was listed as director of marketing in the derivatives department in The Bond Buyer's Municipal Marketplace "Red Book" last fall. McConnell was listed as having been managing director of marketing during the spring of last year.

93.    On March 3, 2008, Bloomberg reported the following:

The criminal investigation of U.S. municipal bond firms is spreading as current or former bankers at **Bear Stearns Cos.**, **UBS AG**, **JP Morgan Chase & Co.** and **Deutsche Bank AG** disclosed they are targets of the probe.

Peter Ghavami, the former co-head of municipal derivatives at Zurich-based **UBS**, Europe's biggest bank by assets, is part of the Justice Department's investigation, employment records with the Financial Industry Regulatory Authority show. Charlotte, North Carolina-based **Wachovia Corp.** and **Piper Jaffray Cos.** In Minneapolis disclosed last week that their employees were targeted.

. . . .

Ghavami, a former co-lead of the municipal derivatives group at **UBS** who later became head of one of the bank's commodities divisions, was among the banker who received letters saying they are targets of the investigation, Finra records show. Ghavami quit **UBS** in November and started at New York-based Lehmann Brothers Holdings Inc. as head of capital markets for Russia in January.

**Bear Stearns'** Stephen Salvadore and former **JPMorgan** banker James Hertz said they are targets, according to Finra records. Goldman Sachs Group Inc.'s Shomi Raz, who worked at **JPMorgan** until 2003, disclosed to Finra that he is being investigated, without saying whether he is a target.

. . .

Hertz was fired by **JPMorgan** in December, according to records with Finra.

"Mr. Hertz has been advised that he is a target of a grand jury investigation regarding municipal securities business," his record states.

. . .

**Bear Stearns'** Salvadore received a letter notifying him that he is a target of an investigation "concerning antitrust and other violations involving contracts related to municipal bonds," his record states.

Patrick Marsh, the head of municipal structuring at Frankfurt-based **Deutsche Bank**, Germany's biggest bank, disclosed in November he was a target of the probe. Samuel Gruer, who works for Marsh at **Deutsche Bank**, also received a "target letter" from the Department of Justice in November, according to regulatory filings.

A person familiar with the probe said prosecutors were focusing on alleged conduct by Marsh and Gruer at their former employers. Marsh, who joined **Deutsche Bank** in April 2005, formerly worked at **Bear Stearns**. Gruer was employed by **JPMorgan** until June 2006.

94.    On March 3, 2008, Bond Buyer reported the following:

**NELNET Inc.**, an education planning and financing company, disclosed Friday that **Shockley Financial Corp.**, an indirect wholly owned subsidiary, and two associates who provided investment advisory services for municipal and corporate bonds, on Feb. 8 were subpoened by a grand jury in New York City for documents and information relating to the criminal investigation.
. . .

Market participants said Friday that the individuals and firms known to have been subpoened or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicy disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees. even before their 10-K filings are due, but

33

banks and investment advisory firms are not subject to the same
disclosure requirements.

. . .

"Usually by the time an individual gets a target letter, the
investigation is pretty far down the road and it's an indication that
indictments are going to be issued in the relative near terms," said
John K. Markey, a partner a Mintz Levin Cohn Ferris Glovsky &
Popeo PC in Boston, and former federal and state prosecutor.

Markey said that in a target letter, "The Department of Justice is
informing an individual or his attorney that it already has
substantial evidence of the commission of a federal crime. It
usually is a sign that the individual is going to be indicted and it
may prompt an attempt at a plea bargain or cooperation deal with
the government."

. . .

Mary A. Packer, president of **PackerKiss Securities Inc.**, in San
Rafael, Calif., disclosed in her regulatory filing that she was
notified by the Justice Department on Dec. 11 that she is a target of
the grand jury muni investigation . . .

**Piper Jaffray & Co.**, disclosed in the regulatory filing for James
H. Towne, former managing director of the firm's municipal
derivatives group, that he received a notice from the Justice
Department's antitrust division Dec. 15 relating to "potential
antitrust and other violations involving contracts related to
municipal bonds.

95.    On March 5, 2008, the Wall Street Journal reported the following:

Federal authorities are preparing to charge more than two dozen
people and a handful of financial firms amid an investigation of
municipal contract awards, according to company disclosures and
people familiar with the matter.

. . .

In the past few weeks, at least four companies—including banks
**UBS AG, Bank of America Corp.**, bond issuer **Financial
Security Assurance Holdings Ltd.** and product developer **CDR
Financial Products Inc.** – disclosed that they received so-called

Wells notices from the SEC. A Wells notice indicates that the agency is considering filing civil charges and gives the recipient an opportunity to say why charges shouldn't be filed. **FSA** said it was facing civil charges.

Several individuals also were sent Wells notices, a person familiar with the investigation said, and more notices to firms and people might be sent.

The Justice Department's antitrust division has sent target letters to almost 30 individuals, according to people familiar with the matter. A target letter indicates the department will seek indictment or file criminal charges . . .

Authorities are investigating whether investment firms colluded to rig the bidding for the right to invest the municipal money, people familiar with the matter said.

Among the areas of interest is whether parties submitted phony bids to let one bank win a contract in exchange for another bank getting a contract later. In addition, authorities are looking into whether the financial firms paid kickbacks to other firms to win business. Federal tax laws and rules require such contracts to have at least three bids to make them competitive.

As a result of the alleged wrongdoing, municipalities may have paid higher fees than they might have under competitive bidding.

. . .

The municipal market has long been opaque and ripe for abuse.

. . .

Municipalities often use an agent to run a bidding process to find the bank that will pay the highest interest rate.

. . .

About 30 companies or their subsidiaries have received subpoenas, people familiar the inquiry say."

35

### History of Fraud in the Municipal Derivatives Market

96.     The wrongful conduct alleged herein is not the first time that Wall Street firms have run afoul of laws designed to prevent unfair profiteering on the proceeds of a bond issuance.  Commencing in January 1998, the United States Securities and Exchange Commission sanctioned 21 firms who were involved in fraudulent activities that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on how much they could earn.  According to the SEC, this so-called "yield-burning" scandal led to settlements of $172 million as a result of misconduct on 3600 separate municipal bond issues.  Piper Jaffray & Co., one of the Provider Defendants here, was involved in the earlier municipal bonds scandal.

### WRONGDOING ALLEGED

97.     Plaintiff incorporates by reference each of the foregoing paragraphs of their complaint and summarize their allegations of wrongdoing as follows:

98.     The Broker Defendants, who were purportedly acting as the agents of issuers (i.e. municipalities), knowingly facilitated sham auctions for Municipal Derivatives to make it appear that an auction had been conducted in compliance with I.R.S. rules and regulations.

99.     In these sham auctions, several bidders, including at times one or more Provider Defendants, would submit bids at prices they knew were not competitive so that another Provider, including at times a Provider Defendant, could win the business by slightly underbidding the sham bids.

100.    The providers who knowingly and intentionally engaged in these rigged auctions, including the Provider Defendants, understood that they would take turns providing the winning bid.  At times, the providers, including one or more Provider Defendants, directly discussed with

36

each other the terms of their bids. On other occasions, communications between the providers, including one or more Provider Defendants, were made indirectly through the Broker Defendants, who would guide the providers, including one or more Provider Defendants, by suggesting the terms of their respective bids. The provider designated to win a particular auction frequently bid after it had been given the terms of the bids provided by the other bidders.

101.     At times, providers, including one or more Provider Defendants, engaged in back-end swaps to compensate other providers, including one or more Provider Defendants, who submitted the sham bids. On other occasions, the winning provider, including at times one or more Provider Defendants, would secretly compensate other providers, including at times one or more Provider Defendants, for declining to submit a bid.

102.     The brokers, including one or more Broker Defendants were handsomely compensated for their role as the issuer's agent in these Municipal Derivatives auctions and they agreed to facilitate the bid-rigging by the Provider Defendants to induce the providers to recommend that issuers in later auctions use them as brokers. The Broker Defendants also received secret payments from the providers, including one or more Provider Defendants, to facilitate the bid-rigging alleged herein.

103.     One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that Defendant Bank of America provided to the City of Atlanta in 2002, in which Defendant CDR acted as the broker and handled the bidding. In a June 28, 2002 e-mail contained in court records, Douglas Campbell told Phil Murphy that $182,393 was paid to Defendants CDR, Piper Jaffray, PaineWebber, and Winters. The payments were described as a bid to build Defendant Bank of America's relationship with these companies.

37

104.    Yet more evidence of bid-rigging and price-fixing exists. The IRS has focused on over 20 lease-to-own deals between CDR and Defendant Societe Generale, as well as CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation. According to letters the IRS sent to issuers in the Fall of 2006, the IRS has evidence of quarterly payments Societe Generale made to CDR for "unspecified services" relating to these lease-to-own deals. The letters also asserted that the IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues. The IRS now is examining whether the awarding of GIC bids was prearranged to allow Societe Generale to inflate various fees and divert illegal arbitrage as part of a larger plan involving numerous other bond issuances.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action on its own behalf and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from a Provider Defendant or Bank of America, or through a Broker Defendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

106.    Plaintiff does not know the exact number of class members because such information is in the exclusive control of Defendants and their unnamed co-conspirators. But due to the nature of the trade and commerce involved, Plaintiff believes that the Class described above comprises thousands of members.

107.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

108.    There are questions of law and fact common to the Class, including:

      a.    Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices, and rig bids and allocate customers and markets of Municipal Derivatives;

      b.    The identity of the participants of the alleged conspiracy;

      c.    The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

      d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

      e.    Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

      f.    The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;

      g.    Whether Defendants fraudulently concealed the conspiracy's existence from the Plaintiff and the other members of the Class; and

      h.    The appropriate class-wide measure of damages.

109.    Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff purchased Municipal Derivatives, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

110.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

111.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

112.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

114.    Defendants' activities, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

115.    During the Class Period, Defendants issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation other than the states in which Defendants reside.

40

116.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## EFFECTS

117.    Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

        a.      Prices charged by Defendants to Plaintiff and the members of the Class for Municipal Derivatives were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

        b.      Customers and markets of Municipal Derivatives were allocated among Defendants;

        c.      Plaintiff and the other members of the Class had to pay more for Municipal Derivatives than they would have paid in a competitive marketplace, unaffected by Defendants' collusive and unlawful activities;

        d.      Price competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

        e.      As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

## FRAUDULENT CONCEALMENT

118.    Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

119.    Plaintiff and the Class members did not discover, nor could they have discovered

through reasonable diligence, that Defendants were violating the antitrust laws until shortly

before this litigation was commenced because Defendants used deceptive and secret methods to

avoid detection and to affirmatively conceal their violations.  Defendants did not tell Plaintiff or

other class members that they were rigging bids.  To the contrary, Plaintiff and the other class

members were falsely assured that the Broker Defendants were acting as their agents and were

soliciting bids for Municipal Derivatives that were fair and competitively priced and that

complied with specific IRS rules and regulations that required Broker Defendants to obtain at

least three commercially reasonable bids.  Accordingly, Plaintiff and the other class members

could not have discovered the violations alleged herein until shortly before the filing of this

Complaint because Defendants conducted their conspiracy secretly, concealed the nature of their

unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities

through various other means and methods designed to avoid detection.

120.    Defendants engaged in a successful price-fixing conspiracy concerning Municipal

Derivatives, which they affirmatively concealed, at least in the following respects:

a.    By meeting secretly to discuss prices, customers and markets of Municipal
Derivatives sold in the U.S. and elsewhere;

b.    By agreeing among themselves at meetings and in communications not to
discuss publicly, or otherwise reveal, the nature and substance of the acts
and communications in furtherance of their illegal scheme; and

c.    By intentionally creating the false appearance of competition by engaging
in sham auctions in which the results were pre-determined.

121.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That judgment be entered for Plaintiff and the members of the Class against Defendants for treble damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    That Plaintiff and the members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: March 12, 2008                     By: _____

    Precious Martin Senior                     Roland Riopelle, Esq. (RR-2950)
    PRECIOUS MARTIN SENIOR &                  SERCARZ & RIOPELLE, LLP
    ASSOCIATES PLLC                            Carnegie Hall Tower
    821 North Congress St.                     152 W. 57th Street
    P.O. Box 373                               New York, New York 10019
    Jackson, MI 39205-0373                     Tel: (212) 586-4900
    Telephone: (601) 944-1447                  Fax: (212) 586-1234
    Facsimile: (601) 944-1448

                                         Attorneys for Plaintiff

                                         *Hinds County, Mississippi*