UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08-02516 (VM)(JCF) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## **DECLARATION OF J. DOUGLAS RICHARDS**

I, J. Douglas Richards, hereby declare as follows:

1.      I am a member of the law firm of Pomerantz Haudek Block Grossman & Gross LLP ("Pomerantz"). Pomerantz represents Plaintiff Haywood County, Tennessee in the above-captioned action. I respectfully submit this Declaration in further support of Plaintiff Haywood County, Tennessee's motion to appoint Pomerantz Haudek Block Grossman & Gross LLP as Interim Lead Counsel to represent the class plaintiffs in this consolidated action, pursuant to Fed. R. Civ. P. 23(g)(3), along with such other Lead Counsel firms as the Court may find appropriate.

2.      Attached as Exhibit A is a true and correct copy of the firm resume for Pomerantz Haudek Block Grossman & Gross LLP.

3.      Attached as Exhibit B is a true and correct copy of a written agreement that I understand Cohen Milstein Hausfeld & Toll P.L.L.C. has entered into with defendant Bank of America Corporation.

4.      Attached as Exhibit C is a true and correct copy of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. 108-237.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 2nd day of July, in New York, New York.

J. Douglas Richards

# EXHIBIT A

## POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP

Pomerantz Haudek Block Grossman & Gross LLP ("Pomerantz Firm" or "Firm") is one of the nation's foremost specialists in corporate, securities, antitrust and ERISA class litigation. The Firm was founded by the late Abraham L. Pomerantz, one of the "pioneers who developed the class action/derivative action field."[1] Mr. Pomerantz rose to national prominence as a "champion of the small investor" and a "battler against corporate skullduggery."[2] The Institutional Shareholder Services ranked the Pomerantz Firm third in the country in 2005 for the highest average settlement amount achieved on behalf of clients.[3]

For over 70 years, the Firm has specialized in representing victims of securities frauds, breaches of fiduciary duty, corporate mismanagement, and price fixing conspiracies, as it continues the proud tradition established by Mr. Pomerantz. The Firm also has thriving ERISA, healthcare and consumer litigation practices. Pomerantz has set important precedents in its practice areas. The Firm is led by senior partner Stanley M. Grossman, a nationally prominent litigator. Mr. Grossman recently argued *Stoneridge Investment Partners v. Scientific Atlanta, Inc.*, to the United States Supreme Court, and made strong arguments that a cause of action exists against secondary actors for "scheme liability" under Section 10(b) of the Securities Exchange Act of 1934. Although the Court affirmed, by a vote of 5 to 3, the decision of the Court of Appeals dismissing the claims against the two "secondary" defendants, it made statements that we believe will be helpful to plaintiffs in future

---

[1] New York Law Journal (August 1, 1983).

[2] Robert J. Cole, *Class Action Dean*, The National Law Journal, Vol. 1 No. 2 at 1 (Sept. 25, 1978).

[3] Securities Class Action Services 50 for 2005.

1

cases. For example, the Court ruled that "secondary actors" who engage in deceptive *conduct* can be liable for violating Section 10(b) even if they never make any public false statements. The Court also left open the possibility that accountants and investment banks, which operate in the "realm of financing business" might be subject to scheme liability claims in situations where others would not be. 128 S. Ct. 761 (2008).

Courts have consistently acknowledged the ability of the Pomerantz Firm to vigorously pursue the claims of class members. In granting the fee request in *In re Salomon Brothers Treasury Litigation*, 91 Civ. 5471 (RPP) (S.D.N.Y.), where the Firm successfully negotiated a $100 million settlement for the class in a complex antitrust and securities case, Judge Patterson stated:

> I am going to approve the settlement, and I am going to approve the attorneys fees that you have requested with cost.
>
> As I am doing it so summarily, does not mean I have not considered it at length. But it does not need that much consideration because I've observed the conduct of the attorneys involved here. They get the work done, and it was a tough one.
>
> I think that there were a lot of people who thought there was going to be no recovery at all in this case.

In appointing Pomerantz Lead Counsel in *American Italian Pasta Co. Sec. Litig.*, No 05-CV0725-W-ODS (W.D. Mo.), a class action which involved a massive fraud and restatements spanning several years, the District Court observed that the Firm "has significant experience (and has been extremely effective) litigating securities class actions, employs highly qualified attorneys, and possesses ample resources to effectively manage the class litigation and protect the class's interests."

The Pomerantz Firm, as Lead Counsel, negotiated a $146.25 million settlement in *In re Charter Communications Sec. Litig.*, 02 Cv1186 (E.D. Mo.). Approving the settlement, the Court praised the Firm's efforts: "This Court believes Lead Plaintiff achieved an excellent result in a

2

complex action, where the risk of obtaining a significantly smaller recovery, if any, was substantial."

In awarding fees to the Pomerantz Firm, the Court cited "the vigor with which Lead Counsel . . .

investigated claims, briefed the motions to dismiss, and negotiated the settlement . . .."

In approving the $100 million settlement in *Snyder v. Nationwide Insurance Co.*, Index No.

97/0633 (N.Y. Supreme Court, Onondaga County), a case where the Pomerantz Firm served as co-

lead counsel, Judge Tormey stated, "It was a pleasure to work with you. This is a good result.

You've got some great attorneys working on it."

In *Sherleigh Associates Inc. Profit Sharing Plan v. COHR, Inc.,* No. 98-3028-JSL (BQRx)

(C.D. Cal.), where as co-lead, the Pomerantz Firm helped obtained a substantial settlement, the court

stated: "This is a good job. I don't always think all jobs are good. This one is a good job." And in

*In re Wiring Devices Antitrust Litigation*, MDL Docket No. 331 (E.D.N.Y. Sept. 9, 1980), where the

Firm was again lead counsel, Chief Judge Jack B. Weinstein stated:

> Counsel for the plaintiffs I think did an excellent job . . . . They are
> outstanding and skillful. The litigation was and is extremely com-
> plex. They assumed a great deal of responsibility. They recovered a
> very large amount given the possibility of no recovery here which was
> in my opinion substantial.

Certifying a class in a securities fraud action against analysts in *DeMarco v. Robertson*

*Stephens*, 2005 U.S. Dist. LEXIS (S.D.N.Y.), Judge Lynch stated that the Pomerantz Firm had "ably

and zealously represented the interests of the class." Numerous courts have agreed with that

assessment. *See, e.g.*, *Steinberg v. Nationwide Mutual Insurance Co.*, 99 CV 7725 (E.D.N.Y.)

(Judge Spatt, in granting class certification and appointing the Firm as class counsel, observed: "The

Pomerantz firm has a strong reputation as class counsel and has demonstrated its competence to

serve as class counsel in this motion for class certification." 2004 U.S. Dist. LEXIS 17669 at *24);

3

*Mercury Savings and Loan*, CV 90-87 LHM (C.D. Cal. 1995) (Judge McLaughlin commended the Firm for the "absolutely extraordinary job in this litigation."); *Boardwalk Marketplace Securities Litigation*, MDL No. 712 (D. Conn.) (Judge Eginton described the Firm's services as "exemplary," praised it for its "usual fine job of lawyering...[in] an extremely complex matter," and concluded that the case was "very well-handled and managed." Tr. at 6, 5/20/92; Tr. at 10, 10/10/92); *Nodar v. Weksel*, 84 Civ. 3870 (S.D.N.Y.) (Judge Broderick acknowledged "that the services rendered [by the Pomerantz Firm] were excellent services from the point of view of the class represented, [and] the result was an excellent result . . . ." Tr. at 21-22, 12/27/90); *Klein v. A.G. Becker Paribas, Inc.*, 83 Civ. 6456 (S.D.N.Y. 1987) (Judge Goettel complimented the Firm for providing "excellent . . . absolutely top-drawer representation for the class, particularly in light of the vigorous defense offered by the defense firm." (Tr. at 22, 3/6/87)); *Digital Securities Litigation*, 83-3255Y (D. Mass.) (Judge Young lauded the Firm for its "[v]ery fine lawyering" (Tr. at 13, 9/18/86); *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 40 (S.D.N.Y. 1977) (Judge Frankel, referring to Pomerantz, said: "Their experience in handling class actions of this nature is known to the court and certainly puts to rest any doubt that the absent class members will receive the quality of representation to which they are entitled."); *Rauch v. Bilzerian,* 88 Civ. 15624 (Sup. Ct. N.J. 1991) (The Court referred to the partners from the Pomerantz Firm who had tried the case as "exceptionally competent counsel," and as having provided "top drawer, topflight [representation], certainly as good as I've seen in my stay on this court.").

Pomerantz has a long legacy of setting important precedents. Most recently, the Firm was before the Supreme Court on an issue of critical importance — whether scheme liability is actionable under § 10(b) and Rule 10b-5(a) and (c). *See Stoneridge Investment Partners v. Scientific-Atlanta*,

4

No. 06-43 (2007). While affirming the dismissal of two "secondary actors," the Court made numerous statements that make clear that "scheme liability" is still alive, al be it, in more limited circumstances. Among the many important reported decisions obtained on behalf of the Pomerantz Firm's clients are: *EBC I, Inc. v. Goldman Sachs & Co.*, 2005 N.Y. LEXIS 1178 (June 7, 2005) (New York State's highest court found for the first time that a lead managing underwriter can owe fiduciary duties to an issuer in connection with the issuer's IPO even where the underwriting contract does not establish any fiduciary relationship); *Ross v. Bernhard*, 396 U.S. 531 (1970) ((establishing the right to trial by jury of derivative actions); *Kronfeld v. TWA*, 832 F.2d 726 (2d Cir. 1987) (holding, *before Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), that a corporation may have a duty to disclose ongoing merger negotiations); *In re Summit Medical Systems Secs. Litig.*, 294 F.3d 969, 978 (8th Cir. 2002) (holding that standing existed for aftermarket purchasers who could trace their purchase of shares to a false registration); *Wool v. Tandem, Inc.*, 818 F.2d 1433 (9th Cir. 1987) (establishing that "in and out" traders may recover damages under the federal securities laws); *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir. 1971); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 740 F.2d 190 (2d Cir. 1984) (establishing limits on advisory fees charged by investment advisors under the Investment Company Act); *Moses v. Burgin*, 445 F.2d 369 (1st Cir. 1971) (establishing duty of investment advisor to disclose all material facts to funds' outside directors); *In re Comverse Technology Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 14878 (E.D.N.Y. 2007) (clarifying the standards for calculating the "largest financial interest" in a manner consistent with the Supreme Court's ruling on loss causation in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005)). *See, e.g., Pearlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955)*DeMarco v. Robertson Stephens*, 2005 U.S. Dist. LEXIS 2005 (S.D.N.Y. 2005); *Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) (GEL);

5

*DeMarco v. Robertson Stephens*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004); *In re Green Tree Fin. Corp.*

*Options Litig.*, No. 97-2679, 2002 U.S. Dist. LEXIS 13986 (D. Minn. July 29, 2002); *Drolet v.*

*Healthsource, Inc.*, 968 F. Supp. 757 (D.N.H. 1997); *In re Texas International Company Sec. Litig.*,

[1988-89 Decisions] Fed. Sec. L. Rep. (CCH) ¶ 94,125 (W.D. Okla. 1988); *Fisher v. Kletz*, 266 F.

Supp. 180 (S.D.N.Y. 1967).

Moreover, among the class and shareholder derivative actions in which Pomerantz was lead

or co-lead counsel are:

> *In re Salomon Analysts AT&T Litig.*, 91 Civ. 5471 (S.D.N.Y.)
> ($74.75 million recovery);
>
> *In re Charter Communications, Inc. Secs. Litig.*, 4:02CV1186 (E.D.
> Mo. 2005) ($146.25 million recovery);
>
> *In re Elan Corp. Sec. Litig.*, No. 02-CV-0865(RMB) (S.D.N.Y. 2005)
> ($75 million recovery);
>
> *In re Safety-Kleen Corp. Stockholders Litigation*, C.A. No. 3:00-CV-
> 736-17 (D.S.C. 2004) ($54.5 million recovery);
>
> *In re Transkaryotic Sec. Litig.*, No. 03-10165 (D. Mass 2008)
> (member of Executive Committee) ($50 million recovery);
>
> *In re Summit Metals, Inc. v. Gray*, No., 98-2870 (D. Del. 2004) ($43
> million judgment and required turnover of the stock of two
> corporations);
>
> *In re Livent, Inc. Noteholders Securities Litigation* Case No. 98-CV-
> 7161 (S.D.N.Y. 2003) ($17.25 million aggregate settlements; $36
> million additional judgment (with interest);
>
> *In re American Italian Pasta Company Sec. Litig.*, No. 05-CV-0725
> (W.D. Mo. 2008) ($25 million settlement from the company; case is
> continuing against outside auditor);
>
> *In re Methionine Antitrust Litigation*, Master File No. C-99-3491-
> CRB, MDL No. 1311 (N.D. Cal. 2002) ($107 million recovery);

6

*In re Sorbates Direct Purchaser Antitrust Litigation*, C98-4886 Cal (N.D. Cal. 2000) (over $82 million recovery);

*Snyder v. Nationwide Insurance Co.*, Index No. 97/0633 (Supreme Court, N.Y., Onondaga County 1998) ($100 million recovery);

*In re First Executive Corporation Securities Litigation*, CV-89-7135 DT (Kx) (C.D. Cal. 1994) ($102 million partial recovery);

*In re Salomon Brothers Treasury Litigation*, 91 Civ. 5471 (RPP) (S.D.N.Y. 1994) ($100 million recovery);

*Mardean Duckworth v. Country Life Insurance Co.,* No. 98 CH 01046 (C.D. Ill. 2000) ($45 million recovery);

*In re National Health Laboratories, Inc. Securities*, CV-92-1949-H (CM) (S.D. Cal. 1995) ($64 million recovery);

*In re Boardwalk Marketplace Securities Litigation*, M.D.L. Docket No. 712 (D. Conn. 1994) (over $66 million benefit);

*In re Woolworth Corporation Securities Class Action Litigation*, 94 Civ. 2217 (RO) (S.D.N.Y. 1997) (recovery of $20 million);

*Frank v. Paul* (CenTrust Savings Bank Securities Litigation), 90-0084-CIV (S.D. Fla. 1996) ($20 million recovery);

*Wallace v. Fox* Docket No. 3:96 - CV - 00772 (PCD) (D. Conn. 1997) (Northeast Utilities Shareholder Derivative Action) ($25 million recovery);

*Hurley v. FDIC*, Civil Action No. 88-1940-T (D. Mass. 1992) ($29 million judgment after trial against two former officers of First Service Bank for Savings);

*In re Ocean Drilling & Exploration Company Shareholders Litigation*, Civ. No. 11898 (Del. Ch. 1991) ($38 million cash benefit);

*In re Telerate, Inc. Shareholders Litigation*, Civ. 1115 (Del. Ch. 1989) ($95 million benefit).

*In re AM International, Inc. Securities Litigation*, M-21-31, MDL Docket No. 494 (S.D.N.Y. 1987) ($23 million recovery);

*In re Data Point Securities Litigation*, SA-82-CA-338 (W.D. Tex. 1987) ($28.4 million recovery); and

7

*In re National Student Marketing Securities Litigation*, MDL Docket No. 105 (D.D.C. 1983) ($35 million recovery);

Brief biographies of the Firm's lawyers are provided below:

## ROBERT J. AXELROD

Robert J. Axelrod is a partner at Pomerantz. Mr. Axelrod practices securities, antitrust, and insurance and consumer litigation. As a member of the Firm's Healthcare and Consumer Group, Mr. Axelrod currently is prosecuting actions on behalf of clients including the American Medical Association, the American Dental Association, and the Medical Society of the State of New York, against such insurers as United Healthcare Corporation, CIGNA, Aetna, Oxford, Health Net, Inc., and Nationwide. Mr. Axelrod was on the successful trial team in *Addison v. American Medical Security*. Additional healthcare cases that Mr. Axelrod has litigated with partner D. Brian Hufford, include *American Medical Association v. United Healthcare Corporation, American Dental Association v. Aetna, Inc.,* and *Wachtel v. Health Net Inc.* In *Health Net*, 01-4183, 03-1801, there is a preliminary settlement of over $200 million in cash, plus important non-cash benefits, including the revamping of the system for calculating the reimbursements of claimants. Mr. Axelrod also has been involved in the prosecution of numerous securities and antitrust actions.

Mr. Axelrod serves as a member of the Class Action Committee of the New York State Bar Association. He is a member of the Temple University College of Liberal Arts Alumni Board, and serves as a trustee and General Counsel of Temple Beth El in Huntington, New York.

Mr. Axelrod is admitted in New York, the United States District Courts for the Southern and Eastern Districts of New York, and the United States Courts of Appeals for the Second and Third Circuits.

8

## **DANIEL L. BERGER**

Daniel L. Berger graduated from Haverford College in 1976, and Columbia Law School in 1979 where he was a Stone Scholar.

Mr. Berger joined the Firm as a partner in September 2006. Previously, Mr. Berger was a senior partner of Bernstein Litowitz Berger & Grossmann, where he litigated complex securities and discrimination class actions for 22 years. While at that firm, Mr. Berger tried two 10b-5 securities class actions to jury verdicts, among the very few such cases ever tried. He served as principal lead counsel in many of the largest securities litigations in history, achieving successful recoveries for classes of investors in cases including *In re Cendant Corp. Sec. Litig.*, (D. N.J.) ($3.3 Billion); *In re Lucent Technologies, Inc. Sec. Litig.* (D. N.J.) ($675 Million); *In re Bristol-Myers Squibb Sec. Litig.*, (S.D.N.Y.) ($300 Million); *In re Daimler Chrysler A.G. Sec. Litig.*, (D. Del.) ($300 Million); *In re Conseco, Inc. Sec. Litig.*, (S.D. Ind.) ($120 Million); *In re Symbol Technologies Sec. Litig.*, (E.D.N.Y.) ($139 Million); and *In re OM Group Sec. Litig.*, (N.D. Ohio) ($92 Million). Mr. Berger has successfully argued several appeals that made new law favorable to investors, including *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2005); *McCall v. Scott*, 250 F.3d 997 (6th Cir. 2001) and *Fine v. American Solar King Corp.*, 919 F.2d 290 (5th Cir. 1990). Mr. Berger also was lead class counsel in several important discrimination class actions, in particular *Roberts v. Texaco, Inc.* (S.D.N.Y.), where he represented African-American employees of Texaco and achieved the largest settlement ($175 Million) of a race discrimination class action.

Mr. Berger's work has received praise from many federal courts. For example, in commenting on the settlement achieved in *McCall v. Scott*, one of the most significant recoveries in a derivative action, the United States District Court for the Middle District of Tennessee wrote:

9

> [The settlement] confers an exceptional benefit upon the company
> and the shareholders by way of the corporate governance
> plan....Counsel's excellent qualifications and reputations are well
> documented in the record, and they have litigated this complex case
> adeptly and tenaciously throughout the six years it has been pending.
> They assumed an enormous risk and have shown great patience by
> taking this case on a contingent basis, and despite an early setback
> they have persevered and brought about not only a large cash
> settlement but sweeping corporate reforms that may be invaluable to
> the beneficiaries.

In addition, Mr. Berger's work as lead trial counsel in *In re ICN/Viratek Sec. Litig.* was noted

by the United States District Court for the Southern District of New York, which said:

> "[P]laintiffs' counsel did a superb job here on behalf of the class. . .
> This was a very hard fought case. You had very able, superb
> opponents, and they put you to your task. . . The trial work was
> beautifully done and I believe very efficiently done. . .

Mr. Berger was a member of the Board of Managers of Haverford College from 2000-2003

and currently serves on the Board of Managers of Columbia Law School. He served on the Board of

inMotion, Inc., a non-profit organization providing legal services to victims of domestic violence, for

six years, and currently is a member of the Board of Madison Square Park Association.

Mr. Berger is admitted in New York, the United States District Courts for the Southern and

Eastern Districts of New York, and the United States Courts of Appeals for the Second, Third, Fifth,

Sixth, Seventh, Ninth and Tenth Circuits.

10

## MICHAEL M. BUCHMAN

Michael Buchman joined the Firm as a partner in 2007. Mr. Buchman has litigated complex antitrust and consumer protection class actions for over ten years. Mr. Buchman served as an Assistant Attorney General in the Antitrust Bureau of the New York State Attorney General's Office. He has an advanced degree in international antitrust and trade law from Fordham University School of Law.

Mr. Buchman has extensive experience litigating complex commercial matters in federal and state courts. Over the past seven years, he has spearheaded an effort to challenge anticompetitive conduct by pharmaceutical companies designed to artificially inflate the price of brand name prescription drugs. He has served as co-lead counsel in a number of "generic drug" cases, including *In re Buspirone Antitrust Litig.*, MDL 1413 (S.D.N.Y.) ($90m settlement); *In re Relafen Antitrust Litig.*, 01-12222-WGY (D. Mass.) ($75m settlement); and *In re Augmentin Antitrust Litig.*, 02 Civ. 445 (E.D. Va. Norfolk Div.) ($29m settlement). Some of the settlements obtained by Mr. Buchman have resulted in substantial "cy pres" monetary awards for well known charitable organizations. For example, in *Augmentin*, awards exceeding $100,000 were donated on a "cy pres" basis to St. Jude Children's Research Hospital and Children's Rights of New York. Mr. Buchman also has extensive experience in other areas of antitrust law. For example, he was actively involved in *In re NASDAQ Market-Makers Antitrust Litig.*, MDL 1023 (S.D.N.Y.) ($1.027b) and *In re Visa Check/Mastermoney Antitrust Litigation*, CV 96-5238 (E.D.N.Y.) ($3b), two of the largest antitrust settlements ever reached.

Courts have acknowledged the high quality of Mr. Buchman's litigation efforts. For example, former Chief Judge William G. Young noted in *Relafen*, where Mr. Buchman was a co-lead, "[t]his

11

proposed settlement is the result of a great deal of very fine lawyering . . ." Similarly, in *Buspar*, where he also was a co-lead, Judge John G. Koeltl stated: "Let me say that the lawyers in this case have done a stupendous job. They really have." His "tenacious and skillful" work as a co-lead was also recognized by Judge Lewis A. Kaplan of the Southern District of New York in an international antitrust class action brought on behalf of foreign purchasers and sellers of works of art sold at auction by Christie's and Sotheby's which resulted in a $40 million settlement.

Mr. Buchman frequently speaks on antitrust and consumer protection class action issues. In 2002, he appeared on the *CBS Evening News* and spoke about generic drug litigations. That same year, he presented at the Practicing Law Institute's 10th Annual Consumer Financial Services Litigation on Recent Developments in State Unfair Deceptive Acts and Practices Statutes and Private Attorney General Litigation. On February 7, 2007, he spoke at the 4th National In-House Counsel Conference on Managing Complex Litigation on class certification. Mr. Buchman has also authored or co-authored articles on procedure or competition law, including a Task Force on Dealer Terminations for The Association of the Bar of the City of New York, Committee on Antitrust and Trade Regulation entitled *Dealer Termination in New York* dated June 1, 1998, and *What's in a Name — the Diversity Death-Knell for Underwriters of Lloyd's of London and their Names; Humm v. Lombard World Trade, Inc.*, Vol. 4, Issue 10 International Insurance Law Review 314 (1996).

He is admitted in the states of Connecticut and New York, and the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the United States District Courts for the Southern and Eastern Districts of New York and the Districts of Arizona and Connecticut, and the United States Court of International Trade.

12

## PATRICK V. DAHLSTROM

Mr. Dahlstrom is a 1987 graduate of the Washington College of Law at American University in Washington, D.C., where he was a Dean's Fellow, Editor-in-Chief of the Administrative Law Journal, a member of the Moot Court Board representing Washington College of Law in the New York County Bar Association's Antitrust Moot Court Competition, and a member of the Vietnam Veterans of America Legal Services/Public Interest Law Clinic.

Upon graduating, Mr. Dahlstrom served as the Pro Se Staff Attorney for the United States District Court for the Eastern District of New York and was a law clerk to the Honorable Joan M. Azrack, United States Magistrate Judge. He joined the Pomerantz Firm as an associate in the Fall of 1991 and became a partner in January 1996. Mr. Dahlstrom is the resident partner in the Pomerantz Firm's Chicago Office. He focuses on securities fraud litigation.

Recently, in *In re Comverse Technology Sec. Litig.*, 2007 U.S. LEXIS 14878 (E.D.N.Y. 2007), Mr. Dahlstrom obtained important clarification regarding the calculation of the "largest financial interest" in connection with of the selection of a lead plaintiff, in a manner consistent with *Dura*, 544 U.S. 336 (2005). In *DeMarco v. Robertson Stephens*, 2005 U.S. Dist. LEXIS (S.D.N.Y. 2005), he obtained the first class certification in a federal securities case involving fraud by analysts. Some examples of other notable litigations by Mr. Dahlstrom are *In re Safety-Kleen Stockholders Securities Litigation*, 3:00-736-17 (D. S.C.) (as co-lead counsel, Firm obtained $54.5 million settlement); *In re Livent, Inc. Noteholders Securities Litigation*, 98 Civ. 7161 (VM) (S.D.N.Y.) (Firm, as sole-lead, obtained $17 million settlement, plus $36 million judgment (with interest)); and *In re Woolworth Corporation Securities Class Action Litigation*, 94 Civ. 2217 (RO) (S.D.N.Y.) (Firm, as co-lead counsel, secured a $20 million settlement). Mr. Dahlstrom was also co-class

counsel and a member of the trial team in *In re ICN/Viratek Securities Litigation*, 87 Civ. 4296 (KMW) (S.D.N.Y.).

Mr. Dahlstrom is admitted in New York and Illinois, as well as the United States District Courts for the Southern and Eastern Districts of New York, the Northern District of Illinois, the Northern District of Indiana, the Eastern District of Wisconsin, the District of Colorado, the Western District of Pennsylvania, the United States Courts of Appeals for the Fourth, Sixth, Seventh and Eight Circuits, and the United States Supreme Court.

## MARC I. GROSS

Marc I. Gross has been associated with the Firm since 1976 and became a partner in 1984. He graduated from New York University Law School in 1976 and received his undergraduate degree from Columbia University in 1973.

Mr. Gross has extensive experience in litigating class (securities, antitrust and consumer) and derivative actions. He is sole or co-lead counsel in many of the Firm's major pending cases, and has won rulings highly favorable to plaintiffs.

Mr. Gross has obtained numerous large recoveries. For example, he was sole Lead Counsel in *In re Charter Communications Inc. Sec. Litig.*, MDL No. 1506 E.D. Mo. (CAS), a case where, as described above, the Court lauded the Firm's efforts in obtaining a $146.25 million settlement. He was also co-lead counsel in *Snyder v. Nationwide Insurance Co.*, Index No. 97/0633 (N.Y. Supreme Court, Onondaga County), which resulted in a settlement valued at $100 million for defrauded life insurance policy customers in New York. In approving the settlement, Judge Tormey stated:

> The Court approves the settlement in all respects. It is so ordered, and I compliment you all, not only the manner in which you

14

> arrived at this result today, but the time that you -- in which it was
> done. And I think you all did a very, very good job for all the people.
> You made attorneys look good. I thank you very much. It was nice
> working with you all.

Mr. Gross was the attorney in charge of *Texas Int'l Co. Sec. Litig.* (W.D. Okla.), where, in

granting class certification, the Court observed:

> The performance of plaintiffs' counsel thus far leaves the Court with
> no doubt that plaintiffs' claims will be vigorously and satisfactorily
> prosecuted throughout the course of this litigation.

In the course of approving the subsequent settlement of the case, the Court added:

> I would like to compliment all the parties and attorneys in this case.
> . . . You have all worked together better than I think any case I've had
> that involved these extensive issues and parties and potential
> problems. And I for one appreciate it. And I think it shows certainly
> a great deal of professionalism on all your part.

Other examples of Mr. Gross' representation as sole or co-lead counsel are: *In re Elan Corp.*

*Sec. Litig.*, No. 02-CV-865 (RMB)(FM) (S.D.N.Y.) ($75 million settlement); *In re Salomon Analysts*

*AT&T Litig.* ($74.75 million settlement) (S.D.N.Y.); *In re National Health Labs., Inc. Securities*,

CV-92-1949-H (CM) (S.D. Cal. 1995) ($64 million recovery); *In re American Italian Pasta Co. Sec.*

*Litig*, No 05-CV0725-W-ODS (S.D.N.Y.) ($25 mi partial settlement with case ongoing against

auditors); *Mardean Duckworth v. Country Life Insurance Co*, No. 98 CH 01046 (C.D. Ill. 2000) ($45

million settlement); and *Frank v. Paul (Centrust Savings Bank Securities Litigation)*, 93 Civ. 1453

(TCP) (E.D.N.Y. 1996) (over $20 million recovery). He was a member of the Plaintiffs' Executive

Committee in *In re Transkaryotic Therapies Sec. Litig.* (03-cv-10165-RWZ) (D. Mass.), which has

settled for $50 million (court approval of settlement has been requested);

Mr. Gross has been a member of the New York City Bar Association's Federal Courts

Committee, an early neutral evaluator for the Eastern District of New York, and a mediator for the

15

Commercial Division of the Supreme Court of the State of New York. He is currently a Vice President of the Institute of Law and Economic Policy ("ILEP"), a not-for profit organization devoted to promoting academic research and dialogue in securities law issues and litigation. At the 2006 ILEP Conference, Mr. Gross was a commentator on a panel discussing Sarbanes-Oxley governance issues. He was Treasurer of the National Association of Securities and Commercial Law Trial Attorneys. He was a guest panelist for a Spring 1998 conference on "Courts on Trial" sponsored by the Institute of Law and Economics and held at the University of Arizona Law School, and is the author of "*Complex Litigation at the Millennium Loser-Pays - or Whose 'Fault' Is It Anyway: A Response to Hensler-Rowe's "Beyond 'It Just Ain't Worth It'"*, which appeared in the 64 Law & Contemporary Problems (Duke Law School) (2001).

Mr. Gross has also served as Chairman of Neighbors Helping Neighbors, a not-for-profit housing group based in Brooklyn, New York that is affiliated with the Neighborhood Reinvestment Corporation.

Mr. Gross is admitted in New York, the United States District Courts for the Southern, Northern and Eastern Districts of New York, the Eastern and Western Districts of Missouri, District of Nebraska, District of Arizona, the United States Courts of Appeals for the First, Second, Third and Eighth Circuits, and the United States Supreme Court.

## STANLEY M. GROSSMAN

Stanley M. Grossman, the senior partner of the Pomerantz Firm, was featured in the New York Law Journal (August 1, 1983) article: "*Top Litigators in Securities Field -- A Who's Who of City's Leading Courtroom Combatants*." He has been with the Pomerantz Firm since February

16

1969, and has been a member of the Firm since 1976. Throughout this period, he has mainly represented plaintiffs in securities and antitrust class actions, including many of those listed in the firm biography. *See. e.g., Ross v. Bernhard*, 396 U.S. 531; *Rosenfeld v. Black*, 445 F.2d 137 (2d Cir. 1971); *Wool v. Tandem*, 818 F.2d 1433 (9th Cir.); *In re Salomon Bros. Treasury Litig*, 9 F.3d 230 (2d Cir.). Recently, he appeared before the United States Supreme Court to argue that scheme liability is actionable under Section 10(b) and Rule 10b-5(a) and (c). *See Stoneridge Investment Partners v. Scientific-Atlanta*, No. 06-43 (2007). Other examples of cases where he was the lead or co-lead counsel for plaintiffs and the class include: *In re Salomon Brothers Treasury Litigation*, 91 Civ. 5471 (RPP)(S.D.N.Y. 1994) ($100 million cash recovery); *In re First Executive Corporation Securities Litigation*, CV-89-7135 DT (Kx)(C.D. Cal. 1994) ($100 million settlement); *In re Sorbates Direct Purchaser Antitrust Litigation*, C98-4886 CAL (N.D. Cal. 2000) (over $80 million settlement for the class).

Senior Judge Milton Pollack of the Southern District of New York appointed Mr. Grossman to the Executive Committee of counsel charged with allocating to claimants hundreds of millions of dollars obtained in settlements with Drexel Burnham & Co. and Michael Milken.

Many courts have acknowledged the high quality of the legal representation provided by Mr. Grossman to investors. For example, in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 79 Civ. 3123 (S.D.N.Y.), where Mr. Grossman was lead trial counsel for plaintiff, Judge Pollack noted at the completion of the:

> [I] can fairly say, having remained abreast of the law on the factual and legal matters that have been presented, that I know of no case that has been better presented so as to give the Court an opportunity to reach a determination, for which the court thanks you.

17

Mr. Grossman was also the lead trial attorney in *Rauch v. Bilzerian* (Super. Ct. N.J.)(directors owed the same duty of loyalty to preferred shareholders as common shareholders in a corporate takeover), where the court described the Pomerantz team as "exceptionally competent counsel." He headed the six week trial on liability in *Walsh v. Northrop Grumman* (E.D.N.Y.) (a securities and ERISA class action arising from Northrop's takeover of Grumman), after which a substantial settlement was reached.

Mr. Grossman has lectured to the profession on various occasions under the auspices of the Southern Federal Securities Institute, Columbia University School of Law, Duke University Law School, University of Arizona Law School, Brooklyn Law School, ALI-ABA, PLI, the New York State Bar Association, and the Association of the Bar of the City of New York. Most recently, Mr. Grossman was a featured panelist in a Practicing Law Institute "Hot Topic Briefing" entitled "*Stoneridge*- Is There Scheme Liability or Not?" He also was a panelist at an April 2008 Conference sponsored by the Institute for Law and Economic Policy, entitled "The Continuing Evolution of Securities Class Actions." Mr. Grossman also recently presented at the 2008 Meeting of the American Bar Association, in a discussion entitled "Insider's View of the Stoneridge Case: Investor Protection or Frivolous Litigation"; and he participated as a panelist on securities litigation developments at the 2008 annual meeting of the ABA Section of Litigation. Mr. Grossman is the author of "Commentary: The Social Meaning of Shareholder Suits," 65 BROOKLYN LAW REV. (1999), among other articles.

Mr. Grossman has been active in numerous professional organizations. He is the former president of the National Association of Securities Attorneys — an organization of attorneys specializing in securities class action litigation. During his tenure, he represented the organization

18

in meetings with the Chairman of the Securities and Exchange Commission, members of Congress and of the Executive Branch in furnishing input and commentary on legislation which became the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In the summer of 1998, at the invitation of Chairman of the Judiciary Committee Henry Hyde, Mr. Grossman testified before Congress on proposed legislation dealing with "federalization of state class actions." Subsequently, Mr. Grossman was asked to participate with Congressional counsel in drafting proposed legislation.

Mr. Grossman presently serves as a vice president and adviser of ILEP, the public policy research and educational foundation focusing on securities laws. He is also a member of the United States Advisory Board of the Institute for Consumer Antitrust Studies at Loyola University Chicago. Additionally, he is on the Advisory Committee for the Abraham L. Pomerantz Lectures at Brooklyn Law School.

He is currently a member of the Judiciary Committee of the New York City Bar Association. Previously he served on the Association's Committee on Professional and Judicial Ethics; State Courts of Superior Jurisdiction; and Trade and Antitrust. He is also a member of the Litigation Section dealing with class actions at the American Bar Association.

Mr. Grossman is actively involved in local and national civic affairs. In June, 1999, he was appointed by the New York City Bar Association to chair a special Blue Ribbon Commission on the future of the City University of New York. Upon the publication of the Commission's Report, the President of the Association described it as "insightful, measured and persuasive . . . a striking example of the very best of what this Association can do."

He is a director of the Lincoln Center Institute for the Arts in Education, as well as a member of the Appleseed Foundation, a national public interest advocacy group. In addition, he is a member

19

of the AFL-CIO Center for Working Capital's National Advisory Council of Employee Benefit Professionals.

Mr. Grossman is admitted in New York, the United States District Courts for the Southern, and Eastern Districts of New York, Central District of California, Eastern District of Wisconsin, District of Arizona, District of Colorado, the United States Courts of Appeals for the First, Second, Third, Ninth and Eleventh Circuits, and the United States Supreme Court.

## D. BRIAN HUFFORD

D. Brian Hufford joined the Pomerantz Firm in April 1993 and became a partner in July 1995. After obtaining a Masters of Urban Affairs from Wichita State University in 1982, Mr. Hufford attended the Yale Law School, where he was Notes and Topics Editor for the *Yale Law and Policy Review* and was awarded the Thomas I. Emerson Prize for the Outstanding Legislative Services Project. Graduating from Yale in 1985, Mr. Hufford subsequently spent two years in Washington, D.C. as an Honors Attorney in the United States Department of the Treasury's Honors Law Program. From 1987 until he joined the Firm in 1993, he was a litigation associate at Davis Polk & Wardwell, where he worked primarily on securities and class actions. His article "*Deterring Fraud vs. Avoiding the Strike Suit: Reaching An Appropriate Balance*," was published in 61 *Brooklyn Law Rev.* 593 (Summer 1995).

At the Pomerantz Firm, Mr. Hufford has prosecuted not only a number of securities and antitrust cases, but is also the attorney in charge of the Firm's Healthcare and Consumer Group. Mr. Hufford successfully argued before the New York Appellate Division in *Batas v. Prudential*, 281 A.D.2d 260, 724 N.Y.S.2d 3 (1st Dep't 2001), in which the court upheld claims that Prudential relied

20

on improper procedures for the determination of medical necessity in its health insurance contracts. Mr. Hufford also successfully argued *Drolet v. Healthsource, Inc.*, 968 F. Supp. 757 (D.N.H. 1997), in which the court upheld the charge that the defendant breached fiduciary duties under ERISA by misrepresenting the financial incentives it paid to physicians to reduce medical expenditures. In addition, Mr. Hufford received a successful decision upholding claims against United Healthcare in *American Medical Association v. United Healthcare Corp.*, 2002 U.S. Dist. LEXIS 20309 (S.D.N.Y. Oct. 23, 2002), where plaintiffs claimed that the defendant relied on an improper database for determining "usual, customary and reasonable" fees for the purpose of reimbursing subscribers for services received from out-of-network health care providers. Moreover, Mr. Hufford was the Pomerantz partner in charge *Addison v. HealthNet*, where a preliminary settlement of over $200 million, plus important non-cash was reached. If approved by the court, this will be one of the largest settlements ever in a health insurance litigation. Mr. Hufford was also the partner-in-charge in Addison *v. American Medical Security*, Case No. CA 001455-AB (Cir. Ct., Palm Beach Cty., Fla.), in which plaintiffs won a two-week bench trial, with the Court finding in March 2002 that the defendant had violated Florida law by, among other things, improperly raising health care premiums based on an individual's health history.

Mr. Hufford has written and lectured in the area of healthcare litigation. Further, he was featured in the book *Net Law: How Lawyers Use the Internet*, by Paul Jacobsen (Jan. 1997), which discusses how he has used the Internet to investigate some of the firm's pending class actions.

Mr. Hufford is admitted in New York and Ohio, and the United States District Courts of the Southern and Eastern Districts of New York.

21

## CHERYL HAMER MACKELL

Cheryl Hamer Mackell joined the Firm in February 2003 to head up its Washington, D.C. office and became a partner in January 2007. She is a 1973 graduate of Columbia University and a 1983 graduate of Lincoln University Law School. She studied tax law at Golden Gate University and holds a Certificate in Journalism from New York University. At Pomerantz, Ms. Mackell has been involved in numerous securities fraud cases, including *In re Symbol Technologies, Inc. Sec. Litig.*, (E.D.N.Y. filed Aug. 16, 2005) and *In re American Italian Pasta Co. Sec. Litig.*, (W.D. Mo. Filed Aug. 12, 2005).

Before joining Pomerantz, Ms. Mackell served as of counsel to nationally known securities class action law firms focusing on plaintiff securities fraud litigation. In private practice for over 20 years, she has litigated, at both the state and federal levels, RICO, Continuing Criminal Enterprise, death penalty and civil rights cases. She has authored numerous criminal writs and appeals.

She was an Adjunct Professor at Pace University, Dyson College of Arts and Sciences, Criminal Justice Program and The Graduate School of Public Administration, where she taught Non-Profit Corporate Law, from 1996 to 1998. She is a member of the American Bar Association's Litigation and Individual Rights Sections, the Corporate, Finance & Securities Law Section of the District of Columbia Bar.

Ms. Mackell is admitted in California, United States District Court for the Northern, Southern, Eastern and Central Districts of California, the District of New Mexico, the District of Columbia, the United States Courts of Appeals for the Second, Third, Fourth, Seventh, Ninth, Tenth and Eleventh Circuits, and the United States Supreme Court.

22

## **H. ADAM PRUSSIN**

H. Adam Prussin joined the Firm as of counsel in June 2000, and became a partner in January 2002. He graduated *cum laude* from Yale College in 1969, and after obtaining a Masters Degree from the University of Michigan in 1971, he received his J.D. from Harvard Law School in 1974.

In addition to securities litigation, Mr. Prussin has extensive experience in derivative actions. He has published several articles on the subject of the standards and procedures for obtaining dismissal of shareholder derivative actions, including *"Termination of Derivative Suits Against Directors on Business Judgement Grounds: From Zapata to Aronson,"* 39 The Business Lawyer 1503, 1984; *"Dismissal of Derivative Actions Under the Business Judgement Rule: Zapata One Year Later,"* 38 The Business Lawyer 401, 1983; and *"The Business Judgement Rule and Shareholder Derivative Actions: Viva Zapata?,"* 37 The Business Lawyer 27, 1981.

Mr. Prussin was special litigation counsel in *Summit Metals, Inc. v. Gray*, a derivative action which resulted in entry of a judgment, after trial, of $43 million in cash, plus an order transferring the stock of two multi-million-dollar companies to the plaintiff. He was also one of the lead lawyers in *In re Livent Noteholders Securities Litigation*. Mr. Prussin is co-lead counsel in several of the Firm's pending derivative actions.

Before joining the Firm, Mr. Prussin was a named partner in Silverman, Harnes, Harnes, Prussin & Keller, which specializes in representing plaintiffs in shareholder derivative and class action litigation, particularly those involving self-dealing by corporate officers, directors and controlling shareholders. Mr. Prussin played a key role in several landmark derivative cases in the Delaware courts, and has appeared frequently before the Delaware Supreme Court.

23

Before joining Silverman, Harnes in 1994, Mr. Prussin was of counsel to Weil, Gotshal & Manges. While there, he represented numerous corporate defendants in shareholder derivative actions and class actions, and also in general commercial, bankruptcy and antitrust disputes.

Mr. Prussin is admitted in New York, the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second, Ninth and D.C. Circuits.

## J. DOUGLAS RICHARDS

J. Douglas Richards joined Pomerantz in March 2007 as a partner specializing in antitrust class actions. He served for more than two years in 1997-2000 as Deputy General Counsel of the Commodity Futures Trading Commission, where he supervised all staff attorneys in the Office of General Counsel and managed more than 35 appeals in the United States Courts of Appeals. Mr. Richards was responsible for the management of all litigation by and against that federal agency as well as its appellate adjudicatory function, and was the recipient from the agency of a Special Act or Service Award for greatly reducing the agency's adjudicatory backlog and successfully defending its opinions on appeal to the Circuit Courts. Prior to that time, he was a litigation partner for more than eight years with O'Sullivan Graev & Karabell (which merged into O'Melveny & Myers in 2002 and became its New York office). While with O'Sullivan he participated in diverse commercial litigation including antitrust cases such as *In re Beer Industry Antitrust Litigation*, 86 CV 2400 (E.D.N.Y.), in which he was a lead trial counsel for defendant the Stroh Brewery Company and successfully obtained a directed verdict for it after a two-week jury trial. Mr. Richards has broad experience with the litigation of antitrust and trade regulation matters at the trial and appellate levels.

24

Mr. Richards has especially extensive experience in the successful prosecution of antitrust class actions. He was co-lead counsel for the plaintiffs in a class action against Microsoft in New York state court, which resulted in a settlement providing benefits of more than $120 million for New York consumers and needy public schools. He was co-lead counsel in *In re Buspirone Antitrust Litigation*, MDL No. 1410 (S.D.N.Y.), which led to a $90 million settlement and in which presiding Judge Koeltl stated that the plaintiffs' attorneys had done "a stupendous job." He was co-lead counsel in *In re Relafen Antitrust Litig.*, No. 01-12239 (D. Mass.), which led to a $75 million settlement and in which presiding Judge Young stated that the settlement was "the result of a great deal of very fine lawyering." He was co-lead counsel for international customers of Christie's and Sotheby's in connection with class action claims against them for price-fixing, in connection with which presiding Judge Kaplan observed that the representation of the plaintiffs had been "tenacious and skillful," and in which a $40 million settlement was achieved for foreign auction house customers. He also made a substantial contribution to the record-setting recovery of more than $3 billion in the antitrust class action against Visa and MasterCard in *In re Visa Check/Mastermoney Antitrust Litig.*, CV-96-5238 (E.D.N.Y.), which is the largest antitrust settlement in the over 100 year history of the Sherman Act, and was formally credited by lead counsel Lloyd Constantine at the end of that case for having been a "consistent source of helpful high level advice."

Mr. Richards has argued more than twenty-five appeals in the federal and state courts of appeals. In recent years, he has argued appeals on several cutting-edge issues of antitrust law, including to the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, No. 05-1126, a case governing pleading requirements for antitrust conspiracy cases. He participated in 2007 in the briefing to the Supreme Court in *Credit Suisse v. Billing*, No. 05-1157, a case concerning the scope

25

of operation of antitrust law in regulated industries. He also has argued such leading appellate cases as *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, No. 2008-1097 (Fed. Cir.) (pending); *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370 (2d Cir. 2005), *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004), and *Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002).

Mr. Richards also has been a frequent speaker on issues of antitrust law. In November 2007 he was a panelist at the ABA Fall Forum for a presentation entitled "Litigation an Antitrust Case After Twombly." In October 2007 he was panelist at the 2007 Fall Bench and Bar Retreat of the Federal Bar Council, titled "Rule 23 in the Second Circuit: Post-CAFA and Post-IPO." In October 2007 he was a panelist at the ABA's Antitrust Litigation Course, commenting on class certification in antitrust class actions. In August 2007 he was a panelist in a presentation at the ABA Annual Meeting titled "2007 Supreme Court Antitrust Findings: The Insider's Perspective." In July 2007 he was a speaker in an ABA Webcase program titled "The Supreme Court's Revolutionary Decisions on Pleadings – Will Your Pleadings Pass the New Test?" In April 2007 he was a speaker at the "Hot Topics 2007" presentation at the ABA Antitrust Section 55th Annual Spring Meeting in Washington, D.C. In November 2006, he was a speaker at a Federal Bar Council presentation titled "Antitrust Issues in Patent Litigation Settlements: the Divergent Views of Federal Courts and Agencies." In September 2006 Mr. Richards was a speaker in a Federalist Society presentation at NYU Law School, titled "Does Procedure Dominate Substance? Of Class Actions and Pretrial Motions." He also recently authored *Three Limitations of Twombly: Antitrust Conspiracy Inferences In a Context of Historical Monopoly*, 82 St. John's L. Rev. 849 (2008) and *What Makes An Antitrust Class Action Remedy Successful?: A Tale of Two Settlements*, 80 Tulane L. Rev. 621 (2005).

Mr. Richards is admitted in New York, as well as the United States District Court for the Southern and Eastern Districts of New York, the District of Connecticut, all of the Circuits of the United States Courts of Appeals, and the United States Supreme Court.

## SHAHEEN RUSHD

Shaheen Rushd graduated *summa cum laude* from New York Law School in 1981 and obtained her undergraduate degree from Kalamazoo College in 1977 (*magna cum laude*; elected to Phi Beta Kappa).

Ms. Rushd joined the Firm as an associate in January 1983 and became a partner in July 1991. Previously, Ms. Rushd was a staff attorney at the New York Regional Office of the Federal Trade Commission and served as law clerk to the Honorable Leonard I. Garth, Circuit Court Judge of the United States Court of Appeals for the Third Circuit.

Ms. Rushd specializes in securities and antitrust class actions. She has participated in the litigation of many of the Firm's major cases, including *Stoneridge Investment Partners v. Scientific-Atlanta, Inc.; EBC I, Inc. v. Goldman Sachs & Co.; Comverse Technology, Inc. Sec. Litig ; Kronfeld v. TWA*; and *In re Safety-Kleen Corp. Stockholders Litigation*. She was also part of the successful trial teams in *Walsh v. Northrop Grumman, et al.*, CV-94-5105 (E.D.N.Y.) and *Rauch v. Bilzerian*, 88 Civ. 15624 (Super. Ct. N.J.).

Ms. Rushd was a trustee of Kalamazoo College from 1996 through June 2002. She has served as an Adjunct Instructor at New York Law School and was a member of the New York City Bar Association's Antitrust and Trade Regulation Committee. She is a member of the ABA Section of Business Law.

27

Ms. Rushd is admitted in New York, the United States District Court for the Southern and Eastern Districts of New York, the United States Courts of Appeals for the Eighth and Eleventh Circuits, and the United States Supreme Court.

## MURIELLE STEVEN WALSH

Murielle Steven Walsh joined the Firm as an associate in April 1998 and became partner in January 2007. Ms. Steven Walsh graduated *cum laude* from New York Law School in 1996, where she was the recipient of the Irving Mariash Scholarship. During law school, Ms. Steven Walsh interned with the Kings County District Attorney and worked within the mergers and acquisitions group of Sullivan & Cromwell.

At Pomerantz, Ms. Steven Walsh specializes in securities and corporate governance-related litigation. Ms. Steven Walsh was part of the trial team in *Lewis v. Beall*, a derivative action in California state court that focused on the duties of corporate directors. More recently, in *In re Livent Noteholders' Securities Litigation*, Ms. Steven Walsh was one of the lead attorneys in prosecuting this securities class action against the company's former chief executive officers, and obtained a $36.6 million judgment against these individuals (which was recently affirmed by the Second Circuit). The Pomerantz Firm also obtained settlements totaling over $17 million from other defendants in the case.

Ms. Steven Walsh is also part of the team working on the *EBC I v. Goldman Sachs* case, in which the Pomerantz firm obtained a landmark ruling from the New York Court of Appeals - that underwriters owe certain fiduciary duties to their issuer clients.

Ms. Steven Walsh currently serves as a member of the editorial board for Class Action Reports. In the past, she has been involved in political asylum work with the Association of the Bar of the City of New York.

Ms. Steven Walsh is admitted in New York and in the United States District Courts for the Eastern and Southern Districts of New York.

## JOSHUA B. SILVERMAN

Joshua B. Silverman joined the Pomerantz Firm in April 2006, as Of Counsel. Mr. Silverman is a 1993 graduate of the University of Michigan, where he received *Phi Beta Kappa* honors, and a 1996 graduate of the University of Michigan Law School. He focuses on prosecution of securities fraud class action lawsuits. He was a key member of the Pomerantz team of lawyers in *Stoneridge Investment Partners v. Scientific-Atlanta, Inc.*

Before joining the Pomerantz Firm, Mr. Silverman was a litigation associate at McGuireWoods LLP and its Chicago predecessor, Ross & Hardies. His practice there focused on complex commercial litigation including class action commodities fraud, civil RICO and antitrust cases. Mr. Silverman also spent two years as a securities trader.

Mr. Silverman is admitted in Illinois, the United States District Court for the Northern District of Illinois, the United States Courts of Appeals for the Seventh and Eighth Circuits, and the United States Supreme Court.

## LEIGH HANDELMAN SMOLLAR

Leigh Handelman Smollar became Of Counsel to the Firm in 2008. She has been associated with the Firm since January 2002.

Ms. Handelman Smollar graduated from Chicago-Kent College of Law in 1996. Upon her graduation, she spent the next 5 years specializing in complex litigation, handling a broad variety of matters.

Ms. Handelman Smollar co-authored an article for the Illinois Institute for Continuing Legal Education (IICLE) entitled "Shareholder Derivative Suits and Stockholder Litigation in Illinois," published in IICLE Chancery and Special Remedies 2004 Practice Handbook.

Ms. Handelman Smollar is admitted in Illinois, the United States District Court for the Northern District of Illinois, Eastern District of Missouri, and the United States Courts of Appeals for the Seventh and Eighth Circuits.

## JASON S. COWART

Jason S. Cowart became associated with the Firm in February 2005. He focuses on the prosecution of securities fraud class actions. Mr. Cowart graduated *cum laude* from Northwestern University Law School in 1999. While in law school, he won the Moot Court competition and was an editor of the Journal of International Law and Business.

After law school, Mr. Cowart served as a law clerk to United States District Court Judge Richard Enslen. Before joining the Pomerantz Firm, Mr. Cowart was a litigation associate at Sidley Austin Brown & Wood LLP for over four years. During that time, Mr. Cowart concentrated his

30

practice on complex commercial litigation including antitrust, contract, fraud, and health care-related matters.

Mr. Cowart is the co-author of *State Immunity, Political Accountability and Alden v. Maine*, 75 Notre Dame L. Rev. 1069 (2000).

Mr. Cowart is admitted in New York and Washington, D.C., the United States District Court for the Southern and Eastern Districts of New York, the Western District of Michigan, the District of Columbia, and the United States Supreme Court.

### R. JAMES HODGSON

Jim Hodgson became associated with the Firm in May 2007. He focuses on the prosecution of securities fraud class actions.

Mr. Hodgson graduated from the University of Pennsylvania Law School in 2003. While in law school, he served as a judicial intern to the Honorable John F. Keenan, United States District Judge, Southern District of New York. He also served as a Senior Editor of the University of Pennsylvania Law Review and, upon graduation, was recognized with an award for "Exemplary Public Service while at Penn Law School."

Following law school, Mr. Hodgson was associated with the law firm of Fried, Frank, Harris, Shriver & Jacobson LLP for nearly four years. At Fried, Frank, Mr. Hodgson focused his practice on general commercial and securities litigation, regulatory defense, copyright enforcement, and white-collar criminal defense. In addition, he has tried (on a pro bono basis) numerous asylum law cases on behalf of refugees seeking asylum protection in the United States.

31

Mr. Hodgson is admitted in New York. He is a member of American Bar Association, New York State Bar Association, and Association of the Bar of the City of New York.

## JEREMY A. LIEBERMAN

Jeremy A. Lieberman became associated with the Firm in August 2004. He focuses on the prosecution of securities fraud class actions. Mr. Lieberman graduated from Fordham University School of Law in 2002. While in law school, Mr. Lieberman served as a staff member of the Fordham Urban Law Journal.

Upon graduation, Mr. Lieberman was a litigation associate at Chadbourne & Parke LLP, where he specialized in complex commercial litigation and products liability.

Mr. Lieberman is admitted in New York. He is a member of the New York State Bar Association.

## FEI-LU QIAN

Fei-Lu Qian became associated with the Firm in July 2005. He focuses on the prosecution of securities fraud class actions. Mr. Qian graduated from Albany Law School of Union University in 2003. He was Associate Editor of the Albany Law Review. While in law school, he interned at the New York State Office of the Attorney General.

Mr. Qian began his legal career as an associate at Lovell Stewart Halebian LLP, where he specialized in securities litigation.

Mr. Qian is admitted in New York and the United States District Courts for the Southern and Eastern Districts of New York.

32

## CAROL A. STRAW

Carol A. Straw became associated with the Firm in 2007. She focuses on securities fraud class and derivative actions. Ms. Straw is a 1991 graduate of Columbia University School of Law and received her undergraduate degree from Queens College, *cum laude*, with honors in Economics.

Before law school, Ms. Straw interned with the NYC Public Development Corporation under the Mayor's Urban Fellows Program. After law school, she had her own private practice for many years.

Ms. Straw has represented indigent clients in divorce and child support proceedings as a participant in the Brooklyn Volunteer Lawyers Association.

Ms. Straw is admitted in New York and the District of Columbia.

## TAMAR A. WEINRIB

Tamar A. Weinrib joined Pomerantz as an associate in April 2008. Ms. Weinrib graduated from Fordham University School of Law in 2004 and, while there, participated in and coached Moot Court competitions.

After law school, Ms. Weinrib worked as a litigation associate in the New York office of Clifford Chance US LLP for over three years, where she focused on complex commercial litigation. In addition, she was involved in pro bono cases, including a criminal appeal and a housing dispute filed with the Human Rights Commission.

Ms. Weinrib is admitted in New York and the United States District Courts for the Southern and Eastern Districts of New York.

## SUSAN J. WEISWASSER

Susan J. Weiswasser became associated with the Firm in December 2004. She focuses on health insurance and other class action insurance litigation..

Ms. Weiswasser graduated from Brooklyn Law School in 2000. While in law school, Ms. Weiswasser served as a law clerk intern to the Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York. Ms. Weiswasser also served as a legal intern with the New York State Capital Defender Office.

Ms. Weiswasser is admitted in New York, the United States District Courts for the Southern and Eastern Districts of New York, and the United States Court of Appeals for the Third Circuit. She is a member of the New York City Bar Association.

# EXHIBIT  B

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into by the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Plaintiffs' Counsel"), on behalf of their clients, and Bank of America Corporation ("BoA"), (together, "the Parties"), regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business. The Effective Date of this Agreement is September 12, 2007.

The Parties hereby agree that the terms of this Agreement shall apply from the Effective Date.

The Parties hereby agree and acknowledge that they each are entering this Agreement with the intent of working in good faith to attempt to settle and resolve all potential claims described above.

The Agreement shall apply to all information, materials, oral communications, and documents (and the contents of all of the foregoing) disclosed, produced, or conveyed in any form by BoA to Plaintiffs' Counsel in connection with or during settlement discussions between the Parties related to the municipal derivatives business, and all copies thereof ("Settlement Materials").

1.      All Settlement Materials shall be confidential, shall be used only in connection with the settlement discussions between the Parties related to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business, shall not be used directly or indirectly for any other purpose and shall not be disclosed to any person or entity except in accordance with the terms of this Agreement.

2.      Plaintiffs' Counsel shall not disclose Settlement Materials to any other person or entity, *provided,* however, that Plaintiffs' Counsel may disclose Settlement Materials to economic consultants retained by Plaintiffs' Counsel for the purpose of assisting in settlement discussions related to the above-referenced

1

litigation and/or additional plaintiffs' counsel not mentioned in this Agreement. Prior to any such disclosure, Plaintiffs' Counsel shall provide BoA with the names of all such economic consultants and/or additional counsel to whom Plaintiffs' Counsel intends to provide access to Settlement Materials and must receive from BoA its prior written consent. Any consultants provided Settlement Materials under this paragraph first must sign Addendum A to this Agreement and agree to be bound by each and every one of the terms of this Agreement. Additional counsel provided Settlement Materials under this paragraph first must: (i) sign Addendum A to this Agreement on behalf of their firm and agree to be bound by each and every one of the terms of this Agreement, and (ii) comply with Paragraph 3 of this Agreement.

3.     Plaintiffs' Counsel agree that, prior to receiving any Settlement Materials, Plaintiffs' Counsel will provide BoA a list of all of the clients that have retained Plaintiffs' Counsel in connection with potential claims arising out of alleged anti-competitive activity in the municipal derivatives business and executed versions of Addendum B executed by each of Plaintiffs' Counsel's clients. Plaintiffs' Counsel further agree to provide BoA with the names of any additional clients that retain Plaintiffs' Counsel in connection with potential claims arising out of alleged anti-competitive activity in the municipal derivatives business during the settlement negotiations and executed versions of Addendum B executed by each of Plaintiffs' Counsel's additional clients, and to provide such notice and the executed Addenda B within five (5) calendar days of such retention.

4.     Any summaries or copies of Settlement Materials prepared by Plaintiffs' Counsel, additional plaintiffs' counsel, or any of their agents (including any economic consultants), including any attorney work product referencing or containing any Settlement Materials, shall be subject to the terms of this Agreement to the same extent as the Settlement Materials themselves. The application of this Agreement to any attorney work product shall not constitute any waiver of attorney work product or attorney-client privilege.

2

5. BoA may, in its sole discretion, terminate settlement discussions at any time. If settlement discussions are terminated under any circumstances, then within ten (10) calendar days after such termination of settlement discussions, Plaintiffs' Counsel shall return to BoA all Settlement Materials; shall destroy all work product derived from, including and/or referencing Settlement Materials; and shall certify by affidavit that the requirements of this Agreement have been complied with fully. The foregoing obligations apply to all Settlement Materials and work product that is in the custody of additional plaintiffs' counsel or any agent of Plaintiffs' Counsel (or additional plaintiffs' counsel that receive Settlement Materials pursuant to Paragraph 2). However, the return of Settlement Materials shall not affect BoA's agreement to cooperate pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA") (pursuant to Paragraph 12) with Plaintiffs' Counsel and their clients in the event no settlement is reached.

6. Plaintiffs' Counsel agrees that if BoA discloses information protected from disclosure by the attorney-client privilege or the attorney work-product doctrine during settlement discussions, such disclosure shall not be deemed a waiver in whole or in part of BoA's claim of attorney-client privilege or work-product protection over that information and/or the subject matter covered by that information, and Plaintiffs' Counsel will not argue to anyone (including, but not limited to, any court, tribunal or arbitration panel) that such disclosure is a waiver. BoA agrees to notify Plaintiffs' Counsel if it learns of inadvertent or unintentional disclosure of privileged information and Plaintiffs' Counsel agrees that they will return all originals and copies of the privileged information within five (5) calendar days of being notified of such disclosure by BoA.

7. In the event that Plaintiffs' Counsel inadvertently discloses Settlement Materials to a third party, Plaintiffs' Counsel shall provide BoA notice within three (3) calendar days of knowledge of doing so and use all reasonable efforts to retrieve all copies of the inadvertently produced Settlement Materials from any person or persons in possession of such copies. The inadvertent disclosure of Settlement

3

Materials to third parties by any person or party shall not waive the confidentiality of the information or the obligations hereunder, and Plaintiffs' Counsel agrees that it will not argue to anyone (including but not limited to, any court, tribunal or arbitration panel) that such disclosure is a waiver. Notwithstanding anything in this paragraph 7, any disclosure of Settlement Materials not in strict accordance with all of the terms of this Agreement (inadvertent or otherwise) shall constitute a breach of this Agreement.

8.    Plaintiffs' Counsel agree that they will not, at any time, use the fact that BoA produced material during the settlement discussions to argue to anyone (including, but not limited to, any court, tribunal or arbitration panel), that such material should be produced by BoA in any proceeding. Subject to the preceding sentence, the Parties agree that Plaintiffs' Counsel may use the fact that BoA produced factual material during settlement discussions to establish that such factual information existed.

9.    The protections afforded Settlement Materials under this Agreement shall exceed those provided in Federal Rule of Evidence 408.

10.    During the course of settlement negotiations with Plaintiffs' Counsel pursuant to this Agreement, and to promote efficiency, economy, and the confidentiality of Settlement Materials (as defined on page 1), Plaintiffs' Counsel shall coordinate, organize, and manage any and all cooperation with any potential civil plaintiffs to be provided by BoA as the antitrust leniency applicant to satisfy its cooperation obligations to civil plaintiffs under ACPERA, except as otherwise agreed by the Parties. The designation of Plaintiffs' Counsel to be responsible for such coordination, organization and management applies to all aspects of any settlement negotiations regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business while this Agreement is effective, including the conveyance of Settlement Materials, except as otherwise agreed by the Parties. BoA agrees that, unless and until BoA terminates settlement discussions pursuant to Paragraph 5 and subject to Paragraph 11, it will not convey Settlement

4

Materials to any potential civil plaintiff (or counsel for such potential civil plaintiff) regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business that is not represented by Plaintiffs' Counsel. BoA agrees that, unless BoA terminates settlement discussions pursuant to Paragraph 5 and subject to Paragraph 11, if BoA is contacted by any potential civil plaintiff (or counsel for such potential civil plaintiff) requesting cooperation materials related to or seeking to discuss settlement of potential claims arising out of alleged anti-competitive activity in the municipal derivatives business who is not represented by Plaintiffs' Counsel, BoA shall notify Plaintiffs' Counsel within three (3) calendar days and refer the potential civil plaintiff (or counsel for such potential civil plaintiff) to Plaintiffs' Counsel without divulging anything conveyed between the Parties under this Agreement. Likewise, Plaintiffs' Counsel shall notify BoA within three (3) calendar days if contacted by any potential civil plaintiff (or counsel for such potential civil plaintiff) not represented by Plaintiffs' Counsel.

11.     The Parties agree that if counsel for a party that may have a claim arising out of alleged anti-competitive activity in the municipal derivatives industry informs BoA in writing that: (i) such counsel has executed Addendum A and its clients have executed Addendum B, and (ii) Plaintiffs' Counsel has, nonetheless, failed to provide such counsel with access to all Settlement Materials, then BoA shall immediately notify Plaintiffs' Counsel in writing and Plaintiffs' Counsel shall have five (5) calendar days to provide that counsel with such Settlement Materials. The Parties further agree that, if BoA does not receive within those five (5) calendar days written confirmation from the requesting counsel that all requested Settlement Materials have been provided, then Paragraph 10 shall not apply to BoA.

12.     BoA agrees to provide to Plaintiffs' Counsel and their clients (as identified pursuant to Paragraph 3) the cooperation set forth in Section 213(b) of ACPERA, in conjunction with either their settlement of or litigation of claims regarding the municipal derivatives business. Even if no settlement is reached during this process, BoA shall still be obligated to provide the cooperation set forth in Section 213(b) of ACPERA to Plaintiffs' Counsel and their clients in preparation and

5

pursuit of any claim regarding the municipal derivatives business. In exchange for BoA's ongoing cooperation, each person or entity represented by Plaintiffs' Counsel at any time on or after the Effective Date of the Agreement with regard to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business (as identified pursuant to Paragraph 3) agrees to accept in any settlement with or judgment against BoA only (whether or not a settlement is ultimately reached with BoA in this process) an amount of damages that shall not exceed that portion of the actual damages sustained by them which is attributable to the commerce done by BoA in the municipal derivatives business affected by the alleged anti-competitive activity, and agrees not to seek damages in excess of the foregoing in any settlement or litigation with BoA. However, this Agreement does not foreclose any client from seeking additional damages above and beyond actual damages related to BoA's conduct from other defendants under joint and several liability, as BoA's sales will remain in the case for purposes of calculating the potential liability of other defendants in the action; all such rights for treble damages from other defendants are specifically reserved by Plaintiffs' Counsel on behalf of all of their clients.

13.    It is the intent of the Parties that this Agreement is binding on the Parties, as well as all persons or entities represented by Plaintiffs' Counsel at anytime on or after the Agreement's Effective Date with regard to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business (as identified pursuant to Paragraph 3) and that all obligations set forth in this Agreement (including but not limited to the confidentiality obligations set forth in Paragraph 1), except those obligations set out in Paragraphs 10 and 11 (which are specifically tied to ongoing settlement discussions between the Parties), shall survive and be binding on the Parties even if settlement discussions between the Parties are terminated.

14.    This Agreement may not be amended or modified, except if done in writing and executed by all parties hereto.

6

    15.    The Parties agree that, due to the inadequacy of any remedy at law, equitable relief would be appropriate in the event of any threatened or actual violation of this Agreement.

Dated:

Michael D. Hausfeld
COHEN, MILSTEIN,
 HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

*For Cohen, Milstein, Hausfeld & Toll, P.L.L.C.*

Dated: September 12, 2007

Kevin R. Sullivan
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*For Bank of America Corporation*

7

**ADDENDUM A**

**STATEMENT REQUIRED OF ALL PERSONS
RECEIVING ACCESS TO SETTLEMENT MATERIALS**

I hereby attest to my understanding that Settlement Materials may be provided to me pursuant to the terms, conditions, and restrictions of the Confidentiality Agreement between the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., on behalf of their clients in connection with settlement discussions regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business ("Plaintiffs' Counsel"), and Bank of America Corporation ("BoA") (together, "the Parties") dated September 12, 2007 (the "Agreement"), that I have been given a copy of and have read the Agreement; that I have had its meaning and effect explained to me by the attorneys providing me with such Settlement Materials; and that I hereby agree to be bound by the Agreement and each and every one of its terms.

By: _____

Date:

**ADDENDUM B**


**ACKNOWLEDGMENT OF CLIENTS**

_____ hereby attests that it has been given a copy of and has read the Confidentiality Agreement dated September 12, 2007 between the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Bank of America Corporation regarding settlement discussions related to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business (the "Agreement"); that it has had the Agreement's meaning and effect explained to its representatives by the attorneys who it has retained in connection with potential claims arising out of alleged anti-competitive activity in the municipal derivatives business; and that it hereby agrees to be bound by the Agreement and each and every one of its terms. The individual executing this Addendum on behalf of corporations or other entities represents and warrants that he or she has been authorized by the corporation or entity on whose behalf they are signing to execute the Addendum on the corporation's or entity's behalf.

[CLIENT NAME]

By: _____

Its: _____

Date:

# EXHIBIT C

consensus standards or not later than 90 days after the date of the enactment of the Standards Development Organization Advancement Act of 2004, whichever is later, file simultaneously with

[[Page 118 STAT. 665]]

the Attorney General and the Commission, a written notification disclosing--
        ``(A) the name and principal place of business of the standards development organization, and
        ``(B) documents showing the nature and scope of such activity.

Any standards development organization may file additional disclosure notifications pursuant to this section as are appropriate to extend the protections of section 4 to standards development activities that are not covered by the initial filing or that have changed significantly since the initial filing.'',
        (2) in subsection (b)--
            (A) in the 1st sentence by inserting ``, or a notice with respect to such standards development activity that identifies the standards development organization engaged in such activity and that describes such activity in general terms'' before the period at the end, and
            (B) in the last sentence by inserting ``or available to such organization, as the case may be'' before the period,
        (3) in subsection (d)(2) by inserting ``, or the standards development activity'' after ``venture'',
        (4) in subsection (e)--
            (A) by striking ``person who'' and inserting ``person or standards development organization that'', and
            (B) by inserting ``or any standards development organization'' after ``person'' the last place it appears, and
        (5) in subsection (g)(1) by inserting ``or standards development organization'' after ``person''.

SEC. 108. <<NOTE: 15 USC 4301 note.>> RULE OF CONSTRUCTION.

    Nothing in this title shall be construed to alter or modify the antitrust treatment under existing law of--
        (1) parties participating in standards development activity of standards development organizations within the scope of this title, including the existing standard under which the conduct of the parties is reviewed, regardless of the standard under which the conduct of the standards development organizations in which they participate are reviewed, or
        (2) other organizations and parties engaged in standard-setting processes not within the scope of this amendment to the title.

TITLE II--ANTITRUST <<NOTE: Antitrust Criminal Penalty Enhancement and Reform Act of 2004>> CRIMINAL PENALTY ENHANCEMENT AND REFORM ACT OF 2004

SEC. 201. <<NOTE: 15 USC 1 note.>> SHORT TITLE.

    This title may be cited as the ``Antitrust Criminal Penalty



Enhancement and Reform Act of 2004''.

[[Page 118 STAT. 666]]

     Subtitle A--Antitrust Enforcement Enhancements and Cooperation
                              Incentives

SEC. 211. <<NOTE: 15 USC 1 note.>> SUNSET.

     (a) In General.--Except as provided in subsection (b), the
provisions of sections 211 through 214 shall cease to have effect 5
years after the date of enactment of this Act.
     (b) Exception.--With respect to an applicant who has entered into an
antitrust leniency agreement on or before the date on which the
provisions of sections 211 through 214 of this subtitle shall cease to
have effect, the provisions of sections 211 through 214 of this subtitle
shall continue in effect.

SEC. 212. <<NOTE: 15 USC 1 note.>> DEFINITIONS.

     In this subtitle:
          (1) Antitrust division.--The term ``Antitrust Division''
     means the United States Department of Justice Antitrust
     Division.
          (2) Antitrust leniency agreement.--The term ``antitrust
     leniency agreement,'' or ``agreement,'' means a leniency letter
     agreement, whether conditional or final, between a person and
     the Antitrust Division pursuant to the Corporate Leniency Policy
     of the Antitrust Division in effect on the date of execution of
     the agreement.
          (3) Antitrust leniency applicant.--The term ``antitrust
     leniency applicant,'' or ``applicant,'' means, with respect to
     an antitrust leniency agreement, the person that has entered
     into the agreement.
          (4) Claimant.--The term ``claimant'' means a person or
     class, that has brought, or on whose behalf has been brought, a
     civil action alleging a violation of section 1 or 3 of the
     Sherman Act or any similar State law, except that the term does
     not include a State or a subdivision of a State with respect to
     a civil action brought to recover damages sustained by the State
     or subdivision.
          (5) Cooperating individual.--The term ``cooperating
     individual'' means, with respect to an antitrust leniency
     agreement, a current or former director, officer, or employee of
     the antitrust leniency applicant who is covered by the
     agreement.
          (6) Person.--The term ``person'' has the meaning given it in
     subsection (a) of the first section of the Clayton Act.

SEC. 213. <<NOTE: 15 USC 1 note.>> LIMITATION ON RECOVERY.

     (a) In General.--Subject to subsection (d), in any civil action
alleging a violation of section 1 or 3 of the Sherman Act, or alleging a
violation of any similar State law, based on conduct covered by a
currently effective antitrust leniency agreement, the amount of damages
recovered by or on behalf of a claimant from an antitrust leniency
applicant who satisfies the requirements of subsection (b), together
with the amounts so recovered from cooperating individuals who satisfy
such requirements, shall not exceed that portion of the actual damages
sustained by such claimant which is attributable to the commerce done by

the applicant in the goods or services affected by the violation.
        (b) Requirements.--Subject to subsection (c), an antitrust leniency
applicant or cooperating individual satisfies the requirements

[[Page 118 STAT. 667]]

of this subsection with respect to a civil action described in
subsection (a) if the court in which the civil action is brought
determines, after considering any appropriate pleadings from the
claimant, that the applicant or cooperating individual, as the case may
be, has provided satisfactory cooperation to the claimant with respect
to the civil action, which cooperation shall include--
                (1) providing a full account to the claimant of all facts
            known to the applicant or cooperating individual, as the case
            may be, that are potentially relevant to the civil action;
                (2) furnishing all documents or other items potentially
            relevant to the civil action that are in the possession,
            custody, or control of the applicant or cooperating individual,
            as the case may be, wherever they are located; and
                (3)(A) in the case of a cooperating individual--
                        (i) making himself or herself available for such
                    interviews, depositions, or testimony in connection with
                    the civil action as the claimant may reasonably require;
                    and
                        (ii) responding completely and truthfully, without
                    making any attempt either falsely to protect or falsely
                    to implicate any person or entity, and without
                    intentionally withholding any potentially relevant
                    information, to all questions asked by the claimant in
                    interviews, depositions, trials, or any other court
                    proceedings in connection with the civil action; or
                (B) in the case of an antitrust leniency applicant, using
            its best efforts to secure and facilitate from cooperating
            individuals covered by the agreement the cooperation described
            in clauses (i) and (ii) and subparagraph (A).

        (c) Timeliness.--If the initial contact by the antitrust leniency
applicant with the Antitrust Division regarding conduct covered by the
antitrust leniency agreement occurs after a State, or subdivision of a
State, has issued compulsory process in connection with an investigation
of allegations of a violation of section 1 or 3 of the Sherman Act or
any similar State law based on conduct covered by the antitrust leniency
agreement or after a civil action described in subsection (a) has been
filed, then the court shall consider, in making the determination
concerning satisfactory cooperation described in subsection (b), the
timeliness of the applicant's initial cooperation with the claimant.
        (d) Continuation.--Nothing in this section shall be construed to
modify, impair, or supersede the provisions of sections 4, 4A, and 4C of
the Clayton Act relating to the recovery of costs of suit, including a
reasonable attorney's fee, and interest on damages, to the extent that
such recovery is authorized by such sections.

SEC. 214. <<NOTE: 15 USC 1 note.>> RIGHTS, AUTHORITIES, AND LIABILITIES
            NOT AFFECTED.

    Nothing in this subtitle shall be construed to--
                (1) affect the rights of the Antitrust Division to seek a
            stay or protective order in a civil action based on conduct
            covered by an antitrust leniency agreement to prevent the
            cooperation described in section 213(b) from impairing or

impeding the investigation or prosecution by the Antitrust
Division of conduct covered by the agreement;
        (2) create any right to challenge any decision by the
Antitrust Division with respect to an antitrust leniency
agreement; or

[[Page 118 STAT. 668]]

        (3) affect, in any way, the joint and several liability of
any party to a civil action described in section 213(a), other
than that of the antitrust leniency applicant and cooperating
individuals as provided in section 213(a) of this title.

SEC. 215. INCREASED PENALTIES FOR ANTITRUST VIOLATIONS.

    (a) Restraint of Trade Among the States.--Section 1 of the Sherman
Act (15 U.S.C. 1) is amended by--
        (1) striking ``$10,000,000'' and inserting ``$100,000,000'';
        (2) striking ``$350,000'' and inserting ``$1,000,000''; and
        (3) striking ``three'' and inserting ``10''.

    (b) Monopolizing Trade.--Section 2 of the Sherman Act (15 U.S.C. 2)
is amended by--
        (1) striking ``$10,000,000'' and inserting ``$100,000,000'';
        (2) striking ``$350,000'' and inserting ``$1,000,000''; and
        (3) striking ``three'' and inserting ``10''.

    (c) Other Restraints of Trade.--Section 3 of the Sherman Act (15
U.S.C. 3) is amended by--
        (1) striking ``$10,000,000'' and inserting ``$100,000,000'';
        (2) striking ``$350,000'' and inserting ``$1,000,000''; and
        (3) striking ``three'' and inserting ``10''.

                    Subtitle B--Tunney Act Reform

SEC. 221. PUBLIC <<NOTE: 15 USC 16 note.>> INTEREST DETERMINATION.

    (a) Congressional Findings and Declaration of Purposes.--
        (1) Findings.--Congress finds that--
                (A) the purpose of the Tunney Act was to ensure that
            the entry of antitrust consent judgments is in the
            public interest; and
                (B) it would misconstrue the meaning and
            Congressional intent in enacting the Tunney Act to limit
            the discretion of district courts to review antitrust
            consent judgments solely to determining whether entry of
            those consent judgments would make a ``mockery of the
            judicial function''.
        (2) Purposes.--The purpose of this section is to effectuate
    the original Congressional intent in enacting the Tunney Act and
    to ensure that United States settlements of civil antitrust
    suits are in the public interest.

    (b) Public Interest Determination.--Section 5 of the Clayton Act (15
U.S.C. 16) is amended--
        (1) in subsection (d), by inserting at the end the
    following: ``Upon application by the United States, the district
    court may, for good cause (based on a finding that the expense
    of publication in the Federal Register exceeds the public
    interest benefits to be gained from such publication), authorize

an alternative method of public dissemination of the public
comments received and the response to those comments.'';
        (2) in subsection (e)--
                (A) in the matter before paragraph (1), by--
                        (i) striking ``court may'' and inserting
                    ``court shall''; and
                        (ii) inserting ``(1)'' before ``Before''; and
                (B) striking paragraphs (1) and (2) and inserting
            the following:

[[Page 118 STAT. 669]]

        ``(A) the competitive impact of such judgment, including
    termination of alleged violations, provisions for enforcement
    and modification, duration of relief sought, anticipated effects
    of alternative remedies actually considered, whether its terms
    are ambiguous, and any other competitive considerations bearing
    upon the adequacy of such judgment that the court deems
    necessary to a determination of whether the consent judgment is
    in the public interest; and
        ``(B) the impact of entry of such judgment upon competition
    in the relevant market or markets, upon the public generally and
    individuals alleging specific injury from the violations set
    forth in the complaint including consideration of the public
    benefit, if any, to be derived from a determination of the
    issues at trial.

    ``(2) Nothing in this section shall be construed to require the
court to conduct an evidentiary hearing or to require the court to
permit anyone to intervene.''; and
        (3) in subsection (g), by inserting ``by any officer,
    director, employee, or agent of such defendant'' before ``, or
    other person''.

    Approved June 22, 2004.

LEGISLATIVE HISTORY--H.R. 1086:
--------------------------------------------------------------------------

HOUSE REPORTS: No. 108-125 and Pt. 2 (Comm. on the Judiciary).
CONGRESSIONAL RECORD:
                                        Vol. 149 (2003):
                        June 10, considered and passed
                            House.
                                        Vol. 150 (2004):
                        Apr. 2, considered and passed
                            Senate, amended.
                        June 2, House concurred in Senate
                            amendment.