UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE MUNICIPAL DERIVATIVES
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

MDL No. 1950

Master Docket No. 08 Civ. 2516 (VM) (JCF)

**RESPONSE OF CITY OF OAKLAND,
CALIFORNIA AND COUNTY OF
ALAMEDA, CALIFORNIA IN SUPPORT
OF MOTION FOR THE APPOINTMENT
OF LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP AS INTERIM LEAD
OR CO-LEAD COUNSEL**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .............................................................................................. 1

II.   OAKLAND'S AND ALAMEDA'S COMPLAINTS ARE THE
      PRODUCT OF LIEFF CABRASER'S THOROUGH AND
      INDEPENDENT INVESTIGATION .................................................................. 2

III.  LIEFF CABRASER REPRESENTS THREE LARGE AND
      SOPHISTICATED MUNICIPALITIES THAT PURCHASED OVER
      $1.8 BILLION OF MUNICIPAL DERIVATIVES ............................................. 5

IV.   LIEFF CABRASER HAS EXTENSIVE TRIAL AND COMPLEX CASE
      MANAGEMENT EXPERIENCE ...................................................................... 5

V.    CONCLUSION ............................................................................................... 10

773969.6

I.    **INTRODUCTION**

The City of Oakland, California ("Oakland") and the County of Alameda, California ("Alameda"), now joined by the City of Fresno, California,[1] submit this Response to the Interim Lead Counsel motions filed by Haywood County on behalf of Pomerantz Haddock Block Grossman & Gross, LLP ("Pomerantz") and by the Fairfax County plaintiffs on behalf of Boies, Schiller & Flexner LLP, Susman Godfrey L.L.P., and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("BSF/SG/CMHT").

As demonstrated by the opening memorandum of Oakland and Alameda ("Oakland/Alameda Memo"), and as discussed below, Lieff Cabraser easily satisfies Federal Rule of Civil Procedure 23(g)'s criteria for the appointment of Interim Lead or Co-Lead Counsel for the following reasons:

- Lieff Cabraser conducted its own extensive and independent pre-filing investigation relying on its own gathering of facts, expert analysis, and considerable experience in the antitrust field (Rule 23(g)(1)(A)(i));

- Lieff Cabraser has 30 years of experience in handling hundreds of class actions, antirust cases, and multidistrict litigation actions, including representing governmental entity clients such as Plaintiffs in this action (Rule 23(g)(1)(A)(ii));

- Lieff Cabraser has extensive antitrust experience (Rule 23(g)(1)(A)(iii));

---

[1] The City of Fresno, California filed its Complaint against the Defendants on July 17, 2008, in the United States District Court for the Eastern District of California.  Fresno supports Oakland's and Alameda's motion to appoint Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser") as Interim Lead or Co-Lead Counsel.  A copy of the complaint is attached as Exhibit A to the Supplemental Fastiff Declaration.

- Lieff Cabraser has the attorney and financial resources necessary to represent this large nationwide putative class (Rule 23(g)(1)(A)(iv)); and

- Lieff Cabraser is the only counsel representing Plaintiffs in California and in the Western United States, asserting significant federal and California law claims against the most complete group of Defendants (Rule 23(g)(1)(B)).

Lieff Cabraser respectfully requests that the Court appoint it as Interim Lead or Co-Lead Counsel as part of a proposed Plaintiffs' lead counsel structure of up to four Interim Co-Lead Counsel.

## II.    OAKLAND'S AND ALAMEDA'S COMPLAINTS ARE THE PRODUCT OF LIEFF CABRASER'S THOROUGH AND INDEPENDENT INVESTIGATION

As explained in the Oakland/Alameda Memorandum, Lieff Cabraser conducted its own investigation of potential antitrust and other violations concerning municipal finance reinvestments, collectively termed "Municipal Derivatives," including GICs, swaps, swaptions, and float and forward delivery agreements.  In so doing, it relied exclusively on publicly available information, including the GIC database it compiled, its own analysis, the analysis of its expert, and consultation with its clients.  As emphasized by Rule 23, Lieff Cabraser did its own research and investigation.  In so doing, it did not trade substantive legal rights for the information required to prepare its clients' complaints.  It did not approach the amnesty applicant, Bank of America ("BofA") and seek to obtain information it needed to complete its investigation, in exchange for a waiver of treble damages and joint and several liability.  Lieff Cabraser believes the Class is well-served by the Court appointing as Interim Lead or Co-Lead Counsel a law firm for Plaintiffs that retains the full arsenal of the Class's remedies and has not received information conditioned on a waiver of treble damages and joint and several liability.

Lieff Cabraser has advised its clients not to accept the BofA deal and not give up what they are already entitled to obtain in formal discovery.  It is Lieff Cabraser's considered judgment, based on its experience in these cases and its knowledge of the substantive law, that such a *quid pro quo* is unnecessary.  BofA disclosed it sought amnesty under the Department of Justice's Antitrust Corporate Leniency Policy (the "Leniency Policy") in connection with the conduct at issue.  Bank of America Corp, 2007 Form 10-K, p. 123, attached as Exhibit B to the Supplemental Declaration of Eric B. Fastiff ("Supp. Fastiff Decl.").  Among other things, the Leniency Policy requires that the participant admit wrongdoing and cooperate with the DOJ by reporting the "wrongdoing with candor and completeness."  *See* Leniency Policy, Supp. Fastiff Decl., Exh. C at ¶ B(4).  Plaintiffs may obtain these same facts in BofA's initial disclosures or, if necessary, through formal discovery.  Lieff Cabraser will thus be able to prosecute claims on behalf of the Class with a full complement of key remedies at their clients' disposal.  At this juncture, Oakland, Alameda, and Fresno do not agree to waive treble damages or to accept whatever information BofA provided to other counsel.  Once BofA discloses what it has already disclosed or is willing to disclose, then Oakland, Alameda, and Fresno can make an informed decision regarding whether or not they should waive the treble damage remedies.  At this time, we are not prepared to recommend our clients surrender these substantial remedies simply to perform a pre-filing investigation, as other counsel apparently required.[2]

---

[2] It is unclear what this information entailed, what has been exchanged, what may have been included in a complaint the BSF/SG/CMHT group filed, and to what extent it is the basis of their Interim Lead Counsel application.  On a motion for Lead Counsel, it is also unclear whether, under Rule 23(g)(A)(i), the Court *can* consider any facts upon which an applicant for Lead Counsel relies which, as here, were obtained prior to initiation of litigation, absent court supervision, and in exchange for a waiver or release of rights by one or more individual plaintiffs.  Such an agreement – to obtain certain information upon which a plaintiff's counsel obtains in exchange for a waiver or release of important substantive rights (here the entitlement to treble damages) – is exceedingly rare, if not unprecedented.  This would provide the

*(Footnote continued on next page)*

BSF/SG/CMHT claims Lieff Cabraser did not investigate its clients' claims or prepare complaints on their behalf. They make the claim that, because there is a substantive overlap between the complaints Lieff Cabraser drafted and those they drafted, Lieff Cabraser's investigation and other work is somehow a copy of or derivative of the work of others. Not so.

The fact is Lieff Cabraser conducted its own thorough and independent pre-filing investigation based on public sources, expert analysis and its own experience in the antitrust field. Supp. Fastiff Decl., ¶ 5. BSF/SG/CMHT criticize Lieff Cabraser's reliance on these sources and point to the resemblance of the Lieff Cabraser complaints to their own. The complaints Lieff Cabraser drafted do bear some facial resemblance to those prepared by others. The resemblance derives largely from the substantial identity of the defendants named (although the Oakland, Alameda, and Fresno complaints name more) and the routine pleading of class certification requirements and the elements of the cause of action. In fact, this similarity further demonstrates why Lieff Cabraser should be appointed an Interim Lead Counsel. BSF/SG/CMHT apparently found it necessary to give up treble damage and joint and several liability remedies against BofA in order to gather such facts and produce a similar pleading. Lieff Cabraser and its clients did not. What the comparison of the complaints shows is that there was ample evidence in the public record for someone with the knowledge and wherewithal to perform an investigation.

Moreover, Lieff Cabraser's investigation produced complaints significantly different than the others. Lieff Cabraser's complaints, drafted on behalf of Oakland, Alameda,

*(Footnote continued from previous page)*
unfortunate opportunity for a defendant to conduct a reverse auction among plaintiffs' counsel who might be inclined to seek strategic advantages in their attempt to be appointed lead counsel. Likewise, defendants should not have the opportunity or incentive to tip the balance in a disputed lead counsel motion to the most willing or sympathetic plaintiff's counsel.

773969.6

and Fresno, are more broad, name more Defendants, and attribute different conduct to certain

Defendants, all part of a single overarching conspiracy.  The complaints also assert claims under

additional legal theories including under California statutes that provide additional remedies for

Oakland, Alameda, and Fresno.  There is nothing in the complaints or in any of the Rule 23(g)

motions that controverts the showing that Lieff Cabraser performed its own thorough

investigation, separate from and well beyond that of the other firms seeking to be Interim Lead

Counsel.

## III.   LIEFF CABRASER REPRESENTS THREE LARGE AND SOPHISTICATED MUNICIPALITIES THAT PURCHASED OVER $1.8 BILLION OF MUNICIPAL DERIVATIVES

As shown in the Oakland/Alameda Memorandum, Oakland and Alameda

collectively purchased over $1.3 billion of GICs, swaps, float and forward delivery agreements,

and other Municipal Derivative products.  Supp. Fastiff Decl., ¶ 2.  The City of Fresno, for

example, purchased over $500 million of GICs during the class period.  *Id*., ¶ 3.  These three

municipalities, each having substantial purchases, stepped forward, hired Lieff Cabraser, and

request the Court appoint their chosen counsel as Interim Lead or Co-Lead Counsel.  The choice

that these sophisticated entities, with combined purchases of $1.8 billion, made in retaining Lieff

Cabraser speaks volumes.  None of the other counsel have reported their clients' purchases.  This

is not surprising, considering many of them are smaller counties or school districts that have

issued limited amounts of debt and purchased even fewer Municipal Derivatives.

## IV.   LIEFF CABRASER HAS EXTENSIVE TRIAL AND COMPLEX CASE MANAGEMENT EXPERIENCE

In their opening memoranda, Pomerantz and BSF/SG/CMHT commented on their

trial and complex case experience.  We acknowledge that they are all quality firms and possess

significant relevant experience.  In response, we refer the Court to Lieff Cabraser's antitrust

experience, summarized in the Oakland/Alameda Memo at p. 13-15.  In addition, Lieff Cabraser

has as much complex case litigation experience, including experience as court-appointed lead

counsel in highly successful multidistrict litigation, as any firm in the country.  Courts across the

country repeatedly demonstrated their confidence in Lieff Cabraser's skills.  Indeed, Lieff

Cabraser possesses as much relevant experience as any law firm in the United States.  For

example:

- ■ ***Cases involving Financial Fraud and Related Wrongdoing***

- *Claghorn v. Edsaco*, No. 98-3039-SI (N.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel.  $170.7 million jury verdict.

- *In re National Century Financial Enterprises, Inc. Investment Litigation*, MDL 1565 (S.D. Ohio).  Lieff Cabraser served as Lead Counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in a securities fraud and breach of fiduciary duties lawsuit against Bank One, JPMorgan Chase Bank, and Credit Suisse First Boston LLC.  Substantial partial settlements, which must remain confidential, have been reached.

- *In re Broadcom Corporation*, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser serves as Lead Counsel in a stockholder derivative action against the board of directors of Broadcom Corporation.

- *In re Brooks Automation, Inc. Securities Litigation*, No. 06 CA 11068 (D. Mass.).  Lieff Cabraser serves as Lead Counsel for the lead plaintiff, the Los Angeles County Employees Retirement Association.  Multi-million dollar settlement has been preliminarily approved.

- *In re Cablevision Systems Corp. Shareholder Derivative Litig.*, No. 06-cv-4130-DGT-AKT (E.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel in a stockholder derivative action against Cablevision's board of directors.

- *In re Network Associates, Inc. Securities Litigation*, No. C-99-1729-WHA (N.D. Cal.).  Lieff Cabraser served as Lead Counsel.  $30 million settlement.

- *In re California Micro Devices Securities Litigation*, No. C-94-2817-VRW (N.D. Cal.).  Lieff Cabraser served as Liaison Counsel for the lead plaintiffs, the Colorado Public Employees' Retirement Association and the California State Teachers' Retirement System, and the class they represented.  $31 million settlement.

- *In re FPI/Agretech Securities Litigation*, MDL No. 763 (D. Haw.).  Lieff Cabraser served as Lead Class Counsel on behalf of multiple classes of investors defrauded in a limited partnership investment scheme.  The Court approved $15 million in partial pretrial settlements.  $25 million jury verdict.

- *In re Qwest Communications International, Inc. Securities & ERISA Litigation*, MDL No. 1788 (D. Colo.).  Settled claims of the New York State Common Retirement Fund, San Francisco Employees Retirement System, two Denver funds, and BlackRock for approximately 50% of provable damages.

■ ***Multi-District Litigation Mass Tort Cases***

- *Multi-State Tobacco Litigation*.  Lieff Cabraser represented the Attorneys General of Massachusetts, Louisiana and Illinois, several additional states, and 18 cities and counties in California.  In California alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to be paid over 25 years.

- *Barbosa Garcia, et al. v. Excelaire Service, Inc., and Honeywell International, Inc.*, No. 06-CV-5964 (E.D.N.Y.). Lieff Cabraser, with co-counsel, represents over twenty families whose loved ones died in the Gol Airlines Flight 1907 crash.

- *In re Vytorin/Zetia Marketing, Sales Practices and Products Liability Litigation*, MDL No. 1938 (D. N.J.).  The Court has appointed Lieff Cabraser to the Executive Committee in the litigation arising out of the sale and marketing of two cholesterol drugs.

- *Rezulin Products Liability Litigation*, MDL No. 1348 (S.D.N.Y.). Lieff Cabraser is a member of the Court-appointed Science and Expert Witness Committee.

- *Fen-Phen ("Diet Drugs") Litigation,* MDL No. 1203 (E.D. Pa.).  The Court appointed Lieff Cabraser to the Plaintiffs' Management Committee that organized and directed the Fen-Phen diet drugs federal litigation.  $4.75 billion settlement.

- *In re Simon II Litigation,* No. 00-CV-5332 (JBW) (E.D.N.Y.) Lieff Cabraser served as Lead Counsel on behalf of cigarette smokers.

- *In re ConAgra Peanut Butter Products Liability Litigation*, MDL No. 1845 (N.D. Ga.).  Lieff Cabraser is Lead Counsel in the litigation arising out of the recall of Peter Pan and Great Value peanut butter.

- *In re Vioxx Products Liability Litigation,* MDL No. 1657 (E.D. La.). The Court appointed Lieff Cabraser to the Plaintiffs' Steering Committee, which had the responsibility of conducting all pretrial discovery of Vioxx cases in federal court and pursuing all settlement options with Merck.  Merck will pay $4.85 billion into a settlement fund.

- *In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation*, MDL No. 1785 (D. S.C.).  Lieff Cabraser serves on the Plaintiffs' Executive

Committee in litigation arising out of Bausch & Lomb's recall in 2006 of its product ReNu with MoistureLoc.

- *In re Guidant Implantable Defibrillators Products Liability Litigation*, MDL No. 1708 (D. Minn.). Lieff Cabraser serves on the Plaintiffs' Lead Counsel Committee in litigation arising out of the recall of Guidant cardiac defibrillators implanted in patients because of potential malfunctions in the devices. $240 million settlement.

- *In re Bextra/Celebrex* Marketing *Sales Practices and Products Liability Litigation*, MDL 1699 (N.D. Cal.). Lieff Cabraser serves as Plaintiffs' Liaison Counsel.

- *Blood Factor VIII And* Factor *IX Litigation* (MDL No. 986) (N.D. Ill.). Lieff Cabraser is serves as Lead Counsel of the "second generation" Blood Factor MDL litigation on behalf of clients in Asia, Europe, Central and South America, and the Middle East.

- *In re Baycol Products Litigation,* MDL No. 1431 (D. Minn.). Lieff Cabraser serves as a member of the Plaintiffs' Steering Committee (PSC) and the Executive Committee of the PSC. Our clients reached confidential favorable settlements with Bayer.

- *In re Silicone Gel Breast Implants Products Liability Litigation*, MDL No. 926 (N.D. Ala.). Lieff Cabraser serves on the Plaintiffs' Steering Committee and was one of five members of the negotiating committee which achieved a $4.25 billion global settlement with certain defendants.

- *In re Telectronics Pacing Systems Inc., Accufix Atrial "J" Leads Products Liability Litigation*, MDL No. 1057 (S.D. Ohio). Lieff Cabraser served on the Plaintiffs' Steering Committee. $58 million settlement.

- *In re Felbatol Products Liability Litigation,* MDL No. 1048 (N.D. Cal.). Lieff Cabraser served as Co-Lead Class Counsel and Plaintiffs' Liaison Counsel. The litigation was settled favorably on behalf of all major injury claimants.

■ ***Complex Employment Cases***

- *Rosenburg, et al. v. IBM,* No. C06-0430 JDC (N.D. Cal.). Lieff Cabraser served as Class Counsel. A $65 million settlement of a class action suit by current and former technical support workers for IBM seeking unpaid overtime.

- *Satchell, et al. v. FedEx Express*, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.). Lieff Cabraser served as Class Counsel. A $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees. The settlement also requires FedEx to change its promotion, discipline, and pay practices.

- *Amochaev et al. v. Citigroup Global Markets, Inc., d/b/a Smith Barney*, No. C05-1298 PJH (N.D. Cal.). Lieff Cabraser served as Class Counsel. In April 2008, Citigroup Inc. agreed to pay $33 million and included comprehensive injunctive relief designed to increase business opportunities and promote equality in compensation for female brokers.

- *Gonzalez et al. v. Abercrombie & Fitch Stores, Inc. et al.*, No. C03-2817 SI (N.D. Cal.). Lieff Cabraser served as Lead Class Counsel. In April 2005, the Court approved a settlement, valued at approximately $50 million for Latino, African American, Asian American, and female applicants and employees who charged the company with discrimination. The settlement also requires the company to institute a range of policies and programs to promote diversity among its workforce and to prevent discrimination based on race or gender.

■   *Complex Fraud Cases*

- *Catholic Healthcare West Cases*, J.C.C.P. No. 4453 (Cal. Supr. Ct.). Lieff Cabraser served as Lead Counsel. Settlement in excess of $400 million.

- *Sutter Health Uninsured Pricing Cases*, J.C.C.P. No. 4388 (Cal. Supr. Ct.). Lieff Cabraser served as Lead Counsel. Settlement in excess of $250 million.

- *Morris v. AT&T Wireless Services,* No. C-04-1997-MJP (W.D. Wash.). Lieff Cabraser served as class counsel. $40 million settlement.

- *Estate of Holman, et al. v. Noble Energy, Inc.*, No. 03 CV 9 (Dist. Ct., Weld County, Colorado). Lieff Cabraser served as Co-Lead Counsel. $53 million settlement.

- *Providian Credit Card Cases*, J.C.C.P. No. 4085 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Lead Counsel. $105 million settlement.

- *In re Synthroid Marketing Litigation*, MDL No. 1182 (N.D. Ill.). Lieff Cabraser served as Co-Lead Counsel. $87.4 million settlement.

- *Richison v. American Cemwood Corp.*, No. 005532 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Lead Class Counsel. $140 million settlement.

- *In re Unocal Refinery Litigation,* No. C 94-04141 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Lead Class Counsel. $80 million settlement.

■   *Trial Experience*

- In California in 2007, Lieff Cabraser attorneys obtained a $54 million verdict against DaimlerChrysler in a wrongful death case (*Mraz v. DaimlerChrysler*). The judgment included a $50 million award of punitive damages. The jury found that the evidence showed the vehicle at issue, a 1991 Dodge Dakota, had a defective transmission and that DaimlerChrysler acted with malice and with a conscious disregard for the health and safety of others.

- In Louisiana in 2008, Lieff Cabraser again prosecuted a wrongful death case (*Guillot v. DaimlerChrysler*) against Chrysler involving a 1999 Jeep Grand Cherokee. The jury held DaimlerChrysler liable for the death of the infant, Collin Guillot, and returned a $7.2 million verdict (including interest; Louisiana law does not provide a punitive damage remedy).

•       In Louisiana in 2006, a federal jury found that Merck had failed to warn doctors about Vioxx's risks and was responsible for the heart attack suffered by retired FBI agent Gerald Barnett and awarded $51 million in damages. Lieff Cabraser was co-trial counsel.

•       In Louisiana in 2004, Lieff Cabraser tried a class action case against Aventis Crop Sciences and others on behalf of 1,500 crawfish farmers. For over four weeks Lieff Cabraser introduced evidence that their clients' crawfish crops were devastated by a defective and toxic pesticide sold by Aventis and used in rice fields at or near their crawfish ponds. Prior to the conclusion of trial, the parties reached a $45 million settlement.

•       In Georgia in 2004, Lieff Cabraser started a class action trial by families whose loved ones were improperly cremated and desecrated by Tri-State Crematory. One week into trial, settlements were reached totaling over $35 million. A second trial against a non-settling defendant resulted in an $80 million settlement.

•       In California in 2003, Lieff Cabraser was a member of the trial team where a federal jury held Lehman Brothers, Inc. liable for knowingly assisting First Alliance Mortgage Corporation in committing fraud. The jury found that First Alliance systematically defrauded borrowers, and that Lehman Brothers aided and abetted the fraudulent scheme.

•       In California in 2002, in *Claghorn v. Edsaco*, Lieff Cabraser obtained in California a $170.7 million jury verdict in a securities fraud class action. The verdict was the twelfth largest verdict in the U.S. that year.

Lieff Cabraser's record of relevant experience is second to none and reflects the firm's capability to lead large, complex, multi-party cases successfully.

## V.     <u>CONCLUSION</u>

Lieff Cabraser has represented plaintiffs in complex class actions for over 30 years. As demonstrated by the hundreds of cases listed in its resume, including the subset identified in the Oakland/Alameda Memorandum and in this Response, Lieff Cabraser regularly serves as lead counsel, co-lead counsel, a member of a steering committee, or court-appointed class counsel. This track record of success is testament to Lieff Cabraser's ability to oversee and work with attorneys in antitrust cases as well as in a broad spectrum of complex cases. This ability has generated substantial recoveries for the firm's clients in some of the most successful civil litigation in the United States.

Lieff Cabraser seeks to work collegially with the other counsel in this case.  It has

attacked neither any other counsel's fitness for appointment nor their pleadings.  We look

forward to working with all the other counsel, either as Interim Lead or Co-Lead Counsel.  While

Lieff Cabraser continues to believe that the Court may properly appoint it as sole Interim Lead

Counsel, we remain willing to serve with up to three other firms as Interim Co-Lead Counsel,

supported by an Executive Committee.

Dated: July 18, 2008                Respectfully submitted,

                                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


                                    By:_____*/s/ Steven E. Fineman*_____
                                             Steven E. Fineman

                                    John A. Russo, City Attorney
                                    Barbara Parker, Chief Asst. City Attorney
                                    Mark Morodomi, Supervising Deputy City Attorney
                                    Kathleen Salem-Boyd, Deputy City Attorney
                                    CITY OF OAKLAND, CALIFORNIA
                                    One Frank H. Ogawa Plaza, 6th Floor
                                    Oakland, California 94612
                                    Telephone:    (510) 238-3034
                                    Facsimile:    (510) 238-6500

                                    Richard E. Winnie, County Counsel
                                    Brian E. Washington, Assistant County Counsel
                                    Claude F. Kolm, Deputy County Counsel
                                    COUNTY OF ALAMEDA, CALIFORNIA
                                    1221 Oak Street, Suite 463
                                    Oakland, CA  94612
                                    Telephone:    (510) 272-6700
                                    Facsimile:    (510) 272-5020

James C. Sanchez, City Attorney
CITY OF FRESNO, CALIFORNIA
Fresno City Hall
2600 Fresno Street, Second Floor
Fresno, California 93721-3600
Telephone:     (559) 621-7500
Facsimile:     (559) 488-1084

Steven E. Fineman
Daniel E. Seltz
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017
Telephone:     (212) 355-9500
Facsimile:     (212) 355-9592

Richard M. Heimann
Joseph R. Saveri
Eric B. Fastiff
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:     (415) 956-1000
Facsimile:     (415) 956-1008

James A. Quadra
Sylvia Sokol
MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, CA 94104
Telephone:     (415) 362-3599
Facsimile:     (415) 362-2006

*Attorneys for Individual and Representative Plaintiffs*
*City of Oakland, California, County of Alameda,*
*California, and City of Fresno, California*

## <u>CERTIFICATE OF SERVICE</u>

On July 18, 2008, I authorized the service by the Court's electronic case filing system of this Memorandum and the accompanying Supplemental Declaration of Eric B. Fastiff.

                         *__/s/ Eric B. Fastiff_____*
                         Eric B. Fastiff

773969.6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08 Civ. 2516 (VM) (JCF) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **SUPPLEMENTAL DECLARATION OF ERIC B. FASTIFF IN SUPPORT OF MOTION FOR THE APPOINTMENT OF LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP AS INTERIM LEAD OR CO-LEAD COUNSEL** |

I, ERIC B. FASTIFF, declare:

1.      I am a member of the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP.  I am one of the counsel for plaintiffs City of Oakland, County of Alameda, and City of Fresno in this action.  I make this declaration based on my own personal knowledge.  If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

2.      I am informed that Oakland and Alameda collectively purchased over $1.3 billion of Guaranteed Investment Contracts ("GICs"), swaps, float and forward delivery agreements, and other Municipal Derivative products during the class period.

3.      I am informed that the City of Fresno purchased over $500 million of one type of these products, GICs, during the class period.

4.      A true and correct copy of the complaint filed by the City of Fresno in the Eastern District of California on July 17, 2008 is attached hereto as Exhibit A.

5.      In filing complaints on behalf of its clients, Lieff Cabraser conducted a

thorough and independent pre-filing investigation based on public sources, expert analysis and

its own experience in the field.

6.      Attached hereto as Exhibit B is a true and correct copy of an excerpt of

Bank of America's Form 10-K, dated February 28, 2008.

7.      Attached hereto as Exhibit C is a true and correct copy of the Department

of Justice's Corporate Leniency Policy.

I declare under penalty of perjury that the foregoing is true and correct.  Executed

this 18th day of July, 2008, in San Francisco, California.


                        _____/s/ *Eric B. Fastiff*_____
                                    ERIC B. FASTIFF

# EXHIBIT A

1  James C. Sanchez, City Attorney
   CITY OF FRESNO, CALIFORNIA
2  Fresno City Hall
   2600 Fresno Street, Second Floor
3  Fresno, California 93721-3600
   Telephone:     (559) 621-7500
4  Facsimile:     (559) 488-1084

5  Richard M. Heimann (SBN 63607)
   *rheimann@lchb.com*
6  Joseph R. Saveri (SBN 130064)
   *jsaveri@lchb.com*
7  Eric B. Fastiff (SBN 182260)
   *efastiff@lchb.com*
8  Jordan Elias (SBN 228731)
   *jelias@lchb.com*
9  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 30th Floor
10 San Francisco, California 94111
   Telephone:     (415) 956-1000
11 Facsimile:     (415) 956-1008

12 James A. Quadra (SBN 131084)
   *quadra@meqlaw.com*
13 Sylvia Sokol (SBN 200126)
   *sokol@meqlaw.com*
14 MOSCONE, EMBLIDGE & QUADRA, LLP
   220 Montgomery Street
15 Mills Tower, Suite 2100
   San Francisco, California 94104
16 Telephone:     (415) 362-3599
   Facsimile:     (415) 362-2006

17
   *Attorneys for Individual and Representative Plaintiff*
18 *City of Fresno, California*

19              UNITED STATES DISTRICT COURT

20              EASTERN DISTRICT OF CALIFORNIA

21 CITY OF FRESNO, CALIFORNIA, a Municipal        Case No.
   Corporation, on behalf of itself and all others
22 similarly situated,                            CLASS ACTION

23              Plaintiff,                        COMPLAINT FOR VIOLATIONS
                                                  OF THE SHERMAN ACT, THE
24       v.                                       CARTWRIGHT ACT,
                                                  AND THE UNFAIR
25 AIG FINANCIAL PRODUCTS CORP.; AIG              COMPETITION LAW
   SUNAMERICA LIFE ASSURANCE CO.; BANK
26 OF AMERICA CORPORATION; BANK OF
   AMERICA, N.A.; BEAR STEARNS                    JURY TRIAL DEMANDED
27 COMPANIES, INC.; CAIN BROTHERS &
   COMPANY, LLC; CDR FINANCIAL
28 *(caption continued on next page)*

774117.2                                          CLASS ACTION COMPLAINT

1  PRODUCTS, INC.; FINANCIAL GUARANTY
   INSURANCE CO.; FINANCIAL SECURITY
2  ASSURANCE HOLDINGS, LTD.; FIRST
   SOUTHWEST COMPANY; GE FUNDING
3  CAPITAL MARKET SERVICES, INC.;
   GENWORTH FINANCIAL, INC.; GENWORTH
4  FINANCIAL INVESTMENT MANAGEMENT,
   LLC; GEORGE K. BAUM & COMPANY;
5  INVESTMENT MANAGEMENT ADVISORY
   GROUP, INC.; JPMORGAN CHASE & CO.;
6  JPMORGAN CHASE BANK, N.A.; KINSELL
   NEWCOMB & DE DIOS, INC.; LEHMAN
7  BROTHERS INC.; MERRILL LYNCH & CO.
   INC.; MORGAN KEEGAN & CO., INC.;
8  MORGAN STANLEY; NATIONAL
   WESTMINSTER BANK plc; NATIXIS, S.A.;
9  PACKERKISS SECURITIES, INC.; PIPER
   JAFFRAY & CO.; SECURITY CAPITAL
10 ASSURANCE, INC.; SHOCKLEY FINANCIAL
   CORP.; SOCIÉTÉ GÉNÉRALE; SOUND
11 CAPITAL MANAGEMENT, INC.; TRINITY
   FUNDING COMPANY, LLC; UBS AG; UBS
12 SECURITIES LLC; UBS FINANCIAL SERVICES
   INC.; WACHOVIA BANK, N.A.; WACHOVIA
13 CORPORATION; WINTERS & CO. ADVISORS,
   LLC; XL ASSET FUNDING COMPANY 1 LLC;
14 XL CAPITAL, LTD.; and XL LIFE
   INSURANCE & ANNUITY COMPANY,
15
16              Defendants.

18        Plaintiff City of Fresno, California (hereafter "the City of Fresno" or "Plaintiff"),

19 individually and on behalf of a class of all those similarly situated, brings this action for treble

20 damages under the antitrust laws of the United States against Defendants, demands a trial by jury,

21 and alleges the following on information and belief except as to the contents of Paragraphs 1 and

22 16 which are based on personal knowledge:

23                          **NATURE OF THE CASE**

24        1.    The City of Fresno, California has issued hundreds of millions of dollars of

25 tax-free bonds since 1992 and has purchased Guaranteed Investment Contracts ("GICs") to allow

26 the City of Fresno to have funds available while earning either a higher rate of return than it

27 would if it had simply invested the proceeds in a savings account or a hedge against variable

28 interest rates.  For example, the City of Fresno and its constituent agencies issued tax-free

774117.2                              - 1 -                    CLASS ACTION COMPLAINT

1    municipal bonds, *inter alia*, to finance the construction of a parking garage at the Fresno

2    Convention Center, the renovation of Fresno Yosemite International Airport, the expansion of

3    Fresno's Exhibit Hall, and the creation and installation of new street lights.

4           2.     The City of Fresno alleges a nationwide conspiracy among Defendants to

5    rig bids, to allocate customers and markets, and to fix, raise, maintain, or stabilize the returns

6    received by the City of Fresno and the members of the Class for Municipal Derivatives (as

7    defined below), including but not limited to GICs, sold in the United States.

8           3.     The City of Fresno brings this action on behalf of itself and all entities that

9    contracted for Municipal Derivatives in the United States and its territories directly from

10    Municipal Derivatives Seller Defendants and Municipal Derivatives Broker Defendants, as

11    defined in this Complaint during the period from January 1, 1992 through December 31, 2007.

12    As a result of Defendants' unlawful conduct, the City of Fresno and the Class, as defined in this

13    Complaint, have paid supracompetitive prices for these products, and therefore suffered injury to

14    their business and property.

15                        **JURISDICTION AND VENUE**

16           4.     The City of Fresno brings this action pursuant to Section 4 of the Clayton

17    Act, 15 U.S.C. § 15, for treble damages, as well as reasonable attorneys' fees and costs of suit, for

18    Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act,

19    California Business and Professions Code § 16720, *et seq.*, and the California Unfair Competition

20    Law, Business and Professions Code § 17200, *et seq.*

21           5.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and

22    1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

23           6.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and

24    22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the

25    Defendants resided, transacted business, was found, or had agents in this district, and because a

26    substantial part of the events giving rise to the City of Fresno's claims occurred, and a substantial

27    portion of the affected interstate trade and commerce described below was carried out in this

28    district.

**INTRA-DISTRICT ASSIGNMENT**

7.     Pursuant to Local Rule 3-120(d), this action should be assigned to the Fresno Division based on the City of Fresno's location.

**DEFINITIONS**

8.     Bid:  As used herein, the term "Bid" means the Rate of Return offered by prospective Municipal Derivatives Sellers during the Competitive Bidding Process for GICs or the competitive processes by which other Municipal Derivatives are purchased by Government Entities.

9.     Competitive Bidding Process:  As used herein, the term "Competitive Bidding Process" means the process mandated by Treasury Regulation § 148.5, *et seq.*, and detailed below in Paragraphs 74 through 92, by which at least three Municipal Derivatives Sellers submit Bids to the Municipal Derivatives Broker retained by the Government Entity seeking to purchase a Guaranteed Investment Contract, as that term is defined herein.

10.     Government Entity:  As used herein, the term "Government Entity" means any state, local or municipal body or any subdivision thereof.  Excluded from the definition of Government Entity is any federal government body.

11.     Municipal Derivative:  As used herein, the term "Municipal Derivative" means a variety of financial instruments that Government Entities use to invest the proceeds of bond offerings while waiting to use bond proceeds for their purposes or to hedge and shift the interest-rate risk associated with the issuance of tax-exempt debt.  As used herein, the term Municipal Derivative encompasses all of the following types of transactions:

a.     Guaranteed Investment Contract ("GIC"):  "Guaranteed Investment Contract" or "GIC" is a security in which a Government Entity contracts with a Municipal Derivative Counterparty, typically an investment bank or bond insurer with an AAA or AA credit rating, to invest the proceeds of a municipal bond offering for a fixed amount of time in exchange for a series of payments at a guaranteed Rate of Return over the life of the contract.  A GIC is a Municipal Derivative, and are sometimes characterized as "forward purchase," "forward delivery or "repurchase" agreements (typically used for debt service funds), or as "unsecured" GICs

1    (typically used for capital projects and subject to provisions allowing investment principal to be

2    drawn down pursuant to a set schedule).  A GIC is similar to a bond, in that "principal" – the

3    proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate

4    of Return determined by the terms of the contract.

5             b.       Advance Refunding Escrow:  An "advance refunding escrow" is an

6    arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding

7    bond) are deposited into an escrow account for investment in an amount sufficient to pay the

8    principal of, and interest on, the underlying issue to be refunded on the original interest payment

9    and maturity dates.

10            c.       Swap:  A "swap" is a type of agreement frequently used to

11   minimize the interest rate risk Government Entities face when issuing large amounts of tax-

12   exempt debt obligations.  A swap involves two Counterparties – the Government Entity and a

13   Municipal Derivatives Seller – and is essentially the sale of an instrument and the simultaneous

14   purchase of another instrument for purposes of enhancing the Counterparties' respective holdings.

15   Government Entities use swaps to achieve desired tax results, or to alter or protect various

16   features of an existing municipal bond portfolio.  There are several types of swaps:  (a) floating-

17   for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-

18   rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices).

19   Government Entities, even those with sophisticated and experienced municipal finance

20   departments, retain a Municipal Derivatives Broker (including many of those named as

21   Defendants herein) as "swap advisors" to aid in the swap transaction.

22            d.       Option:  An "option" is one of two types of agreements used to

23   shift a Government Entity's tax-exempt securities holdings typically acquired in association with

24   issuance of municipal bonds.

25                     i.       A Put Option is a provision in a bond contract where the

26   investor has the right, on specified dates after required notification, to surrender the securities to

27   the issuer or the issuer's agent at the predetermined price (usually par value).

28

1    ii.    A <u>Call Option</u> is a transaction where the issuer repays to the

2  holder of an outstanding security the principal amount thereof (plus, in certain cases, an

3  additional amount representing a redemption premium) as a result of the issuer exercising a right

4  under the bond contract to repay the security prior to its scheduled maturity date (often referred to

5  as the "call").

6    e.    <u>Swaption</u>:  A "Swaption" is the combination of a Swap and an

7  Option.

8    f.    <u>Interest Rate Floors and Collars</u>:  Interest rate "floors" and "collars"

9  are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the

10  Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing

11  to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less

12  than a particular interest rate within range of interest rates (a "collar").

13    g.    <u>Forward Rate Agreements</u>:  An over-the-counter contract between

14  parties that determines the rate of interest to be paid or received on an obligation beginning at a

15  future start date.  The contract will determine the rates to be used along with the termination date

16  and notional value.  On this type of agreement, it is only the differential that is paid on the

17  notional amount of the contract.  Typically, for agreements dealing with interest rates, the parties

18  to the contract will exchange a fixed rate for a variable one.  The party paying the fixed rate is

19  usually referred to as the borrower, while the party receiving the fixed rate is referred to as the

20  lender.

21    12.    <u>Municipal Derivatives Broker</u>: As used herein, the term "Derivatives

22  Broker" means an entity retained by a Government Entity to oversee the processes, including the

23  Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased.

24  Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal

25  Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding

26  undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly

27  competitive means.  Derivatives Brokers enjoy mutually symbiotic and financially beneficial

28  relationships with large investment banks and insurance companies, and act as "finders" of

1    municipal securities business for the securities dealers or investment banks that often pay

2    kickbacks to the Municipal Derivatives Brokers in the form of finders' fees and monthly

3    retainers.

4        13.    Municipal Derivatives Counterparty:  As used herein, the term "Municipal

5    Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a

6    Government Entity contracts for a transaction involving the purchase of one or more of the

7    Municipal Derivatives described herein.

8        14.    Municipal Derivatives Seller: As used herein, the term "Derivatives Seller"

9    means an entity offering to enter into a Municipal Derivative transaction with a Government

10    Entity pursuant to the Competitive Bidding Process or other competitive process.

11        15.    Rate of Return: As used herein, the term "Rate of Return" means the fixed

12    amount, typically expressed as a percentage of the underlying bond proceeds amount or as a

13    specific interest rate, offered by a potential Municipal Derivatives Seller and ultimately received

14    by a Government Entity after it enters into the GIC or similar Municipal Derivative transaction

15    with a Municipal Derivatives Counterparty.  The Rate of Return is an element of the Competitive

16    Bidding Process where competition is intended to occur for the benefit of bond issues.  It was a

17    focus of Defendants' illegal bid-rigging and customer allocation scheme alleged herein.

18                                    **PARTIES**

19                                    **Plaintiff**

20        16.    Plaintiff, the City of Fresno, California, is a municipal corporation and a

21    Government Entity.  The City of Fresno purchased Municipal Derivatives, including from one or

22    more Derivatives Seller Defendants, pursuant to a Competitive Bidding Process during the Class

23    Period.  The City of Fresno purchased millions of dollars' worth of Municipal Derivatives from

24    one or more of the Derivatives Seller Defendants undertaken to purchase the Municipal

25    Derivatives.  As a result of the unlawful conspiracy alleged herein, the City of Fresno was injured

26    in its business or property.  The City of Fresno has contracted for its GICs with a variety of

27    brokers and underwriters, including defendants AIG Financial Products Corp., JPMorgan Chase

28    Bank, N.A., and XL Asset Funding 1, LLC, on which the Department of Justice has served

1  subpoenas, or informed their officers and employees they are targets of the investigation, as part

2  of its investigation into Municipal Derivative bid-rigging. The City of Fresno and its constituent

3  agencies purchased GICs in conjunction with, *inter alia*, debt financing of redevelopment

4  projects, expansion of the City's Exhibit Hall, construction projects at Fresno Yosemite

5  International Airport and the Fresno Convention Center, and the creation and installation of new

6  street lights.

7  **Municipal Derivatives Seller Defendants**

8  17.    Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware

9  corporation maintaining its principal place of business in Wilton, Connecticut.  It is a wholly

10  owned subsidiary of AIG International Inc.  During the Class Period, AIG Financial issued and

11  sold Municipal Derivatives to the City of Fresno and/or members of the Class in the United

12  States.

13  a.    AIG Financial is part of the Capital Markets arm of its parent

14  company AIG, and raises funds for AIG in part through investment in Municipal Derivatives.

15  b.    In November, 2006, AIG Financial received a subpoena from the

16  Antitrust Division of the United States Department of Justice in connection with its grand jury

17  investigation into anticompetitive conduct in the Municipal Derivatives business.

18  18.    Defendant AIG SunAmerica Life Assurance Co., ("AIG SunAmerica") is

19  an Arizona corporation maintaining its principal place of business in Los Angeles, California.

20  During the Class Period, AIG SunAmerica issued and sold Municipal Derivatives to the City of

21  Fresno and/or members of the Class in the United States.

22  a.    In November, 2006, AIG SunAmerica received a subpoena from

23  the Securities and Exchange Commission in connection with the SEC's investigation into

24  anticompetitive practices in the Municipal Derivatives industry.

25  19.    Defendant Bank of America Corporation ("BOA") is a Delaware

26  corporation with its principal place of business in Charlotte, North Carolina.  During the time

27  period covered by this complaint, Bank of America was headquartered in San Francisco,

28  California and conducted substantial business operations in this judicial district.  During the Class

1    Period, BOA issued and sold Municipal Derivatives to the City of Fresno and/or members of the

2    Class in the United States, either directly or through its wholly-owned subsidiary Defendant Bank

3    of America, N.A ("BANA").

4              20.    Defendant Bank of America, N.A. ("BANA"), a wholly-owned subsidiary

5    of Defendant BOA, is a Delaware corporation with its principal place of business in Charlotte,

6    North Carolina.  During the Class Period, BANA issued and sold Municipal Derivatives to the

7    City of Fresno and/or members of the Class in the United States.

8              a.    In November, 2006, BOA received subpoenas from the Antitrust

9    Division of the United States Department of Justice and the Securities and Exchange Commission

10   in connection with those agencies' investigations into anticompetitive conduct in the Municipal

11   Derivatives business.

12             b.    In February, 2007, BOA entered into a Corporate Conditional

13   Leniency agreement with the DOJ in connection with the antitrust investigation into

14   anticompetitive conduct in the Municipal Derivatives business, indicating that BOA had engaged

15   in potentially criminal anti-competitive conduct in relation to the Municipal Derivatives industry.

16   Such leniency agreements, which insulate the corporate applicant from criminal antitrust

17   prosecution as long as it cooperates, are only entered into after the cooperating company has

18   proactively offered the DOJ evidence of *per se* violations of the antitrust laws.  Such leniency

19   agreements only cover criminal antitrust violations, and do not insulate companies from criminal,

20   civil or administrative actions in other areas.

21             c.    On February 4, 2008, Defendant BOA's subsidiary BANA received

22   a so-called Wells notice from the SEC, advising the company that the SEC staff has

23   recommended that the SEC bring a civil or administrative action against BANA in connection

24   with its investigation of anticompetitive practices in the Municipal Derivatives industry.

25             d.    BOA and BANA are also targets of investigation by the Internal

26   Revenue Service ("IRS") in connection with anticompetitive practices in the Municipal

27   Derivatives industry.  In February, 2007, concurrently with its entrance into the DOJ's Corporate

28   Leniency agreement covering criminal antitrust violations,  BOA entered into an agreement with

1   the IRS related to BOA's role in providing GICs and other agreements in connection with certain
2   "blind pool" municipal bond transactions.

3              e.      BOA has also been implicated in a bid-rigging and kickback

4   scheme involving a large GIC that BOA sold to the City of Atlanta in 2002 that also involved

5   Derivative Broker Defendants CDR and Winters & Co. as well as Derivative Seller Defendants

6   UBS and Piper Jaffray.

7              21.      Defendant Bear Stearns Companies, Inc. ("Bear Stearns") is a Delaware

8   corporation with its principal place of business in New York, New York.  During the Class

9   Period, Bear Stearns issued and sold Municipal Derivatives to the City of Fresno and/or members

10   of the Class in the United States.

11              a.      The SEC has previously investigated Bearn Stearns' municipal

12   bond department and its municipal bond underwriting practices.

13              b.      Stephen Salvadore, currently the Senior Managing Director and

14   Manager of Municipal Capital Markets Derivatives and Investments at Bear Stearns, has

15   disclosed that he is a target of the grand jury convened in the Southern District of New York by

16   the Antitrust Division of the Department of Justice investigating antitrust and other violations

17   related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

18   kind received by Salvadore are an indication that the DOJ has substantial evidence of the

19   commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

20   plea agreement or cooperation deal.

21              c.      In addition, at least one former Bear Stearns employee is a target of

22   both the SEC and the grand jury convened in the Southern District of New York by the Antitrust

23   Division of the Department of Justice investigating antitrust and other violations related to

24   anticompetitive conduct in the Municipal Derivatives business.

25              d.      Patrick Marsh, who worked at Bear Stearns from 2000 to 2005 and

26   whose last position at the company was Managing Director and Chief of Municipal Structuring,

27   has disclosed that he was the recipient of a Wells notice from the SEC recommending civil or

28   administrative action against him in connection with securities violations related to bidding

1  procedures in the Municipal Derivatives industry during his tenure at Bear Stearns.  Marsh also

2  disclosed that he is a target of the grand jury convened in the Southern District of New York by

3  the Antitrust Division of the Department of Justice investigating antitrust and other violations

4  related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

5  kind received by Marsh are an indication that the DOJ has substantial evidence of the commission

6  of a federal crime and typically a sign that the recipient will soon be indicted absent a plea

7  agreement or cooperation deal.  Marsh was also subpoenaed by the SEC in connection with its

8  investigation into wrongdoing associated with municipal bond derivatives transactions in

9  Jefferson County, Alabama.

10       22.    Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware

11  corporation maintaining its principal place of business in New York, New York.  During the

12  Class Period, FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives

13  to the City of Fresno and/or members of the Class in the United States.

14            a.    FGIC has received a subpoena from the Securities and Exchange

15  Commission in connection with the SEC's investigation into anticompetitive practices in the

16  Municipal Derivatives industry.

17       23.    Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings")

18  is a New York corporation maintaining its principal place of business in New York, New York.

19  During the Class Period, FSA Holdings issued and sold Municipal Derivatives to the City of

20  Fresno and/or members of the Class in the United States, either directly or through its wholly-

21  owned subsidiary FSA Capital Management Services, LLC, ("FSA Capital"), a Delaware limited

22  liability company headquartered in New York City.

23            a.    In November, 2006 FSA Holdings received subpoenas from the

24  Antitrust Division of the United States Department of Justice and the Securities and Exchange

25  Commission in connection with those agencies' investigations into anticompetitive conduct in the

26  Municipal Derivatives business.

27            b.    On February 4, 2008, FSA Holdings received a so-called Wells

28  notice from the Philadelphia regional office of the SEC, informing the company that the SEC

1  staff had recommended civil or administrative action against FSA Holdings in connection with its

2  investigation into anticompetitive practices in the Municipal Derivatives industry.  The Wells

3  notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities

4  Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

5        24.    Defendant First Southwest Company ("First Southwest") is a Delaware

6  corporation with its principal place of business in Dallas, Texas.  During the Class Period, First

7  Southwest issued and sold Municipal Derivatives to the City of Fresno and/or members of the

8  Class in the United States.

9        a.    First Southwest has received a subpoena from the Securities and

10  Exchange Commission in connection with the SEC's investigation into anticompetitive practices

11  in the Municipal Derivatives industry.

12        25.    Defendant Genworth Financial, Inc. ("Genworth") is a New York

13  corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued

14  and sold Municipal Derivatives to the City of Fresno and/or members of the Class in the United

15  States.

16        26.    Defendant Genworth Financial Investment Management, LLC ("GFIM"),

17  formerly known as Genworth Financial Asset Management, LLC, is a Virginia corporation

18  maintaining its principal place of business at Richmond, Virginia.  Genworth issued and sold

19  Municipal Derivatives to the City of Fresno and/or members of the Class in the United States.

20        a.    GFIM received subpoenas from the Antitrust Division of the United

21  States Department of Justice and the Securities and Exchange Commission in connection with

22  those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

23        27.    Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a

24  Delaware corporation maintaining its principal place of business in New York, New York.  GE

25  Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

26  During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the

27  Class.

28

28.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware corporation maintaining its principal place of business in New York, New York.  During the Class Period, JPMorgan issued and sold Municipal Derivatives to the City of Fresno and/or members of the Class in the United States.

a.    In November, 2006, JPMorgan received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

b.    At least three former JPMorgan employees are targets of the Justice Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives industry.

c.    Samuel Gruer, who worked at JPMorgan from 1994 through 2006 and whose last position was Vice-President in the Derivatives Marketing unit of the company's Tax-Exempt Capital Markets Group, has disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the kind received by Gruer are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

d.    Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the kind received by Raz are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

e.    James Hertz, who worked at JPMorgan from 1994 until he was fired from the firm in January, 2008, has also disclosed that JPMorgan informed him that he was

1    under investigation by the DOJ for what Hertz described as "conduct on the municipal derivatives

2    marketing desk," an indication that the investigation involves JPMorgan's entire municipal

3    derivatives business, which necessarily includes Municipal Derivatives.  Target letters of the kind

4    received by Hertz are an indication that the DOJ has substantial evidence of the commission of a

5    federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

6    or cooperation deal.

7            29.    Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national

8    banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase.  During

9    the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to the City of Fresno

10   and/or members of the Class in the United States.

11           30.    Defendant Kinsell Newcomb & De Dios Inc. ("KND") is a California

12   corporation with its principal place of business in Solano Beach, California.  During the Class

13   Period, KND issued and sold Municipal Derivatives to the City of Fresno and/or members of the

14   Class in the United States.

15                   a.    KND has received subpoenas from the Antitrust Division of the

16   United States Department of Justice and the Securities and Exchange Commission in connection

17   with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

18   business.

19           31.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware

20   corporation maintaining its principal place of business in New York, New York.  During the

21   Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class.

22   Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

23           32.    Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware

24   corporation maintaining its principal place of business in New York, New York.  During the

25   Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

26           33.    Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation

27   maintaining its principal place of business in New York, New York.  During the Class Period,

28   Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

34.    Defendant National Westminster Bank plc ("NatWest") is a public limited corporation maintaining its principal place of business in London, England.  During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class.  NatWest is a subsidiary of Royal Bank of Scotland.

35.    Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate & Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place of business in Paris, France.  During the Class Period, Natixis issued and sold Municipal Derivatives to the City of Fresno and/or members of the Class in the United States.

a.    In November, 2006, Natixis' predecessor IXIS Corporate & Investment Bank received a subpoena from the Antitrust Division of the United States Department of Justice in connection with its grand jury investigation into anticompetitive conduct in the Municipal Derivatives business.

36.    Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to the City of Fresno and/or members of the Class in the United States.

a.    Piper Jaffray has received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

b.    James Towne, employed as Managing Director of Piper Jaffray's municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed him that he is under investigation by the Antitrust Division of the Department of Justice for potential antitrust and other violations relating to the Municipal Derivatives industry.

37.    Defendant Security Capital Assurance, Inc. ("Security Capital") is a foreign corporation maintaining its principal place of business in Hamilton, Bermuda.  During the Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd.

1   and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to the City of

2   Fresno and/or members of the Class in the United States.

3          38.    Defendant Société Générale ("SocGen") is a French corporation

4   headquartered in Paris.  During the Class Period, SocGen issued and sold Municipal Derivatives

5   to the City of Fresno and/or members of the Class in the United States, either directly or through

6   its wholly-owned subsidiaries Société Générale Americas, Inc., a Delaware corporation

7   headquartered in New York, New York and/or SG Americas Securities, LLC, a Delaware limited

8   liability corporation also headquartered in New York, New York.

9          a.    SocGen has received a subpoena from the Securities and Exchange

10  Commission in connection with the SEC's investigation into anticompetitive practices in the

11  Municipal Derivatives industry.

12         b.    SocGen's Municipal Derivatives business is being scrutinized by

13  the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered

14  by CDR.

15         39.    Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York

16  limited liability corporation maintaining its principal place of business in New York, New York.

17  GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

18  During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the

19  Class.

20         40.    Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters

21  in Basel, Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to

22  the City of Fresno and/or members of the Class in the United States, either directly or through its

23  wholly-owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

24         a.    In November, 2006, UBS received subpoenas from the Antitrust

25  Division of the United States Department of Justice and the Securities and Exchange Commission

26  in connection with those agencies' investigations into anticompetitive conduct in the Municipal

27  Derivatives business.

28

1        b.        On February 4, 2008, UBS received a so-called Wells notice from

2    the Philadelphia regional office of the SEC advising the company that the SEC staff had

3    recommended that the SEC bring a civil action against UBS in connection with the

4    anticompetitive practices associated with municipal bond derivatives.

5        c.        Peter Ghavami, until December 2007 the Managing Director and

6    Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently

7    disclosed that he is a target of the grand jury convened in the Southern District of New York by

8    the Antitrust Division of the Department of Justice investigating antitrust and other violations

9    related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

10   kind received by Ghavami are an indication that the DOJ has substantial evidence of the

11   commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

12   plea agreement or cooperation deal.

13       41.       Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is

14   a Delaware corporation with its principal place of business in New York, New York.  It is a

15   subsidiary of UBS AG.  During the Class Period, UBS Securities issued and sold Municipal

16   Derivatives to members of the Class.

17       42.       Defendant UBS Financial Services Inc. ("UBS Financial"), formerly

18   known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New

19   York, New York.  It is a subsidiary of UBS AG.  In 2000, UBS Financial was purchased by

20   Defendant UBS AG.  During the Class Period, UBS Financial issued and sold Municipal

21   Derivatives to members of the Class.

22       43.       Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina

23   corporation with its principal place of business in Charlotte, North Carolina.  During the Class

24   Period, Wachovia N.A. issued and sold Municipal Derivatives to the City of Fresno and/or

25   members of the Class in the United States.

26       44.       Defendant Wachovia Corporation ("Wachovia") is a North Carolina

27   corporation with its principal place of business in Charlotte, North Carolina.  During the Class

28   Period, Wachovia issued and sold Municipal Derivatives to the City of Fresno and/or members of

1   the Class in the United States either directly or through its wholly-owned subsidiary Defendant

2   Wachovia Bank, N.A. ("Wachovia N.A.").

3              a.    In November, 2006, Wachovia received subpoenas from the

4   Antitrust Division of the United States Department of Justice and the Securities and Exchange

5   Commission in connection with those agencies' investigations into anticompetitive conduct in the

6   Municipal Derivatives business.

7              b.    Both the DOJ and the SEC have advised Wachovia that they

8   believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid

9   municipal derivatives transactions.

10             c.    Two Wachovia N.A. employees working in the company's

11  Derivatives Marketing Department, Martin McConnell (the Managing Director of Marketing) and

12  Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the

13  grand jury convened in the Southern District of New York by the Antitrust Division of the

14  Department of Justice investigating antitrust and other violations related to anticompetitive

15  conduct in the Municipal Derivatives business.  Target letters of the kind received by McConnell

16  and Saunders are an indication that the DOJ has substantial evidence of the commission of a

17  federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

18  or cooperation deal.  Wachovia placed both Saunders – who worked for Defendant Bank of

19  America from 1998 through 2003 – and McConnell on administrative leave following their

20  disclosure that they were targets of the government's grand jury investigation.

21        45.    Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited

22  liability corporation maintaining its principal place of business in Schaumberg, Illinois.  During

23  the Class Period, XLAF issued and sold Municipal Derivatives to the City of Fresno and/or

24  members of the Class in the United States.

25             a.    XLAF received subpoenas from the Antitrust Division of the

26  United States Department of Justice and the Securities and Exchange Commission in connection

27  with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

28  business.

1    46.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance")

2    is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois.

3    During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to the City of

4    Fresno and/or members of the Class.

5    47.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation

6    maintaining its principal place of business in Hamilton, Bermuda.  During the Class Period, XL

7    Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding

8    1, LLC issued and sold Municipal Derivatives to the City of Fresno and/or members of the Class

9    in the United States.

10    **Municipal Derivatives Broker Defendants**

11    48.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited

12    liability corporation with its principal place of business in New York, New York.  During the

13    Class Period, Cain acted as a broker for members of the Class in purchasing Municipal

14    Derivatives from one or more of the Municipal Derivatives Seller Defendants.

15    a.    Cain was subpoenaed by the SEC in connection with its

16    investigation of anticompetitive practices in the Municipal Derivatives industry.

17    49.    Defendant CDR Financial Products, Inc. ("CDR") is a Delaware

18    corporation maintaining its principal place of business at Beverly Hills, California.  During the

19    Class Period, CDR acted as a broker for members of the Class in purchasing Municipal

20    Derivatives from one or more of the Municipal Derivatives Seller Defendants.

21    a.    CDR's California offices were raided by the FBI in November,

22    2006, at the start of the government's investigation into anticompetitive conduct in the Municipal

23    Derivatives market.

24    b.    CDR has been the subject of a series of long-standing federal

25    governmental investigations involving its dealings with other participants in the municipal

26    derivatives market, including Defendant Bank of America.

27    50.    Defendant George K. Baum & Company ("Baum") is a Missouri

28    corporation with its principal place of business in Kansas City, Missouri.  During the Class

1    Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives

2    from one or more of the Municipal Derivatives Seller Defendants.

3              a.    Baum was subpoenaed by the SEC in connection with its

4    investigation of anticompetitive practices in the Municipal Derivatives industry.

5              b.    Baum has been the target of previous governmental investigations

6    related to its Municipal Derivatives business.

7              c.    On November 10, 2006, Baum settled allegations with the IRS that

8    it diverted profits from municipal bond deals.  In one instance the IRS alleged that bidding was

9    rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in

10   1999 and issued by the Illinois Development Finance Authority.

11             51.   Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

12   Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania.

13   During the Class Period, IMAGE acted as a broker for members of the Class in purchasing

14   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

15             a.    IMAGE's Pennsylvania offices were raided by the FBI in

16   November, 2006, at the start of the government's investigation into anticompetitive conduct in the

17   Municipal Derivatives market.

18             52.   Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of

19   Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in

20   Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for members of

21   the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives

22   Seller Defendants.

23             a.    Morgan Keegan has received a subpoena from the Securities and

24   Exchange Commission in connection with the SEC's investigation into anticompetitive practices

25   in the Municipal Derivatives industry.

26             53.   Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida

27   corporation maintaining its principal place of business in Delray Beach, Florida.  During the

28

1  Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal

2  Derivatives from one or more of the Municipal Derivatives Seller Defendants.

3      54.    Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet

4  Inc., is a corporation maintaining its principal place of business in Aurora, Colorado.  During the

5  Class Period, Shockley acted as a broker for members of the Class in purchasing Municipal

6  Derivatives from one or more of the Municipal Derivatives Seller Defendants.

7      55.    Defendant Sound Capital Management, Inc. ("Sound Capital") is a

8  Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota.

9  During the Class Period, Sound Capital acted as a broker for members of the Class in purchasing

10  Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

11      a.    Sound Capital's Minnesota offices were raided by the FBI in

12  November, 2006, at the start of the government's investigation into anticompetitive conduct in the

13  Municipal Derivatives market.

14      56.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California

15  limited liability company maintaining its principal place of business in Los Angeles, California.

16  During the Class Period, Winters acted as a broker for members of the Class in purchasing

17  Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

18                              **CO-CONSPIRATORS**

19      57.    Various other persons, firms and corporations, not named as Defendants

20  herein, have participated as co-conspirators with Defendants and have performed acts and made

21  statements in furtherance of the conspiracy.

22      58.    Whenever in this Complaint reference is made to any act, deed or

23  transaction of any corporation, the allegation means that the corporation engaged in the act, deed

24  or transaction by or through its officers, directors, agents, employees or representatives while they

25  were actively engaged in the management, direction, control or transaction of the corporation's

26  business or affairs.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLASS ACTION ALLEGATIONS

59.     The City of Fresno brings this action on behalf of itself and as a class

action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil

Procedure on behalf of all members of the following Class:

> All state, local or municipal Government Entities and private
> entities in the United States and its territories that purchased
> Municipal Derivatives directly from one or more of the Municipal
> Derivatives Seller Defendants and/or through one or more of the
> Derivatives Broker Defendants at any time from January 1, 1992
> through December 31, 2007.  Excluded from the Class are all
> federal governmental entities and instrumentalities of the federal
> government.

60.     The City of Fresno does not know the exact number of Class members

because such information is in the exclusive control of Defendants.  But due to the nature of the

trade and commerce involved, the City of Fresno believes that there are hundreds or thousands of

Class members as described above, the exact number and their identities being known by

Defendants.

61.     The Class is so numerous and geographically dispersed that joinder of all

members is impracticable.

62.     There are questions of law and fact common to the Class, including:

a.     Whether Defendants and their co-conspirators engaged in a

combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective

prices of Municipal Derivatives sold in the United States;

b.     Whether Defendants and their co-conspirators engaged in a

combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the

United States;

c.     Whether Defendants and their co-conspirators engaged in a

combination and conspiracy among themselves to allocate customers and the markets for

Municipal Derivatives sold in the United States;

d.     The identity of the participants of the alleged conspiracy;

1          e.     The duration of the alleged conspiracy and the acts carried out by

2     Defendants and their co-conspirators in furtherance of the conspiracy;

3               f.     Whether the alleged conspiracy violated Section 1 of the Sherman

4     Act, 15 U.S.C. § 1;

5               g.     Whether the conduct of Defendants and their co-conspirators, as

6     alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code

7     § 16720, *et seq.*;

8               h.     Whether the conduct of Defendants and their co-conspirators, as

9     alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof.

10    Code § 17200, *et seq.*;

11              i.     Whether the conduct of Defendants and their co-conspirators, as

12    alleged in this Complaint, caused injury to the business or property of the City of Fresno and the

13    other members of the Class;

14              j.     The effect of the alleged conspiracy on the effective prices of

15    Municipal Derivatives sold in the United States during the Class Period;

16              k.     Whether the Defendants and their co-conspirators fraudulently

17    concealed the conspiracy's existence from the City of Fresno and the other members of the Class;

18    and

19              l.     The appropriate class-wide measure of damages.

20         63.     The City of Fresno is a member of the Class, the City of Fresno's claims

21    are typical of the claims of the Class members, and the City of Fresno will fairly and adequately

22    protect the interests of the Class.  The City of Fresno is a direct purchaser of Municipal

23    Derivatives, and its interests are coincident with, and not antagonistic to, those of the other

24    members of the Class.

25         64.     The City of Fresno is represented by counsel who are competent and

26    experienced in the prosecution of antitrust and class action litigation.

27

28

774117.2                              - 22 -                    CLASS ACTION COMPLAINT

65.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

66.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

**TRADE AND INTERSTATE COMMERCE**

68.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

69.     During the Class Period, Defendants and their co-conspirators issued and sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of interstate commerce to Government Entities located in states other than the states in which the Municipal Derivatives Seller Defendants issued and/or brokered these products.

70.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

**FACTS**

**The Market for Municipal Derivatives**

71.     Municipalities and state and local government agencies issue over $2 trillion worth of municipal bonds annually.

72.    While the tax-free bonds are sold in contemplation of construction, public housing or other public-works projects, municipalities have in the last decade opted to invest the proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk associated with the issuance of large amounts of tax-exempt debt.

73.    Municipal Derivatives have become an attractive investment vehicle for municipalities looking to park bond proceeds until the money raised from the sale is actually needed for capital projects, or to protect themselves from interest-rate risk associated with issuing their tax-exempt bonds.  There are roughly $40 - $60 billion in Municipal Derivatives created in the United States annually.

74.    The market for Municipal Derivatives has become more concentrated since the late 1990's, with an increasingly smaller number of investment banks and bond insurers occupying the market.

75.    The Municipal Derivatives industry has been variously described by market participants as opaque, intertwined and interconnected, all characteristics which facilitate the type of illegal collusion alleged herein.  The Municipal Derivatives market lacks transparency, and regulatory and private efforts to impose transparency have not been successful.  On July 26, 2007, the Chairman of the Securities and Exchange Commission delivered a white paper to Congress calling for improved oversight of the municipal securities market.

**The Competitive Bidding Process**

76.    A wide variety of Municipal Derivatives are sold through competitive bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers acting as their fiduciaries.

77.    The Competitive Bidding Process involving GICs is illustrative of the way many Government Entities purchase Municipal Derivatives, and indicative of the methods by which the Defendants have succeeded in manipulating these financial instruments pursuant to their bid-rigging and customer allocation conspiracy.

78.    Flush with proceeds from a muni bond sale, a Government Entity looks to invest in a GIC.  The Government Entity will retain a GIC Broker to facilitate the acquisition of

the contract.  The Government Entities typically pay a fee to the GIC Broker for shopping for GIC Bids.

79.    In the wake of the so-called "yield-burning" scandal of the 1980's and 1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged fees that acted to artificially reduce the yields on their underlying bond issues – the IRS promulgated regulations meant to ensure that Government Entities were purchasing Municipal Derivatives at a fair market value price.

80.    IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot exceed the yield of the municipal bond itself.  Any interest exceeding the bond rate of the tax-exempt bond investments is required to be rebated to the IRS, absent an exception.

81.    To satisfy these so-called arbitrage rules, any given GIC is structured to limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond whose issuance financed the investment in the GIC in the first place.  The Rate of Return any particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively capped.

82.    Treasury Regulations related to Municipal Derivatives are aimed at ensuring that Government Entities get competitive bids on the interest rate a Municipal Derivatives Seller pays the municipalities under the terms of the GIC.  According to Treasury Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain procedures.  Essentially, there should be at least three reasonably competitive bids solicited from Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid – that is, no bidder can have a "last look" to review other bids before bidding on the contract. Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an entity with "an established industry reputation" as a competitive Municipal Derivatives Seller. The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging has occurred.

1           83.     The Municipal Derivatives Broker, acting as the fiduciary to the

2    Government Entity, oversees the solicitation and placement of the bids from Municipal

3    Derivatives Sellers.

4           84.     After hiring a Municipal Derivatives Broker to oversee the solicitation of

5    GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the

6    Competitive Bidding Process.

7           85.     The parties to a GIC are the Municipal Derivatives Seller, acting as the

8    Counterparty and the Government Entity.  The Municipal Derivatives Seller now acting as the

9    Counterparty supplies the most salient term, namely the Rate of Return on the investment.

10          86.     The GIC entitles the Government Entity to receive the return of the

11   Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to

12   withdraw principal from the GIC as permitted.

13          87.     Generally, a Government Entity will acquire a GIC in order to invest funds

14   on deposit in a debt service reserve fund or construction fund until it needs to use such funds to

15   service debt or fund the payment of project expenses in accordance with the underlying bond

16   documents.

17          88.     In exchange for the payment of a guaranteed Rate of Return to the

18   Government Entity, and the full repayment of all principal on a date certain, the Municipal

19   Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity.

20   The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of

21   Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns

22   the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to

23   whatever investment the Municipal Derivatives Counterparty chooses.

24          89.     The Competitive Bidding Process outlined in the Treasury Regulations

25   mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids

26   from Municipal Derivatives Sellers.  Each bidder typically faxes its Bid into the Municipal

27   Derivatives Broker, which collects the ostensibly competitive Bids and informs the Government

28

1   Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and

2   the time each Bid was received.

3          90.     Each GIC Bid includes a warranty  that the Bid was determined without

4   regard to any other formal or informal agreement with another Municipal Derivatives Seller, and

5   that the Bid was not submitted solely as a so-called "courtesy" Bid.

6          91.     The Municipal Derivatives Seller that offers the highest-yielding Rate of

7   Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding

8   Process.

9          92.     The vast majority of GICs purchased in the United States are purchased

10  pursuant to the competitive bidding process established by Treasury Regulation § 1.148-5 *et seq.*,

11  which has been in effect since approximately 1993, and which contains only some of the Treasury

12  Regulations governing the reinvestment of municipal bond proceeds.

13         93.     The GIC bidding and purchasing process, as well as those processes

14  relating to the purchase of other types of Municipal Derivatives, are susceptible to abuse even

15  when dealings involve sophisticated and experienced Government Entities.

16         94.     Even sophisticated Government Entities (who rely in large part on the

17  Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are

18  the target of the bid-rigging and customer allocation conspiracy alleged herein.

19                       **The Bid-Rigging Conspiracy**

20         95.     The potential for bid-rigging in any given GIC transaction exists in the

21  exploitation of the Rate of Return that a particular GIC Seller is willing to offer to a Government

22  Entity looking to invest its bond proceeds.  The Municipal Derivatives Seller Defendants, aided

23  by the Municipal Derivatives Broker Defendants, have turned the Treasury Regulations into a

24  travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

25         96.     The Municipal Derivatives Seller Defendants, in concert with the

26  Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal

27  Derivatives bought by Government Entities as part of their bid-rigging and customer allocation

28  conspiracy.

1    97.    Bid-rigging of GIC transactions, which are illustrative of anticompetitive

2    conduct in the overall market for Municipal Derivatives, typically occurs when only one firm

3    submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids

4    offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

5    98.    Other times, bids are late or incomplete, leaving only one viable bid for the

6    Government Entity to choose from.

7    99.    Although at least one market participant has attempted to add transparency

8    to the market by developing a web-based bid auction service, GIC Bids are traditionally done

9    over the phone or sent to Municipal Derivatives Brokers via fax, facilitating collusion of the type

10    alleged herein.

11    100.    At least one investment bank has provided the government with transcripts

12    of telephone conversations that indicated that the investment bank and other market participants

13    were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

14    101.    While the winning bid may be financially viable in light of the Treasury

15    Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and

16    does not necessarily provide the Government Entity with the best possible Rate of Return on the

17    investment it is seeking by buying the GIC.

18    102.    The unrealistically low bids – dubbed "courtesy bids" because they are

19    provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is

20    below fair market value – are often more than 100 basis points below the winning bid.  As Mark

21    Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005,

22    "When a bid is 100 to 150 basis points below the market and there is no justification for that

23    being so low, one of the assumption you can draw is that there are courtesy bids being provided."

24    103.    Often the winning bid is the only one high enough to make the GIC work

25    and be a worthwhile reinvestment vehicle for the Government Entity.

26    104.    According to a speaker at a teleconference organized by the National

27    Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of

28    courtesy bids in GICs transactions is common.  IRS officials have stated that bid-rigging is a wide

1  and pervasive practice in GIC transactions and have uncovered numerous transactions involving

2  rigged bids and customer allocation.  A number of these transactions involve both the Municipal

3  Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

4        105.    Municipal Derivatives Brokers also routinely offer favored Municipal

5  Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even

6  exclude potential bidders without the Government Entity's knowledge.

7        106.    Evidence seized by the federal government as part of its wide-ranging

8  investigation, including taped telephone conversations, revealed instances in which the winning

9  bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for

10  preferential treatment in later deals.

11        107.    As part of its ongoing investigation into these practices, the IRS also

12  uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for

13  the GIC – that is, provide a less than fair market value interest rate – and then overpay the

14  Municipal Derivatives Broker for other investment agreements or remarketing fees associated

15  with the GIC, a form of kickback that may jeopardize the tax-exempt status of the underlying

16  bond or result in excess "arbitrage" paid to the federal government.

17                **Governmental Investigations of Defendants' Conspiracy**

18        108.    On Wednesday, November 15, 2006, the FBI began a series of nationwide

19  raids on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker

20  Defendants.  The FBI raids coincided with the service of nearly two dozen subpoenas on other

21  participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers

22  named as Defendants herein.

23        109.    The DOJ's Antitrust Division served subpoenas from a grand jury sitting in

24  the Southern District of New York, and a number of the targeted companies revealed that they

25  had also received subpoenas from the Securities and Exchange Commission in connection with a

26  parallel civil probe.

27        110.    The Antitrust Division is conducting a criminal probe into anticompetitive

28  conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging

1  market participants with continuing acts of conspiracy, and (as detailed above) have targeted a

2  number of individuals for indictment.

3          111.    The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused

4  on securities fraud in municipal bond deals undertaken since 2000.  Upon information and belief,

5  the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme

6  involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary

7  corollary to the conspiracy alleged herein.  Such non-disclosure of kickbacks to Municipal

8  Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may

9  subject them to potentially excessive arbitrage payments to the federal government.

10         112.    The DOJ and SEC investigations follow a lengthy and continuing probe by

11  the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

12         113.    The Justice Department subpoenas asked for documents, e-mails, tapes or

13  notes of phone conversations and other information regarding "contracts involving the investment

14  or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as

15  well as] related transactions involving the management or transferal of the interest rate risk

16  associated with those bonds, including but not limited to [GICs], forward supply, purchase or

17  delivery agreements; repurchase agreements; swaps; options; and swaptions."

18         114.    The subpoenas also demanded organizational charts, phone directories, and

19  lists of all employees involved with Municipal Derivatives, in addition to all documents

20  associated with what the subpoenas apparently described as "relevant municipal contracts

21  awarded or intended to be awarded pursuant to competitive bidding," which would include

22  invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients;

23  actual or proposed responses to those RFPs; and amounts and prices bid for the various

24  investment vehicles.

25         115.    On February 9, 2007, Defendant Bank of America announced that it

26  entered into a leniency agreement with the Justice Department in connection with what it

27  described as "the Department's investigation into anticompetitive practices in the municipal

28  derivatives industry."

116.   Defendant Bank of America noted that the amnesty grant "was the result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation."

117.   Entry into the DOJ's amnesty program follows presentation of evidence of a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America. Evidence of Defendant Bank of America's dealings, including recorded telephone conversations of traders giving courtesy bids, was one of the key galvanizers of the criminal investigation.  Key derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the head of BOA's derivatives department.

118.   Defendant Bank of America also disclosed that it had reached a $14.7 million settlement with the IRS relating to the company's role in providing GICs and other agreements to municipal bond issuers.

119.   As detailed in Paragraphs 16 to 53 above, a number of individuals have been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives Seller Defendants are facing civil and administrative actions from the SEC in relation to that agency's investigation into anticompetitive practices in the Municipal Derivatives market.

**FRAUDULENT CONCEALMENT**

120.   The City of Fresno and members of the Class had no knowledge of the agreement, contract, combination, and conspiracy alleged in this Complaint, or of any facts that might have led to the discovery thereof, until shortly before the filing of this action.  The City of Fresno could not have discovered the agreement, contract, combination, and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and methods of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their agreement, contract, combination, and conspiracy.  These methods of secrecy included, but were not limited to, secret meetings, misrepresentations concerning the reasons for price increases, encouraging witnesses to give false testimony to the grand jury and government officials, and destroying or concealing evidence of their illegal conduct.

1    121.    The affirmative acts of the Defendants alleged herein, including acts in

2    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

3    precluded detection.

4    122.    By its very nature, Defendants' bid-rigging and customer-allocation

5    conspiracy was inherently self-concealing.  The Municipal Derivatives industry is not exempt

6    from antitrust regulation, and thus the City of Fresno reasonably considered it to be a well-

7    regulated competitive industry.

8    123.    In the context of the circumstances surrounding Defendants' pricing

9    practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a

10    reasonable person that defendants' bidding and pricing were conspiratorial.  Accordingly, a

11    reasonable person under the circumstances would not have been alerted to investigate the

12    legitimacy of Defendants' proffered Municipal Derivatives prices.

13    124.    The City of Fresno and members of the Class could not have discovered

14    the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable

15    diligence because of the deceptive practices and techniques of secrecy employed by Defendants

16    and their co-conspirators to avoid detection of, and fraudulently conceal, their contract,

17    combination or conspiracy.  Such practices are especially prevalent in bid-rigging and customer-

18    allocation conspiracies such as the one alleged herein.

19    125.    Because the alleged conspiracy was both self-concealing and affirmatively

20    concealed by Defendants and their co-conspirators, the City of Fresno and members of the Class

21    had no knowledge of the alleged conspiracy, or of any facts or information that would have

22    caused a reasonably diligent person to investigate whether a conspiracy existed.

23    126.    As a result of Defendants' fraudulent concealment of their conspiracy, the

24    running of any statute of limitations has been tolled with respect to any claims that the City of

25    Fresno and members of the Class have alleged in this Complaint.

26    127.    Throughout the Class Period, Defendants and their co-conspirators

27    affirmatively and fraudulently concealed their unlawful conduct.

28

1    128.    The City of Fresno and the Class members did not discover, nor could have

2    discovered through reasonable diligence, that Defendants and their co-conspirators were violating

3    the antitrust laws until before this litigation was commenced because Defendants and their co-

4    conspirators used and continue to use deceptive and secret methods to avoid detection and to

5    affirmatively conceal their violations.  Nor could the City of Fresno or the Class members have

6    discovered the violations earlier than that time because Defendants and their co-conspirators

7    conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in

8    furtherance thereof, and fraudulently concealed their activities through various other means and

9    methods designed to avoid detection.

10    129.    Defendants and their co-conspirators engaged in a successful

11    anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively

12    concealed, at least in the following respects:

13        a.    By meeting secretly to discuss effective prices, bids, and customers

14    and markets of Municipal Derivatives in the U.S.;

15        b.    By agreeing among themselves not to discuss publicly, or otherwise

16    reveal, the nature and substance of the acts and communications in furtherance of their illegal

17    scheme;

18        c.    By intentionally creating the false appearance of competition by

19    staging sham auctions in which the results were pre-determined; and

20        d.    By furnishing each other participant in all given bidding sessions

21    with illegal "last looks" at their ostensible competitors' bids.

22    130.    The City of Fresno and Class members did not know, and could not have

23    discovered through reasonable diligence, that the auctions arranged by the Derivatives Broker

24    Defendants were sham, and that rather than being competitive, the results of the auctions were

25    rigged.

26    131.    As a result of Defendants' fraudulent concealment, all applicable statutes

27    of limitations affecting the City of Fresno's and the Class' claims have been tolled.

28

1

## CLAIMS FOR RELIEF

2

### FIRST CLAIM FOR RELIEF
(Violation of Section 1 of the Sherman Act)

3

4    132.    From as early as January 1, 1992 through the present, Defendants and their

5    co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the

6    sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and

7    commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

8    133.    The contract, combination or conspiracy consisted of an agreement among

9    the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially

10    supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and

11    markets for Municipal Derivatives in the United States.

12    134.    In formulating and effectuating this conspiracy, Defendants and their co-

13    conspirators did those things that they combined and conspired to do, including:

14    a.    participating in meetings and conversations among themselves

15    during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix,

16    increase, maintain or stabilize effective prices paid by the City of Fresno and members of the

17    Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate

18    customers and markets of Municipal Derivatives;

19    b.    arranging sham auctions among the Municipal Derivatives Seller

20    Defendants that were designed to create the appearance of competition for the sale of Municipal

21    Derivatives, but in which the result had been agreed upon among the Defendants and co-

22    conspirators;

23    c.    allocating customers and markets for Municipal Derivatives in the

24    United States in furtherance of their agreements;

25    d.    rigging bids for Municipal Derivatives sold in the United States;

26    and

27    e.    participating in meetings and conversations among themselves to

28    implement, adhere and police the agreements they reached.

135.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

136.    The Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

a.    Effective prices paid by the City of Fresno and the members of the Class with respect to Municipal Derivatives were fixed, stabilized and maintained at artificially low and non-competitive levels in the United States;

b.    Bids for Municipal Derivatives sold in the United States were rigged;

c.    Customers and markets for Municipal Derivatives were allocated among Defendants and their co-conspirators;

d.    The City of Fresno and the other members of the Class paid more or received lower Rates of Return for the Municipal Derivatives they purchased than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

e.    Price competition with respect to the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

f.    As a direct and proximate result of the illegal combination, contract or conspiracy, the City of Fresno and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined, by being deprived of the highest-allowable interest rate on its Municipal Derivatives investment.  The courtesy (sometimes also called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the Government Entities by creating the appearance of competition to conceal the secretly deflated interest rate offers.

1

**SECOND CLAIM FOR RELIEF**
**(Violation of the California Cartwright Act,**
2
**Cal. Bus. & Prof. Code section 16720, *et seq.*)**

3          137.    The City of Fresno, on behalf of itself and all others similarly situated,

4   realleges and incorporates, as if fully alleged herein, each of the allegations contained in the

5   preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

6          138.    The unlawful conduct of Defendants, including the Defendants

7   headquartered or based in California, was centered in and carried out within California, and

8   Defendants' conduct within California injured all members of the Class throughout the United

9   States.  Therefore, this claim for relief under California law is brought on behalf of all members

10  of the Class, whether or not they are California residents.

11         139.    Beginning at least as early as January 1, 1992 through the present, the exact

12  dates being unknown to the City of Fresno, Defendants and various co-conspirators entered into

13  and engaged in a continuing unlawful trust in restraint of the trade and commerce described above

14  in violation of Section 16720, California Business and Professional Code. Defendants, and each

15  of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of,

16  allocate markets and rig bids for, Municipal Derivatives.

17         140.    For the purpose of forming and implementing the alleged combinations,

18  trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did

19  those things they conspired to do, including but not limited to the acts alleged above, including

20  actions:

21                 a.      to fix, raise, maintain and stabilize the price of Municipal

22  Derivatives;

23                 b.      to allocate markets for Municipal Derivatives amongst themselves;

24  and

25                 c.      to submit rigged bids for Municipal Derivatives.

26         141.    In formulating and carrying out the alleged combinations, trusts,

27  agreements, understandings and concert of action, Defendants and their co-conspirators engaged

28  in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

1    maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

2    Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

3    contract, combination, and conspiracy.

4         142.    The combination and conspiracy alleged herein has had the following

5    effects, among others:

6         a.    Price competition in the sale of Municipal Derivatives has been

7    restrained, suppressed and/or eliminated in the State of California and throughout the United

8    States;

9         b.    Prices for Municipal Derivatives sold by Defendants and their

10    co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

11    competitive levels in the State of California and throughout the United States; and

12         c.    Those who purchased Municipal Derivatives from Defendants and

13    their co-conspirators have been deprived of the benefit of free and open competition.

14         143.    As a direct and proximate result of the illegal combination, trust,

15    agreement, understanding and concert of action, the City of Fresno and the members of the Class

16    have been injured in their business and property in that they paid more for Municipal Derivatives

17    than they otherwise would have paid in the absence of Defendants' unlawful conduct.

18         144.    As a result of Defendants' violation of Section 16720 of the California

19    Business and Professions Code, the City of Fresno seeks treble damages and the costs of suit,

20    including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

21    Professions Code.

22    **THIRD CLAIM FOR RELIEF**
   **(Violation of the California Unfair Competition Law,**
23    **Cal. Bus. & Prof. Code section 17200, *et seq*.)**

24         145.    The City of Fresno, on behalf of itself and all others similarly situated,

25    realleges and incorporates, as if fully alleged herein, each of the allegations contained in the

26    preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

27         146.    Defendants' unlawful conduct was centered in, carried out and perfected

28    mainly within the State of California, and Defendants' conduct within California injured all

1    members of the Class throughout the United States.  Therefore, this claim for relief under

2    California law is brought on behalf of all members of the Class, whether or not they are

3    California residents.

4            147.    Beginning at least as early as January 1, 1992 and continuing to the

5    present, the exact dates being unknown to the City of Fresno, Defendants committed acts of

6    unfair competition, as defined by Sections 17200, *et seq*. of the California Business and

7    Professions Code, commonly known as the Unfair Competition Law, by engaging in the acts and

8    practices specified above.

9            148.    The City of Fresno and the members of the Class bring this claim pursuant

10    to Sections 17203 and 17204 of the California Business and Professions Code, to obtain

11    restitution and/or disgorgement from these Defendants for acts, as alleged herein, that violate the

12    Unfair Competition Law.

13            149.    Defendants' acts, omissions, misrepresentations, practices and non-

14    disclosures, as alleged herein, constitute a common course of conduct of unfair competition by

15    means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

16    California Business and Professions Code, Section 17200, *et seq*., in that, for example:

17            a.    the violations of Section 16720, *et seq*., of the California Business

18    and Professions Code, set forth above;

19            b.    the acts described above violate the Sherman Act, 15 U.S.C. § 1;

20            c.    Defendants' acts, omissions, misrepresentations, practices and

21    nondisclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the

22    California Business and Professions Code, and whether or not concerted or independent acts, are

23    otherwise unfair, unconscionable, unlawful or fraudulent;

24            d.    Defendants' acts and practices are unfair to consumers of Municipal

25    Derivatives in the State of California and throughout the United States, within the meaning of

26    Section 17200, California Business and Professions Code; and

27            e.    Defendants' acts and practices are fraudulent or deceptive within

28    the meaning of Section 17200 of the California Business and Professions Code.

150.     The City of Fresno and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

151.     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused the City of Fresno and the members of the Class to pay supra-competitive and artificially-inflated prices for Municipal Derivatives.  The City of Fresno and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

152.     The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

153.     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. The City of Fresno and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for relief as follows:

1.     That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that the City of Fresno be certified as a class representative and the City of Fresno's counsel be appointed as counsel for the Class;

2.     That the unlawful contract, combination or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the Cartwright Act);

1         3.      That the unlawful contract, combination or conspiracy alleged be adjudged

2  and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the

3  California Business & Professions Code (the Unfair Competition Law);

4         4.      That the City of Fresno and the Class recover damages and restitution, as

5  provided by law, determined to have been sustained as to each of them, in an amount to be trebled

6  in accordance with the antitrust laws, and that judgment be entered against defendants on behalf

7  of the City of Fresno and of the Class;

8         5.      That the City of Fresno and the Class recover their costs of the suit,

9  including attorneys' fees, as provided by law; and

10        6.      For such other and further relief as is just under the circumstances.

## **DEMAND FOR JURY TRIAL**

12         Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

13  a jury trial as to all issues so triable.

Dated: July 17, 2008         By:   */s/ Eric B. Fastiff*

James C. Sanchez, City Attorney
CITY OF FRESNO, CALIFORNIA
Fresno City Hall
2600 Fresno Street, Second Floor
Fresno, California 93721-3600
Telephone:    (559) 621-7500
Facsimile:    (559) 488-1084

Richard M. Heimann (SBN 63607)
*rheimann@lchb.com*
Joseph R. Saveri (SBN 130064)
*jsaveri@lchb.com*
Eric B. Fastiff (SBN 182260)
*efastiff@lchb.com*
Jordan Elias (SBN 228731)
*jelias@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

1

James A. Quadra (SBN 131084)
*quadra@meqlaw.com*

2

Sylvia Sokol (SBN 200126)
*sokol@meqlaw.com*

3

MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street

4

Mills Tower, Suite 2100
San Francisco, CA 94104

5

Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

6

7

Steven E. Fineman (SBN 140335)
*sfineman@lchb.com*

Daniel E. Seltz

8

*dseltz@lchb.com*
Michael J. Miarmi

9

*mmiarmi@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

10

780 Third Avenue, 48th Floor
New York, NY  10017

11

Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

12

13

*Attorneys for Individual and Representative Plaintiff*
*City of Fresno, California*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

### ANNUAL REPORT
### PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**(Mark One)**

[✓]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2007

or

[   ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from          to

**Commission file number:**

1-6523

**Exact Name of Registrant as Specified in its Charter:**

# Bank of America Corporation

**State or Other Jurisdiction of Incorporation or Organization:**
Delaware

**IRS Employer Identification No.:**
56-0906609

**Address of Principal Executive Offices:**
Bank of America Corporate Center
100 N. Tryon Street
Charlotte, North Carolina 28255

**Registrant's telephone number, including area code:**
(704) 386-5681

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock | New York Stock Exchange |
| | London Stock Exchange |
| | Tokyo Stock Exchange |
| Depositary Shares, Each Representing a 1/1000th interest in a share of 6.204% Non-Cumulative Preferred Stock, Series D | New York Stock Exchange |
| Depositary Shares, Each Representing a 1/1,000th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series E | New York Stock Exchange |
| Depositary Shares, Each Representing a 1/1,000th interest in a share of 6.625% Non-Cumulative Preferred Stock, Series I | New York Stock Exchange |
| Depositary Shares, Each Representing a 1/1,000th interest in a share of 7.25% Non-Cumulative Preferred Stock, Series J | New York Stock Exchange |
| 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series L | New York Stock Exchange |
| Minimum Return Index EAGLES[SM], due June 1, 2010, Linked to the +Nasdaq-100 Index* | American Stock Exchange |
| Minimum Return Index EAGLES*, due June 28, 2010, Linked to the S&P 500* Index | American Stock Exchange |
| Minimum Return – Return Linked Notes, due June 24, 2010, Linked to the Nikkei 225 Index | American Stock Exchange |
| Minimum Return Basket EAGLES[SM], due August 2, 2010, Linked to a Basket of Energy Stocks | American Stock Exchange |
| Minimum Return Index EAGLES*, due August 28, 2009, Linked to the Russell 2000* Index | American Stock Exchange |
| Minimum Return Index EAGLES*, due September 25, 2009, Linked to the Dow Jones Industrial Average[SM] | American Stock Exchange |
| Minimum Return Index EAGLES*, due October 29, 2010, Linked to the Nasdaq-100 Index* | American Stock Exchange |
| 1.50% Index CYCLES[TM], due November 26, 2010, Linked to the S&P 500* Index | American Stock Exchange |

price in certain initial public offerings (IPOs). The complaints, which have been filed by both purchasers and certain issuers in IPOs, seek treble damages and injunctive relief. On February 24, 2004, the District Court granted defendants' motion to dismiss as to the purchasers' damages claims. On April 18, 2006, the District Court denied class certification with respect to the issuers' damages claims. On September 11, 2007, the U.S. Court of Appeals for the Second Circuit reversed the order denying class certification as to the issuers' damages claims and remanded the case to the District Court for further class certification proceedings.

### Interchange Antitrust Litigation and Visa-Related Litigation

The Corporation and certain of its subsidiaries are defendants in putative class actions filed on behalf of retail merchants that accept Visa and MasterCard payment cards. Additional defendants include Visa, MasterCard, and other financial institutions. Plaintiffs' First Consolidated and Amended Class Action Complaint alleges that the defendants conspired to fix the level of interchange and merchant discount fees and that certain other practices, including various Visa and MasterCard rules, violate federal and California antitrust laws. Plaintiffs also filed a supplemental complaint against certain defendants, including the Corporation and certain of its subsidiaries, alleging federal antitrust claims and a fraudulent conveyance claim arising out of MasterCard's 2006 initial public offering. The putative class plaintiffs seek unspecified treble damages and injunctive relief. The actions are coordinated for pre-trial proceedings in the U.S. District Court for the Eastern District of New York with individual actions brought only against Visa and MasterCard under the caption *In Re Payment Card Interchange Fee and Merchant Discount Anti-Trust Litigation (Interchange)*. On January 8, 2008, the District Court dismissed all claims for pre-2004 damages. A motion to dismiss the supplemental complaint is pending.

The Corporation and certain of its subsidiaries have entered into agreements that provide for sharing liabilities in connection with antitrust litigation against Visa (the Visa-Related Litigation), including *Discover Financial Services. v. Visa U.S.A., et al.*, pending in the U.S. District Court for the Southern District of New York, which alleges that Visa and others unlawfully inhibited competition in the payment card industry, and *Interchange*. The agreements also provide for sharing liabilities in connection with *American Express Travel Related Services Company v. Visa USA, et al.*, which was settled by Visa in November 2007. Under these agreements, the Corporation's obligations to Visa are capped at the Corporation's membership interest of 12.1% in Visa USA. In November 2007, Visa Inc. filed a registration statement with the SEC with respect to a proposed initial public offering (Visa IPO). Subject to market conditions and other factors, Visa Inc. states that it expects the Visa IPO to occur in the first quarter of 2008. The Corporation expects that a portion of the proceeds from the Visa IPO will be used by Visa Inc. to fund liabilities arising from the Visa-Related Litigation.

### Miller

On August 13, 1998, a predecessor of BANA was named as a defendant in a class action filed in Superior Court of California, County of San Francisco, entitled *Paul J. Miller v. Bank of America, N.A.*, challenging its practice of debiting accounts that received, by direct deposit, governmental benefits to repay fees incurred in those accounts. The action alleges, among other claims, fraud, negligent misrepresentation and other violations of California law. On October 16, 2001, a class was certified consisting of more than one million California residents who have, had or will have, at any time after August 13, 1994, a deposit account with BANA into which payments of public benefits are or have been directly deposited by the government.

On March 4, 2005, the trial court entered a judgment that purported to award the class restitution in the amount of $284 million, plus attorneys' fees, and provided that class members whose accounts were assessed an insufficient funds fee in violation of law suffered substantial emotional or economic harm and, therefore, are entitled to an additional $1,000 statutory penalty. The judgment also purported to enjoin BANA, among other things, from engaging in the account balancing practices at issue. On November 22, 2005, the California Court of Appeal stayed the judgment, including the injunction, pending appeal.

On November 20, 2006, the California Court of Appeal reversed the judgment in its entirety, holding that BANA's practice did not constitute a violation of California law. On March 21, 2007, the California Supreme Court granted plaintiff's petition to review the Court of Appeal's decision.

### Municipal Derivatives Matters

The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA, from the early 1990s to date. The activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, BANA received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.

On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed. Subject to satisfying DOJ and the court presiding over any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages in certain types of related civil antitrust actions, and (ii) relief from joint and several antitrust liability with other civil defendants.

### Parmalat Finanziaria S.p.A.

On December 24, 2003, Parmalat Finanziaria S.p.A. was admitted into insolvency proceedings in Italy, known as "extraordinary administration." The Corporation, through certain of its subsidiaries, including BANA, provided financial services and extended credit to Parmalat and its related entities. On June 21, 2004, Extraordinary Commissioner Dr. Enrico Bondi filed with the Italian Ministry of Production Activities a plan of reorganization for the restructuring of the companies of the Parmalat group that are included in the Italian extraordinary administration proceeding.

In July 2004, the Italian Ministry of Production Activities approved the Extraordinary Commissioner's restructuring plan, as amended, for the Parmalat group companies that are included in the Italian extraordinary administration proceeding. This plan was approved by the voting creditors and the Court of Parma, Italy in October of 2005.

Litigation and investigations relating to Parmalat are pending in both Italy and the United States, and the Corporation is responding to inquiries concerning Parmalat from regulatory and law enforcement authorities in Italy and the United States.

EXHIBIT C



# Department of Justice

---

## CORPORATE LENIENCY POLICY

The Division has a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions.  "Leniency" means not charging such a firm criminally for the activity being reported.  (The policy also is known as the corporate amnesty or corporate immunity policy.)

A.  **Leniency Before an Investigation Has Begun**

Leniency will be granted to a corporation reporting illegal activity before an investigation has begun, if the following six conditions are met:

1.  At the time the corporation comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source;

2.  The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

3.   The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation;

4.   The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

5.   Where possible, the corporation makes restitution to injured parties; and

6.   The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity.

B.   **<u>Alternative Requirements for Leniency</u>**

If a corporation comes forward to report illegal antitrust activity and does not meet all six of the conditions set out in Part A, above, the corporation, whether it comes forward before or after an investigation has begun, will be granted leniency if the following seven conditions are met:

1.   The corporation is the first one to come forward and qualify for leniency with respect to the illegal activity being reported;

2.   The Division, at the time the corporation comes in, does not yet have evidence against the company that is likely to result in a sustainable conviction;

3.   The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

4.   The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation;

5.   The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

6.   Where possible, the corporation makes restitution to injured parties; and

7.   The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.

In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity.  The burden of satisfying condition 7 will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity.  That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.

C. **Leniency for Corporate Directors, Officers, and Employees**

If a corporation qualifies for leniency under Part A, above, all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation.

If a corporation does not qualify for leniency under Part A, above, the directors, officers, and employees who come forward with the corporation will be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually.

D. **Leniency Procedure**

If the staff that receives the request for leniency believes the corporation qualifies for and should be accorded leniency, it should forward a favorable recommendation to the Office of Operations, setting forth the reasons why leniency should be granted.  Staff should not delay making such a recommendation until a fact memo recommending prosecution of others is prepared. The Director of Operations will review the request and forward it to the Assistant Attorney General for final decision.  If the staff recommends against leniency, corporate counsel may wish to seek an appointment with the Director of Operations to make their

views known.  Counsel are not entitled to such a meeting as a matter of right, but the opportunity will generally be afforded.

Issued August 10, 1993