UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 <br><br> Master Docket No. 08-02516 (VM)(JCF) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## REPLY MEMORANDUM OF PLAINTIFF HAYWOOD COUNTY, TENNESSEE CONCERNING APPOINTMENT OF INTERIM LEAD COUNSEL UNDER RULE 23(g)

Plaintiff Haywood County, Tennessee respectfully submits this brief and the accompanying Reply Declaration of Michael M. Buchman ("Buchman Decl.") in further support of its motion under Fed. R. Civ. P. 23(g), and in response to: (i) the Memorandum of Law in Support of Motion for Appointment of Interim Leadership Structure, dated July 10, 2008 ("CMHT Br."), filed by Cohen, Milstein, Hausfeld & Toll P.L.L.C ("CMHT"), Boies, Schiller & Flexner LLP ("BSF") and Susman Godfrey L.L.P. ("Susman"); and (ii) the Memorandum in Support of Motion of City of Oakland and County of Alameda, California for the Appointment of Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser") as Interim Lead or Co-Lead Counsel, dated July 13, 2007 ("LCHB Br.").

This motion raises novel and important questions concerning initial organization of antitrust class actions – specifically, whether a plaintiff's law firm that has not been appointed as lead counsel by any Court should be permitted to establish an effective "lock" on leadership for itself and its chosen other firms, in an antitrust class action, by entering into a pre-complaint "sweetheart settlement," outside the context of any publicly filed class action and without judicial oversight, that greatly advantages one defendant in exchange for preferential treatment for that law firm from that defendant. This question has vital importance in view of the essential role of antitrust class actions in

supplementing "the limited resources available to [the Department of Justice] for enforcing the antitrust laws." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). The only other court decision that has addressed directly analogous issues to date is *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56 (E.D.N.Y. 2006)(Mag. J.), where Magistrate Judge Pohorelsky effectively answered the question "no" by appointing, as a majority of lead counsel, law firms that had *not* been involved in the pre-complaint settlement.

Since the time of extensive amendments made to Rule 23 in 1966, antitrust class actions have had a distinguished four-decade history. Each of the five outstanding law firms that seek leadership roles here has played a significant role in that history. However, to the best of our knowledge, the only other antitrust class action in which any plaintiffs' law firm has *ever* entered into a pre-complaint settlement analogous to the written agreement entered into here (the "CMHT Agreement") between CMHT and defendant Bank of America ("BofA") was in *Air Cargo,* where similar agreements were entered into by CMHT in 2006. Just a year or so later, CMHT then entered into its analogous CMHT Agreement with BofA. CMHT evidently plans to make such "pre-complaint settlements" its new *modus operandi*. CMHT effectively so declares in its brief, asserting that the CMHT Agreement "should serve as a model for plaintiffs in future cases." CMHT Br. at 2. CMHT even suggests that its pre-complaint settlement initiatives here have not been confined to BofA, referring to "ongoing settlement talks with BoA *and certain other defendants.*" CMHT Br. at 5 (emphasis added).

There are good reasons why such pre-complaint settlements without judicial oversight were not previously seen in antitrust actions – they are fraught with potential for abuse. CMHT's pre-complaint settlement strategy is not a favorable "innovative technique," as CMHT pretends. *See* CMHT Br. at 1, 6. Nor is it in the best interests of the Class. Instead, it is a an undesirable leadership ploy -- closely

2

analogous to the notorious class action phenomenon of "reverse auctions"[1] --the broad implementation of which would be corrosive not only to the openness and fairness of class action procedure, but also to the essential Court supervision that keeps potential conflicts of interest in check in class actions. If CMHT succeeds in effectively "locking up" case leadership through such ploys prior to any appointment by the Court of lead counsel to represent the Class, other firms inevitably will be compelled to emulate CMHT's strategy, likely leading to unseemly competition among plaintiffs' firms to offer advantageous pre-complaint "deals" to cooperating defendants – a race to the bottom which is not in the interest of the Class. A sensible remedy for the dangers that CMHT's pre-complaint settlement strategy creates for the Class would be (i) to prevent plaintiffs' counsel who choose to propose such pre-complaint settlements from obtaining any advantage thereby in contested leadership controversies, and (ii) to appoint at least a majority of co-lead counsel that were not involved in the pre-complaint settlement. That was essentially what Magistrate Judge Pohorelsky did in *Air Cargo*.

The *Air Cargo* opinion rightly points out that in light of CMHT's pre-complaint settlement in that case, to appoint CMHT to a dominant position as lead counsel would "promot[e] an appearance that defendants have influenced the selection of interim class counsel." 240 F.R.D. at 58. That is even

---

[1] *See* Manual for Complex Litigation, Fourth, § 21.61 (2004) (identifying a "reverse auction" as the first of various "recurring potential abuses in class action litigation that judges should be wary of" and defining it as when a "defendant selects among attorneys for competing classes and negotiates an agreement with the attorneys who are willing to accept the lowest class recovery...."). *See also,* Justin Scheck, *"Reverse Auctions: Lawyers Square Off With Firms Trying to Undercut Settlements,"* The Recorder, July 20, 2005 (Buchman Decl. Ex. A) ("In big cases, defendants facing multiple suits can pit plaintiff firms against each other in hopes of getting the cheapest – and most comprehensive – settlement."); John C. Coffee, Jr., *"Class Wars: The Dilemma of the Mass Tort Class Action,"* 95 Colum. L. Rev. 1343, 1370 (1995)(first coining the phrase "reverse auction" and observing that "[t]he net result is that defendants can seek the lowest bidder from among these rival groups . . . . [T]he critical factor essential to collusion is competition among teams of plaintiffs' attorneys that the defendants can exploit.").

3

more flagrantly true here than in *Air Cargo*. CMHT's written agreement with BofA is rife with hallmarks of favoritism by BofA to CMHT over other plaintiffs' firms, explicitly providing in paragraph 10 thereof: (i) that CMHT "shall coordinate, organize, and manage any and all cooperation with any potential civil plaintiffs to be provided by" BofA; (ii) that BofA "will not convey Settlement Materials to any potential civil plaintiff (or counsel for such potential civil plaintiff) . . . that is not represented by" CMHT; and (iii) that if BofA "is contacted by any potential civil plaintiff (or counsel for such potential civil plaintiff)" BofA will "refer the potential civil plaintiff (or counsel for such potential civil plaintiff) to" CMHT.[2]

For a favored defendant to promise in return to "refer" clients to a particular plaintiffs' law firm, and otherwise to favor its chosen plaintiff's firm in exchange for a purported waiver of legal rights of the Class, is unseemly at best and creates obvious potential for conflicts of interest and other "baggage which may interfere with the resolution of these actions." *Air Cargo*, 240 F.R.D. at 58; *see also*, Coffee, *supra*, 95 Colum. L. Rev. at 1378 ("Nothing better facilitates collusion than the ability on the part of the defendants to choose the counsel who will represent the plaintiff class. . . . [T]he dynamics for collusion are set in motion when such a selection process is possible. . . . [I]n some

---

[2] These Faustian bargains, struck directly between CMHT and a defendant in this case, are all the more troubling given that it seems that at the time the agreement was entered into, *CMHT did not yet even represent any plaintiff at all*. The CMHT Agreement does not identify any clients on whose behalf CMHT is entering into the agreement. Pomerantz therefore has requested and received copies, from counsel from BofA, of all Addendums B to the agreement, which paragraph 3 thereof requires be executed "within five (5) calendar days of" any client's retention by CMHT. The earliest date of any of those Addendums B is September 25, 2007, indicating that that client was retained no earlier than September 20, 2007 – eight days after the September 12, 2007 date of the CMHT Agreement. Buchman Decl. ¶ 7. Thus, the dates of the addenda tend to confirm what is suggested by the face of the CMHT Agreement, which is that at the time of the agreement, CMHT was acting only for itself. Paragraph 3 also states that CMHT would provide "a list of all clients that ha[d] retained" CMHT at the time of the agreement, but Pomerantz has been advised by counsel for BofA that no such list was provided. *Id.*

particularly dramatic cases, [this occurs] prior even to the filing of the class action. . . .")(footnotes and citations omitted).  Unseemly appearances are particularly pronounced in this case because: (i) procedurally, CMHT has sought to implement its "single damages" settlement agreement with BofA by limiting the claims asserted against BofA *ab initio* in its complaint, thereby circumventing both the settlement approval mandated by Rule 23 *and* the Court approval of single damages provided for in the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA")[3]; and (ii) substantively, CMHT's "single damages" agreement with BofA is starkly inconsistent with the clear legislative intent of ACPERA, which explicitly makes its "single damage" limitations inapplicable to cases brought by "a State or a subdivision of a State."

CMHT's motion papers do not even attempt to justify the *procedural* irregularity of the CMHT Agreement, in circumventing Court approval of CMHT's "single damages" agreement with BofA.  As to *substantive* issues, CMHT weakly asserts that the plaintiff class in this case includes non-State entities.  CMHT Br. at 9 ("*First*, not all the members of the proposed class are states or their subdivisions.").  However, every named plaintiff in the cases filed to date is a State entity as to which ACPERA's exception from single damages is applicable.  Even if some small proportion of the absent class members might be non-State entities, the identities of all named plaintiffs forcefully highlight

---

[3] CMHT concedes in its brief that "this Court, of course, must review and approve any proposed settlement."  CMHT Br. at 10.  However, CMHT ignores the fact that by limiting its clients' recovery from BofA to single damages in its complaint, CMHT *already has partially settled* its clients' claims against BofA.  *See* CMHT Br. at 24 (asserting, notwithstanding the CMHT Agreement limiting recovery by any client of CMHT to single damages, that "there has been no settlement with BofA.").  Because CMHT has implemented that aspect of its settlement by structuring its complaint to limit recovery in the first instance, and because CMHT presumably would do the same again in a consolidated complaint on behalf of the Class if it and its preferred co-counsel were to dominate the lead counsel group, it is difficult to see procedurally how the already-settled treble damages claims against BofA would come to be reviewed by the Court for fairness under Rule 23.  No release of the treble damages claim would be required, because the "back door" mechanism of the settlement is the non-assertion of treble damages claims against BofA in the first place.

that the leniency that CMHT has agreed to provide to BoA, under the CMHT Agreement, is irreconcilable with the unambiguous language and clear Congressional intent of ACPERA.

CMHT's brief largely does not defend CMHT's attempted waiver of Class rights against BofA in principle, but instead rests on bare assertions that the CMHT Agreement is in the practical interests of the Class, and that were it not for CMHT's agreement with BoA, CMHT'S complaint could not have been filed. CMHT Br. at 3, 6, 10 (asserting that the CMHT Agreement "made these suits possible," that it "was the key to getting this action off the ground," and that "the proposed class has derived an enormous benefit from the Agreement; without it, there would be no lawsuit."). Metaphorically speaking, CMHT's pragmatic argument is the familiar adage that one "must break eggs to make an omelet."

Whatever potential merit such pragmatic arguments may have in other cases, they have no substance here. Annexed as Exhibit B to the Buchman Declaration is a detailed chart comparing the factual content of CMHT's complaint, point-by-point, with corresponding information publicly available in the press. As to every vital factual contention in CMHT's complaint, *directly corresponding information is widely and publicly available in the media.* Publicly available information concerning Defendants' conspiracy has *not* been very "sparse" as CMHT asserts (CMHT Br. at 2) but instead includes *all* of the essential factual contents of CMHT's complaint. Thus, for CMHT to offer up its complaint as the definitive "fruits" of its cooperation with BofA merely reinforces a conclusion that the Class in this case would receive little benefit, if any, from CMHT's self-serving agreement with BofA. That is not surprising, since the CMHT Agreement itself makes plain that CMHT made its commitment to seek only single damages from BofA *prior to* determining whether BofA had information to provide, in exchange, that would provide any genuine benefit to the

6

Class. *Cf.* LCHB Br. at 11-12 (more appropriately stating that "without knowing the value" of cooperation from BofA, Lieff Cabraser "is not prepared to give up the Class' rights against BofA.").

To characterize potential complications stemming from the CMHT Agreement merely as "baggage" understates the potential extent to which they could "interfere with the resolution of these actions." *Air Cargo,* 240 F.R.D. at 58. Innumerable challenging questions will confront appointed lead counsel immediately, in connection with the key task of preparing the Consolidated Amended Complaint, as a result of the CMHT Agreement. If any law firm which has already agreed "embraced and executed" the CMHT Agreement (CMHT Br. at 2 n.2) were to serve as co-lead counsel, how could lead counsel as a group decide to pursue full treble damages against BofA, consistently with that law firm's already-existing commitment, to seek only single damages against BofA on behalf of its clients? Would BofA seek to disqualify such a firm from serving as lead counsel, if the consolidated amended complaint were to seek full treble damages against BofA? What disruption might be caused to orderly progress in this case by such events? Might the potential for disruption to the court's established leadership structure unduly influence lead counsel's judgment concerning whether pursuit of full treble damages against BofA is truly in the best interests of the Class? And even if lead counsel wished to implement the CMHT Agreement in the Consolidated Amended Complaint, how might the necessary approval of that decision that is contemplated by paragraph 3 of the CMHT Agreement be obtained from absent class members? Might State Attorneys General and other State officials be expected to object to the waiver of treble damages as to BofA, given that ACPERA does not allow it? By what procedure would such objections be presented to the Court, if such a waiver is effectuated *ab initio* by narrowing the relief sought in the complaint, as CMHT has done in its prior complaints? If such objections were somehow raised and the Court were to endorse them, would a new complaint need to be drafted and the case need to be restarted from "square one"? If all lead counsel were to

7

have shared any information given by BofA, would an entirely new lead counsel group then have to be appointed? If so, at what cost to orderly progress in this case?

In light of these cascading complications, the Court would be well-justified in avoiding such issues altogether by appointing as lead counsel – at least for purposes of finalizing the Consolidated Amended Complaint -- *only* law firms that have *not* "embraced and executed the Agreement with BoA" (*see* CMHT Br. at 2 n. 2) -- which would leave Pomerantz and Lieff Cabraser as the only remaining candidates from among those five law firms that have sought a lead counsel position. Whether the lead counsel group should be broadened to include one or more of CMHT and its group could be revisited thereafter, if appropriate, in light of the independent, objective decision that interim lead counsel make with regard to whether or not to implement any "single damages" strategy with regard to BofA.

Alternatively, if the Court is sufficiently confident that these problems will somehow be overcome, a majority of the lead counsel group still should be composed of those who have not "embraced and executed the Agreement with BoA," as in *Air Cargo,* so that an objective *majority* judgment can be made concerning how to handle the problems attending the CMHT Agreement. If that is the Court's preferred course of action, then Haywood County respectfully suggests that the Court should appoint, as co-lead counsel for the plaintiffs in this matter, the three law firms of: (i) Pomerantz; (ii) Lieff Cabraser; and (iii) as a third co-lead counsel, the firm of BSF, or such other single firm from the leadership structure proposed by CMHT as the Court might find preferable.[4]  The

---

[4] Haywood County began investigating this matter in early 2007 and was one of the first plaintiffs to file these actions. Buchman Decl. ¶¶ 2-3. Its attorneys have been deeply involved at every step in the initial proceedings in this case, including the transfer proceedings under 28 U.S.C. § 1407 and preparation and negotiation of Case Management Order No. 1. *Id.* ¶¶ 4-6. By contrast, the Susman firm did not even have a case on file until July 2008 – two months or more *after* cases had been filed by Pomerantz and Lieff Cabraser – and has been significantly less involved in initial case management. Susman's executed Addendum B to the CMHT Agreement is dated July 8, 2008, so there is no reason

Pomerantz and Lieff Cabraser firms are both eminently qualified to serve as lead counsel in this case, both had independent cases on file months ago, and neither Pomerantz nor Lieff Cabraser has "embraced and executed" the problematic CMHT Agreement. *Cf.* CMHT Br. at 2 n.2.

Haywood County and Pomerantz respectfully represent and assure the Court that if a leadership structure including the Pomerantz Firm is established, Pomerantz will endeavor cooperatively to include CMHT and its associated firms in continued, substantial and meaningful work in this case, to the extent that this can be achieved consistently with foreseen or unforeseen complications stemming from the CMHT Agreement. As CMHT recognizes by asserting that high praise by judges has sometimes been directed at "plaintiffs' counsel as a whole" -- which have indeed occasionally included Lieff Cabraser or CMHT collectively with the Pomerantz partners who will have primary responsibility for this case – the pertinent Pomerantz partners have repeatedly proven their willingness and ability to work professionally and cooperatively with all of the proposed lead counsel firms, despite an occasional necessity to take stands of principle, on important issues like those presented in this motion, that may be inconsistent with positions advocated by plaintiffs' other firms. The presence of diverse perspectives among lead counsel in a large and complex antitrust case is a strength and not a weakness, which is another compelling reason to appoint the differently-situated firms of Pomerantz, Lieff Cabraser and BSF (or, alternatively, CMHT) as three-way co-lead counsel, if the Court is sufficiently confident that potential issues relating to the CMHT Agreement can be overcome through further negotiations with BofA or otherwise.

---

to believe that it did substantial work in this case until extremely recently. CMHT's motion papers offer little justification for the Susman firm to be appointed as a co-lead in this case, apart from a mere assertion that Susman is friendly with BSF and CMHT as a result of prior work done together in the *Vitamins* case. Putting CMHT's desire for autocratic control over this case by it and its chosen firms aside, there is no reason for the Susman firm to be shoehorned in at the last minute as lead counsel over well-qualified firms like Pomerantz that have had cases on file and have been investigating this matter for months.

## CONCLUSION

Plaintiff Haywood County, Tennessee requests that Pomerantz be appointed Interim Lead

Counsel, along with such other Lead Counsel firms as the Court may find appropriate.

Dated: July 18, 2008
     New York, New York

                                 **POMERANTZ HAUDEK BLOCK**
                                 **GROSSMAN & GROSS LLP**

By: J. Douglas Richards
                                 Michael M. Buchman
                                 100 Park Avenue
                                 New York, New York 10017
                                 Telephone: (212) 661-1100
                                 Facsimile: (212) 661-8665

                                 Michael J. Banks
                                 BANKS LAW FIRM
                                 108 S. Washington Avenue
                                 Brownsville, Tennessee 38012
                                 Telephone: (731 772-5300
                                 Facsimile: (731) 772-5302

                                 *Counsel for Plaintiff Haywood County*
                                 *Tennessee*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MUNICIPAL DERIVATIVES
ANTITRUST LITIGATION

MDL No. 1950

Master Docket No. 08-02516 (VM)(JCF)

THIS DOCUMENT RELATES TO:
ALL ACTIONS

## DECLARATION OF MICHAEL M. BUCHMAN

I, Michael M. Buchman, hereby declare as follows:

1. I am a member of the firm of Pomerantz Haudek Block Grossman & Gross LLP ("Pomerantz") and a member of the Bar of this Court. I respectfully submit this declaration in support of the motion of Haywood County, Tennessee for appointment of lead counsel pursuant to Fed. R. Civ. P. 23(g).

2. Haywood County, Tennessee, through its counsel and with the assistance of an expert, began investigating this matter in early 2007.

3. Pomerantz filed an action on behalf of Haywood County, Tennessee on March 24, 2008, prior to all other actions herein with the exception of the initial actions filed by Cohen Milstein Hausfeld & Toll P.L.L.C., on behalf of various clients, the first of which had been filed only 12 days earlier.

4. Shortly after commencement of the action by Haywood County I inquired with counsel for Bank of America concerning potential cooperation. Counsel for Bank of America advised me of the existence of the agreement between Cohen Milstein Hausfeld & Toll P.L.L.C. and Bank of America (the "CMHT Agreement") and indicated that no cooperation would be forthcoming from Bank of America to Pomerantz unless Haywood County and Pomerantz first agreed to be bound

by that agreement. Haywood County and Pomerantz have not considered it desirable or appropriate to join into that agreement, and, therefore, have not received the cooperation from Bank of America that is contemplated by it.

5.      On behalf of the Class Plaintiffs, I successfully briefed and argued before the Judicial Panel on Multidistrict Litigation that these cases should be consolidated in this District pursuant to 28 U.S.C. § 1407.

6.      Since transfer to this District was effectuated, I or my partner, J. Douglas Richards, have cooperated actively with other plaintiffs' counsel as well as defense counsel at every stage of these proceedings, including the negotiation and preparation of Case Management Order No. 1 and its initial oral presentation to the Court on July 11, 2008.

7.      On July 10, 2008, Pomerantz requested that counsel for Bank of America produce copies of all Addendums A and B referenced in paragraphs 2 and 3 of the CMHT Agreement. Those documents were provided to Pomerantz on July 17 and 18, 2008. The earliest of the Addendums B referenced in paragraph 3 of the CMHT Agreement that have been provided is dated September 25, 2007. Counsel for Bank of America have advised Pomerantz that they were not in fact provided with any other "list of all of the clients that have retained" CMHT as referenced in paragraph 3 of the CMHT Agreement.

8.      Annexed hereto as Exhibit A is a copy of Justin Scheck, *Reverse Auctions: Lawyers Square Off With Firms Trying to Undercut Settlements*, The Recorder, July 20, 2005, which is cited in footnote 1 of the accompanying memorandum of law.

9.      Annexed hereto as Exhibit B is a chart comparing the factual content of CMHT's complaint, in *Fairfax County, Virginia v. Wachovia Bank, N.A.,* et al, cv 00432, with publicly available information concerning the information contained therein, as referenced on page 6 of the accompanying memorandum.

2

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 18,

2008.

Michael M. Buchman

# EXHIBIT A

1 of 1 DOCUMENT

Copyright 2005 ALM Properties, Inc.
All Rights Reserved
The Recorder

July 18, 2005 Monday

**SECTION:** NEWS; Pg. 1 Vol. 129 No. 137

**LENGTH:** 1840 words

**HEADLINE:** Reverse auctions: Lawyers square off with firms trying to undercut settlements

**BYLINE:** Justin Scheck

**BODY:**

Linda Dardarian expected an aggressive fight in her class action against Countrywide Home Loans – but she didn't think it would be against another plaintiff lawyer trying to settle her case for half its worth.

That was the battle she faced last year, when the law firm led by prominent attorney David Boies tried to settle a Los Angeles employment suit against Countrywide out from under her.

"I was furious," said Dardarian, a partner at Goldstein, Demchak, Baller, Borgen & Dardarian in Oakland. "My feeling was that they had used the other case as a way to stop the court in Los Angeles and interfere with my ability to represent my clients."

Dardarian experienced a rarity in employment cases, but it's common enough in the class action bar that there's a name for it: the reverse auction. In big cases, defendants facing multiple suits can pit plaintiff firms against each other in hopes of getting the cheapest – and most comprehensive – settlement.

"When there are overlapping claims, the defendant can go and shop the deal for the lowest price," said Samuel Issacharoff, a Columbia Law School professor who helped Dardarian fend off the Boies firm.

One defense attorney said there's an advantage to having multiple settlements on the table. "You obviously are trying to get the broadest relief possible for the cheapest amount," said Dominic Surprenant, a partner with Quinn Emanuel Urquhart Oliver & Hedges in Los Angeles who defends class actions.

Sometimes the problem arises when two plaintiff firms unknowingly file similar class actions. Other times, after one plaintiff firm spends years – and a lot of money – building a solid case, latecomers rush in, file copycat suits and look to settle fast and cheap.

Daniel Girard, a partner with Girard Gibbs & DeBartolomeo in San Francisco, knows all about that. He's spent the past two years in a game of legal whack-a-mole, flying to courts in Florida, Illinois and Texas to beat back the settlement offers that tend to pop up when he has an expensive case headed to trial.

"It's just amazing because of the brazenness of it," he said.

Stopping a reverse auction generally requires convincing a judge to rule that a proposed settlement is unfair. But this doesn't always work, and plaintiff lawyers are often forced to take other measures – in and out of court – to prevent another firm from settling their claims.

Ethical gray areas in class action law have allowed reverse auctions to become a trend, said Joseph McMonigle, an ethics expert and partner at Long & Levit in San Francisco.

He said that competing filings can allow defendants to pick the plaintiff with the weakest case. With weaker opposition, he said, defense lawyers have more leverage to reach a cheap settlement.

There is the danger that a lawyer in that position might be tempted to cut a worse deal for his clients just to make

Reverse auctions: Lawyers square off with firms trying to undercut settl

sure he gets paid. Since there are few clear rules on the duty a plaintiff lawyer has to a prospective class that hasn't been certified, there's some ethical wiggle room. "It certainly isn't something that makes the legal profession shine," McMonigle said.

As bad a break as reverse auctions can be for the lawyers being undercut, the settlements tend to be a disaster for class members – the deals can result in undervalued payouts, inflated attorneys fees, no injunctive relief and blanket immunity for a defendant from follow-up claims.

Dardarian said she doesn't see the Boies firm as a clear predator in her Countrywide case – Boies had been litigating other cases against the lender before Dardarian filed hers. But she said Boies' proposed settlement was a raw deal for her class.

It would have settled overtime claims for plaintiffs spanning several states – including Dardarian's California class – for $16 million.

After a nasty epistolary spat with Caryl Boies – David Boies' partner and daughter – Dardarian persuaded a Texas judge to overrule that deal last year. Dardarian finally settled her suit in April – coming away with $30 million for California plaintiffs.

Caryl Boies said she didn't engage in a reverse auction, and said she didn't know whether Countrywide tried to enter the cheaper settlement with her to avoid Dardarian's more valuable claims.

"I don't want to speculate on what they're thinking. Their goal was to settle all of the claims, and they could not do that in California," Boies said.

Reverse auctions are a new concern for Dardarian. Her firm – where partners come from places like the NAACP and tend to retire early to write hiking books or start a nonprofit – specializes in employment law, an island of civility in the harshly competitive class action bar.

But the successes of firms like Goldstein, Demchak may be changing that, as other lawyers seeking big payouts get into the field.

Take the example of Mary Anne Sedey. In another case of an employment reverse auction, the St. Louis plaintiff lawyer had to hire more than 20 outside attorneys to defeat another firm's attempt to undercut her discrimination suit against Rent-A-Center.

Four months after Sedey filed her case, another firm took a discrimination suit it had already filed on behalf of two clients and refiled it as a class action.

Sedey got rid of the competing firm's $12 million settlement deal by lobbying scores of class members to file objections. She eventually came away with $47 million for the class in 2002.

While Sedey and Dardarian fended off their competitors, the large awards they came away with create an incentive for other firms to get in on the employment suits.

Yet Dardarian and Sedey are optimistic that employment class actions will remain an oasis of good manners.

"I'm hoping this is not a trend," Sedey said. Girard gave up that hope years ago.

### WHACK-A-MOLE

Reverse auctions have become a routine concern for consumer lawyers like Girard and Mark Chavez, of the Mill Valley firm Chavez &amp; Gertler. And for good reason.

The two have repeatedly had other firms try to settle suits out from under them. Earlier this year, Girard fought back a deal that would have ended his suit over America Online's billing practices.

He says the case could produce damages exceeding $500 million, but an Illinois firm tried to settle the claims for $25 million in an Illinois state court.

The lawyers there added new charges to their complaint as part of the settlement agreement to jettison Girard's federal claims in California, he said.

In May, a judge in U.S. District Court for the Central District of California placed an injunction on the Illinois deal.

Girard is also trying to strike down a settlement of a class action against American Express, alleging that defense lawyers pitted various firms against one another in a reverse auction.

And in 2003, he defeated a Texas settlement over Hyundai horsepower claims before reaching his own more valuable deal.

In that case, Girard had filed a complaint in Orange County Superior Court in late 2002; three weeks later, another firm filed a suit making the same allegations in Beaumont, Texas.

Girard said the carmaker balked when he made a key discovery request: a sealed document from an unrelated court case in which a Hyundai employee said the company knew about its horsepower problems for years.

"We were trying to get that affidavit unsealed when they went to the Beaumont plaintiffs," Girard said. He said Hyundai wanted to settle with the Texas lawyers – who had conducted no discovery – to avoid the bigger liability that the discovery material would have created in California.

In early 2003, Hyundai reached a settlement with the Texas lawyers that would have provided free lube jobs to class members. After protests by Girard, a Texas judge refused to approve that settlement – and didn't hide his disapproval of the competing lawyers' proposed deal.

"With the exception of [the competing] attorneys, who negotiated the settlement and stand to receive $2 million if it is approved, none of the other class members or counsel with pending actions against Hyundai supports the proposed settlement," wrote Jefferson County Judge Gary Sanderson.

Chavez has had two similar experiences in recent years. In 2002, he was unable to stop another firm from settling a case he says he originated against a lending company. And he is currently trying to defeat another lawyer's effort to settle a suit he has against Craftmatic beds.

Girard said the problem is on the rise.

"It's been in the air for some time now," he said. "It's in the last few years that the atmosphere seems to have evolved into a sort of 'anything goes' mentality."

### CUTTING THEIR LOSSES

While some reverse auctions are the result of malicious intent, Issacharoff said, it's not always a case of unscrupulous lawyers jumping a high-stakes claim. Most come about when plaintiff lawyers inadvertently find themselves with competing claims. When one such firm realizes its case is weak, it may enter a cheap settlement, rather than walk away with a defeat – and little or no recovery.

He said Caryl Boies's situation in Countrywide may be a prime example.

Boies, he said, was put in a tough spot when a Texas judge sent her case to arbitration – which eliminated the class-action aspect of the case.

"In essence," Boies said, "we were a lawsuit without a house, because Countrywide's arbitration provision also prohibits collective actions."

In supporting Dardarian, Issacharoff said Boies had been left with no leverage to force a settlement – unless she offered a deal that would also settle out Dardarian's expensive California claims. (Boies disagrees, saying she had leverage in the form of threatened future suits.)

"There are bottom feeders that go around shopping for cheap class actions," Isaacharoff said. "But I don't think the Boies firm is one of them."

The all-or-nothing nature of plaintiff litigation can make it tempting for a lawyer to sell out the class, said Columbia law professor John Coffee – who coined the term reverse auction.

Coffee said the result of negotiations by lawyers with little leverage is often a settlement that benefits the defendant and plaintiff lawyer at the expense of the class. It essentially makes the plaintiff and defense lawyers partners against the class members, he said.

"Once you realize you're losing, the only way to win is through collusion," he said.

Reverse auctions: Lawyers square off with firms trying to undercut settl

### GRIM FORECAST

Despite the recent experiences of Dardarian and Sedey, employment lawyers say they're not bracing for an onslaught of low-ball settlements.

"It is more collegial in the plaintiff employment bar," said James Finberg, a partner at Lieff Cabraser Heimann & Bernstein.

And Barry Goldstein, of counsel with Goldstein Demchak, agrees. He said employment lawyers are more aware of reverse auctions since Dardarian presented a paper at an April American Bar Association conference about the problem.

But, Coffee warns, "the field of labor class actions is expanding." And this generates concern.

"As it expands, you're importing problems that may exist in other parts of the profession," Goldstein said.

*Reporter Justin Scheck's e-mail address is jscheck@alm.com.*

**LOAD-DATE:** July 19, 2005

EXHIBIT B

Fairfax County, Virginia et al. v. Wachovia Bank N.A., et al., Case No. 1:08—cv-00432 (DDC Mar. 12, 2008)

| ¶ # | Fairfax County, Virginia et al. | Corresponding Information in the Public Record |
|---|---|---|
| | **CLASS ACTION COMPLAINT** | |
| | **NATURE OF THE CASE** | |
| 1 | Plaintiffs allege herein a conspiracy among Defendants, co-conspirator Bank of America, N.A. ("Bank of America"), and unnamed co-conspirators, to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives (as defined below) sold in the United States and its territories. | See infra, ¶¶ 94, 97-127, for more specific factual allegations. |
| 2 | Plaintiffs and Bank of America have engaged in confidential discussions about some of the facts and circumstances detailed in this Complaint over the last eight months in the context of a settlement process, including a number of sessions overseen by the Honorable Daniel Weinstein (Ret.) of JAMS. Judge Weinstein is one of the nation's preeminent mediators of complex civil disputes. These discussions have been conducted pursuant to, among other things, an agreement that requires full and timely cooperation by Bank of America, which has been received. The information contained in this Complaint comes in part from information obtained from Bank of America and in part from publicly-available information, including regulatory filings. | The Cohen, Milstein, Hausfeld & Toll (CMHT) agreement with Bank of America is public knowledge. |
| 3 | This lawsuit arises out of an illegal agreement, understanding and conspiracy among providers and brokers of Municipal Derivatives to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal Bonds. This illegal agreement, understanding and, conspiracy is based on per se illegal horizontal communications and conduct among providers of Municipal Derivatives. These providers have engaged in communications facilitating and conduct restraining competition such as rigging of bids, secret compensation of losing bidders, courtesy bids, deliberately losing bids, and agreements not to bid. Brokers | See infra, ¶¶ 94, 97-127, for more specific factual allegations. |

| | | |
|---|---|---|
| 4 | have knowingly participated in this per se illegal conspiracy to limit competition by facilitating indirect communications among providers and have shared the wrongful profits from the illegal agreement to restrain competition. | |
| | There has been an unprecedented investigation by the United States Department of Justice's ("DOJ") Antitrust Division, the internal Revenue Service ("IRS"), and the Securities and Exchange Commission ("SEC") into industry-wide collusive practices in the two-hundred year old municipal bond industry. A grand jury investigation currently is being conducted by the Antitrust Division in the United States District Court for the Southern District of New York. Approximately thirty (30) large commercial and investment banks, insurance companies, and brokers have been subpoenaed, and the offices of three brokers have been raised by the Federal Bureau of Investigation. Numerous employees and former employees of various Defendants recently received letters notifying them that they are regarded as targets of the grand jury investigation concerning antitrust and other violations regarding contracts related to municipal bonds. | See infra ¶¶ 108-114 (IRS Investigation) and ¶¶ 115-121 (Antitrust Division Investigation), for more specific factual allegations. |
| 5 | This lawsuit also follows Bank of America's conditional acceptance into the Antitrust Division's amnesty program, in connection with which there was disclosure of information regarding the conspiracy described below and the promise to provide full and complete cooperation to the Antitrust Division and the Plaintiffs and the class they seek to represent. The inevitable and practical result of this illegal conduct affected the market prices of Municipal Derivatives in all transactions. | See infra ¶¶ 85, 100, 122-125 (The DOJ Grants Conditional Amnesty to B of A), for more specific factual allegations. |
| 6 | Plaintiffs bring this action to seek civil redress for their injuries on behalf of themselves and all state, local and municipal government entities and their agencies, as well as private entities, that purchased by competitive bidding or auction Municipal Derivatives in the United States and its territories directly from the Provider Defendants (as defined | See infra ¶¶ 17-39 Provider Defendants); 40-54 (Broker Defendants), 55 (co-conspirator Bank of America), 128 (the municipal government wrongdoing alleged), and 94, 97-127 (specific factual wrongdoing alleged), for more specific factual allegations. |

| | | |
|---|---|---|
| | below) or from co-conspirator Bank of America and/or through Broker Defendants (as defined below) in the period from January 1, 1992 through the present (the "Class Period"). At all relevant times, the Provider Defendants, co-conspirator Bank of America, and Broker Defendants issued and/or sold Municipal Derivatives. During the Class Period, Defendants, co-conspirator Bank of America, and unnamed co-conspirators agreed, combined, and conspired with each other to fix prices, and to rig bids and allocate customers and markets of Municipal Derivatives sold in the United States and its territories. As a result of the unlawful conduct of Defendants, co-conspirator Bank of America, and unnamed co-conspirators, Plaintiffs and the Class (as defined in this Complaint) received, *inter alia,* lower interest rates on these contracts than they would have in a competitive market, and paid ancillary fees and other costs and expenses related thereto. Plaintiffs have consequently suffered injury to their business and property. | |
| | **JURISDICTION AND VENUE** | |
| 7 | This action is instituted under Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages ... [and] ... Section 1 of the Sherman Act, 15 U.S.C. § 1. | No factual support from Bank of America necessary. |
| 8 | This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. | No factual support from Bank of America necessary. |
| 9 | Venue is proper ... pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d). .... | No factual support from Bank of America necessary. |
| | **PLAINTIFFS** | |
| 10 | Plaintiff State of Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period. | No factual support from Bank of America necessary. |
| 11 | Plaintiff City of Chicago, Illinois purchased .... | No factual support from Bank of America necessary. |
| 12 | Plaintiff Fairfax County, Virginia purchased .... | No factual support from Bank of America necessary. |

| 13 | Plaintiff City of Fall River, Massachusetts purchased ..... | No factual support from Bank of America necessary. |
|---|---|---|
| 14 | Plaintiff Charleston Co. Sch. Dist., SC purchased .... | No factual support from Bank of America necessary. |
| 15 | Plaintiff Berkeley County, South Carolina purchased ...... | No factual support from Bank of America necessary. |
| 16 | Plaintiff Alabama State University purchased .... | No factual support from Bank of America necessary. |
| 17-54 | **DEFENDANTS** | Each of these paragraphs contains the name of a corporation, its State of incorporation and its principal place of business, all of which is public information. |
| | **NAMED CO-CONSPIRATOR** | |
| 55 | Co-conspirator Bank of America, N.A., not named as a Defendant herein, ..... | Contains name, State of incorporation and principal place of business for co-conspirator Bank of America, all of which is public information. |
| | **UNNAMED CO-CONSPIRATORS** | |
| 56 | Various other persons, firms and corporations, not named herein as a Provider Defendant, Broker Defendant, or named conspirator, have participated as co-conspirators with the Provider Defendants, the Broker Defendants, and co-conspirator Bank of America, and have performed acts and made statements in furtherance of the conspiracy. | No factual support from Bank of America necessary. |
| 57 | Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs. | No factual support from Bank of America necessary. |
| | **DEFINITIONS AND BACKGROUND** | |
| 58-84 | These paragraphs contain general background information and definitions concerning municipal bonds / derivatives and the IRS rules and regulations related thereto. | General industry information available from consultants or experts. |
| | **FACTUAL ALLEGATIONS** | |
| | **Wrongdoing Alleged** | |
| 85 | During the Class Period defined herein, the Provider Defendants and co-conspirator Bank of America entered into a continuing agreement, understanding, and conspiracy to-unreasonably restrain trade and commerce in the United | "Bank of America Corp. ... entered into an amnesty agreement with the U.S. Justice Department protecting it form criminal prosecution in the department's wide ranging investigation into bidding practices for municipal derivatives. In exchange for |

States, in violation of :. Section 1 of the Sherman Act, 15 U.S.C. § 1.

annesty, the bank is providing information and cooperating fully with Justice officials."

| 86 | In particular, the Provider Defendants, and co-conspirator Bank of America, have combined and conspired to allocate customers and fix or stabilize the prices of Municipal Derivatives, including the interest rates paid to issuers on such derivatives, sold in the United States through agreements not to compete and acts of bid rigging. Overt acts in furtherance of this conspiracy, including use of the mails or wires to transmit and process rigged bids, were undertaken in this District. | Bond Buyer, BoA Gets Criminal Amnesty" (Feb. 12, 2007). See also infra ¶¶ 100, 122-125 (The DOJ Grants Conditional Amnesty to B of A). |
|---|---|---|
| 87 | The Provider Defendants and co-conspirator Bank of America, who knowingly and intentionally engaged in these rigged auctions, understood that they would take turns providing the winning bid. At times, the Provider Defendants directly discussed with each other the terms of their bids.

For some of these communications, audiotapes, including audiotapes of conversations involving the Provider Defendants and/or co-conspirator Bank of America's marketers of Municipal Derivatives (such as individuals on Provider Defendants and/or co-conspirator Bank of America's marketing desks) exist. | See infra, ¶¶ 94, 97-127, for more specific factual allegations.

"The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid rigging on GICs in the municipal market. The firm turned the documents over to the SEC and the Justice Department ...."

Bond Buyer, IRS Steps Up Probes of GIC Bid Rigging (January 6, 2005). |
| 88 | On other occasions, communications between the Providers Defendants and co-conspirator Bank of America were made indirectly through one or more of the Broker Defendants, who would guide the Provider Defendants and/or co-conspirator Bank of America by suggesting the terms of | See infra, ¶¶ 94, 97-127, for more specific factual allegations. |

| | | |
|---|---|---|
| | their respective bids. The Provider designated to win a particular auction frequently bid after it had been provided with the terms of the bids provided by the other bidders, a practice known as a "last look" that is expressly forbidden by IRS regulations. | |
| 89 | At times, one or more of the Provider Defendants and co-conspirator Bank of America, engaged in complementary trades to compensate other Providers Defendants and/or co-conspirator Bank of America, who either did not submit bids or who engaged in sham bids. On other occasions, the winning Provider, including at times one or more of the Provider Defendants and/or co-conspirator Bank of America, would secretly compensate one or more Provider Defendants and/or co-conspirator Bank of America for declining to submit a bid. | See infra, ¶¶ 94, 97-127, for more specific factual allegations. |
| 90 | The Broker Defendants have knowingly participated in the illegal agreement, understanding, and conspiracy not to compete and to rig bids in order to win the favor of the Provider Defendants and co-conspirator Bank of America and share in the profits of the conspiracy, all in breach of their fiduciary and other duties as agents for Plaintiffs and members of the class during the bidding process. | See infra, ¶¶ 94, 97-127, for more specific factual allegations. |
| 91 | The Broker Defendants touted to issuers their abilities to facilitate deals for the Provider Defendants and co-conspirator Bank of America and touted the network of relationships they created among Providers. For example, on its website, CDR claims "CDR Financial develops products and strategic alliances across a wide spectrum of financial institutions, including asset managers, banks, broker dealers and insurance companies." | See infra ¶ 92. |
| 92 | The interconnected nature of the Municipal Derivatives industry facilitated and reinforced the conspiratorial conduct alleged herein, leading to the massive, multi-agency government investigation. As *The Bond Buyer* reported on November 21, 2006: | As this sentence itself makes clear, the sentence relies on public information.

As this paragraph itself makes clear, the paragraph relies on public information. |

| | | |
|---|---|---|
| | "The industry tends to be "quite intertwined and interconnected," said Willis Ritter, a partner at Ungaretti & Harris here. "Virtually all the major houses are involved in selling [GICs], so if you think you've found something about one, you suspect you're going to find it about all of them." | |
| 93 | The existence of the illegal agreement, understanding and conspiracy is confirmed by *per se illegal* horizontal communications among marketing personnel employed in the municipal bond/derivative departments of the Provider Defendants and co-conspirator Bank of America. These individuals have participated in direct communications with competitor providers with respect to the following, inter alia: | See infra, ¶¶ 94, 97-127, for more specific factual allegations. |
| | a. the rigging of bids, including the collusive. suppression of interest rates paid to issuers on Municipal Derivatives; | |
| | b. conduct that would be used to limit competition; | |
| | c. sharing of profits from a winning bid with a losing bidder and other secret compensation of losing bidders; | |
| | d. bids that would be won by specific Provider Defendants and/or coconspirator Bank of America; and | |
| | e. an exchange of a deliberately losing bid for a future winning bid. | |
| 94 | The Broker Defendants' knowing participation in the illegal agreement, understanding and conspiracy not to compete and to rig bids is established by their serving as a conduit for indirect communications among the Provider Defendants and co-conspirator Bank of America that were per se illegal. Again, overt acts in furtherance of this conspiracy, including; on information, use of the mails or wires to transmit and process rigged bids, were undertaken in this District. The Provider Defendants and co-conspirator Bank of America also shared their | See infra, ¶¶ 97-127, for more specific factual allegations. |

| | | |
|---|---|---|
| | wrongful profits from the illegal agreement, understanding and conspiracy, by paying kickbacks to Broker Defendants. | |
| | For example, Defendant CDR had a secret agreement with the provider of a GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida. The deal allowed Defendant CDR to increase its fees if none of $220 million in bond proceeds was used for its intended purpose - affordable housing. | "[Defendant] CDR had a secret agreement with the provider of a [GIC] bonds issued in 1999 by an authority in Gulf Breeze, Florida, …. The deal allowed [Defendant] CDR to increase its fees if none of $220 million in bond proceeds was used for its intended purpose -- affordable housing." Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006). See also Bloomberg.com, Bank's $7 Billion Tax Exempt Bond Ruse Yields Nothing for Needy (Oct. 4, 2006). |
| 95 | The existence of the illegal agreement, understanding and conspiracy is further established by per se illegal horizontal and coordinated conduct among the marketing personnel employed in the municipal bond/derivative departments of the Provider Defendants and co-conspirator Bank of America. These individuals have participated in, inter alia, the following conduct to limit competition, rig bids and to create the appearance of competition where there was none:<br><br>a. courtesy bids submitted to create the appearance of competition where there was none; bids known to be unrealistically low and deliberately losing bids;<br><br>c. bidding processes where only one bid was sufficiently high to make the deal work; agreements to share profits from a winning bid with a losing bidder through transactions between Provider. Defendants and co-conspirator Bank of America;<br><br>e. conduct in violation of 1R5 regulations relating to the bidding process; secret last look agreements; and agreements not to bid. | See supra ¶ 94 and infra 97-127, for more specific factual allegations. |
| 96 | The Broker Defendants' knowing participation in the illegal agreement, understanding and conspiracy not to compete | See supra ¶ 94 and infra 97-127, for more specific factual allegations. |

| | | |
|---|---|---|
| | and to rig bids is also established by their participation in the per se illegal conduct to limit competition, rig bids and to create the appearance of competition where there, was none. Broker Defendants further participated in and facilitated the illegal agreement, understanding and conspiracy by arranging the allocation of winning bids among the Provider Defendants and co-conspirator Bank of America. The Broker Defendants further communicated to the Provider Defendants and co-conspirator Bank of America concerning, inter alia<br><br>a. winning bids that would be allocated to Provider Defendants and co-conspirator Bank of America;<br>b. confirming understandings that bids would be won by Provider Defendants and co-conspirator Bank of America;<br>c. confirming understandings that bids would be lost by Provider Defendants and co-conspirator Bank of America;<br>d. the fact that bids were being rigged; and<br>e. bid levels that would be necessary by Provider Defendants and coconspirator Bank of America to win or lose a bid. | |
| 97 | Individuals employed by the Defendants who have engaged in the unlawful contract, combination or conspiracy include, *inter alia* | "At least ten current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ ... according to regulatory filing [i.e., Financial Industry Regulatory Authority (FINRA)].<br><br>* * *<br><br>James Hertz ... Samuel Gruer ... Shlomi Raz ...Patrick Marsh ...Stephen Salvadore ...Peter Ghavarni ... Mary H. Packer ... James H. Towne ...Jay Saunders .... Martin McConnell ...."<br><br>Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008). |
| a | Douglas Campbell, a former co-conspirator Bank of America sales team manager who also formerly worked at Defendant Piper Jaffray; | "In ... 2001 and '02, Douglas Campbell, an employee of Bank of America. ..., paid a total of $182,393 to banks and advisers that played no role in any transaction, ... "<br><br>Bloomberg.com, Getting Paid for Doing Nothing (Dec. 6, |

| | | |
|---|---|---|
| b | Dean Pinard, former manager of co-conspirator Bank of America's derivatives department; | 2006). _See also_ Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006) ("A Bank of America employee who bid for the Atlanta bond work, Doug Campbell, was fired after disclosing that he paid $57,393 to CDR for transactions in which it played no role."); Bloomberg, Bank of America to Cooperate in Muni Bid-Rig Probe (Feb. 9, 2007) (same); Bond Buyer, BoA Gets Criminal Amnesty (Feb. 12, 2007) (same). |
| | | "Sources said that key derivatives officials at the bank were on 'administrative leave,' including Dean Pinard, who had managed the bank's derivatives department in Charlotte, N.C." Bond Buyer, BoA Gets Criminal Amnesty (February 12, 2007). _See also_ BofA official leaves amid probe of derivatives industry ("Bank of America Corp.'s managing director in charge of the business that sell derivatives [Dean Pinard] ... left his job as the bank cooperatives with a criminal investigation of the industry."). |
| c | Phil Murphy, former head managing director of co-conspirator Bank of America's derivatives department; | "In ... 2001 and '02, Douglas Campbell, an employee of Bank of America. ..., paid a total of $182,393 to banks and advisers that played no role in any transaction, the banker disclosed ... to his boss, then managing director Phil Murphy." Bloomberg.com, Getting Paid for Doing Nothing (Dec. 6, 2006). _See also_ Bond Buyer, BoA Gets Criminal Amnesty (Feb. 12, 2007) ("... Doug Campbell, a Bank of America sales manager who was fired from the firm in August 2002 ... told Phil Murphy, then the head of managing director of the firms derivatives department, that ... firms were paid $182, 393 for 'unrelated client transactions.'"). |
| d | James Hertz, former vice-president in Defendant JP Morgan's tax-exempt capital markets group; | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, James Hertz received a target letter from the DOJ in connection with its antitrust investigation; Bloomberg, Goldman, Bear Sterns Bankers Targeted in Muni Criminal Probe (Feb. 29, 2008) ("Bear Sterns's Stephen Salvadore and former JP Morgan Chase & Co. |

| | | |
|---|---|---|
| e | Stephen Salvadore, Managing Director of municipal capital markets and derivatives at Defendant Bear Stearns; | banker James Hertz are targets of the antitrust investigation of Wall Street's sales of derivatives and investment contracts to state and local governments ...."). Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Stephen Salvadore received a target letter from the DOJ in connection with its antitrust investigation); Bloomberg, Goldman, Bear Stearns Bankers Targeted in Muni Criminal Probe (Feb. 29, 2008) ("Bear Sterns's Stephen Salvadore and former JP Morgan Chase & Co. banker James Hertz are targets of the antitrust investigation of Wall Street's sales of derivatives and investment contracts to state and local governments ...."); Investment News, Justice Dept. eyes big rigging in banks (March 3, 2008) ("Stephen A. Salvadore ... notified FINRA that he was under investigation by the Justice Department concerning antitrust violations related to muni bond"). |
| f | Jay Saunders, who worked in the derivatives marketing department at Defendant Wachovia;. | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Jay Saunders received a target letter from the DOJ in connection with its antitrust investigation); Bond Buyer, Justice Dept. Targets 2 Wachovia Employees (Feb. 29, 2008) ("The two employees – Jay Saunders and Martin McConnel – worked in the derivatives marketing departments at the bank, but were put on administrative leave after receiving written notification that they were targets of the grand jury investigation."); NYT, U.S. Investigates 2 Wachovia Employees (Feb. 29, 2008) (same). |
| g | Martin McConnell, who worked in the derivatives marketing department at Defendant Wachovia; | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Martin McConnell received a target letter from the DOJ in connection with its antitrust investigation); Bond Buyer, Justice Dept. Targets 2 Wachovia Employees (Feb. 29, 2008) ("The two employees – Jay Saunders and Martin McConnell – worked in the derivatives marketing departments at the bank, but were put on administrative leave after receiving written notification that they were targets of the grand jury investigation."); NYT, U.S. Investigates 2 Wachovia Employees (Feb. 29, 2008) (same). |

| | | |
|---|---|---|
| h | Peter Ghavai, former Managing Director and co-manager in Defendant UBS's municipal derivatives group; | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Peter Ghavai received a target letter from the DOJ in connection with its antitrust investigation); Investment News, Justice Dept. eyes big rigging in banks (March 3, 2008) ("Those being probed include Peter Ghavai, formerly the co-head of municipal derivatives at UBS, who is the target of a grand jury investigation by the antitrust division of the Department of Justice ...."). |
| i | Patrick Marsh, Managing Director of Deutsche Bank's municipal restructuring unit, who had worked at Defendant Bear Stearns; | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Patrick Marsh received a target letter from the DOJ in connection with its antitrust investigation); Investment News, Justice Dept. eyes big rigging in banks (March 3, 2008) ("Other recipients of target letters from the Justice Department include Patrick Marsh, head of muni structuring at Deutsche Bank, and Samuel Gruer, director of muni structuring at Deutsche Bank."). |
| j | Shlomi Raz, a banker who formerly worked at Defendant JP Morgan; and | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Shlomi Raz received a target letter from the DOJ in connection with its antitrust investigation); Bloomberg, Goldman, Bear Stearns Bankers Targeted in Muni Criminal Probe (Feb. 29, 2008) ("Goldman's Shlomi [formerly of JP Morgan] also disclosed to Finra that he is being investigated ...."). |
| k | Samuel Gruer, former vice-president in Defendant JP Morgan's tax-exempt capital markets group. | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Samuel Gruer received a target letter from the DOJ in connection with its antitrust investigation); Investment News, Justice Dept. eyes big rigging in banks (March 3, 2008) ("Other recipients of target letters from the Justice Department include Patrick Marsh, head of muni structuring at Deutsche Bank, and Samuel Gruer, director of muni structuring at Deutsche Bank."). |
| 98 | Individuals employed by the Brokers who have engaged in the unlawful contract, combination or conspiracy include: | "At least ten current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ ... according to regulatory filing * * * [including Mary H. Packer and James H. Towne]" |

| | | |
|---|---|---|
| | | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008). |
| a | James Towne, former Managing Director of Defendant Piper Jaffray's municipal derivatives group; | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, James Towne received a target letter from the DOJ in connection with its antitrust investigation); Bond Buyer, Justice Dept. Targets Ex-Piper Jaffray Employee in Anticompetitive Probe (Feb. 28, 2008) ("Piper Jaffray Cos. disclosed ... that a former employee [James H. Towne] has been notified by the Justice Department that he is the target of its investigation of anticompetitive practices in connection with the derivatives and investment areas of the municipal market."). |
| b | David Lail, who worked in Defendant Baum's derivatives department; and | Bond Buyer, IRS Reaches Settlement with Baum (Nov. 10, 2006) ("The former employee referenced in the [IRS settlement] announcement likely include David T. Lail, who the firm fired in 2004 for violating 'certain company policies and procedures concerning the receipt of a check from a third party with whom the company had done business,' ....."). |
| c | Mary Packer, president of Defendant PackerKiss | Bond Buyer, Wall Street Brokers Get DOJ Letters (March 3, 2008) (according to regulatory filings, Mary Packer received a target letter from the DOJ in connection with its antitrust investigation). |
| 99 | The conspiracy has been facilitated through intercompetitor contacts at trade associations. One such association is the International Swaps & Derivatives Association ("ISDA"). The ISDA's members include the following: Bank of America, JP Morgan, Bear Stearns, Societe Generale, UBS, and Wachovia. Another is the American Bankers Association, which counts among its members the Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia. | Industry information, including fact that ISA is the leading trade organization concerning derivatives and a list of ISDA's members, is available from numerous publicly available sources and/or consultants/ experts. |
| 100 | Co-conspirator Bank of America, which is, as discussed below, a participant in the DOJ's amnesty program, has described the conspiracy and provided information to the DOJ relating to specific rigged bids and communications among Provider Defendants to restrain competition. | "Bank of America Corp. ... entered into an amnesty agreement with the U.S. Justice Department protecting it form criminal prosecution in the department's wide ranging investigation into bidding practices for municipal derivatives.  In exchange for amnesty, the bank is providing information and cooperating fully with Justice officials." |

| 101 | One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that co-conspirator Bank of America provided to the City of Atlanta in 2002, in which Defendant CDR acted as the broker and handled the bidding. | "CDR's handling of investment bids for the City of Atlanta has already come under scrutiny. The IRS last year told officials from Atlanta that the city may have overpaid for a $453 million guaranteed investment contract from Bank of America Corp. in an auction run by CDR. The contract was for money raised by a 1999 water sewer bond." |
|---|---|---|
| | | Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006). |
| | | "Questions about bid rigging were also raised in connection with a $453 million guaranteed investment contract that Bank of America won from the city of Atlanta. That bidding for that agreement was handled by CDR Financial Products Inc., a Beverly Hills, California adviser to local governments that was raided in November in connection with the Justice Department probe. |
| | | The IRS in 2005 told Atlanta officials that the city may have overpaid for a $453 million guaranteed investment contract from Bank of America Corp. The IRS asked whether banks arranged to submit 'courtesy losing bids" at an auction held to win the city's investment business, according to a Feb. 5 2005 letter obtained by Bloomberg News. |
| | | Bloomberg, Bank of America to Cooperate in Muni Bid-Rig Probate (Feb. 9, 2007); see also Bloomberg.com, U.S. Criminal Probe Rattles 2 Trillion Municipal Bond Market (Dec. 7, 2006), |
| | In a June 28, 2002 e-mail, Douglas Campbell told Phil Murphy that $182,393 was paid to Defendants CDR, Piper Jaffray, PaineWebber, and Winters. The payments were | "In nine separate transactions in 2001 and '02, Douglas Campbell, an employee of Bank of America, ...., paid a total of $182,393 to banks and advisers [including CDR ($57,393), |

Bond Buyer, BoA Gets Criminal Amnesty" (Feb. 12, 2007). See also infra ¶¶ 122-125 (The DOJ Grants Conditional Amnesty to B of A), for more specific factual allegations.

| | |
|---|---|
| described as a bid to build co-conspirator Bank of America's relationship with these companies. | Piper Jaffray ($40,000), PaineWebber ($75,000), and Winters ($10,000)] that played no role in any transaction, the banker disclosed in a June 28, 2002, e- mail to his boss, then managing director Phil Murphy." |
| | Bloomberg.com, Getting Paid for Doing Nothing (Dec. 6, 2006). |
| | "Bank of America in 2002 fired the employee in its municipal derivatives department who handled the Atlanta contract after he told his manager that he paid a total of $182,393 to CDR, another broker, and two rival banks on transactions in which they played no role, according to records from the NASD and North Carolina's state court in Mecklenburg County, as reported in a Bloomberg article on Oct. 4. |
| | The payments to CDR were described as a bid to build its relationship with the broker, according to an e-mail contained in court records." |
| | Bloomberg, Bank of America to Cooperate in Muni Bid-Rig Probe (Feb. 9, 2007). |
| | "A Bank of America employee who bid for the Atlanta bond work, Doug Campbell, was fired after disclosing that he paid $57,393 to CDR for transactions in which it played no role. |
| | The employee said in internal e-mails that the payments were made to bolster his relationship with CDR. Campbell also wrote that he made similar payments to another broker of guaranteed investment contracts, Los Angeles-based Winters & Co., and PaineWebber Inc., now a unit of Zurich-based UBS AG and a rival bidder for investment contracts. |
| | Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006). |

"Information surfaced in public documents showing officials at Bank of America paid firms such as CDR Financial Products, Piper Jaffray & Co., Winter & Co., and PaineWebber Inc., now UBS Securities LLC, for transactions in which they not involved, Bloomberg Markets reported last year.

In a June 28, 2002, email, Doug Campbell, a Bank of America sales manager who was fired from the firm in August 2002 and now works at Piper Jaffray, told Phil Murphy, then the head of managing director of the firms derivatives department, that the four firms were paid $182,393 for 'unrelated client transactions.'

Murphy resigned from Bank of America in September 2002 and now works at Winters.

'I believe this list contains all the situations where BoA paid external business contract on a transaction where the external business contact was not involved in some way in the transaction,' Campbell said in the memo, one of several documents that Bloomberg said it obtained from the NASD and North Carolina's state court in Mecklenburg County.

Campbell said the $40,000 of fees to Piper were 'just saying thanks for all the swap business we had been doing.' The $75,000 to PaineWebber was to 'help [two employees] since they were struggling to get their external reinvest business going,' he said. The $10,000 to Winters 'was the first day [Winters & Co. head] Chris [Winters] opened his new firm.'

'The CDR fees have been part of the ongoing attempt to develop a better relationship with our major brokers,'" Campbell said."

Bond Buyer, BoA Gets Criminal Amnesty (Feb. 12, 2007).

102 | Other examples of bid-rigging and kickbacks exist. | 
---|---|---
| The IRS is examining over 20 lease-to-own deals between Defendants *CDR* and Societe Generale, as well as Defendant CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation. | "The IRS has also been looking into bid-rigging and other problems with GICs and the investment of bond proceeds for several years. It has focused on the roles of CDR and Societe Generale, a French Bank, in over 20 ' lease to own' deals, as well as the firms involvement in California school advance refundings and put option cases from several issuers around the country."<br><br>Bond Buyer, FBI Raid Officers of CDR, IMAGE (Nov. 16, 2006). |
| There is evidence of quarterly payments Defendant Societe Generale made to Defendant CDR for "unspecified services" relating to these lease-to-own deals. | "The Internal Revenue Service believes Societe Generale and CDR Financial Products Inc. fixed prices on financial products to divert arbitrage in the lease-to-own deals [in 22 transactions between 1996 and 2005 ], and had an ongoing arrangement to promote similar abusive arbitrage schemes, ...."<br><br>Bond Buyer, IRS Alleges CDR, Societe Generale Fixed Prices (April 16, 2007).<br><br>"The Internal Revenue Service has evidence of quarterly payments made by French investment bank Societe Generale to a transaction promoter [CDR] for 'unspecified services' related to lease-to-own bond deals, according to letters sent to municipal issuers last fall. |
| The IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues. | ... the IRS' audits of 21 such deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues.<br><br>    *    *    *<br><br>Sources say the promoter-structurer firm is Beverly Hills, Calif.-based CDR Financial Products, ..."<br><br>Bond Buyer, IRS, Lease Deals Had Bad Fees (Jan. 5, 2007); |

| | | |
|---|---|---|
| 103 | The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. According to documents obtained from the authority, the IRS said it was concerned about quarterly payments made by Defendant Societe Gendrale to Defendant CDR, which structured the transaction and evaluated bids for the investment agreement. Records show that Defendant FSA was one of the four that bid for that contract. | See also Bond Buyer, IRS Investigates Lease Deals for Fee Scheme (June 12, 2006) ("Two firms [CDR and Societe Generale] may have conspired to exchange undisclosed fees masked as transfers of credit risk in a group of 'lease-to-own ', bond deals, the Internal Revenue Service alleged last week in similar letters sent to 16 municipal issuers."); Bond Buyer, IRS Alleges CDR, Societe Generale Fixed Prices (April 16, 2007) ("First, and perhaps most problematically, according to sources, its evidence Societe Generale 'is making quarterly payments of $13,812 to CDR Financial Products out of the forward purchase fee  for certain unidentified fees …' the IRS said."); Bond Buyer, Lease Deal Parties Got Bonds As Well As Fees (April 26, 2007) ("First, the agency [IRS] told both issuers it believes Societe Generale is making quarterly payment to CDR out of its forward purchase fee for 'certain unidentified services.'"); Bond Buyer, Lease-to-Own Issuer Discloses IRS Settlement (May 31, 2007) ("The IRS has alleged that SoGen made payments to CDR that were unrelated to the transfer of credit risk and were deliberate diversions of arbitrage earned off guaranteed investment contracts."). "The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industrial Development Authority to help individuals buy homes. According to documents obtained from the authority, the IRS said it was concerned about quarterly payments made by Paris-based Societe Generale, … to [Defendant] CDR, which structured the transaction and evaluated bids for the investment agreement. … Financial Security Assurance [FSA] was one of the four that bid for that contract, the records show." Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006). See also Bloomberg.com, Bank of America Financial Security in SEC Muni Probe (Feb. 8, 2008). |
| 104 | As another example, in November of 2006, as part of a settlement with the IRS, it was disclosed that Defendant Baum illegally diverted profits on municipal bond deals. | "On Nov. 10, George K. Baum & Co., … settled allegations with the IRS that it diverted profits on municipal bond deals. In one instance the IRS alleged that bidding was rigged in the |

That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. The agency found evidence of big rigging in these deals.

•

Defendant Baum had rigged the deals to allow Defendant CDC, who was the winning Provider on many of them, to underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees, diverting arbitrage profits back to Defendant Baum. In one case, Defendant CDC paid a large fee directly to David Lail of Defendant Baum.

selection of a guaranteed investment contract provider for a $150 million loan pool underwritten by Baum in 1999 and issued by the Illinois Finance Authority. * * * The IRS settlement with Baum covered more than $2 billion of such deals between 1997 and 2001."

Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006).

"Five days before companies disclosed receiving subpoenas from the Justice Department in connection with its probe, George K. Baum & Co., ... said it settled allegations with the IRS that it illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion of co-called blind-pool deals between 1997 and 2001."

Bloomberg, Bank of America to Cooperate in Muni Bid-Rig Probe (February 9, 2007).

"Several years ago the IRS informed about 20 tax-exempt bond issuers from Arizona to Florida that Baum had rigged GIC bids to allow the winning provider, most often CDC Funding Corp., to underpay for the GIC and simultaneously overpay for other investment agreements and remarketing fees, diverting arbitrage profits back to Baum to pay issuance costs.

In one instance, the IRS found that CDC paid a large fee directly into the personal account of a Baum employee, thought to be [David] Lail who provided the necessary bidding certificates [and who the firm fired in 2004 for violating 'certain company policies and procedures concerning the receipt of a check from a third party with whom the company had done business']."

Bond Buyer, IRS Reaches Settlement With Baum (Nov. 10, 2006).

| | | |
|---|---|---|
| 105 | Co-Conspirator Bank of America also provided the GIC, on at least one of the Defendant Baum transactions targeted by the IRS, a $100 million issue from the Illinois Development finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc. Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant hidden payment to Defendant Baum. | "Bank of America provided the guaranteed investment contract [GIC] on at least one of the Baum transactions targeted by the IRS, a $100 million issue sold in 2000 by Rural Enterprises of Oklahoma Inc., bond documents show. Rural Enterprise of Oklahoma Inc. disclosed in July 2003 that a 'significant,' hidden payment was made to Baum by the provider of the investment agreement." |
| 106 | The objective of the illegal agreement, understanding, and conspiracy is to artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the market prices of Municipal Derivatives sold by the Provider Defendants and co-conspirator Bank of America. | Bloomberg, Bank of America to Cooperate in Muni Bid-Rig Probe (February 9, 2007); see also Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006).<br><br>See supra ¶ 94, 97-106, for more specific factual allegations. |
| 107 | In addition to information supplied by co-conspirator Bank of America, the foregoing allegations are supported by disclosures in connection with investigations being conducted by the DOJ's Antitrust Division and the IRS into industry-wide collusive practices in the Municipal Derivatives industry. | As this paragraph itself makes clear, the foregoing allegations are supported by disclosures in the public record. |
| | **Internal Revenue Service Investigation** | |
| 108 | The IRS was the first agency to launch an investigation of collusive practices in the Municipal Derivatives industry. Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in taxes by engaging in abusive arbitrage devices. The IRS was concerned that some GIC providers were overcharging issuers for GICs and other investment products. This would artificially lower, or "burn," investment yields below the bond yield. The spread between the investment and bond yields was then passed to the provider, rather than rebated to the IRS as required by the federal tax laws. | See infra ¶ 109 (primarily consisting of quotes from IRS agents – regarding their discovery of wide spread pervasive bid rigging, in the Municipal Derivatives marketplace, including courtesy and unrealistic bids for GICs – contained in an article from the The Bond Buyer, entitled IRS Steps Up Probes of GIC Bid Rigging (January 6, 2005). |
| 109 | In 2005, Charles Anderson, field operations manager for the | "'It looks like bid rigging is wider and more pervasive than we |

IRS's tax-exempt bond office, publicly stated that "[i]t looks like bid rigging is wider and more pervasive than we thought." Mark Scott, director of the IRS's tax-exempt bond office, publicly stated that "[w]hen a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided." These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work." As Scott went on to note, "[t]hat's basically what we've been doing ... is following those, what I like to refer to as 'tentacles of abuse.'"

thought,' said Charles Anderson, field operations manager for the IRS's tax-exempt bond office, who would not specifically comment on any IRS investigation or other agencies' activities.

'I think the investigation is broadening at this point,' said Mark Scott, director of the IRS's tax-exempt bond office, who also declined to provide any specific details.

With as many as 20 IRS investigations of GIC bid rigging in the municipal market, the agency has increasingly found over the past year that some firms are providing so-called courtesy, or unrealistic bids, for GICs.

An issuer generally selects its GIC provider through a competitive bidding process, often hiring a GIC broker to conduct bidding. Bid rigging can occur when only one of the firms vying to provide the GIC submits a financially viable, bona fide bid and the other two firms submit courtesy bids that are unrealistic and that virtually broker guarantee the company with the viable bid will win the bidding process

'When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided,' Scott said.

These types of bids are 'provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value,' Scott said. 'We have seen transactions where the winning bid is the only bid high enough to make the deal work.'

* * *

'That's basically what we've been doing ... is following those, what I like to refer to as 'tentacles of abuse,' he [Scott] said."

Bond Buyer, IRS Steps Up Probes of GIC Bid Rigging (January 6, 2005).

| | | |
|---|---|---|
| 110 | As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging." The IRS probe showed that investment contracts were sold at below market rates, according to Anderson. That means lower returns for municipalities and less tax revenue for the IRS. He added, "[p]eople were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal." | "Anderson of the IRS says regulators 'think we have evidence of bid rigging.' * * * * The IRS probe shows that investment contracts were sold at below market rates, Anderson said. That meant lower returns for municipalities and less tax revenue for the IRS, he said. 'People were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal,' said the IRS's Anderson."<br><br>Bloomberg, U.S. Criminal Probe Rattles 2 Trillion Municipal Bond Market (Dec. 7, 2006). |
| 111 | At the same time, Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association, noted: "[t]he way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be.... And it's certainly possible that when you don't have transparency you can have abuses." | "'The way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be,' said Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association. 'And it's certainly possible that when you don't have transparency you can have abuses.'"<br><br>Bloomberg, U.S. Criminal Probe Rattles 2 Trillion Municipal Bond Market (Dec. 7, 2006). |
| 112 | The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market. | "The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market. ...."<br><br>Bond Buyer, IRS Steps Up Probes of GIC Bid Rigging (January 6, 2005). |
| 113 | On February 7, 2007, co-conspirator Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities. | "In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions." |

| | | |
|---|---|---|
| | | BoA Press Release, Bank of America Cooperation in Municipal Bonds Investigation recognized by Justice Dept. Amnesty; Settles Certain Matters with IRS (Feb. 7, 2007). See also Bloomberg, BoA to Cooperate in Muni Bid-Rig Probe (Feb. 9, 2007); Bond Buyer, BoA Gets Criminal Amnesty (Feb. 12, 2007). |
| 114 | In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price fixing, bid-rigging and kickbacks. | The Bond Buyer, Justice, SEC Probe Muni Derivatives (November 21, 2006) (investigation involves, "…whether firms disclosed that bidding practices for GIC's and other investment products were competitive when they were not, made or received hidden fees, payments, or kickback, or failed to disclose other key information to issuers …"). See also supra ¶ 109 (quoting IRS agents regarding their discovery of wide spread pervasive bid rigging, including courtesy and unrealistic bids for GICs.). |
| | **Antitrust Division Investigation** | |
| 115 | In light of these revelations, the Antitrust Division of the DOJ commenced its own investigation of the bid-rigging in the Municipal Derivatives markets. For the better part of two years, the Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives. The DOJ is conducting an "investigation of anticompetitive practices in the municipal bond industry," said spokeswoman Kathleen Bloomquist. | See supra ¶¶ 94, 97-115 and infra ¶¶ 116-127, for more specific factual allegations. See also Bond Buyer, FBI Raid Officers of CDR, IMAGE (Nov. 16, 2006) ("'The antitrust division is investigating the possibility of anti-competitive practices in the municipal bond industry.' Justice spokeswoman Kathleen Bloomquist said … Knowledgeable sources said industry practitioners and government employees, including IRS agents, have been called before a federal grand jury ……"); Bloomberg, Municipal Bonds Antitrust Case Probed by Grand Jury (Dec. 11, 2006) (also quoting Justice spokeswoman Kathleen Bloomquist). |
| 116 | On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital. | "The FBI raided the offices of at least two GIC brokers, CDR Financial Products in Beverly Hills, Calif., and Investment Management Advisory Group Inc. [IMAGE], in Pottstown, Pa., early Wednesday [November 15, 2006], morning …." Bond Buyer, FBI Raid Officers of CDR, IMAGE (Nov. 16, 2006). "In the criminal probe, a third GIC broker, Sound Capital |

| 117 | Following the FBI raids, the Broker Defendants and Provider Defendants were served with subpoenas. The subpoenas sought detailed information from the companies dating back to 1992. | Management, disclosed yesterday that the Federal Bureau of Investigation had raised its Eden Prairie, Minn., offices.<br><br>* * *<br><br>The Sound Capital [FBI] raid came as the FBI also raised the offices of CDR and Image Wednesday." |
|---|---|---|
| | | Bond Buyer, Wide-Ranging Probe (November 17, 2006). |
| | | See also Bloomberg, <u>U.S Subpoenas Muni Firms, Seizes Papers in Probe</u> (Nov. 16, 2006); Bloomberg, <u>U.S. Criminal Probe Rattles 2 Trillion Municipal Bond Market</u> (Dec. 7, 2006). |
| | The subpoenas asked for documents, e-mails, tapes or notes of phone conversations, and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to guaranteed investment contracts; forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions." | "The Justice Department's antitrust division, … is focusing on anti-competitive behavior … with regard to transactions that date back through 1992 …. |
| | The subpoenas also requested corporate organizational charts, telephone directories, and lists of all individuals involved with GICs and derivatives, in addition to all documents associated with "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding"- including invitations to bid; solicitations; notices, or requests for quotations or proposals issued to any provider; actual or proposed responses; and amounts and prices bid. | The…subpoenas…asked for documents, emails, tapes or notes of phone conversations, and other information regarding 'contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to guaranteed investment contracts; forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions.'<br><br>The subpoenas also requested corporate organizational charts, telephone directories, and lists of all individuals involved with GICs and derivatives, in addition to all documents associated with 'relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding' -- including invitations to bid; solicitations; notices, or requests for quotations or proposals issued to any provider; actual or proposed responses; and amounts and prices bid.'" |

| | | |
|---|---|---|
| 118 | On December 11, 2006, prosecutors based out of the Antitrust Division's New York field office that were tasked with investigating the alleged bid-rigging brought their case to a federal grand jury sitting in the Southern District of New York. | Bond Buyer, Justice, SEC Probe Muni Derivatives (Nov. 21, 2006); See also Bloomberg, U.S. Criminal Probe Rattles 2 Trillion Municipal Bond Market (Dec. 7, 2006); Bloomberg, U.S Subpoenas Muni Firms, Seizes Papers in Probe (Nov. 16, 2006).<br><br>"Prosecutors investigating bid-rigging in the municipal bond market have brought their case to a federal grand jury in New York, a person with knowledge of the case said.<br><br>Ralph Giordano, chief of the New York office of the U.S. Justice Department's Antitrust Division, and Rebecca Meiklejohn, a trial attorney, are leading the criminal investigation, the person said."<br><br>Bloomberg, Municipal Bonds Antitrust Case Probed by Grand Jury (Dec. 11, 2006).<br><br>See also N.Y. Post, Federal Grand Jury Gets Case on Muni Bond Bid Rigging (Dec. 12, 2006) (same). |
| 119 | According to news reports and company filings, the following Defendants have received governmental subpoenas: GE Funding; GE Trinity; CDR; FSA; FGIC, Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; IXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Societe Generale; Baum; Feld Winters; JP Morgan; American International Group Inc.; Bear Stearns; UBS; Piper Jaffray; Wachovia.; Cain Brothers; Morgan Keegan; Shockley; Genworth Financial; and SunAmerica. | As this paragraph itself makes clear, the paragraph relies on public information, i.e., news reports and company filings. |
| 120 | At least ten current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ or notified that they are part of the DOJ's investigation:<br><br>James Hertz, Samuel Gruer, Shlomi Raz, Patrick Marsh, Stephen Salvadore, Peter Ghavami, Mary H. Packer, James | "At least ten current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ ... according to regulatory filing [i.e., Financial Industry Regulatory Authority (FINRA)].<br><br>***<br><br>James Hertz ... Samuel Gruer ... Shlomi Raz ...Patrick Marsh ...Stephen Salvadore ...Peter Ghavami ... Mary H. Packer .... |

| | | |
|---|---|---|
| 121 | H. Towne, Jay Saunders and Martin McConnell.<br><br>Many of these individuals submitted information to the Financial Industry Regulatory Authority ("FINRA") disclosing that they were DOJ targets.<br><br>As a March 3, 2008 *Bond Buyer* article noted:<br><br>Market participants said Friday that the individuals and firms known to have been subpoenaed or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicly disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but banks and investment advisory firms are not subject to the same disclosure requirements.<br><br>"Usually by the time an individual gets a target letter, the investigation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms," said John K. Markey, a partner at Mintz Levin Cohn Ferris Glovsky & Popeo PC in Boston, and former federal and state prosecutor.<br><br>Markey said that in a target letter, "The Department of Justice is informing an individual or his attorney that it already has substantial evidence of the commission of a federal crime. It usually is a sign that the individual is going to be indicted and it may prompt an attempt at a plea bargain or | James H. Towne ... Jay Saunders ... Martin McConnell ...."<br><br>*Bond Buyer*, Wall Street Brokers Get DOJ Letters (March 3, 2008). *See also* supra, ¶ 97 (d) – (i) and ¶ 98 (a) & (c).<br><br>As this paragraph itself makes clear, the paragraph relies on public information. |

| | | cooperation deal with the government." |
|---|---|---|
| | **The DOJ Grants Conditional Amnesty to B of A** | |
| 122 | On February 9, 2007, co-conspirator Bank of America, the second largest bank in the United States, announced that it was cooperating with the DOJ's investigation into bidding practices in the municipal bond business in exchange for leniency as part of the DOJ's amnesty program. | "Bank of America Corp. announced Friday [February 9, 2007] it had entered into an amnesty agreement with the U.S. Justice Department protecting it form criminal prosecution in the department's wide ranging investigation into bidding practices for municipal derivatives. In exchange for amnesty, the bank is providing information and cooperating fully with Justice officials."<br><br>Bond Buyer, <u>BoA Gets Criminal Amnesty</u>" (Feb. 12, 2007).<br><br>"Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation."<br><br>Bank of America Press Release, <u>Bank of America Cooperation in Municipal Bonds Investigation recognized by Justice Dept. Amnesty; Settles Certain Matters with IRS</u> (Feb. 9, 2007). |
| 123 | On February 9, 2007, co-conspirator Bank of America issued a press release and stated the following:<br><br>Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result | See also Bloomberg.com, <u>Bank of America to Cooperate in Muni Bid-Rig Probe</u> (Feb. 9, 2007).<br><br>As this paragraph itself makes clear, the paragraph relies on public information. |

| | | |
|---|---|---|
| | of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.<br><br>The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department.<br><br>In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions. | |
| 124 | It was reported that key derivatives officials at the bank were on "administrative leave," including Dean Pinard. | "Sources said that key derivatives officials at the bank were on 'administrative leave,' including Dean Pinard, who had managed the bank's derivatives department in Charlotte, N.C."<br><br>Bond Buyer, BoA Gets Criminal Amnesty (February 12, 2007). |
| 125 | On February 28, 2008, co-conspirator Bank of America, in its SEC Form 10-K, at page 123, stated the following:<br><br>Municipal Derivatives Matters<br><br>The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices *in* the municipal derivatives industry involving | As this paragraph itself makes clear, the paragraph relies on public information. |

various parties, including BANA [co-conspirator Bank of America], from the early 1990s to date. The activities at issue *in* these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, RANA received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.

On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed. Subject to satisfying DOJ and the court presiding over any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages

|  |  |  |
|---|---|---|
|  | in certain types of related civil antitrust actions, and (ii) relief from joint and several antitrust liability with other civil defendants. |  |
|  | **History of Fraud In The Derivatives Market** |  |
| 126 | The wrongful conduct alleged herein is not the first time that Wall Street firms have run afoul of laws designed to prevent unfair profiteering on the proceeds of a bond issuance. In 1998, twenty-one firms were sanctioned for involvement in fraudulent activities that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on hose much they could earn. This so-called "yield-burning" scandal led to settlements of $172 million as a result of misconduct on 3600 separate municipal bond issues. Piper Jaffray, one of the Provider Defendants here, was involved in the earlier municipal bonds scandal. | "Since news of the subpoenas first came to light, market participants have voiced their concern over the negative light that the probes could cast on the municipal market. In the investment arena, they echo the problems of the of the yield burning scandals of the 1990's. The controversy over yield-burning led to a global settlement in 2000 in which 17 brokers-dealers paid a combined $138.3 million to settle SEC charges in connection with the practice." *Bond Buyer, Be Wary of Bid-Rigging, Players Warn* (December 13, 2006). |
| 127 | Likewise, in 2002, Stifel Nicolaus broker Robert Cochran paid $220,000 to settle civil allegations against him in connection with bid rigging on a GIC transaction with the Oklahoma Turnpike Authority ("OTA") in 1989 and a forward contract with OTA in 1992. In the former instance, the bid was rigged in favor of Provider Defendant AIG, using a "last look." The "last look" was used to deter cheating by Provider Defendants and/or co-conspirator Bank of America by allowing the pre-designated winner to confirm that the other bidders had submitted non-competitive, sham bids before the auction closed. | "In 2002 former, former Stifel, Nicolaus & Co. investment banker Robert Cochran paid $220,000 to settle SEC securities fraud and other civil allegations against him, stemming from undisclosed payments he obtained for Stifel on deals for two Oklahoma-based issuers in the early 1990s. * * * When the Oklahoma Turnpike Authority issued $568 million in revenue bonds in 1989, it looked to enter a guaranteed investment contract. …. Stifel was a member of the underwriting syndicate and Pacific Matrix acted as the 'finder' for re-investment of the bonds. Cochran and Pacific conspired to rig the bidding process …. The two did so by giving AIG a 'last look' at its competitors' bid for the contract, documents state. Cochran arranged to call Pacific Matrix once he learned of the highest submitted bid.'" |

|  |  | Bond Buyer, Enforcement: Court Documents Show What Bid-Rigging Looks Like (December 19, 2006). |
|---|---|---|
|  | **CLASS ACTION ALLEGATIONS** |  |
| 128 | Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:<br><br>All state, local and municipal government entities, independent government agencies, and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from, a Provider Defendant or Bank of America, or through a Broker Defendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories. | No factual support from Bank of America necessary. |
| 129 | Plaintiffs do not know the exact number of class members because such information is in the exclusive control of the Provider Defendants, co-conspirator Bank of America, the Broker Defendants, and unnamed co-conspirators. But due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known by the Provider Defendants, co-conspirator Bank of America, the Broker Defendants, and unnamed co-conspirators. | No factual support from Bank of America necessary. |
| 130 | The Class is so numerous and geographically dispersed that joinder of all members is impracticable. | No factual support from Bank of America necessary. |
| 131 | There are questions of law and fact common to the Class, including:<br><br>a. Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, maintain or stabilize prices, and rig bids and allocate | No factual support from Bank of America necessary. |

| | | |
|---|---|---|
| | customers and markets of Municipal Derivatives;<br>b. The identity of the participants of the alleged conspiracy;<br>c. The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators-in furtherance of the conspiracy;<br>d. Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;<br>e. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs, and the other members of the Class;<br>f. The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;<br>g. Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the other members of the Class; and<br>h. The appropriate class-wide measure of damages. | |
| 132 | Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are purchasers of Municipal Derivatives, and their interests are coincident with, and not antagonistic to, those of the other members of the Class. | No factual support from Bank of America necessary. |
| 133 | Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation. | No factual support from Bank of America necessary. |
| 134 | The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. | No factual support from Bank of America necessary. |
| 135 | The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages. | No factual support from Bank of America necessary. |
| 136 | A class action is superior to other available methods for the | No factual support from Bank of America necessary. |

| | | |
|---|---|---|
| | fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action. | |
| | **TRADE AND INTERSTATE COMMERCE** | |
| 137 | The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce | No factual support from Bank of America necessary. |
| 138 | During the Class Period, Defendants and their co-conspirators issued and/or, sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation, other than the states in which Defendants and their co-conspirators were citizens. | No factual support from Bank of America necessary. |
| 139 | The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce. | No factual support from Bank of America necessary. |
| | **CAUSE OF ACTION** | |
| 140 | Plaintiffs hereby sue Defendants for participating, along with the Bank of America, in a conspiracy to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives sold in the United States and its territories in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. | No factual support from Bank of America necessary. |
| 141 | The combination and conspiracy alleged herein has had the following effects, among others:<br>a. Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United | No factual support from Bank of America necessary. |

33

| | | |
|---|---|---|
| | States;<br>b. Bids charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels throughout the United States;<br>c. Customers and markets of Municipal Derivatives were allocated among Defendants and their co-conspirators;<br>d. Plaintiffs and the other members of the Class received lesser interest rates on Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;<br>e. Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and<br>f. As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined. | |
| 142 | As a result of this combination and conspiracy, Plaintiffs and members of the Class suffered injury to their business and property. | No factual support from Bank of America necessary. |
| 143 | Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Plaintiffs seek to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations alleged herein. | No factual support from Bank of America necessary. |
| | **FRAUDULENT CONCEALMENT** | |
| 144 | Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct | No factual support from Bank of America necessary. |
| 145 | Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that | No factual support from Bank of America necessary. |

| | |
|---|---|
| | Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Neither Defendants nor their co-conspirators told Plaintiffs or other class members that they were rigging bids. To the contrary, Plaintiffs were falsely assured that the Broker Defendants were acting as their agents and were soliciting bids for Municipal Derivatives that were fair and competitively priced and that complied with specific IRS rules and regulations that required Broker Defendants to obtain at least three commercially reasonable bids. Accordingly, Plaintiffs and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. | |
| 146 | Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:<br><br>a. By meeting secretly to discuss prices, customers and markets of Municipal Derivatives sold in the United States and elsewhere;<br><br>b. By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;<br><br>c. By intentionally creating the false appearance of competition by engaging in sham auctions in which the results were pre-determined;<br><br>d. Through covert sharing of profits or other secret | <u>See supra</u>, ¶¶ 94, 97-127, for more specific factual allegations. |

| | compensation paid to losing bidders;<br>e. By secretly communicating about bids that would be<br>won or lost by the , Provider Defendants;<br>f. By paying kickbacks to Broker Defendants;<br>g. By submitting cover or courtesy bids, or unrealistically<br>low or other artificial bids, and/or deliberately; losing bids,<br>to create the appearance of, competition where there was<br>none; and<br>h. By covert agreements not to bid. | |
|---|---|---|
| 147 | As a result of Defendants and their co-conspirators'<br>fraudulent concealment, all applicable statutes of limitations<br>affecting the Plaintiffs' and the Class's claims have been<br>tolled. | No factual support from Bank of America necessary. |