## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAIRFAX COUNTY, VIRGINIA; STATE OF MISSISSIPPI; CITY OF BALTIMORE, MARYLAND; CENTRAL BUCKS SCHOOL DISTRICT; and BUCKS COUNTY WATER AND SEWER AUTHORITY<br><br>On behalf of themselves and all other similarly situated entities,<br><br>                Plaintiffs,<br><br>        v.<br><br>BANK OF AMERICA, N.A.; WACHOVIA BANK N.A.; AIG FINANCIAL PRODUCTS CORP.; BEAR, STEARNS & CO., INC.; FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.; FINANCIAL SECURITY ASSURANCE, INC.; FINANCIAL GUARANTY INSURANCE CO. LLC; GE FUNDING CAPITAL MARKET SERVICES, INC.; GENWORTH FINANCIAL INVESTMENT MANAGEMENT, LLC; FELD WINTERS FINANCIAL LLC; NATIXIS S.A.; JP MORGAN CHASE & CO; PIPER JAFFRAY & CO.; SOCIÉTÉ GÉNÉRALE SA; AIG SUNAMERICA LIFE ASSURANCE CO.; UBS AG; XL CAPITAL, LTD.; XL ASSET FUNDING CO. I, LLC; XL LIFE INSURANCE & ANNUITY INC.; MERRILL LYNCH & CO, INC.; MORGAN STANLEY; NATIONAL WESTMINSTER BANK PLC; NATIXIS FUNDING CORP.; INVESTMENT MANAGEMENT ADVISORY GROUP, INC.; CDR FINANCIAL PRODUCTS; WINTERS & CO. ADVISORS, LLC; FIRST SOUTHWEST COMPANY; GEORGE K. BAUM & CO.; KINSELL NEWCOMB & DE DIOS INC.; PACKERKISS SECURITIES, | **MDL No. 1950**<br>**Master Docket No. 08-02156**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

INC.; SHOCKLEY FINANCIAL CORP.;            :
SOUND CAPITAL MANAGEMENT, INC.;            :
CAIN BROTHERS & CO., LLC; MORGAN           :
KEEGAN & CO., INC.; TRINITY                :
FUNDING CO. LLC., and MUNICIPAL            :
GOVERNMENT INVESTORS CORP.,                :
                                           :
                        Defendants.        :

## NATURE OF THE CASE

1.      Plaintiffs allege herein a conspiracy among Defendants and unnamed co-conspirators, to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives (as defined below) sold in the United States and its territories.

2.      Plaintiffs and Provider Defendant Bank of America, N.A. ("Bank of America") have engaged in confidential discussions about some of the facts and circumstances detailed in this Complaint over the last 14 months in the context of a settlement process, including a number of sessions overseen by the Honorable Daniel Weinstein (Ret.) of JAMS.  Judge Weinstein is one of the nation's preeminent mediators of complex civil disputes.  These discussions have been conducted pursuant to, among other things, an agreement that requires full and timely cooperation by Bank of America, which has been received.  The information contained in this Complaint comes in part from information obtained from Bank of America and in part from publicly-available information, including regulatory filings.

3.      This lawsuit arises out of an illegal agreement, understanding and conspiracy among providers and brokers of Municipal Derivatives to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal Bonds or other entities that use the proceeds of issuances of Municipal Bonds.  This illegal agreement, understanding and conspiracy is based on *per se* illegal horizontal communications and conduct among providers of Municipal Derivatives.  These providers have engaged in communications facilitating and conduct restraining competition such as rigging of bids, secret compensation of losing bidders, courtesy bids, deliberately losing bids, and

1

agreements not to bid. Brokers have knowingly participated in this *per se* illegal conspiracy to limit competition by facilitating indirect communications among providers and have shared the wrongful profits from the illegal agreement to restrain competition.

4.       There has been an unprecedented set of investigation by the United States Department of Justice's ("DOJ") Antitrust Division, the Internal Revenue Service ("IRS"), the Securities and Exchange Commission ("SEC"), and, more recently, state attorneys general ("AGs"), into industry-wide collusive practices in the two-hundred year old municipal bond industry. A grand jury investigation currently is being conducted by the Antitrust Division in the United States District Court for the Southern District of New York. Over thirty (30) large commercial and investment banks, insurance companies, and brokers have been subpoenaed, and the offices of three brokers have been raided by the Federal Bureau of Investigation. Numerous employees and former employees of various Defendants recently received letters notifying them that they are regarded as targets of the grand jury investigation concerning antitrust and other violations regarding contracts related to municipal bonds.

5.       This lawsuit also follows Bank of America's conditional acceptance into the DOJ Antitrust Division's amnesty program, in connection with which there was disclosure of information regarding the conspiracy described below and the promise to provide full and complete cooperation to the Antitrust Division and the Plaintiffs and the class they seek to represent. The inevitable and practical result of this illegal conduct affected the market prices of Municipal Derivatives in all transactions.

6.       Plaintiffs bring this action to seek civil redress for their injuries on behalf of themselves and all state, local and municipal government entities and their agencies, as

well as private entities, that purchased by competitive bidding or auction Municipal

Derivatives in the United States and its territories directly from the Provider Defendants

(as defined below) and/or through Broker Defendants (as defined below) in the period

from January 1, 1992 through the present (the "Class Period"). At all relevant times, the

Provider Defendants and the Broker Defendants issued and/or sold Municipal

Derivatives. During the Class Period, Defendants and unnamed co-conspirators agreed,

combined, and conspired with each other to fix prices, and to rig bids and allocate

customers and markets of Municipal Derivatives sold in the United States and its

territories. As a result of the unlawful conduct of Defendants and unnamed co-

conspirators, Plaintiffs and the Class (as defined in this Complaint) received, *inter alia*,

lower interest rates on these contracts than they would have in a competitive market, and

paid ancillary fees and other costs and expenses related thereto. Plaintiffs have

consequently suffered injury to their business and property.

## JURISDICTION AND VENUE

7. This action is instituted under Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including

reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and

the members of the Class by reason of the violations, as hereinafter alleged, of Section 1

of the Sherman Act, 15 U.S.C. § 1.

8. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

9. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the

Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because

during the Class Period the Defendants resided, transacted business, were found, or had

agents in this District, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and because overt acts in furtherance of the alleged conspiracy were undertaken in this District.

## PLAINTIFFS

10.    Plaintiff City of Baltimore, Maryland purchased one or more Municipal Derivatives from at least one Provider Co-Conspirator and/or through at least one Broker Co-Conspirator during the Class Period.

11.    Plaintiff State of Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

12.    Plaintiff Fairfax County, Virginia purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

13.    Plaintiff Central Bucks School District purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

14.    Plaintiff Bucks County Water and Sewer Authority purchased one or more Municipal Derivatives from at least one Provider Defendant and/or co-conspirator Bank of America and/or through at least one Broker Defendant during the Class Period.

## PROVIDER DEFENDANTS

15.    The entities listed below are collectively referenced herein as "Provider Defendants."

16.    Provider Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation with its principal place of business in New York, New York.

4

During the Class Period, AIG Financial issued and sold Municipal Derivatives to members of the Class.

17.     Provider Defendant AIG SunAmerica Life Assurance Co. ("SunAmerica") is an Arizona corporation with its principal place of business in Los Angeles, California. During the Class Period, SunAmerica issued and sold Municipal Derivatives to members of the Class.

18.     Provider Defendant Bank of America, N.A. is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class.  Bank of America transacts business in the Southern District of New York.

19.     Provider Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Bear Stearns issued and sold Municipal Derivatives to members of the Class.

20.     Provider Defendant Financial Security Assurance Holdings, Ltd. ("FSAHL") is a New York corporation with its principal place of business in New York, New York.  During the Class Period, FSAHL issued and sold Municipal Derivatives to members of the Class.

21.     Provider Defendant Financial Security Assurance, Inc. ("FSAI") is a New York corporation with its principal place of business in New York, New York.  During the Class Period, FSAI issued and sold Municipal Derivatives to members of the Class. FSAI and FSAHL are referred to collectively herein as "FSA."

22.     Provider Defendant Financial Guaranty Insurance Company ("FGIC") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, FGIC issued and sold Municipal Derivatives to members of the Class.

23.     Provider Defendant Trinity Funding Co. LLC ("GE Trinity"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a New York limited liability corporation with its principal place of business in New York, New York. During the Class Period, Trinity issued and sold Municipal Derivatives to members of the Class.

24.     Provider Defendant GE Funding Capital Market Services, Inc. ("GE Funding"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the Class.

25.     Provider Defendant Genworth Financial Investment Management, LLC ("Genworth Financial"), an indirect subsidiary of Genworth Financial, Inc., is a Delaware corporation with its principal place of business in Richmond, Virginia. During the Class Period, Genworth Financial issued and sold Municipal Derivatives to members of the Class.

26.     Provider Defendant Natixis S.A. f/k/a IXIS Corporate and Investment Bank ("IXIS") is a French corporation with its principal place of business in Paris, France. During the Class Period, IXIS issued and sold Municipal Derivatives to members of the Class.

6

27.     Provider Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

28.     Provider Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.

29.     Provider Defendant Société Générale SA ("Société Générale") is a French corporation with its principal place of business in Paris, France. During the Class Period, Société Générale issued and sold Municipal Derivatives to members of the Class.

30.     Provider Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business in Zurich, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

31.     Provider Defendant Wachovia Bank N.A. ("Wachovia") is a national chartered banking association with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.

32.     Provider Defendant XL Capital Ltd. ("XL Capital") is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. During the Class Period, Security Capital Assurance issued and sold Municipal Derivatives to members of the Class.

33.     Provider Defendant XL Asset Funding Co. I LLC ("XL Asset Funding") is a limited liability company with its principal place of business in Schaumburg, Illinois.

During the Class Period, XL Asset Funding issued and sold Municipal Derivatives to members of the Class.

34.     Provider Defendant XL Life Insurance & Annuity, Inc. ("XL Life Insurance") is a subsidiary of XL Life & Annuity Holding Co. with its principal place of business in Schaumburg, Illinois.  During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to members of the Class.  XL Capital, XL Asset Funding and XL Life Insurance are referred to collectively herein as "XL."

35.     Provider Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

36.     Provider Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

37.     Provider Defendant National Westminster Bank plc ("NatWest") is a public limited company with its principal place of business in London, England.  During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class.  NatWest is a subsidiary of Royal Bank of Scotland.

### BROKER DEFENDANTS

38.     The entities listed below are collectively referred to herein as "Broker Defendants."

39.     Broker Defendant Natixis Funding Corp. f/k/a IXIS Funding Corp, and before that, f/k/a CDC Funding Corp. ("CDC") is a New York corporation with its

8

principal place of business in New York, New York. During the Class Period, CDC acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants. CDC also functioned on some deals as a Provider, and to the extent it did so, is also referenced herein as one of the Provider Defendants.

40.    Broker Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania. During the Class Period, IMAGE acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

41.    Broker Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business in Beverly Hills, California. During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

42.    Broker Defendant Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business in Sherman Oaks, California.

43.    Broker Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business in Los Angeles, California. During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

44.    Broker Defendant First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas. During the Class Period, First Southwest acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

45.     Broker Defendant George K. Baum & Co. ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri.  During the Class Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

46.     Broker Defendant Kinsell Newcomb & De Dios Inc. ("Kinsell") is a California corporation with its principal place of business in Carlsbad, California.  During the Class Period, Kinsell acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

47.     Broker Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporation, with its principal place of business in Delray Beach, Florida.  During the Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

48.     Broker Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet Inc., is a corporation with its principal place of business in Aurora, Colorado. During the Class Period, Shockley acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

49.     Broker Defendant Sound Capital Management, Inc. ("Sound Capital") is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota. During the Class Period, Sound Capital acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

50.     Broker Defendant Cain Brothers & Co., LLC ("Cain Brothers") is a Delaware limited liability company with its principal place of business in New York,

New York.  During the Class Period, Cain Brothers acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

51.     Broker Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation with its principal place of business in Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

52.     Broker Defendant Municipal Government Investors Corp. ("MGIC") is a New York corporation with its principal place of business in Manhasset, New York. During the Class Period, MGIC acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

## UNNAMED CO-CONSPIRATORS

53.     Various other persons, firms and corporations, not named herein as a Provider Defendant, Broker Defendant, or named conspirator, have participated as co-conspirators with the Provider Defendants and/or the Broker Defendants and have performed acts and made statements in furtherance of the conspiracy.

54.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## DEFINITIONS AND BACKGROUND

### MUNICIPAL BONDS

11

55.     Municipal bonds are issued by states, cities, and counties, or their agencies, as well as by tax-exempt, non-profit private entities (collectively "issuers") to raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants. Because of the tax-exempt status of most municipal bonds, investors usually accept lower interest payments than on other types of borrowing. This makes the issuance of bonds an attractive source of financing to many government and private entities, as the borrowing rate available in the tax free municipal bond market is frequently lower than what is available through other channels.

56.     Municipal bonds bear interest at either a fixed or variable rate of interest. The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span at least several years.

57.     In order for municipal bonds to maintain their tax-exempt status, Internal Revenue Service regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

58.     Municipal bond proceeds typically are put into three types of funds to serve their purpose within the anticipated life of the project. The largest type of fund is known as the project fund or construction fund and, as its name implies, is used to pay for the construction or public works project at hand. The two smaller types of funds are administrative in nature, and ensure that the project fund is adequately funded and that the investors recoup their investment. The debt service fund, or "sinking fund," contains the money used to make principal and interest payments on the bond. The payments out

12

of this fund usually are due semi-annually, although the principal portion of the payment may only be due annually.  The debt service reserve fund ensures that if unforeseen contingencies occur, debt obligations can still be paid.

59.    Because municipal bonds typically are used to fund multi-year projects, most of a given bond's proceeds cannot or need not be spent in one lump sum.  Rather, the proceeds are spent at regularly set intervals, and are invested to earn interest until they are put to use for their stated purpose.

60.    The municipal bond industry is extremely large.  Approximately $385 billion worth of municipal bonds were issued in 2006, according to the Securities Industry and Financial Markets Association.  The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

### MUNICIPAL DERIVATIVES

61.    The investment vehicles in which issuers or those who receive money from bond issuances invest their bond proceeds until they are ripe for use are known as Municipal Derivatives.  "Municipal Derivatives" is an umbrella term that refers to a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings while they are waiting to spend them for their given purposes.  The term has been used in the industry to describe swaps and related transactions (as defined below) and, on occasion, the various types of Guaranteed Investment Contracts (as also defined below). As used in this Complaint, the term encompasses all of the transactions described in the next twelve paragraphs.

62.    Municipal Derivatives are provided by highly rated insurance companies and large commercial and investment banks, and they typically are sold to government entities.  Municipal Derivatives are a particularly favored form of investment in the

13

municipal bond industry because they are considered safe and reliable investment vehicles.

63.     When governmental or private non-profit entities desire to purchase Municipal Derivatives (*i.e.*, enter into Municipal Derivative contracts), they frequently will engage a broker to obtain the best possible price for such derivatives by arranging an auction among multiple providers of Municipal Derivatives.

64.     Municipal Derivatives are grouped generally into two categories, pertaining either to: (a) the investment of bond proceeds, or (b) the bond's underlying interest rate obligations.  The former category of Municipal Derivatives includes instruments such as Guaranteed Investment Contracts, commonly known as GICs (forward purchase, supply, or delivery agreements and repurchase agreements) and escrow agreements.  The latter category of Municipal Derivatives includes instruments such as Swaps, Options, "Swaptions," Collars, and Floors, which are risk-shifting vehicles.

65.     A GIC is an agreement secured by a contract with a financial institution (*i.e.*, a provider), which guarantees a fixed rate of return and a fixed date of maturity. GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a provider agrees to guarantee a fixed or variable rate of interest or a future payment that is based on an index or similar criteria that is payable at a predetermined date on monies that are deposited with the company.[1]  The types of investment agreements that the IRS generally

---

[1]     Interest rates for Municipal Derivatives typically are calculated pursuant to LIBOR or what were BMA rates.  LIBOR refers to the London Interbank Offered

references as GICs are:  (a) Forward Purchase or Forward Delivery Agreements; (b) Repurchase Agreements or Collateralized GICs; and (c) Unsecured or Uncollateralized GICs.

66.     A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds.  Issuers (*i.e.* municipalities and other nonprofit entities authorized to issue bonds) can request bids based on rate of return or on upfront payments, although the latter is the norm.  This is an agreement wherein the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed.  Forward contracts are generally entered into in the over-the-counter markets.  A forward contract may be used for any number of purposes.  For example, a forward contract may provide for the delivery of specific types of securities on specified future dates at fixed yields for the purpose of optimizing the investment of a debt service reserve fund.  A forward refunding is used where the bonds to be refunded are not permitted to be advance refunded on a tax-exempt basis under the Internal Revenue Code.  In such a case, the issuer agrees to issue, and the underwriter agrees to purchase, the new issue of bonds on a future date that would effect a current refunding.

67.     An Unsecured or Uncollateralized GIC does not involve associated securities, but rather pure funds, and thus functions like a savings account.  It is used most often for construction or project funds.  In the bidding process, the issuer sets forth a

---

Rate, the standard rate for quoting interbank lendings of Eurodollar deposits, while BMA refers to the Bond Market Association Index.  The BMA Index has more recently been superseded by the SIFMA (Security Industry & Financial Markets Association) Index.

proposed draw-down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period. These agreements typically have terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties for not meeting deadlines, such as construction benchmarks.

68.    A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return. This is known as a collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

69.    When bonds are issued to refinance a prior issue, and principal or interest on the prior issue will be paid more than 90 days after issuance of the new refunding bonds, the new bonds will be considered an "advance refunding" of the prior bonds. Proceeds of such an issue are generally invested in an advance refunding escrow to be used to pay principal and interest on, and redemption price of, the prior bonds. Under the arbitrage provisions of Section 148 of the Internal Revenue Code, proceeds of the refunding issue invested in the advance refunding escrow generally may not be invested at yield that is higher than the yield on the refunding issue. It is not always possible to have the investments in the escrow maturing on precisely the same dates that amounts will be needed to pay principal or interest on the prior bonds, so amounts potentially will sit un-invested in the escrow for such periods of time. In order to avoid this inefficiency, the issuer may enter into a forward float agreement with an investment provider, under which the issuer typically will receive an up-front payment in exchange for giving the

16

investment provider the right to invest the proceeds during the float periods. The up-front payment received by the issuer must be taken into account in computing the yield on the advance refunding escrow for purposes of the arbitrage rules.

70.     A Swap is a type of agreement frequently used with respect to the exchange of interest rate obligations. A swap may be used to achieve desired tax results, or to alter various features of a bond portfolio, including call protection, diversification or consolidation, and marketability of holdings. There are several types of swaps: (a) floating-for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-rate) swap, where the two are based on different indices (*i.e.*, LIBOR or BMA).

71.     An Option is a provision in a bond contract where the Provider has the right, on specified dates after required notification, to cancel or terminate a Municipal Derivative.

72.     A "Swaption" is the combination of a Swap and an Option.

73.     A Floor (also known as an "interest rate floor") is an agreement whereby the issuer agrees to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference between the interest rate floor and the actual lower rate on the debt. It is used typically on variable rate debt, and refers to the minimum interest rate that can be paid on the debt. Thus, a Floor agreement establishes, for an issuer of variable rate bonds, a minimum or "floor" rate of interest that the issuer will effectively pay, though the bonds themselves may state a different minimum rate.

74.     A Collar is an agreement entered into by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. As with a Floor agreement, the floor component of the Collar establishes the effective minimum rate of interest that the issuer will pay. The cap component "caps" or establishes a maximum rate of interest the issuer will effectively pay, which again may vary from the maximum stated rate of interest on the variable rate debt.

75.     Like the municipal bond industry, the Municipal Derivatives industry is very large. A substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

76.     The Municipal Derivatives industry is relatively concentrated. There are no more than 20 major providers of Municipal Derivatives in the United States. With respect to GICs in particular, there are 10 to 12 major dealers in the United States. On the other hand, the number of issuers is in the tens of thousands.

77.     In a competitive marketplace, providers would be expected to compete against each other for issuers' business on the basis of the highest rate of return for Municipal Derivatives that they could earn for issuers.

### IRS RULES AND REGULATIONS

78.     IRS rules and their corresponding regulations subject issuers to potential taxation from arbitrage (*i.e.*, profit) off of their tax-exempt bond proceeds, subject to certain exceptions. *See* Internal Revenue Code § 148(a); Internal Revenue Code §§ 148(c), (d) and (e) (enumerating exceptions to this principle). Specifically, if the yield from the municipal derivative exceeds the bond's yield by a certain amount, it will be deemed arbitrage and be subject to taxation. In addition, providers cannot divert arbitrage earnings, meaning that they cannot "burn" an otherwise arbitrage yield by

18

charging the issuer a higher fee and reducing the yield by the amount of the fee in order to comply with the rules.

79.    The purpose of the rules and regulations governing arbitrage is to limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates. The rules and regulations, therefore, require all interest that exceeds the bond rate made on tax exempt bond investments to be rebated to the IRS, absent an exception.

80.    Another group of IRS regulations sets forth the procedure for establishing the fair market value of GICs. *See* Treasury Reg. § 1.148-5(d)(6). These regulations govern the bidding process for GICs, and there is a rebuttable presumption that a fair price is obtained for GICs procured in compliance with these regulations. Key regulations include the following:

a.    The bid specifications must be in writing;

b.    The bid specifications must be timely forwarded to potential providers;

c.    The bid specifications must contain all material terms (*i.e.*, the term directly or indirectly affects yield);

d.    The bid specifications must state that by submitting a bid, the potential provider is representing that it has not consulted with other potential providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person;

e.    The bid specifications must be commercially reasonable;

19

f.      There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

g.      The bid specifications must contain a reasonably expected draw down schedule;

h.      All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

i.      The issuer must receive at least three bids from solicited providers.

81.      The intent and purpose behind the IRS safe harbor regulations is to provide a fair, competitive, and transparent process for issuers to obtain the best possible price for tax-exempt municipal derivatives. But due to the concerted effort of the Broker Defendants, the Provider Defendants and co-conspirator Bank of America during the Class Period to conspire to fix prices, rig bids and allocate customers and markets – as opposed to competing– this laudable goal was not realized.

## FACTUAL ALLEGATIONS

### WRONGDOING ALLEGED

82.      During the Class Period defined herein, the Provider Defendants entered into a continuing agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

83.      In particular, the Provider Defendants have combined and conspired to allocate customers and fix or stabilize the prices of Municipal Derivatives, including the interest rates paid to issuers on such derivatives, sold in the United States through agreements not to compete and acts of bid rigging. Overt acts in furtherance of this

20

conspiracy, including use of the mails or wires to transmit and process rigged bids, were undertaken in this District.

84.     The Provider Defendants who knowingly and intentionally engaged in these rigged auctions, understood that they would take turns providing the winning bid. At times, the Provider Defendants directly discussed with each other the terms of their bids.  For some of these communications, audiotapes, including audiotapes of conversations involving the Provider Defendants' marketing of Municipal Derivatives (such as individuals on Provider Defendants' marketing desks) exist. As Charles Anderson, former field operations manager for the IRS's tax-exempt bond office, has said, "I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion'..... It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg.  Ultimately, the same kinds of acts that give rise to 6700 [liability] can also give rise to criminal conspiracy counts against attorneys. I would not be surprised to see bankers and lawyers go to jail."

85.     On other occasions, communications among the Providers Defendants were made indirectly through one or more of the Broker Defendants, who would guide the Provider Defendants by suggesting the terms of their respective bids.  The Provider designated to win a particular auction frequently bid after it had been provided with the terms of the bids provided by the other bidders, a practice known as a "last look" that is expressly forbidden by IRS regulations.

86.     At times, one or more of the Provider Defendants engaged in complementary trades to compensate other Providers Defendants, who either did not

21

submit bids or who engaged in sham bids. On other occasions, the winning Provider, including at times one or more of the Provider Defendants, would secretly compensate one or more Provider Defendants for declining to submit a bid.

87.     The Broker Defendants have knowingly participated in the illegal agreement, understanding, and conspiracy not to compete and to rig bids in order to win the favor of the Provider Defendants and share in the profits of the conspiracy, all in breach of their fiduciary and other duties as agents for Plaintiffs and members of the class during the bidding process.

88.     The Broker Defendants touted to issuers their abilities to facilitate deals for the Provider Defendants and touted the network of relationships they created among Providers. For example, on its website, CDR claims "CDR Financial develops products and strategic alliances across a wide spectrum of financial institutions, including asset managers, banks, broker dealers and insurance companies."

89.     The interconnected nature of the Municipal Derivatives industry facilitated and reinforced the conspiratorial conduct alleged herein, leading to the massive, multi-agency government investigation. As *The Bond Buyer* reported on November 21, 2006:

> The industry tends to be quite intertwined and interconnected," said Willis Ritter, a partner at Ungaretti & Harris here. "Virtually all the major houses are involved in selling [GICs], so if you think you've found something about one, you suspect you're going to find it about all of them.

90.     The existence of the illegal agreement, understanding and conspiracy is confirmed by *per se* illegal horizontal communications among marketing personnel employed in the municipal bond/derivative departments of the Provider Defendants and

co-conspirator Bank of America. These individuals have participated in direct
communications with competitor providers with respect to the following, *inter alia*:

    a.    the rigging of bids, including the collusive suppression of interest
rates paid to issuers on Municipal Derivatives;

    b.    conduct that would be used to limit competition;

    c.    sharing of profits from a winning bid with a losing bidder and
other secret compensation of losing bidders;

    d.    bids that would be won by specific Provider Defendants; and

    e.    an exchange of a deliberately losing bid for a future winning bid.

91.    The Broker Defendants' knowing participation in the illegal agreement,
understanding and conspiracy not to compete and to rig bids is established by their
serving as a conduit for indirect communications among the Provider Defendants that
were per se illegal. Again, overt acts in furtherance of this conspiracy, including, on
information, use of the mails or wires to transmit and process rigged bids, were
undertaken in this District. The Provider Defendants also shared their wrongful profits
from the illegal agreement, understanding and conspiracy, by paying kickbacks to Broker
Defendants. For example, Defendant CDR had a secret agreement with the provider of a
GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida. The deal allowed
Defendant CDR to increase its fees if none of $220 million in bond proceeds was used for
its intended purpose – affordable housing.

92.    The existence of the illegal agreement, understanding and conspiracy is
further established by *per se* illegal horizontal and coordinated conduct among the
marketing personnel employed in the municipal bond/derivative departments of the

Provider Defendants. These individuals have participated in, *inter alia*, the following conduct to limit competition, rig bids and to create the appearance of competition where there was none:

      a.    courtesy bids submitted to create the appearance of competition where there was none;

      b.    bids known to be unrealistically low and deliberately losing bids;

      c.    bidding processes where only one bid was sufficiently high to make the deal work;

      d.    agreements to share profits from a winning bid with a losing bidder through transactions between Provider Defendants;

      e.    conduct in violation of IRS regulations relating to the bidding process;

      f.    secret last look agreements; and

      g.    agreements not to bid.

93.    The Broker Defendants' knowing participation in the illegal agreement, understanding and conspiracy not to compete and to rig bids is also established by their participation in the per se illegal conduct to limit competition, rig bids and to create the appearance of competition where there was none. Broker Defendants further participated in and facilitated the illegal agreement, understanding and conspiracy by arranging the allocation of winning bids among the Provider Defendants. The Broker Defendants further communicated to the Provider Defendants concerning, inter alia:

      a.    winning bids that would be allocated to Provider Defendants;

b.   confirming understandings that bids would be won by Provider Defendants;

c.   confirming understandings that bids would be lost by Provider Defendants;

d.   the fact that bids were being rigged; and

e.   bid levels that would be necessary by Provider Defendants to win or lose a bid.

94.   Individuals employed by the Provider Defendants who have engaged in the illegal communications and conduct among Provider Defendants to restrain competition include, *inter alia*:

a.   Douglas Campbell, a former co-conspirator Bank of America sales team manager who also formerly worked at Defendant Piper Jaffray;

b.   Dean Pinard, former manager of co-conspirator Bank of America's derivatives department;

c.   Phil Murphy, former head managing director of co-conspirator Bank of America's derivatives department who subsequently joined Winters;

d.   James Hertz, former vice-president in Defendant JP Morgan's tax-exempt capital markets group;

e.   Stephen Salvadore, Managing Director of municipal capital markets and derivatives at Defendant Bear Stearns;

f.     Douglas MacFaddin, former head of cash derivatives and marketing at JP Morgan;

g.     Jay Saunders, who worked in the derivatives marketing department at Defendant Wachovia;

h.     Martin McConnell, who worked in the derivatives marketing department at Defendant Wachovia;

i.     Peter Ghavami, former Managing Director and co-manager in Defendant UBS's municipal derivatives group;

j.     Patrick Marsh, Managing Director of Deutsche Bank's municipal restructuring unit, who had worked at Defendant Bear Stearns;

k.     Shlomi Raz, a banker who formerly worked at Defendant JP Morgan; and

l.     Samuel Gruer, former vice-president in Defendant JP Morgan's tax-exempt capital markets group.

95.     Individuals employed by the Broker Defendants who have engaged in the illegal agreement, understanding and conspiracy include:

a.     James Towne, former Managing Director of Defendant Piper Jaffray's municipal derivatives group;

b.     David Lail, who worked in Defendant Baum's derivatives department; and

c.     Mary Packer, president of Defendant PackerKiss.

96.     The conspiracy has been facilitated through intercompetitor contacts at trade associations. One such association is the International Swaps & Derivatives

26

Association ("ISDA"), which describes itself at its website as "represent[ing] participants in the privately negotiated derivatives industry, [and] is the largest global financial trade association." The ISDA's members include the following: Bank of America, JP Morgan, Bear Stearns, Société Générale, UBS, and Wachovia. Another is the American Bankers Association, which counts among its members the Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia. A third is the Securities Industry and Financial Markets Association ("SIFMA"), formed in 2006 by the merger of the Securities Industry Association and the Bond Market Association. As stated at SIFMA's website, "[w]hile its name has changed, its mission has been consistent: to represent the bond markets; advocate on their behalf; provide opportunities for professional development and industry education and serve as conduit through which the industry communicates with regulators, legislators, the media and the public." The members of SIFMA include the following Defendants or affiliates thereof: AIG, Bank of America, Bear Stearns, First Southwest, GE Capital, JP Morgan, Merrill Lynch, Natixis, Piper Jaffray, Morgan Keegan, and Wachovia. The Chairman of SIFMA is Blythe Masters of JP Morgan and its Chaor-Elect is G. Douglas Edwards of Morgan Keegan.

97.    Conferences, such as those presented by the Information Management Network ("IMN") also provide venues to collude. For example, over the last six years, IMN has hosted the New England Public Finance Conference, which will be held this October in Boston, Massachusetts. As its website explains, "IMN will bring together public finance officials, issuers, underwriters and public finance professionals from Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont for two days of informative dialogue and education on how to improve public finance within

their respective states. This year's forum will provide a platform for the discussion and points of view about issues affecting state officials, institutional investors, issuers, underwriters, bond counsel and rating agencies in the New England region while providing the highest quality education for the enhancement of public finance." IMN also hosts the Issuers & Investors Summit, to be held this December in La Quinta, California; "[d]ebt issuers are faced with a complex number of choices and opportunities involving the financial structures that support the many projects necessary to meet the needs of their communities and local area constituents. Investors will gain an inside track on new and existing financing projects, with ample networking opportunities to meet and form relationships with a range of entities from both the not-for-profit and government sectors."

98.     Co-conspirator Bank of America, which is, as discussed below, a participant in the DOJ's amnesty program, has described the conspiracy and provided information to the DOJ relating to specific rigged bids and communications among Provider Defendants to restrain competition.

99.     One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that co-conspirator Bank of America provided to the City of Atlanta in 2002, in which Defendant CDR acted as the broker and handled the bidding. Another is reflected in the 2007 lawsuit by Biola University against Bank of America, where it was accused of sharing kickbacks with BNP Paribas on bond issuances and related swaps.

100.     The use of kickbacks is illustrated by a June 28, 2002 e-mail that Douglas Campbell provided to Phil Murphy, which contained a list the situations where Bank of America paid an external business contact on a transaction where the external business

contact was not involved in the transaction (e.g., the external business contact was not a

broker, investment banker or did not provide the client with market pricing verification)."

The list showed that $182,393 was paid to Defendants CDR, Piper Jaffray, PaineWebber,

and Winters.  The payments were described as a bid to build Bank of America's

relationship with these companies or to say "thanks for all the swap business." The e-mail

is reproduced below.

-----Original Message-----
From:       Campbell, Doug L.
Sent:       Friday, June 28, 2002 11:08 AM
To:         Murphy, Phil D.
Subject:    Fees Paid on Unrelated Client Transactions

Phil –

After reviewing NBtrades, I have come up with the following list of fees paid to external "broker/banker" on
deals where I was the marketer.  I believe this list contains all of the situations where BofA  paid an external
business contact on a transaction where the external business contact was not involved in some way in the
transaction (e.g., the external business contact was not a broker, investment banker or did not provide the
client with market pricing verification).    I found only four firms that we had paid fees to in this manner...CDR,
Piper, Winters & Co. and PaineWebber...the Piper / PaineWebber / Winters fees were more one-off events (in
Piper's case just saying thanks for all the swap business we had been doing, in PaineWebber case trying to
help Mark and Gary  since they were struggling to get their external reinvest business going, Winters case it
was the first day Chris opened his new firm).  The CDR fees have been part of the ongoing attempt to
develop a better relationship with our major brokers.

CDR - 1/01 - $19, 893 - Brighton/Muskegon swaps - Piper trades. Jim Towne was aware I was paying addit.
brokerage to CDR so I am not                               sure if this really belongs on this list...

CDR - 3/01 - $7,500 - Three and Two Baseball (Swap)

CDR - 6/01 - $20,000 - WTVP (Illinois Public TV) (Swap)

CDR - 2/02 - $10,000 - Clinton Community School (QZAB)

PW - 2/02 - $50,000 - Depauw University (swap) - Piper trade, Depauw is also a PW client, Jim Towne was
aware I was paying addit.                  brokerage to PW so I am not sure if this belongs on the
list...

PW - 3/02 - $25,000 - Grandview (QZAB)

Piper - 1/02 - $20,000 - Hendrum and Clinton QZABS – Piper originally showed us this opportunity but then
client hired Evenson Dodge

Piper - 4/02 - $20,000 - Bernie (QZAB)

Winters - 4/01 - $10,000 School of the Plains (Swap)

Let me know if I need to do anything else.  I will keep looking as well just to make sure I have not missed one.

101.    Other examples of bid-rigging and kickbacks exist.  The IRS is examining

over 20 lease-to-own deals between Defendants CDR and Société Générale, as well as

Defendant CDR's involvement in California school advance refunding escrows and put

option cases from several issuers around the nation. There is evidence of quarterly payments Defendant Société Générale made to Defendant CDR for "unspecified services" relating to these lease-to-own deals. The IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues. Similarly, Feld Winters engaged in an unlawful kickback scheme with Pacific Matrix Financial Group, Inc. and O'Brien Partners, Inc. with respect to Municipal Derivative transactions in the 1990s.

102.    The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. According to documents obtained from the authority, the IRS said it was concerned about quarterly payments made by Defendant Société Générale to Defendant CDR, which structured the transaction and evaluated bids for the investment agreement. Records show that Defendant FSA was one of the four that bid for that contract.

103.    As another example, in November of 2006, as part of a settlement with the IRS, it was disclosed that Defendant Baum illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. The agency found evidence of big rigging in these deals. Defendant Baum had rigged the deals to allow Defendant CDC, who was the winning Provider on many of them, to underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees, diverting arbitrage profits back to Defendant Baum. In one case, Defendant CDC paid a large fee directly to David Lail of Defendant Baum.

104.    This was not the only incident involving Defendant Baum. Defendant Bank of America also provided the GIC on at least one of the Defendant Baum

30

transactions targeted by the IRS, a $100 million issue from the Illinois Development
Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc ("Rural
Enterprises"). Rural Enterprises disclosed in July 2003 that Defendant Bank of America
made a significant hidden payment to Defendant Baum. Defendant Baum also
announced acceptance of an IRS penalty in November of 2006, purportedly in connection
with bid-rigging involving Natixis.

105.    As yet another example, Jefferson County, Alabama, paid Provider
Defendants Bank of America, JP Morgan, Bear Stearns, and Lehman Brothers, Inc. $120
million in fees – six times above the prevailing rate – for $5.8 billion in interest rate
swaps, and Defendant CDR was the County's adviser on these swaps. These transactions
are being investigated by the DOJ and SEC. In particular, these banks charged Jefferson
County about $50 million above prevailing prices for 11 of the swaps it bought between
2001 and 2004. Records show that none of the fees were disclosed to the County's
commissioners. Porter, White & Co., a Birmingham-based financial advisory firm later
hired by the County to analyze its swaps, said the banks received as much as $100
million in excessive fees on all 17 of the County's swaps. Falsely believing that these
swaps would help it save money in refinancing its sewer debt obligations, the County
held "Investor Relations" seminars in 2003 and 2004 at a Birmingham hotel, led and
sponsored by CDR, JP Morgan and Bear Stearns. Smaller municipalities that otherwise
could not afford this type of training attended the seminars. On April 30, 2008, the SEC
sued Larry Langford, Jefferson County's former county commission president and now
Birmingham, Alabama's mayor, for fraud in allegedly accepting $156,000 from William
Blount of Blount Parrish & Co. ("Blount"), a Montgomery-based underwriter, while

entering into the swaps. Blount and Bear Stearns jointly pitched the County on a swap

deal worth $1.5 billion in early 2004. Several months later, in June of 2004, the County

executed this swap, as well as another $380 million swap with Defendant Bank of

America. The DOJ also is investigating the bankers and officials involved in these

swaps. At least four JP Morgan bankers who worked for the bank at the time the

Jefferson County swaps were done, including Douglas MacFaddin, the former head of

municipal derivatives sales, have been told by the U.S. Attorney's office that they could

face criminal charges. "In Jefferson County's case, the people who were allegedly doing

the price fixing were right at the center of the scandal," said Christopher "Kit" Taylor,

who ran the Municipal Securities Rulemaking Board, the public finance regulator in the

United States, from 1978 to 2007.

106.    The objective of the illegal agreement, understanding, and conspiracy is to

artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the

market prices of Municipal Derivatives sold by the Provider Defendants and co-

conspirator Bank of America.

107.    In addition to information supplied by Bank of America, the foregoing

allegations are supported by disclosures in connection with investigations being

conducted by the DOJ's Antitrust Division and the IRS into industry-wide collusive

practices in the Municipal Derivatives industry.[2]

## INTERNAL REVENUE SERVICE INVESTIGATION

---

[2]    The SEC is also conducting a parallel investigation that has led to Wells
notices recently being issued to Bank of America, GE Funding, UBS, FSA, JP Morgan,
Wachovia and Bear Stearns. A Wells notice informs a company that an investigation by
regulators is completed and charges may be filed.

108.    The IRS was the first agency to launch an investigation of collusive practices in the Municipal Derivatives industry.  Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in taxes by engaging in abusive arbitrage devices.  The IRS was concerned that some GIC providers were overcharging issuers for GICs and other investment products.  This would artificially lower, or "burn," investment yields below the bond yield.  The spread between the investment and bond yields was then passed to the provider, rather than rebated to the IRS as required by the federal tax laws.

109.    In 2005, Charles Anderson publicly stated that "[i]t looks like bid rigging is wider and more pervasive than we thought."  Mark Scott, director of the IRS's tax-exempt bond office, publicly stated that "[w]hen a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."  These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work."  As Scott went on to note, "[t]hat's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse.'"

110.    As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging."  The IRS probe showed that investment contracts were sold at below market rates, according to Anderson.  That means lower returns for municipalities and less tax revenue for the IRS.  He added, "[p]eople were winning GICs at below fair market values and there were obviously

deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal."

111.   At the same time, Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association, noted: "[t]he way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be…. And it's certainly possible that when you don't have transparency you can have abuses."

112.   The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

113.   On February 7, 2007, co-conspirator Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities.

114.   In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks.

**ANTITRUST DIVISION INVESTIGATION**

115.   In light of these revelations, the Antitrust Division of the DOJ commenced its own investigation of the bid-rigging in the Municipal Derivatives markets.  For the better part of two years, the Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other

34

Municipal Derivatives.  The DOJ is conducting an "investigation of anticompetitive practices in the municipal bond industry," said spokeswoman Kathleen Bloomquist.

116.    On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants:  CDR, IMAGE, and Sound Capital.

117.    Following the FBI raids, the Broker Defendants and Provider Defendants were served with subpoenas.  The subpoenas sought detailed information from the companies dating back to 1992.  The subpoenas asked for documents, e-mails, tapes or notes of phone conversations, and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to guaranteed investment contracts; forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions."  The subpoenas also requested corporate organizational charts, telephone directories, and lists of all individuals involved with GICs and derivatives, in addition to all documents associated with "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding" – including invitations to bid; solicitations; notices, or requests for quotations or proposals issued to any provider; actual or proposed responses; and amounts and prices bid.

118.    On December 11, 2006, prosecutors based out of the Antitrust Division's New York field office that were tasked with investigating the alleged bid-rigging brought their case to a federal grand jury sitting in the Southern District of New York.

119.   According to news reports and company filings, the following Defendants have received governmental subpoenas: GE Funding; GE Trinity; CDR; FSA; FGIC.; Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; IXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Société Générale; Baum; Winters; JP Morgan; American International Group Inc.; Bear Stearns; Feld Winters; UBS; Piper Jaffray; Wachovia.; Cain Brothers;  Morgan Keegan; Shockley; Genworth Financial; and SunAmerica.

120.   At least eleven current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ or notified that they are part of the DOJ's investigation:  James Hertz, Samuel Gruer, Shlomi Raz, Patrick Marsh, Douglas MacFaddin, Stephen Salvadore, Peter Ghavami, Mary H. Packer, James H. Towne, Jay Saunders and Martin McConnell.  Many of these individuals submitted information to the Financial Industry Regulatory Authority ("FINRA") disclosing that they are DOJ targets.

121.   As a March 3, 2008 *Bond Buyer* article noted:

> Market participants said Friday that the individuals and firms known to have been subpoenaed or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicly disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but banks and investment advisory firms are not subject to the same disclosure requirements.
>
> . . .
>
> "Usually by the time an individual gets a target letter, the investigation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms," said John K. Markey, a partner at

Mintz Levin Cohn Ferris Glovsky & Popeo PC in Boston, and former federal and state prosecutor.

Markey said that in a target letter, "The Department of Justice is informing an individual or his attorney that it already has substantial evidence of the commission of a federal crime. It usually is a sign that the individual is going to be indicted and it may prompt an attempt at a plea bargain or cooperation deal with the government."

## THE DOJ GRANTS CONDITIONAL AMNESTY TO BANK OF AMERICA

122.    On February 9, 2007, co-conspirator Bank of America, the second largest

bank in the United States, announced that it was cooperating with the DOJ's investigation

into bidding practices in the municipal bond business in exchange for leniency as part of

the DOJ's amnesty program.

123.    On February 9, 2007, co-conspirator Bank of America issued a press

release and stated the following:

> Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in Connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.

> The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department...

> In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions.

37

124.   It was reported that key derivatives officials at the bank were on

"administrative leave," including Dean Pinard.

125.   On February 28, 2008, co-conspirator Bank of America, in its SEC Form

10-K at page 123, stated the following:

> Municipal Derivatives Matters
>
> The Antitrust Division of the U.S. Department of Justice
> (DOJ), the SEC, and the IRS are investigating possible
> anticompetitive bidding practices in the municipal
> derivatives industry involving various parties, including
> BANA [co-conspirator Bank of America], from the early
> 1990s to date.  The activities at issue in these industry-wide
> government investigations concern the bidding process for
> municipal derivatives that are offered to states,
> municipalities and other issuers of tax-exempt bonds. The
> Corporation has cooperated, and continues to cooperate,
> with the DOJ, the SEC and the IRS.  On February 4, 2008,
> BANA received a Wells notice advising that the SEC staff
> is considering recommending that the SEC bring a civil
> injunctive action and/or an administrative proceeding "in
> connection with the bidding of various financial
> instruments associated with municipal securities." BANA
> intends to respond to the notice.  An SEC action or
> proceeding could seek a permanent injunction,
> disgorgement plus prejudgment interest, civil penalties and
> other remedial relief.
>
> On January 11, 2007, the Corporation entered into a
> Corporate Conditional Leniency Letter (the Letter) with
> DOJ. Under the Letter and subject to the Corporation's
> continuing cooperation, DOJ will not bring any criminal
> antitrust prosecution against the Corporation in connection
> with the matters that the Corporation reported to DOJ.
> Civil actions may be filed. Subject to satisfying DOJ and
> the court presiding over any civil litigation of the
> Corporation's cooperation, the Corporation is eligible for
> (i) a limit on liability to single, rather than treble, damages
> in certain types of related civil antitrust actions, and
> (ii) relief from joint and several antitrust liability with other
> civil defendants.

### INVESTIGATION BY STATE AGS

126.    In late July of 2008, XL Capital Ltd. revealed that it had received in June of 2008 a subpoena from the Connecticut AG and a Civil Investigative Demand ("CID") from the Florida AG "in connection with a coordinated multi-state attorneys general investigation of municipal bond related guaranteed investment contracts." Each seeks information going back to January 1, 1998. It has been reported that a total of 38 firms have received such investigative requests from state AGs, including: Provider Defendants AIG Financial, Bank of America, SunAmerica, Bear Stearns, Feld Winters, FGIC, FSAHL, FSAI, GE Funding, GE Trinity, Genworth Financial, IXIS, JPMorgan, Piper Jaffray, Société Générale, UBS, Wachovia, XL Asset Funding, XL Life Insurance, Merrill Lynch, Morgan Stanley and NatWest and Broker Defendants Cain Brothers, CDC, CDR, First Southwest, Winters, Morgan Keegan, MGIC, Baum, Kinsell, PackerKiss, Shockley, and Sound Capital.

### HISTORY OF FRAUD IN THE MUNICIPAL DERIVATIVES MARKET

127.    The wrongful conduct alleged herein is not the first time that Wall Street firms have run afoul of laws designed to prevent unfair profiteering on the proceeds of a bond issuance.  In 1998, twenty-one firms were sanctioned for involvement in fraudulent activities that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on how much they could earn.  This so-called "yield-burning" scandal led to settlements of $172 million as a result of misconduct on 3600 separate municipal bond issues.  Piper Jaffray, one of the Provider Defendants here, was involved in the earlier municipal bonds scandal.

128.    Likewise, in 2002, Stifel Nicolaus broker Robert Cochran paid $220,000 to settle civil allegations against him in connection with bid rigging on a GIC transaction with the Oklahoma Turnpike Authority ("OTA") in 1989 and a forward contract with

OTA in 1992. In the former instance, the bid was rigged in favor of Provider Defendant

AIG, using a "last look." The "last look" was used to deter cheating by Provider

Defendants and/or co-conspirator Bank of America by allowing the pre-designated

winner to confirm that the other bidders had submitted non-competitive, sham bids before

the auction closed.

## CLASS ACTION ALLEGATIONS

129.   Plaintiffs bring this action on behalf of themselves and as a class action

under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of all members of the following Class:

> All state, local and municipal government entities,
> independent government agencies and private entities that
> purchased by competitive bidding or auction Municipal
> Derivatives directly from a Provider Defendant or Bank of
> America, or through a Broker Defendant, at any time from
> January 1, 1992 through the present in the United States
> and its territories or for delivery in the United States and its
> territories.

130.   Plaintiffs do not know the exact number of class members because such

information is in the exclusive control of the Provider Defendants, co-conspirator Bank

of America, the Broker Defendants, and unnamed co-conspirators. But due to the nature

of the trade and commerce involved, Plaintiffs believe that there are thousands of Class

members as above described, the exact number and their identities being known by the

Provider Defendants, co-conspirator Bank of America, the Broker Defendants, and

unnamed co-conspirators.

131.   The Class is so numerous and geographically dispersed that joinder of all

members is impracticable.

132.   There are questions of law and fact common to the Class, including:

40

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, maintain or stabilize prices, and rig bids and allocate customers and markets of Municipal Derivatives;

b.    The identity of the participants of the alleged conspiracy;

c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

f.    The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;

g.    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the other members of the Class; and

h.    The appropriate class-wide measure of damages.

133.    Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are purchasers of Municipal Derivatives, and their interests are coincident with, and not antagonistic to, those of the other members of the Class.

134.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

135.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

136.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

137.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

138.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

139.    During the Class Period, Defendants and their co-conspirators issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation, other than the states in which Defendants and their co-conspirators were citizens.

140.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## CAUSE OF ACTION

141.    Plaintiffs hereby sue Defendants for participating, along with the Bank of America, in a conspiracy to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives sold in the United States and its territories in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.    Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United States;

    b.    Bids charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels throughout the United States;

    c.    Customers and markets of Municipal Derivatives were allocated among Defendants and their co-conspirators;

    d.    Plaintiffs and the other members of the Class received lesser interest rates on  Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;

    e.    Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

f.      As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

143.    As a result of this combination and conspiracy, Plaintiffs and members of the Class suffered injury to their business and property.

144.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Plaintiffs seek to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations alleged herein.

### FRAUDULENT CONCEALMENT

145.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

146.    Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Neither Defendants nor their co-conspirators told Plaintiffs or other class members that they were rigging bids. To the contrary, Plaintiffs were falsely assured that the Broker Defendants were acting as their agents and were soliciting bids for Municipal Derivatives that were fair and competitively priced and that complied with specific IRS rules and regulations that required Broker Defendants to obtain at least three commercially reasonable bids. Accordingly, Plaintiffs and Class members could not have discovered the violations

alleged herein earlier until shortly before the filing of this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

147.    Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

    a.    By meeting secretly to discuss prices, customers and markets of Municipal Derivatives sold in the United States and elsewhere;

    b.    By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

    c.    By intentionally creating the false appearance of competition by engaging in sham auctions in which the results were pre-determined;

    d.    Through covert sharing of profits or other secret compensation paid to losing bidders;

    e.    By secretly communicating about bids that would be won or lost by the Provider Defendants;

    f.    By paying kickbacks to Broker Defendants;

g.     By submitting cover or courtesy bids, or unrealistically low or

other artificial bids, and/or deliberately losing bids, to create the

appearance of competition where there was none; and

h.     By covert agreements not to bid.

148.   As a result of Defendants and their co-conspirators' fraudulent

concealment, all applicable statutes of limitations affecting the Plaintiffs' and the

Class's claims have been tolled.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray as follows:

A.     That the Court determine that this action may be maintained as a class

action under Rule 23 of the Federal Rules of Civil Procedure;

B.     That the contract, combination or conspiracy, and the acts done in

furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a

*per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     That judgment be entered for Plaintiffs and members of the Class against

Defendants for treble damages sustained by Plaintiffs and the members of the Class as

allowed by law, together with the costs of this action, including reasonable attorneys'

fees;

D.     That Plaintiffs and the Class be awarded pre-judgment and post-judgment

interest at the highest legal rate from and after the date of service of this Complaint to the

extent provided by law; and

E.     That Plaintiffs and members of the Class have such other, further or

different relief as the case may require and the Court may deem just and proper under the

circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the

claims asserted in this Complaint so triable.

Dated: August 22, 2008

By: _____

| | |
|---|---|
| William A. Isaacson | Robert G. Eisler |
| Tanya Chutkan | Sharon K. Robertson |
| Jonathan M. Shaw | COHEN, MILSTEIN, HAUSFELD & |
| Jack A. Simms | TOLL P.L.L.C. |
| BOIES, SCHILLER & FLEXNER LLP | 150 East 52nd Street, Thirtieth Floor |
| 5301 Wisconsin Ave. NW | New York, NY 10022 |
| Washington, DC 20015 | Telephone: (212) 838-7797 |
| Telephone: (202) 237-2727 | Facsimile: (212) 838-7745 |
| Facsimile: (202) 237-6131 | |
| | |
| Magda M. Jimenez | Michael D. Hausfeld |
| BOIES, SCHILLER & FLEXNER LLP | Richard A. Koffman |
| 575 Lexington Avenue, 7th Floor | Megan E. Jones |
| New York, NY 10022 | Christopher J. Cormier |
| Telephone: (212) 446-2300 | COHEN, MILSTEIN, HAUSFELD & |
| Facsimile: (212) 446-2350 | TOLL P.L.L.C. |
| | 1100 New York Ave., N.W. |
| | Suite 500, West Tower |
| | Washington, D.C. 20005-3964 |
| | Telephone: (202) 408-4600 |
| | Facsimile: (202) 408-4699 |
| | |
| William C. Carmody | Michael P. Lehmann |
| Arun Subramanian | Christopher L. Lebsock |
| SUSMAN GODFREY L.L.P.* | Jon T. King |
| 654 Madison Avenue, 5th Floor | COHEN, MILSTEIN, HAUSFELD & |
| New York, NY 10065-8440 | TOLL P.L.L.C. |
| Telephone: (212) 336-8330 | One Embarcadero Plaza |
| Facsimile: (212) 336-8340 | San Francisco, CA 94111 |
| | Telephone: (415) 229-2080 |
| | Facsimile: (415) 986-3643 |

_____

\*      Susman Godfrey L.L.P. is Counsel for plaintiffs against all Defendants except GE
Funding Capital Market Services, Inc., Genworth Financial Investment Management,
LLC  and Trinity Funding Co. LLC.

H. Lee Godfrey
SUSMAN GODFREY L.L.P.*
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Marc M. Seltzer
SUSMAN GODFREY L.L.P.*
1901 Ave. of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

**Plaintiffs' Interim Co-Lead Counsel**

Jonathan W. Cuneo
Daniel M. Cohen
CUNEO GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, D.C. 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

Steven Greenfogel
MEREDITH COHEN GREENFOGEL
& SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Telephone: (215) 564-5182
Facsimile: (215) 569-0958

Joel Davidow (DC Bar No. 50849)
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS
PLLC
1200 New Hampshire Ave., N.W.,
Suite 570
Washington, DC 20036
Telephone: (202) 659-8000
Facsimile: (202) 659-8822

Arnold Levin
Laurence S. Berman
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Telephone: (215) 567-6565
Facsimile: (215) 568-5872

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401
Telephone: (843) 723-9804
Facsimile: (843) 723-7446

Samuel D. Heins
Vincent J. Esades
Dylan J. McFarland
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Steven A. Kanner
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015
Telephone: (224) 224-632-4500
Facsimile: (224) 632-4521

48

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234

Precious Martin Senior
PRECIOUS MARTIN SENIOR &
ASSOCIATES PLLC
821 North Congress St.
P.O. Box 373
Jackson, MS 39205-0373
Telephone: (601) 944-1447
Facsimile: (601) 944-1448

Solomon B. Cera
Joseph M. Barton
Pamela A. Markert
scera@gbcslaw.com
GOLD BENNETT CERA & SIDENER LLP
Attorneys At Law
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415)777-2230
Facsimile: (415) 777-5189

Craig C. Corbitt
Francis O. Scarpulla
ZELLE, HOFMANN, VOELBEL, MASON
& GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770

Robert Green
Jenelle Welling
GREEN WELLING LLP
595 Market Street, Suite 2750
San Francisco, California 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

Roland G. Riopelle
SERCARZ & RIOPELLE, LLP
152 W. 57th Street, Suite 24C
New York, NY 10019
Telephone: (212) 586-4900
Facsimile: (212) 586-1234

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 North, Suite 340
Jackson, MS 39211
Telephone: (601) 977-5253
Facsimile: (601) 977-5236

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Arthur N. Bailey
ARTHUR N. BAILEY &
ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983

Dianne Nast
RODA NAST P.C.
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000
Facsimile: (717) 892-1200

Susan Kupfer
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center
Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166

Guido Saveri
R. Alexander Saveri
SAVER & SAVERI INC
Saveri & Saveri Inc.
111 Pine Street
Suite 1700
San Francisco, CA 94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

*Additional Plaintiffs' Counsel*