**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUN 2 2 2009

---

IN RE MUNICIPAL DERIVATIVES
ANTITRUST LITIGATION

: MDL No. 1950

Master Docket No. 08-02516
(VM) (DF)

---

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**SECOND CONSOLIDATED**
**AMENDED CLASS ACTION**
**COMPLAINT**

JURY TRIAL DEMANDED

---

## NATURE OF THE CASE

1.      Plaintiffs allege herein a conspiracy among Defendants and certain named and unnamed co-conspirators, to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives (as defined below) sold in the United States and its territories.

2.      Plaintiffs and Provider Defendant Bank of America, N.A. ("Bank of America") have engaged in confidential discussions about some of the facts and circumstances detailed in this Complaint over the last 23 months in the context of a settlement process, including a number of sessions overseen by the Honorable Daniel Weinstein (Ret.) of JAMS. Judge Weinstein is one of the nation's preeminent mediators of complex civil disputes. These discussions have been conducted pursuant to, *inter alia*, an agreement that requires full and timely cooperation by Bank of America, which has been received, subject to certain limitations. The information contained in this Complaint comes in part from information obtained from Bank of America and in part from publicly-available information, including regulatory filings. The Bank of America has

supplied Plaintiffs with extensive information since the Court's order of April 30, 2009

granting dismissal of the prior Complaint with leave to replead. That new information,

much of which Plaintiffs did not have before because of limitations formerly placed on

Bank of America's cooperation by the United States Department of Justice's ("DOJ")

Antitrust Division, is reflected in this Complaint.

3.      As explained below, Bank of America has received a conditional

leniency letter from the DOJ's Antitrust Division. This fact, in and of itself, is significant.

It means that Bank of America is an *admitted felon*. It further means that Bank of

America is an *admitted co-conspirator*. The significance of obtaining a conditional

leniency letter was explained by Scott D. Hammond, Deputy Assistant Attorney General

for Criminal Enforcement, in a November 19, 2008 presentation available on the DOJ's

website at http://www.usdoj.gov/atr/public/criminal/239583.htm:

> *Does a leniency applicant have to admit to a criminal*
> *violation of the antitrust laws before receiving a*
> *conditional leniency letter?*
>
> Yes. The Division's leniency policies were established for
> corporations and individuals "reporting their illegal
> antitrust activity," and the policies protect leniency
> recipients from criminal conviction. Thus, *the applicant*
> *must admit its participation in a criminal antitrust violation*
> *involving price fixing, bid rigging, capacity restriction, or*
> *allocation of markets, customers, or sales or production*
> *volumes before it will receive a conditional leniency letter.*
> Applicants that have not engaged in criminal violations of
> the antitrust laws have no need to receive leniency
> protection from a criminal violation and will receive no
> benefit from the leniency program.
>
> When the model corporate conditional leniency letter was
> first drafted, the Division did not employ a marker system.
> Thus, companies received conditional leniency letters far
> earlier in the process, often before the company had an
> opportunity to conduct an internal investigation. However,
> the Division's practice has changed over time. The Division

2

now employs a marker system, and the Division provides
the company with an opportunity to investigate thoroughly
its own conduct. While the applicant may not be able to
confirm that it committed a criminal antitrust violation
when it seeks and receives a marker, by the end of the
marker process, *before it is provided with a conditional
leniency letter, it should be in a position to admit to its
participation in a criminal violation of the Sherman Act.*
The Division may also insist on interviews with key
executives of the applicant who were involved in the
violation before issuing the conditional leniency letter. *A
company that argues that an agreement to fix prices, rig
bids, restrict capacity, or allocate markets might be
inferred from its conduct but that cannot produce any
employees who will admit that the company entered into
such an agreement generally has not made a sufficient
admission of criminal antitrust violation to be eligible for
leniency. A company that, for whatever reason, is not able
or willing to admit to its participation in a criminal
antitrust conspiracy is not eligible for leniency.* Previously
the model conditional leniency letters referred to the
conduct being reported as "*possible* [. . . price fixing, bid
rigging, market allocation] or other conduct violative of
Section 1 of the Sherman Act." (emphasis added). Because
applicants must report a criminal violation of the antitrust
laws before receiving a conditional leniency letter, the
word "possible" has been deleted from the model letter, and
a reference to "or other conduct constituting a criminal
violation of Section 1 of the Sherman Act" has been added
to the model letters. (Emphases added.)

4.        The DOJ, which is investigating anticompetitive practices in the

Municipal Derivatives sector, has prevented plaintiffs from obtaining certain

documentation of illegal conspiratorial conduct (including, but not limited to, the

audiotapes of conspiratorial conversations engaged in by certain members of Bank of

America's Municipal Derivatives trading desk and transcriptions thereof). The DOJ's

position is reflected in its recent request for a partial stay of these proceedings. Any

references herein to the contents of audiotapes obtained from Bank of America's

Municipal Derivatives trading desk are based not on the tapes themselves, but on information from Bank of America that summarized their contents.

 5. This lawsuit arises out of an illegal agreement, understanding and conspiracy among providers and brokers of Municipal Derivatives to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal Bonds or other entities that use the proceeds of issuances of Municipal Bonds. This illegal agreement, understanding and conspiracy is based on *per se* illegal horizontal communications and conduct among providers of Municipal Derivatives. These providers have engaged in communications facilitating and conduct restraining competition such as rigging of bids, secret compensation of losing bidders, courtesy bids, deliberately losing bids, and agreements not to bid. Brokers have knowingly participated in this *per se* illegal conspiracy to limit competition by acting as conduits for communication of pricing and bidding information among providers with the knowledge and consent of providers and have shared the wrongful profits from the illegal agreement to restrain competition.

 6. There has been an unprecedented set of investigations by the DOJ's Antitrust Division, the Internal Revenue Service ("IRS"), the Securities and Exchange Commission ("SEC"), and, more recently, state attorneys general ("AGs"), into industry-wide collusive practices in the two-hundred year old municipal bond industry. A grand jury investigation currently is being conducted by the Antitrust Division in the United States District Court for the Southern District of New York. Over thirty large commercial and investment banks, insurance companies, and brokers have been subpoenaed, and the offices of three brokers have been raided by the Federal Bureau of Investigation. Numerous employees and former employees of various Defendants

recently received letters notifying them that they are regarded as targets of the grand jury investigation concerning antitrust and other violations regarding contracts related to municipal bonds.

7.        Plaintiffs bring this action to seek civil redress for their injuries on behalf of themselves and all state, local and municipal government entities and their agencies, as well as private entities, that purchased by competitive bidding or auction Municipal Derivatives in the United States and its territories directly from the Provider Defendants (as defined below) and/or through Broker Defendants (as defined below) in the period from January 1, 1992 through the present (the "Class Period"). This time period tracks the time period of the DOJ's investigation. At all relevant times, the Provider Defendants and the Broker Defendants issued and/or sold Municipal Derivatives. During the Class Period, Defendants and certain named and unnamed co-conspirators agreed, combined, and conspired with each other to fix prices, and to rig bids and allocate customers and markets of Municipal Derivatives sold in the United States and its territories. As a result of the unlawful conduct of Defendants and named and unnamed co-conspirators, Plaintiffs and the Class (as defined in this Complaint) received, inter alia, lower interest rates on these contracts than they would have in a competitive market, and paid ancillary fees and other costs and expenses related thereto. Plaintiffs have consequently suffered injury to their business and property.

### JURISDICTION AND VENUE

8.        This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and

5

the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

10.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class Period the Defendants resided, transacted business, were found, or had agents in this District, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and because overt acts in furtherance of the alleged conspiracy were undertaken in this District.

## PLAINTIFFS

11.     Plaintiff City of Baltimore, Maryland ("Baltimore") purchased one or more Municipal Derivatives from at least one Provider Co-Conspirator or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

12.     Plaintiff University of Mississippi Medical Center purchased one or more Municipal Derivatives from at least one Provider Defendant or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

13.     Plaintiff University of Southern Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

14.     Plaintiff Mississippi Department of Transportation purchased one or more Municipal Derivatives from at least one Provider Defendant or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

15.     Plaintiff University of Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

16.     The entities identified in the four preceding paragraphs are referred to collectively as the "Mississippi Plaintiffs." All of the Mississippi Plaintiffs are agencies, subdivisions or instrumentalities of the State of Mississippi, which previously filed an action relating to these same claims.

17.     Plaintiff Central Bucks School District ("Central Bucks") purchased one or more Municipal Derivatives from at least one Provider Defendant or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

18.     Plaintiff Bucks County Water & Sewer Authority purchased one or more Municipal Derivatives from at least one Provider Defendant or co-conspirator and/or through at least one Broker Defendant or co-conspirator during the Class Period.

19.     The entities identified in the two preceding paragraphs are referred to collectively as the "Bucks County Plaintiffs."

**PROVIDER DEFENDANTS**

20.     The entities listed below (along with Natixis Funding Corp. f/k/a IXIS Funding Corp, and before that, f/k/a CDC Funding Corp., to the extent it acted as a provider with respect to Municipal Derivatives) are collectively referenced herein as "Provider Defendants."

21.     Provider Defendant Bank of America, N.A. is a Delaware corporation with its principal place of business in Charlotte, North Carolina. During the Class Period,

7

Bank of America issued and sold Municipal Derivatives to members of the Class. Bank of America transacts business in the Southern District of New York.

22.     Provider Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") was a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Bear Stearns issued and sold Municipal Derivatives to members of the Class. In March of 2008, Bear Stearns was acquired by Defendant JP Morgan Chase & Co. Bear Stearns is now a division of JP Morgan Chase & Co., but still operates a Municipal Bond Department and a Municipal Derivatives trading desk. *See* < http://www.bearstearns.com/sitewide/institutions/fixed_income/municipal_debt/index. htm>.

23.     Provider Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

24.     Provider Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

25.     Provider Defendant National Westminster Bank plc ("NatWest") is a public limited company with its principal place of business in London, England. During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a subsidiary of the Royal Bank of Scotland.

8

26.     Provider Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class. Piper Jaffray also provided brokerage functions to issuers.

27.     Provider Defendant Société Générale SA ("Société Générale") is a French corporation with its principal place of business in Paris, France. During the Class Period, Société Générale issued and sold Municipal Derivatives to members of the Class.

28.     Provider Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business in Zurich, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class. In 2000, UBS merged with PaineWebber.

29.     Provider Defendant Wachovia Bank N.A. ("Wachovia") was a national chartered banking association with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class. On December 31, 2008, Wells Fargo & Co. acquired Wachovia, as reflected in the former's SEC Form 10-Q for the period ending March 31, 2009.

30.     Provider Defendant Wells Fargo & Co., Inc. ("Wells Fargo") is a diversified financial services company with its headquarters in San Francisco, California. Wells Fargo is sued herein as the successor in interest to Wachovia, having acquired the assets and liabilities of the latter in the aforementioned transaction that closed on December 31, 2008. Wells Fargo's most recent Form 10-Q lists the present action under pending "Legal Actions."

## BROKER DEFENDANTS

31.     The entities listed below (along with Piper Jaffray, to the extent it performed brokerage services relating to Municipal Derivatives) are collectively referred to herein as "Broker Defendants."

32.     Broker Defendant Natixis Funding Corp. f/k/a IXIS Funding Corp, and before that, f/k/a CDC Funding Corp. ("CDC") is a New York corporation with its principal place of business in New York, New York.  During the Class Period, CDC acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.  CDC also functioned on some deals as a Provider, and to the extent it did so, is also referenced herein as one of the Provider Defendants.

33.     Broker Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania.  During the Class Period, IMAGE acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

34.     Broker Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business in Beverly Hills, California.  During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

35.     Broker Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business in Los Angeles, California.  During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

36.     Broker Defendant George K. Baum & Co. ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri.  During the

Class Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

37.     Broker Defendant Sound Capital Management, Inc. ("Sound Capital") is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota. During the Class Period, Sound Capital acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

## NAMED AND UNNAMED CO-CONSPIRATORS

38.     Various other persons, firms and corporations, not named herein as a Provider Defendant or Broker Defendant have participated as co-conspirators with the Provider Defendants and/or the Broker Defendants and have performed acts and made statements in furtherance of the conspiracy. Some of these firms are as yet unidentified. Others that have been identified are as follows.

39.     Provider co-conspirator AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, AIG Financial issued and sold Municipal Derivatives to members of the Class.

40.     Provider co-conspirator SunAmerica Life Assurance Co. ("SunAmerica") is an Arizona corporation with its principal place of business in Los Angeles, California. During the Class Period, SunAmerica issued and sold Municipal Derivatives to members of the Class.

41.     Provider co-conspirator Financial Security Assurance Holdings, Ltd. ("FSAHL") is a New York corporation with its principal place of business in New York, New York. During the Class Period, FSAHL issued and sold Municipal Derivatives to members of the Class.

42. Provider co-conspirator Financial Security Assurance, Inc. ("FSAI") is a New York corporation with its principal place of business in New York, New York. During the Class Period, FSAI issued and sold Municipal Derivatives to members of the Class. FSAI and FSAHL are referred to collectively herein as "FSA."

43. Provider co-conspirator Trinity Funding Co. LLC ("GE Trinity"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a New York limited liability corporation with its principal place of business in New York, New York. During the Class Period, Trinity issued and sold Municipal Derivatives to members of the Class.

44. Provider co-conspirator GE Funding Capital Market Services, Inc. ("GE Funding"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the Class.

45. Provider co-conspirator Lehman Brothers ("Lehman") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Lehman issued and sold Municipal Derivatives to members of the Class. Lehman filed for bankruptcy in September of 2008.

46. Provider co-conspirator XL Capital Ltd. ("XL Capital") is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. During the Class Period, XL Capital issued and sold Municipal Derivatives to members of the Class.

47. Provider co-conspirator XL Asset Funding Co. I LLC ("XL Asset Funding") is a limited liability company with its principal place of business in

Schaumburg, Illinois. During the Class Period, XL Asset Funding issued and sold Municipal Derivatives to members of the Class.

48.     Provider co-conspirator XL Life Insurance & Annuity, Inc. ("XL Life Insurance") is a subsidiary of XL Life & Annuity Holding Co. with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to members of the Class. XL Capital, XL Asset Funding and XL Life Insurance are referred to collectively herein as "XL."

49.     The Provider entities identified in the preceding paragraphs are referred to collectively as the "Provider co-conspirators."

50.     Broker co-conspirator Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business in Sherman Oaks, California. During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants and the Provider co-conspirators.

51.     Broker co-conspirator First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas. During the Class Period, First Southwest acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants and the Provider co-conspirators.

52.     Broker co-conspirator Kinsell Newcomb & De Dios Inc. ("Kinsell") is a California corporation with its principal place of business in Carlsbad, California. During the Class Period, Kinsell acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants and the Provider co-conspirators.

13

53.     Broker co-conspirator Mesirow Financial ("Mesirow") is an Illinois corporation with its principal place of business in Chicago, Illinois. During the Class Period, Mesirow acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants and the Provider co-conspirators.

54.     Broker co-conspirator Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation with its principal place of business in Memphis, Tennessee. During the Class Period, Morgan Keegan acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants and the Provider co-conspirators.

55.     Broker co-conspirator PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporation, with its principal place of business in Delray Beach, Florida. During the Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants and the Provider co-conspirators.

56.     The Broker entities identified in the preceding paragraphs are referred to collectively as the "Broker co-conspirators."

57.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## DEFINITIONS AND BACKGROUND

### MUNICIPAL BONDS

58.     Municipal bonds are issued by states, cities, and counties, or their agencies, as well as by tax-exempt, non-profit private entities (collectively "issuers") to

14

raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants. Because of the tax-exempt status of most municipal bonds, investors usually accept lower interest payments than on other types of borrowing. This makes the issuance of bonds an attractive source of financing to many government and private entities, as the borrowing rate available in the tax free municipal bond market is frequently lower than what is available through other channels.

59.     Municipal bonds bear interest at either a fixed or variable rate of interest. The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span at least several years.

60.     In order for municipal bonds to maintain their tax-exempt status, IRS regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

61.     Municipal bond proceeds typically are put into three types of funds to serve their purpose within the anticipated life of the project. The largest type of fund is known as the project fund or construction fund and, as its name implies, is used to pay for the construction or public works project at hand. The two smaller types of funds are administrative in nature, and ensure that the project fund is adequately funded and that the investors recoup their investment. The debt service fund, or "sinking fund," contains the money used to make principal and interest payments on the bond. The payments out of this fund usually are due semi-annually, although the principal portion of the payment

15

may only be due annually. The debt service reserve fund ensures that if unforeseen contingencies occur, debt obligations can still be paid.

62.    Because municipal bonds typically are used to fund multi-year projects, most of a given bond's proceeds cannot or need not be spent in one lump sum. Rather, the proceeds are spent at regularly set intervals, and are invested to earn interest until they are put to use for their stated purpose.

63.    The municipal bond industry is extremely large. Approximately $385 billion worth of municipal bonds were issued in 2006, according to the Securities Industry and Financial Markets Association. The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

### MUNICIPAL DERIVATIVES

64.    The investment vehicles in which issuers or those who receive money from bond issuances invest their bond proceeds until they are ripe for use are known as Municipal Derivatives. "Municipal Derivatives" is an umbrella term that refers to a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings while they are waiting to spend them for their given purposes. The term has been used in the industry to describe swaps and related transactions (as defined below) and, on occasion, the various types of Guaranteed Investment Contracts (as also defined below). As used in this Complaint, the term encompasses all of the transactions described in the next twelve paragraphs.

65.    Municipal Derivatives are provided by highly rated insurance companies and large commercial and investment banks, and they typically are sold to government entities. Municipal Derivatives are a particularly favored form of investment

16

in the municipal bond industry because they are considered safe and reliable investment vehicles.

66.      When governmental or private non-profit entities desire to purchase Municipal Derivatives (*i.e.*, enter into Municipal Derivative contracts), they frequently will engage a broker to obtain the best possible price for such derivatives by arranging an auction among multiple providers of Municipal Derivatives.

67.      Municipal Derivatives are grouped generally into two categories, pertaining either to: (a) the investment of bond proceeds, or (b) the bond's underlying interest rate obligations. The former category of Municipal Derivatives includes instruments such as Guaranteed Investment Contracts, commonly known as GICs (forward purchase, supply, or delivery agreements and repurchase agreements) and certificates of deposit ("CDs") on escrow agreements. The latter category of Municipal Derivatives includes instruments such as Swaps, Options, "Swaptions," Collars, and Floors, which are risk-shifting vehicles.

68.      A GIC is an agreement secured by a contract with a financial institution (*i.e.*, a provider), which guarantees a fixed rate of return and a fixed date of maturity. GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a provider agrees to guarantee a fixed or variable rate of interest or a future payment that is based on an index or similar criteria that is payable at a predetermined date on monies that are deposited with the company.[1] The types of investment agreements that the IRS generally

---

[1]      Interest rates for Municipal Derivatives typically are calculated pursuant to LIBOR or what were BMA rates. LIBOR refers to the London Interbank Offered

references as GICs are: (a) Forward Purchase or Forward Delivery Agreements; (b) Repurchase Agreements or Collateralized GICs; and (c) Unsecured or Uncollateralized GICs.

69.     A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds. Issuers (*i.e.* municipalities and other nonprofit entities authorized to issue bonds) can request bids based on rate of return or on upfront payments, although the latter is the norm. This is an agreement wherein the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. Forward contracts are generally entered into in the over-the-counter markets. A forward contract may be used for any number of purposes. For example, a forward contract may provide for the delivery of specific types of securities on specified future dates at fixed yields for the purpose of optimizing the investment of a debt service reserve fund. A forward refunding is used where the bonds to be refunded are not permitted to be advance refunded on a tax-exempt basis under the Internal Revenue Code. In such a case, the issuer agrees to issue, and the underwriter agrees to purchase, the new issue of bonds on a future date that would effect a current refunding.

70.     An Unsecured or Uncollateralized GIC does not involve associated securities, but rather pure funds, and thus functions like a savings account. It is used most often for construction or project funds. In the bidding process, the issuer sets forth a

---

Rate, the standard rate for quoting interbank lendings of Eurodollar deposits, while BMA refers to the Bond Market Association Index. The BMA Index has more recently been superseded by the SIFMA (Security Industry & Financial Markets Association) Index.

proposed draw-down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period. These agreements typically have terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties for not meeting deadlines, such as construction benchmarks.

71.    A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return. This is known as a collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

72.    When bonds are issued to refinance a prior issue, and principal or interest on the prior issue will be paid more than 90 days after issuance of the new refunding bonds, the new bonds will be considered an "advance refunding" of the prior bonds. Proceeds of such an issue are generally invested in an advance refunding escrow to be used to pay principal and interest on, and redemption price of, the prior bonds. Under the arbitrage provisions of Section 148 of the Internal Revenue Code, proceeds of the refunding issue invested in the advance refunding escrow generally may not be invested at yield that is higher than the yield on the refunding issue. It is not always possible to have the investments in the escrow maturing on precisely the same dates that amounts will be needed to pay principal or interest on the prior bonds, so amounts potentially will sit un-invested in the escrow for such periods of time. In order to avoid this inefficiency, the issuer may enter into a forward float agreement with an investment provider, under which the issuer typically will receive an up-front payment in exchange

19

for giving the investment provider the right to invest the proceeds during the float periods. The up-front payment received by the issuer must be taken into account in computing the yield on the advance refunding escrow for purposes of the arbitrage rules.

73.     A Swap is a type of agreement frequently used with respect to the exchange of interest rate obligations. A swap may be used to achieve desired tax results, or to alter various features of a bond portfolio, including call protection, diversification or consolidation, and marketability of holdings. There are several types of swaps: (a) floating-for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-rate) swap, where the two are based on different indices (*i.e.*, LIBOR or BMA).

74.     An Option is a provision in a bond contract where the Provider has the right, on specified dates after required notification, to cancel or terminate a Municipal Derivative.

75.     A "Swaption" is the combination of a Swap and an Option.

76.     A Floor (also known as an "interest rate floor") is an agreement whereby the issuer agrees to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference between the interest rate floor and the actual lower rate on the debt. It is used typically on variable rate debt, and refers to the minimum interest rate that can be paid on the debt. Thus, a Floor agreement establishes, for an issuer of variable rate bonds, a minimum or "floor" rate of interest that the issuer will effectively pay, though the bonds themselves may state a different minimum rate.

77.     A Collar is an agreement entered into by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. As with a Floor agreement, the floor component of the Collar establishes the effective minimum rate of interest that the issuer will pay. The cap component "caps" or establishes a maximum rate of interest the issuer will effectively pay, which again may vary from the maximum stated rate of interest on the variable rate debt.

78.     Like the municipal bond industry, the Municipal Derivatives industry is very large. A substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

79.     The Municipal Derivatives industry is relatively concentrated. There are no more than 20 major providers of Municipal Derivatives in the United States. With respect to GICs in particular, there are 10 to 12 major dealers in the United States. On the other hand, the number of issuers is in the tens of thousands.

80.     In a competitive marketplace, providers would be expected to compete against each other for issuers' business on the basis of the highest rate of return for Municipal Derivatives that they could earn for issuers.

## IRS RULES AND REGULATIONS

81.     IRS rules and their corresponding regulations subject issuers to potential taxation from arbitrage (*i.e.*, profit) off of their tax-exempt bond proceeds, subject to certain exceptions. *See* Internal Revenue Code § 148(a); Internal Revenue Code §§ 148(c), (d) and (e) (enumerating exceptions to this principle). Specifically, if the yield from the municipal derivative exceeds the bond's yield by a certain amount, it will be deemed arbitrage and be subject to taxation. In addition, providers cannot divert arbitrage earnings, meaning that they cannot "burn" an otherwise arbitrage yield by

21

charging the issuer a higher fee and reducing the yield by the amount of the fee in order to comply with the rules.

82.     The purpose of the rules and regulations governing arbitrage is to limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates. The rules and regulations, therefore, require all interest that exceeds the bond rate made on tax exempt bond investments to be rebated to the IRS, absent an exception.

83.     Another group of IRS regulations sets forth the procedure for establishing the fair market value of GICs. *See* Treasury Reg. § 1.148-5(d)(6). These regulations govern the bidding process for GICs, and there is a rebuttable presumption that a fair price is obtained for GICs procured in compliance with these regulations. Key regulations include the following:

      a.     The bid specifications must be in writing;

      b.     The bid specifications must be timely forwarded to potential providers;

      c.     The bid specifications must contain all material terms (*i.e.*, the term directly or indirectly affects yield);

      d.     The bid specifications must contain "a statement notifying potential providers that submission of a bid is a representation that the potential provider did not consult with any other potential provider about its bid, that the bid was determined without regard to any other formal or informal agreement that the potential provider has with the issuer or any other person (whether or not in

22

connection with the bond issue), and that the bid is not being submitted solely as a courtesy to the issuer or any other person...." (Section 1.148-5(d)(6)(iii)(a)(3));

  e.  The bid specifications must be commercially reasonable;

  f.  There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

  g.  The bid specifications must contain a reasonably expected draw down schedule;

  h.  All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

  i.  The issuer must receive at least bids from at least "three reasonably competitive providers" (Section 1.148-5(d)(6)(iii)(a)(7)).

  84.  The intent and purpose behind the IRS safe harbor regulations is to provide a fair, competitive, and transparent process for issuers to obtain the best possible price for tax-exempt municipal derivatives. But due to the concerted effort of the Broker Defendants and Broker co-conspirators, the Provider Defendants and Provider co-conspirators and unnamed co-conspirators during the Class Period to conspire to fix prices, rig bids and allocate customers and markets – as opposed to competing– this laudable goal was not realized.

## FACTUAL ALLEGATIONS

### OVERVIEW OF WRONGDOING ALLEGED

85.     During the Class Period defined herein, the Provider Defendants and Provider co-conspirators entered into a continuing agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

86.     In particular, the Provider Defendants and Provider co-conspirators have combined and conspired to allocate customers and fix or stabilize the prices of Municipal Derivatives, including the interest rates paid to issuers on such derivatives, sold in the United States through agreements not to compete and acts of bid rigging. Overt acts in furtherance of this conspiracy, including use of the mails or wires to transmit and process rigged bids, were undertaken in this District.

87.     The Broker Defendants and Broker co-conspirators have knowingly participated in the illegal agreement, understanding, and conspiracy not to compete and to rig bids in order to win the favor of the Provider Defendants and Provider co-conspirators and share in the profits of the conspiracy, all in breach of their fiduciary and other duties as agents for Plaintiffs and members of the class during the bidding process.

88.     The objective of the alleged illegal agreement, understanding and conspiracy is to artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the market prices of, Municipal Derivatives sold by Provider Defendants and Provider co-conspirators.

89.     Plaintiffs and Bank of America have engaged in confidential discussions about many of the facts and circumstances alleged in this Complaint, as noted above. In addition to information supplied by Bank of America, the allegations herein are

24

supported by disclosures in connection with investigations being conducted by the DOJ's Antitrust Division and the IRS into industry-wide collusive practices in the Municipal Derivatives industry.[2]

90.     Information concerning the workings of the alleged conspiracy has been provided by a confidential witness formerly employed by Bank of America who is cooperating with the DOJ in its antitrust investigation and whose identity has not been revealed to Plaintiffs. This person shall be referred to herein as "CW." The information provided by this witness gives only a partial picture of the workings of the alleged conspiracy, but is illustrative of how it operated.

91.     It is further known, as described below, that the extant audiotapes from Bank of America's Municipal Derivatives trading desk contain unlawful discussions with its competitors regarding bid-rigging and customer allocation of Municipal Derivatives. As Charles Anderson ("Anderson"), former  field operations manager for the IRS's tax-exempt bond office,  has said, "I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.....' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg. Ultimately, the same kinds of acts that give rise to 6700 [liability] can also give rise to criminal conspiracy counts against attorneys. I would not be surprised to see bankers and lawyers go to jail."

---

[2]     The SEC is also conducting a parallel investigation that has led to Wells notices recently being issued to Bank of America, GE Funding, UBS, FSA, JP Morgan, Wachovia and Bear Stearns. A Wells notice informs a company that an investigation by regulators is completed and charges may be filed.

## AGREEMENT AND CONSPIRACY TO RIG BIDS AND ALLOCATE CUSTOMERS

92.     The Provider Defendants and Provider co-conspirators who knowingly and intentionally engaged in these rigged auctions understood that they would take turns providing the winning bid.

93.     At times, as described below, the Provider Defendants and Provider co-conspirators directly discussed with each other the terms of their bids and discussed their collusive activities with Broker Defendants and broker co-conspirators.

94.     One venue at which these discussions occurred consisted of the respective Municipal Derivatives trading desks maintained by each of the Provider Defendants and Provider co-conspirators. These trading desks were often located in the same localities. For example, Bank of America, Wachovia and JP Morgan all maintained municipal derivative trading desks in Charlotte, North Carolina. Other Provider Defendants or Provider co-conspirators maintained such desks in New York City. E-mails to and from these trading desks were sent routinely and telephonic conversations at these trading desks were routinely audiotaped. Unlawful communications were conducted among the Provider Defendants and Provider co-conspirators by other means as well, such as cellular telephones, Blackberries and face-to-face meetings.

95.     On numerous other occasions, as described below, communications among the Provider Defendants and Provider co-conspirators were made through one or more of the Broker Defendants, who would act as the authorized go-betweens of the Provider Defendants and Provider co-conspirators by communicating and coordinating the terms of their respective bids. The Provider designated to win a particular auction frequently bid after it had been provided with the terms of the bids provided by

the other bidders, a practice known as a "last look" that is expressly forbidden by IRS regulations.

96.     At times, one or more of the Provider Defendants and Provider co-conspirators engaged in complementary trades to compensate other Providers Defendants and Provider co-conspirators, who either did not submit bids or who engaged in the provision of sham bids. On other occasions, the winning Provider, including at times one or more of the Provider Defendants and Provider co-conspirators, would secretly compensate one or more Provider Defendants and Provider co-conspirators for declining to submit a bid.

97.     The existence of the illegal agreement, understanding and conspiracy is confirmed by *per se* illegal horizontal communications among marketing personnel employed in the Municipal Derivative departments of the Provider Defendants. These individuals have participated in direct communications with competitor providers with respect to the following, inter alia:

    a.      the rigging of bids, including the collusive suppression of interest rates paid to issuers on Municipal Derivatives;

    b.      conduct that would be used to limit competition;

    c.      sharing of profits from a winning bid with a losing bidder and other secret compensation of losing bidders;

    d.      bids that would be won by specific Provider Defendants and Provider co-conspirators; and

    e.      an exchange of a deliberately losing bid for a future winning bid.

98.     The Broker Defendants and Broker co-conspirators' knowing
participation in the illegal agreement, understanding and conspiracy not to compete and
to rig bids is established by their serving as a conduit for indirect communications among
the Provider Defendants and Provider co-conspirators that were *per se* illegal. Again,
overt acts in furtherance of this conspiracy, including, on information, use of the mails or
wires to transmit and process rigged bids, were undertaken in this District. The Provider
Defendants and Provider co-conspirators also shared their wrongful profits from the
illegal agreement, understanding and conspiracy, by paying kickbacks to Broker
Defendants and Broker co-conspirators. The existence of the illegal agreement,
understanding and conspiracy is further established by *per se* illegal horizontal and
coordinated conduct among the marketing personnel employed in the municipal
bond/derivative departments of the Provider Defendants and Provider co-conspirators.
These individuals have participated in, *inter alia*, the following conduct to limit
competition, rig bids and to create the appearance of competition where there was none:

> a.     courtesy bids submitted to create the appearance of competition
> where there was none;

> b.     bids known to be unrealistically low and deliberately losing bids;

> c.     bidding processes where only one bid was sufficiently high to
> make the deal work;

> d.     agreements to share profits from a winning bid with a losing bidder
> through transactions between Provider Defendants and co-
> conspirators;

28

e.    conduct in violation of IRS regulations relating to the bidding process;

f.    secret last look agreements; and

g.    agreements not to bid.

99.     The Broker Defendants and Broker co-conspirators' knowing participation in the illegal agreement, understanding and conspiracy not to compete and to rig bids is also established by their participation in the *per se* illegal conduct to limit competition, rig bids and to create the appearance of competition where there was none. Broker Defendants and Broker co-conspirators further participated in and facilitated the illegal agreement, understanding and conspiracy by acting as the conduits for passing confidential pricing and bidding information among, and arranging the allocation of winning bids among, the Provider Defendants and Provider co-conspirators, all with the knowledge and consent of . The Broker Defendants and Broker co-conspirators further communicated to the Provider Defendants and Provider co-conspirators concerning, *inter alia*:

a.    winning bids that would be allocated to Provider Defendants and co-conspirators;

b.    confirming understandings that bids would be won by Provider Defendants and Provider co-conspirators;

c.    confirming understandings that bids would be lost by Provider Defendants and Provider co-conspirators;

d.    the fact that bids were being rigged; and

29

     e.     bid levels that would be necessary by Provider Defendants and

           Provider co-conspirators to win or lose a bid.

## PARTIAL LISTING OF INDIVIDUAL PARTICIPANTS IN THE ALLEGED CONSPIRACY

100.     Individuals employed by the Provider Defendants or Provider Co-
conspirators who have engaged in the illegal communications and conduct among
Provider Defendants and Provider co-conspirators to restrain competition include, but are
not limited to, the following. These individuals were not randomly selected from Provider
Defendants' or Provider co-conspirators' corporate directories, but are people who have
acknowledged that they are targets of DOJ prosecution and/or have been identified by
Bank of America as engaging in collusive conduct.

     a.     Douglas Campbell ("Campbell") was a former Bank of America

           Municipal Derivatives sales team manager. He left the Bank of

           America in August of 2002 and then worked for Piper Jaffray, with

           whom he is no longer employed. Campbell had numerous

           communications, with, *inter alia*, Jim Towne of Piper Jaffray,

           Martin McConnell of Wachovia, Mark Zaino of UBS, Martin

           Stallone of IMAGE, Johan Rosenberg of Sound Capital, Douglas

           Goldberg of CDR, Dani Naeh of CDR and a Mr. Steinhauer of

           Baum relating to the alleged conspiracy, as described below.

           Campbell also authored the June 28, 2002 e-mail on kickbacks to

           Piper Jaffray, CDR and Winters described below. The e-mail

           indicates communications on this topic to Jim Towne. Campbell

           participated in or oversaw unlawful collusive discussions with

other Defendants and co-conspirators conducted from Bank of America's Municipal Derivatives trading desk or other venues.

b.      Dean Pinard ("Pinard") was a former manager of Bank of America's Municipal Derivatives department. He was put on administrative leave by Bank of America on February 12, 2007. Pinard participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from Bank of America's Municipal Derivatives trading desk or other venues. He was also the recipient of the March 11, 2002 e-mail from Phil Murphy described below that discussed the provision of secret kickbacks to IMAGE for its participation in the alleged conspiracy.

c.      Philip Murphy ("Murphy") was the former head managing director of Bank of America's Municipal Derivatives department and one of the ringleaders of the alleged conspiracy. Murphy participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from Bank of America's Municipal Derivatives trading desk or other venues. Murphy had numerous communications, with, *inter alia*, Martin Stallone of IMAGE, as described below. Murphy was also the recipient of the aforementioned May 11, 2002 e-mail regarding IMAGE and the recipient of June 28, 2002 e-mail on kickbacks from Campbell described below. Murphy left Bank of America in September of 2002 and is now a principal at Winters, the website of which says

31

that "[h]e is one of the pioneers of the municipal derivative and investment agreement business having developed or improved many of the structures being used in the market today."

d.     James Hertz ("Hertz") worked at JP Morgan from 1998 until December of 2007. He was former vice-president in JP Morgan's tax-exempt capital markets group. Along with Douglas MacFaddin and Samuel Gruer, he came over to JP Morgan from Chase Bank and, along with them, assumed control over JP Morgan's Municipal Derivatives trading desk in 2000. His disclosures to the Financial Industry Regulatory Authority ("FINRA") indicate that he was targeted by the DOJ for "conduct on the municipal derivatives marketing desk." Hertz participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from JP Morgan's Municipal Derivatives trading desk or other venues. JP Morgan fired Hertz after learning he was a subject of the DOJ criminal investigation.

e.     Stephen Salvadore ("Salvadore") was Head of Municipal Derivatives and Municipal Cash Trading at Bear Stearns. He worked at Bear Stearns from 1999 to July of 2008. His disclosures to FINRA state that he was targeted by DOJ "concerning antitrust and other violations involving contracts related to municipal bonds." Salvadore participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted

32

from Bear Stearns' Municipal Derivatives trading desk or other venues.

f.  Douglas MacFaddin ("MacFaddin") was former head of cash derivatives and marketing at JP Morgan. He took over JP Morgan's Municipal Derivatives trading desk, along with Hertz and Samuel Gruer, in 2000. MacFaddin left JP Morgan in March of 2008 after learning he was a subject of the DOJ criminal investigation. His disclosures to FINRA indicate that he was targeted by the DOJ for "conduct on the Municipal Derivatives marketing desk." MacFaddin participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from JP Morgan's Municipal Derivatives trading desk or other venues. MacFaddin also participated in illegal activity with respect to Jefferson County, Alabama that is described below.

g.  Jay Saunders ("Saunders") worked in the Municipal Derivatives marketing department at Bank of America from 1999 to 2003 and then moved over to Wachovia, where he came to serve as director of marketing for its derivatives department. Saunders left Wachovia in July of 2008. His disclosures to FINRA state that he was targeted by DOJ "concerning antitrust and other violations involving contracts related to municipal bonds." Saunders participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from Bank of

33

America's and Wachovia's respective Municipal Derivatives

trading desk or other venues.

h.   Martin McConnell ("McConnell") worked with Saunders in the

Municipal Derivatives marketing department at Wachovia and

came to hold the position of Managing Director of marketing. He

worked at Wachovia from May of 2005 to July of 2008. His

disclosures to FINRA state that he was targeted by DOJ

"concerning antitrust and other violations involving contracts

related to municipal bonds." Saunders participated in or oversaw

unlawful collusive discussions with other Defendants and co-

conspirators conducted from Wachovia's Municipal Derivatives

trading desk or other venues. He participated in unlawful collusive

discussions with, *inter alia*, Campbell of Bank of America and

Martin Stallone of IMAGE, as described below.

i.   Peter Ghavami ("Ghavami") was the former Managing Director

and co-manager in UBS's Municipal Derivatives group. He joined

UBS from JP Morgan and worked at UBS from April of 1999 to

December of 2007. His disclosures to FINRA state that he was

targeted by DOJ "concerning antitrust and other violations

involving contracts related to municipal bonds." Ghavami

participated in or oversaw unlawful collusive discussions with

other Defendants and co-conspirators conducted Wachovia's

Municipal Derivatives trading desk or other venues.

34

j.  Patrick Marsh ("Marsh") served as Senior Managing Director in Municipal Finance Products at Bear Stearns until he left to join Deutsche Bank in April of 2005. He disclosed to FINRA that the DOJ has targeted him with respect to antitrust violations relating to municipal bonds while at Bear Stearns and has also disclosed that he is likely to be sued by the SEC for his conduct with respect to such bonds while he was at Bear Stearns. Marsh participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from Bear Stearns' Municipal Derivatives trading desk or other venues.

k.  Shlomi Raz ("Raz") worked on structured credit and interest rate derivative marketing at JP Morgan. He worked at JP Morgan from July of 1996 to July of 2003, when he left to join Goldman Sachs. His disclosures to FINRA state that he was targeted by DOJ "concerning antitrust and other violations involving contracts related to municipal bonds." Raz participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted JP Morgan's Municipal Derivatives trading desk or other venues.

l.  Samuel Gruer ("Gruer") was a former vice-president in JP Morgan's tax-exempt capital markets group. He took over JP Morgan's Municipal Derivatives trading desk, along with Hertz and MacFaddin, in 2000.  He worked at JP Morgan from February

of 2000 until June of 2006, when he left to go to Deutsche Bank. Gruer disclosed to FINRA that the DOJ has targeted him with respect to antitrust violations relating to municipal bonds while at JP Morgan. Gruer participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from JP Morgan's Municipal Derivatives trading desk or other venues. Gruer had discussions with, *inter alia*, Martin Stallone of IMAGE and the CW, as described below.

m.  Robert Taylor ("Taylor") was a trader of Municipal Derivatives at Lehman. He participated, *inter alia*, in discussions with Martin Stallone of IMAGE relating to the alleged conspiracy, as described below.

n.  James Towne ("Towne") was the former Managing Director of Piper Jaffray's Municipal Derivatives group. He worked at Piper Jaffray from 1996 to January of 2008. His disclosures to FINRA state that he was targeted by DOJ "concerning antitrust and other violations involving contracts related to municipal bonds." Towne participated in or oversaw unlawful collusive discussions with other Defendants and co-conspirators conducted from Piper Jaffray's Municipal Derivatives trading desk or other venues. These included many unlawful discussions with Campbell, among others. In addition, Campbell's June 28, 2002 e-mail on kickbacks to Piper Jaffray, CDR and Winters described below indicates

36

communications that Towne had discussions on this topic with
Campbell and Bank of America.

    o.    Mark Zaino ("Zaino") worked on UBS's Municipal Derivatives
trading desk until he left the company in 2007. He had collusive
discussions with, *inter alia*, Campbell, as described below. Zaino
participated in or oversaw unlawful collusive discussions with
other Defendants and co-conspirators conducted from UBS's
Municipal Derivatives trading desk or other venues.

101.    Individuals employed by the Broker Defendants or Broker Co-
conspirators who have engaged in the illegal agreement, understanding and conspiracy
include the following. These individuals were not randomly selected from Broker
Defendants' or Broker co-conspirators' corporate directories, but are people who have
acknowleged that they are targets of DOJ prosecution and/or have been identified by
Bank of America as engaging in collusive conduct.

    a.    David Lail ("Lail") worked in Baum's Municipal Derivatives
department. He was a kickback recipient with respect to the blind
pool deals with CDC that are described below.

    b.    Mary Packer ("Packer") is president of PackerKiss, where she has
worked since July of 2003. Her disclosures to FINRA state that she
was targeted by DOJ "regarding certain matters involving
transactions related to municipal bonds."

    c.    Martin Stallone ("Stallone"), who joined IMAGE in 1999, is its
Managing Director. Stallone had various communications with,

*inter alia*, Murphy, Campbell, the CW, Gruer, Marsh, McConnell, and Taylor relating to the alleged conspiracy, as described below.

d.   Johan Rosenberg ("Rosenberg") is now President of, and was formerly a Vice-President of, Sound Capital. Rosenberg had various communications with, *inter alia*, Campbell and the CW relating to the alleged conspiracy, as described below.

e.   Michael Frasco ("Frasco") is a Managing Director at Natixis, formerly CDC, with responsibilities for Municipal Derivatives. Frasco had various communications with, *inter alia*, the CW, as described below.

f.   Douglas Goldberg ("Goldberg") was a Senior Vice-President at CDR with responsibilities for Municipal Derivatives before leaving to join Deutsche Bank in September of 2006. Goldberg had numerous discussions with, *inter alia*, Campbell and the CW, as described below. His most recent FINRA disclosure indicates that he is under investigation.

g.   Dani Naeh ("Naeh") worked on Municipal Derivatives at CDR until 2004, when he left to become a Managing Partner at ICS Venture Group Ltd. Naeh had discussions with, *inter alia*, the CW, as described below.

## EXAMPLES OF THE COORDINATION OF COLLUSIVE BIDDING THROUGH BROKERS

102.   The CW learned of the aforementioned collusive conduct after he joined Bank of America's Municipal Derivatives trading desk in April of 1999 on the recommendation of executives from Broker Defendant IMAGE. He discussed his sphere

38

of operations with Bank of America's Murphy and Campbell, who assigned him to work with IMAGE. In his work on Bank of America's Municipal Derivatives trading desk, the CW dealt primarily with Stallone.

103.    Other traders at the Bank of America Municipal Derivatives trading desk worked with other brokers and providers in close proximity to the CW. Campbell, for example, worked with Towne of Piper Jaffray and Goldberg of CDR, among others. Within earshot of others, Murphy, Campbell, and other traders often changed the Bank of America's bids on transactions in response to information supplied by a Provider Defendant, a Broker Defendant, a Provider co-conspirator, or a Broker co-conspirator about competing bids by other providers. Murphy suggested to the CW that IMAGE would do the same for him. The CW conveyed this suggestion to Stallone, who was receptive to it.

104.    Often, the traders on Bank of America's Municipal Derivatives trading desk knew ahead of time if the Bank of America would get a deal. The traders understood that on some deals, a provider other than Bank of America would win, but also knew that the Bank of America would make it up on other deals where it was agreed that it would be the winning bidder. Bank of America's traders understood that other Provider Defendants and Provider co-conspirators operated with a similar understanding. Murphy monitored the CW's work and expressed dissatisfaction if the CW did not know who would win a trade before it was bid. The collusive practices continued, however, even after Murphy was no longer employed by Bank of America.

105.    The CW and other members of Bank of America's trading desk used various verbal cues to rig bids. One approach used by the CW was to ask if the Bank of

America's bid was a "good fit," in order to elicit from Stallone information on competing bids. Sometimes Stallone would say the Bank of America's bid was "aggressive" and had to be reworked to conform to the conspiratorially-set bid range. At other times, Stallone would ask the CW to get the Bank of America to a specific number, which was intended to be in furtherance of the alleged conspiracy. Stallone would also say that Bank of America could get more out of a particular deal if it would include a specified brokerage fee—a kickback to IMAGE for steering business to it. On occasion, if Stallone were unavailable, the CW would deal with Peter Loughead ("Loughead") of IMAGE.

106.     If Bank of America desired to be the prearranged winning bidder on a deal, the CW would tell Stallone it "really wanted to win that trade" or had an "axe" for that deal. Often, Stallone helped Bank of America on deals where the latter introduced IMAGE to the issuer and got it hired as a broker.

107.     Stallone would also provide information to the CW about competing bids, saying how other providers saw the market or indicating that "the market was around here" or stating that another company "was working a long time on this and they see the market here" or promising that "I will call you when I get the market."

108.     In addition to allowing the Provider Defendants and Provider co-conspirators to rig bids and allocate customers, the use of sham courtesy bids was important to ostensibly meet the IRS's safe harbor requirement of bids from at least three "reasonably competitive" providers, as described above. Stallone would often ask the CW to provide a courtesy bid where it was expected beforehand that Bank of America would not win. Likewise, there exists an audiotape of a conversation between Campbell and Towne of Piper Jaffray, where the latter told the former that JP Morgan wanted to

win the trade in question and therefore wanted a courtesy bid from Bank of America that the bank could furnish after first being apprised of JP Morgan's bid. Towne specifically asked Campbell to adjust Bank of America's numbers to be closer and inferior to JP Morgan's bid.

109.     The CW also was told by Stallone that the latter had requested and obtained courtesy bids from NatWest. On at least one occasion, Stallone told the CW that Bank of America should back down from a trade because it was slated to go to NatWest.

110.     Similarly, Stallone told the CW at one point that he would get McConnell of Wachovia to submit a courtesy bid.

111.     In another instance, Stallone said Taylor of Lehman was willing to submit a sham bid on business it did not want.

112.     At one point, the CW met Frasco of CDC at the Plaza Hotel. Frasco said CDC had submitted bids on business it had no expectation of winning.

113.     The CW had collusive communications with Rosenberg of Sound Capital. On one deal, Rosenberg advised the CW of where Bank of America needed to be in order to win the trade. Rosenberg had a practice of soliciting sham bids from Bank of America's Municipal Derivatives trading desk.

114.     Audiotapes from Bank of America's trading desk confirm other examples where the bank was solicited to provide collusive sham bids. In one instance, Campbell told Goldberg of CDR that Bank of America was willing to make a bid even though it was not interested in the transaction in question and had no intention of winning the bid. Bank of America often engaged in similar conduct at the request of other

Defendants, including Piper Jaffray, IMAGE and Sound Capital and continued to do so after Campbell and Murphy left its employ.

115.    Defendants or co-conspirators like Bank of America, UBS, Lehman, Wachovia, CDC and JP Morgan also received "last looks" that were in order to further their collusive bidding practices. In one taped conversation between Campbell and Towne of Piper Jaffray, Towne stated that he gave Morgan Stanley an opportunity to lower its bid on a transaction through such a "last look."

116.    One set of trades the CW worked on involved CDs on escrow accounts for Pennsylvania school districts and other entities, transactions about which Murphy and Campbell were fully briefed. Stallone told the CW that he would get sham courtesy bids from Wachovia, Lehman and JP Morgan, who had no expectations of winning these deals. Bank of America won the first ten deals. Then Stallone directed that Bank of America make a courtesy bid so that JP Morgan could win some deals. As these trades developed, Stallone would tell the CW if JP Morgan or Bank of America would be winning a bid. On several occasions, Stallone said that a particular deal needed to go to JP Morgan. Stallone at one point told the CW that JP Morgan understood that it had just won a big transaction and that Bank of America wanted this one. Stallone's contact at JP Morgan on these transactions was Gruer. Gruer reported to MacFaddin of JP Morgan and worked with Raz and Hertz of JP Morgan.

117.    The issuing entities involved in some of these transactions involving CDs on escrow accounts included, *inter alia*, the North Penn School District; the Cameron School District; the Downington Area School District; the Avonworth School District; the Carnegie Borough School District; the Tyne-Richland School District; the

Sto-Rox School District; the Milville Area School District; the City of Scranton School District; the Township of Moon; the Harbor Creek School District; the Slippery Rock School District; the Upper Dauphin School District; the Penns Valley School District; the Township of Ross; the County of Luzerne; the Hamburg Area School District; the St. Mary's Area School District; the Springfield Township; the Pattiston Area School District; the County of Chester; and the Ulster Tobacco Asset Securitization Corporation.

118.     Numerous other Municipal Derivatives transactions involving the Bank of America and other Defendants exist.

119.     Among the collusive Municipal Derivative trades that were brokered though IMAGE, involved the Bank of America, and have been identified through audiotapes, the CW, and/or e-mails were those involving: (a) a forward purchase agreement for the Pennsylvania Intergovernmental Cooperation Authority (a deal where Chase Manhattan Bank, now part of JP Morgan, was one of the bidders); (b) investment agreements for the Virgin Islands (a deal where Lehman was one of the bidders); (c) a forward purchase agreement for the Guam Power Authority (another deal where Lehman was one of the bidders); (d) a deposit agreement involving Springfield Township; and (e) a forward purchase agreement for Biola University. Pinard, Murphy, Campbell, Brian Zwerner ("Zwerner") (a trader on Bank of America's Municipal Derivatives trading desk), and/or James Engel (another trader on Bank of America's Municipal Derivatives trading desk) were involved in these deals for Bank of America. Stallone, Loughead, John Brenner and/or E. Gilbert Carpenter (IMAGE's Managing Director) were involved on behalf of IMAGE and Taylor was involved on behalf of Lehman.

120.    Among the collusive Municipal Derivatives trades that were brokered
through Feld Winters, involved the Bank of America, and have been identified through
audiotapes, the CW, and/or e-mails was a forward purchase agreement involving the
County of Santa Barbara, California where the other bidders included AIG, JP Morgan
and Wachovia. Murphy, Campbell, Zwerner and/or Dave Johnson (another trader on
Bank of America's Municipal Derivatives trading desk) were involved for Bank of
America. Jeff Feld (founder and CEO of Feld Winters) and Jeff Kandel (its President)
were involved for Feld Winters.

121.    Among the collusive Municipal Derivatives trades that were brokered
through CDR, involved the Bank of America, and have been identified through
audiotapes, the CW, and/or e-mails were: (a) a forward purchase agreement for the
University of Tampa; (b) a forward purchase agreement for the Tampa Port Authority; (c)
a transaction involving Hillcrest Healthcare System, where Bank of America engaged in
bid collusion with JP Morgan; (d) forward purchase and escrow agreements involving the
Art College of Design; (e) a transaction involving the New Jersey Transit Corporation;
and (f) an escrow funding and a forward purchase agreement for the Commonwealth of
Massachusetts. Pinard, Campbell, and/or Zwerner were involved in these trades for the
Bank of America. Naeh or Goldberg were involved for CDR and, on the latter three of
these trades, Zaino was involved for UBS. There is an audiotape of discussions between
Campbell and Zaino discussing the pricing terms of the Massachusetts deal and the
timing of Bank of America's bid.

122.    CDR was also involved, with Bank of America and Kinsell, in suspect
Municipal Derivatives transactions relating to refunding bonds issued by the Oxnard,

California, School District and the Delano, California Joint High School District. These instances are also being investigated as part of the overall federal probe described below.

123.     On one occasion, when another trader on Bank of America's trading desk asked Campbell if he would share his contact at CDR, Campbell responded "you don't want the responsibility associated with CDR." Goldberg and Neah of CDR at one point told the CW that if he could get Bank of America's bid to a specified level, he could win a particular deal.

124.     Among the collusive Municipal Derivatives trades that were brokered through PackerKiss, involved the Bank of America, and and have been identified through audiotapes, the CW, and/or e-mails were escrow deposit agreements involving the Puerto Rico Electric Power Authority ("PREPA"). There is an audiotape of a discussion between Zaino and Campbell on that portion of the PREPA transaction involving bidding on a defeasance escrow, where Zaino advised Campbell on how Bank of America should bid.

125.     Among the collusive Municipal Derivatives trades that were brokered through Sound Capital, involved the Bank of America, and  have been identified through audiotapes, the CW, and/or e-mails were: (a) a forward purchase agreement involving the County of Santa Barbara, California; and (b) escrow deposit agreements involving Williams County, where Bank of America, Wachovia and Lehman were bidders. With respect to the latter, Rosenberg of Sound Capital advised Campbell of other bids.

126.     Among the collusive Municipal Derivatives trades that were brokered through Baum, involved the Bank of America, and have been identified through audiotapes, the CW, and/or e-mails were swaps involving Jackson Laboratories. Audiotapes exist of discussions between Campbell and a Mr. Steinhauer of Baum where

the latter shared competitive bidding information and advised Bank of America how best to structure a collusive bid.

127.    Bank of America was also involved in numerous bid rigs with Baum and other Defendants and co-conspirators that involved GICs, debt service reserve funds, recycling funds or the like with respect to state or local governmental entities. These include trades involving: (a) the Orange County, Florida, Health Facilities Authority ("OCHFA"); (b) the Louisiana Local Government Environmental Facility & Community Development Authority ("LLGEFCDA") ; (c) the Illinois Development & Financial Authority ("IDFA"); (d) Oklahoma Rural Enterprises ("ORE"); (e) the Western Virginia Hospital Finance Authority ("WVFHA"); and (f) Henderson County, Kentucky. Campbell handled the deals for the WVFHA, ORE, LLGEFCDA, and Henderson County; he and Murphy jointly handled the deal for IDFA. Lail was the person at Baum who was principally involved in these deals. Gruer of JP Morgan submitted collusive sham courtesy bids on all of these deals except that involving ORE. a non-defendant provider whose identity is being kept confidential did likewise with respect to Henderson County. [3] Frasco of CDC did likewise with respect to Henderson County, the WVFHA, and IDFA. Campbell, on behalf of Bank of America, did likewise with respect to the OCHFA and LLGEFCDA, deliberately submitting bids that were less than what was needed to cover the debt service, liquidity, and credit enhancement on the bonds.

128.    Campbell had numerous conspiratorial communications with Towne while the latter was at Piper Jaffray. The following examples are illustrative. Campbell

---

[3] The identity of this provider is being kept confidential pursuant to agreement with the Bank of America, subject to any future Court order that requires disclosure.

would advise Towne about which deals Bank of America wanted to win with the expectation that Towne would work with other providers to ensure such success. On one occasion, Campbell gave Towne Bank of America's prebidding indications on specific deals and Towne would respond with information on the level at which the deal would trade and the interest of other providers. On another occasion, Towne told Campbell to submit a courtesy bid by giving to Bank of America the expected bidding levels of other providers so that Campbell could respond with a less competitive bid, which he did. On a third occasion, Towne told Campbell about the levels at which JP Morgan and Solomon Smith Barney were bidding. Towne said Bank of America would not win that bid, but would get the next one, and Campbell agreed.

129. Bank of America rewarded Piper Jaffray and others with kickbacks for collusive activities in furtherance of the alleged conspiracy. This is illustrated by a June 28, 2002 e-mail that Campbell provided to Murphy, which contained a list of the situations where Bank of America paid an external business contact on a transaction where the external business contact was not involved in the transaction (*e.g.*, the external business contact was not a broker, investment banker or did not provide the client with market pricing verification)." The list showed that $182,393 was paid to CDR, Piper Jaffray, Winters, and PaineWebber (which had merged with UBS in October of 2000). The payments were described as a bid to build Bank of America's relationship with these companies or to say "thanks for all the swap business." The e-mail is reproduced below.

-----Original Message-----
From:       Campbell, Doug L.
Sent:       Friday, June 28, 2002 11:08 AM
To:         Murphy, Phil D.
Subject:    Fees Paid on Unrelated Client Transactions

Phil --

After reviewing NBtrades, I have come up with the following list of fees paid to external "broker/banker" on deals where I was the marketer. I believe this list contains all of the situations where BofA paid an external business contact on a transaction where the external business contact was not involved in some way in the transaction (e.g., the external business contact was not a broker, investment banker or did not provide the client with market pricing verification). I found only four firms that we had paid fees to in this manner...CDR, Piper, Winters & Co. and PaineWebber...the Piper / PaineWebber / Winters fees were more one-off events (in Piper's case just saying thanks for all the swap business we had been doing, in PaineWebber case trying to help Mark and Gary since they were struggling to get their external reinvest business going, Winters case it was the first day Chris opened his new firm). The CDR fees have been part of the ongoing attempt to develop a better relationship with our major brokers.

CDR - 1/01 - $19, 893 - Brighton/Muskegon swaps - Piper trades. Jim Towne was aware I was paying addit. brokerage to CDR so I am not               sure if this really belongs on this list..

CDR - 3/01 - $7,500 - Three and Two Baseball (Swap)

CDR - 6/01 - $20,000 - WTVP (Illinois Public TV) (Swap)

CDR - 2/02 - $10,000 - Clinton Community School (QZAB)

PW - 2/02 - $50,000 - Depauw University (swap) -- Piper trade, Depauw is also a PW client...Jim Towne was aware I was paying addit.               brokerage to PW so I am not sure if this belongs on the list...

PW - 3/02 - $25,000 - Grandview (QZAB)

Piper - 1/02- $20,000 - Hendrum and Clinton QZABS -- Piper originally showed us this opportunity but then client hired Evensen Dodge

Piper - 4/02 - $20,000 - Bernie (QZAB)

Winters - 4/01 - $10,000 School of the Plains (Swap)

Let me know if I need to do anything else. I will keep looking as well just to make sure I have not missed one.

130.    Among other instances of bid-rigging and kickbacks involving Bank of

America is the $453 million GIC that Bank of America provided to the City of Atlanta in

2002, in which CDR acted as the broker and handled the bidding. Campbell was the Bank

of America representative in charge of that deal and colluded with representatives at

CDR to place the winning bid. The IRS has indicated that the other bidders on the deal

submitted "courtesy losing bids" to enable Bank of America to win the transaction.

131.    As yet another example, Jefferson County, Alabama (the county in

which Birmingham is situated), paid Bank of America, JP Morgan, Bear Stearns, and

Lehman. $120.2 million in fees -- six times above the prevailing rate -- for $5.8 billion in

interest rate swaps, and CDR was the County's adviser on these swaps. These transactions are being investigated by the DOJ and SEC. In particular, these banks charged Jefferson County about $50 million above prevailing prices for 11 of the swaps it bought between 2001 and 2004. Records show that none of the fees were disclosed to the County's commissioners. Porter, White & Co., a Birmingham-based financial advisory firm later hired by the County to analyze its swaps, said the banks received as much as $100 million in excessive fees on all 17 of the County's swaps. Falsely believing that these swaps would help it save money in refinancing its sewer debt obligations, the County held "Investor Relations" seminars in 2003 and 2004 at a Birmingham hotel, led and sponsored by CDR, JP Morgan and Bear Stearns. Smaller municipalities that otherwise could not afford this type of training attended the seminars. On April 30, 2008, the SEC sued Larry Langford, Jefferson County's former county commission president and now Birmingham, Alabama's mayor, for fraud in allegedly accepting $156,000 from William Blount of Blount Parrish & Co. ("Blount"), a Montgomery-based underwriter, while entering into the swaps. Blount and Bear Stearns jointly pitched the County on a swap deal worth $1.5 billion in early 2004. Several months later, in June of 2004, the County executed this swap, as well as another $380 million swap with Defendant Bank of America. The DOJ also is investigating the bankers and officials involved in these swaps. In May of 2009, JP Morgan indicated in a regulatory filing that it may be sued by the SEC in connection with the Jefferson County deals. As a result of these activities, the biggest municipal bankruptcy since Orange County, California's default in 1994 is looming.

132. "In Jefferson County's case, the people who were allegedly doing the price fixing were right at the center of the scandal," said Christopher "Kit" Taylor ("Taylor"), who ran the Municipal Securities Rulemaking Board, the public finance regulator in the United States, from 1978 to 2007. Taylor has stated that ``[t]he legacy of this is going to resonate in state and local governments for years."

133. Other collusive transactions involving Municipal Derivatives deals where Bank of America was not involved (but for which it is liable as a co-conspirator) also exist.

134. For example, Baum was involved in many collusive Municipal Derivative deals other than those described above. In November of 2006, as part of a settlement with the IRS, it was disclosed that Baum illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. The agency found evidence of bid rigging in these deals. With respect to 20 tax-exempt bond issuers from Arizona to Florida, Baum rigged GIC bids to allow the winning provider, most often CDC, to underpay for the GIC and simultaneously overpay for other investment agreements and remarketing fees, diverting arbitrage profits back to Baum to pay issuance costs. These unlawful bid-riggings included GICs relating to (in addition to the OFCHA and WVFHA examples cited previously): (a) a $128 million pooled variable-rate bond deal for the Arizona Health Facilities Authority ("AHFA"); (b) two hospital revenue bond issues totaling over $300 million for Ohio Hospital Capital, Inc.; (c) $250 million in revenue bonds sold by Knox County, Tennessee's Health, Educational & Housing Facility; (d) $84 million in pooled variable-rate bonds sold by the Missouri Health & Educational Facilities

Authority; and (e) $86.5 million in pooled variable-rate bonds sold by the South Georgia Hospital Authority. Lail was the primary representative for Baum on most of these deals. For all of them, Gruer of JP Morgan submitted to Lail collusive sham courtesy bids. On all of the deals except that involving AHFA, the non-defendant provider whose identity is being kept confidential pursuant to an agreement with the Bank of America submitted to Lail collusive sham courtesy bids. The beneficiary of the collusive bidding on these deals was CDC, which won all six of them. In one case, it was found that CDC paid a large fee directly into the personal account of Lail, who provided the necessary bidding certifications.

135.    As another example, the Butler Area School District and Butler County General Authority have sued JP Morgan for unlawful and anticompetitive collusion in connection with a 2003 swaption and a Constant Maturity Swap Amendment dated August 22, 2006. Butler has identified Gregory R. Zappala, Nicholas Falgione, and Michael Lena of JP Morgan, and Stallone, David J. Eckhart, Michael Garner and Robert Jones of IMAGE as being involved in the improper conduct with respect to it.

136.    As yet another example, Feld Winters engaged in an unlawful kickback scheme with Pacific Matrix Financial Group, Inc. and O'Brien Partners, Inc. with respect to Municipal Derivative transactions in the 1990s.

137.    As a further example, the IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes that involved Société Générale and CDR . The transactions involved an abusive scheme that diverted investment earnings to deal participants. The IRS said that it "already has evidence of significant wire transfer payments... from [Société Générale] to

51

the firm [CDR] that promoted and structured these transactions.," The awarding of bids

for GICs was prearranged to allow Société Générale to inflate various fees and divert

illegal arbitrage as part of what the IRS called a "larger plan involving numerous other

bond issuances." These payments constituted secret kickbacks between a Broker

Defendant and a Provider Defendant in furtherance of the market allocation that was part

of the claimed conspiracy.

      138.    Pima County was not the only instance of such illegal kickbacks

flowing from Société Générale to CDR or vice versa. Others included the East Bay-Delta,

California, Housing & Finance Agency; the Harrisonburg, Virginia, Redevelopment &

Housing Authority; Pulaski County, Arkansas; the Albuquerque, New Mexico Region III

Housing Authority ("Region III"); the Riverside-San Bernardino Housing & Finance

Agency; and the San Diego Area Housing & Finance Agency. In connection with the

Region III deal, the IRS noted that "Société Générale had an ongoing arrangement with

CDR to promote similar abusive arbitrage devices," and that "CDR and Société Générale

appear to have fixed pricing on financial products to facilitate the diversion of arbitrage."

### COLLUSIVE PRACTICES REGARDING NEGOTIATED TRANSACTIONS

      139.    The illegal conspiracy extended to negotiated, as well as competitively-

bid, transactions. On negotiated deals, Bank of America would ask brokers for a "market

pricing letter," a certification that the pricing on a negotiated deal reflected a fair market

price. Brokers would submit such letter even where they knew that market prices were

premised on collusive activities.

      140.    In one negotiated deal involving the renovation of the Olympic Club in

San Francisco entered into in April of 2002, IMAGE sent a market pricing letter to

Murphy for use with the issuer. In a March 11, 2002 e-mail to Pinard, Murphy mentioned

that he would be requesting this letter and said that if IMAGE didn't get the brokerage business on another deal involving Beacon Tradeport Community Development District, "we can find some $ elsewhere."

141.    Similarly, in August of 2004, a trader on Bank of America's Municipal Derivatives trading desk and a Wachovia employee discussed the pricing of a swap transaction for the NC State Student Aid Association that was not bid out and that the two Providers Defendants were splitting.

142.    Likewise, in July of 2004, in a negotiated deal involving a trigger swap for a wastewater facility for the City of Chicago, Bank of America and JP Morgan were collusively given the opportunity to see the pricing of Lehman and adjust their own pricing accordingly, so that Lehman got 60% of the deal and JP Morgan and Bank of America each got 20%. The Broker Co-conspirator on the deal, Mesirow, suggested that this arrangement could be subject to scrutiny.

143.    Another instance involving negotiated transactions is reflected in the 2007 lawsuit by Biola University against Bank of America, where it was accused of sharing kickbacks with BNP Paribas on bond issuances and related swaps consummated in January-February of 2002 and November of 2004.

## COLLUSIVE COMMUNICATIONS AMONG PROVIDERS

144.    In addition to the discussions with Piper Jaffray and CDC described above, Bank of America's employees had repeated communications with employees of other Provider Defendants and Provider co-conspirators in furtherance of the alleged conspiracy. Some illustrative examples disclosed by Bank of America follow.

145.    For example, there is an audiotape from 2002 in which a UBS trader told a Bank of America trader that it had an "axe" for a swap with respect to which

IMAGE was handling the bidding on the following day. Another example of collusive communications between UBS and Bank of America are the conversations between Campbell and Zaino of UBS with respect to the Commonwealth of Massachusetts deal mentioned earlier.

146.     The CW met Gruer of JP Morgan at a holiday party hosted by IMAGE at Sparks Steak House in New York City and told Gruer that he was glad that Bank of America and JP Morgan weren't "kicking each other's teeth out" on escrow CD bidding and that it had worked out well for both companies. Gruer acknowledged the cooperation between the two firms. The CW did not hesitate to call Gruer on particular deals in order to ask how aggressively JP Morgan would be bidding.

147.     There is an audiotape in which Campbell told McConnell of Wachovia that Campbell had advised Goldberg of CDR that it was acceptable to Bank of America that another provider won a deal brokered by CDR. The deal in question was won by PaineWebber, which, as noted above, was owned by UBS.

148.     In another audiotape, Campbell and McConnell of Wachovia discussed including Bank of America in a deal in order to justify paying Bank of America $300,000 to compensate it for allowing Wachovia to do a deal with Towne at Piper Jaffray, with whom Campbell regularly worked.

149.     There are also audiotapes where employees from Bank of America and other Provider Defendants (including representatives of Bank of America, JP Morgan and UBS) discussed splitting the economics of, and/or pricing for, swap transactions, with the goal of coordinating bids for them.

## OTHER FACTS INDICATIVE OF A CONSPIRACY

150.     The alleged conspiracy has also been facilitated through

intercompetitor contacts at trade associations. One such association is the International

Swaps & Derivatives Association ("ISDA"), which describes itself at its website as

"represent[ing] participants in the privately negotiated derivatives industry, [and] is the

largest global financial trade association." The ISDA's members include the following:

Bank of America, JP Morgan, Bear Stearns, Société Générale, UBS, and Wachovia.

Another is the American Bankers Association, which counts among its members the

Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia. A third is the

Securities Industry and Financial Markets Association ("SIFMA"), formed in 2006 by the

merger of the Securities Industry Association and the Bond Market Association. As

stated at SIFMA's website, "[w]hile its name has changed, its mission has been

consistent: to represent the bond markets; advocate on their behalf; provide opportunities

for professional development and industry education and serve as conduit through which

the industry communicates with regulators, legislators, the media and the public." The

members of SIFMA include the following Defendants and co-conspirators or affiliates

thereof: AIG, Bank of America, Bear Stearns, First Southwest, GE Capital, JP Morgan,

Natixis, Piper Jaffray, Morgan Keegan, and Wachovia. The Chairman of SIFMA is

Blythe Masters of JP Morgan, its President and CEO is T. Timothy Ryan, Jr., formerly of

JP Morgan.

151.     Conferences, such as those presented by the Information Management

Network ("IMN") also provide venues to collude. For example, over the last six years,

IMN has hosted the New England Public Finance Conference, which will be held this

October in Boston, Massachusetts. As its website explains, "IMN will bring together

public finance officials, issuers, underwriters and public finance professionals from Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont for two days of informative dialogue and education on how to improve public finance within their respective states. This year's forum will provide a platform for the discussion and points of view about issues affecting state officials, institutional investors, issuers, underwriters, bond counsel and rating agencies in the New England region while providing the highest quality education for the enhancement of public finance." MacFaddin of JP Morgan chaired an IMN Municipal Derivatives conference in May of 2006 in which many of the Provider Defendants, Provider co-conspirators, Broker Defendants and Broker co-conspirators were represented. IMN also hosts the Issuers & Investors Summit, which was held in December of 2008 at La Quinta, California; "[d]ebt issuers are faced with a complex number of choices and opportunities involving the financial structures that support the many projects necessary to meet the needs of their communities and local area constituents. Investors will gain an inside track on new and existing financing projects, with ample networking opportunities to meet and form relationships with a range of entities from both the not-for-profit and government sectors."

152.      As other examples, Pinard of Bank of America did a presentation at the Bond Buyer Derivatives/Short Term Finance Institute Conference in June of 2006 at which Julie Hughes (a Vice-President of Sound Capital), Evan Zarefsky (a Vice-President of CDR), and Michael Marz (Vice-Chairman of First Southwest) were present. Pinard also participated in the May 2006 meeting of the Pennsylvania Association of

Bond Lawyers , giving a presentation on the economics of derivatives at which Michael
Lena of JP Morgan was a co-presenter.

153.     The Broker Defendants and Broker co-conspirators touted to issuers
their abilities to facilitate deals for the Provider Defendants and Provider co-conspirators
and touted the network of relationships they created among Providers. For example, on
its website, CDR claims "CDR Financial develops products and strategic alliances across
a wide spectrum of financial institutions, including asset managers, banks, broker dealers
and insurance companies."

154.     The interconnected nature of the Municipal Derivatives industry
facilitated and reinforced the conspiratorial conduct alleged herein, leading to the
massive, multi-agency government investigation. As the *Bond Buyer* reported on
November 21, 2006:

> The industry tends to be quite intertwined and
> interconnected," said Willis Ritter, a partner at Ungaretti &
> Harris here. "Virtually all the major houses are involved in
> selling [GICs], so if you think you've found something
> about one, you suspect you're going to find it about all of
> them.

## INTERNAL REVENUE SERVICE INVESTIGATION

155.     The IRS was the first agency to launch an investigation of collusive
practices in the Municipal Derivatives industry. Its inquiry initially focused on dozens of
municipal bond deals where the providers failed to pay $100 million in taxes by engaging
in abusive arbitrage devices. The IRS was concerned that some GIC providers were
overcharging issuers for GICs and other investment products. This would artificially
lower, or "burn," investment yields below the bond yield. The spread between the

investment and bond yields was then passed to the provider, rather than rebated to the IRS as required by the federal tax laws.

156.     Anderson of the IRS has stated that "[i]t looks like bid rigging is wider and more pervasive than we thought." Mark Scott ("Scott"), director of the IRS's tax-exempt bond office, publicly stated that "[w]hen a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided." These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work." As Scott went on to note, "[t]hat's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse.'" These are the types of courtesy bids described above in connection with the Bank of America's collusive activities. By January 2005, the IRS was already involved in as many as 20 bid-rigging investigations in the municipal derivatives market. However, no information that was then publicly available informed Plaintiffs of the full scope of the conspiracy alleged here.

157.     As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging." The IRS probe showed that investment contracts were sold at below market rates, according to Anderson. That means lower returns for municipalities and less tax revenue for the IRS. He added, "[p]eople were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal."

158.     At the same time, Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association, noted: "[t]he way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be.... And it's certainly possible that when you don't have transparency you can have abuses."

159.     The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

160.     On February 7, 2007, Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities.

161.     In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks.

## ANTITRUST DIVISION INVESTIGATION

162.     In light of these revelations, the Antitrust Division of the DOJ commenced its own investigation of the bid-rigging in the Municipal Derivatives markets. For the better part of two years, the Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives. The DOJ is conducting an "investigation of anticompetitive practices in the municipal bond industry," said spokeswoman Kathleen

Bloomquist. The investigation is the largest criminal investigation of public finance ever conducted by the DOJ.

163.    On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital.

164.    Following the FBI raids, the Broker Defendants, Broker co-conspirators, Provider Defendants and Provider co-conspirators were served with subpoenas. The subpoenas sought detailed information from the companies dating back to 1992. The subpoenas asked for documents, e-mails, tapes or notes of phone conversations, and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferral of the interest rate risk associated with those bonds, including but not limited to guaranteed investment contracts; forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions." The subpoenas also requested corporate organizational charts, telephone directories, and lists of all individuals involved with GICs and derivatives, in addition to all documents associated with "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding" – including invitations to bid; solicitations; notices, or requests for quotations or proposals issued to any provider; actual or proposed responses; and amounts and prices bid.

165.    On December 11, 2006, prosecutors based out of the Antitrust Division's New York field office that were tasked with investigating the alleged bid-

rigging brought their case to a federal grand jury sitting in the Southern District of New York.

166.     According to news reports and company filings, more than 30 banks, insurance companies, and brokers , have received governmental subpoenas, including, *inter alia*, the following entities: GE Funding; GE Trinity; CDR; FSA; Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; IXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Lehman; Société Générale; Baum; Winters; JP Morgan; American International Group Inc.; Bear Stearns; Feld Winters; UBS; Piper Jaffray; Wachovia.; Morgan Keegan; and Genworth Financial.

167.     As noted above, at least twelve current or former brokers at major Wall Street and other firms have been targeted for possible indictment by the DOJ or notified that they are part of the DOJ's investigation:  Hertz, Gruer, Raz, Marsh, MacFaddin, Salvadore, Ghavami, Packer, Towne, Goldberg, Saunders and McConnell.

168.     As a March 3, 2008 *Bond Buyer* article noted:

> Market participants said Friday that the individuals and firms known to have been subpoenaed or to have received target letters in the investigation may just be the tip of the iceberg.  Most firms are not publicly disclosing the Justice Department actions until their 10-K financial filings are due.  Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but banks and investment advisory firms are not subject to the same disclosure requirements.

> . . . .

> "Usually by the time an individual gets a target letter, the investigation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms," said John K. Markey, a partner at Mintz Levin Cohn Ferris Glovsky & Popeo PC in Boston, and former federal and state prosecutor.

> Markey said that in a target letter, "The Department of
> Justice is informing an individual or his attorney that it
> already has substantial evidence of the commission of a
> federal crime. It usually is a sign that the individual is
> going to be indicted and it may prompt an attempt at a plea
> bargain or cooperation deal with the government."

### THE DOJ GRANTS CONDITIONAL AMNESTY TO BANK OF AMERICA

169.     On February 9, 2007, Bank of America announced that it was

cooperating with the DOJ's investigation into bidding practices in the municipal bond

business in exchange for leniency as part of the DOJ's amnesty program.

170.     On February 9, 2007, Bank of America also issued a press release and

stated the following:

> Bank of America Corporation has entered a leniency
> agreement with the United States Department of Justice in
> Connection with the Department's investigation into
> bidding practices in the municipal derivatives industry.
> This amnesty grant was as a result of the company
> voluntarily providing information to the Department before
> the Department began its investigation, as well as the
> company's continuing cooperation.
>
> The amnesty agreement provides that, in return for the
> company's continuing cooperation with the Justice
> Department's investigation, the Justice Department will not
> bring any criminal antitrust prosecution against the
> company in connection with matters that the company
> reported to the Justice Department.. .
>
> In addition, in a matter involving the Internal Revenue
> Service (IRS), Bank of America has agreed to a $14.7
> million settlement with the IRS relating to the company's
> role in providing guaranteed investment contracts and other
> agreements in connection with certain "blind pool" bond
> transactions.

171.     It was reported that key derivatives officials at the bank were on

"administrative leave," including Pinard.

172.   On February 27, 2009, Bank of America, in its SEC Form 10-K at page

154, stated the following:

> Municipal Derivatives Matters
>
> The Antitrust Division of the U.S. Department of Justice
> (DOJ), the SEC, and the IRS are investigating possible
> anticompetitive bidding practices in the municipal
> derivatives industry involving various parties, including
> BANA, from the early 1990s to date. The activities at issue
> in these industry-wide government investigations concern
> the bidding process for municipal derivatives that are
> offered to states, municipalities and other issuers of tax-
> exempt bonds. The Corporation has cooperated, and
> continues to cooperate, with the DOJ, the SEC and the IRS.
> On February 4, 2008, BANA received a Wells notice
> advising that the SEC staff is considering recommending
> that the SEC bring a civil injunctive action and/or an
> administrative proceeding "in connection with the bidding
> of various financial instruments associated with municipal
> securities." An SEC action or proceeding could seek a
> permanent injunction, disgorgement plus prejudgment
> interest, civil penalties and other remedial relief.
>
> ****
>
> On January 11, 2007, the Corporation entered into a
> Corporate Conditional Leniency Letter (the Letter) with
> DOJ. Under the Letter and subject to the Corporation's
> continuing cooperation, DOJ will not bring any criminal
> antitrust prosecution against the Corporation in connection
> with the matters that the Corporation reported to DOJ.
> Subject to satisfying DOJ and the court presiding over any
> civil litigation of the Corporation's cooperation, the
> Corporation is eligible for (i) a limit on liability to single,
> rather than treble, damages in certain types of related civil
> antitrust actions, and (ii) relief from joint and several
> antitrust liability with other civil defendants.
>
> ****
>
> Beginning in April 2008, the Corporation and BANA
> received subpoenas, interrogatories and/or civil
> investigative demands from a number of state attorneys
> general requesting documents and information regarding
> municipal derivatives transactions from 1992 through the

present. The Corporation and BANA are cooperating with
the state attorneys general.

## INVESTIGATION BY STATE AGS

173.    In late July of 2008, XL Capital Ltd. revealed that it had received in

June of 2008 a subpoena from the Connecticut AG and a Civil Investigative Demand

("CID") from the Florida AG "in connection with a coordinated multi-state attorneys

general investigation of municipal bond related guaranteed investment contracts." Each

seeks information going back to January 1, 1998. It has been reported that a total of 38

firms have received such investigative requests from state AGs, including, *inter alia*: AIG

Financial, Bank of America, AIG SunAmerica, Bear Stearns, FGIC, FSAHL, FSAI, GE

Funding, GE Trinity, Genworth Financial, IXIS, JP Morgan, Piper Jaffray, Société

Générale, UBS, Wachovia, XL Asset Funding, XL Life Insurance, Morgan Stanley,

NatWest, CDC, CDR, First Southwest, Winters, Morgan Keegan, MGIC, Baum, Kinsell,

PackerKiss, and Sound Capital.

174.    In January of 2009, it was revealed that the California AG, in

conjunction with the Connecticut and Florida AGs, was conducting an investigation into

antitrust violations with respect to the municipal derivatives market.

## ONGOING NATURE OF ALLEGED CONSPIRACY

175.    Acts in furtherance of the alleged conspiracy have taken place since

March 12, 2004, the date four years prior to when the original complaint in this matter

was filed. *Fairfax County, Virginia v. Wachovia Bank, N.A. et al.*, 08 Civ. 432 (D.D.C.

filed on March 12, 2008) (the "*Fairfax* action"). These include the submission of sham

courtesy bids in furtherance of the alleged conspiracy, the provision by Broker

Defendants and Broker co-conspirators of confidential information concerning bids by

Provider Defendants and Provider co-conspirators, the collusive exchange of pricing information on negotiated or bidded transactions (examples of which have been provided above) and direct discussions among Provider Defendants and Provider co-conspirators regarding the pricing of trades on Municipal Derivatives.

176.    As noted above, Bank of America's 2009 SEC filing states that the governmental investigations cover the period from the early 1990s "to date."

177.    Many of the individuals targeted by the DOJ for antitrust prosecution did not leave the employ of their respective Defendant employers until 2006, 2007, or 2008. These include: Towne of Piper Jaffray (left in January of 2008); Zaino of UBS (left in 2007); Salvadore of Bear Stearns (left in July of 2008); MacFaddin of JP Morgan (left in March of 2008); Pinard of Bank of America (left in February of 2007); Hertz of JP Morgan (left in December of 2007); Ghavami of UBS (left in December of 2007); Saunders of Wachovia (left in July of 2008); Gruer of JP Morgan (left in June of 2006); and Goldberg of CDR (left in September of 2006). One—McConnell of Wachovia--only worked at Wachovia from 2005 to July of 2008. Thus, it is reasonable to infer that their anticompetitive practices have continued to at least the times of their respective departures. Others, like Stallone of IMAGE, Rosenberg of Sound Capital, Frasco of Natixis (formerly CDC) or Murphy, formerly of Bank of America and now at Winters, are still currently employed by a Defendant.

178.    With the potential exception of Bank of America, no Provider Defendant, Provider co-conspirator, Broker Defendant, or Broker co-conspirator has effectively withdrawn from the alleged conspiracy and their respective refusals to

acknowledge their misconduct are ongoing acts in furtherance of the conspiracy.[4] No individual DOJ target identified in this Complaint has effectively withdrawn from the conspiracy either.

179. Many of the Municipal Derivatives transactions that are the subject of this Complaint and were entered into prior to March of 2004 are ongoing. The adverse effects Class members are experiencing from them are ongoing as well and constitute a continuing violation of the antitrust laws.

180. Similarly, while Jefferson County entered into collusive swap deals involving Bear Stearns, JP Morgan and Bank of America in June of 2004, the adverse effects of those rigged deals continue to the present and constitute a continuing violation of the antitrust laws.

---

[4] On September 3, 2008, after the initial Consolidated Amended Complaint in this matter was filed, JP Morgan announced that it was shutting down its unit selling debt derivatives to municipalities. The announcement came on the heels of a lawsuit filed in federal court on August 29, 2008 by the Erie, Pennsylvania school district, which alleged that JP Morgan and a Pennsylvania financial adviser colluded to reap more than $1 million in excessive fees on a 2003 Municipal Derivative deal. The lawsuit also named IMAGE and Martin Stallone as defendants and alleged that they had knowledge of and participated in "anti-competitive collusive conduct." Christopher "Kit" Taylor, who ran the Municipal Securities Rulemaking Board from 1978 to 2007, ascribed JP Morgan's closure to an effort to protect the company's reputation. "It cuts down on all the bad publicity," he said. He went on to add "I wonder if they are trying to get ahead of the Justice Department's decision....They want, when that comes out, to say we're out of that business." At no time has JP Morgan made any effort to disavow the conspiracy alleged here.

## HISTORY OF FRAUD IN THE MUNICIPAL DERIVATIVES MARKET

181. The wrongful conduct alleged herein is not the first time that Wall Street firms have run afoul of laws designed to prevent unfair profiteering on the proceeds of a bond issuance. In 1998, 21 firms were sanctioned for involvement in fraudulent activities that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on how much they could earn. This so-called "yield-burning" scandal led to settlements of $172 million as a result of misconduct on 3600 separate municipal bond issues. Piper Jaffray, one of the Provider Defendants here, was involved in the earlier municipal bonds scandal.

182. Likewise, in 2002, Stifel Nicolaus broker Robert Cochran paid $220,000 to settle civil allegations against him in connection with bid rigging on a GIC transaction with the Oklahoma Turnpike Authority ("OTA") in 1989 and a forward contract with OTA in 1992. In the former instance, the bid was rigged in favor of AIG, using a "last look." The "last look" was used to deter cheating by Provider Defendants and/or Bank of America by allowing the pre-designated winner to confirm that the other bidders had submitted non-competitive, sham bids before the auction closed.

## CLASS ACTION ALLEGATIONS

183. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local and municipal government entities, independent government agencies and private entities that purchased Municipal Derivatives directly from a Provider Defendant, or through a Broker Defendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

184.    Plaintiffs do not know the exact number of class members because such information is in the exclusive control of the Provider Defendants, the Provider co-conspirators, the Broker Defendants, the Broker co-conspirators, and unnamed co-conspirators. But due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known by the Provider Defendants, Provider co-conspirators, the Broker Defendants, the Broker co-conspirators, and unnamed co-conspirators.

185.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

186.    There are questions of law and fact common to the Class, including:

    a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, maintain or stabilize prices, and rig bids and allocate customers and markets of Municipal Derivatives;

    b.    The identity of the participants of the alleged conspiracy;

    c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act (15 U.S.C. § 1);

    e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

    f.     The effect of the alleged conspiracy on the prices of Municipal

          Derivatives sold in the United States during the Class Period;

    g.    Whether Defendants and their co-conspirators fraudulently

          concealed the conspiracy's existence from the Plaintiffs and the

          other members of the Class; and

    h.    The appropriate class-wide measure of damages.

187.    Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are purchasers of Municipal Derivatives, and their interests are coincident with, and not antagonistic to, those of the other members of the Class.

188.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

189.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

190.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

191.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

192. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

193. During the Class Period, Defendants and their co-conspirators issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation, other than the states in which Defendants and their co-conspirators were citizens.

194. The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## CAUSE OF ACTION

195. Plaintiffs hereby sue Defendants for participating, along with the Bank of America, in a conspiracy to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives sold in the United States and its territories in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

196. The combination and conspiracy alleged herein has had the following effects, among others:

> a. Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United States;

70

b.   Bids charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels throughout the United States;

c.   Customers and markets of Municipal Derivatives were allocated among Defendants and their co-conspirators;

d.   Plaintiffs and the other members of the Class received lesser interest rates on Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;

e.   Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

f.   As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

197.   As a result of this combination and conspiracy, Plaintiffs and members of the Class suffered injury to their business and property.

198.   Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Plaintiffs seek to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations alleged herein.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

199.     Plaintiffs had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to the Bank of America's announcement of cooperation with the DOJ and the subsequent discussions with Bank of America, which revealed the scope of the claimed conspiracy.

200.     Plaintiffs could not have determined the nature of, scope of, or full participants in, the alleged conspiracy from press reports made public prior to the filing of the *Fairfax* action. The claims asserted herein relate back to the filing of that action. This inability of Plaintiffs and Class members to confirm the true nature of the alleged conspiracy from such press reports is confirmed by public statements made at the time of the disclosure of subpoenas issued by the DOJ in late 2006. For example, in a *Bond Buyer* article dated December 22, 2006, Carol Lew, president of the National Association of Bond Lawyers, was quoted as saying "[r]ight now, there is a lack of public information…We don't know if any of these allegations are true or what the facts are and that tempers everything."

201.     Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs. These violations constitute injurious acts which restart the applicable statute of limitations.

202.     In addition, Defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret until shortly before the initial complaints in this matter were filed. As a result, Plaintiffs and the Class members were unaware of Defendants' unlawful conduct alleged herein and did

not know that they were paying artificially high prices for Municipal Derivatives throughout the United States throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

203. Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

204. Neither Defendants nor their co-conspirators told Plaintiffs or other class members that they were rigging bids or engaging in the other unlawful collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy was inherently self-concealing.

205. As pointed out above, to the contrary, pursuant to the IRS regulations cited above, each Provider Defendant and Provider co-conspirator was required to certify in connection with a Municipal Derivatives transaction that it had not consulted with other potential Providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person. Such certifications were made repeatedly to Plaintiffs who relied on them and, in so relying, did not undertake further inquiry if such agreements had occurred.

206. With respect to negotiated Municipal Derivative transactions, Defendants supplied false market pricing letters certifying that the pricing on a negotiated deal reflected a fair market price. Plaintiffs and members of the Class relied on these false certifications.

207.     Likewise, Plaintiffs were falsely assured that the Broker Defendants and
Broker co-conspirators were acting as their fiduciary agents and were soliciting bids for
Municipal Derivatives that were fair and competitively priced and that complied with
specific IRS rules and regulations that required Broker Defendants and Broker co-
conspirators to obtain at least three commercially reasonable bids. Such assurances were
made repeatedly to Plaintiffs who relied on them and, in so relying, did not undertake
further inquiry if such agreements had occurred.

208.     Again, contemporaneous statements made at the time the DOJ issued
subpoenas in late 2006, support this conclusion. In the December 22, 2006 *Bond Buyer*
article cited above, Patrick Born ("Born"), Chief Financial Officer of the city of
Minneapolis and head of the debt committee of the Government Finance Officers
Association, noted that "[w]e've been relying on certifications [that bids have been
competitive]. Are we going to discover that people are simply not doing what they said
they were doing, or is it something else?" In a Bloomberg article dated December 7,
2006, Born observed that "[t]he way these folks [providers and brokers] have operated,
largely by telephone and largely out of public view, are [*sic*] not as transparent as they
might be...."

209.     The practices used by Plaintiffs are illustrative in this regard. Broker
Defendants or Broker co-conspirators (such as, for example, IMAGE or FSA) routinely
submitted to Baltimore a standardized "Certificate of Bidding Agent" saying that at least
three offers on a proposed Municipal Derivatives deal were received from "reasonably
competitive" providers and asserting "[t]hat the offers were solicited on a competitive
basis. All offerors had an equal opportunity to bid and no offeror was given the

74

opportunity to review the other offers (a last look) before submitting its offer." The standardized form specifically stated that "the foregoing information may be relied upon" by Baltimore. Broker Defendants and Broker co-conspirators falsely made these representations to Baltimore, thus causing it to believe that the bids it received from them for Municipal Derivatives transactions were the result of a full and fair competitive process.

210.    Broker Defendants and Broker co-conspirators were not the only ones to make such fraudulent representations to Baltimore. Provider Defendants and Provider co-conspirators did so as well. Provider Defendants and Provider co-conspirators submitted a standardized "Bid Form & Acknowledgement" or "Competitive Bid Form" for proposed Municipal Derivatives transactions. An exemplar of this form is one submitted to Baltimore on April 30, 2003 by Lehman, the winning bidder on an escrow fund investment (where UBS, Bank of America, and Wachovia were unsuccessful bidders), in which Lehman acknowleged that Baltimore would rely on its certification and asserted that "[w]e did not consult with any other potential provider about this bid, the bid was determined without regard to any other formal or informal agreement we have with the City…or any other person (whether or not in connection with the Bonds), and the bid is not being submitted solely as a courtesy to the City…or any other person." Lehman also asserted that "we did not have the opportunity to review other bids (*i.e.*, a 'last look') before providing a bid." Other Provider Defendants or Provider co-conspirators routinely made such representations in bid forms on Municipal Derivatives deals submitted to Baltimore. Provider Defendants and Provider co-conspirators falsely made these representations to Baltimore, thus causing it to believe that the bids it

received from them for Municipal Derivatives transactions were the result of a full and fair competitive process.

211. The Bucks County Plaintiffs also used standardized bidding forms. The one used by Central Bucks, for example, contained the following language: "[p]roviders are hereby notified that by submitting a bid a representation is deemed to have been made that the provider did not consult with any other potential provider about its bid, that the bid was determined without regard to any other formal or informal agreement that the potential provider has with the borrower or any other person (whether or not in connection with the bond issue), and that the bid is not being submitted solely as a courtesy to the borrower or any other person for purposes of satisfying the requirements that (a) the borrower receive at least three bids from providers that the borrower solicited under a bona fide solicitation, and (b) at least one of the three bids is from a reasonably competitive provider." In concealment of the alleged conspiracy, Provider Defendants and Provider co-conspirators falsely made these representations to the Bucks County Plaintiffs, thus causing them to believe that the bids they received from them for Municipal Derivatives transactions were the result of a full and fair competitive process.

212. The various Mississippi Plaintiffs used a variety of standardized bid forms wherein Provider Defendants and Provider co-conspirators were required to affirm that: (a) each did not consult with any other potential provider concerning its bid; (b) the bid was determined without regard to any formal or informal agreement with any other persons, and (c) the bid was not being submitted as a courtesy to any other person. Provider Defendants and Provider co-conspirators falsely made these representations to the Mississippi Plaintiffs, thus causing them to believe that the bids they received from

76

them for Municipal Derivatives transactions were the result of a full and fair competitive process.

213. Accordingly, Plaintiffs and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

214. Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

  a. By meeting secretly (including use of private telephonic communications from Defendants' and co-conspirators' Municipal Derivatives trading desks) to discuss prices, customers and markets of Municipal Derivatives sold in the United States and elsewhere;

  b. By evading the audiotaping on the Provider Defendants' and Provider co-conspirators' Municipal Derivatives trading desks through the use, *inter alia*, of cellular telephones, Blackberries and face-to-face meetings

  c. By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

      d.     By intentionally creating the false appearance of competition by engaging in sham auctions in which the results were pre-determined;

      e.     Through covert sharing of profits or other secret compensation paid to losing bidders;

      f.     By secretly communicating about bids that would be won or lost by the Provider Defendants and Provider co-conspirators;

      g.     By paying kickbacks to Broker Defendants and Broker co-conspirators

      h.     By submitting cover or courtesy bids, or unrealistically low or other artificial bids, and/or deliberately losing bids, to create the appearance of competition where there was none; and

      i.     By covert agreements not to bid.

215.   Specific examples of concealing activity, in addition to those described above, include the following. In one instance where Rosenberg of Sound Capital meant to send an e-mail to a Provider Defendant giving a secret "last look," he mistakenly tapped the "Reply All" key, so that the e-mail was also sent to the lawyer for the issuer. When that attorney called up Rosenberg to inquire about what was going on, Rosenberg lied about the purpose of the e-mail. As another example, Naeh of CDR would send conspiratorial e-mails to persons at Bank of America, such as Pinard, through his personal GoAmerica account rather than his office account. On the Bank of America Municipal Derivatives trading desk, concealing activities were rampant. The CW often told co-conspirators to call him on his cellular phone in order to avoid audiotaping of his

conversations with them. It was common for traders to ask if they could go off the desk when bidding or to tell a co-conspirator "I'll call you back later", *i.e.*, from a safe telephone. Campbell of Bank of America circumvented the capture of e-mails sent on his Bank of America-provided Blackberry handheld device by contacting the Blackberries of co-conspirators (including Towne of Piper Jaffray) directly, through the use of a Personal Identification Number.

216.    The Provider Defendants and Provider co-conspirators also concealed the alleged conspiracy by failing to apprise Plaintiffs of the existence of audiotapes from their respective Municipal Derivatives trading desks that revealed collusive activities and by reusing and overwriting the evidence contained on such audiotapes. As a result of the latter practice, evidence relevant to the claims here may have become inaccessible to Plaintiffs. Once the existence of the audiotapes still in existence became known, they were seized by the DOJ and Plaintiffs were foreclosed from access to them, thereby rendering impossible the production of the audiotapes and their use by Plaintiffs in the exercise of due diligence.

217.    Other examples of concealing activity relate to misleading press statements made when there began to be public reports about the subpoenas issued as part of the federal probes. For instance, a November 17, 2006 report on the subpoenas in *Bond Buyer* indicated that: (a) Sound Capital asserted that it was unaware of any claims or charges against it and that its business continued "uninterrupted"; (b) FSA indicated that it had no awareness of any charges involving its own practices; (c) CDR asserted that it had acted "appropriately" in connection with the investigated matters; and (d) CDC asserted that it was "simply a fact witness" and that investigators "just want to know what

our involvement in the industry is." Similarly, in a May 18, 2007 Bloomberg news report, JP Morgan indicated that it was not a target of the DOJ probe and was merely contacted by the DOJ and SEC about bidding "and related matters in public finance." In the same article, Charles Youtz, a Vice-President of Baum, assured the public that "[w]e do not anticipate any impact on the reputation of [*sic*] financial viability of the firm." These statements and others like them, upon which Plaintiffs could reasonably rely, were intended to be misleading and did mislead Plaintiffs about the scope of, and participants in, the alleged conspiracy.

218.    Despite the exercise of due diligence by Plaintiffs and the Class members, they did not discover the conspiracy until shortly before the initial complaints were filed in this matter. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and the Class members had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed, until shortly before the initial complaints were filed in this matter. Moreover, none of the facts or information available to Plaintiffs and the Class members prior to then, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy. As a result of Defendants and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class's claims have been tolled.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      That the contract, combination or conspiracy, and the acts done in

furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a

*per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That judgment be entered for Plaintiffs and members of the Class against

Defendants for treble damages sustained by Plaintiffs and the members of the Class as

allowed by law, together with the costs of this action, including reasonable attorneys'

fees;

D.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment

interest at the highest legal rate from and after the date of service of this Complaint to the

extent provided by law; and

E.      That Plaintiffs and members of the Class have such other, further or

different relief as the case may require and the Court may deem just and proper under the

circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the

claims asserted in this Complaint so triable.

Dated: June 18, 2009

By: _____

William A. Isaacson                          Arun S. Subramanian
Tanya Chutkan                                William Christopher Carmody
Jonathan Shaw                                SUSMAN GODFREY L.L.P.
Jack A. Simms                                654 Madison Avenue
BOIES, SCHILLER & FLEXNER LLP                5th Floor
5301 Wisconsin Ave. NW                       New York, New York  10065
Washington, DC 20015                         Telephone: (212) 336-8330
Telephone: (202) 237-2727                    Facsimile:  (212) 336-8340
Facsimile:  (202) 237-6131

Magda M. Jimenez
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350

Michael D. Hausfeld
Robert G. Eisler
Megan E. Jones
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Fax: (202) 540-7201

H. Lee Godfrey
SUSMAN GODFREY L.L.P
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150

Michael P. Lehmann
Christopher L. Lebsock
Jon T. King
HAUSFELD LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

**Plaintiffs' Interim Co-Lead Counsel**

Jonathan W. Cuneo
Daniel M. Cohen
CUNEO GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, D.C. 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

Joel Davidow (DC Bar No. 50849)
Clifford K. Williams
KILE GOEKJIAN REED &
McMANUS PLLC
1200 New Hampshire Ave., N.W.
Suite 570
Washington, DC 20036
Telephone: (202) 659-8000
Facsimile: (202) 659-8822

Steven Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Telephone: (215) 564-5182
Facsimile: (215) 569-0958

Arnold Levin
Laurence S. Berman
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street
28th Floor
Philadelphia, PA 19103
Telephone: (215) 567-6565
Facsimile: (215) 568-5872

Samuel D. Heins
Vincent J. Esades
Dylan J. McFarland
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL
BOODROOKAS ALVAREZ &
SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234

Eugene A. Spector
Jeffery J. Corrigan
William G. Caldes
SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.
1818 Market St., Suite 2500
Philadelphia PA 19013
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI INC.
111 Pine Street
Suite 1700
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401
Telephone: (843) 723-9804
Facsimile: (843) 723-7446

Steven A. Kanner
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015
Telephone: (224) 224-632-4500
Facsimile: (224) 632-4521

Roland G. Riopelle
SERCARZ & RIOPELLE, LLP
152 W. 57th Street, Suite 24C
New York, NY 10019
Telephone: (212) 586-4900
Facsimile: (212) 586-1234

Solomon B. Cera
Pamela A. Markert
GOLD BENNETT CERA
& SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Hollis L. Salzman
Bernard Persky
Gregory S. Asciolla
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Robert Green
Jenelle Welling
GREEN WELLING LLP
595 Market Street, Suite 2750
San Francisco, California 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

Susan Kupfer
GLANCY BINKOW &
 GOLDBERG LLP
1801 Ave. of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 North
Suite 340
Jackson, MS 39211
Telephone: (601) 977-5253
Facsimile: (601) 977-5236

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983

Dianne Nast
RODA NAST P.C.
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000
Facsimile: (717) 892-1200

**Additional Plaintiffs' Counsel**