# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08-02516 (VM) (GWG) |
| THIS DOCUMENT RELATES TO: | |
| *COUNTY OF SAN MATEO v. Bank of America, N.A., et al.* | |

RECEIVED
SEP 15 2009
U.S.D.C. S.D. N.Y.
CASHIERS

# SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

**PAGE NO.**

I.     **NATURE OF THE ACTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    **JURISDICTION AND VENUE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.    Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   **PARTIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.    Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.    Defendants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          1.    Provider Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          2.    Broker Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          3.    Doe Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     C.    Named and Unnamed Co-conspirators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.   **OVERVIEW OF MUNICIPAL DERIVATIVES**. . . . . . . . . . . . . . . . . . . . . . . . . 24

     A.    Municipal Bond Basics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     B.    Municipal Derivatives Basics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          1.    Guaranteed Investment Contracts "GICs". . . . . . . . . . . . . . . . . . . . . 28

          2.    Forward Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          3.    Advanced Refunding Escrow. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

          4.    Swaps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

               a.    Basic Swap Valuation - Logic of "Rational Pricing" . . . . . . . . . 31

          5.    Interest Rate Agreements,  Options, And Swaptions. . . . . . . . . . . . . . . 33

V.    **DEFENDANTS' ILLEGAL MANIPULATION OF THE MUNICIPAL DERIVATIVE MARKET**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     A.    Overview Of Defendants' Illegal Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . 35

1.     Mechanics Of The Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     a.     Bid-Rigging Of Auctions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

          i.     Pre-Selecting A Particular Provider Defendant To Win An Auction for a Municipal Derivative. . . . . . . . . . . . . . . . . . 38

          ii.     Submitting Courtesy Bids To Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction. . . . . . . . 46

          iii.     Passing to Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction. . . . . . . . . . . . . . . . . . . . . . 52

          iv.     The Pre-Selected Provider Defendant Gets A "Last Look" At Other Bids to Ensure Winning a Municipal Derivative Auction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

          v.     The Pre-Selected Provider Defendant Gets Guidance and The Terms Of Other Bids to Ensure Winning a Municipal Derivative Auction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

     b.     Manipulation Of Negotiated Deals. . . . . . . . . . . . . . . . . . . . . . . . 58

     c.     Kick-Backs And Other Types Of Unlawful Consideration. . . . . . 60

     d.     Defendants' Overt Acts To Prevent Discovery Of Their Conspiratorial Communications. . . . . . . . . . . . . . . . . . . . . . . . . . 66

2.     "It's nice to have friends": Repeat Appearances By Defendants' Representatives In Different Transactions, Personal Relationships Amongst Them, And Other Factors Encouraging And Enabling The Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

     a.     Repeat Appearances In Multiple Transactions . . . . . . . . . . . . . 68

     b.     Personal Relationships Amongst Defendants' Representatives.. . 69

3.     Industry-Wide Quality And Market-Wide Effect Of Conspiracy. . . . . . 74

B.     Evidence Of The Conspiracy's Operation Through Specific Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

1.     Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Proffered By Defendant Bank Of America. . . . . 76

a.     Pennsylvania Intergovernmental Cooperation Authority Forward
       Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

b.     Hillcrest Healthcare System (Oklahoma) Forward Purchase
       Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

c.     Guam Power Forward Purchase Agreement. . . . . . . . . . . . . . . . 77

d.     Pennsylvania School Districts and Other Entities Escrows. . . . . . 78

e.     Springfield Township (Pennsylvania) Collateralized Deposit. . . . 80

f.     Biola University (California) Forward Purchase Agreement. . . . . 80

g.     Santa Barbara County (California) Forward Purchase
       Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

h.     Art Center College of Design (California). . . . . . . . . . . . . . . . . . 82

i.     Beacon Tradeport Community Development District (Florida) and
       The Olympic Club (California) Transactions. . . . . . . . . . . . . . . . 82

j.     University of Tampa (Florida) Forward Purchase Agreement. . . . 83

k.     Puerto Rico Electric Power Authority Escrow Deposit
       Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

l.     Rhode Island Gross Funded Escrow Agreement. . . . . . . . . . . . . 84

m.     Williamson County (Tennessee) Escrow Deposit Agreements. . . 84

n.     Jackson Lab (Maine) Interest Rate Swaps. . . . . . . . . . . . . . . . . . 85

o.     Commonwealth of Massachusetts Forward Purchase
       Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

p.     Virgin Islands Debt Service Reserve Fund. . . . . . . . . . . . . . . . . 86

q.     New Jersey Transit Corporation Escrow Agreement. . . . . . . . . . 86

r.     Tampa Port Authority Forward Purchase Agreement. . . . . . . . . 87

s.     City of Chicago Wastewater Facility Swap. . . . . . . . . . . . . . . . . 87

t.     2007 Bank of America IRS Settlements. . . . . . . . . . . . . . . . . . . 88

2.      Preliminary Statistical Analysis Of Municipal Derivative Transactions Of California Issuers Reveals Probative Evidence Of Bid-Rigging. . . . . . . . 89

        a.      Evidence Suggesting Courtesy Bids. . . . . . . . . . . . . . . . . . . . . . . 89

                i.      City of Riverside GIC May 28, 2004 (Row 1). . . . . . . . . . 91

                ii.     City of Riverside (California) GIC Aug. 1, 2003 (Row 2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

                iii.    Los Angeles World Airports GIC March 5, 1998 (Row 3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

                iv.     City of Riverside GIC February 12, 2004 (Row 4). . . . . . 95

                v.      City of Riverside (California) GIC July 16, 2003 (Row 5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

                vi.     City of Riverside (California) GIC May 15, 2008 (Row 6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

                vii.    City of Riverside (California) GIC Nov. 17, 2004 (Row 7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

                viii.   City of Los Angeles GIC April 27, 2005 (Row 8). . . . . . 100

                ix.     San Mateo County (California) GIC September 6, 2001 (Row 9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

                x.      City of Los Angeles (California) GIC March 19, 2002 (Row 10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

        b.      San Mateo County (California) November 14, 2003 Swap Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

3.      Publicized Evidence Of The Conspiracy's Operation In Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

        a.      Pacific Matrix - Stifel Transactions. . . . . . . . . . . . . . . . . . . . . . 108

                i.      Oklahoma Turnpike Authority GIC. . . . . . . . . . . . . . . . 109

                ii.     Pottawatomie County (Oklahoma) Development Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

                iii.    Oklahoma Turnpike Authority Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

iv.     Sisters of St. Mary's Forward Purchase Agreement. . . . 111

b.     Baum - CDC Funding  Transactions. . . . . . . . . . . . . . . . . . . . . 111

c.     Baum - Bank of America Transaction
(Rural Enterprises of Okla.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

d.     CDR - Bank of America Transaction (City of Atlanta). . . . . . . . 112

e.     CDR - SocGen Transactions (Lease-to-Own And California
School Advance Refunding Deals). . . . . . . . . . . . . . . . . . . . . . . 113

f.     Oxnard California School District And Delano California Joint
High School District. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

g.     Baum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

h.     Butler Area School District Swaptions. . . . . . . . . . . . . . . . . . . . 115

i.     North Carolina University State Student Aid Association.. . . . . 115

j.     Jefferson County Swaps.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

k.     Biola University (California) Swap. . . . . . . . . . . . . . . . . . . . . . . 115

VI.     **SAN MATEO MUNICIPAL DERIVATIVE TRANSACTIONS**. . . . . . . . . . . . . . 116

A.     Reinvestment Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

1.     JPFA Lease Revenue Bonds (San Mateo County Health Center) 1994
Series A - Project / Acquisition Fund GICs. . . . . . . . . . . . . . . . . . . . . . 117

2.     JPFA Lease Revenue Bonds (Youth Services Campus) 2003 Series A, B,
and C - Reserve and Interest Fund GICs. . . . . . . . . . . . . . . . . . . . . . . . 118

3.     Other San Mateo GIC Transactions Without Bidding Documents. . . . . 121

4.     Debt Service Forward Sale Agreement - San Mateo County Joint Powers
Financing Authority, Lease Revenue Bonds 2001 Series A and B. . . . . 122

B.     Swap Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

1.     JPFA Lease Revenue Bonds (Youth Services Campus) 2003 Series A, B,
and C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

C.     Repeat Appearances Of The Same Representatives Of The Same Defendants In San Mateo Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . 124

VII.   **DOJ ANTITRUST DIVISION EMPANELS GRAND JURY TO PURSUE INDUSTRY-WIDE CRIMINAL INVESTIGATION - BOFA SEEKS AMNESTY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

A.     BofA Admits To Participation In Conspiracy - Enters DOJ Leniency Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

B.     Other Defendants Report That They And Their Former Employees Are Under Investigation Related To Their Involvement In The Conspiracy. . . . . . . . . . . . 134

1.     UBS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

2.     JP Morgan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

3.     Bear Stearns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

4.     Piper Jaffray. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

5.     Wachovia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

6.     FSA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

VIII.  **ACCRUAL OF CLAIMS, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

IX.    **SAN MATEO SUFFERED INJURY THROUGH THE CONDUCT OF THE DEFENDANTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

X.     **TRADE AND INTERSTATE COMMERCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

XI.    **CLAIMS FOR RELIEF**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

FIRST CAUSE OF ACTION – VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

SECOND CAUSE OF ACTION – VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

**PRAYER FOR RELIEF**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

**JURY TRIAL DEMAND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Plaintiff, the County of San Mateo ("San Mateo" of "Plaintiff"), brings this action for damages and injunctive relief against the Defendants (defined *infra*) for violations of the California antitrust laws (the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et. seq.*) and United States antitrust laws (Section 1 of the Sherman Act, 15 U.S.C. § 1).  San Mateo complains and alleges upon information and belief except as to those paragraphs that are based on personal knowledge, as follows:

I.

<u>**NATURE OF THE ACTION**</u>

1.     Several years ago, Warren E. Buffett, the noted investor, warned that derivatives are "***financial weapons of mass destruction, carrying dangers that, while now latent, are potentially lethal.***"  His view was echoed by investment banker Felix G. Rohatyn, who described derivatives as potential "***hydrogen bombs.***"  The impact of those prophetic comments were recently felt on every street on Main Street, U.S.A., including those of Plaintiff the County of San Mateo.

2.     This action arises from the illegal and unlawful acts of the Defendants, who conspired to manipulate, and did manipulate, the terms that the U.S. public and non-profit entities, including San Mateo, receive on specialized investment vehicles known as Municipal Derivatives, as well as the costs and fees associated with Municipal Derivative transactions.

3.     Municipal Derivatives are specialized investment vehicles used by U.S. public entities and non-profits, such as San Mateo, to hold and preserve the public monies raised from the sale of municipal bonds, hedge the interest rate obligations of those bonds, and achieve other financial goals. The former are commonly referred to as "guaranteed investment derivatives" or

1

"GIC," the latter are commonly referred to as "swaps."  Both types are discussed in more detail below. In short, Municipal Derivatives are specialized financial products that San Mateo and other public entities use to stretch scarce public monies.

4.     Defendants' conspiracy involved, but was not limited to, allocating the market for Municipal Derivatives amongst themselves, rigging the process by which the U.S. public and non-profit entities acquire Municipal Derivatives, sharing their illegal gains through kick-backs to one another, and making other secret, undisclosed arrangements.  These illegal and unlawful acts of the Defendants negatively affected the terms of every Municipal Derivative enter into by San Mateo during the period of the alleged conspiracy and thereafter.

5.     In November of 2006, the United States Department of Justice ("DOJ") Antitrust Division publically announced that it was investigating anticompetitive conduct by the providers and brokers of Municipal Derivatives.  Soon thereafter it was reported that a criminal grand jury had been empaneled in the Southern District of New York ("S.D.N.Y.") to pursue criminal indictments of individuals and companies implicated in this investigation, criminal subpoenas were issued to over 25 brokers and providers and the offices of three brokers were raided by the Federal Bureau of Investigation ("FBI").   It soon came to light that both the Internal Revenue Service ("IRS") and the Securities and Exchange Commission ("SEC") were engaged in parallel investigations, and a consortium of State Attorneys General had initiated a coordinated investigation of the same conduct against an expanded list of Municipal Derivatives brokers and providers.

6.     On January 3, 2007, soon after the DOJ's investigation was announced, then retiring Field Manager in the IRS' Tax Exempt Bond Office, Charles Anderson described his

impression of the DOJ's investigation and what it would likely produce as follows:

> I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg. . .  ***I would not be surprised to see bankers and lawyers go to jail***.

(emphasis added).

7.      Events over the subsequent months suggest that Anderson will likely be proven correct on both points: bankers will be going to jail and it will take time to unwind it all.

8.      In February 2007, Defendant Bank of America publically announced that it had requested entry, and had been accepted, into the Corporate Leniency Program of the DOJ's Antitrust Division, in connection with "industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds."  In so doing, Defendant Bank of America effectively admitted to its criminal involvement in the antitrust conduct under investigation.

9.      In the months that have followed, a growing list of Municipal Derivative brokers and providers, and their current and former employees, have reportedly received further inquiries from the DOJ, notifications in the form of "Target Letters" that they are the target of criminal investigation by the DOJ, and/or a "Wells notice" from the SEC, informing them that the SEC intends to file civil complaints against them.

10.     It is apparent that the DOJ investigations are still active and ongoing.  Indeed, the DOJ sought a stay of much of the discovery in this preceding for that reason, and continues to request the issuance of subpoenas from the S.D.N.Y. seeking information for the grand jury to consider.

11.     For example, on July 2, 2009, a subpoena was issued to the City of Riverside

seeking a detailed list of documents concerning the Municipal Derivatives entered into by the

City of Riverside associated with a $110,000,000 bond issuance in 2004, and the transactions by

which the City of Riverside entered into the Municipal Derivatives.  The Municipal Derivatives

entered into by the City of Riverside in association with this issuance include: a $93,018,253.54

GIC entered into with Defendant GE Trinity Plus (defined below) on June 10, 2004; a

$1,714,913.06 GIC and a $6,466,290.63 GIC, both entered into with Defendant MBIA (defined

below) on June 10, 2004; a $2,315,561.94 GIC entered into with Defendant FSA (defined below)

on May 14, 2008, and an $82,500,000.00 swap entered into with Defendant Merrill Lynch

(defined below).

12.     At around the same time the City of Riverside received this subpoena, it was

reported that Connecticut Attorney General Richard Blumenthal had gone to the Connecticut

Superior Court in Hartford to compel Defendant FSA to turn over 600 hours of audio recordings

already released to the SEC and DOJ in connection with their respective investigations of the

municipal derivatives industry.  According to Attorney General Blumenthal, these tapes contain

"a rich source of evidence of potential violations" of state antitrust laws.  However, he has only

been able to gain access to a small portion of them.

13.     San Mateo has also been stymied in its efforts to gain access to evidence that it

knows to be in the possession of the DOJ and other federal authorities.

14.     Therefore, the allegations herein are based on San Mateo's independent

investigation.  This investigation has included receiving oral and documentary evidence from

Defendant Bank of America ("BofA"), who provided San Mateo with an oral proffer of evidence

4

based on the testimony of former employee of Defendant ("Confidential Witness" or "CW"), a description of the contents of various tape recorded conversations, emails and deal files.  The investigation has also involved the gathering and analysis of publically available information, including the SEC filings of Defendants and press articles.  Finally, San Mateo has conducted quantitative and pattern analyses of information regarding Municipal Derivative transactions entered into by it, as well as by other California cities, counties and public entities.

15.     This investigation has revealed a far-reaching, industry-wide conspiracy, through which Municipal Derivative providers, working with Municipal Derivative brokers, foreswore competition with one another in the Municipal Derivative transactions of San Mateo and others.  Instead, they allocated Municipal Derivative transactions amongst themselves in the following manner: they signaled to each other their intended bids and whether they were interested in winning a particular transaction or not, submitted courtesy bids on transactions they had no intention or desire to win in order to give transactions an artificial veneer of fairness, refrained from bidding on transactions to allow another to prevail without competition, lowered their intended bids in response to signals that the transaction could be won by them at terms that would yield higher profits, and took other actions that depressed the returns that San Mateo and other municipal bond issuers earned on municipal derivative transactions.

16.     These and similar illegal activities occurred in transactions involving all types of derivatives, including both GICs and swaps, and were not limited to transactions that purportedly involved formal competitively-bid auctions.   Rather, San Mateo has uncovered evidence probative of the conspiracy's operation in negotiated transactions for Municipal Derivatives such

as swaps, through means including collusive arrangements affecting market pricing quotations by which the terms of negotiated deals were supposed to be verified.

17. Moreover, San Mateo's investigation has revealed probative evidence that the conspiracy also operated to deny municipal bond issuers competition in the services provided by brokers of Municipal Derivatives and compel them to pay exorbitant fees for such services.

18. Because of the pervasiveness of this conduct and the inter-transactional relationship of Defendants' illegal conduct, the conspiracy has had a market-wide effect on the terms of Municipal Derivative transactions and prices of services associated therewith, depriving San Mateo and other municipal bond issuers of the benefits of free competition. As a result, San Mateo suffered harm in several ways, including, but not limited to: (a) receiving rates on Municipal Derivatives that were artificially depressed and uncompetitive; (b) being forced to engage counterparties to Municipal Derivative transactions that carried increased credit risks that were not reflected in the terms of the transactions; and (c) being forced to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions.

## II.

## JURISDICTION AND VENUE

### A.    Jurisdiction

19. This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and the costs of suit, including treble damages, injunctive relief, and reasonable attorneys' fees, against Defendants, and each of them, for the injuries sustained by Plaintiffs by reason of the violations, as alleged herein, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

21.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 5 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d), because during the conduct alleged herein, the Defendants resided, transacted business, were found, and/or had agents in this District, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and because overt acts in furtherance of the alleged conspiracy were committed in this District.

22.     In addition, Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their business dealings and transactions in this District, by having caused injuries through their acts and omissions throughout the State of California, and by their violation of the Cartwright Act, Business & Professions Code §§ 16700, *et seq.*

23.     This Court has subject matter jurisdiction over the State statutory and common law causes of action asserted herein pursuant to Article VI, § 10 of the California Constitution. Each cause of action asserted, including claims alleging violations of the Cartwright Act arises under the laws of the State of California.

24.     Defendants, and each of them, have sufficient minimum contacts within California to make the exercise of jurisdiction over each Defendant by California courts consistent with traditional notions of fair play and substantial justice.  Each Defendant participates, or during the relevant period did participate, in the California market through brokering or providing Municipal Derivatives to California public and non-profit entities and/or affecting the terms of municipal derivatives acquired by such entities through their participation

7

in the conspiracy alleged herein. Moreover, Defendants, and each of them, do substantial

business in the State of California.

25.     Venue is proper because Plaintiff is located in San Mateo County and Defendants'

illegal conduct was directed at and suffered from San Mateo County.  Moreover, several of the

Defendants are citizens of the State of California and are headquartered in Los Angeles County,

including Defendant CDR Financial Products, whose offices in Beverly Hills were raided by the

FBI in November of 2006.

26.     The damages suffered by Plaintiff exceeds this Court's jurisdictional minimum.

27.     This District has jurisdiction over the claims asserted in this action pursuant to 28

U.S.C. § 1331, federal question jurisdiction, and 28 U.S.C. § 1367, supplemental jurisdiction of

state law claims.

### III.

### PARTIES

**A.     Plaintiff**

28.     **Plaintiff County of San Mateo ("San Mateo" or "Plaintiff")** is a county

and a political subdivision of the State of California. San Mateo is the 13th most  populous

county in California, with a population of more than 700,000 residents.  San Mateo is home to a

number of significant venues in northern California including the Cow Palace, San Mateo

County Expo Center, and the South San Francisco Expo Center. Plaintiff San Mateo County

entered into Municipal Derivative agreements with one or more of the Defendants. Plaintiff San

Mateo County believes that these Municipal Derivative contracts were subject to the unlawful

and illegal acts of the Defendants. Plaintiff San Mateo County believes that it has suffered harm

due to the illegal bid-rigging activities of the Defendants.

**B.**     **Defendants**

      **1.**     **Provider Defendants**

29.     Provider Defendants are those Defendants that acted as counter parties in

Municipal Derivative transactions entered into by San Mateo and other public entities and/or

submitted bids and pricing information in such transactions.  All of the Provider Defendants were

part of the conspiracy.  The term provider is commonly used in the Municipal Derivatives

industry to refer to those entities that are counter parties to issuers, such as San Mateo, in

Municipal Derivative transactions, as opposed to brokers of Municipal Derivatives, discussed

below.

      30.     Provider Defendant **Bank of America, N.A. ("Bank of America" or "BofA")** is

a Delaware corporation with its principal place of business in Charlotte, North Carolina.  As a

member of the conspiracy, Bank of America, directly and through its fully owned subsidiary

Defendant Merrill Lynch & Co., Inc., was a counter-party to Municipal Derivatives invested in

by public and non-profit entities and engaged in the misconduct that led to the harm suffered by

San Mateo.

      31.     Provider Defendant **Merrill Lynch & Co., Inc**. ("**Merrill Lynch**"), a wholly

owned subsidiary of Defendant Bank of America, is a Delaware corporation with its principal

place of business in Charlotte, North Carolina (formerly New York, NY).  Defendant Bank of

America acquired Merrill Lynch in January of 2009.  As a member of the conspiracy, Merrill

Lynch was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

32.     Provider Defendant **UBS AG ("UBS AG")** is a Swiss corporation with its principal place of business in New York, NY.  As a member of the conspiracy, UBS AG, directly and/or through its wholly owned subsidiaries Defendant UBS Securities, LLC and/or Defendant UBS Financial Services, Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

33.     Provider Defendant **UBS Financial Services, Inc., f/k/a PaineWebber, Inc. ("PaineWebber"),** a wholly owned subsidiary of Defendant UBS AG, is a Delaware corporation with its principal place of business in New York, New York.  In 2000, UBS AG acquired PaineWebber.  As a member of the conspiracy, PaineWebber, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

34.     Provider Defendant **UBS Securities, LLC, f/k/a UBS Warburg LLC ("UBS Securities")**, a wholly owned subsidiary of Defendant UBS AG, is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, UBS Securities was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

35.     Provider Defendants **UBS AG, PaineWebber, and UBS Securities** are referred to collectively herein as "**UBS**."

10

36.     Provider Defendant **JP Morgan Chase & Co.,  f/k/a Chase Financial, f/k/a Morgan Guaranty Trust Company of New York, f/k/a JP Morgan Chase ("JP Morgan")** is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, JP Morgan, directly and through its fully owned subsidiary Defendant J.P. Morgan Securities, Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

37.     Provider Defendant **J.P. Morgan Securities, Inc., f/k/a Bear, Stearns & Co., Inc., ("Bear Stearns")**, a wholly owned subsidiary of Defendant JP Morgan, is a Delaware corporation with its principal place of business in New York, NY.   In May of 2008, Defendant JP Morgan acquired Bear Stearns.  As a member of the conspiracy, Bear Stearns was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

38.     Provider Defendant **MBIA Inc. ("MBIA")** is a Connecticut corporation with its principal place of business in Armonk, NY.  As a member of the conspiracy, MBIA was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

39.     Provider Defendant **Citibank, N.A. ("Citibank")** is a nationally-chartered Bank, with its headquarters in New York, NY.  As a member of the conspiracy, Citibank was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

40.     Provider Defendant **Morgan Stanley ("Morgan Stanley")** is a Delaware corporation with its principal place of business in New York, NY.  As a member of the

11

conspiracy, Morgan Stanley was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

41.      Provider Defendant **Citigroup Financial Products Inc. f/k/a Salomon Brothers Holding Company Inc. ("SBHC")**, is a subsidiary of Citigroup, Inc. and a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, SBHC, through its predecessor Salomon Brothers Holding Company Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

42.      Provider Defendant **Citigroup Global Markets Holdings Inc. f/k/a Salomon Smith Barney Holdings Inc. ("SMBHI")** is a subsidiary of Citigroup, Inc. and a New York corporation with its principal place of business in New York, NY.  As a member of the conspiracy, SMBHI, through its predecessor Salomon Smith Barney Holdings Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.  SMBHI's role as counter-party and participant in the misconduct alleged herein included acting as a guarantor of some or all Municipal Derivatives issued by SBHC.  The guarantees provided by SMBHI were a necessary pre-condition of SBHC's ability to serve as a counter-party in some or all of the Municipal Derivative transactions to which SBHC acted as a counter-party or sought to act as a counter-party.

43.      Provider Defendants SBHC and SMBHI are collectively referred to herein as "Salomon Smith Barney."

12

44. Provider Defendant **Rabobank Group ("Rabobank")** is a Dutch cooperative banking institution. As a member of the conspiracy, Rabobank was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

45. Provider Defendant **Bayerische Landesbank Girozentrale ("BayernLB")** is a German corporation with its principal place of business in Munich, Germany. As a member of the conspiracy, BayernLB was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

46. Provider Defendant **Transamerica Occidental Life Insurance Company, ("Transamerica")** a wholly owned subsidiary of Transamerica Corporation, is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. As a member of the conspiracy, Transamerica was a counter-party to Municipal Derivatives invested in by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

47. Provider Defendant **Piper Jaffray & Co. ("Piper Jaffray")** is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. As a member of the conspiracy, Piper Jaffray was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo. Piper Jaffray also acted as a broker of municipal derivatives to public and non-profit entities and engaged in misconduct in that capacity as well that led to the harm suffered by San Mateo.

48. Provider Defendant **Societe Generale SA ("SocGen")** is a French corporation with its principal place of business in Paris, France. As a member of the conspiracy, SocGen was

13

a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

49.     Provider Defendant **Wachovia Bank, N.A.**, **f/k/a First Union Corporation ("Wachovia")**, a wholly owned subsidiary of Wells Fargo & Company, is a nationally chartered banking association with its principal place of business in Charlotte, North Carolina.  In December of 2008, Defendant Wells Fargo & Company acquired Wachovia.  As a member of the conspiracy, Wachovia was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

50.     Provider Defendant **Wells Fargo & Company ("Wells Fargo")** is a Delaware corporation with its principal place of business in San Francisco, California.  As a member of the conspiracy, Wells Fargo, directly and through its subsidiary Defendant Wachovia, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.  Wells Fargo also acted as a broker of municipal derivatives to public and non-profit entities and engaged in misconduct in that capacity as well that led to the harm suffered by San Mateo.

51.     Provider Defendant **AIG Financial Products Corp. ("AIG Financial")** is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, AIG Financial, directly and through its fully owned subsidiary AIG Matched Funding Corp., issued and was the counter-party to Municipal Derivatives invested in by California public entities and engaged in the misconduct that led to the harm suffered by San Mateo.

52.     Provider Defendant **Assurance Guaranty US Holdings, Inc. ("Assured Holdings")** is a New York corporation with its principal place of business in New York, NY.

Assured Holdings is the holding company of Financial Security Assurance, Inc.  Assured

Holdings is the successor in interest to Financial Security Assurance Holdings

Ltd., which through its Financial Products segment, FSAI, and FSAI's subsidiaries was a

counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged

in the misconduct that led to the harm suffered by San Mateo.

53.     Provider Defendant **Dexia** is a Belgian financial institution headquartered in

Brussels Belgium. Defendant Dexia is 13.9% stage holder of Assured Holdings and is the former

owner of Financial Security Assurance, Inc.  According to the terms of the deal by which

Assured Holdings assumed majority ownership and control of Financial Security Assurance, Inc.,

on July 1, 2009, Dexia retained all risks and responsibilities for Financial Security Assurance,

Inc.'s financial products business, which includes acting as counter-party to Municipal

Derivatives, in the manners alleged below, entered into by public and non-profit entities and

engaged in the misconduct that led to the harm suffered by San Mateo.

54.     Provider Defendant **Financial Security Assurance, Inc. ("FSAI")**, a wholly

owned subsidiary of Assured Guaranty Ltd., is a New York corporation with its principal place of

business in New York, NY.  As a member of the conspiracy, FSAI directly and through its direct

subsidiaries FSA CMS, FSA Capital Services LLC and FSA Capital Management Services LLC.,

was a counter-party to Municipal Derivatives entered into by public and non-profit entities and

engaged in the misconduct that led to the harm suffered by San Mateo.

55.     Provider Defendant **FSA Capital Services LLC**, a wholly owned subsidiary of

FSA CMS, is a New York corporation with its principal place of business in New York, NY.  As

a member of the conspiracy, FSA Capital Services LLC was a counter-party to Municipal

Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

56.     Provider Defendant **FSA Capital Management Services LLC**, a wholly owned subsidiary of FSA CMS, is a New York corporation with its principal place of business in New York, NY.  As a member of the conspiracy, FSA Capital Management Services LLC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

57.     Provider Defendants **Assured Holdings**, **Dexia, FSAI, FSA Capital Services LLC,** and **FSA Capital Management Services LLC** are referred to collectively herein as "**FSA**."

58.     Provider Defendant **National Westminster Bank, Plc ("NatWest")**, a subsidiary of Royal Bank of Scotland, is a public limited company with its principal place of business in London, England.  As a member of the conspiracy, NatWest was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

59.     Provider Defendant **GE Funding Capital Market Services, Inc. ("GE Funding")**, a wholly owned subsidiary of General Electric Capital Services, Inc. and member of the GE Funding Capital Market Services Group, is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, GE Funding  was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

60.     Provider Defendant **Trinity Funding Co., LLC ("GE Trinity Funding")**, a wholly owned subsidiary of General Electric Capital Services, Inc. and member of the GE Funding Capital Market Services Group, is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, GE Trinity Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

61.     Provider Defendant **Trinity Plus Funding Co., LLC ("GE Trinity Plus Funding")**, a wholly owned subsidiary of General Electric Capital Services, Inc. and member of the GE Funding Capital Market Services Group, is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, GE Trinity Plus Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

62.     Provider Defendants GE Funding, GE Trinity Funding, and GE Trinity Plus Funding are collectively referred to herein as "GE Trinity."

63.     Provider Defendant **Natixis Funding Corp. f/k/a CDC Funding Corp.** ("**CDC Funding**")**,** is a New York corporation with its principal place of business in New York, NY.  As a member of the conspiracy, CDC Funding acted directly as a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo. CDC Funding also functioned in some transactions as a Broker, and is also referenced herein as one of the Broker Defendants.  CDC Funding's provision of Guaranteed Investments Contracts was guaranteed by its parent Natixis, S.A.

17

64. Provider Defendant **Natixis S.A., f/k/a/ CDC Finance-CDC IXIS ("CDC")**, is a French corporation with its principal place of business in Paris, France. As a member of the conspiracy, Natixis is the ultimate parent of its subsidiary CDC Funding, and directly and/or through CDC Funding, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo. CDC's role as counter-party and participant in the misconduct alleged herein included acting as a guarantor of some or all Municipal Derivatives issued by CDC Funding. The guarantees provided by CDC were a necessary pre-condition of CDC Funding's ability to serve as a counter-party in some or all of the Municipal Derivative transactions to which CDC Funding acted as a counter-party or sought to act as a counter-party.

65. Provider Defendants CDC Funding and CDC are collectively referred to herein as "CDC" or "Natixis."

66. Provider Defendant **XL Capital Ltd. (f/k/a Security Capital Assurance Ltd.) ("XL Capital")** is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. As a member of the conspiracy, XL Capital, d/b/a Security Capital, directly and/or through its subsidiaries Defendant XL Asset Funding I, LLC and/or Defendant XL Life Insurance & Annuity Company, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

67. Provider Defendant **XL Asset Funding I, LLC ("XL Asset")**, a wholly owned subsidiary of XL Capital, is a limited liability company with its principal place of business in Schaumburg, Illinois. As a member of the conspiracy, XL Asset was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the

18

misconduct that led to the harm suffered by San Mateo. XL Asset's provision of Guaranteed Investment Contracts was guaranteed by XL Capital Assurance Inc.

68. Provider **Defendant Syncora Guarantee, Inc. f/k/a XL Capital Assurance Inc. ("XL Capital Assurance")**, a wholly owned operating company and subsidiary of Syncora Holdings, Ltd., is a New York stock insurance company. As a member of the conspiracy, XL Capital Assurance, together with its affiliate XL Asset, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo. XL Capital Assurance's role as counter-party and participant in the misconduct alleged herein included acting as a guarantor of some or all Municipal Derivatives issued by XL Asset. The guarantees provided by XL Capital Assurance were a necessary pre-condition of XL Asset's ability to serve as a counter-party in some or all of the Municipal Derivative transactions to which XL Asset acted as a counter-party or sought to act as a counter-party.

69. Providers **XL Capital**, **XL Asset** and **XL Capital Assurance** are collectively referred to herein as "**XL**."

### 2. Broker Defendants

70. Broker Defendants constitute those Defendants that acted as brokers for San Mateo and other California public entities in the acquisition of Municipal Derivatives from the Provider Defendants. The Broker Defendants served key roles in the rigging of Municipal Derivative auctions, orchestrating and facilitating the rigging of particular actions.

71. Broker Defendant **CDR Financial Products ("CDR")** is a California corporation with its principal place of business in Beverly Hills, California. As a broker of Municipal

19

Derivatives to public and non-profit entities, CDR acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

72.     Broker Defendant **Feld Winters Financial LLC ("Feld Winters")** is a California limited liability company with its principal place of business in Sherman Oaks, California.  As a broker of Municipal Derivatives to public and non-profit entities, Feld Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

73.     Broker Defendant **Winters & Co. Advisors, LLC ("Winters")** is a California limited liability company with its principal place of business in Los Angeles, California.  As a broker of Municipal Derivatives to public and non-profit entities, Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

74.     Broker Defendant **George K. Baum & Co. ("Baum")** is a Missouri corporation with its principal place of business in Kansas City, Missouri.  As a broker of Municipal Derivatives to public and non-profit entities, Baum acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

75.     Broker Defendant **Sound Capital Management, Inc. ("Sound Capital")** is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota.  As a broker of Municipal Derivatives to public and non-profit entities, Sound Capital acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

20

76.     Broker Defendant **Investment Management Advisory Group, Inc. ("IMAGE")** is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania.  As a broker of Municipal Derivatives to public and non-profit entities, IMAGE acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

77.     Broker Defendant **First Southwest Company ("First Southwest")** is a corporation with its principal place of business in Dallas, Texas.  As a broker of Municipal Derivatives to public and non-profit entities, First Southwest acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

78.     Broker Defendant **PFM Group, Inc. ("PFM Group")** is a Pennsylvania corporation with its principal place of business in Abington, PA.  As a broker of Municipal Derivatives to public and non-profit entities, PFM Group, directly and through its wholly owned subsidiary PFM Asset Management LLC, acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

79.     Broker Defendant **PFM Asset Management LLC ("PFM Asset")** is a Pennsylvania corporation with its principal place of business in Philadelphia, PA.  As a broker of Municipal Derivatives to public and non-profit entities, PFM Asset acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

80.     Broker Defendants **PFM Group** and **PFM Asset** are collectively referred to herein as **"PFM."**

### 3. Doe Defendants

81. Except as described herein, San Mateo is ignorant of the true names of Defendants sued as Does 1 through 50 inclusive and, therefore, sues these Defendants by such fictitious names. San Mateo will seek leave of the Court to amend this Complaint to allege their true names and capacities when they are ascertained.

82. San Mateo alleges that each of these Doe Defendants is responsible in some manner for the acts and occurrences alleged herein, and that San Mateo's damages were caused by such Doe Defendants.

## C. Named and Unnamed Co-conspirators

83. Provider co-conspirator **Financial Guaranty Insurance Company ("FGIC")** is a Delaware corporation with its principal place of business in New York, NY. As a member of the conspiracy, FGIC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

84. Provider co-conspirator **AIG Matched Funding Corp. ("AIGMFC")** is a Delaware corporation with its principal place of business in Wilton, CT. As a member of the conspiracy, AIG MFC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

85. Provider co-conspirator **AIG Sunamerica Life Assurance Co. ("AIG Sunamerica")** is an Arizona corporation with its principal place of business in Los Angeles, California. As a member of the conspiracy, AIG Sunamerica was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

22

86. Provider Defendant AIG Financial and Provider co-conspirators AIG MFC and AIG Sunamerica are collectively defined herein as "AIG."

87. Provider co-conspirator **AMBAC Financial Group, Inc. ("Ambac")** is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, Ambac was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

88. Provider co-conspirator **Genworth Financial Investment Management, LLC ("Genworth")** is a Virginia limited liability corporation. As a member of the conspiracy, Genworth was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

89. Broker co-conspirator **Morgan Keegan & Co. Ltd. ("Morgan Keegan")** is a subsidiary of Regions Financial Corp., a Tennessee corporation with its principal place of business in Memphis, Tennessee. As a broker of Municipal Derivatives to public and non-profit entities, Morgan Keegan acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

90. Broker co-conspirator **Kinsell Newcomb & De Dios Inc. ("Kinsell")** is a California corporation with its principal place of business in Carlsbad, California. As a broker of Municipal Derivatives to public and non-profit entities, Kinsell acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

91. Broker co-conspirator **PackerKiss Securities ("PackerKiss")** is a Florida corporation with its principal place of business in Daley Beach, Florida. As a broker of

Municipal Derivatives to public and non-profit entities, PackerKiss acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

92.     Broker co-conspirator **Shockley Financial Corp. ("Shockley")**, a wholly owned subsidiary of NelNet Inc., is a Colorado corporation with its principal place of business in Aura, Colorado.  As a broker of Municipal Derivatives to public and non-profit entities, Shockley acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including San Mateo.

93.     Provider co-conspirator **Lehman Brothers Inc. ("Lehman")** is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, Lehman was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by San Mateo.

**IV.**

**OVERVIEW OF MUNICIPAL DERIVATIVES**

**A.     Municipal Bond Basics**

94.     Municipal bonds are issued by U.S. states, cities, and counties, or their respective agencies and other government entities to raise funds for various public projects, including, the construction and repair of roads and building public structures such as schools, parks, power plants and mass transit facilities.  Public entities also issue municipal bonds – known as "tax revenue anticipation notes" ("TRANs"), "certificates of participation", "lease revenue bonds", etc. – to raise funds to pay for current expenses while awaiting future revenues.

95.     When a public entity issues bonds, it is generally referred to as an "issuer."  (The same term is used for non-profit entities that issue tax-exempt equivalents to municipal bonds).

24

This term is also used in Municipal Derivative transactions to refer to the public or non-profit entity that enters into a Municipal Derivative deal with a provider.

96.     Municipal Derivatives are provided by large commercial and investment banks or highly rated insurance companies (collectively referred to herein as "providers").

97.     When a public or non-profit entity seeks to purchase a Municipal Derivative by entering into Municipal Derivative contract with a provider, they may engage the services of a broker. The legitimate role of the broker is to obtain= the best possible price for the Municipal Derivative by arranging competitively bid auctions among multiple potential providers of Municipal Derivatives.

98.     Municipal bonds are tax-exempt and as a result, investors are usually willing to accept lower interest rates from municipal bonds than they would accept from other forms of borrowing (assuming comparable risk). This makes issuance of municipal bonds an attractive fiscal option for many public entities, and, as a result, the municipal bond industry is extremely large. According to the Securities Industry and Financial Markets Association, approximately $385 billion worth of municipal bonds were issued in 2006. The total United States municipal bond market is currently valued at approximately $2.6 trillion. At any time, public entities in California have several thousand bond issuances outstanding. The total market value of the California bond market is approximately $200 billion or more. In 2007, it is estimated that California public entities issued approximately $20 billion of municipal bonds.

99.     Traditionally municipal bonds pay interest to bond holders at either a fixed or variable rate of interest that is pegged to some kind of index such as the London Inter-Bank Offered Rate ("LIBOR") (the standard for quoting interbank lending of Eurodollar deposits), or

the Security Industry & Financial Markets Association Index ("SIFMA Index").  The issuer of a municipal bond receives a cash payment at the time of issuance.  In return, the issuer agrees to repay the principal and the interest to the bond holders over time.  Repayment periods vary and may be as short as a few month but typically lasts for several years, often several decades.

100.    In recent years, bond issuers have, in increasing numbers, issued two other types of bonds, variable rate demand bonds ("VRDBs") and auction rate securities ("ARS").  Both VRDBs and ARSs, through slightly different mechanisms, are designed to allow issuers of long-term bonds to take advantage of short-term interest rates by "re-marketing" the bonds on a weekly or monthly basis.  Both types of bonds are also frequently associated with swaps, through which an issuer can seek to gain a synthetic fixed rate that would not otherwise be available to the issuer.

101.    Proceeds from the issuance of municipal bonds for public projects or construction are typically put into three types of funds.  The primary fund is known as the project fund or the construction fund.  This fund is used to pay for the actual construction or repair project work.  The second fund, which is smaller in nature, is known as the debt service fund, or "sinking fund."  This fund is used to make principal and interest payments to bond holders.  The third type of fund is known as the debt service reserve fund.  This reserve fund is used to pay debt obligations in case of unforeseen contingencies.  Because of the revenue-anticipation purpose and shorter term quality of TRANs and other similar kinds of bonds, proceeds from issuances of these bonds are typically placed in similar but different types of funds than traditional bonds.

**B.**    **Municipal Derivatives Basics**

102.    "Municipal Derivatives" refers to a variety of specialized investment vehicles through which issuers of municipal and tax-exempt bonds seek to: (1) earn a return on bond proceeds while those proceeds are unused; (2) hedge the interest rate obligations of underlying bonds; and/or (3) accomplish other financial goals. The Municipal Derivatives industry is almost as large as the municipal bond market. A substantial portion of the $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives with almost $40 billion in California alone.

103.    All Municipal Derivatives, whatever the purpose they are designed to achieve for the issuer, involve a reciprocal exchange of money between the issuer and a Municipal Derivative provider. Unless otherwise specified, as used in this Complaint, the term "Municipal Derivatives" generically encompasses all of the transactions described herein.

104.    In the case of Municipal Derivatives used by issuers to earn a <u>return</u> on unused bond proceeds, the issuer gives the provider a lump sum of money (principal) and in exchange receives from the provider periodic payments based on the lump sum and interest thereon. From the issuers perspective, the lump sum to periodic payment exchange is much like an annuity. There are several types of reinvestment derivatives, which vary somewhat in form. The most common type is a called a "guaranteed investment contract" or "GIC." The acronym GIC is often used as short hand to refer to various types of reinvestment derivatives. The term **"reinvestment derivative"** is used herein to refer generally to Municipal Derivatives used by issuers to reinvest bond proceeds.

27

105.    The most common type Municipal Derivative used by issuers to <u>hedge</u> the interest rate obligations of underlying bonds are interest rate swaps or just "swaps."   In a swap, the issuer makes periodic payments to the provider calculated on a certain rate of interest on a generally amortizing amount of principal, and receives in exchange periodic payments from the provider based on a different rate of interest on the same amount of principal.  The economic calculi of both parties that is supposed underlie such an exchange is discussed below but is generally referred to as the logic of "rational pricing," based on the comparative advantage of access to different types of credit markets.   The term **"hedging derivative"** is used herein to refer generally to Municipal Derivatives, such as swaps, options, swaptions ceilings, floors and collars, that issuers use, generally, to hedge the interest rate obligations on underlying loans and shift the risk their on.  They are most commonly associated with ARS and VRDB issuances, which have interest rates that set at short-term intervals.

106.    A much less common type of Municipal Derivative involves an exchange of periodic payments *from* an issuer *to* a provider for a lump sum payment *from* a provider.   These are often referred to a **"forward sales agreements."**  However, forward sales agreements can also refer to Municipal Derivatives in which the cash flows mirror those in a reinvestment derivative (a lump sum from the issuer in exchange for periodic payments from the provider).

**1.    <u>Guaranteed Investment Contracts "GICs"</u>**

107.    A GIC is a contract between a municipal bond issuer and a financial institution by which the financial institution guarantees periodic payments equaling, in total, the amount of bond proceeds invested, plus interest at a rate set by a competitive bidding process.  A GIC is a type of annuity available to U.S. public entities that issue municipal bonds.  The counterparty to

GICs are typically insurance companies and investment banks, which in this role are referred to as "providers" or "counterparties." These products are intended to provide issuers with guaranteed returns on unused bonds proceeds. "GICs" can refer to unallocated group contracts, investment contracts, funding agreements, guaranteed interest contracts, or other similar financial products in which a provider agrees to pay a fixed or variable rate of interest or a future payment that is based on an index or similar criteria, such as the LIBOR or the SIFMA Index, that is payable at predetermined dates.

108.    A Repurchase Agreement or a "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return. This is known as a Collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

109.    An "Unsecured" or "Uncollateralized GIC" does not involve any securities. This type of Municipal Derivative instrument is most similar to other types of annuities: the financial institution guarantees payments at specified points of time. These agreements may contain terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties if deadlines are not met.

## 2.    **Forward Agreements**

110.    A forward agreement is often used with debt service funds. It is an agreement where the buyer and the seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. A forward agreement may require the delivery of a specified security at a specified future date at fixed

29

yields for the purpose of optimizing the investment of a debt service reserve fund. A forward agreement may also be used to require an issuer to issue, and a company to underwrite, an issuance of bonds on a specified date in the future for the purpose of refunding an outstanding debt issuance.

### 3. Advanced Refunding Escrow

111. Public and non-profit entities can issue bonds to refinance prior bond issuances. An advanced refunding escrow is an arrangement pursuant to which the proceeds of the refunding issue (the new bond issued to refund an outstanding bond) are held in escrow and invested so that the escrow account funds can be used to pay off the principal and interest on the municipal bond issue that is being refunded.

112. GICs, forward agreements, and advanced refunding escrows are collectively referred to herein as **"reinvestment derivatives."**

### 4. Swaps

113. A swap is an exchange of future cash flows (*i.e.*, periodic payments) between an issuer and a provider.

114. Swaps are generally used by issuers to hedge interest rate obligations on underlying municipal bonds, but can also be used to achieve other financial goals including gaining access to synthetic fixed rates that are not otherwise available to the issuer.

115. In a swap transaction, the issuer and provider essentially trade or "swap" future cash flows. Swaps include: (a) floating-for-fixed interest rate swaps, (b) fixed-for-floating rate swaps, and (c) floating-for-floating interest rate swaps, when the two instruments are based off of different indices.

30

116.     While issuers sometimes enter into swaps and other types of hedging derivatives for investment purposes, issuers usually enter into them to hedge their interest rate obligations related to a particular bond issuances

117.     In recent years, it has become increasingly common for issuers to combine interest rate swaps with VRDB or ARS bond issuances, the interest rates on which are reset on regular short-term bases, such as on weekly or monthly bases.  In the swaps associated with these types of bonds, the issuer receives from the swap provider a floating interest rate that is supposed to approximate the short-term interest rates that the issuer will be obligated to pay holders of the bonds; in exchange, the issuer pays a swap provider a conditioned fixed interest rate.

### a.     Basic Swap Valuation - Logic of "Rational Pricing"

118.     Underpinning a legitimate swap transaction is the logic of "rational pricing." According to the logic of rational pricing, when an issuer and provider enter into a swap transaction, the present values ("PV") of the exchanged future cash flows should be equal or "netted off" against one another.  (Present value is the value on a given date of a future payment or series of future payments, discounted to reflect the time value of money and other factors such as investment risk.)  Another way to put this is that the net present value ("NPV") of the swap should be zero or "arbitrage free," at the date of its initiation.  In other words, a swap should involve the exchange of future cash flows that have roughly equal values.

119.     In the fixed-for-floating rate example described above, where the issuer pays a fixed rate and the provider pays a floating rate, the PV of future fixed rate payments by the issuer should be equal to the present value of the expected future floating rate payments by the provider.

31

In other words again, the exchange should be a wash, with the issuer and provider exchanging future cash flows of the same PV.

120.   If, as it should be, the NPV of the swap, as to parties that entered into it, is zero, neither party's motivation for entering the swap should be based on any belief that they have received a more valuable future cash flow in exchange for a less valuable future cash flow. Again, the NPV of the cash flows should be zero; on the market, the cash flow is worth the same. Rather, each party's motivation for entering the swap should be based on each party's respective comparative advantage based on access to different borrowing markets.

121.   In our example, the issuer enters into the swap because it believes that the PV of the floating rate the issuer will receive from the provider will be more than the PV of the floating rate cash flows that the issuer will be obligated to pay bond holders, both calculated over the life of the bond.  In other words, the issuer's access to the ARS and VRDB markets should give it a comparative advantage vis-á-vis the provider as to floating interest rates: the provider has to pay the issuer a higher floating interest rate than the issuer has to pay bond holders. The provider, in turn, enters into the swap because it believes that the PV of the fixed rate payments that the provider will receive from the issuer is greater than the PV of fixed rate payments  that  the provider would be obligated to pay another lender.  In other words, the provider has a comparative advantage vis-á-vis the issuer as to fixed rates: the issuer has to pay the provider a higher fixed rate than the provider has to pay another lender.

122.   Thus, when the NPV of a swap is not zero, but rather the NPV is significantly greater for the provider than for the issuer and no up-front payment is made by the provider to the issuer, the reasonable conclusion is that the transaction has been manipulated to the advantage of

32

the provider.  Again, the NPV should zero as between the issuer and the provider.  The financial benefit to providers should be derived from their comparative advantage concerning access to the borrowing markets in question, not cheating the issuers with whom they enter into the swaps.

123.    However, as alleged below, there are several publically reported instances where issuers have lost billions of dollars as a result unfairly valued swaps in which evidence of price collusion amongst supposed competing providers has been identified.  Moreover, a preliminary analysis of several swap transactions entered into by various California cities, counties and government agencies reveals that significant mis-pricing occurred in favor of the swap providers, and there exists probative evidence that the mis-pricing was the result of collusion between swap providers.

124.    Finally, evidence originally uncovered by San Mateo and now widely reported, as well as evidence provided by Bank of America, demonstrates how pricing letters prepared by providers to issuers and other means were used by Defendants to both manipulate the terms of swap deals and provide illegal kickbacks to one another.

## 5.    Interest Rate Agreements,  Options, And Swaptions

125.    An "interest rate floor agreement" is a financial instrument in which the buyer of the agreement is protected by receiving a guaranteed minimum interest rate (the "interest rate floor") that can be paid on the debt.  Guaranteed payments are made even if the actual interest rate drops below a specified strike rate (the "floor rate").  Interest rate floor agreements are typically used for bonds with variable interest rates.  For issuers of municipal bonds, floor agreements are used to provide greater certainty concerning the interest payments that must be paid.

126.    An "interest rate ceiling agreement" is a financial instrument in which the buyer of the agreement is protected by receiving a guaranteed maximum interest rate (the "interest rate ceiling" or "interest rate cap").  Payments are made when the actual interest rate rises about a specified strike rate (the "cap rate").  Interest rate ceiling agreements are typically used in bonds with variable interest rates.  For issuers of municipal bonds, ceiling agreements are used to provide greater certainty in the interest payments that must be paid.

127.    A "collar agreement" is a financial instrument that combines a floor agreement with a ceiling agreement.  In other words, an issuer can enter a collar agreement to combine an interest rate floor and interest rate ceiling on its variable rate debt.  This agreement ensures that interest payments will be within the range set by the collar.

128.    An "option" is a provision in a bond contract where the provider has the right, on specified dates, after giving required notification, to cancel or terminate the Municipal Derivative.

129.    A "swaption" is a combination of a swap and an option.

130.    Swaps, interest rate agreements, collars, options, and swaptions are collectively referred to herein as "hedging derivatives."

131.    Several qualities of all these types of Municipal Derivatives encouraged and facilitated the Defendants conspiracy to allocate the market for them and depress their terms. These factors include but are not limited to: the complexity of the their terms, makes them difficult to value and provides opportunities to hide or disguise the results of manipulation; the significant barriers of entry to the market for Municipal Derivatives due to their complexity and the capital requirements that potential providers need to meet in order to have required credit

ratings, and applicable regulations; and the fungibility of Municipal Derivatives that share the same terms and come from similarly rated providers.

**V.**

**DEFENDANTS' ILLEGAL MANIPULATION OF THE
MUNICIPAL DERIVATIVE MARKET**

**A.**     **Overview Of Defendants' Illegal Conspiracy**

132.     Defendants illegal conspiracy was based on a web of interlocking relationships between Provider Defendants, Broker Defendants, and the people employed by them, who eschewed competition with one another in favor of cooperation that ensured the Defendants made excessive illegal profits, and that issuers, including San Mateo, were denied the benefits of competition.

133.     Defendant Bank of America's CW explained that "he learned that his was a business about doing favors, generating referrals for brokers, and getting favors in return."

134.     As the CW more colorfully put it in a conversation with Sam Gruer of Defendant JP Morgan at a Christmas Party held by Broker Defendant IMAGE, Provider Defendants, with the assistance of Broker Defendants, worked cooperatively instead of "kicking each other's teeth out."

135.     However, "kicking each other's teeth out" is what competitors like Defendant JP Morgan and Defendant Bank of America are supposed to do. Municipal Derivative providers should be competing with one another to offer the best economic deal to San Mateo and other issuers on the basis of the Municipal Derivative terms, including interest rates, dates of deposits or payments, fees, credit worthiness, and other factors. Municipal Derivative brokers, as fiduciaries of the issuers, are supposed to work on behalf of issuers to help facilitate issuers

35

achieve the best economic deal from competing providers, and should be competing with one

another in terms of the quality of such services they provide, including the fees they charge, etc.

136.     Defendants conspiracy denied San Mateo and other issuers such benefits this

competition.  San Mateo suffered from the effects wrought by the denial of competition and was

injured thereby, not only in particular Municipal Derivative transactions in which overt collusion

occurred, but all Municipal Derivative transactions into which it entered during the period of the

conspiracy and thereafter.  The pervasiveness of the conspiracy, the inter-transactional character

of much of the conspiratorial conduct, and the participation in the conspiracy of most if not all

the major Municipal Derivative providers and brokers had market-wide effect on the terms of all

Municipal Derivative transactions during the period of the conspiracy and afterwards.

### 1.     <u>Mechanics Of The Conspiracy</u>

137.     The Defendants conspiracy had three major components: (a) rigging auctions for

reinvestment and hedging derivatives; (b) manipulation of negotiated deals, particularly for

hedging derivatives; and (c) provision of illegal kickbacks and other types of covert

consideration to other members of the conspiracy.  Unifying its various components was an

understanding and agreement that Provider Defendants would, with the assistance of Broker

Defendants, cooperate with one another in a *you scratch my back I'll scratch yours* arrangement,

whereby Municipal Derivative transactions were allocated amongst Provider Defendants and

Provider Defendants were able to win those deals on terms that would not have been possible in

a competitive market.

a.    **Bid-Rigging Of Auctions**

138.    One of the principal means by which competition between Municipal Derivative

providers is supposed to occur are through Municipal Derivative auctions.  These auctions were

one of the principal forums for manipulation by Defendants.

139.    In a formal Municipal Derivative auction, the issuer, directly, through its broker,

or via other means, solicits formal written bids from prospective Municipal Derivative providers.

The bids submitted are evaluated by the bidder to determine which bid represents the best

economic deal to the issuer, according to the criteria discussed herein.

140.    In many instances, the proposed interest rate in the bid is the most important term

or component of a bid, representing, for example, in a GIC, the rate of return that the issuer will

earn on the principal.

141.    Because certain Internal Revenue Service ("IRS") regulations applicable to

determining the fair market value for GICs and other types of reinvestment derivatives require

that a formal auction be held for certain presumptions to apply, formal auctions are most

commonly held for GICs and other types of reinvestment derivatives.  However, formal auctions

are also used by issuers to procure swaps and other types of Municipal derivatives .

142.    The U.S. Treasury Department ("Treasury") apparently recognized that while

these auctions can and should allow issuers to procure Municipal Derivatives on the best possible

terms available in the market, the auctions also create a powerful incentive for collusion amongst

providers.  Accordingly, Treasury enacted rules that effectively require all providers who submit

bids in auctions for GIC's and other types of reinvestment-type Municipal Derivatives to

represent to issuers that:

> [T]hat the potential provider ***did not consult with any other potential provider
> about its bid***, that the bid ***was determined without regard to any other formal or***

*informal agreement* that the potential provider has with the issuer or any other person (whether or not in connection with the bond issue), and that the bid *is not being submitted solely as a courtesy* to the issuer or any other person for purposes of satisfying the requirements of paragraph (d)(6)(iii)(B)(1) or (2) of this section.

26 C.F.R. § 1.148-5(d)(6)(iii)(3) (emphasis added). San Mateo, like many issuers, uses a

standardized bid solicitation form that requires that such representations be made.

143.    However, not withstanding such representations, Defendants knowingly and

intentionally conspired with each other to rig bids in Municipal Derivative auctions precisely in

many of the ways that Defendant Providers are expressly <u>required</u> to swear they will not.

144.    As then IRS Field Manager Charles Anderson, speaking to Bloomberg in 2006

recognized, this bid-rigging caused the terms that San Mateo and other issuers to be depressed

and, therefore, cost them billions of dollars:    *"People were winning GICs at below fair market*

*values and there were obviously deliberate losing bids by the losing bidders, thereby allowing*

*the winner to win a sweetheart deal."*   A sweetheart deal for the provider is bad deal for the

issuer.

### i.    <u>Pre-Selecting A Particular Provider Defendant To Win An Auction for a Municipal Derivative</u>

145.    Both a means and a principal purpose of the Defendants' conspiracy was the

formal and informal pre-selection amongst themselves of the Provider Defendants who would

win particular auctions.  Through the pre-selection process, Provider Defendants were able to

allocate amongst themselves Municipal Derivative transactions and protect profit margins on

such transactions that would have been shrunk had the Providers legitimately competed amongst

themselves.

146.    The unlawful pre-selection practice was so prevalent that the CW's supervisor at

Defendant Bank of America Phil Murphy would express disappointment with the CW if he did

not know who would win a Municipal Derivative auction in advance of bidding.

147. Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America and publically available information reveal that the following Provider Defendants were pre-selected as winners of particular auctions:

- Defendant Bank of America,

- Defendant UBS,

- Defendant Wachovia,

- Defendant CDC,

- Defendant NatWest,

- Defendant SocGen,

- Defendant JP Morgan, and

- AIG.

148. Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America employees and publically available information reveal that the following Provider Defendants took actions to assist another Provider Defendant win a particular auction:

- Defendant BofA,

- Defendant JP Morgan,

- Defendant Merrill Lynch,

- Defendant Morgan Stanley,

- Defendant NatWest,

- Defendant Piper Jaffray,

- Defendant UBS, and

- Defendant Wachovia.

149.     As alleged herein, statistical analyses of bidding patterns in eighty-nine (89) reinvestment derivative auctions reveals probative evidence that the following Provider Defendants took actions to assist another Provider Defendant win a particular auction and/or were pre-selected as winners of particular Municipal Derivative auctions:

- Defendant BayernLB,

- Defendant Rabobank,

- Defendant JP Morgan,

- Defendant XL,

- Defendant Wells Fargo,

- Defendant MBIA,

- Defendant Bank of America,

- Defendant CDC,

- Defendant SocGen,

- Defendant GE Trinity,

- Defendant Transamerica;

- Defendant FSA;

- Defendant Smith Barney.

150.     Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America employees reveal that Broker Defendants took actions to assist a Provider Defendant win a particular auction, including, but not limited to the following:

- Defendant IMAGE,

- Defendant Piper Jaffray,

- Defendant CDR,

- Defendant Southwest,

- Defendant Feld Winters,

- Defendant Sound Capital,

- Defendant George K Baum, and

- Defendant PFM.

151. Actions taken by other Provider Defendants in order to assist another Provider Defendant win a particular auction would include, but was not limited to, submitting a courtesy bid that they knew would not be competitive or deliberately passing on an auction.

152. Broker Defendants assisted in accomplishing the goals of the conspiracy through a variety of means including, but not limited to: acting as the intermediary between Provider Defendants to indicate whether a certain Provider Defendant desired to win a bid and should be selected; indicating to non-selected Provider Defendants at what pricing they could submit and still allow the pre-selected Provider Defendant to prevail; and giving the pre-selected Provider Defendant information regarding the bids of other providers and consulting with the pre-selected Provider Defendant to ensure that it won the auction with the highest possible profit margin.

153. The codewords used by Provider Defendants to communicate their desire to each other to be pre-selected as the winner of a particular auction included:

- "We really want this deal."

- "We want to get in on this rate."

- "I can do better, I want this bid."

41

- "[I] want[] to win."

154.    The codeword "axe" was commonly used to refer to a Provider Defendant's interest in winning a deal, as in a particular Provider Defendant has an "axe" for the Municipal Derivative being auctioned next Wednesday.

155.    The codeword "aggressive" was used to refer to a high bid, and "aggressively" was used to refer to bidding to win an auction through submission of high bids.

156.    When the CW started work at Defendant Bank of America's Municipal Derivative desk, he overheard his supervisors at Defendant BofA, Phil Murphy and Doug Campbell, commonly use this code language during phone calls regarding Municipal Derivative auctions.

157.    Murphy told the CW that in order for Defendant Bank of America to be the pre-selected winner in auctions in which Broker Defendant IMAGE was involved, the CW needed to tell Marty Stallone of Defendant IMAGE that the CW "wanted to win" and "would work with IMAGE."  When the CW conveyed these sentiments to Stallone, Stallone was not surprised and said he would help where and when he could.

158.    Subsequently, CW would tell Stallone of Broker Defendant IMAGE, if there was a particular auction that the CW wanted to win for Defendant Bank of America.  Stallone helped the CW with instructions, including, but not limited to: (a) what he needed to bid for Defendant BofA to win, and (b) whether the CW needed to bid more competitively, (c) that he would get back to him when he had the other bids, (d) whether the CW could lower his bid, and thus increase Defendant BofA's profit, and still win the auction.

159.    As the relationship between Stallone and the CW developed, Stallone would unilaterally call the CW and tell him where other providers saw the market.  On some deals, Stallone would tell CW that another provider wanted to win.  Stallone would tell CW how other

providers "saw the market."  CW understood this to mean that he was not to be as competitive, because another Provider Defendant had been pre-selected as the winner of the auction.  It was understood that in such situations, that Stallone would act as the intermediary between Defendant BofA and the other Provider Defendants.

160.   From approximately 1999 through 2003, the other Provider Defendants that the CW recalls being pre-selected as winners of particular Municipal Derivative auctions in this manner, included Provider Defendant UBS, Provider Defendant Wachovia, Provider Defendant CDC, and Provider Defendant JP Morgan.

161.   The CW also said that there were instances when he knew ahead of time that Defendant Bank of America would win a particular auction, and when another Provider Defendant would win.

162.    The CW indicated that it was helpful if he was able to convince the issuer to engage Defendant IMAGE as the broker for the Municipal Derivative auction.  The CW explained that members of Defendant Bank of America's Municipal Derivative desk did not always have the opportunity to make such a recommendation.

163.   The CW stated that when a Broker Defendant arranged for Defendant BofA to win sufficient numbers of auctions, the relationship with the broker was referred to as "working out."  He said that members of Defendant BofA's Municipal Derivatives desk developed a good sense of which relationships with which Broker Defendants were working out in this way.

164.   Evidence provided by Defendant BofA suggests that Provider Defendant BofA had this type of collusive relationship with Broker Defendants IMAGE, Feld Winters, MGIC, Sound Capital, and George K Baum.

165.     From approximately 1999 through 2003, the members of Provider Defendant Bank of America's Municipal Derivative desk were  Phil Murphy, Doug Campbell, Jay Saunders, Dee Bradley (William Dee Bradley), Jeff Klein, and Dean Pinard.

166.     Common codewords used by Broker Defendants to communicate to a Provider Defendant that another Provider Defendant desired to be pre-selected as the winner of a particular auction or that the Provider Defendant to whom the communication was made could be pre-selected as the winner, included:

- "I think I can help you here."

- "I will call you when I get the market."

- "x company has been working a long time with the market and they see it here."

-  "This one needs to go to JP Morgan."

- "JP Morgan understands that they just won a big transaction and that BofA wants this one."

167.     In situations where a Broker Defendant was not available to act as the intermediary between Provider Defendants, representatives of the Provider Defendants would communicate directly with one another.

168.     For example, the CW described at least three separate conversations with Sam Gruer of Provider Defendant JP Morgan regarding particular Municipal Derivative auctions.  In one such conversation regarding an auction for a specific escrow deal, the CW recalled discussing with Gruer whether Gruer would be bidding in the auction on behalf of Provider Defendant JP Morgan and, if so, how aggressively.  In other words, the conversation was to determine whether this was an auction that JP Morgan intended to bid and win.

169.    In another conversation between the CW and Gruer at the IMAGE Christmas party referenced above, the CW had expressed his happiness to Gruer that they had worked out an arrangement on these types of escrow deals that worked out for both Provider Defendant BofA and Provider Defendant JP Morgan.  He further expressed his happiness that Provider Defendant BofA and Provider Defendant JP Morgan had had the opportunity to cooperate in the auctions.

170.    Provider Defendant BofA and Provider Defendant JP Morgan are supposed to be competitors in Municipal Derivative transactions, not cooperators.

171.    Other examples of direct conspiratorial communications between representatives of Provider Defendants found on the tapes from Defendant Bank of America's Municipal Derivatives desk, include a series of conversations between Martin McConnell of Provider Defendant Wachovia and Doug Campbell of Provider Defendant BofA

172.    For example, in a taped conversation between Martin McConnell of Provider Defendant Wachovia and Doug Campbell of Provider Defendant BofA in 2002, Campbell tells McConnell that he told Doug Goldberg of CDR that it was okay if another provider won a deal that CDR brokered and that Defendant PaineWebber won the deal.

173.    In another taped conversation between McConnell of Defendant Wachovia and Campbell of Defendant BofA, Campbell is heard discussing with McConnell including Defendant BofA in an unidentified Municipal Derivative transaction, apparently in some sort of credit support role.  Campbell appears to indicate to McConnell that Defendant Wachovia should agree to the arrangement because Campbell had let Defendant Wachovia win a Municipal Derivative transaction with Broker Defendant Piper Jaffray, with whom Campbell regularly dealt.

45

174.    There are also recordings of collusive conversations between Phil Murphy and

Doug Campbell, both of Provider Defendant BofA, a Peter at Provider Defendant UBS (likely

Peter Ghavami), and an unidentified person at Provider Defendant JP Morgan regarding certain

swap transactions, as well between an unidentified representative of Defendant Bank of America

and an unidentified representative of Defendant UBS regarding a certain swap transactions.

175.    In one such conversation, an unidentified representative of Defendant UBS is

heard telling an unidentified representative of Defendant BofA that Defendant UBS was

interested in a swap that IMAGE was handling next day.  The reasonable inference is that

IMAGE was handling an auction for the swap the next day and the representative of Defendant

UBS was telling a representative of one of his supposed competitors in such an auction,

Defendant BofA, that Defendant UBS would like to win the auction and was seeking an

agreement for Defendant BofA to assist Defendant UBS in doing so.

176.    Swap deals were both negotiated and competitively bid at auction.  The

conspiracy involved manipulation of the terms in both situations.  However, the fact that the

representative of Defendant UBS refers to Broker Defendant IMAGE handling the swap the next

day suggests that this particular swap was put to auction; in a negotiated deal a broker would not

be handling the deal on a single date certain; rather, the negotiation would take place over a

period of time.

### ii.    Submitting Courtesy Bids To Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction

177.    Another mechanism of the conspiracy was the submission of a courtesy bid by a

Provider Defendant in an auction for the benefit of another Provider Defendant.  A courtesy bid

is a purposely non-competitive bid that a Defendant Provider submits with no intention of

winning the auction but rather to assist another Defendant Provider win the auction.

178.     According to the CW, Provider Defendants submitted courtesy bids both to assist another Provider Defendant win a particular auction as well as to meet IRS safe harbor conditions.   As discussed herein, IRS regulations require that bids be received from at least three providers for a presumption of fair market value to apply.  In either case, the submission of a courtesy bid constituted a collusive manipulation of the auction process that affected the terms for particular Municipal Derivative at auction as well as the market for such Municipal Derivatives.

179.     The practice was so blatant and prevalent that Provider Defendants would bid on deals on which they were not qualified or authorized to bid.

180.     For example, Defendant IMAGE would sometimes ask the CW to bid on deals even if the CW did not have internal credit approval to do so.  Phil Murphy, the CW's supervisor at Defendant BofA, would instruct the CW to bid on those deals with a vague condition in the bid as a safety net, so that Defendant BofA could back out of it if it won.

181.     Similarly, the CW described how Defendant Wachovia and Defendant JP Morgan, as well as Defendant NatWest and Lehman, would submit bids for certain escrow CDs that neither were qualified to provide under applicable state laws.

182.     The CW reported that he would be given a "safe range" by Broker Defendant IMAGE Marty Stallone when Stallone would pass along a request for a courtesy bid form him so that the CW would not inadvertently win a bid he didn't want.

183.     The CW specifically identified Defendant JP Morgan, Defendant CDC, Defendant UBS, Defendant Natwest, and Defendant Wachovia and Named Co-Conspirator Lehman as providers that he knew submitted courtesy bids.

184.    Information provided by the CW and descriptions of the contents of tapes of conversations of employees on Defendant Bank of America's Municipal Derivative desk and publically available information indicate that the following Provider Defendants submitted courtesy bids to assist another Provider Defendant win a particular auction: Defendant Bank of America, Defendant JP Morgan, Defendant NatWest, Defendant Wachovia, Defendant CDC, Defendant NatWest, Defendant Merrill Lynch, and Defendant UBS.

185.    The same information reveals that the following Provider Defendants benefitted from the submission of courtesy bids by other Provider Defendants: Defendant Bank of America, Defendant JP Morgan, AIG, and Defendant NatWest.

186.    A statistical analysis of bidding patterns in eighty-nine (89) reinvestment derivative auctions reveals evidence probative of submission of courtesy bids by the following Providers: Defendant BayernLB, Defendant Rabobank, Defendant JP Morgan, Defendant XL, Defendant Wells Fargo, Defendant MBIA, Defendant Bank of America, and Defendant Transamerica.

187.    The same analysis reveals evidence probative of the receipt of the benefits of the submission of courtesy bids by the following Provider Defendants: Defendant MBIA, Defendant CDC, Defendant SocGen, Defendant GE Trinity, Defendant FSA, Defendant Transamerica, and Defendant Smith Barney.

188.    Broker Defendants and Provider Defendants used code words to facilitate the use of courtesy bids.  Broker Defendants would communicate such information by saying things such as the following:

•      "x company has been working a long time with the market and they see it here."

•      "I need a bid."

48

- "Can you give me a bid."

- "I know you usually pass on construction bids, but would you mind pricing it up?"

189.   According to the CW, representatives of Broker Defendant IMAGE would use these phrases as well as others.  For example, on occasion, the CW would be asked by Peter Loughead or Stallone at IMAGE to just "give them a rate," which CW understood meant that a different Provider Defendant would win the auction.  In such situation the CW would submit a rate that he knew or assumed would not win.

190.   Sometimes the requests were more direct and blatant.  For example, tapes of members of Defendant Bank of America's Municipal derivatives desk from 2002 reveal a conversation between Jim Towne of Broker Defendant Piper Jaffrey and Provider Defendant BofA's Doug Campbell in which Towne tells Campbell that Provider Defendant JP Morgan wants to win the auction in question.  Campbell then gives the Defendant Bank of America's bid after hearing what Defendant JP Morgan is bidding. Towne asks Campbell to adjust Defendant BofA's bid up closer to Defendant JP Morgan's bid, apparently so that it would not draw attention.  Campbell says that's fine, but that he doesn't want to win the auction.  Towne agrees.

191.   Similarly, according to the CW, Defendant Natwest was not equipped to do many types of Municipal Derivative deals that Defenant BofA could do, but Defendant NatWest would, nonetheless, submit courtesy bids on auctions for such deals for the benefit of Defendant BofA.  Sometime in 1999-2001, Broker Defendant IMAGE's Stallone told the CW to "back off" on a deal because it was one that Natwest could do (apparently in recognition for the similar courtesy bids that Defendant NatWest had submitted for the benefit of Defendant Bank of America).

49

192.     The CW also recalled instances where Stallone of Broker Defendant IMAGE would tell him regarding Martin McConnell of Defendant Provider Wachovia's municipal derivatives desk: "I can get Martin to get a number on this."  This meant that Stallone could get Defendant Wachovia to submit a courtesy bid.

193.     Tapes also reveal a conversation in 2002 between Defendant Bank of America's Murphy and David Schott, possibly of Lasalle Financial asking Murphy to bid on a deal even if Defendant BofA isn't interested in the deal, because another bid is needed.

194.     The tapes also reveal a conversation in 2002 in which Defendant Bank of America's Doug Campbell offers to Doug Goldberg of CDR to submit a bid if it is needed.  A Municipal Derivative provider should be submitting a bid because it wants to compete for the Municipal Derivative at auction, not because another Municipal Derivative provider would like to use the bid's existence to win the Municipal Derivative.

195.     The CW also related how Stallone of Broker Defendant IMAGE told him in regards to a deal that Rob Taylor at Lehman didn't want business, but would submit a bid.

196.     The CW also relate how Stallone of Broker Defendant IMAGE told him that he could get Mike Frasco of Broker/Provider Defendant CDC to submit bids.  This was significant because CDC did not participate in many Municipal Derivative transactions as a provider. CW ran into Frasco in 2003 at the Plaza hotel in New York.  Frasco told the CW that "CDC does not rig bids, but it did submit bids that it did not expect to win."  Frasco indicated that this distinction was purportedly based on the proposition that Defendant CDC that would take the business for which it did win.

197.    A series of conversations between unidentified Defendant Bank of America employees and employees of Broker Defendants from 2004 reveals further evidence of courtesy bidding by Defendant Bank of America.

198.    For example, in a conversation recorded on July 20, 2004, Mike Harris, an employee of Broker Defendant PFM, requested that Dan Epeneter at Defendant BofA put in a bid on the Bridgeport escrow float, because a third bid was needed to meet the IRS's safe harbor conditions.

199.    In a conversation recorded on July 26, 2004 between a representative of Broker Defendant Piper Jaffray and an unidentified Municipal Derivatives desk employee of Defendant BofA, the BofA employee is heard saying that he is considering passing on an unnamed deal set later that day.  The representative of Piper Jaffray is heard asking in response whether BofA would bid anyway.  The BofA employee responds that he is considering bidding on a number of deals.

200.    In a conversation recorded on July 28, 2004 between two unidentified employees of Defendant BofA, the employees are heard discussing whether Defendant BofA should submit or pass on a bid requested by Broker Defendant Piper Jaffray.  One of the BofA employee tells an employee of at the Municipal Derivative's desk of BofA employee to ask whether Piper Jaffray already has 3 bids, in which case BofA can pass.

201.    In a conversation recorded on July 28, 2004 between a member of Defendant Bank of America's Municipal Derivatives desk and a representative of Broker Piper Jaffray, the BofA employee is heard telling the Piper Jaffray representative that BofA intends to pass in a particular Municipal Derivative auction.  The broker responds that he needs a bid.  The BofA employee responds that he will call back with a bid.

202.    In a series of conversations recorded on August 18, 2004 between Dan Epeneter, a member of Defendant Bank of America's Municipal Derivative desk and another BofA employee and a representative of Broker Defendant IMAGE, the IMAGE representative asked BofA to submit a $1.5 million escrow bid for an unnamed deal. Epeneter of BofA asked IMAGE to adjust the bid time so BofA could bid, and the IMAGE representative agreed to adjust the time to accommodate BofA. The BofA desk employee ultimately provides the bid to Defendant IMAGE after discussing it with other BofA employees.

203.    In an series of conversations recorded on August 21, 2004 between a representative of Broker Defendant Sound Capital and a member of Defendant BofA's Municipal Derivative desk, the BofA employee is heard asking whether Sound Capital needs a bid from BofA and is heard discussing the terms of the bid with the Sound Capital representative. In a subsequent conversation between the same persons, the BofA employee is heard discussing that the bid submitted by BofA was close to winning, but lost. The BofA employees expresses his relief that BofA did not win the auction because, if they had won it, BofA would have lost money on the deal.

204.    The foregoing are just examples of the recorded conversations between employees of Defendant BofA and other representatives of brokers regarding the submission of courtesy bids in auctions for which a Provider Defendant or Provider had no intention of winning.

### iii.    Passing to Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction

205.    One of the means by which Provider Defendants would act to assist a pre-selected winner prevail in a particular auction was by passing on an auction that it otherwise would have bid on.

52

206.    Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America reveal that the following Provider Defendants fraudulently passed and/or knowingly accepted a fraudulent pass from another Provider Defendant:

- Defendant Bank of America;

- Defendant JP Morgan; and

- Defendant UBS.

207.    Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America reveal that the following Broker Defendants knowingly facilitated and/or encouraged one or more Provider Defendant to pass on a particular auction in order to allow another Provider Defendant to win that auction:

- Defendant IMAGE;

- Defendant CDR;

- Defendant Piper Jaffary; and

- Defendant First Southwest.

208.    In order to advance the conspiracy, Broker Defendants used codewords to communicate to Provider Defendants that another Provider Defendant desired it to pass on a particular auction or that another Provider Defendant would be willing to pass on its behalf including:

- "This one needs to go to JP Morgan."

- "JP Morgan understands that they just won a big transaction and that BofA wants this one."

### iv. The Pre-Selected Provider Defendant Gets A "Last Look" At Other Bids to Ensure Winning a Municipal Derivative Auction

209. Another means by which Defendants ensured that the Provider Defendant pre-selected to win a particular Municipal Derivative auction was by giving the pre-selected winner a "last look" at the bids already submitted. This allowed the pre-selected Provider Defendant to submit a bid that would be just enough to win the auction, but no more, thereby increasing its profit margin, and enabled it to police compliance by the other colluding Defendant Providers with whom it had made bidding agreements.

210. The CW described how representatives of Broker Defendants would give representatives of a pre-selected Provider Defendant, including Defendant Bank of America a "last look," whereby the Broker Defendant would tell the pre-selected Provider Defendant what other providers had bid to give the pre-selected Provider Defendant an opportunity to adjust its bid to ensure winning.

211. The CW reported that Stallone of Broker Defendant IMAGE would tell the CW what CW needed to bid in order for Provider Defendant Bank of America to win a deal. Stallone would also tell the CW other providers' bidding information so CW would know what he needed to bid in order for Defendant Bank of America to win. Stallone would also tell the CW that if the CW could do "a couple better," referring usually to basis points, Defendant Bank of America could win the deal.

212. The CW believes that Provider Defendant JP Morgan, Provider Defendant UBS, Provider Defendant Wachovia, Provider Defendant Bear Stearns (in connection with Patrick Marsh who worked in different periods for both Defendant Bear Stearns and Defendant NatWest) received similar types of last looks.

213.    Indeed, the practice was so prevalent that persons in the industry reacted with surprise when someone was given a last look and did not take advantage of it.

214.    For example, in recording of a conversation between Jim Towne of Broker Defendant Piper Jaffray and Doug Campbell of Defendant BofA, Towne is heard discussing how he gave a representative of Provider Morgan Stanley a last look in particular Municipal Derivative auction and the opportunity to change its bid, but that, in this instance, Defendant Morgan Stanley did not change its bid.  Both Towne and Campbell are heard discussing how crazy it was that Defendant Morgan Stanley did not change its bid in this instance.

215.    Codewords used by Broker Defendants to give last looks or to indicate their willingness to do so included:

•      "I think I can help you here."

•      "I will call you when I get the market."

> **v.      The Pre-Selected Provider Defendant Gets Guidance and The Terms Of Other Bids to Ensure Winning a Municipal Derivative Auction**

216.    Defendants' conspiracy also involved the provision of more detailed bidding guidance by Broker Defendants to Provider Defendants, which not only allowed a particular Provider Defendant to win an auction for a particular Municipal Derivative but also to do so on terms that gave the provider the highest possible profit.

217.    Speaking in 2005, before the DOJ had publically announced that it was engaged in an industry-wide investigation into collusion amongst Municipal Derivative brokers and providers, the Director of the IRS' Tax-Exempt Bond Office Mark Scott, described amongst the evidence of probative of bid-rigging in municipal derivative transactions "transactions where the winning bid is the only bid high enough to make the deal work."

218.    It is clear now that the result of the bidding process was due to the particularized guidance that Defendants provided one another regarding Municipal Derivative auctions that allowed the pre-selected winner to prevail on terms that were no higher than necessary to win the auction and, thus, achieved the maximum level of profit for the pre-selected Provider Defendant.

219.    One of the principal ways Defendants accomplished this was by the submission of by Provider Defendant of pre-bid "indications," which would indicate where they intended to bid at auction.

220.    For the Provider Defendants who were *not* the pre-selected winner of a particular Municipal Derivative auction, an indication from the pre-selected winner of the auction allowed the other Provider Defendants to craft their courtesy bids so that they would not win the auction. Similarly, these Provider Defendants could submit their own indications to ensure that their intended courtesy bid would no win the auction but would look sufficiently legitimate to assist the pre-selected winner.

221.    For the Provider Defendant pre-selected as the winner of an auction, the indications submitted by it and other Provider Defendants allowed the pre-selected winner to craft its bid at a level just high enough to win but no higher, maximizing its profit, and depressing the terms that the issuer received.

222.    For example, the CW described a number of instances where he would submit pre-bid indications on behalf of Defendant Bank of America to Martin Stallone of Broker Defendant IMAGE.

223.    The CW explained that he would submit an indication to Stallone prior to the bid being due, and then call Stallone to ask if the indication "was a good fit." Sometimes Stallone would respond by asking "could you get to this number," indicating that the CW would need to

raise the bid for Defendant Bank of America to win the auction, or by saying that indication "looks aggressive," which would signal to CW to re-work the bid to make it more profitable for Defendant BofA.

224. The CW also described how Stallone of Defendant IMAGE would sometimes signal to him that Defendant BofA could lower its bid by five basis point, and thus gain more profit from the auction, by telling the CW that he could include the brokerage fee in the bid. The customary brokerage fee on Municipal Derivative transactions was five basis points.

225. The CW explained how a bid was re-worked to be more profitable for Defendant Bank of America, and would not always involve lowering the rate of the agreement, but could involved the other types of adjustments depending on the particular terms of the Municipal Derivative in question. Thus, it could raise or lower interest rates, adjust a flat amount, or adjust a date.

226. If the Municipal Derivative was a straight GIC, the CW would reduce the interest rate, which would result in less interest payments to the issuer. If the Municipal Derivative was an escrow, which often were bid based on the total dollar amount the issuer is required to pay the provider for escrow, the CW might increase the amount of money demanded from the issuer. For escrows bid based on date, the later the date, the more beneficial the provider, so the CW would make the date later. If the Municipal Derivative being auctioned was a swap, the adjustment could take different forms depending on the nature of the swap. Thus it could involve lowering the value of the cash flow from the Defendant Bank of America to the issuer, raising the value of the cash flow from the issuer to Defendant Bank of America, or both. How this was done would depend on the nature of the swap.

57

227.    Tape evidence of conversations involving Defendant Bank of America employees and representatives of other Defendants demonstrate the pervasiveness of the use of indications in Defendants' conspiracy.

228.    For example, the tapes reveal, in the context of a Municipal Derivative transaction involving Santa Barbara County, that Defendant Bank of America's Phil Murphy gave a representative of Broker Defendant Feld Winters an indication of $200,000, which appears to have referred to Defendant BofA's expected profit on the deal.  The representative of Defendant Feld Winters responded by saying that Defendant Bank of America's  bid would need to be "a little tighter," only about $150,000.  Ultimately, the profit earned by Defendant Bank of America on the deal was around $160,000.

### b.    Manipulation Of Negotiated Deals

229.     Defendants' conspiracy was not limited Municipal Derivative transactions for which auctions were competitively bid.  Defendants also conspired to manipulate the terms that issuers received on negotiated deals, particularly but not only swap transactions.

230.    Defendants did so through means including but not limit to allocating transactions amongst Provider Defendants, coordinating pricing, and giving falsified pricing verification information to providers.

231.     For example, there are recordings of conversations between Phil Murphy and Doug Campbell, both of Provider Defendant BofA, a Peter at Provider Defendant UBS (likely Peter Ghavami), and an unidentified person at Provider Defendant JP Morgan regarding certain swap transactions, in which these persons discuss splitting the economics and/or pricing of certain swap transactions.

232.    When presented with this information, the CW did not express surprise at the contents of the conversation. Rather, he expressed his lack of surprise that Defendant JP Morgan and Defendant UBS were involved in such discussions, because they were among the largest underwriters at the time.

233.    Underwriters have traditionally had the inside track on swap deals associated with the bonds which they underwrite.

234.    Provider Defendants conspired with one another to preserve the advantage that this reaped for one another by providing artificially low price quotes when issuers sought from them pricing verification of terms negotiated with another Provider Defendant.

235.    For example, as discussed elsewhere herein, when San Mateo County sought pricing verification for swap terms negotiated with Defendant Solomon Smith Barney and Lehman, which were the underwriters of the associated bonds, representatives of both Defendant UBS and Defendant Piper Jaffray quoted San Mateo a price within a one or two basis points of the negotiated terms. This is despite the fact that a preliminary analysis of the swap terms show that the swap was grossly undervalued as to San Mateo.

236.    It is difficult to understand how both Defendant UBS and Defendant Piper Jaffray could both have provided quotes very close to the terms negotiated with Defendant Solomon Smith Barney and Lehman when those terms were so far off a fair market price, unless Defendant UBS and Defendant Piper Jaffray had coordinated the pricing verification quotes with Defendant Solomon Smith Barney and Lehman (and/or Defendant AIG Financial which ultimately was substituted for Lehman).

237.    This conclusion is bolstered by the arrangement negotiated between San Mateo and Defendant Solomon Smith Barney and Defendant AIG Financial and Lehman, which gave

the these parties a right to beat any better quote offered by another provider. The existence of such an arrangement, if communicated to them, would have given Defendant UBS and Defendant Piper Jaffray an additional incentive to comply with a request from Defendant Solomon Smith Barney, Defendant AIG Financial and/or Lehman to provide an artificially low price verification quote.

238. Moreover, Bank of America provided evidence, also discussed elsewhere herein, that referrals for providing pricing verification letters were used to compensate members of the conspiracy for other conspiratorial conduct. It is reasonable to infer that the contents of these letters were also manipulated.

### c. Kick-Backs And Other Types Of Unlawful Consideration

239. Defendants' conspiracy was greased by way of "kick-backs" and other types of consideration that Provider Defendants would make to other Provider Defendants and Broker Defendants. This consisted of both making direct payments to some Defendants, as well directing business to other Defendants. These practices are another manifestation of the *you scratch my back I'll scratch yours* ethic that animated the conspiracy and affected the entire market for Municipal Derivatives.

240. An email sent in June 28, 2002 by Doug Campbell of Provider Defendant Bank of America to Phil Murphy of Provider Defendant Bank of America that San Mateo discovered through its independent investigation at the start of this litigation powerfully evinces the role of kickbacks in the Defendants' conspiracy.

241. In the email, Defendant Bank of America admits to making kickbacks to Provider Defendants and Broker Defendants, using the proceeds from deals in which those Provider

Defendants and Broker Defendants were not even involved but were part Defendants'
conspiracy.

242.    The email states:  **"I believe this list contains all of the situations where BOFA
Defendant Bank of America paid an external business contact on a transaction where the
external business contact was not involved in some ways in the transaction."**   The email
goes on to list a series of payments to Broker Defendant CDR, Broker Defendant Winters,
Provider/Broker Defendant Piper Jaffray and Paine Webber, Inc. (part of Provider Defendant
UBS), totaling $182,393, along with references to the Municipal Derivative transactions from
which the moneys were derived.

—Original Message—
From:        Campbell, Doug L.
Sent:        Friday, June 28, 2002 11:08 AM
To:          Murphy, Phil D.
Subject:     Fees Paid on Unrelated Client Transactions

Phil —

After reviewing NB trades, I have come up with the following list of fees paid to external "broker/banker" on deals where I was the marketer.  I believe this list contains all of the situations where BofA paid an external business contact on a transaction where the external business contact was not involved in some way in the transaction (e.g., the external business contact was not a broker, investment banker or did not provide the client with market pricing verification).   I found only four firms that we had paid fees to in this manner...CDR, Piper, Winters & Co, and PaineWebber...the Piper / PaineWebber / Winters fees were more one-off events (in Piper's case just saying thanks for all the swap business we had been doing, in PaineWebber case trying to help Mark and Gary  since they were struggling to get their external reinvest business going, Winters case it was the first day Chris opened his new firm).   The CDR fees have been part of the ongoing attempt to develop a better relationship with our major brokers.

CDR - 1/01 - $19, 893 - Brighton/Muskegon swaps - Piper trades, Jim Towne was aware I was paying addit. brokerage to CDR so I am not                              sure if this really belongs on this list..

CDR - 3/01 - $7,500 - Three and Two Baseball (Swap)

CDR - 8/01 - $20,000 - WTVP (Illinois Public TV) (Swap)

CDR - 2/02 - $10,000 - Clinton Community School (QZAB)

PW - 2/02 - $50,000 - Depauw University (swap) – Piper trade, Depauw is also a PW client, Jim Towne was aware I was paying addit.                         brokerage to PW so I am not sure if this belongs on this list...

PW - 3/02 - $25,000 - Grandview (QZAB)

Piper - 1/02- $20,000 - Hendrum and Clinton QZABS – Piper originally showed us this opportunity but then client hired Evenson Dodge

Piper - 4/02 - $20,000 - Bernie (QZAB)

Winters - 4/01 - $10,000 School of the Plains (Swap)

Let me know if I need to do anything else.  I will keep looking as well just to make sure I have not missed one.

243.    Among the interesting elements of the email are the reasons that Campbell gives

for making the payments.

244.    Particularly revealing is the statement:  **"The CDR fees have been part of an

ongoing attempt to develop a better relationship with our major brokers."**  The "better

relationship," which the email states Defendant Bank of America is attempting to develop with

CDR has to do with positioning Defendant Bank of America to benefit from CDR's

conspiratorial conduct.

62

245. According to the CW, Campbell was involved in bid rigging of municipal derivative auctions on behalf of Provider Defendant Bank of America with Broker Defendant CDR. The CW recalled a story in which another member of Provider Defendant Bank of America's Municipal Derivative desk asked Campbell about sharing the CDR relationship with him. Campbell told that desk member that "you don't want the responsibility associated with CDR." The CW also recalls Doug Goldberg & Dani Naeh of Provider Defendant CDR saying "can you show me a level," indicating that if the CW could get Defendant BofA's number higher, Defendant BofA could win the Municipal Derivative acution.

246. In a February of 2005 letter, Charles Anderson, Field Manager of the IRS's Tax-Exempt Bond office states: **"We have serious concerns about the relationship between Bank of America and CDR relative to this bond issue."**

247. Provider Defendant SocGen has also come under scrutiny for making what appear to be kickback's to Broker Defendant CDR. An IRS investigation into CDR's involvement in California school advance refunding escrows and over 20 lease-to-own deals between Provider Defendant SocGen and Broker Defendant CDR revealed evidence of quarterly payments made by SocGen to CDR for "unspecified purposes." The investigation is now centered on bid-rigging and price-fixing issues.

248. IRS concerns have also been raised about similar payments made by SocGen to CDR in the context of a $27 million bond sold to Pima County, AZ. Defendant FSA was one of four bidders on the deal.

249. The explanation Campbell gives in the email for the payments to Provider Defendant PaineWebber is also revealing. Defendant PainWebber was a provider of Municipal Derivatives, as was Defendant Bank of America. Thus, Defendant Bank of America and

Defendant PaineWebber should have been competitors. However, as the email reveals, Defendant Bank of America and Defendant PaineWebber did deal with one another as competitors but rather as co-conspirators, which have a mutual interest in the other's success. Therefore, Campbell explains that he directed $75,000 to be directed to Defendant PaineWebber because PaineWebber was in the process of launching the reinvestment derivative side of their business. It is difficult, if not impossible, to identify a legitimate reason why Defendant Bank of America would have an interest in seeing them succeed in this effort.

250. The email is also revealing in the inter-linkages between the conspiratorial conduct taken by Defendants in various Municipal Derivative transactions. As the email demonstrates Defendants would often use illegal proceeds from one Municipal Derivative transaction to compensate a co-conspirator for conspiratorial assistance in different transaction.

251. As discussed elsewhere herein, this was a common practice amongst Defendants and include conduct such as directing business for things such as pricing verification letters in negotiated swap deals to Defendants who had assisted the other Defendant prevail in a separate reinvestment derivative auction.

252. Another common practice along these lines was that by Provider Defendants recommending specific Broker Defendants for Municipal Derivative brokering work related to bonds that the Provider Defendant played an underwriter role on. The CW makes clear that it was well understood among the members of Provider Defendant Bank of America's municipal derivative desk that such referrals were effective ways to solicit conspiratorial conduct by Broker Defendants for Defendant Bank of America's benefit.

253. Finally, the letter is interesting for what it excludes. According to Campbell it lists only payments to "an external business contact on a transaction where the external business

64

contact was not involved in some ways in the transaction (e.g. the external business contact was not a broker, investment bank or did not provide the client with market pricing verification)." The import of this is that similar payments were also made from the proceeds of transactions to brokers and investment banks that *were* involved in the transactions from which the moneys came.  It seems further from the email that this is much longer list of payments.

254.     Brokers are supposed to be paid in Municipal Derivative transactions based on a certain percentage of the total amount of the transaction, generally five basis points, and there is no legitimate reason why the winner of a Municipal Derivative transaction would pay another provider that had been involved in it.  Thus, it is difficult to conceive of a reason why Defendant Bank of America would have been paying Broker Defendants and Provider Defendants involved in particular Municipal Derivative transactions that Defendant Bank of America won, except in consideration for their conspiratorial conduct that assisted Defendant Bank of America win.

255.     Along these lines, on November 10, 2006, Broker Defendant Baum, which brokered a number of black box deals worth approximately $2 billion, announced that it had paid an undisclosed penalty to the IRS.  As part of that settlement, it was disclosed that Broker Defendant Baum had engaged in bid rigging in which Baum assisted certain providers, including Provider Defendant CDC win particular Municipal Derivative transactions.  This permitted pre-selected providers, including Defendant Natixis Funding, to obtain  "sweetheart deals" on the Municipal Derivative transaction.  There is evidence that these providers then made payments to Defendant Baum in consideration.

256.     The IRS has also investigated a 2000 transaction between Defendants Bank of America and Provider Defendant Baum, where Bank of America provided a GIC on a $100 million issue from the Illinois Development Finance Authority sold by Rural Enterprises of

Oklahoma, Inc ("Rural Enterprises").  In July 2003, Rural Enterprises revealed that Defendant

Bank of America made "significant" hidden payments to Provider Defendant Baum in

connection with the deal.

> **d.    Defendants' Overt Acts To Prevent Discovery Of Their**
> **Conspiratorial Communications**

257.    Some or all of Defendants recorded the phone calls and tracked the email

communications of their employees during some or all of the period of the conspiracy.   For

example, Defendant Bank of America taped the phone conversations of its employees at its

Municipal Derivatives desk until the fall of 2004, purportedly to provide clarity in the event of

any uncertainty regarding orders.  It has also been reported that FSA has provided 600 hours of

tapes to the DOJ and SEC in connection with each's investigation of the conspiracy.

258.    It is clear that Defendants' employees were fully aware that their communications

were being recorded and that their conduct was illegal.  Accordingly, they took affirmative action

to both disguise the meaning of their communications by using commonly understood code

words, as alleged herein, and by affirmatively switching to non-recorded means of

communication when undertaking conspiratorial discussions.

259.    For example,  the Cooperating Witness commonly told co-conspirators to call him

on his cellular phone so as to avoid having their conversations audiotaped.  It was also

commonplace for Bank of America employees to tell their fellow co-conspirator "I'll call you

back later" (i.e. from a secure line) or to ask if they could go off the trading desk when bidding.

Campbell of Bank of America also avoided detection by circumventing the capture of emails sent

on his Bank of America Blackberry by directly contacting the Blackberries of co-conspirators,

including Towne of Piper Jaffray, through the use of a Personal Identification Number.  The

Cooperating Witness also told various co-conspirators to call him on his cell phone so as to avoid

detection. Moreover, it was common for Brokers to ask "are you off the desk" when doing a deal, again to avoid having their conversations recorded.

260. What's more, representatives of Defendants would use their personal (as opposed to work) email accounts for conspiratorial communications. For example, Naeh of Broker Defendant CDR would send conspiratorial e-mails to individuals at Provider Defendant Bank of America, including Pinard, through Naeh's personal GoAmerica email account rather than his work account. He did so because he recognized that these communications were illegal and sought to evade their discovery.

### 2. "It's nice to have friends": Repeat Appearances By Defendants' Representatives In Different Transactions, Personal Relationships Amongst Them, And Other Factors Encouraging And Enabling The Conspiracy

261. It is axiomatic that in order to conspire co-conspirators need the opportunity to do so. Or stated somewhat more cynically but infinitely more eloquently by Adam Smith, *"People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."*

262. The Municipal Derivative's industry is characterized by a number of factors that enabled and encouraged the *you scratch my back I'll scratch yours* ethic that animated the conspiracy. These factors include but are not limited to: the repeated appearances of not just the same Defendants, but also the same representatives of those Defendants in multiple different transactions; the strong personal relationships that developed between such representatives as a result of this and other factors; the manner in which Defendants' representatives were compensated; and the additional opportunities for collusion provided to them.

a.     **Repeat Appearances In Multiple Transactions**

263.     One of the most critical factors that gave rise to Defendants' conspiracy and enabled it to thrive was that not only did the same Provider Defendants and, to an extent, Broker Defendants show up in multiple Municipal Derivative transactions, the same persons represented the Defendants in those transactions.  This enabled a *quid pro quo* of Municipal Derivative transaction allocation that would not otherwise be possible.

264.     Provider Defendants were willing to not only allow another Provider Defendant to win a particular Municipal Derivative transaction, without competition, but to actually assist another Provider Defendant win (through the submission of courtesy bids, etc.) because of the nature of the industry.  The same representatives of different Provider Defendants' showed up in multiple transactions, often with the same representatives of Broker Defendants.  These representatives developed a sense of trust in one another a sense of sharing the benefits of cooperation versus competition.

265.      The most colorful expression of this sentiment was the CW's statement to Samuel Gruer of Provider Defendant JP Morgan at a Christmas party hosted by IMAGE in which the CW, who worked at Provider Defendant BofA's Municipal Derivatives desk, told Gruer that he was glad that Bank of America and JP Morgan weren't "kicking each other's teeth out" on a series of deals involving escrows, but were instead working things out so both firms could benefit from the business, a sentiment which Gruer acknowledged sharing.

266.     Indeed, according to the CW, Stallone of Provider Defendant Image would often say things to the CW such as "this one needs to go to JP Morgan" and "JP Morgan understands that they just won a big transaction and that BofA wants this one."  Sam Gruer was Stallone's contact at JP Morgan.

267. More generally, the CW stated that it was understood that you would win some transactions and that other Provider Defendants would win other. The Defendants' conspiracy depended and thrived on this understand, which is evinced in multiple transactions in which a Provider Defendant defers from competing with another in exchange for a similar courtesy in a subsequent transaction.

### b.    Personal Relationships Amongst Defendants' Representatives

268. Developing out of this process was a deep sense among representatives of Defendants of the importance of developing personal relationships with one another.

269. The CW explained that when he started at Provider Defendant BofA, he struggled to win the auctions he bid on. He observed that when his supervisors at Defendant BofA Phil Murphy and Doug Campbell wanted bids, they would say things like "I can do better, I want this bid" to the brokers, and were able to re-bid or adjust bids to brokers.

270. Much of the compensation of employees of Defendant BofA's municipal derivatives desk is based on bonuses that are tied to the amount of profit that the employee generates through the Municipal Derivative transactions that the employee executes. This type of compensation structure appears to be common among Municipal Derivative providers and gives employees of Municipal Derivative providers a personal incentive to participate in illegal conduct that generates higher profits for the Municipal Derivative provider by whom they are employed.

271. The CW spoke with Murphy, who told CW that IMAGE would be receptive to the same process. Murphy told CW that he needed to say CW "wanted to win" and "would work with IMAGE." The CW conveyed this to Marty Stallone of Broker Defendant IMAGE.

According to the CW, Stallone was not surprised when the CW expressed these things to him and said he would help where and when he could.

272. The CW had, in fact, been recommended for the job at Defendant Bank of America to Phil Murphy as well as Doug Campbell by Marty Stallone and Dave Eckhart of Broker Defendant IMAGE, whom the CW knew through prior public-finance related employment contacts. As soon as he started, the CW was assigned to work with IMAGE because of his personal relationship with Stallone and Eckhart. Broker Defendant IMAGE indicated to the CW, soon after he started, that Provider Defendant BofA would be included on every Municipal Derivative transaction that IMAGE handled, ensuring that Defendant Bank of America would show up in multiple deals with other Provider Defendants such as JP Morgan with whom IMAGE also had a close relationship.

273. The personal relationships that representatives of Provider Defendants had with Broker Defendants played an important role in the conspiracy.

274. At Defendant Bank of America, Doug Campbell worked with Doug Goldberg and Dani Naeh of Broker Defendant CDR, as did Phil Murphy of Defendant Bank of America. Defendant BofA's Campbell also worked closely with Johann Rosenberg of Broker Defendant Sound Capital. Phil Murphy worked closely with Jeff Kandell and Jeff Feld of Broker Defendant Feld Winters. Various personnel at Defendant Bank of America also had relationships with Ed Steinhauer and David Lail of Broker Defendant Baum.

275. These kinds of relationships between representatives of Provider Defendants and representatives of Broker Defendants ensured Provider Defendants easier access to the bid-rigging means of the conspiracy and pre-selection as winner of a particular auction in which they desired to prevail.

70

276. As Dani Naeh of Broker Defendant CDR put it to Dean Pinard of Provider Defendant BofA after apparently assisting Pinard prevail in a particular Municipal Derivative Auction, "It's nice to have friends."

277. It was not only the relationships between representatives of Broker Defendants and representatives of Provider Defendants that were important to the conspiracy. It is also clear that the personal relationships that existed between representatives of Provider Defendants was also very imporant.

278. For example, the CW described how on deals that were being brokered by a broker with whom the CW was not familiar, the CW reached out directly to Gruer of Defendant JP Morgan to discuss how aggressively each intended to bid.

279. It is evident that representatives of Provider Defendants not only had multiple opportunities to conduct conspiratorial communication directly with representatives of Broker Defendants but also with representatives of other Provider Defendants, and they used those opportunities. These opportunities included but were not limited to: direct phone calls between such representatives; social gatherings, such as the IMAGE Christmas party at Sparks discussed herein; industry association meetings; and other opportunities provided by the location of most the Municipal Derivatives desks of most providers in New York.

280. Another important factor contributing to the personal relationships that existed among representatives of the Provider Defendants and the resulting trust that this engendered among them in a conspiracy that involved *quid pro quo* allocation of transactions, was the incestuousness of hiring practices in the Municipal Derivatives industry.

281. For example, Doug Campbell who was with Defendant BofA during the period of time during which the CW provided the most information subsequently left Defendant BofA to

join Broker/Provider Defendant Piper Jaffray. Prior to joining Defendant Bank of America, Campbell worked at First Union, which merged with Defendant Wachovia in 2001. Similarly, Phil Murphy left Defendant Bank of America to join Broker Defendant Winters, and was also a former employee of First Union.

282. Indeed, such a pattern of employment is common amongst the individuals that have received target letters from the DOJ related to their investigation of the Municipal Derivatives industry. For example, Paul Jay Saunders went from Defendant Bank of America to Defendant Wachovia; Peter Ghavami went from Defendant JP Morgan to Defendant UBS Securities; Patrick Marsh went from Defendant NatWest to Defendant Bear Stearns to Deutsche Bank; Samuel M. Gruer went from Defendant JP Morgan also to Deutsche Bank; and Schlomi Raz went from Defendant JP Morgan to Goldman Sachs.

283. Inter-competitor hiring provides communication bridges between companies that would otherwise not exist. The potential for these lines of communication to facilitate anticompetitive agreements is heightened when the employees involved are long-time, high-level executives responsible for the overall stewardship of the companies they represent.

284. Further facilitating these collusive relationships has been the intense consolidation that has occurred in the industry, which has dramatically shrunk the number of potential providers and brokers and brought together and condensed individuals in the industry and their webs of connections to others.

285. These relationships have been made even tighter and further opportunities for conspiratorial communications have been provided by the numerous municipal bond industry associations that exist and the numerous industry conventions that occur.

286.     One of the largest groups is the Securities Industry and Financial Markets Association (SIFMA), whose membership includes more than a dozen Broker and Provider Defendants, including: AIG Financial; Bank of America; UBS; J.P. Morgan; Merrill Lynch; Morgan Stanley; Piper Jaffray; Wachovia; Wells Fargo; Natixis Funding; SocGen; Baum; First Southwest; and Morgan Keegan.  In fact, the two top elected officers in SIFMA for 2008 were senior officers for two of the Defendants, Blyth Masters, head of global commodities for Provider Defendant J.P. Morgan, and G. Douglas Edwards, president and CEO of Broker Morgan Keegan.

287.     SIFMA, in fact, touts itself  "as a conduit through which the municipal bond industry communicates with regulators, legislators, the media and the public," and holds annual conferences at resort destinations at which representatives of Defendants regularly meet and participate.

288.     Another industry association is the International Swaps and Derivatives Associations ("ISDA").  The ISDA describes itself as a representative of firms that participate in "the privately negotiated derivatives industry."  Its membership includes the following Provider and Broker Defendants:  Bank of America N.A.; UBS; J.P. Morgan; NATIXIS; Morgan Stanley; Wachovia; Wells Fargo; XL Capital; Genworth; SocGen; and Sound Capital.  The ISDA holds Annual General Meetings which representatives of these Defendants regularly meet and participate.

289.     The American Bankers Association is yet another industry organization whose members include Broker and Provider Defenants Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia.

290.     In addition to these industry associations and the meetings held by them, there are also conferences arranged by third parties which representatives of Defendants commonly meet and participate.  These include municipal finance conferences regularly held by The Information Management Network ("IMN") in California, and similar conferences held by the California Debt and Investment Advisory Commission ("CDIAC").  Moreover, *The Bond Buyer*, a major publication focusing on public financing, holds an Annual California Public Finance Conference which representatives of the Defendants regularly meet and participate.

### 3.     **Industry-Wide Quality And Market-Wide Effect Of Conspiracy**

291.     In 2005, then IRS Director Mark Scott explained why the IRS was expanding its investigation into bid-rigging in the Municipal Derivative industry, by describing "tentacles of abuse" that led investigators from one rigged transaction to the next.

292.     He explained the process this way: "We are going to continue following up.  To the extent that we're out looking with respect to one particular transaction and we come across evidence that points to two or three or 10 other transactions, we're going to broaden our investigation as well.  That's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse.'  It is hard to say how widespread the problem is, but there is a significant problem out there at this point."

293.     Approximately two years later, the DOJ announced the existence of an industry-wide investigation and sent a first round of subpoenas out to over thirty-five brokers and providers of Municipal Derivatives and initiated FBI raids of three others.

294.     It is clear now that the problem is industry-wide and the effects of the conspiracy have been felt by every issuer that entered into a Municipal Derivative transaction that occurred during the period of the conspiracy and after.

295. Defendants' conspiracy, by its nature, depended for its operation on cross-transactional conduct, what Scott referred to as "tentacles of abuse."

296. Provider Defendants agreed to allow another Provider Defendant to win a particular auction and, in fact, assisted it in winning the auction, only because they were confident that, in return, they would later be given the same opportunity in a different auction.

297. Similarly, Provider Defendants agreed to give falsified price verifications of swaps negotiated by other Provider Defendants, because they understood that in subsequent similar situations they would be extended the same courtesy.

298. And Broker Defendants knew that they assisted Provider Defendants in one transaction they would get compensated through others through kick-backs or referrals.

299. Provider Defendants collectively understood that by cooperating in this way they could all make tidy profits at the expense of Los Angeles and other issuers, rather than "kicking each other's teeth in" through needless competition. And Broker Defendants recognized that they could provide a valuable service to the Provider Defendants by facilitating the conspiracy for which they would be handsomely rewarded.

300. As a result of this ever expanding web of inter-locking relationships between collusive conduct in different Municipal Derivative transactions, an ever increasing number of Municipal Derivative transactions became directly involved in the conduct.

301. So pervasive, in fact, was the conspiratorial conduct at the dominant providers of Municipal Derivatives, such as Bank of America, UBS, Wachovia, and JP Morgan, that it became accepted practice for the conduct to occur and industry participants were surprised not when it occurred, but rather when it did not.

302.     As a result of this and other factors, the effect of Defendants' conspiracy was felt in every Municipal Derivative entered into by issuers during the period of the conspiracy and after.

**B.     Evidence Of The Conspiracy's Operation Through Specific Municipal Derivative Transactions**

303.     Based on its independent investigation, which included, but was not limited to, discussions with Defendant Bank of America and statistical analyses of bidding patterns and results of various Municipal Derivative transactions entered into by various California issuers, the following Municipal Derivative transactions have been identified, which presents probative evidence of the Defendants' conspiracy.

304.     However, the following information reflects the restrictions placed by the DOJ on the amount and type of information that Defendant Bank of America has been able to reveal to San Mateo, the  limitations that the Court has placed on discovery by San Mateo, and the strict secrecy that the DOJ has maintained as to the evidence that its ongoing investigation has revealed.  Despite that, the list presents a graphic snapshot of the pervasiveness and consistency of Defendants' conspiratorial conduct in transactions for all types of Municipal Derivatives entered into by issuers from coast-to-coast.

**1.     Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Proffered By Defendant Bank Of America**

**a.     Pennsylvania Intergovernmental Cooperation Authority Forward Purchase Agreement**

305.     Defendant BofA and Chase Manhattan Bank, now part of JP Morgan**,** manipulated a forward purchase agreement entered into by the Pennsylvania Intergovernmental Cooperation Authority on August 27, 1998.  The terms of the forward purchase agreement were reached through a sham bidding process.  IMAGE brokered and was actively involved in the

conspiracy to manipulate this transaction. During the bidding process IMAGE told BofA that "***this deal had to go to Chase.***" In furtherance of the conspiracy, BofA passed on the transaction by either withdrawing its bid or not submitting one. Following completion of the transaction, which JP Morgan won, BofA and JP Morgan entered into a hedging agreement with BofA (a kickback for not entering a legitimate bid) so that BofA would profit from the transaction. As alleged herein, BofA and JP Morgan commonly conspired to manipulate the municipal derivatives market.

### b. Hillcrest Healthcare System (Oklahoma) Forward Purchase Agreement

306. Defendant BofA and JP Morgan also colluded to manipulate a forward purchase agreement entered into by the Hillcrest Healthcare System, an Oklahoma public entity, on December 22, 1999. CDR brokered and was actively involved in the conspiracy to manipulate this transaction. An email exchange between Murphy of BofA and Bauman of BofA, prior to the completion of the transaction, demonstrates collusion between BofA, JP Morgan and CDR. In return for completing an unrelated two hundred million dollar swap with JP Morgan, brokered by CDR, the Hillcrest Healthcare System deal was being "laid up" for BofA by JP Morgan and CDR. In other words, JP Morgan passed on the deal and BofA got a sweetheart deal as a kickback for prior deals it had manipulated with JP Morgan and CDR.

### c. Guam Power Forward Purchase Agreement

307. Defendant BofA and Lehman Brothers manipulated a forward purchase agreement entered into by Guam Power on August 30, 2000. IMAGE brokered and was actively involved in the conspiracy to manipulate this transaction for which it received a fee of $350,395. Prior to the completion of the transaction, Stallone of IMAGE was in contact with both Lehman Brothers and BofA regarding the terms of the transaction. Both BofA and Lehman submitted price

indications to Stallone. Stallone told BofA "here's what Lehman is thinking, what are you thinking?" and asked if BofA would split the deal with Lehman Brothers. He also told BofA that it should "move a little" so that the bids would be closer together and Stallone could then suggest that the issuer split the transaction. Taylor of Lehman Brothers was involved on the transaction. When the deal closed it was split between Lehman and BofA just as the conspirators intended.

### d. Pennsylvania School Districts and Other Entities Escrows

308. JP Morgan, BofA, Wachovia, Lehman Brothers manipulated a series of transactions which included escrow CDs for Pennsylvania school districts and other entities. During these transactions it was common for the Cooperating Witness and Stallone of IMAGE to discuss the bidding rates. In fact, Stallone would advise the Cooperating Witness that Bank of America was being too aggressive so that BofA could manipulate the transaction to its advantage. CW and Stallone also discussed indications prior to entering several of the transactions.

309. Murphy and Campbell of Bank of America were fully aware that these transactions were manipulated. Moroever, Stallone of IMAGE told the Cooperating Witness that he would elicit courtesy bids from Wachovia, Lehman and JP Morgan. As was often the case in this conspiracy, these entities had no expectations of winning these transactions. JP Morgan was particularly active in manipulating these transactions. Gruer of JP Morgan was Stallone's contact. Gruer reported to MacFaddin of JP Morgan and also worked with Raz and Hertz of JP Morgan who were all involved in advancing the conspiracy.

310. Bank of America won the first ten deals, but when it was JP Morgan's turn to win, Stallone of IMAGE would direct Bank of America to submit a courtesy bid. As these transactions progressed, Stallone would tell the Cooperating Witness if JP Morgan or Bank of

America would be the winning bidder. In several instances, Stallone said that a particular deal "needs to go to JP Morgan." At one point, Stallone also told the Cooperating Witness that JP Morgan understood that it had just won a big transaction, and that Bank of America wanted this one. This sort of back and forth was a common way that all parties of the conspiracy advanced their own interest at the expense of the issuers.

311. The issuers involved in some of these transactions included:

     i.     The North Penn School District;

     ii.     The Cameron School District;

     iii.     The Downington Area School District;

     iv.     The Avonworth School District;

     v.     The Carnegie Borough School District;

     vi.     The Tyne-Richland School District;

     vii.     The Sto-Rox School District;

     viii.     The Milville Area School District;

     ix.     The City of Scranton School District;

     x.     The Township of Moon;

     xi.     The Harbor Creek School District;

     xii.     The Slippery Rock School District;

     xiii.     The Upper Dauphin School District;

     xiv.     The Penns Valley School District;

     xv.     The Township of Ross;

     xvi.     The County of Luzerne;

     xvii.     The Hamburg Area School District;

xviii.   The St. Mary's Area School District; the Springfield Township;

xix.    The Pattiston Area School District;

xx.     The County of Chester;

xxi.    The Springfield Township;

xxii.   The Ulster Tobacco Asset Securitization Corporation; and

xxiii.  Montgomery County Pennsylvania.

**e.      Springfield Township (Pennsylvania) Collateralized Deposit**

312.    BofA manipulated a collateralized deposit on a debt service fund issued by the Springfield Township, Pennsylvania on May 16, 2001.  The terms of this agreement were reached through a sham bidding process.  IMAGE brokered and was actively involved in the conspiracy to manipulate this transaction. Loughead of IMAGE and Pinard of BofA, in a series of emails, discussed the bid amount BofA would sumbit in order to secure the transaction. Loughead sent Pinard an email which asked, "***what kind of dough re mi we talking about for our friends at Springfield.***"  Pinard responded, "I may be able to go as tight as 40k if I need to." Loughead responded, "***don't fall on any swords.  I held out 30k as high hopes.  Anything above makes me look good, but as you see fit.  Did we pick up that much more, or are you working cheap.***"  Bid forms show that Saunders of BofA submitted a bid for $31,000, an amount just above Loughead's suggested amount.

**f.      Biola University (California) Forward Purchase Agreement**

313.    BofA manipulated a forward purchase agreement entered into by Biloa University on January 7, 2002.  IMAGE brokered and was actively involved in the conspiracy to manipulate this transaction.  Involved in these deals for Bank of America were Pinard, Murphy, Campbell, Brian Zwerner ("Zwerner"), and/or James Engel.  Stallone, Loughead, John Brenner and/or E.

Gilbert Carpenter (IMAGE's Managing Director) were involved on behalf of IMAGE. Taylor of Lehman was also involved. As is the case for many of the transactions discussed herein, little information is known about the exact role the Providers and/or Brokers played in manipulating this transaction because the transactions was identified by DOJ as being suspicious and/or is under investigation and therefore was not discussed in detail during the BofA Proffer.

g. **Santa Barbara County (California) Forward Purchase Agreement**

314. BofA actively manipulated an auction for a forward purchase agreement entered into by Santa Barbara County on May 6, 2002. Feld Winters brokered and was actively involved in the conspiracy to manipulate this transaction. As was common in manipulated transactions, prior to entering into the forward purchase agreement BofA pushed Santa Barbara to select Feld Winters to act as the broker so that BofA could have access to a broker it knew would assist BofA in rigging the transaction and to provide Feld Winters a kickback for its assistance in rigging other transactions. Other bidders in this transaction included AIG, AMBAC, JP Morgan, Solomon Smith Barney and Wachovia. Murphy, Campbell, Zwerner, and/or Johnson, all employees of BofA, were actively aware of and involved in the manipulating this transaction. Jeff Feld (founder and CEO of Feld Winters) and Jeff Kandell (President of Feld Winters) were involved on behalf of Feld Winters. Prior to entering a bid Johnson of BofA sent an email to Murphy and Feld Winters asking that Feld Winters prepare a list of who would be solicited for the bid. Moreover, there is a taped conversation where Murphy of BofA sought and received bidding information from Feld Winters. In fact, Murphy gave Feld Winters pricing indication on the transaction and Murphy asked about other bidders. In this transaction, Murphy gave an $200,000 indication, and Feld Winters responded he would have to bid a little tighter, only about $150,000. After the complection of the fraudulent transaction, Feld Winters received kickbacks

of $12,500 and $17,500 for its involvement in the conspiracy. Taped conversations relating to this transactions reveal that Providers commonly recorded profit in a portfolio managed by a different group other than the traders themselves.

        **h.**    **Art Center College of Design (California)**

315. BofA and UBS manipulated a forward purchase agreement and a related swap transaction entered into by Art Center College of Design located in Sacramento, California on May 7, 2002. The terms of the forward purchase agreement were reached through a sham bidding process. CDR brokered and was actively involved in the conspiracy to manipulate this transaction. Zaino of UBS was involved in the in this transaction as well. Tape recorded conversations reveal that Naeh of CDR and Murphy of BofA would discuss outstanding bids and the level BofA would have to bid in order to win the transaction. As alleged herein, taped discussions between Campbell of BofA and Zaino reveal that the two also discussed the pricing terms of and the timing of Bank of America's bid relating to a transaction involving the Commonwealth of Massachusetts.

        **i.**    **Beacon Tradeport Community Development District (Florida) and The Olympic Club (California) Transactions**

316. A series of transactions involving BofA and IMAGE clearly demonstrate the important role that kickbacks and personal relationships played in perpetuating the conspiracy. On March 13, 2002 Beacon Tradeport Community Development District ("Beacon") a Florida public agency, entered into a manipulated transaction with BofA. The terms of the transaction were reached through a sham bidding process. Prior to entering into the transaction, as it had done before, BofA pushed Beacon to hire IMAGE to work as its broker. Prior to submitting its bid to Beacon, BofA was given access to the bid specifications submitted by other Providers. BofA estimates that it made $750,000 in profits from this fraudulent transaction.

317.     As was often the case in this conspiracy, Providers would pay kickbacks to Brokers by selecting them to provide services on unrelated transactions for which they could receive exuberant fees.  In a March 11, 2002 email addressed to Pinard of BofA, Murphy states that Murphy would be requesting a market pricing letter for a transaction involving The Olympic Club in San Francisco, California and said that if IMAGE did not get the brokerage business on the Beacon deal, "we can find some $ elsewhere."  In fact, several weeks after completion of the Beacon Transaction, IMAGE sent a market pricing letter to Murphy of Bank of America relating to a negotiated transaction involving the renovation of The Olympic Club.  IMAGE received $50,000 for issuing this letter.  The Olympic Club transaction was completed in April 4, 2002. These transactions demonstrate the central role kickbacks played in advancing the conspiracy.

**j.      University of Tampa (Florida) Forward Purchase Agreement**

318.     BofA manipulated an auction for a  forward purchase agreement entered into by the University of Tampa on March 25, 2002.  CDR brokered and was actively involved in the conspiracy to manipulate this transaction.  Prior to completion of the transaction, Pinard of BofA and Naeh of CDR sent each other a series of emails in which the parties reference their plans to manipulate the auction process.  CW said that he gave early indications of this deal to Naeh & called back to see if indications won deal.  At one point Pinard emailed Naeh and told him to "call me on my cell below when you get a Tampa number."  Ultimately, BofA won the auction, and CDR received a $250,000 fee.

**k.      Puerto Rico Electric Power Authority Escrow Deposit Agreements**

319.     BofA and UBS colluded to manipulate auctions for a revenue fund and a defeasance escrow deposit both entered into by the Puerto Rico Electric Power Authority on June 11, 2002.  PackerKiss brokered and was actively involved in the conspiracy to manipulate these

transactions.  In a recorded conversation between Zaino and Campbell, Zaino instructed

Campbell on how Bank of America should bid to win the defeasance escrow.  Following the

transaction, Campbell of BofA told Murphy of BofA that he wanted to pay CDR a kickback even

though they did not act as a broker in this transaction.  The kickback was likely for the role CDR

might have played in working with UBS in facilitating the fraudulent transactions.

        **l.**       **Rhode Island Gross Funded Escrow Agreement**

320.  BofA, JP Morgan, Wachovia, Morgan Stanley, and Broker First Southwest

colluded to manipulate two transactions tied to a series of bonds Rhode Island sought to refund

on June 20, 2002.  The first transaction was an escrow transaction which involved a competitive

auction process.  During the bidding process, First Southwest sent revised bid information to

various Providers including Hertz and MacFaddin of JP Morgan as well as Wachovia and

Morgan Stanley.  BofA did not bid, a clear "pass" made by BofA.  After the sham bidding

process was complete, UBS won the auction.  A day after UBS won the auction, UBS and BofA

entered into a forward purchase whereby UBS transferred its rights and obligations relating to the

escrow transaction to BofA.  UBS and BofA entered this transaction to generate broker fees, a

kickback to the Broker who was involved in the conspiracy.

        **m.**    **Williamson County (Tennessee) Escrow Deposit Agreements**

321.  BofA manipulated two escrow deposit agreements issued by Williamson County,

Tennessee on June 24, 2002.  Sound Capital brokered and was actively involved in the

conspiracy to manipulate this transaction.  BofA, Lehman, and Wachovia bid on these

transactions.  Recorded conversations reveal that Rosenberg of Sound Capital advised Campbell

of Bank of America as to the bids levels of other providers.  In fact, after hearing Wachovia's

bid, Campbell asked Rosenberg if he could change one of BofA's bids.  Rosenberg said he would

be willing to change the bid, but was reluctant to because he already told Williamson County the bid results. Campbell responded that it was at least worth asking. BofA was the Provider for this transaction.

### n. Jackson Lab (Maine) Interest Rate Swaps

322. BofA manipulated two interest rate swaps entered into by Jackson Labs, located in Bar Harbor, Maine, on June 28, 2001. Baum brokered the transactions. Recorded conversations between Campbell of BofA and Steinhauer of Baum reveal that the two discussed bids submitted by other Providers including Bear Sterns and Fleet Bank, now part of BofA, as well as the bids BofA would have to submit in order to win the auctions. Prior to submitting a bid Campbell asked Steinhauer who else will be bidding and whether Steinhauer thought pricing will be aggressive. Steinhauer indicated that a lot of providers were bidding, including Bear Sterns & Fleet Bank. Campbell and Steinhauer then discussed pre-bid indications on both trades.

### o. Commonwealth of Massachusetts Forward Purchase Agreement

323. BofA and UBS colluded to manipulate a forward purchase agreement entered into by the Commonwealth of Massachusetts on June 19, 2002. The terms of the transaction were set by an auction process. For this transaction, UBS acted as both the Broker and a Provider and was actively involved in the conspiracy to manipulate this transaction. Taped discussions between Campbell of BofA and Zaino of UBS reveal that the two discussed the pricing terms of the transaction. Moreover, prior to submitting its bid, UBS sent BofA the bid specifications submitted by other Providers. Wachovia ultimately won the transaction. Taped discussions between Campbell and Golberg of CDR, who did not act as a Broker in the transaction, recorded after completion of the transaction, reveal that Campbell was upset with Zaino because he did not deliver the deal to BofA.

p. **Virgin Islands Debt Service Reserve Fund**

324.    BofA and Lehman Brothers were actively involved in the manipulation of a debt service agreement entered into by the Virgin Islands on June 19, 2002.  In February of 2002, months before completion of the transaction, Stallone of IMAGE sent Pinard of BofA an email which indicated that Stallone would try to arrange for BofA to win the auction.  Leading up to the time of auction, Stallone and Pinard discussed a transaction involving the Camden County Municipal Utilities Authority ("Camden").  Based on information contained in various emails between BofA and IMAGE, BofA had arranged to win the Camden transaction, but was unable to win the transaction because Gib Carpenter of IMAGE failed to secure the transaction for BofA.  Given IMAGE's failure relating to the Camden transaction, Stallone of IMAGE promised Pinard of BofA, "*I will do my best to make it up on the Virgin Islands Debt Service Reserve Funds.*"

325.    On June 19, 2002, Stallone and Campbell of BofA discussed what BofA needed to bid to win the Virgin Island transaction.  Stallone told Campbell that he would provide a signal to Campbell on what BofA should bid.  Stallone also indicated that he would try to get Lehman's bid before BofA submitted their bid.  Ultimately, Morgan Stanley won the auction and entered into a deal with the Virgin Islands.  Stallone was apologetic and told Campbell that he would discuss why BofA failed to secure the transaction with Pinard.  Campbell indicated that Pinard had similar conversations with other brokers that failed to secure bids for BofA including Rosenberg of Sound Capital and Naeh of CDR.

q. **New Jersey Transit Corporation Escrow Agreement**

326.    BofA and UBS were actively involved in the manipulation of an auction for the sale of securities entered into by the New Jersey Transit Corporation on June 20, 2002.  CDR

brokered and was actively involved in the conspiracy to manipulate this transaction. Tapped conversations reveal that Campbell of BofA, Zaino of UBS and Naeh of CDR exchanged bid and pricing information prior to BofA and UBS submitting their respective bids. As alleged herein, Zaino and Campbell also discussed pricing terms of and the timing of Bank of America's bid related to a transaction involving the Commonwealth of Massachusetts.

### r.     Tampa Port Authority Forward Purchase Agreement

327.     BofA actively manipulated the sale of a forward purchase agreement entered into by the Tampa Port Authority on July 8, 2002. CDR brokered and was actively involved in the conspiracy to manipulate this transaction. Naeh of CDR actively shared information about the bidding process with BofA. While conspiring to manipulate the transaction, Naeh of CDR sent an email to Pinard of BofA which stated "***Its nice to have friends***. We'll call you in a little bit." Ultimately, Provider Defendant BofA won the transaction. This email underscores the fact that personal connections and repeat business were two of the key factors that drove the conspiracy.

### s.     City of Chicago Wastewater Facility Swap

328.     BofA, JP Morgan, and Lehman Brothers colluded to manipulate a trigger swap entered into by the City of Chicago Wastewater Facility ("CCWF") in July of 2004. Mesirow brokered the transaction. Lehman Brothers negotiated the deal with the CCWF and/or Medirow. Bank of America and JP Morgan were given the opportunity to see the terms of the pricing submitted by Lehman and adjust their pricing accordingly, so that Lehman got 60% of the deal and JP Morgan and Bank of America each got 20%. Given the terms of the deal, Mesirow, the broker on the deal, suggested that this arrangement could be subject to scrutiny. This transaction again demonstrates that the close relationship BofA and JP Morgan had in manipulating the municipal derivatives market.

**t.**   **2007 Bank of America IRS Settlements**

In early 2007, the IRS settled a series of cases with BofA relating to its manipulation of various municipal derivative transactions.  BofA, Baum, and other co-conspirators were implicated in the manipulation of GICs, debt service reserve funds, and other transactions involving:

i.   The Orange County, Florida, Health Facilities Authority;

ii.   The Louisiana Local Government Environmental Facility & Community Development Authority;

iii.   The Illinois Development & Financial Authority;

iv.   Oklahoma Rural Enterprises;

v.   The Western Virginia Hospital Finance Authority; and

vi.   Henderson County, Kentucky.

329.   Multiple entities were involved in manipulating these transactions.  Lail of Baum was principally involved in each of these transactions.  Campbell of Bank of America personally handled transactions for the Western Virginia Hospital Finance Authority, Oklahoma Rural Enterprises, Louisiana Local Government Environmental Facility & Community Development Authority, and Henderson County, and Campbell and Murphy jointly handled the deal for Illinois Development & Financial Authority.  Gruer of JP Morgan submitted courtesy bids for each of these transactions, with the exception of the Oklahoma Rural Enterprises transaction.  A non-defendant provider, whose identity is being kept confidential pursuant to agreement with the Bank of America, did likewise with respect to Henderson County.  Frasco of CDC submitted sham bids with respect to Henderson County, the Western Virginia Hospital Finance Authority, and Illinois Development & Financial Authority.  Campbell of Bank of America deliberately

submitted bids that were less than what was needed to cover the debt service, liquidity, and credit enhancement on the bonds with respect to the Orange County, Florida, Health Facilities Authority and the Louisiana Local Government Environmental Facility & Community Development Authority. Bank of America also indicated that Merrill Lynch conspired with Lail of Provider Defendant Baum to submit a courtesy bid to Henderson County.

### 2. Preliminary Statistical Analysis Of Municipal Derivative Transactions Of California Issuers Reveals Probative Evidence Of Bid-Rigging

#### a. Evidence Suggesting Courtesy Bids

330. A preliminary examination of bidding information for eighty-nine reinvestment derivative auctions conducted on behalf of various California cities and counties suggests that courtesy bids in the Municipal Derivatives market were common. In Table 1, below, are nine reinvestment derivative auctions in which bidding patterns suggest that the auction was affected by courtesy bidding.

331. "Courtesy bids" are bids that are too low to be competitive but which are submitted by Provider Defendants to give the appearance of legitimacy to an auction. Courtesy bids are collusive as they are made for the benefit of other Defendant Providers who have been pre-selected to win a particular auction. In fact, among the requirements for a GIC or a yield restricted defeasance escrow to fall within the "safe harbor" provisions of Treasury Regulations for establishing "fair market value," an issuer must receive at least three (3) bids from potential providers. 26 C.F.R. § 148-5(d)(6)(iii)(B)(1). Submission of courtesy bids ensures that this requirement is met, giving false assurance of fairness to issuers, while insulating the pre-selected winner of the auction from real competition. Or as then IRS Director Mark Scott stated in 2005, these bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value."

332.    IRS Director Scott, in 2005, articulated a rough guideline for determining when a bid submitted in a Municipal Derivative action was likely a courtesy bid:  "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."

333.    According to Director Scott, evidence of these types of abuses is frequently perceptible in bidding behaviors by providers in particular auctions.  For example, Director Scott stated,  "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."  Such bids, Director Scott continued, are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value."

334.    All potential and actual bidders can be assumed to have access to virtually the same information, including market rates.  In fact, Treasury Regulations require that, in order for a presumption of fair market value to apply to a reinvestment derivative procured through auction, that all providers whose bids are solicited for a particular auction be provided with bid specifications that "include all material terms of the bid."

335.    Moreover, all potential bidders have the option of passing if they do not want to compete for a particular contract at auction.

336.    One would expect, therefore, that the range between the lowest and highest bids in a particular auction would be quite narrow.  A preliminary analysis of eighty-nine reinvestment derivative auctions conducted on behalf of various California cities, counties, and government agencies confirms this.  The **median spread** between the highest and lowest bids in these auctions was approximately **25 basis points**, a figure that is moreover likely artificially inflated by the existence of the artificially low courtesy bids described below.

337.    Based on these factors and circumstances specific to particular auctions, the

lowest bids in the following auctions, which range from 2.8 to 145 basis points below the

winning bid, appear to have been submitted not with the intention of competing for the contract

on auction, but rather as courtesy for another bidder, most likely the ultimate winner of the

particular auction.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Table 1** <br> **Courtesy Bids** |
| | Date | Issuer | Low Bidder | High Bidder | Max-Min Spread | Bid 1 | Bid 2 | Bid 3 | Bid 4 | Bid 5 | Bid 6 | Bid 7 | Bid 8 |
| 1 | 5/28/04 | City of Riverside | BayernLB | MBIA | 1.45% | 3.50% | 4.05% | 4.50% | 4.55% | 4.57% | 4.91% | 4.95% | 4.95% |
| 2 | 8/1/03 | City of Riverside | Rabobank | CDC | 1.36% | 3.85% | 4.95% | 5.00% | 5.21% | | | | |
| 3 | 3/5/98 | LA World Airports | JP Mogan | WestLB | .89% | 3.93% | 4.25% | 4.50% | 4.82% | | | | |
| 4 | 2/12/04 | City of Riverside | Rabobank | SocGen | 0.85% | 2.65% | 3.20% | 3.21% | 3.50% | | | | |
| 5 | 7/16/03 | City of Riverside | XL | Tran | 0.73% | 3.81% | 4.04% | 4.22% | 4.29% | 4.42% | 4.54% | | |
| 6 | 5/15/08 | City of Riverside | W. Fargo | FSA | 0.71% | 2.32% | 2.71% | 2.86% | 3.03% | | | | |
| 7 | 11/17/04 | City of Riverside | BayernLB | MBIA | 0.66% | 4.36% | 4.41% | 4.77% | 4.81% | 4.90% | 5.02% | | |
| 8 | 4/27/05 | City of Los Angeles | MBIA | Aegon | 0.62% | 3.40% | 3.73% | 4.02% | | | | | |
| 9 | 9/6/01 | San Mateo County | BofA | SSBar | 0.57% | 2.64% | 3.00% | 3.03% | 3.20% | 3.20% | 3.21% | | |
| 10 | 3/19/02 | City of Los Angeles | Aegon | MBIA | 0.51% | 5.55% | 5.92% | 5.97% | 5.98% | 5.99% | 6.00% | 6.06% | |

### i.    City of Riverside GIC May 28, 2004 (Row 1)

338.    The greatest difference between the lowest and highest bids found in the eighty-

nine California city and county GIC auctions that were analyzed, is a difference of **145 basis**

**points** recorded on Row 1 of Table 1, in the May 28, 2004 GIC auction conducted on behalf of

the City of Riverside.  In that auction, Defendant BayernLB submitted a bid of only 3.50% while

the winner of the auction, Defendant MBIA represented by Jim Binette, submitted a bid of

4.95%.

339.    The **145 basis point** spread between Defendant BayernLB's bid and the winning

bid of Defendant MBIA falls well within the range that Director Scott identified as suspect, and

for good reason.  A bid that is that far below the winning bid does not reasonably appear to have

been submitted with the intention of winning the auction.  This conclusion is reinforced by the

facts that: (1) the 145 basis point spread is almost six times the median spread observed in the

eighty-nine reinvestment derivative auctions analyzed; (2) the next lowest bid was **55 basis points** above Defendant BayernLB's bid; and (3) the other bids were **at least 100 basis points** above Defendant BayernLB's bid. It can be reasonably assumed that Defendant BayernLB would have had the same access to information as other bidders, including market rates and, thus, Defendant BayernLB would have known that this bid was woefully below market rates and had no chance of success.

340.    Given, as explained above, Defendant BayernLB was under no legitimate obligation to submit a bid in this auction, the most reasonable conclusion is that the bid was submitted as a courtesy to another bidder, most plausibly Defendant MBIA, which won the auction. In fact, it is difficult to explain why Defendant BayernLB would have submitted such a bid, except as a courtesy.

341.    This conclusion is supported by the submission of Defendant BayernLB of another apparent courtesy bid approximately five and half months later in another GIC auction conducted on behalf of the City of Riverside, discussed herein, again with the apparent intention of benefitting Defendant MBIA.

342.    Moreover, as also discussed below, Defendant MBIA also appears to have engaged in reciprocal courtesy bid arrangements with Defendant Transamerica that affected at least two auctions conducted on behalf of Los Angeles in 2002 and 2005. Together these events suggest that Defendant MBIA has engaged in a pattern of involvement in bid-rigging that included the submission of courtesy bids by it or other participants in particular auctions. This reinforces the conclusion that unusually low bids that were either submitted by Defendant MBIA, or by another Defendant in an auction in which MBIA won, were in fact courtesy bids.

343.    Finally, the conclusion that Defendant BayernLB's unusually low bid in this auction was a courtesy bid is supported by Defendant BayernLB publically reported involvement in a GIC auction conducted on behalf of the University of New Mexico regarding the bidding process for which the DOJ has requested specific information.

344.    The other bidding participants in the May 28, 2004 auction were Defendant Transamerica, AIG, Defendant CDC, Defendant FSA, Defendant Rabobank, and Defendant Societe Generale.

345.    The providers from whom bids were solicited for this action, but which passed, were Ambac, Defendant Solomon Smith Barney, FGIC, Defendant JP Morgan, RBC, and Defendant GE Trinity.

### ii.    City of Riverside (California) GIC Aug. 1, 2003 (Row 2)

346.    Another suspiciously low bid that appears to have been submitted without the hope or intention that bid would be competitive but rather as a courtesy to another bidder is the bid submitted by Defendant Rabobank, represented by John Gallagher in the GIC auction conducted by the City of Riverside on August 1, 2003 (Row 2).

347.    In the August 1, 2003 auction, Defendant Rabobank submitted a bid of 3.85%, **136 basis points** below the winning bid of 5.21%, submitted by Defendant CDC, represented by Vincent Bernardeau. Of the eighty-nine auctions analyzed, this was the second largest spread found and was almost five and half times higher than the median spread. Moreover, Defendant Rabobank's bid was **110 basis points** below the next lowest bid. In fact, all of the other bids were tightly concentrated around the 4.95% to 5.21% range, which supports the proposition that participants to the auction all had reasonably equal access to information, including market rates. Thus, given these factors and Defendant Rabobank's ability to have passed if it was not inclined

to compete for the contract offered, it seems most plausible that Defendant Rabobank submitted the bid as courtesy, most likely to benefit the auction's ultimate winner, Defendant CDC.

348. This conclusion is reinforced by the facts that: (1) as discussed above, Defendant CDC has been implicated in investigations of bid-rigging of a series municipal derivative auctions involving Defendant Baum; and (2) Defendant CDC's announcement discussed below that one of its employees had received a target letter from the DOJ's antitrust division, informing him that the DOJ intends to seek his criminal prosecution for participating in the conspiracy alleged herein.

349. The other participants who bid in the auction were Defendant FSA represented by Walter Schemitsch and Defendant MBIA represented by Jim Binette.

350. Participants who passed in the auction were AIG represented by Chris Toft, Ambac represented by Jessica Carcaterra. Defendant Bayern LB represented by Frank Postiglione, and FGIC, represented by Peter Grimm.

### iii. Los Angeles World Airports GIC March 5, 1998 (Row 3)

351. The results of the GIC auction conducted on behalf of Los Angeles World Airports on March 5,1998 (Row 3) suggest that Defendant JP Morgan submitted a courtesy bid for the benefit of WestLB.

352. Defendant JP Morgan, represented by Peter Ghavauri submitted a bid of 3.93%, **89 basis points** below the winning bid of 4.82% submitted by WestLB represented by Peter Chabot . This is the third largest spread identified in the eighty-nine auctions analyzed and is over three and half times more than the median.

353. Moreover, the fact that there are just four bids for the auction also suggests that Defendant JP Morgan submitted the bid as a courtesy. It was a consistent practice amongst co-

conspirators to request, receive and submit courtesy bids in order to get the required three bids necessary for the safe harbor provisions of the IRS regulations to apply. The fact that only four bids were submitted and the fourth was significantly below the winning bid suggests that the submitter of that bid, Defendant JP Morgan, did so not with the intention of prevailing but rather as courtesy.

354.    This conclusion is supported by the evidence discussed elsewhere herein of the submission of courtesy bids in other auctions by JP Morgan, specifically in auctions run by Defendant CDR, which acted as broker in this auction as well.

355.    The other bidding participants in this auction were Defendant SocGen represented by Donald Travis and Defendant NatWest represented by Patrick Marsh.

356.    The providers from whom bids were solicited for this action, but which passed, were AIG represented by Heather Singer, Defendant Bank of America and Bank of New York.

### iv.    City of Riverside GIC February 12, 2004 (Row 4)

357.    The results of the February 12, 2004 GIC auction conducted on behalf of the City of Riverside suggest that Defendant Rabobank again submitted a courtesy bid, but this time for the benefit of Defendant SocGen.

358.    Defendant Rabobank, represented by John Gallagher submitted a bid of 2.65%, **85 basis points** below the winning bid of 3.50% submitted by Defendant SocGen, represented by Donald Travis. This is the fourth largest spread identified in the eighty-nine auctions analyzed and close to three and half times more than the median. Moreover, the spread between Defendant Rabobank's bid of 2.65% and the next lowest bid of 3.20% was **55 basis points**, while all of the other bids are within 1 to 29 basis points of one another. This, again, supports the proposition that all of the bidders to the auction had reasonably equal access to the same

information, including market rate, and that Defendant Rabobank did not submit this bid in the reasonable expectation of it being competitive. Thus, given that Defendant Rabobank could have chosen to pass if it was not inclined to competitively bid in this auction, the most plausible explanation is that its bid was submitted as a courtesy, most likely for the benefit of the auction's winner, Defendant SocGen.

359. This conclusion is reinforced by the fact that SocGen has been implicated in a number of investigations involving bid-rigging of municipal derivative auctions, discussed above.

360. The other bidders in the February 12, 2004 auction were Defendant Transamerica, represented by Matt Meaney and Defendant CDC, represented by Vincent Bernardeau.

361. Bidders who passed on the auction were AIG represented by Chris Toft, Ambac represented by Jessica Carcaterra, Defendant Bank of America represented by Jay Saunders, Defendant Bayern LB represented by Frank Postiglione, Defendant FSA represented by Steven Goldberg, Defendant JP Morgan represented by Scott Verch, Defendant MBIA represented by Jim Binette, Defendant Merrill Lynch represented by Michele Gesser, Defendant Morgan Stanley represented by Kevin Schwartz, Defendant Solomon Smith Barney represented by Peter Colquitt, Defendant GE Trinity Plus represented by Peter Grimm, and Defendant XL Capital represented by Frank Beardsley.

362. Defendant BofA who was represented in this auction by Paul Jay Saunders, who has reportedly received a target letter from the DOJ, informing him that the DOJ intends to seek his criminal prosecution for involvement in the conspiracy alleged herein.

### v.    City of Riverside (California) GIC July 16, 2003 (Row 5)

363.    The results of the July 16, 2003 GIC auction conducted on behalf of the City of Riverside suggest that Defendant XL Asset submitted a courtesy bid for the benefit of Defendant Trinity.

364.    Defendant XL Asset, represented by K. Brinkman submitted a bid of 3.81%, which was **73 basis points** below the winning bid of 4.55% submitted by Defendant Trinity, represented by Peter Grimm. This is the fifth largest spread identified in the eighty-nine reinvestment auctions that were analyzed and is just under three times the median spread. While the difference between Defendant XL Asset's bid and the other non-winning bids is not as stark as in some of the other auctions discussed, the size of the spread between Defendant XL Asset's bid and Defendant Trinity's winning bid, when compared with the spreads identified in the other auctions between lowest and highest bids, is sufficiently large to make it more plausible that Defendant XL Asset submitted the bid as courtesy for another bidder than with the good faith intention to compete for the contract offered. The most likely intended recipient of the courtesy bid was the ultimate winner of the auction, Defendant Trinity.

365.    This conclusion is reinforced by the fact that Defendant Trinity's sister company, Defendant GE Funding has, as discussed below, received a Wells Notice from the SEC informing it that the SEC intended to bring a civil action against it related to the SEC's investigation of improprieties in the municipal derivatives market.

366.    The other participants in the July 16, 2003 auction include AIG represented by Chris Toft, Defendant Bank of America represented by Jay Saunders, Defendant Bayern LB represented by Frank Postiglione, Defendant CDC represented by Vincent Bernardeau,

Defendant FSA represented by Walter Schemitsch, Defendant MBIA represented by Jim Binette, and Defendant Rabobank represented by John Gallagher.

367. Participants who passed on the July 16, 2003 auction were Ambac represented by Jessica Carcaterra, Defendant ARMCo represented by D. Burlage, FGIC represented by Peter Grimm, Defendant JP Morgan represented by Scott Verch, Defendant Morgan Stanley represented by Kevin Schwartz and Defendant Salomon Smith Barney represented by Peter Colquitt.

368. Defendant BofA was represented in this again auction by Paul Jay Saunders, who has reportedly received a target letter from the DOJ, informing him that the DOJ intends to seek his criminal prosecution for involvement in the conspiracy alleged herein.

### vi. City of Riverside (California) GIC May 15, 2008 (Row 6)

369. Manifesting the continuing nature of the conspiracy, the results of the GIC auction conducted on behalf of the City of Riverside on May 15, 2008, suggest that Defendant Wells Fargo submitted a courtesy bid for benefit of Defendant FSA.

370. Defendant Wells Fargo, represented by John Carney submitted a bid of 2.32%, which was **71 basis points** below the winning bid of 3.03% submitted by Defendant FSA represented by Kevin Connolly. This spread is the sixth largest identified in the preliminary analysis of the eighty-nine reinvestment auctions and close to three times the median spread. Moreover, Wells Fargo's bid was **39 basis points** below the next lowest bid, while all of the rest of the bids are within 15 to 17 basis points of one another. Given that it is reasonable to assume that Defendant Wells Fargo had access to same information as other bidders, it does not appear that Defendant Wells Fargo submitted this bid with the intention to compete for the contract at auction. Given that Defendant Wells Fargo was free to pass in the auction, it therefore appears

most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant FSA.

371. This conclusion is supported by Defendant FSA's reported involvement in other publically reported incidents of suspected bid-rigging in municipal derivative auctions and, as described below, the attention Defendant FSA has attracted in government investigations of the conspiracy alleged herein.

372. The other participants in the May 15, 2008 auction were Defendant Royal Bank of Canada represented by Frank Postiglione and Defendant Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., represented by John Gallagher

373. A Provider who passed on the auction was Defendant Trinity Funding Company.

374. Providers that did not reply for the auction include Defendant Bank of America and Defendant JP Morgan.

### vii. City of Riverside (California) GIC Nov. 17, 2004 (Row 7)

375. As mentioned above, on November 17, 2004, Defendant BayernLB submitted a suspiciously low bid in GIC auction conducted on behalf of the City of Riverside, and Defendant MBIA won the auction, less than six months after Defendant BayernLB had submitted a suspiciously low bid in another GIC auction conducted on behalf of the City of Riverside that Defendant MBIA ultimately won.

376. In the November 17, 2004 auction, Defendant BayernLB, represented by Alfredo Perez submitted a bid of 4.36%, **66 basis points** below the winning bid of 5.02% submitted by Defendant MBIA represented by Jim Binette. This spread is the seventh largest identified in the preliminary analysis of the eighty-nine reinvestment derivative auctions and is more than two and half times the median spread. Given that it is reasonable to assume that Defendant BayernLB

99

had access to the same information as other bidders, it does not appear that Defendant BayernLB submitted this bid with the intention to compete for the contract at auction. Given that Defendant Defendant BayernLB was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant MBIA.

377. This conclusion is reinforced by the identification of another plausible courtesy bid submitted by Defendant BayernLB in the May 28, 2004 auction that was also won by Defendant MBIA. Together, these two event suggest ongoing collusion between Defendant BayernLB and Defendant MBIA.

378. As mentioned above, this conclusion is further supported by Defendant BayernLB's involvement in the New Mexico University municipal derivative auction that has drawn the attention of the DOJ's antitrust division.

379. The other participants in the November 17, 2004 auction were AIG represented by Chris Toft, Defendant CDC represented by S. Maisonneuve, Defendant Rabobank represented by John Gallagher, and Defendant GE Trinity Plus represented by Peter Grimm.

380. Participants that passed in the auction were FGIC represented by Peter Grimm and Defendant FSA represented by Steven Goldberg.

### viii.  City of Los Angeles GIC April 27, 2005 (Row 8)

381. The results of the April 27, 2005 GIC auction conducted on behalf of the City of Los Angeles suggest that Defendant MBIA, represented by Maggie Walsh, submitted a courtesy bid for the benefit of Defendant Transamerica, represented by Matt Meaney.

382. Defendant MBIA's bid of 3.40% was **62 basis points** below Defendant Transamerica's winning bid. This spread is the eighth largest identified in the preliminary

analysis of the eighty-nine reinvestment derivative auctions and is just under two and half times the median spread. Given the reasonable assumption that Defendant MBIA had access to the same information as other bidders, including market rates, it does not appear that Defendant MBIA submitted this bid with the intention of competing for the contract at auction. Given that Defendant MBIA had the freedom to pass if did not want to compete for a particular auction, it therefore appears most plausible that Defendant MBIA submitted this bid as a courtesy, most likely for Defendant Transamerica.

383.    Reinforcing this conclusion is the fact that only three bids were submitted. As mentioned above, Treasury Regulations require that at least three bids be submitted in order for a presumption of fair market value to apply to GIC procured through auction. Thus, without Defendant MBIA's bid, the auction would not have met the required qualifications, and Defendant Transamerica could not have won the contract. The fact that Defendant MBIA submitted a bid that had no possibility of being competitive but operated to satisfy these IRS Regulations strongly suggests that Defendant MBIA submitted the bid as courtesy to Defendant Transamerica.

384.    This conclusion is reinforced by the fact that, as described below, in an auction conducted on behalf of the City of Los Angeles almost exactly three years before, on April 2, 2002, it appears that Defendant Transamerica submitted a courtesy bid for the benefit of Defendant MBIA. In other words, it suggests that in the April 27, 2005 auction Defendant MBIA was *paying back* Defendant Transamerica for a similar courtesy done for Defendant MBIA three years before.

385.    The other participant in the April 27, 2005 auction was Defendant CDC/IXIS, represented by Vincent Bernardeau. The participants who passed in the auction were Defendant

FSA, represented by Walter Schemistsch, Defendant Rabobank represented by John Gallagher, and Defendant XL Asset represented by K. Brinkman.

### ix. San Mateo County (California) GIC September 6, 2001 (Row 9)

386. The results of the September 6, 2001 GIC auction conducted on behalf of San Mateo County suggest that Defendant BofA submitted a courtesy bid for the benefit of Salomon Smith Barney.

387. Defendant BofA, who was represented by James B., submitted a bid of 2.64%, which was **57 basis points** below the winning bid of 3.21% submitted by Salomon Smith Barney, who was represented by Peter Colquitt. This spread is the ninth largest identified in the preliminary analysis of the eighty-nine reinvestment auctions and is over two times the median spread. Moreover, Defendant BofA's bid was **36 basis points** below the next lowest bid, while all of the rest of the bids are within 1 to 21 basis points of one another. In fact, the other bids were all concentrated in two tight clusters, one in the 3.00% range and the other in the 3.20% range. This supports the assumption that all of the potential bidders, including Defendant BofA, had equal access to the same information, including market rates, and, thus that Defendant BofA knew the bid it submitted would not be competitive. Given that Defendant BofA was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Salomon Smith Barney.

388. This conclusion is supported by Defendant BofA's admission that it participated in bid-rigging in municipal derivative auctions and publicized reports of tape recordings of Defendant BofA employees discussing submission of courtesy bids on behalf of other providers.

389. The other participants in the September 6, 2001 auction were Lehman Brothers represented by Anatoly Zelikoff, First Union, a corporate predecessor of Defendant Wachovia,

Defendant Bear Stearns, represented by Anne Kulicu, and Defendant Morgan Stanley represented by Kevin Schwartz.

### x.    City of Los Angeles (California) GIC March 19, 2002 (Row 10)

390.    The results of the March 19, 2002 GIC auction conducted on behalf of Los Angeles suggest that Defendant Transamerica submitted a courtesy bid for the benefit of Defendant MBIA.

391.    Defendant Transamerica represented by Cliff Jenkins submitted a bid of 5.55%, which was **51 basis points** below the winning bid of 6.06% submitted by Defendant MBIA represented by Jacquelyn Hamme.  This spread is the tenth largest identified in the preliminary analysis of the eighty-nine reinvestment auctions and approximately two times the median spread.  Moreover, Defendant BofA's bid was **37 basis points** below the next lowest bid, while all of the rest of the bids are within 1 to 14 basis points of one another.  In fact, the other bids were all concentrated in a tight cluster, in the 5.92% to 6.06% range.  This supports the assumption that all of the potential bidders, including Defendant Transamerica, had equal access to the same information, including market rates, and, thus that Defendant Transamerica knew the bid it submitted would not be competitive. Given that Defendant Transamerica was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant MBIA.

392.    This conclusion is supported by Defendant MBIA's submission of what appears to have been a courtesy bid for the benefit of Defendant Transamerica in another GIC auction conducted on behalf of Los Angeles, three years later.  Together, these two events suggest that Defendant Transamerica and Defendant MBIA had an agreement whereby each would submit a courtesy bid for the benefit of the other in various GIC auctions, depending on the circumstances.

This conclusion is further supported by the descriptions above of two other auctions in which it appears that Defendant MBIA was also the beneficiary of courtesy bids submitted by Defendant BayernLB. Thus, it appears that Defendant MBIA has engaged in a pattern of courtesy bid activity in reinvestment derivative auctions with various other providers.

393.     The other participants in the March 19, 2002 auction were Defendant GE Trinity Plus represented by Peter Grimm, AIG represented by Lee Arthurs, Ambac represented by John Tsigakos, Defendant CDC represented by Vincent Bernardeau, and Defendant FSA represented by Steven Goldberg.

### b.     San Mateo County (California) November 14, 2003 Swap Transaction

394.     On November 17, 2003, San Mateo County through its Joint Powers Financing Authority issued $155,350,000 in auction-rate bonds. San Mateo's ARBs were split into three series, two of which reset on a weekly basis and one of which reset every thirty-five days.

395.     San Mateo sought to hedge the interest rate risk involved with these types of issuances while taking advantage of short-term interest rates to which this type of issuance gave it access to by entering into swap transactions that would cover $133,550,000 of the $155,350,000 issuance amount. San Mateo intended to prepay to bond holders the remaining $20,000,000 from a grant.

396.     From San Mateo's perspective, the swap would be a fixed to floating rate swap, whereby San Mateo would make payments at specified intervals based on a fixed interest rate on an amortizing amount of principal. In exchange, San Mateo would receive payments at the same specified intervals based on a floating rate of interest on the same amortizing amount of principal.

397.     Defendant Solomon Smith Barney and Unnamed Co-Conspirator Lehman were the underwriters of the underlying bonds.  From this position, Solomon Smith Barney and Lehman offered to act as the swap providers according to an approximately 70/30 split that mirrored the split between them as to the underwriting of the associated bonds.  Solomon Smith Barney would act as the counter-party for approximately 70% of the total amount, $93,450,000, and Lehman Brothers would act as the counter-party for the remaining approximately 30% of the total amount, $40,100,000.

398.     Together, Solomon Smith Barney and Lehman proposed to San Mateo a pricing methodology that would be used at the date set for pricing ("Price Date") to determine the terms of the swap.  This methodology was proposed orally to San Mateo a few weeks before the Price Date.  Included in this proposal were mechanisms by which Solomon Smith Barney and Lehman represented to San Mateo that it would be able to independently evaluate the proposed swap terms.

399.     San Mateo found the proposed evaluation mechanisms difficult to verify.  It was, therefore, decided that San Mateo would attempt to evaluate the terms of the swap by seeking pricing quotations from personnel at Defendant UBS and Defendant Piper Jaffray.   Defendant Solomon Smith Barney and Lehman were given a right of first refusal, according to which each would be given the opportunity to meet or beat any terms offered by UBS or Piper Jaffray.

400.     A few days prior to the Price Date, a representative of San Mateo contacted an employee at Defendant Piper Jaffray, who gave a rough pricing that turned out to be within a few basis points plus or minus of the terms offered by Solomon Smith Barney and Lehman at closing.

401.     The day before the Price Date, a representative of San Mateo contacted a member of Defendant UBS' swap trading desk, who confirmed that the pricing being offered by Lehman

and Solomon Smith Barney was very close to what his desk was offering. Ultimately, the specific terms offered by Defendant UBS were within a couple of basis points plus or minus what the terms offered by Lehman and Solomon Smith Barney at the Price Date.

402.     The final terms at the Price Date were that San Mateo would pay a fixed rate of 3.33% and receive one half of the United States Dollar London Interbank Offered Rate ("LIBOR") plus .29% .

403.     In advance of the Price Date, San Mateo determined that Lehman's stand-alone credit-rating was too low for it to serve as a counter-party in the swap transaction. In reaction to these concerns, Lehman entered into an arrangement with Defendant AIG Financial whereby AIG Financial would replace Lehman as counter party to the $40,100,000 swap. Lehman chose Defendant AIG Financial Products as its replacement, and San Mateo was not made privy to negotiations between Lehman and Defendant AIG Financial Products, or the terms of any deal reached between them. No negotiations occurred between San Mateo and Defendant AIG Financial Products.

404.     San Mateo was told by Lehman only that Defendant AIG Financial Products was "laying off" the risk to Lehman and being paid for providing the credible counterparty rating.

405.     A preliminary analysis of the terms of the swaps suggests that Defendant Solomon Smith Barney, Defendant AIG Financial Products, Defendant UBS, Defendant Piper Jaffray, and un-named co-conspirator Lehman Brothers colluded to artificially depress the terms of the deal that San Mateo received, while making those terms appear competitive.

406.     The terms of San Mateo's swaps were analyzed using the SWPM analytic command on Bloomberg, a financial data and analysis tool popularly used by investment professionals. The SWPM command analytic uses LIBOR yield curves as an input to a

discounted cash flow model into which various pieces of information are inputted. Using this command analytic, the value of cash flows San Mateo received under the terms of the swap can be compared with the value of the cash flows San Mateo paid under the swap.

407.    Because the swaps do not involve any significant up front payment by either San Mateo or either of the ultimate swap providers, Defendant Solomon Smith Barney or Defendant AIG Financial Products or Lehman, the value of the cash flows received by San Mateo should be equal to the value of the cash flows paid by San Mateo. As discussed herein, this is based on the logic of rational pricing, which is supposed to underly swap valuations. In fact, however, based on this preliminary analysis, which accounted for transaction costs based on bid/ask spreads, the value of cash flows paid by San Mateo to Defendant Citibank, under the terms of the swap, was $2,296,859 more than the value of the cash flow that Defendant Citibank was obligated to pay San Mateo. This difference equals approximately 2.45% of the principal amount of $23,450,000.

408.    The $40,100,000 portion of the swap deal for which Defendant AIG Financial Products was ultimately the counterpart was similarly negatively valued against San Mateo: the value of the cash flows to be paid by San Mateo to Defendant AIG Financial Products was worth $982,379 less than the cash flows to be paid by Defendant AIG Financial Products to San Mateo. This difference again equals approximately 2.45% of the principal amount of $40,100,000. Another way of looking at this is that San Mateo should have been paid $3,279,309 by Defendants at the initiation of the transactions in order for the swap terms to have been fair. Or to state it differently again, the spread between the swap terms and fair market price was approximately $3.3 million of 245 base points.

409.    It is very difficult to understand, therefore, why Defendant UBS and Defendant Piper Jaffray would have given market quotes to San Mateo that were so close to the terms

offered by Defendant Citibank or Lehman.  Indeed, the most plausible explanation is that

Defendant UBS and Defendant Piper Jaffray were made aware of the terms offered by Citibank

and Lehman/AIG Financial Products and deliberately quoted terms to San Mateo with the

purpose of falsely portraying the terms offered by Citibank and Lehman/AIG Financial Products

as fair.  Indeed, the economically rational thing for Defendant UBS or Defendant Piper Jaffrey to

do would have been to offer San Mateo terms that would have yielded them a lower but still

substantial spread.

3.    **Publicized Evidence Of The Conspiracy's Operation In Municipal Derivative Transactions**

a.    **Pacific Matrix - Stifel Transactions**

410.    One of the most detailed publicized examples of bid-rigging in reinvestment

derivative auctions come from a series of SEC settlements, cumulating in 2002, arising from

claims against multiple participants from all corners of the municipal market. The settlements

arose from claims against, including but not limited to, former Stifel, Nicolaus & Co. investment

banker Robert Cohran, for bid-rigging involving Pacific Matrix, from which Christopher Winters

left in 1992 to form Broker Defendant Feld Winters, and Stifel, Nicolaus & Company, Inc.

("Pacific Matrix - Stifel Transactions").

411.    The Pacific Matrix - Stifel Transactions covered by the SEC settlement involved

the rigging of reinvestment derivative auctions conducted on behalf of the Oklahoma Turnpike

Authority, the Sisters of St. Mary's Health Care Obligated Group, and the Pottawatomie County

Development Authority, in the early 1990s. Information revealed in the SEC settlement of claims

related to these transactions powerfully demonstrates how the mechanisms of the conspiracy

described above, including the roles played by "**last looks**", "**courtesy bids**", and "**kickbacks**"

as well as the important role that **personal relationships** and **repeat business** played in advancing the conspiracy.

### i.    Oklahoma Turnpike Authority GIC

412.    In February 1989, the Oklahoma Turnpike Authority ("OTA") issued $568 million in revenue bonds. A portion of the bond proceeds was to be invested in a GIC. Although bond counsel and the OTA required the GIC to be competitively bid, a vice president of Pacific Matrix and employees of Stifel, Nicolaus & Company, Inc. ("Stifel"), a broker, conspired to ensure that AIG (the corporate parent of Defendants AIG Financial and AIG Sunamerica) won the auction.

413.    According to court filings and press reports, prior to the bidding, Robert Cochran, Stifel's executive vice president, contacted Pacific Matrix and suggested a scheme whereby Pacific Matrix and Cochran would bring in the winning GIC provider and split the fee paid by the provider. The parties contacted AIG and proposed a plan whereby Pacific Matrix and Stifel would provide AIG with a "**last look**" at the bids.

414.    Cochran had prearranged with a Vice President of Pacific Matrix ("VP") to call Pacific Matrix's office once he had learned what the highest submitted bid was and ask for "Wayne" a fictitious name. The VP, in turn, had prearranged with Pacific Matrix's secretary to forward any calls made to "Wayne" to him and his supervisor. By asking for Wayne, Cochran was able to contact the VP without raising suspicions. Cochran then communicated to the VP the amount AIG needed to bid in order to win the auction. The VP relayed this information to AIG which then submitted the winning bid.

415.    In return for receiving the last look, AIG paid $300,000 to Pacific Matrix. Pacific Matrix agreed to split this fee with Stifel and paid the company $150,000 for its involvement in

the conspiracy. In order to facilitate this payment, Pacific Matrix entered into a sham "consulting agreement" with Stifel whereby Stifel would educate Pacific Matrix on forward purchase agreements. Although Stifel did not provide any services to Pacific Matrix, Pacific Matrix paid him $110,000. During a subsequent transaction, Pacific Matrix paid the remaining $40,000 to Stifel.

### ii.     Pottawatomie County (Oklahoma) Development Authority

416.     In 1990, the Pottawatomie County Development Authority ("PCDA") issued bonds valued at approximately $18 million. The PCDA decided to use part of the proceeds from the issue to purchase a GIC. Pacific Matrix, solicited bids for the GIC, and the contract ultimately was awarded to Banque Indosuez. In return for brokering the deal, Pacific Matrix received a fee of $109,025 from Banque Indosuez. Pacific Matrix then kicked back $87,220 of the $109,025 to Stifel.

### iii.     Oklahoma Turnpike Authority Forward Purchase Agreement

417.     In May 1992, the OTA issued approximately $608 million in revenue refunding bonds to advance refund most of its outstanding bonds and to fund proposed turnpike projects. In this transaction, Stifel recommended that the OTA purchase a forward purchase agreement. Again, OTA's bond counsel required that the OTA obtain at least three competitive bids for the forward purchase agreement in order to ensure the fairness of the terms of the ultimate deal; however, unbeknownst to the OTA, Pacific Matrix, with the assistance of Cochran of Stifel, rigged the bidding, this time to ensure selection of Sakura Global Capital, Inc. ("Sakura") as the provider.

418.     At about 3:00 a.m. Pacific time on the morning of the bidding, Pacific Matrix provided Cochran with names of firms that would be willing to enter **"courtesy bids"** later that

day.  Cochran directed Pacific Matrix not to contact any other brokers, thereby preventing them from contacting any "first-tier players."  Cochran also provided Pacific Matrix with the winning bid information that would be submitted by Sakura.  Pacific Matrix relayed this information to the courtesy bidders so they could be assured that their courtesy bids would be below that which would be submitted by Sakura.

419.    Following the transaction, the parties engaged in a series of kickbacks.  Stifel and Sakura each paid Pacific Matrix $50,000.  Sakura also paid an undisclosed brokerage fee of $6.593 million to Stifel in connection with the deal.

### iv.      Sisters of St. Mary's Forward Purchase Agreement

420.    In November 1992, the Sisters of St. Mary's Health Care Obligated Group ("St. Mary's") was the beneficiary of four simultaneous issues of conduit bonds by four separate issuers: the Illinois Health Facilities Authority; the Health and Educational Facilities Authority of the State of Missouri; Dillon County, South Carolina; and the Wisconsin Health and Educational Facilities Authority.  Stifel was a co-managing underwriter for the transaction.  Stifel recommended that St. Mary's enter into a forward purchase agreement.  Although bond counsel required that St. Mary's obtain three competitive bids for the forward, Pacific Matrix again assisted Stifel in ensuring Sakura's selection as the provider.

421.    Pacific Matrix and Stifel conspired to obtain two non-competitive **"courtesy bids"**, while Sakura submitted its winning bid directly to Stifel.  Sakura paid an undisclosed brokerage fee of $100,000 to Stifel in connection with the forward purchase agreement.

### b.      Baum - CDC Funding  Transactions

422.    On November 10, 2006, Defendant Broker Baum announced that it had paid an undisclosed penalty to the IRS for illegally diverting profits from approximately 20 reinvestment

derivative deals worth more than $2 billion, between 1997 and 2001. During the course of the IRS investigation, it was revealed that in several of the deals Defendant Baum rigged the bidding of reinvestment derivative auction so that Defendant Natixis Funding, then known as CDC Funding, would win the contract on terms that constituted a "sweetheart deal" for CDC Funding. According to the IRS, in at least one situation, "CDC had the inside track for the contract because three other bids were late or incomplete."

### c. Baum - Bank of America Transaction (Rural Enterprises of Okla.)

423. Evidence of bid-rigging has also been revealed in an IRS investigation of a reinvestment derivative transaction involving Broker Defendant Baum and Defendant Bank of America in 2000. The deal involved a GIC on a $100 million issue from the Illinois Development Finance Authority sold by Rural Enterprises of Oklahoma. In July 2003, the latter disclosed that Defendant Bank of America made "significant hidden payments" to Defendant Baum & Co. in connection with the deal.

### d. CDR - Bank of America Transaction (City of Atlanta)

424. Bid rigging concerns have also been raised regarding a $453 million GIC entered into by the city of Atlanta in 2005 with Defendant Bank of America, after it won an auction run by Defendant CDR. The IRS has raised questions whether other firms that participated in the auction submitted courtesy bids that assisted Defendant Bank of America win the GIC on artificially depressed terms.

425. An IRS investigation of Defendant Bank of America has uncovered transcripts of telephone conversations involving a Bank of America employee that indicates that Bank of America was itself involved in the submission of courtesy bids. A related February 2005 letter from Charles Anderson, then Field Manager of the IRS's tax-exempt bond division states: "We

have serious concerns about the relationship between Bank of America and CDR relative to this bond issue."

### e. CDR - SocGen Transactions (Lease-to-Own And California School Advance Refunding Deals)

426.    An IRS investigation into over 20 lease-to-own deals, as well as several California School Advance Refunding deals, all involving Provider Defendant SocGen and Broker Defendant CDR has revealed evidence of bid-rigging and secret payments by SocGen and to CDR . According to the IRS, Defendant SocGen made quarterly payments to Defendant CDR for "unspecified purposes" in connection with some of these deals. In another, involving a $27 million bond issued by Pima County, AZ, secret payments made by Defendant SocGen to Defendant CDR have been revealed in connection with the bidding on the associated GIC. Defendant FSA has been identified as one of the four bidders in the GIC auction.

### f. Oxnard California School District And Delano California Joint High School District

427.    CDR and Bank of America were also involved in questionable Municipal Derivatives transactions relating to refunding bonds issued by the Oxnard, California, School District and the Delano, California Joint High School District. Kinsell of Bank America had a hand in these transactions. These transactions are also being investigated as part of the federal investigation described herein.

### g. Baum

428.    In November of 2006, as part of a settlement with the IRS, it was disclosed that Baum illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. The agency found evidence of bid rigging in these deals. With respect to 20 tax-exempt bond issuers from Arizona

to Florida, Baum rigged GIC bids to allow the winning provider, most often CDC, to underpay for the GIC and simultaneously overpay for other investment agreements and remarketing fees, diverting arbitrage profits back to Baum to pay issuance costs. These unlawful bid-riggings included GICs relating to (in addition to the Orange County, Florida, Health Facilities Authority and the Western Virginia Hospital Finance Authority described herein):

    (a)      A $128 million pooled variable-rate bond deal for the Arizona Health Facilities Authority;

    (b)      Two hospital revenue bond issues totaling over $300 million for Ohio Hospital Capital, Inc.;

    (c)      $250 million in revenue bonds sold by Knox County, Tennessee's Health, Educational & Housing Facility;

    (d)      $84 million in pooled variable-rate bonds sold by the Missouri Health & Educational Facilities Authority; and

    (e)      $86.5 million in pooled variable-rate bonds sold by the South Georgia Hospital Authority.

429.     Lail was primarily involved for Baum on most of these deals. For all of them, Gruer of JP Morgan submitted courtesy bids to Baum. On all of these transactions, except the Arizona Health Facilities Authority transaction, a non-defendant provider, whose identity is being kept confidential pursuant to an agreement with the Bank of America, submitted courtesy bids as well. CDC won all six of these transactions. As a kickback, CDC paid a large fee directly into Lail's personal account.

430.     The IRS has alleged that JP Morgan, CDC, Merrill Lynch, Baum, and BofA have conspired in manipulating these and/or other derivative transactions.

114

### h. Butler Area School District Swaptions

431.    The Butler Area School District and Butler County General Authority have brought suit against JP Morgan for anti-competitive collusion in connection with a 2003 swaption and a Constant Maturity Swap Amendment dated August 22, 2006. Butler has identified Gregory R. Zappala, Nicholas Falgione, and Michael Lena of JP Morgan, and Stallone, David J. Eckhart, Michael Garner and Robert Jones of IMAGE as the individuals who manipulated this transaction.

### i. North Carolina University State Student Aid Association

432.    In August 2004, a Bank of America employee and a Wachovia employee discussed the pricing of a swap transaction for the NC State Student Aid Association that the Defendants were splitting. This transaction was not bid out.

### j. Jefferson County Swaps

433.    Another well publicized example includes the fleecing of Jefferson County, Alabama, whereby Defendants Bank of America, JP Morgan, Bear Stearns, and co-conspirator Lehman Brothers, Inc. earned $120 million in fees (six times the prevailing rate) for $5.8 billion in interest rate swaps facilitated by Defendant CDR, which have brought the county to the brink of bankruptcy. Describing the situation, Christopher "Kit" Taylor, former director of the Municipal Securities Rulemaking Board, connected the situation with the conspiracy at the heart of this Complaint: "In Jefferson County's case, the people who were allegedly doing the price fixing were right at the center of the scandal."

### k. Biola University (California) Swap

434.    A 2007 lawsuit filed by Biola University ("Biola") against Bank of America and BNP Paribas ("BNP"), sheds further light on the collusion between brokers and providers. In

2002, Defendant Bank of America recommended that Biola University enter into a interest rate swaps with BNP. Bank of America represented to Biola that the swaps BNP provided would be priced "on market" and that the swap prices were objectively determined by current market rates. Unbeknownst to Biola, Bank of America and BNP collusively set the interest rate tied to the swaps and included excessive markups which Defendants did not disclose. After Biola executed the swap agreement, these markups were secretly transferred to Bank of America through an undisclosed mirror swap between it and BNP. As part of the undisclosed mirror swap, Bank of America would <u>kick back</u> a portion of the fees to BNP. (Soruce *Biola University v. Bank of America et. al.*, Plaintiffs Memorandum of Law in Opposition to Motion to Dismiss).

## VI.

## <u>SAN MATEO MUNICIPAL DERIVATIVE TRANSACTIONS</u>

435.    A preliminary investigation by San Mateo has identified the following Municipal Derivative transactions that occurred during the period on which the DOJ has focused investigation, discussed herein, and that were affected by the conspiracy alleged herein.

436.    In terms of total commerce, San Mateo's preliminary investigation has revealed that, during this period San Mateo invested a total of $96,180,489 of bond proceeds invested in reinvestment derivatives, and entered into an interest rate swap associated with $133,550,000 worth of bond issuances.

437.    As discussed above, a statistical analysis of bidding patterns in the auctions for several of these derivatives is probative of the types of illegal conduct that have been identified by government authorities and others investigating the conspiracy alleged herein.

438.    Moreover, the operation of Defendants' illegal conspiracy depended heavily on personal relationships between representatives of Defendants and the repeated participation of

the same representatives in multiple transactions. As the following descriptions show, in many of San Mateo's Municipal Derivative transactions, the same Defendants participated and were represented in the transactions by the same individuals. This allowed Defendants' conspiracy to operate and thrive in San Mateo's Municipal Derivative transactions.

439. As a result of the industry-wide and inter-transactional quality of the Defendants' illegal conspiracy, ***all*** of the Municipal Derivative transactions entered into by San Mateo during the period of the conspiracy, including but not limited to those transactions described bellow, were affected by the conspiracy and San Mateo was injured thereby. The injuries suffered by San Mateo thereby include but are not limited to: receiving a rates of return on reinvestment derivatives that were artificially depressed and uncompetitive, receiving swap rates that were artificially depressed and uncompetitive, receiving terms on other kinds of municipal derivatives that were artificially depressed and uncompetitive, entering into municipal derivative transactions with providers that carried increased credit risks which were not reflected in the terms of the transaction, engaging brokers for transactions that had conflicts of interest with San Mateo, and paying uncompetitive and inflated fees and costs associated with the transactions.

**A.    Reinvestment Derivative Transactions**

**1.    JPFA Lease Revenue Bonds (San Mateo County Health Center) 1994 Series A - Project / Acquisition Fund GICs**

440. On January 13, 2000, San Mateo entered into a GIC with AIGMFC for the project/acquisition fund from the JPFA Lease Revenue Bonds San Mateo County Health Center 1994 Series A ("1994 JPFA bonds"). Prior to entering into the GIC, San Mateo solicited bids from multiple Municipal Derivative providers. San Mateo received the following bids:

- AIGMFC                          6.582%

- Defendant MBIA              6.520%

- Defendant CDC        6.510%

- Ambac        6.410%

- Defendant BayernLB        6.410%

- WestLB        6.280%

- FGIC        6.110%

441.    In the auction for the GIC, AIGMFC was represented by Keith Stein; Defendant MBIA was represented by Laura Schneider; Defendant CDC was represented by Julie McNally; Ambac was represented by John Tsigakos; Defendant BayernLB was represented by Frank Postiglione; WestLB was represented by Mark Randles; and FGIC was represented by Steve Goldberg.

442.    The broker involved in this transaction was Fund Services Advisors, Inc.  George Majors, a representative for Fund Services Advisors, Inc., awarded the bid to AIGMFC for this GIC transaction.  The bid date and time for this transaction was January 13, 2000 at 11:30 A.M. EST.

**2.    JPFA Lease Revenue Bonds (Youth Services Campus) 2003 Series A, B, and C - Reserve and Interest Fund GICs**

443.    On November 25, 2003, San Mateo entered into two GIC transactions with Defendant AIG Financial for the reinvestments of $1,335,500 and $218,000 in bond proceeds from the JPFA Lease Revenue Bonds, Youth Services Campus, 2003 Series A, B and C ("2003 JPFA Youth Services bonds").  Prior to entering into the GICs, San Mateo solicited bids from multiple Municipal Derivative providers.  San Mateo received the following bids:

**Series A and Series B Reserve and Interest Reserve Fund**

- Defendant AIG Financial        5.03%

- Defendant MBIA        4.91%

| | | |
|---|---|---|
| • | Defendant Rabobank | 4.91% |
| • | Defendant FSA | "Pass" |
| • | Ambac | "Pass" |

444.     In the auction for the GIC, Defendant AIG Financial was represented by Chris

Toft; Defendant MBIA was again represented by Laura Schneider; Defendant Rabobank was

represented by John Gallagher; Defendant FSA was represented by Steve Goldberg; and Ambac

was represented by Jessica Carcaterra.

**Series C Reserve and Interest Reserve Fund**

| | | |
|---|---|---|
| • | Defendant AIG Financial | LIBOR - 20 bp |
| • | Defendant Rabobank | LIBOR - 27 bp |
| • | Defendant MBIA | "Pass" |
| • | Defendant FSA | "Pass" |
| • | Ambac | "Pass" |

445.     In the auction for the GIC, Defendant AIG Financial was again represented by

Chris Toft;  Defendant Rabobank was again represented by John Gallagher; Defendant MBIA

was again represented by Laura Schneider; Defendant FSA was again represented by Steve

Goldberg; and Ambac was again represented by Jessica Carcaterra.

446.     On November 25, 2003, San Mateo entered into two GICs with Defendant MBIA

for the reinvestments of $15,645,748 and $3,908,249 in bond proceeds from the 2003 JPFA

Youth Services bonds.  Prior to entering into the GICs, San Mateo solicited bids from multiple

Municipal Derivative providers.  San Mateo received the following bids:

**Capitalized Interest Fund (Fixed)**

| | | |
|---|---|---|
| • | Defendant MBIA | 1.96% |

- Defendant AIG Financial      1.93%

- Defendant Rabobank      1.85%

- Defendant Saloman Smith Barney      1.84%

- Defendant FSA      "Pass"

- Ambac      "Pass"

447.    In the auction for the GIC, Defendant MBIA was again represented by Laura Schneider; Defendant AIG Financial was again represented by Chris Toft;  Defendant Rabobank was again represented by John Gallagher; Defendant Salomon Smith Barney was represented by Peter Colquitt; Defendant FSA was again represented by Steve Goldberg; and Ambac was again represented by Jessica Carcaterra.

### Capitalized Interest Fund (Variable)

- Defendant MBIA      LIBOR - 15 bp

- Defendant AIG Financial      LIBOR - 20 bp

- Defendant Rabobank      LIBOR - 27 bp

- Defendant Salomon Smith Barney      LIBOR - 45 bp

- Defendant FSA      "Pass"

- Ambac      "Pass"

448.    In the auction for the GIC, Defendant MBIA was again represented by Laura Schneider; Defendant AIG Financial was again represented by Chris Toft;  Defendant Rabobank was again represented by John Gallagher; Defendant Salomon Smith Barney was again represented by Peter Colquitt; Defendant FSA was again represented by Steve Goldberg; and Ambac was again represented by Jessica Carcaterra.

449. The broker involved in these four GIC transactions was Bond Logistix. The representatives from Bond Logistix involved in awarding the bids were Eric Chu and Amy Kron. Bidding occurred on November 17, 2003 at 2:00 P.M. EST.

**3.     Other San Mateo GIC Transactions Without Bidding Documents**

450. San Mateo entered into multiple GIC transactions with various Municipal Derivative providers:

- On January 15, 1998, San Mateo entered into two GICs with Defendant MBIA for the reinvestments of $3,129,631.25 for the Capitalized Interest Fund and $22,289,064.99 for the Construction Fund in bond proceeds from the Lease Revenue Bonds (Capital Projects) 1997 Series A. The broker for this GIC transaction was Salomon Smith Barney.

- San Mateo entered into a GIC with Scott Fetzer Financial Group for the reinvestment of $16,143,433.99 and with Berkshire Hathaway for the reinvestment of $1,526,538.52 in bond proceeds from the Lease Revenue Bonds (Capital Projects) 1995 Series A. The broker for this GIC transaction was Astor Wood Financial.

- San Mateo entered into GIC with Republic National Bank with an interest rate set at 5.860% from the Lease Revenue Bonds Series of 1993 (North County Satellite Clinic Project).

- San Mateo entered into a GIC with FGIC with an interest rate for the reinvestment set at 6.75% from the Lease Revenue Bonds (Capital Projects Program) 1993 Refunding Series A.

4. **Debt Service Forward Sale Agreement - San Mateo County Joint Powers Financing Authority, Lease Revenue Bonds 2001 Series A and B**

451. San Mateo entered into one forward purchase agreement where Defendant PaineWebber acted as their broker. Michael Welty, a representative for Defendant PaineWebber, coordinated the bidding process. On November 16, 2001, San Mateo entered into two GICs with Defendant Wachovia (then known as First Union Bank) in the Debt Service Forward Agreement, for the reinvestment of $2,548,223.78 and in the Construction Fund Agreement, for the reinvestment of $29,436,103.09. Prior to entering into the GICs, San Mateo solicited bids from multiple Municipal Derivative providers. San Mateo received the following bids:

**Debt Service Reserve Fund**

| | | |
|---|---|---|
| • | Defendant Wachovia | 5.53% |
| • | Defendant Bear Stearns | 5.525% |
| • | Defendant Salomon Smith Barney | 5.415% |
| • | Lehman | 5.40% |
| • | Defendant Bank of America | 5.38% |
| • | Defendant Morgan Stanley | 5.37% |

452. In the auction for the GIC, Defendant Bear Stearns was represented by Anne Michelle Lyons; Defendant Salomon Smith Barney was represented by Peter Colquitt; Lehman was represented by Anatoly Zelikoff; Defendant Bank of America was represented by James B. E.; and Defendant Morgan Stanley was represented by Kevin Schwartz.

**Construction Fund**

| | | |
|---|---|---|
| • | Defendant Wachovia | 3.20% |
| • | Defendant Salomon Smith Barney | 3.21% |
| • | Defendant Bear Sterns | 3.20% |

- Defendant Morgan Stanley 3.03%

- Lehman 3.00%

- Defendant Bank of America 2.64%

453.    In the auction for the GIC, Defendant Salomon Smith Barney was again represented by Peter Colquitt; Defendant Bear Stearns was represented by Anne Michelle Lyons; Defendant Morgan Stanley was represented by Kevin Schwartz; Lehman was represented by Anatoly Zelikoff; and Defendant Bank of America was represented by James B. E.

**Blend of Debt Service and Construction Funds**

- Defendant Wachovia 4.65%

- Defendant Bear Sterns 4.65%

- Defendant Salomon Smith Barney 4.4425%

- Lehman 4.40%

- Defendant Morgan Stanley 4.10%

- Defendant Bank of America 3.63%

454.    In the auction for the GIC, Defendant Bear Stearns was represented by Anne Michelle Lyons; Defendant Salomon Smith Barney was again represented by Peter Colquitt; Lehman was represented by Anatoly Zelikoff; Defendant Morgan Stanley was represented by Kevin Schwartz; and Defendant Bank of America was represented by James B. E.

455.    Mike Welty sent further information via email on September 6, 2001 at 10:13 A.M. regarding this GIC transaction to the following individuals: Jeannie Bissell, Jeffrey C. Hyman, Ann Michelle Lyons, Jamie Lister, Jay Saunders, Kevin Schwartz, Martin McConnell, and Peter Colquitt.

B.     **Swap Transactions**

    1.     **JPFA Lease Revenue Bonds (Youth Services Campus) 2003 Series A, B, and C**

456.     San Mateo entered into two SWAP agreements with Defendant Citibank and one SWAP agreement with Defendant AIG Financial.  The transaction is discussed elsewhere herein.

C.     **Repeat Appearances Of The Same Representatives Of The Same Defendants In San Mateo Municipal Derivative Transactions**

457.     Defendants' conspiracy to rig the auctions for Municipal Derivatives involved, but was not limited to, the submission by the Provider Defendants and/or Broker Defendants of a pre-selected winning bid, losing courtesy bids or passes.  Defendants' conspiracy depended on not only the repeat appearances of the same Defendants in multiple Municipal Derivative transactions, but also the repeat appearances of the same representatives of those Defendants in multiple Municipal Derivative transactions.

458.     An analysis of the bid documents from Municipal Derivative auctions conducted on behalf of San Mateo shows that the same representatives bid on the same auctions on behalf of the same Provider Defendants for the same Municipal Derivative transactions.  Six representatives for six provider Defendants appeared in four transactions together.  Five representatives from five different Provider Defendants submitted bids in four auctions and one representative from one Provider Defendant submitted bids on two of the four transactions. Laura Schneider of  Defendant MBIA, Steve Goldberg of  Defendant FSA, Chris Toft of Defendant AIG, John Gallagher of  Defendant Rabobank, and Jessica Carcaterra of Defendant Ambac, each submitted bids for the following Municipal Derivative transactions entered into by San Mateo:

- JPFA Lease Revenue,Youth Services Campus 2003 Series A and B ("JPFA Youth Services 2003") Reserve and Interest Fund;

- JPFA Youth Services 2003 Series C Reserve and Interest Fund;

- JPFA Youth Services 2003 Capitalized Interest (Fixed) Fund; and

- JPFA Youth Services 2003 Capitalized Interest (Variable) Fund.

459.    Peter Colquitt of Provider Defendant Citigroup submitted bids for two out of the four transactions including: the JPFA Youth Services 2003 Capitalized Interest (Fixed) Fund, and the JPFA Youth Services 2003 Capitalized Interest (Variable) Fund.

**VII.**

## DOJ ANTITRUST DIVISION EMPANELS GRAND JURY TO PURSUE INDUSTRY-WIDE CRIMINAL INVESTIGATION - BOFA SEEKS AMNESTY

460.    As mentioned above, in the fall of 2006, the Antitrust Division of the DOJ, through its spokeswoman Kathleen Blomquist, publically announced that it had begun an "investigation of anticompetitive practices in the municipal bond industry." Soon there after it was reported that a criminal grand jury had been empaneled, from which subpoenas were issued to over 25 Broker and Provider Defendants and search warrants authorizing FBI raids, on November 15, 2006, upon the offices of Broker Defendants CDR, IMAGE and Sound Capital.

461.    According to a proffer provided by Defendant Bank of America to San Mateo, outside counsel had discovered evidence suggesting the existence of violations of antitrust laws by members of Bank of America's municipal derivative desk in 2004, which they brought to the attention of the DOJ. The DOJ explicitly instructed Bank of America's counsel to keep this information confidential and not to take any actions that would alert other persons at Bank of America or outside Bank of America that this evidence had been discovered. The DOJ's investigation has apparently been conducted in cooperation with investigations by the IRS and

SEC of certain municipal derivative transactions for violations of tax and securities laws. In the course of these investigations the IRS and SEC has apparently discovered evidence that strongly suggested that participants in such transactions had also violated the criminal antitrust laws, which was brought to the DOJ's attention. Again, as Charles Anderson of the IRS's put it in 2007:

> I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg. . . *I would not be surprised to see bankers and lawyers go to jail*.

(emphasis add).

462. The Provider and Broker Defendants that directly or through their corporate parent or subsidiary received subpoenas from the DOJ's antitrust division are: BofA; UBS; JP Morgan; Bear Stearns; Piper Jaffray; Wachovia; AIG Financial; AIG Sunamerica; FSA; FGIC; GE Funding; GE Trinity; Genworth; Natixis; SocGen; XL; CDR; Feld Winters; Winters; Natixis Funding; Baum; Kinsell; Sound Capital; IMAGE; First Southwest; Morgan Keegan; and Shokley.

463. The subpoenas sought documents, email, notes, tapes or notes of phone conversations from as far back as 1992 regarding: "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified academy bonds [i.e. reinvestment-type Municipal Derivatives] [, as well as] related transactions involving the management or transferal of the interest rate risk associate with those bonds [i.e. hedging-type Municipal Derivatives], including but not limited to guaranteed investment contracts; forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and

swapoptions." The subpoena further requested documents (broadly defined) related to "competitive bidding" for Municipal Derivatives.

464.     On the grounds that the investigation is ongoing, the DOJ has rebuffed attempts by Plaintiffs to gain access to detailed information regarding the investigation or its results. However, certain public information, in particular information contained in the SEC filings of certain Defendants and Financial Industry Regulatory Authority ("FINRA") filings by certain current and former representatives of Defendants, provide pictures of how the investigation has progressed, at least as to, certain Defendants. Notable in these pictures is the evolution of the investigation as it relates to certain Defendants that have provided this information.

465.     Furthermore, it is clear that the investigation is ongoing and developing. On July 2, 2009 the City of Riverside received subpoena duces tecum from the DOJ's Antitrust Division in the S.D.N.Y seeking documents concerning the Municipal Derivatives entered into by the City of Riverside in association with a $110,000,000 bond issuance in 2004, and the various transactions by which the City of Riverside entered into the Municipal Derivatives. The Municipal Derivatives entered into by the City of Riverside in association with this issuance include: (a) a GIC of $1,714,913.06 entered into with Defendant MBIA on June 10, 2004, on which Defendant FSA, Defendant Rabobank, Defendant CDC, Defendant Transamerica, Defendant Bayern LB, and Defendant Societe General also bid and on which Defendant GE Trinity, Defendant Solomon Smith Barney, and Defendant JP Morgan were solicited for bids and passed; (b) a GIC of $6,466,290.63 entered into with Defendant MBIA on June 10, 2004, on which Defendant Bayern LB, Defendant Rabobank, Defendant CDC, Defendant Societe Generale, Defendant FSA, Defendant Transamerica, and Defendant GE Trinity Plus also bid and on which Defendant Solomon Smith Barney and Defendant JP Morgan were solicited for bids

and passed; (c) a GIC of $93,018,253.54 entered into with Defendant GE Trinity Plus on June 10, 2004, on which Defendant Rabobank, Defendant CDC, Defendant Transamerica, Defendant FSA, Defendant Bayern LB, Defendant Societe Generale, Defendant Solomon Smith Barney, and Defendant MBIA also bid, and on which Defendant JP Morgan was solicited for a bid and passed; (d) a $82,500,000.00 swap entered into with Defendant Merrill Lynch on September 16, 2005, on which Defendant Bank of America and Defendant Bear Stearns also submitted bids; and (e) a $2,315,561.94 GIC entered into with Defendant FSA on May 14, 2008, and on which Defendant MBIA and Defendant Rabobank submitted bids and on which bids were solicited from Defendant BofA, Defendant JP Morgan, Defendant Wachovia, and Defendant Wells Fargo, none of whom replied to the solicitation.

466.    Moreover, as alleged herein, the Connecticut Attorney General Richard Blumenthal has gone to the Connecticut Superior Court in Hartford to compel Defendant FSA to turn over 600 hours of audio recordings already released to the SEC and DOJ in connection with their investigation of the municipal derivatives industry. According to the Attorney General Blumenthal, these tapes contain "a rich source of evidence of potential violations" of state antitrust laws. These efforts underscore the fact that discovery in this matter is ongoing and that the allegations contained herein relate to just a portion of the market wide conspiracy.

467.    The most dramatic evolution, of course, can be seen in Defendant BofA. Approximately one and half months after the DOJ's announcement of its investigation, Defendant BofA announced that it sought and received entry into the DOJ's leniency program under ACPERA, effectively publically admitted to its participation in the illegal activities being investigated by the grand jury and.

468. The fact that Defendant BOA announced its entry into the DOJ's leniency program soon after the DOJ publically announced the existence of its investigation and is apparently the only Defendant so far that has been admitted into the program does not, in any way, indicate that Defendant BofA is the only Defendant that violated federal criminal antitrust laws or even that they Defendant BofA faces the greatest potential criminal liability. Rather, it means that Defendant BofA was quickest on the draw. In fact, according to representatives of Defendant BofA, BofA entry into the leniency program in 2004. BofA's representatives at the time were specifically told by the DOJ to keep its entry confidential and not take acts, such as interviewing BofA representatives, that could alert persons of the DOJ's investigation

469. The leniency program under ACPERA is primarily a *first-through-the-door* program. Only the first member of a conspiracy to admit their participation in an illegal anti-competitive conspiracy and provide adequate cooperation is given amnesty from criminal prosecution. Other members of the conspiracy can only receive reductions of their sentences if they admit to their participation in the conspiracy and only to an extent that their cooperation provides the DOJ information beyond that which the original amnesty applicant has already provided.

470. The scope of the subpoenas, both as to the number of companies that received them, over 25, and the subject matter of information sought " competitive bidding" for Municipal Derivatives, makes clear that the DOJ's investigation is not as to single-firm conduct, but rather the conduct of a very significant number of participants in the industry. Indeed, according the descriptions of the investigation contained in many Defendants' SEC filings, the investigation is "industry-wide."

471.    Moreover, the fact that a ***criminal*** grand jury was empaneled by the DOJ supports this conclusion.  According to the DOJ's *Antitrust Division Manuel*, Chap. III.C.5, "In general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price-fixing, bid rigging and horizontal customer and territorial allocations."

472.    Thus, again, that fact that Defendant BofA applied for and gained entry into the leniency primarily indicates two things: (1) Defendant BofA participated in a criminal anti-competitive conspiracy related to Municipal Derivatives market; and (2) Defendant BofA was the first conspirator to get through the DOJ's door.

473.    As the description above of particular Municipal Derivative transactions in which there can be seen plausible evidence of the conspiracy shows and information proffered by BofA to San Mateo demonstrates, the conspiracy involved far more than just Defendant BofA.  The descriptions below of the progress of the investigation of the conspiracy taken from the SEC and FINRA filings of Defendants and their current and former representatives reinforce this conclusion.

474.    These description show how the DOJ after its initial demands for documents has followed up with subsequent demands, which strongly indicates that the production that Defendants made in response contained evidence that was at least suggestive of the Defendants' participation in the conspiracy and justified further inquiry.

475.    The descriptions also reveal that certain current and former representatives of certain Defendants have received "target letters" from the DOJ.  It is the DOJ policy to classify representatives from whom information is sought into two categories "targets" and  "subjects."  In some U.S. Attorney Offices a third category, "witnesses," is also used.  A "subject" of a grand

jury investigation is an representative whose conduct is within the scope of the grand jury's investigation, but against whom there is not yet substantial evidence suggesting or refuting that they committed a crime. A "target" is an representative against whom the prosecutor or grand jury has substantial evidence to link to a crime, and who, in the judgment of the prosecutor, is likely to be indicted. A "witness," if the classification is used, is an representative whom the evidence suggests has not committed a crime but who may have evidence of a crime's commission by another person. The DOJ notifies representatives that they are "targets," so that the representative can be advised of and made aware of his or her due process rights before he or she gives testimony before a grand jury. Accordingly, the DOJ almost never unilaterally notifies an representative of his or her status on the hierarchy of its investigation unless and until it notifies him or her that he or she is a target. Thus, the fact that the current and former representatives of these Defendants have received target letters is strongly suggestive that while working as representatives of Defendants these representatives violated criminal antitrust laws for which these Defendants would be liable.

476. As a March 3, 2008 *Bond Buyer* article noted:

> Market participants said Friday that the individuals and firms known to have been subpoenaed or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicly disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but banks and investment advisory firms are not subject to the same disclosure requirements.

* * *

> "Usually by the time an individual gets a target letter, the investiation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms,"said John F. Markey, a partner at Mintz Levin Cohn Ferris Glovsky &

131

> Popeo PC in Boston, and former federal and state prosecutor.
> Markey said that in a target letter, "The Department of Justice is
> informing an individual or his attorney that it already has
> **substantial evidence** of the commission of a federal crime. It
> usually is a **sign that the individual is going to be indicted** and it
> may **prompt an attempt at a plea bargain or cooperation deal**
> with the government."

(Emphasis added).

477.    Finally, the descriptions also reveal that several Defendants or their current or

former representatives have received Wells Notices from the SEC related to its parallel

investigation. A Wells Notice is similar to a target letter by the DOJ but reflects the civil as

opposed to criminal orientation of most SEC investigations. A Wells Notice indicates that the

SEC staff has determined it may bring a civil action against an representative or firm, and

provides the representative or firm with the opportunity to provide information as to why the

enforcement action should not be brought. The important distinction between Wells Notices and

target letters for our purposes is, as the foregoing description indicates, that Wells Notices are

sent to both representatives and entities. Given the significant overlap between the SEC and DOJ

investigations, it is reasonable to assume that the DOJ has substantial evidence against any

Defendant that has received a Wells Notice.

A.    **BofA Admits To Participation In Conspiracy - Enters DOJ Leniency Program**

478.    On January 11, 2007, Defendant Bank of America effectively admitted to the

existence of  the conspiracy alleged herein and its participation in it:  seeking entry and gaining

acceptance into the DOJ Antitrust Division's Corporate Leniency program, whereby it will gain

certain immunities and leniencies in exchange for cooperating with government agencies and

private plaintiffs. Its SEC Form 10-K for fiscal year 2007 states:

Municipal Derivatives Matters

The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA [Defendant Bank of America] from the early 1990s to date. The activities at issue in these <u>industry-wide</u> government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, BANA received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.

*** 

On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed.

479. The leniency that Bank of America has conditionally received from the DOJ does not extend to its current or former employees. These individuals are still subject to criminal prosecution. The following former employees of Bank of America have received target letter from the Antitrust Division of the DOJ, informing them of the DOJ's intention to seek their criminal indictment related to the DOJ's investigation of the conspiracy alleged herein: Douglas Campbell, a former Sales Team Manager at Bank of America, who was also formerly employed by Provider Defendant Piper Jaffray and the corporate predessor of Defendants Wachovia and Wells Fargo; Dean Pinard, former Manager of the Derivatives Department of Bank of America; Phil Murphy, former Head Managing Director of the Derivatives Department of Bank of

America; and Jay Saunders, a former member of Bank of America municipal derivatives desk and Defendant Wachovia's Derivatives Marketing Department.

480.    Reports have indicated that a number of key derivatives officials at Bank of America were placed on "administrative leave," including Dean Pinard, who managed the bank's derivatives department.

481.    Bank of America has received a Wells notice from the SEC, informing Bank of America that the SEC intended to bring a civil action against Bank of America related to the conspiracy alleged herein.  Bank of America has also received subpoenas and/or formal investigatory demands from State Attorneys General investigating the conspiracy alleged herein.

**B.    Other Defendants Report That They And Their Former Employees Are Under Investigation Related To Their Involvement In The Conspiracy**

482.    The DOJ's decision to conditionally accept Defendant Bank of America into its leniency program provides clear evidence that the DOJ believes that antitrust violations occurred in the Municipal Derivatives Industry and Defendant Bank of America was involved in these violations.

483.    It is axiomatic, however, that Defendant Bank of America could not have acted alone in the bid-rigging conspiracy, and the allegations above related to particular auctions and kickbacks make it clear that this was not the case.  Accordingly, public filings by other Defendants and their employees, as well as other publically available information, indicate strongly that the DOJ, the SEC, and a consortium of State Attorneys General that are investigating the conspiracy, believe that the other named Defendants also participated in the conspiracy.

1.      **UBS**

484.    UBS and its employees have been facing intensifying scrutiny from investigators

regarding their involvement in the conspiracy.  In its Fourth Quarter 2006 Report, the company

reported that it was under investigation for its role as a provider:

> In November 2006, UBS received subpoenas from the U.S. Department of
> Justice, Antitrust Division, and the U.S. Securities and Exchange Commission. These
> subpoenas concern UBS's conduct relating to derivative transactions entered into
> with municipal bond issuers, and to the investment of proceeds of municipal bond
> issuances.

485.    Peter Ghavami, an employee at UBS from 1999 to December 2007, has been

implicated in the DOJ's investigation.   A November 30, 2007 FINRA report states in part that:

> After Mr. Ghavami's resignation [from UBS], UBS was advised by his counsel that
> Mr. Ghavami received a letter from the Antitrust Division, Department of Justice,
> notifying him that he is a target of a grand jury investigation concerning antitrust and
> other violations involving contracts related to municipal bonds.

486.    On February 4, 2008, UBS received a Wells Notice advising it that the SEC was

considering bringing a civil action against UBS in connection with its bidding of various

financial instruments associated with municipal securities.

2.      **JP Morgan**

487.    JP Morgan and its employees have also been targeted by investigators.

JP Morgan, in a 2007 10-K, acknowledged that the firm had produced documents and other

information relating to parallel investigations by the SEC and the antitrust division of the DOJ

relating to possible antitrust and securities violations in connection with the bidding or sale of

guaranteed investment contracts and derivatives to municipal issuers.

488.    On March 18, 2008, the Philadelphia Office of the SEC sent JP Morgan Securities

a Wells Notice stating that it intended to bring civil charges against the company in connection

with its investigations.  According to JP Morgan's 2008 10-K, JP Morgan Securities responded

to that Wells Notice and also responded to a separate Wells Notice the SEC provided to Bear, Stearns & Co., Inc. (now known as JP Morgan Securities Inc.) on February 1, 2008. The investigation of Bear Sterns is described separately below.

489.    On April 21, 2009, the SEC advised JP Morgan that the Commission had authorized the filing of an enforcement action against the firm alleging violations of the federal securities laws and rules promulgated by the Municipal Securities Rulemaking Board.

490.    Several former JP Morgan employees have also been the target of SEC and DOJ investigations.

- In a November 30, 2007 FINRA report, Samuel Michael Gruer, an employee with JP Morgan from 2000 to 2006, acknowledged that he was the target of the grand jury investigation being conducted in the S.D.N.Y. concerning antitrust and other violations involving contracts related to municipal bonds. Four months later, in a March 18, 2008 FINRA report, Gruer acknowledged that he received notice that the SEC was considering bringing a civil injunctive action, and/or instituting administrative proceedings against him in connection with its investigation.

- A December 1, 2007 FINRA report noted that Sholmi Raz was the target of a grand jury investigation concerning possible antitrust and other violations involving contracts related to municipal bonds. Raz was an employee at JP Morgan from 1998 to 2003.

- A December 12, 2007 FINRA report noted that James Leonard Hertz had been advised that he is a target of a grand jury investigation regarding municipal securities business. Hertz had been with the JP Morgan from 1998 until his employment was terminated in December of 2007.

- Several months later, a March 11, 2008 FINRA report noted that Douglas Willis MacFaddin received notice from the DOJ that he was the target of a grand jury investigation regarding municipal securities.  MacFaddin had been with the JP Morgan from 1998 until his employment was terminated in March of 2008.

### 3. **Bear Stearns**

491. Bear Sterns and its employees have been the target of a systematic investigation by the Antitrust Division of the DOJ and the SEC.

492. In a November 30, 2007 FINRA report, Patrick Lyons Marsh, a Bear Stearns employee from 2000-2005, stated that he had been notified that he was a target of the grand jury investigation being conducted in the S.D.N.Y. concerning antitrust and other violations involving contracts related to municipal bonds.

493. The SEC investigation of Mr. Marsh and Bear Stearns appears to be bearing fruit. In a February 2, 2007 FINRA report, Marsh noted that he had been advised that the staff of the SEC was considering recommending that the Commission bring a civil injunctive action and/or institute administrative proceedings against him alleging that he violated section 17(A) of the Securities Act, Section 10(B) of the Exchange Act and Rule 10B-5 thereunder in connection with the bidding of various financial instruments associated with municipal securities.

494. In a January 8, 2008 FINRA notice, it was reported that Stephen Andrew Salvadore, a Bear Stearns employee from 1999 to June 2008,  received a letter stating that he was a target of a grand jury investigation being conducted by the US Department of Justice in the Southern District of New York concerning antitrust and other violations involving contracts related to municipal bonds.

495.     In Bear Stearns' February 2008 10-Q, the company acknowledged that the Antitrust Division of the DOJ and the SEC were investigating possible anti-competitive bidding practices in the municipal derivatives industry involving various parties, including Bear Stearns, from the early 1990's to date.  The company noted that the activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities, and other issuers of tax-exempt bonds.

496.     On February 1, 2008, Bear Stearns received a Wells Notice advising it that the SEC was considering bringing a civil injunctive action and/or an administrative proceeding in connection with the company's bidding for various financial instruments associated with municipal securities.

497.     In its 2008 10-Q, Bear Stearns reported that a group of State Attorneys General and the Office of the Comptroller of the Currency ("OCC") had also opened investigations into the bidding process for municipal derivatives.  Bear Stearns acknowledged that it produced documents and other information to those investigators.

**4.     <u>Piper Jaffray</u>**

498.     Piper Jaffray's 2007 10-K describes the breadth of the government's investigation into it and other providers' behavior:

> We have received subpoenas and requests for information from, and we are responding to, the SEC and the U.S. Department of Justice ("DOJ") Antitrust Division, which are conducting **<u>broad</u>**, **<u>industry-wide investigations</u>** of anticompetitive and other practices relating to the marketing, providing or brokering of contracts involving the investment or reinvestment of proceeds of certain tax-exempt bond issues, including guaranteed investment contracts, derivatives and other investment securities.  In December 2007, the DOJ notified one of our employees, whose employment subsequently was terminated, that he is regarded as a target of the investigation.

(Emphasis added).

499. The targeted employee was likely James Herbert Towne, an employee with the company from 1996 to January 2008, who, according to a December 5, 2007 FINRA notice, was tied to "potential antitrust and other violations involving contracts related to municipal bonds."

### 5. **Wachovia**

500. In its 2007 10-K, Wachovia reported that:

The Department of Justice ("DOJ") and the SEC, beginning in November 2006, have been requesting information from a number of financial institutions, including Wachovia Bank, N.A.'s municipal derivatives group, generally with regard to competitive bid practices in the municipal derivative markets. In connection with these inquiries, Wachovia Bank, N.A. has received subpoenas from both the DOJ and SEC seeking documents and information. The DOJ and the SEC have advised Wachovia Bank, N.A. that they believe certain of its employees engaged in improper conduct in conjunction with certain competitively bid transactions and, in November 2007, the DOJ notified two Wachovia Bank, N.A. employees, both of whom are on administrative leave, that they are regarded as targets of the DOJ's investigation.

501. A November 30, 2007 FINRA report identified Martin McConell, an employee at Wachovia from 2005-2008, as a target of DOJ's criminal investigation of the conspiracy allegation. The report stated that, "Mr. McConnell has been notified in writing that he is regarded as a target of a grand jury investigation being conducted in the Southern District of New York concerning antitrust and other violations involving contracts related to municipal bonds."

502. The government's investigation of Wachovia did not stop with subpoenas and target letters. In its June 2008 10-Q, Wachovia reported that in connection with the bidding of various financial instruments associated with municipal securities, the SEC was considering recommending the institution of civil and/or administrative proceedings against the company.

503. Defendant Wells Fargo, in the company's annual 2008 report, noted these developments and added that the two Wachovia employees who had received target letters from the DOJ had been terminated.

6.     **FSA**

504.     On November 15, 2006, FSA received a subpoena from the Antitrust Division of DOJ issued in connection with an ongoing criminal investigation of bid rigging of awards of municipal GICs.  On November 16, 2006, it receive a subpoena from the SEC related to an ongoing industry-wide civil investigation of brokers and providers of municipal GICs.  The subpoenas requested that the company furnish to the DOJ and SEC records and other information with respect to the company's municipal GIC business.

505.     In its 2006 10-K, FSA acknowledged that it is at risk that information provided pursuant to the subpoenas or otherwise provided to the government in the course of its investigation would lead to indictments of the company and/or its employees, with the potential for convictions or settlements providing for the payment of fines, restrictions on future business activities and, in the case of individual employees, imprisonment.

506.     Following these subpoenas, on February 4, 2008, the SEC's Philadelphia Regional Office sent FSA a Wells Notice concerning the company's bidding of municipal GICs.  The Wells Notice indicated that the SEC was considering recommending that the SEC authorize the staff to bring a civil injunction action and/or institute administrative proceedings against the company, alleging violations of Section 10(b) of the Exchange Act and Rule 10-b-5 thereunder and Section 17(a) of the Securities Act.

507.     On August 26, 2009, it was reported that the Connecticut Attorney General Richard Blumental had gone to the Connecticut Superior Court to compel FSA to turn over 600 hours of audio recordings that FSA had already released to the DOJ and SEC that Attorney General Blumenthal believed contained "a rich source of evidence of potential violations" of antitrust laws.

## VIII.

## ACCRUAL OF CLAIMS, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

508. San Mateo repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

509. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct from San Mateo.

510. San Mateo did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were engaging in the illegal and unlawful conduct as alleged herein until shortly before this litigation was commenced. Nor could San Mateo have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing. Even as late as December 2006, San Mateo lacked the ability to confirm the true nature of the alleged conspiracy from publically available information. This is confirmed by public statements made at the time of the disclosure of subpoenas issued by the DOJ in late 2006. For example, in a Bond Buyer article dated December 22, 2006, Carol Lew, president of the National Association of Bond Lawyers, was quoted as saying "[r]ight now, there is a lack of public information. . .We don't know if any of these allegations are true or what the facts are and that tempers everything."

511. Morever, prior to the disclosure of subpoenas issued by the DOJ in late 2006, any publically available information regarding manipulated municipal derivative transactions focused on representative transactions. It was not until reports in late 2006 that the DOJ issued subpoenas targeting the municipal derivatives provider and broker industry as a whole, that San

141

Mateo could have had any possible knowledge of the industry wide nature of the conspiracy alleged herein.

512. Moreover, as discussed above, pursuant to IRS regulations, Provider Defendants were required to certify that they had not consulted with other Providers, that their bid was not a courtesy bid, and that the bid was independently determined without regard to an agreement with another issuer or other person. These certifications were repeatedly made to San Mateo who relied on them and, in so relying, did not undertake further inquiry as to whether such certifications were legitimate. With respect to negotiated transactions, Defendants supplied false market prices and San Mateo relied on these false certifications.

513. Broker Defendants also falsely assured San Mateo that the were acting as their fiduciary agents and were soliciting bids for Municipal Derivatives that were competitively priced and in compliance with IRS rules and regulations that require at least three commercially reasonable bids. Such assurances were repeatedly made to San Mateo who relied on them and, in so relying, did not undertake further inquiry as to whether such agreements had occurred.

514. Statements made at the time of DOJ issued subpoenas in late 2006, support this conclusion. In a December 22, 2006 Bond Buyer, Patrick Born ("Born"), Chief Financial Officer of the city of Minneapolis and head of the debt committee of the Governmental Finance Officers Association, noted that "[w]e've been relying on certifications that bids have been competitive. Are we going to discover that people are simply not doing what they said they were doing, or is it something else?" In a Bloomberg article dated December 7, 2006, Born noted that "[t]he way these folks providers and brokers have operated, largely by telephone and largely out of public view, are [sic] not as transparent as they might be...."

515. San Mateo used bid forms which required all potential Providers to make representations that the bids submitted were legitimate. San Mateo's bid forms commonly used the following language or similar language:

> "We hereby represent that we did not consult with any other bidder or potential bidder about our bid, that our bid was determined without regard to any other formal or informal agreement that we have with the County or any other person (whether or not in connection with the Bonds) and that the bid is not being submitted solely as a courtesy to the County, or any other person or for the purposes of satisfying the "three bid" requirements set forth in the Treasury Regulation Section 1.148-5(d)(6)(iii)B)(1) and (2)."

In concealment of the alleged conspiracy, Defendants falsely made these representations to San Mateo. These representations caused San Mateo to believe that the bids they received were the result of a complete and fair competitive process.

516. Defendants engaged in a successful and unlawful scheme to defraud issuers of municipal bonds, primarily local and municipal government entities, that they affirmatively concealed, in the following respects:

a. By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

b. By engaging in secret meetings and telephone calls in order to further their unlawful and illegal scheme to fix the bidding process for Municipal Derivatives and allocate amongst themselves the market therefor;

c. By designing corrupted auctions to appear facially legitimate under relevant regulations and practices;

d. Signing bid submission documents in which they explicitly represented that they had not colluded with any other provider or broker in submission of the bid;

e. Through covert sharing of profits or other secret compensation paid to losing bidders;

f. By paying kickbacks to Broker Co-conspirators; and

g. By submitting fraudulent courtesy bids and agreements not to bid to create the false impression of a competitive bidding process.

517. In addition to those described above, Defendants took many steps to conceal their conduct. For instance, in one transaction Rosenberg of Sound Capital intended to send an e-mail to a Provider Defendant giving it a "last look," he mistakenly hit the "Reply All" key, causing the secret e-mail to be sent to the attorney for the issuer. When that attorney called Rosenberg to inquire, Rosenberg lied about the purpose of the e-mail. As another example, Naeh of CDR would send conspiratorial e-mails to representatives at Bank of America, including Pinard, through his personal GoAmerica email account rather than his business account.

518. Bank of America representatives also took substantial steps to conceal their wrongdoing. For example, the Cooperating Witness commonly told co-conspirators to call him on his cellular phone so as to avoid having their conversations audiotaped. It was also commonplace for Bank of America representatives to tell a co-conspirator "I'll call you back later" i.e. from a secure line or to ask if they could go off the trading desk when bidding. Campbell of Bank of America also avoided detection by circumventing the capture of e-mails sent on his Bank of America Blackberry by directly contacting the Blackberries of co-conspirators, including Towne of Piper Jaffray, through the use of a Personal Identification Number.

519. Defendants concealed the conspiracy by failing to apprise San Mateo of the existence of audiotapes that revealed their collusive conduct by reusing and overwriting evidence

contained on such tapes. By reusing and overwriting these tapes, evidence relevant to San Mateo's claims may have become inaccessible. Once the existence of these tapes was discovered by investigators, they were seized by the DOJ and San Mateo was denied access to them.

520. The Defendants also took steps to conceal their activity by making misleading statements to the press at or near the time subpoenas were being handed down by investigators. For example, a November 17, 2006 report on the subpoenas in the Bond Buyer indicated that: Sound Capital claimed that it was unaware of any charges against it and that its business continued "uninterrupted"; FSA also indicated that it had no awareness of chargers involving its practices; CDR asserted that it had acted "appropriately"; and CDC asserted that it was "simply a fact witness" and that investigators "just want to know what our involvement in the industry is." Also, JP Morgan, in a May 18, 2007 Bloomberg news report, indicated that it was not a target of the DOJ probe and was merely contacted by the DOJ and SEC about bidding and "related matters in public finance." In that article, Charles Youtz, a Vice-President of Baum, assured the public that "[w]e do not anticipate any impact on the reputation of [sic] financial viability of the firm." Plaintiffs reasonably relied on these misleading statements and were mislead as to the existence, scope of, and participants in the alleged conspiracy.

521. Furthermore, while Defendant Bank of America's outside counsel discovered evidence of Violations of Antitrust laws as early as 2004, such counsel was specifically instructed by counsel not to reveal that information.

522. Defendants have also committed continuing violations of antitrust laws resulting in monetary injury to Plaintiffs. These violations constitute injurious acts which restart the applicable statute of limitations. Acts in furtherance of the conspiracy have occurred since initial complaint was filed on October 7, 2008. These acts include, among others, the submission of

courtesy bids, the collusive exchange of pricing information on municipal derivative transactions, and direct discussions among the conspirators regarding the pricing of Municipal Derivatives

523.    Additionally, Bank of America's 2009 SEC filing tellingly states that governmental investigations into the conspiracy cover the period from the early 1990s "to date."

524.    Moreover, many of the representatives targeted by the DOJ did not leave their employment until 2006-2008.  These include: Towne of Piper Jaffray (January of 2008); Zaino of UBS (2007); Salvadore of Bear Stearns (July of 2008); MacFaddin of JP Morgan (March of 2008); Pinard of Bank of America ( February of 2007); Hertz of JP Morgan (December of 2007); Ghavami of UBS (December of 2007); Saunders of Wachovia (July of 2008); Gruer of JP Morgan (June of 2006); and Goldberg of CDR (September of 2006).  McConnell of Wachovia worked at Wachovia from 2005 to July of 2008.  Accordingly, it can be inferred that their anticompetitive practices have continued to at least the time of their respective departures. Stallone of IMAGE, Rosenberg of Sound Capital, Frasco of Natixis (formerly CDC), and Murphy, formerly of Bank of America and now at Winters, are still currently employed by a Defendant.

525.    Moreover, the co-conspirators, with the potential exception of Bank of America, have not effectively withdrawn from the conspiracy.  Their refusal acknowledge their misconduct are ongoing acts in furtherance of the conspiracy.

526.    Many of the Municipal Derivatives transactions entered into are ongoing.  The negative effects Plaintiff is experiencing from them are ongoing as well and constitute a continuing violation of the law.

527.    Despite the exercise of due diligence, San Mateo did not discover the conspiracy until shortly before its initial complaint was filed on October 7, 2008.  Because the conspiracy

was both self-concealing and affirmatively concealed by Defendants and their con-conspirators, San Mateo had no knowledge of the conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed, until shortly before the initial complaint was filed in this matter. As a result of Defendants' fraudulent concealment of their conspiracy, San Mateo asserts the tolling of any applicable statute of limitations affecting the rights of action of San Mateo.

**IX.**

**SAN MATEO SUFFERED INJURY
THROUGH THE CONDUCT OF THE DEFENDANTS**

528. San Mateo repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

529. Through their unlawful acts, the Defendants acted to the detriment of San Mateo, leading to the reaping of unlawful profits by the Defendants from the manipulation of the Municipal Derivatives market.

530. By engaging in the unlawful and illegal conspiracy alleged herein, including rigging bids in auctions for Municipal Derivatives and allocating the market amongst themselves, the Defendants acted to the detriment of San Mateo. The Defendants engaged in unlawful conduct in furtherance of the conspiracy that included but was not limited to:

      a.      conspiring to pre-select the winners in particular Municipal Derivative auctions;

      b.      submitting courtesy bids designed to lose in favor of the pre-selected bid winner but give the bidding process the appearance of legitimacy;

      c.      declining to submit a bid in favor of the pre-selected winner;

      d.      submitting deliberately losing bids that were unreasonable and unrealistic;

147

e.       engaging in inappropriate last look arrangements, whereby the pre-selected

winner of the auction was given a last look at submitted bids to ensure that

the bid that it submitted would be just high enough to win and to police

the other participants in the conspiracy.;

f.       agreeing to make and making illegal payments of illegally and unlawfully

gained profits to other Defendants as part of the conspiracy;

g.       enforcing the conspiracy by ensuring that all of the Defendants would

abide by the conspiratorial agreement.

531.    In so doing, Defendants have committed unlawful acts that allowed them to

illegally and improperly obtain public monies of San Mateo.

532.    The nature of the Defendants' unlawful acts has caused serious harm to San

Mateo.  As a direct result of the conduct of the Defendants, San Mateo has received, *inter alia*,

lower rates of return for Municipal Derivatives than they would have in a competitive market,

paid higher fees and other costs in acquiring Municipal Derivatives than they would have in a

competitive market, and been subjected to uncompensated, higher credit risks of counterparties

to Municipal Derivatives than they would have in a competitive market.  Thus, as a direct and

proximate result of the illegal and unlawful acts of the Defendants, San Mateo has been injured

and financially damaged in its business and property in an amount to be determined according to

proof.

## X.

## TRADE AND INTERSTATE COMMERCE

533.     The activities of Defendants, and each of them, and their named and unnamed co-conspirators, as alleged herein, were within the flow of and substantially affected interstate commerce.

534.     During all times alleged herein, Defendants, and each of them, and their named and unnamed co-conspirators, issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to Plaintiffs located in all states across the nation.

535.     The conspiracy in which Defendants, and each of them, and their named and unnamed co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## XI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT

536.     San Mateo repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

537.     The Defendants and their unnamed co-conspirators violated California Business and Professions Code section 16700, *et seq.* (the "Cartwright Act"), by forming one or more combinations to accomplish purposes prohibited by and contrary to the Cartwright Act.  They engaged in an agreement, contract, combination, trust and/or conspiracy to manipulate the market for Municipal Derivatives by *inter alia* fixing the bidding process by which bond issuers acquire Municipal Derivatives and allocated amongst themselves the market therefor.

149

538.     The Defendants and their unnamed co-conspirators committed acts that constitute prohibited conduct under the Cartwright Act, including but not limited to making illegal agreements among themselves to reduce competition and thereby reduce the returns that public and non-profit entities, including San Mateo, earned on Municipal Derivatives and allocate amongst themselves the market therefor.  This scheme involved means, including but not limited to, pre-selecting winners of particular auctions for Municipal Derivatives and submission by other Defendant Providers of no-bids or courtesy bids.  It further involved Defendant Brokers giving "last looks" to Defendant Providers of pre-selected winning bids, sharing illegal and unlawful profits earned from the conspiracy amongst themselves, and other mechanisms that ensured the conspiracy's success.  Defendants' conduct has unfairly and unlawfully decreased the return that San Mateo is able to earn on Municipal Derivatives, exposed San Mateo to uncompensated credit risks, and increased the costs of these vehicles to San Mateo.

539.     As a direct result of the unlawful and unfair actions of Defendants and their unnamed co-conspirators, which actions are continuing, San Mateo suffered injury to its business and property.  As a direct result of the conduct of the Defendants, San Mateo has received, *inter alia*, lower returns for Municipal Derivatives than they would have in a competitive market, paid higher fees and other costs in acquiring Municipal Derivatives than they would have in a competitive market, and been subjected to uncompensated, higher credit risks of counterparties to Municipal Derivatives than they would have in a competitive market.  Thus, as a direct and proximate result of the illegal and unlawful acts of the Defendants, San Mateo has been injured and financially damaged in its business and property in an amount to be determined according to proof.  These injuries have caused, and will continue to cause, damages to San Mateo.

540.    As a direct and legal result of the acts of Defendants and their unnamed co-conspirators, San Mateo was required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which they seek recovery according to proof.

541.    Pursuant to the Cartwright Act, San Mateo is authorized to recover three times the damages they sustained plus interest and reasonable attorneys' fees, costs and expenses.

542.    WHEREFORE, San Mateo prays for judgment against Defendants, and each of them, as set forth below.

## SECOND CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

543.    San Mateo repeats and realleges each of the foregoing paragraphs of this amended complaint and incorporates them by reference as though set forth in full herein.

544.    Defendants, and each of them, and their named and unnamed co-conspirators, engaged in an agreement, contract, combination, trust and/or conspiracy to manipulate the market for Municipal Derivatives by, *inter alia*, engaging in conduct to maintain or stabilize the price of, allocate customers and markets for, and/or rig the bidding process by which municipal bond issuers acquire Municipal Derivatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

545.    Defendants, and each of them, and their named and unnamed co-conspirators, agreed to, and did in fact, restrain trade or commerce in violation of the Sherman Act by engaging in conduct, including, but not limited to, the allocation of the market for Municipal Derivatives amongst themselves, sharing their illegal gains through kick-backs to one another, and making other secret, undisclosed arrangements.

546. In formulating and effectuating their agreement, contract, combination, trust and/or conspiracy, Defendants, and each of them, and their named and unnamed co-conspirators, engaged in anticompetitive activities including, but not limited to, the making of illegal agreements among themselves to reduce competition and thereby reduce the returns that U.S. public and non-profit entities, including San Mateo, earned on Municipal Derivatives and to allocate the market for Municipal Derivatives amongst themselves. This scheme involved means, including but not limited to, the following activities:

(a) Pre-selection of Defendant Providers to be the winners of particular auctions for Municipal Derivatives;

(b) Submission by other Defendant Providers of no-bids or courtesy bids;

(c) Giving of "last looks" by Defendant Brokers to Defendant Providers of pre-selected winning bids, and

(d) Sharing of illegal and unlawful profits earned from the conspiracy amongst the Defendants, as well as other mechanisms that ensured the conspiracy's success.

547. The combination and conspiracy alleged herein had the following effects, among others:

(a) Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated and U.S. public and non-profit entities, including San Mateo, received, *inter alia*, lower returns for Municipal Derivatives than they would have received in a competitive market;

(b) Bids charged by Defendants and their named and unnamed co-conspirators for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels,

forcing U.S. public and non-profit entities, including San Mateo, to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions;

(c)     Customers and markets of Municipal Derivatives were allocated among Defendants and their named and unnamed co-conspirators, forcing U.S. public and non-profit entities, including San Mateo, to engage counterparties to Municipal Derivatives transactions who carried increased credit risks not reflected in the terms of the transactions;

(d)     Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated for U.S. public and non-profit entities, including San Mateo.

548.    As a direct and proximate result of Defendants' illegal agreement, contract, combination, trust and/or conspiracy, Plaintiffs, including San Mateo, have been injured and damaged in their business and property in an amount to be determined according to proof.

549.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, San Mateo seeks to recover treble damages and costs of this suit, including reasonable attorneys' fees, against Defendants, and each of them, for the injuries sustained by San Mateo by reason of the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, San Mateo prays that:

A.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy and the acts done in furtherance thereof by Defendants and their unnamed co-conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.     Judgment be entered against Defendants, jointly and severally, and in favor of San Mateo for treble damages as allowed by law as determined to have been sustained by them;

C.     Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein;

D.     The Court award San Mateo's fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

E.     The Court award San Mateo such other and further relief as may be necessary and appropriate.

DATED: September 14, 2009          **COTCHETT, PITRE & McCARTHY**

By: _____

NANCI E. NISHIMURA
JOSEPH W. COTCHETT
STEVEN N. WILLIAMS
STUART G. GROSS
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**COTCHETT, PITRE & McCARTHY**
IMTIAZ SIDDIQUI
100 Park Avenue, Suite 2600
New York, NY 10017
Telephone: (212) 682-3198
Facsimile: (212) 219-6678

154

**OFFICE OF THE COUNTY COUNSEL**
MICHAEL P. MURPHY, County Counsel
JOHN C. BEIERS, Chief Deputy County Counsel
Hall of Justice and Records
400 County Center, Sixth Floor
Redwood City, CA 94063-1662
Telephone: (650) 363-4250
Facsimile: (650) 363-4034

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: September 14, 2009

**COTCHETT, PITRE & McCARTHY**

By: _____
NANCI E. NISHIMURA
JOSEPH W. COTCHETT
STEVEN N. WILLIAMS
STUART G. GROSS
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**COTCHETT, PITRE & McCARTHY**
IMTIAZ SIDDIQUI
100 Park Avenue, Suite 2600
New York, NY 10017
Telephone: (212) 682-3198
Facsimile: (212) 219-6678

**OFFICE OF THE COUNTY COUNSEL**
MICHAEL P. MURPHY, County Counsel
JOHN C. BEIERS, Chief Deputy County Counsel
Hall of Justice and Records
400 County Center, Sixth Floor
Redwood City, CA 94063-1662
Telephone: (650) 363-4250
Facsimile: (650) 363-4034