UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
HINDS COUNTY, MISSISSIPPI,          :
                                    :
                    Plaintiff,      :
                                    :
        - against -                 :
                                    :    08 Civ. 2516
                                    :
WACHOVIA BANK N.A. et al.,          :
                                    :
                    Defendants.     :
----------------------------------X
IN RE MUNICIPAL DERIVATIVES         :
ANTITRUST LITIGATION                :    08 MDL No. 1950
                                    :
THIS DOCUMENT RELATES TO:           :    **DECISION AND ORDER**
                                    :
CITY OF LOS ANGELES v. BANK OF      :
AMERICA, N.A., ET AL.; 08 CIV.      :
10351; CITY OF RIVERSIDE, ET AL. v.:
BANK OF AMERICA, N.A. ET AL., 09    :
CIV. 10102; CITY OF STOCKTON v.     :
BANK OF AMERICA, N.A., ET AL.,      :
08 CIV. 10350; CONTRA COSTA COUNTY  :
v. BANK OF AMERICA, N.A., ET AL.,   :
09 CIV. 1197; COUNTY OF SAN DIEGO   :
V. BANK OF AMERICA, N.A., ET AL.,   :
09 CIV. 1195; COUNTY OF SAN MATEO   :
v. BANK OF AMERICA, N.A., ET AL.,   :
09 CIV. 1196; COUNTY OF TULARE v.   :
BANK OF AMERICA,N.A., ET AL.,       :
10 CIV. 0628; LOS ANGELES WORLD     :
AIRPORTS v. BANK OF AMERICA, N.A.,  :
ET AL., 10 CIV. 0627; THE           :
REDEVELOPMENT AGENCY OF THE CITY    :
OF STOCKTON, ET AL. v. BANK OF      :
AMERICA, N.A., ET AL., 10 CIV.      :
0630; SACRAMENTO MUNICIPAL UTILITY  :
DISTRICT v. BANK OF AMERICA, N.A.,  :
ET AL., 09 CIV. 10103;              :
SACRAMENTO SUBURBAN WATER DISTRICT  :
v. BANK OF AMERICA, N.A., ET AL.,   :
10 CIV. 0629                        :
----------------------------------X
**VICTOR MARRERO, United States District Judge.**

08 Civ. 2516

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-26-10

The eleven actions addressed in this decision are part of the consolidated pretrial proceedings of the multidistrict litigation ("MDL") In re Municipal Derivatives Antitrust Litigation, 08 MDL No. 1950. Plaintiffs are eleven California municipalities (collectively, "Plaintiffs") which bring substantially similar complaints (the "California Complaints") alleging federal and state antitrust violations arising out of an alleged unlawful conspiracy on the part of more than forty corporate defendants (collectively, "Defendants") and others to illegally rig bids, fix prices and manipulate the market for investment instruments known as municipal derivatives. All Defendants except eight now jointly move to dismiss the California Complaints ("Joint Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). Defendants Syncora Guarantee, Inc. and Syncora Holdings, Ltd. (collectively, "Syncora"), move separately to dismiss the California Complaints (the "Syncora Motion"). Defendants The Goldman Sachs Group, Inc., Goldman Sachs Mitsui Marine Derivative Products, L.P., and Goldman Sachs Bank USA ("collectively Goldman Sachs") also move separately to dismiss the California Complaints (the "Goldman Motion").

For the reasons set forth below, the Joint Motion is GRANTED in part and DENIED in part, the Syncora Motion is GRANTED, and the Goldman Sachs Motion is DENIED.

-2-

## I. BACKGROUND

### A.    PARTIES

Plaintiffs in this action are the following eleven California municipalities: City of Los Angeles ("Los Angeles"), City of Riverside ("Riverside"), City of Stockton, Contra Costa County, County of San Diego, County of San Mateo ("San Mateo"), County of Tulare ("Tulare"), Los Angeles World Airports, The Redevelopment Agency of the City of Stockton, Sacramento Municipal Utility District, and Sacramento Suburban Water District. Plaintiffs assert that Defendants and others illegally rigged bids, fixed prices and manipulated the market for municipal derivatives, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("§ 1"), and California's Cartwright Act, Cal. Bus. & Prof. Code § 16720 (the "Cartwright Act").

Defendants as named in the California Complaints are: Bank of America, N.A. ("BoA"); Wachovia Bank N.A. ("Wachovia"); Wells Fargo & Co. ("Wells Fargo"); Bear Stearns & Co. ("Bear Stearns"); AIG Financial Products Corp. ("AIG"); Financial Security Assurance, Inc. ("FSAI"); GE Funding Capital Market Services, Inc., General Electric Capital Corporation, Trinity Funding Co., LLC, Trinity Plus Funding Co. LLC (collectively, "GE Trinity"); Natixis Funding Corp. ("Natixis Funding"); Natixis S.A. ("Natixis"); JP Morgan Chase

& Co. ("JP Morgan"); Piper Jaffray & Co. ("Piper Jaffray"); Société Générale SA ("Société Générale"); Feld Winters Financial LLC ("Feld Winters")[1]; UBS AG, UBS Financial Services, Inc., UBS Securities, LLC (collectively, "UBS"); XL Capital, Ltd., XL Asset Funding I, LLC, XL Life & Annuity Holding Company (collectively, "XL"); Merrill Lynch & Co., Inc. ("Merrill Lynch"); Morgan Stanley; National Westminster Bank PLC ("NatWest"); Investment Management Advisory Group, Inc. ("Investment Management Advisory"); CDR Financial Products ("CDR"); Winters & Co. Advisors, LLC ("Winters & Co."); First Southwest Company ("First Southwest"); George K. Baum & Co. ("Baum"); Sound Capital Management, Inc. ("Sound Capital"); Syncora; Assured Guaranty US Holdings, Inc. ("Assured"); Bayerische Landesbank Girozentrale ("BLG"); Citibank, N.A., Citigroup Financial Products, Inc., Citigroup Global Markets Holdings, Inc. (collectively, "Citibank"); Dexia S.A. ("Dexia"); Goldman Sachs; MBIA Inc. ("MBIA"); PFM Group, Inc., PFM Asset Management LLC (collectively, "PFM"); Rabobank Group ("Rabobank"); and Transamerica Life Insurance Company ("Transamerica").

All Defendants except BoA, Merrill Lynch, Feld Winters, Syncora, and Goldman Sachs move jointly to dismiss the

---

[1]   Plaintiffs voluntarily dismissed their claims, without prejudice, against Feld Winters on February 4, 2010, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

California Complaints pursuant to Rule 12 (b)(6).[2] Syncora and Goldman Sachs move separately to dismiss the claims against them. Defendants, Syncora, and Goldman Sachs filed memoranda of law in support of their respective motions. In addition, Natixis, Société Générale, Rabobank, NatWest, PFM, Morgan Stanley, GE Trinity, AIG Financial, BLG, Assured, Dexia, Citibank, First Southwest, and Transamerica filed supplemental memoranda of law addressing the California Complaints's specific allegations against them. Plaintiffs filed memoranda of law in opposition to the Joint Motion, the Goldman Motion, and the Syncora Motion, as well as memoranda in opposition to the supplemental memoranda filed by individual Defendants.

B.    PROCEDURAL BACKGROUND

    1.    Multidistrict Litigation

In January 2007, BoA entered into the antitrust corporate leniency program administered by the Department of Justice, Antitrust Division ("DOJ Antitrust") under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"). See Pub. L. No. 108-237, tit. II, §§ 201-221, 118 Stat. 661, 665-669. BoA's action was prompted by DOJ

---

[2] By Stipulation and Order dated February 18, 2010, Magistrate Judge Gabriel W. Gorenstein extended the time for BoA and Merrill Lynch to answer or otherwise respond to the complaints in this action until and including forty-five days following the Court's ruling on all motions to dismiss filed in this MDL.

Antitrust's investigation into transactions of certain financial institutions involved in the municipal derivatives market.  Multiple civil antitrust actions against various defendants were subsequently filed by various municipalities and other entities across the country alleging violations of § 1 arising from bidding on municipal derivatives offerings. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on MDL transferred all pending and subsequent related actions to this District on June 16, 2008, and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings (the "MDL Order").  In accordance with the MDL Order, fifteen cases were ultimately transferred and consolidated with the designated lead case.

2.   Class Action

Interim lead class counsel ("Class Counsel") filed the original consolidated class action complaint ("CAC") in this action on August 22, 2008 against more than forty corporate defendants (collectively, "CAC Defendants").[3]  The CAC alleged

_____

[3] The defendants as named in the CAC were: BoA; Wachovia; AIG; Bear Stearns; Financial Security Assurance Holdings, Ltd. ("FSA Holdings"); FSAI; Financial Guaranty Insurance Co. LLC; GE Funding Capital Market Services, Inc.; Genworth Financial Investment Management, LLC; Feld Winters; Natixis; JP Morgan; Piper Jaffray; Société Générale; AIG SunAmerica Life Assurance Co.; UBS AG; XL Capital, Ltd.; XL Asset Funding Co. I, LLC; XL Life Insurance & Annuity Inc.; Merrill Lynch; Morgan Stanley; NatWest; Natixis Funding; Investment Management Advisory; CDR; Winters & Co.; First Southwest; Baum; Kinsell Newcomb & De Dios Inc.; PackerKiss Securities, Inc.; Shockley Financial Corp.; Sound Capital; Cain Brothers & Co., LLC; Morgan Keegan & Co., Inc.; Trinity Funding Co. LLC; and Municipal Government Investors Corp ("MGIC").

that CAC Defendants conspired to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, municipal derivatives in violation of § 1.  All CAC Defendants except for BoA, Feld Winters and MGIC filed a joint motion to dismiss the CAC.  By Decision and Order dated April 29, 2009 (the "April 2009 Decision"), the Court granted CAC Defendants' joint motion with leave to replead.[4]

Class Counsel filed a second consolidated amended complaint ("SCAC") on June 18, 2009, again alleging a § 1 claim against sixteen corporate defendants.  The SCAC plaintiffs ("SCAC Plaintiffs") purport to represent a class (the "SCAC Class") consisting of:

> All state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction [m]unicipal [d]erivatives directly from a [p]rovider [d]efendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

(SCAC ¶ 183.)  Defendants as named in the SCAC are: BoA; Bear Stearns; JP Morgan; Morgan Stanley; NatWest; Piper Jaffray; Société Générale; UBS; Wachovia; Wells Fargo; Natixis Funding; Investment Management Advisory; CDR;  Winters & Co.; Baum; and Sound Capital (collectively, "SCAC Defendants").

All SCAC Defendants except BoA filed a joint motion to dismiss the SCAC, dated September 18, 2009.  By Decision and

---

[4] The April 2009 Decision is reported as <u>Hinds County, Miss. v. Wachovia Bank N.A.</u>, 620 F. Supp. 2d 499 (S.D.N.Y. 2009).

Order dated March 25, 2010 (the "March 2010 Decision"), the
Court denied SCAC Defendants' joint motion to dismiss and
found that SCAC Plaintiffs had alleged plausible § 1 claims.[5]

In addition, four California municipalities brought a
separate class action complaint on December 15, 2009 (the
"JSAC"), alleging Cartwright Act claims on behalf of
themselves and a class of municipalities against SCAC
Defendants.

B.   FACTUAL ALLEGATIONS[6]

The facts of this case are set forth in the April 2009
and March 2010 Decisions, familiarity with which is assumed.
Here, the Court will briefly review the facts relevant to this
motion to dismiss.

In a series of complaints brought between September and
December 2009, Plaintiffs assert § 1 claims similar to those
alleged in the SCAC and JSAC, as well as Cartwright Act claims
similar to those alleged in the JSAC.  Plaintiffs bring their
§ 1 and Cartwright Act claims against SCAC Defendants and
thirty-one defendants not named in the SCAC or JSAC.
Defendants not named in the SCAC or JSAC, but which are named

---

[5]   The March 2010 Decision is reported as Hinds County, Miss. v. Wachovia
Bank N.A., -- F. Supp. 2d --, No. 08 Civ. 2516, 2010 WL 1244765 (S.D.N.Y.
March 25, 2010).

[6]   The facts below are taken from the California Complaints, which the
Court accepts as true for the purpose of ruling on a motion to dismiss.
See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir.
2008) (citing GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d
463, 465 (2d Cir. 1995)).

-8-

in the California Complaints are: AIG Financial Products; Assured; BLG; Citibank; Dexia; FSAI; First Southwest; GE Trinity; Goldman Sachs; Natixis; MBIA; Merrill Lynch; Natixis; PFM; Rabobank; Syncora; Transamerica; UBS Financial[7]; UBS Securities; and XL (collectively, "Non-Class Defendants").

Plaintiffs allege that "Defendants' conspiracy involved, but was not limited to, allocating the market for [m]unicipal [d]erivatives amongst themselves, rigging the process by which the U.S. public and non-profit entities acquire [m]unicipal [d]erivatives, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements." (E.g., Complaint, County of Tulare v. Bank of America, N.A., et al., 10 Civ. 628 (S.D.N.Y. Dec. 10, 2009) ("Tulare Complaint")[8].). The California Complaints rely on factual allegations similar to those asserted in the SCAC and JSAC. Like the SCAC and the JSAC, Plaintiffs allege that individuals employed by Defendants acted as conduits for communication of pricing and bidding information among Defendants; that Defendants falsely certified that bidding was competitive and in compliance with Treasury Department regulations; that Defendants submitted intentionally losing

---

[7] UBS Financial is named as a defendant in the JSAC, but not in the SCAC.

[8] The Tulare Complaint contains virtually all of the allegations contained in the other ten California Complaints. As a result, for ease of reference, the Court will cite to the Tulare Complaint except where otherwise indicated.

courtesy bids to assist other co-conspirators to win particular municipal derivative transactions; and that Defendants paid kickbacks to manipulate the market for municipal derivatives. Plaintiffs rely largely on the same sources of information relied upon in the SCAC and JSAC, including the same BoA confidential witness, as well as the antitrust investigations undertaken by DOJ Antitrust, the Internal Revenue Service ("IRS"), and state attorneys general. Plaintiffs also rely on the indictment filed by DOJ Antitrust against CDR on October 16, 2009.   See Indictment, United States v. Rubin/Chambers, Dunhill Ins. Servs., Inc., 09 Cr. 1058 (S.D.N.Y. Oct. 29, 2009) ("October 2009 CDR Indictment").

Plaintiffs supplement the allegations shared with the SCAC and JSAC with averments specific to California municipalities. For example, Plaintiffs assert that several Defendants colluded to fix the pricing for Plaintiff San Mateo's November 14, 2003 swap transaction ("2003 San Mateo Swap"). Further, Plaintiffs allege that their statistical analysis of bidding patterns in eighty-nine municipal derivatives auctions (the "Statistical Analysis") "reveal[s] probative evidence" that numerous Defendants "took actions to assist another [Defendant] win a particular auction and/or were pre-selected as winners of particular [m]unicipal [d]erivative auctions." (Tulare Complaint ¶ 164.) Plaintiffs

-10-

assert that, in 2005, Mark Scott, the Director of the IRS's Tax-Exempt Bond Office, articulated a "rough guideline for determining when a bid submitted was likely a courtesy bid: 'When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided.'" (Tulare Complaint ¶ 382 (quoting Mark Scott).) Based on the IRS's alleged "rough guideline," as well as other facts purportedly gleaned from the Statistical Analysis, Plaintiffs assert that the lowest bids in ten California municipal derivative auctions, occurring between March 1998 and May 2008, were not submitted to compete for the contract on auction, but rather as sham, courtesy bids in furtherance of the alleged conspiracy.

## II. DISCUSSION

### A.   LEGAL STANDARD

In assessing a motion to dismiss under Rule 12(b)(6), dismissal of a complaint is appropriate if the plaintiff has failed to offer sufficient factual allegations making the asserted claim plausible on its face. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The task of the Court in ruling on a motion to

-11-

dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (quotation marks omitted).   The Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

B.   PLAUSIBILITY ANALYSIS

Defendants move to dismiss the California Complaints for substantially the same reasons asserted by SCAC Defendants, arguing that (1) Plaintiffs have failed to allege facts plausibly suggesting an industry-wide conspiracy; (2) Plaintiffs have failed to allege facts connecting each Defendant to the alleged conspiracy; (3) Plaintiffs have failed to allege facts sufficient to establish standing; (4) Plaintiffs' claims are time-barred by the applicable statute of limitations; and (5) the Internal Revenue Code and Treasury Regulations preclude Plaintiffs' private antitrust claims.

As to Defendants' first, third, fourth, and fifth arguments, the Court incorporates by reference the legal analysis, reasoning, and conclusions of its March 2010 Decision, and finds all four arguments equally unavailing for the purposes of this motion to dismiss. Given the similarity

-12-

between the California Complaints' and the SCAC's allegations against SCAC Defendants, the Court denies the Joint Motion to dismiss Plaintiffs' § 1 claims against SCAC Defendants for substantially the same reasons articulated in the March 2010 Decision.

The Court also finds that Plaintiffs have stated a plausible Cartwright Act claim against each SCAC Defendant for the purposes of this motion to dismiss. Defendants concede that the Cartwright Act proscribes the same conduct as § 1 of the Sherman Act. (See Defendants' Memorandum in Support of Defendants' Joint Motion to Dismiss the Cotchett Complaints, dated February 9, 2010, at 46.) As a result, the Court denies SCAC Defendants' motion to dismiss Plaintiffs' Cartwright Act claims.

Here, the Court will limit its analysis to whether Plaintiffs have satisfied their pleading burden as to Non-Class Defendants.

### 1.    Allegations Arising out of 2003 San Mateo Swap

Plaintiffs allege that Defendants Citibank, AIG Financial, UBS, and Piper Jaffray colluded to "artificially depress the terms of the" 2003 San Mateo Swap. (Tulare Complaint ¶ 455.)  As the underwriters of the underlying bonds, Citibank and co-conspirator Lehman Brothers ("Lehman") offered to also act as providers for the swap transaction. In

-13-

this role, Citibank and Lehman proposed a pricing methodology to be used to determine the terms of the swap. Finding the proposed terms difficult to verify, San Mateo allegedly sought pricing quotations from UBS and Piper Jaffray, but offered Citibank and Lehman a right of first refusal whereby they would be given the opportunity to match or beat any offer by UBS or Piper Jaffray. Plaintiffs allege that the terms subsequently offered by both UBS and Piper Jaffray were within a few basis points of the pricing terms offered by Citibank and Lehman. Ultimately, on the "Price Date," San Mateo agreed to conduct the transaction on the terms offered by Citibank and Lehman. (Tulare Complaint ¶¶ 451-52.)

In advance of the agreement on the swap's pricing terms, Plaintiffs allege that San Mateo determined that Lehman's credit-rating was too low for it to serve as a counter-party to the swap transaction. As a result, Lehman purportedly entered into an arrangement with AIG Financial whereby AIG Financial would replace Lehman as counter-party to the swap.

Plaintiffs allege that such swap transactions are premised on the idea that when parties to swaps exchange cash flows, "the present values of the exchanged future cash flows should be equal or 'netted off' against one another .... In other words ... the exchange should be a wash, with the issuer and provider exchanging future cash flows of the same

-14-

[present] value." (Tulare Complaint ¶ 133.) "Neither party's motivation for entering the swap should be based on any belief that they have received a more valuable future cash flow in exchange for a less valuable future cash flow." (Id. ¶ 135.)

Plaintiffs allege that Defendants colluded to fix the pricing terms offered to San Mateo, which resulted in a spread of "approximately $3.3 million of 245 base points" between the swap terms offered by Lehman and Citibank and the alleged fair market price of such a swap transaction. (Id. ¶ 458.) In other words, Plaintiffs allege that the resulting "value of [the] cash flows to be paid by San Mateo to Citibank was $2,296,859 more than the value of cash flows that Citibank was obligated to pay San Mateo ... [and] the value of cash flows to be paid by San Mateo to AIG Financial was worth $982,379 less than the cash flows to be paid by AIG Financial." (Id. ¶¶ 457-58.) Plaintiffs assert that the resulting spread, viewed in light of the alleged premise of such swap transactions as described above, is highly suggestive of collusion among Defendants. Plaintiffs assert that the most plausible explanation for the similar, supra-competitive offers of Citibank, Lehman, UBS, and Piper Jaffray is pricing collusion. "Indeed, the economically rational thing for UBS and Piper Jaffrey [sic] to do would have been to offer San Mateo terms

-15-

that would have yielded them a lower but still substantial spread."   (<u>Id.</u> ¶ 459.)

The Court is persuaded that, taken as true, Plaintiffs' allegations plausibly suggest that Citibank, UBS, and Piper Jaffray colluded to manipulate the market for the 2003 San Mateo Swap.  The crucial question in a § 1 case is "whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'"   <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010) (<u>quoting</u> <u>Theatre Enters., Inc. v. Paramount Film Distrib. Corp.</u>, 346 U.S. 537, 540 (1954)).  Allegations that a defendant acted contrary to its economic interest can be suggestive of conspiratorial agreement as opposed to mere parallel pricing. <u>See</u> <u>id.</u> at 324 (<u>quoting</u> <u>In re Flat Glass Antitrust Litig.</u>, 385 F.3d 350, 360-61 (3d Cir. 2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market.")  Here, Plaintiffs allege that UBS and Piper Jaffray acted against their economic interests by offering similar pricing terms to those offered by Citibank and Lehman.   Although the Supreme Court has cautioned that parallel behavior may be a "rational and competitive business strategy," <u>Twombly</u>, 550 U.S. at 554, and the Second Circuit has similarly found that "[s]imilar pricing

-16-

can suggest competition at least as plausibly as it can
suggest anticompetitive conspiracy," In re Elevator Antitrust
Litig., 502 F.3d 47, 51 (2d Cir. 2007), the Court views the
allegations against Citibank in light of the California
Complaints as a whole, as well as the Court's prior findings
in this MDL. The California Complaints, the SCAC, and the
JSAC all contain detailed allegations of collusive
communications by UBS and Piper Jaffray, which, as discussed
at length in the April 2009 and March 2010 Decisions, the
Court has found to plausibly implicate both UBS and Piper
Jaffray. Accordingly, the Court, drawing all reasonable
inferences and resolving doubts in Plaintiffs' favor, finds
that the similar pricing offers for the 2003 San Mateo Swap
render Citibank's involvement in the alleged conspiracy
plausible for the purposes of a motion to dismiss.

However, while Plaintiffs' allegations plausibly suggest
that Citibank, UBS, and Piper Jaffray colluded to manipulate
the pricing of the 2003 San Mateo Swap, Plaintiffs have not
alleged sufficient facts connecting AIG Financial to the
allegedly collusive conduct. The California Complaints assert
merely that AIG Financial was substituted for Lehman as a
counter-party following the agreement on pricing terms. As
alleged, it was Citibank and Lehman that proposed the original
pricing terms similar to those offered by UBS and Piper

Jaffray, and that also ultimately offered the final pricing terms agreed to by San Mateo at the Price Date. Although Plaintiffs allege that San Mateo's concern regarding Lehman's credit-rating arose before the Price Date, and it is thus conceivable that Lehman and AIG Financial's negotiations began before the Price Date, the facts as alleged do not plausibly suggest that AIG Financial was involved in any collusive conduct leading up to the similar pricing offers, or the ultimate agreement on pricing terms on the Price Date. Notably, Plaintiffs do not allege that any negotiations between AIG Financial and Lehman prior to the Price Date implicate AIG Financial in the alleged conspiracy. Instead, Plaintiffs merely allege that "San Mateo was not made privy" to such negotiations. (Tulare Complaint ¶ 453.) Although such negotiations may have afforded AIG Financial the opportunity to conspire, such an opportunity does not by itself plausibly support an inference of AIG Financial's participation in the alleged conspiracy. See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 545 (2d Cir. 1993) ("[M]ere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."). As a result, the Court is not persuaded that AIG Financial's agreement to replace Lehman as a counter-party to the swap after the Price Date is

suggestive of AIG Financial's involvement in any agreement to manipulate the pricing terms offered to San Mateo.

The Court notes that Plaintiffs' other allegations against AIG Financial are also insufficient to state a § 1 claim. The Court previously rejected SCAC Plaintiffs' claims based on a 1989 Oklahoma Turnpike Authority guaranteed investment contract ("GIC"), upon which Plaintiffs also rely here to allege AIG Financial's participation in the alleged conspiracy. See Hinds, 620 F. Supp. 2d at 515. In addition, the California Complaints allege that AIG Financial participated in numerous municipal derivatives transactions, but fail to allege any associated facts plausibly connecting AIG Financial to the alleged conspiracy. As discussed in the April 2009 Decision, an allegation of mere participation in the municipal derivatives market is insufficient to assert an actionable § 1 claim. Id. Accordingly, the Court grants Defendants' Joint Motion as to AIG Financial without prejudice, subject to reinstatement of the claim upon a sufficient showing by Plaintiffs during the course of discovery of facts supporting a plausible inference that AIG Financial participated in the alleged conspiracy.

    2.   Allegations Arising Out of the Statistical Analysis

Plaintiffs rely on the Statistical Analysis to allege sham bidding and other collusive practices in furtherance of

-19-

the alleged conspiracy by several Defendants.  As described above, Plaintiffs assert that the IRS assumes that a 100 to 150 basis point spread between low and high bids on a municipal derivatives transaction is indicative of sham, courtesy bidding.  Plaintiffs employ this rough guideline and the Statistical Analysis to allege participation in the alleged conspiracy by BLG, MBIA, Rabobank, GE Trinity, Transamerica and XL.

      a.   <u>BLG, MBIA and Rabobank Allegations</u>

Plaintiffs allege that BLG and MBIA participated in the alleged conspiracy based on their respective low and high bids on a May 28, 2004 Riverside GIC ("May 2004 Riverside GIC"). BLG entered a bid 145 basis points lower than MBIA's winning bid.  Plaintiffs similarly allege participation by Rabobank based on its low bid in an August 1, 2003 Riverside GIC transaction ("August 2003 Riverside GIC").  Rabobank's bid was allegedly 136 basis points lower than the winning bid by Natixis Funding.

The Court is persuaded that municipal derivatives transactions for which the bidding spread is more than 100 basis points raise a plausible inference that the low and high bidders participated in the alleged conspiracy.  Taken as true, the IRS guideline provides a useful metric for evaluating the plausibility of Plaintiffs' allegations based

-20-

solely on bidding spreads.    The Court thus finds that BLG, MBIA, and Rabobank's participation to be above the speculative level and plausible for the purposes of a motion to dismiss.

b.    Transamerica and GE Trinity Allegations

Plaintiffs also rely on the Statistical Analysis to allege that Transamerica and GE Trinity participated in the alleged conspiracy.    However, unlike the allegations against BLG, MBIA and Rabobank, Plaintiffs point to bidding spreads of less than 100 basis points to support their § 1 allegations against Transamerica and GE Trinity.

Plaintiffs allege that Transamerica submitted a sham, courtesy bid in a March 2002 Los Angeles GIC auction ("March 2002 Los Angeles Transaction") for the benefit of MBIA. Although Transamerica's bid was 51 basis points below MBIA's winning bid, Plaintiffs nonetheless argue that their analysis reveals Transamerica's participation in the alleged conspiracy.    Plaintiffs contend that all of the remaining bids for the March 2002 Los Angeles Transaction were "concentrated in a tight cluster" at the top, within 1 to 14 basis points of one another.    (Tulare Complaint ¶ 443.)    Plaintiffs further allege that such a spread is indicative of conspiratorial activity, despite not falling within the IRS's guideline range, because the median bidding spread in the Statistical Analysis was found to be 25 basis points.

-21-

The Court is not persuaded that a presumption of courtesy bidding or collusive activity should be accorded to a bidding spread that falls below the 100 to 150 basis point IRS guideline range.  In alleging conspiratorial conduct against Transamerica, Plaintiffs simply cite the 25 basis point median spread, gleaned from a set of municipal derivative transactions they themselves selected, and ask the Court to find a factual connection between Defendants and the alleged conspiracy based on a comparison between the 25 basis point median spread and the 51 basis point spread in the March 2002 Los Angeles Transaction.  Plaintiffs point to no authority supporting the proposition that the median bidding spread is an appropriate metric for evaluating bidding behavior or collusive activity in municipal derivatives auctions.  Nor do they allege the statistical significance of the set of municipal derivatives transactions they selected to conduct the Statistical Analysis.  As a result, the Court finds Plaintiffs' allegations against Transamerica to be conclusory and insufficient to state a plausible § 1 claim.  The Court dismisses Plaintiffs' claim against Transamerica without prejudice, subject to reinstatement of the claim upon a sufficient showing by Plaintiffs during the course of discovery of facts supporting a plausible inference that Transamerica participated in the alleged conspiracy.

The Court similarly finds that Plaintiffs have failed to state a § 1 claim against GE Trinity.  Plaintiffs allege that XL submitted a bid that was 73 points lower than GE Trinity's winning bid on a July 16, 2003 Riverside municipal derivatives transaction ("July 2003 Riverside GIC").

Plaintiffs argue that GE Trinity's participation in the alleged conspiracy is bolstered by federal investigations into GE Trinity's conduct in the municipal derivatives market. Plaintiffs allege that GE Trinity has received a Wells notice from the SEC relating to its conduct in the municipal derivatives market, that GE Trinity has been subpoenaed by DOJ Antitrust, and that a June 10, 2004 municipal derivatives transaction between GE Trinity and Riverside is under investigation by DOJ Antitrust. Nonetheless, the Court is not persuaded that these allegations cure Plaintiffs' pleading deficiencies. Although government investigations may bolster § 1 allegations, they may not constitute the entirety of non-conclusory allegations against § 1 defendants.  See Hinds, 2010 WL 1244765, at *10 (quoting In re Tableware Antitrust Litig., 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental investigations, but must also ... undertake his own reasonable inquiry and frame his complaint with allegations of his own design.") Accordingly, the Court dismisses Plaintiffs claims against GE

-23-

Trinity without prejudice, subject to reinstatement of the claim upon a sufficient showing by Plaintiffs during the course of discovery of facts supporting a plausible inference that GE Trinity participated in the alleged conspiracy.

  c. <u>XL and Syncora Allegations</u>

  Plaintiffs argue that XL's low bid for the July 2003 Riverside GIC renders its participation in the alleged conspiracy plausible. XL's bid was 73 points lower than GE Trinity's winning bid. For the same reasons discussed above, the Court finds that allegations of a 73 basis point spread are insufficient to state a § 1 claim. Plaintiffs again attempt to bolster their allegations by alleging that XL received a subpoena from DOJ Antitrust in 2006, and that XL had the opportunity to conspire with other Defendants at industry meetings. In addition, Plaintiffs allege that XL fits the definition of a "financial institution that was a branch or agency of a foreign bank within the meaning of Title 18, United States Code, Section 20," as defined in the October 2009 CDR Indictment, and is thus implicated in the alleged conspiracy. (Tulare Complaint ¶¶ 553-54.)

  The Court is not persuaded and finds that Plaintiffs' conclusory allegations do not plausibly suggest that XL participated in the alleged conspiracy. As described above, to state a viable § 1 claim, Plaintiffs must allege a factual

connection between each Defendant and the alleged conspiracy, and may not rely solely on government investigations and conclusory allegations based on mere participation in the municipal derivatives market.   In addition, the Court has previously rejected SCAC Plaintiffs' reliance on Defendants' mere presence at industry associations and meetings to state a § 1 claim.   See Hinds, 620 F. Supp. 2d at 513.   Accordingly, the Court dismisses Plaintiffs' claim against XL without prejudice, subject to reinstatement of the claim upon a sufficient showing by Plaintiffs during the course of discovery of facts supporting a plausible inference that XL participated in the alleged conspiracy.

The Court also finds that Plaintiffs have failed to state a § 1 claim against Syncora.   Plaintiffs allegations against Syncora are premised entirely on Syncora having provided the financial guarantees for the municipal derivative transactions entered into by XL, and having succeeded to the liabilities of XL.   Since the Court has found the allegations against XL to be insufficient, the Court also finds them insufficient as to Syncora.

### 3.   Assured, FSAI and Dexia Allegations

The California Complaints allege that Assurance is liable as the successor-in-liability to FSAI as a result of Assurance's acquisition of FSA Holdings.   FSAI is allegedly

-25-

liable in the first instance because of the actions in furtherance of the conspiracy undertaken by three wholly-owned subsidiaries (collectively, the "FSA GIC Subsidiaries"). The California Complaints allege that FSAI, during the time period relevant to their allegations, "was a wholly-owned subsidiary of FSA Holdings, which issued GICs and other reinvestment derivatives through its wholly-owned subsidiaries, the FSA GIC Subsidiaries." (Tulare Complaint ¶ 58.) Plaintiffs further allege that all municipal derivative transactions entered into by FSA Holdings were subject to approval by FSAI.

Plaintiffs assert that the Statistical Analysis suggests that FSAI acted in furtherance of the alleged conspiracy. FSAI allegedly bid on both the May 2004 and August 2003 Riverside GICs described above for which the bidding spread was well over the 100 basis point threshold. Although FSAI was not the low or high bidder, the California Complaints allege that the IRS views a bidding spread of more than 100 basis points to be suggestive of multiple courtesy bids, not just one low courtesy bid. In other words, it is plausible to infer, on the basis of the IRS guidelines, that a bidding spread above 100 basis points indicates that the entire bidding process for a particular transaction was infected with conspiratorial conduct. While FSAI's mere participation in such infected transactions may not on its own suffice to

-26-

render FSAI's participation in the alleged conspiracy
plausible, Plaintiffs bolster their allegations with averments
regarding government investigations of FSAI and their
municipal derivatives transactions.  Plaintiffs assert that on
July 2, 2009 Riverside received a subpoena from DOJ Antitrust
seeking documents concerning various transactions associated
with a 2004 bond issuance.  Plaintiffs allege that FSAI bid on
three of the implicated transactions, and won a May 14, 2008
GIC for which BoA, JP Morgan, Wachovia, and Wells Fargo -- all
SCAC Defendants against which this Court previously found § 1
claims plausible -- were the other bidders.  Finally, the
California Complaints allege that the Connecticut Attorney
General has sought "to compel FSA to turn over 600 hours of
audio recordings already released to the SEC and DOJ in
connection with their investigation of the municipal
derivatives industry," believing that the tapes are "a rich
source of evidence of potential violations of state antitrust
laws."  (Id. ¶ 529.)

On the basis of FSAI's participation in the allegedly
infected transactions described above, along with the
extensive allegations of federal and state investigations, the
Court finds that FSAI's participation in the alleged
conspiracy to be "above the speculative level" and that there
exists "reasonably founded hope that the [discovery] process

-27-

will reveal relevant evidence to support a § 1 claim."
Twombly, 550 U.S. at 559 (quotation omitted).[9]

Plaintiffs also assert antitrust claims against Assured
as the successor-in-liability to FSAI because Assured "is a
mere continuation of FSA Holdings and/or the July 1, 2009
transaction was a de facto merger of FSA Holdings with
Assured." (Tulare Complaint ¶ 59.)  Under New York law,[10]

> [t]o determine whether such a de facto merger or mere
> continuation of the predecessor's business has occurred,
> courts consider: (1) continuity of ownership; (2)
> cessation of ordinary business by the predecessor; (3)
> assumption by the successor of liabilities ordinarily
> necessary for continuation of the predecessor's business;
> and (4) continuity of management, personnel, physical
> location, assets, and general business operation.

Nettis v. Levitt, 241 F.3d 186, 193-94 (2d Cir. 2001)
(applying New York law), rev'd on other grounds, Slayton v.
American Express Co., 460 F.3d 215 (2d Cir. 2006).    But
"[n]ot all of these elements are necessary to find a de facto
merger."  Fitzgerald v. Fahnestock & Co., 730 N.Y.S.2d 70, 71

---

[9] Defendants assert that Plaintiffs fail to satisfy Rule 8 of the Federal
Rules of Civil Procedure because their claims against FSAI, Dexia and
Assured are alleged collectively against "FSA."    The Court disagrees.
Given the corporate relationships alleged by the California Complaints,
the Court finds that Plaintiffs have provided sufficient notice to FSAI,
Dexia, and Assured of their claims against them.

[10] Because Assured is allegedly a Delaware corporation with its principal
place of business in New York, and because the acquisition agreement at
issue is governed, as alleged, by New York law, the Court will apply New
York law for the purposes of this motion to dismiss.    See, e.g., Cargo
Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003).  The Court
also notes that California law on successor liability is substantially
similar, and the Court's analysis would thus be analogous under California
law.    See, e.g., Orthotec, LLC v. Reo Spineline, LLC, 438 F. Supp. 2d
1122, 1130 (C.D. Cal. 2006) (applying California law).

(App. Div. 1st Dep't 2001).  Because Plaintiffs allege that
FSA Holdings ceased to exist as a result of the sale of FSA
Holdings to Assured, and that Assured continued the business
of FSA Holdings and assumed its liabilities, the Court finds
that Plaintiffs have satisfied their burden as to Assured for
the purposes of pleading successor liability.

    The Court similarly finds that Plaintiffs have stated a
plausible claim against Dexia as a successor to the FSA GIC
Subsidiaries.  The California Complaints allege that, "[a]s
part of the transaction by which [Assured] acquired FSA
Holdings, ownership of FSA Holdings' financial products group,
including the [FSA GIC Subsidiaries] ... was transferred to
Dexia." (Tulare Complaint ¶ 60.)  Plaintiffs further allege
that, as part of Dexia and Assured's acquisition of FSA
Holdings and FSAI, Dexia "expressly agreed to assume the
liabilities arising from FSA Holdings' financial products
group's business, including GICs and other reinvestment
derivatives."    (Id.)    The Court is persuaded that the
California Complaints' successor liability allegations, taken
as true, raise Plaintiffs' right to relief from Dexia above a
speculative level for the purposes of a motion to dismiss.

    4.    First Southwest Allegations

    Plaintiffs assert that First Southwest, BoA, JP Morgan,
Wachovia, Morgan Stanley "colluded to manipulate" two Rhode

-29-

Island municipal derivatives transactions in June 2002 ("Rhode Island Transactions"). Plaintiffs allege that "[d]uring the bidding process" for one of the Rhode Island Transactions, First Southwest sent "revised bid information to various [p]roviders including Hertz and MacFaddin of JP Morgan as well as Wachovia and Morgan Stanley." (Id. ¶ 369.)

Defendants argue that there is no indication that First Southwest's provision of "revised bid information" was in furtherance of the alleged conspiracy, and that Plaintiffs' allegations against First Southwest are conclusory and insufficient to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 547. The Court disagrees. For the reasons discussed in the March 2010 Decision, the Court declines to view First Southwest's alleged conduct in isolation. Instead, the Court considers the voluminous allegations of bid-rigging in the California Complaints, the SCAC, and the JSAC in finding that First Southwest's conduct here was plausibly in furtherance of the alleged conspiracy. Sharing of bid information during the bidding process is asserted by Plaintiffs and SCAC Plaintiffs to have been an integral part of the collusive scheme at issue. The Court also considers that it has previously found that BoA, JP Morgan, Wachovia and Morgan Stanley -- the providers to which First Southwest allegedly disclosed the

revised bid information -- plausibly participated in the alleged conspiracy.  As a result, the Court finds the § 1 allegations against First Southwest plausible for the purposes of a motion to dismiss.

5.  <u>PFM Allegations</u>

Plaintiffs allege that PFM participated in the alleged conspiracy based on a conversation recorded in July 20, 2004 in which Mike Harris ("Harris") of PFM requested that BoA "put in a bid on [a municipal derivatives transaction] because a third bid was needed to meet the IRS's safe harbor conditions." (Tulare Complaint ¶ 213.) Defendants argue that Harris's request is "consistent only with his doing his job for the benefit of his client -- to get as broad a market as possible and meet the requirements for employing the most efficient demonstration of the fairness of the transaction price." (PFM's Supplemental Memorandum of Law in Support of the Joint Motion, dated February 9, 2010, at 3.) The Court, however, declines to draw such inferences in PFM's favor. Instead, when viewed in the light most favorable to Plaintiffs' allegations, and resolving doubts in Plaintiffs' favor, it is significant that the allegation against PFM involves collusive communication with BoA. Given the sum of allegations against BoA in this MDL, as well as BoA's participation in the DOJ Antitrust corporate leniency program,

-31-

the Court, when drawing reasonable inferences in Plaintiffs'
favor, finds that PFM plausibly participated in the alleged
conspiracy. The IRS's safe harbor conditions are designed, in
part, to ensure the competitive bidding process for municipal
derivative investments, which Plaintiffs allege Defendants
conspired to manipulate.    Plaintiffs and SCAC Plaintiffs
assert that soliciting courtesy bids to satisfy IRS
regulations was a consistent tactic employed by Defendants to
conceal their bid-rigging and to further the conspiracy. That
PFM allegedly asked BoA to enter such a bid renders
Plaintiffs' § 1 claim against PFM plausible for the purposes
of a motion to dismiss.

     6.   <u>Goldman Sachs Allegations</u>

     Plaintiffs allege that Goldman Sachs's conduct arising
out of a 2003 Jefferson County, Alabama swap agreement ("2003
Jefferson Swap") makes Plaintiffs' claim of its participation
in the alleged conspiracy plausible.    The California
Complaints rely on filings by the SEC made in connection with
its November 4, 2009 settlement with JP Morgan, and a separate
civil complaint filed by the SEC against two former JP Morgan
managing directors (collectively, the "SEC Filings").

     According to the SEC Filings, JP Morgan agreed to make a
$3 million payment to Goldman Sachs, at the request of the
president of the Jefferson County Commission (the "County

Commission President"), to ensure that Jefferson County selected JP Morgan and not Goldman Sachs as the provider for the 2003 Jefferson Swap. Goldman Sachs accepted the payment, and paid $300,000 to Blount Parrish & Co. ("Blount"), a Montgomery, Alabama broker-dealer which had solicited the County Commission President to select Goldman Sachs because Blount could not serve as a swap provider under Alabama law.

Plaintiffs allege that the SEC Filings reveal that JP Morgan paid $3 million to Goldman Sachs "in exchange for Goldman's ... agreement not to compete with JP Morgan for a $1.1 billion swap deal associated with the county's 2003-B sewer bonds."  (Id. ¶ 485.)  Goldman Sachs contests this characterization, arguing that the SEC allegations do not reveal a conspiratorial agreement between Goldman Sachs and JP Morgan, but rather merely reflect an agreement between the County Commission President and JP Morgan to prevent Goldman Sachs from getting business. (See Reply Memorandum of Law of Defendants Goldman Sachs in Further Support of the Joint Motion, dated April 16, 2010, at 4.)  In essence, Goldman Sachs urges this Court to infer that it was merely the recipient of a kickback in a "pay-to-play" scheme, not a co-conspirator acting in furtherance of the alleged conspiracy in the municipal derivatives market.  Plaintiffs, by contrast, argue that Goldman Sachs was complicit in the conspiratorial

-33-

activity perpetrated by JP Morgan's Douglas MacFaddin, whom Plaintiffs allege is the target of criminal prosecution by DOJ Antitrust for his conduct in the municipal derivatives industry.

While Plaintiffs and Defendants contest Goldman Sachs's motives, the Court again notes that the inquiry at this stage is not whether Goldman Sachs in fact participated in the alleged antitrust conspiracy, nor is it whether the 2003 Jefferson Swap was an isolated incident of political corruption or part of a larger conspiracy as alleged by Plaintiffs. The parties have posited two factually conflicting theories regarding Goldman Sachs's conduct. Goldman Sachs in effect urges the Court not only to decide this disputed issue at this point of the litigation, but to resolve any doubt and draw inferences in Goldman Sachs's favor. Such a ruling would run counter to governing standards. Instead, the Court now considers only whether Plaintiffs have alleged sufficient facts, accepted as true, rendering it plausible that Goldman Sachs participated in the alleged conspiracy to rig bids, fix prices or otherwise manipulate the municipal derivatives market.

Having reviewed Plaintiffs' allegations, as well as the SEC Filings, and drawing reasonable inferences and resolving doubts in Plaintiffs' favor, the Court is persuaded that

Plaintiffs have alleged sufficient facts to plausibly connect Goldman Sachs to the alleged conspiracy. Goldman Sachs allegedly received and paid kickbacks in connection with the 2003 Jefferson Swap, conduct which plausibly connects it to the manipulation of a municipal derivatives transaction and the collusive scheme alleged by Plaintiffs. That there was also a corrupted political official involved in the manipulation of the 2003 Jefferson Swap does not preclude the plausible connection between Goldman Sachs's role in this instance of manipulation and the industry-wide scheme alleged by Plaintiffs.

### 7. Natixis Allegations

In its March 2010 Decision, the Court found SCAC Plaintiffs' § 1 claim against Natixis Funding plausible for the purposes of a motion to dismiss. Here, Plaintiffs assert that Natixis, Natixis Funding's parent corporation, should also be held liable on theories of agency or alter ego liability.

Plaintiffs assert that Natixis guaranteed all investment contracts issued by Natixis Funding and that these guarantees were a "necessary pre-condition" of Natixis Funding's ability to serve as a counter-party to its municipal derivatives transactions. (Tulare Complaint ¶ 70.) Plaintiffs further assert that Natixis "wholly owns" Natixis Funding, that

-35-

Natixis "fully consolidates operations" of Natixis Funding
into Natixis's financials, and that Natixis's registration
documents indicate that it "only fully consolidates those
subsidiaries that Natixis controls." (<u>Id.</u>) Finally,
Plaintiffs assert that the two entities "share[] certain
executives" including a current Natixis director who was
previously president of Natixis Funding. (<u>Id.</u>)

Under California law, to demonstrate that a parent and
its subsidiary are alter egos, a plaintiff must establish a
prima facie case that the two companies (1) share such unity
of interest and ownership that the companies' separateness no
longer exists and that (2) the failure to disregard the
separate corporate identities would result in fraud or
injustice. <u>See Mesler v. Bragg Mgmt. Co.</u>, 702 P.2d 601, 606
(Cal. 1985);[11] <u>Las Palmas Assocs. V. Las Palmas Ctr. Assocs.</u>,
1 Cal. Rptr. 2d 301, 317 (Cal. Ct. App. 1991); <u>see also</u> <u>Doe v.
Unocal Corp.</u>, 248 F.3d 915, 926 (9th Cir. 2001).

Natixis argues that no alter ego relationship exists
between corporate entities merely because a company guarantees
the financial obligations of a subsidiary or shares officers
or directors. Indeed, a parent corporation may be involved

---

[11] As the transferee Court in a MDL, the Court applies the substantive
state law of the jurisdiction in which the action was filed. <u>See</u> <u>De
George v. American Airlines, Inc.</u>, No. 08 Civ. 2103, 2009 WL 1868016, at
*1 (2d Cir. June 30, 2009).

directly in certain aspects of its wholly-owned subsidiary's affairs without subjecting itself to alter ego status.  For example, as long as it maintains corporate formalities, a parent may provide financing to its subsidiary or approve expenditures or sales by the subsidiary.  See Unocal, 248 F.3d at 926; Fletcher v. Atex, Inc., 68 F.3d 1451, 1461 (2d Cir. 1995) (finding no alter ego liability where parent controlled subsidiary's major expenditures and parent had substantial presence on subsidiary's board of directors).  In support of its motion to dismiss, Natixis points to cases in which courts have found no alter ego status where parent corporations guarantee loans of their subsidiaries.  See Kramer Motor, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980) (parent guaranteeing bank loans to subsidiary); Calvert v. Huckins, 875 F. Supp. 674, 679 (E.D. Cal. 1995) (parent guaranteeing subsidiary's promissory note).  But notably, courts have also found a parent corporation's loan guarantees to be a point of interrelatedness indicative of joint enterprise for the purposes of overcoming corporate separateness.  See Tripmasters, Inc. v. Hyatt Int'l Corp., 696 F. Supp. 925, 937-38 (S.D.N.Y. 1988); Jayne v. Royal Jordanian Airlines Corp., 502 F. Supp. 848, 858 (D.C.N.Y. 1980). Ultimately, to assess whether a parent so controls its subsidiary as to render it a mere instrumentality, courts

-37-

weigh numerous considerations, including whether a
subsidiary's obligations are assumed to be those of the
parent, segregation of corporate records, inadequate
capitalization, commingling of funds and other assets, whether
the subsidiary is operated exclusively in the interest of the
parent, and whether the parent and subsidiary consolidate
financial statements. See, e.g., Sonora Diamond Corp. v.
Superior Court, 99 Cal. Rptr. 2d 824, 836 (Cal. Ct. App.
2000); Brooklyn Navy Yard Cogeneration Partners, L.P. v.
Superior Court of Orange County, 70 Cal. Rptr. 2d 419, 425
(Cal. Ct. App. 1997).

In essence, Plaintiffs allege that Natixis controlled
whether Natixis Funding could participate in all of its
municipal derivatives transactions. Taken as true, the Court
finds Plaintiffs' allegations to be materially distinguishable
from the parent-subsidiary relationship cases involving loan
guarantees relied on by Defendants. Whereas those cases
involved isolated loan guarantees offered to enable the
subsidiary to further its independent business enterprise,
here, Plaintiffs allege that Natixis Funding and Natixis
operated in tandem to serve as counter-party to numerous
municipal derivatives transactions, including those
transactions implicated in the alleged antitrust conspiracy.

On the basis of Plaintiffs' allegations that Natixis
controls Natixis Funding generally, and that Natixis and
Natixis Funding, in effect, operated as a single enterprise to
serve as a counter-party to municipal derivatives
transactions, the Court finds that Plaintiffs have alleged
sufficient facts to plead a prima facie case of alter ego
liability. In so doing, the Court also considers that alter
ego liability is an equitable doctrine, and that piercing the
corporate veil may be appropriate where failing to do so would
lead to an inequitable result. See Katzir's Floor & Home
Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1149 (9th Cir. 2004)
(applying California law); Tomaselli v. Transamerica Ins. Co.,
31 Cal. Rptr. 2d 433, 443 (Cal Ct. App. 1994). The Court
finds that Plaintiffs have plausibly alleged that the legal
fiction separating Natixis and Natixis Funding was illusory as
to the transactions at issue, and that Natixis Funding was
merely a conduit for Natixis's participation in the municipal
derivatives market. If in fact Natixis and Natixis Funding
operated as a unitary enterprise for the purposes of the
municipal derivatives transactions at issue, for Natixis to
now assert its corporate separateness to escape liability for
any frauds or misdeeds committed by the enterprise would be
inequitable and unjust. Accordingly, the Court denies
Defendants' motion to dismiss the claims against Natixis.

-39-

### III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 580) of defendants The Goldman Sachs Group, Inc., Goldman Sachs Mitsui Marine Derivative Products, L.P. and Goldman Sachs Bank USA is DENIED; and it is further

**ORDERED** that the motion (Docket No. 587) of defendants Syncora Guarantee Inc. and Syncora Holdings Ltd. (collectively, "Syncora") to dismiss the complaints of the City of Los Angeles, City of Riverside, City of Stockton, Contra Costa County, County of San Diego, County of San Mateo, County of Tulare, Los Angeles World Airports, The Redevelopment Agency of the City of Stockton, Sacramento Municipal Utility District, and Sacramento Suburban Water District (collectively, the "California Complaints") is GRANTED; and it is further

**ORDERED** that the motion (Docket No. 593) of defendants to dismiss the California Complaints is DENIED as to JP Morgan Chase & Co., Morgan Stanley, Wells Fargo & Co., Inc., National Westminster Bank PLC, MBIA, Inc., Rabobank Group, Société Générale SA, CDR Financial Products, Bear Stearns & Co. Inc., Piper Jaffray & Co., UBS AG, UBS Financial Services, Inc., UBS Securities, LLC, Winters & Co. Advisors LLC, Wachovia Bank N.A., PFM Group, Inc., PFM Asset Management LLC, Assured

-40-

Guaranty US Holdings Inc., Dexia S.A., Bayerische Landesbank Girozentrale, Natixis S.A., Natixis Funding Corp., Investment Management Advisory Group, Inc., First Southwest Company, George K. Baum & Co., Financial Security Assurance Inc., Sound Capital Management, Inc., Citibank, N.A., Citigroup Financial Products, Inc., and Citigroup Global Markets Holdings, Inc.; and it is further

ORDERED that the motion (Docket No. 593) of defendants to dismiss the California Complaints is GRANTED as to AIG Financial Products Corp., Transamerica Life Insurance Company, XL Asset Funding Company LLC, GE Funding Capital Market Services, Inc., Trinity Funding Co., LLC, Trinity Plus Funding Co., LLC, XL Life Insurance & Annuity Company, XL Capital Ltd., XL Life and Annuity Holding Company, and General Electric Capital Corporation (collectively and together with Syncora, "Dismissed Defendants"). The Court dismisses plaintiffs claims against Dismissed Defendants without prejudice, subject to reinstatement of the claims upon a sufficient showing by plaintiff-municipalities during the course of discovery of facts supporting a plausible inference that Dismissed Defendants participated in the alleged conspiracy; and it is finally

ORDERED that the parties are directed to appear at a pretrial conference on April 30, 2010 at 1:30 p.m. and, in

-41-

preparation for that conference, to confer and propose an agreed upon Case Management Plan in the form provided by the Court.

**SO ORDERED.**

Dated:      New York, New York
            26 April 2010

                                                    Victor Marrero
                                                    U.S.D.J.