# REDACTED - FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MUNICIPAL DERIVATIVES ANTITRUST
LITIGATION

_____

THIS DOCUMENT RELATES TO:
ALL ACTIONS

MDL No. 1950
Master Docket No. 08-02516 (VM) (JCF)

**Memorandum of Law in Support of
Class Plaintiffs' Motion to Protect the
Interests of the Putative Class and
Preserve this MDL Court's Jurisdiction
And For Addition Of Necessary Parties**

<u>CLASS ACTION</u>

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................................1

II. FACTUAL BACKGROUND.................................................................................3

    A. EARLY PROCEEDINGS.................................................................................3

    B. CLASS NEGOTIATIONS WITH BOA.................................................................5

    C. BOA'S NATIONAL OPT IN SETTLEMENT ......................................................7

        1. The Opt In Structure of the State Agreement. ............................................7

    D. THE PROPOSED "NOTICE PACKET" UNDER THE STATE AGREEMENT.................................................................................10

    E. AG ANNOUNCEMENTS CONCERNING THE STATE AGREEMENT.................................................................................10

III. ARGUMENT.................................................................................11

    A. THIS COURT HAS JURISDICTION UNDER THE ALL WRITS ACT AND RULE 23 TO PROTECT THE PUTATIVE CLASS AND THE JURISDICTION OF THE COURT. .............................................11

        1. The Court Has Authority Under the All Writs Act to Protect Its Own Jurisdiction. .......................................................11

        2. Under Rule 23, this Court May Make Appropriate Orders to Protect the Class.......................................................16

    B. THIS COURT SHOULD PROTECT THE PUTATIVE CLASS AND THE JURISDICTION OF THE COURT FROM UNAUTHORIZED CLASS SETTLEMENT NEGOTIATIONS, UNFAIR CLASS SETTLEMENTS, AND MISLEADING COMMUNICATIONS TO THE CLASS. ...............................................................20

        1. The Court Should Protect the Class from the Opt In Settlement Entered Into Without its Authorization. ................................. 20

        2. The Court Should Protect the Class from an Opt In Settlement that Has Not Been Subject to Fairness Procedures....................................22

        3. The Court Should Supervise Notice to the Class.......................................24

4.     The Court Should Protect the Class from Misleading Communications. ........................................................................25

C.     The Court Should Also Order The AGs of The Settling States To Be Joined In This Action as Necessary Parties Pursuant to Rule 19(a)..............................................................................................27

IV.    CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Avon Cosmetics (FEBO)Ltd. v. New Hampton, Inc.*,
    No. 90 Civ. 7208 (RLC), 1991 WL 90808 (S.D.N.Y. May 22, 1991) ...................................29

*Battle v. Liberty Nat'l Life Ins. Co.*,
    877 F.2d 877 (11th Cir. 1989) ............................................................................................14

*Belt v. Emcare, Inc.*,
    299 F. Supp. 2d 664 (E.D. Tex. 2003) ...............................................................................19

*Burford v. Cargill, Inc.*,
    No. 05-0283, 2007 WL 81667 (W.D.La. June 9, 2007) .......................................................27

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010).................................................................................................12

*Cobell v. Norton*,
    212 F.R.D. 14 (D.D.C. 2002)..............................................................................................19

*Commonwealth of Pa. v. Milk Indus. Management Corp.*,
    812 F.Supp. 500 (E.D. Pa. 1992) ........................................................................................9

*Erhardt v. Prudential Group, Inc.*,
    629 F.2d 843 (2d Cir. 1980)........................................................................................18, 25

*Friedman v. Intervet Inc.*,
    No. 3:09-cv-2945, 2010 WL 3087432 (N.D. Ohio Aug. 6, 2010)........................................19

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981).......................................................................................................16, 18

*Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*,
    115 F.R.D. 506 (E.D. Pa. 1987).........................................................................................17

*Hinds County v. Wachovia Bank, N.A.*,
    700 F.Supp.2d 378 (S.D.N.Y. 2010).....................................................................................5

*Hinds County v. Wachovia Bank, N.A.*,
    Nos. 08-CV-2516, and 08-MDL-1950, 2010 WL 1837823 (S.D.N.Y. April 26, 2010) .........10

*Hoffmann-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989)...........................................................................................................18

*In re Armored Car Antitrust Litig.*,
    645 F.2d 488 (5th Cir. 1981) ................................................................9

*In re Asbestos School Litig.*,
    No. 83-0268, 1991 WL 61156 (E.D. Pa. Apr. 16, 1991)........................................14

*In re Baldwin-United Corporation (Single Premium Deferred Annuities Insurance Litig.)*,
    770 F.2d 328 (2d Cir. 1985) ....................................................14, 15, 16

*In re Bank of America Wage & Hour Employment Litig.*,
    No. 10-MD-2138 JWL, 2010 WL 3833034 (D. Kan. Sept. 10, 2010) ...................................14

*In re Corrugated Container Antitrust Litig.*,
    659 F.2d 1322 (5th Cir. 1981) ................................................................14

*In re Currency Conversation Fee Antitrust Litig.*,
    224 F.R.D. 555 (S.D.N.Y. 2004) ..................................................................17, 19

*In re Diet Drugs Prods. Liability Litig.*,
    282 F.3d 220 (3d Cir. 2002)....................................................................14

*In re Dynamic Random Access (DRAM) Antitrust Litig.*,
    No. M 02-1486 PJH, 2007 WL 2517851 (N.D. Cal. Aug. 31, 2007), *recon. denied*,
    2007 WL 3034369 (N.D. Cal. Oct. 16, 2007) ...........................................9

*In re Fine Paper Antitrust Litig.*,
    82 F.R.D. 143 (E.D. Pa. 1979), *aff'd*, 685 F.2d 810 (3d Cir. 1982), *cert. denied sub
    nom. State of Alaska v. Boise Cascade Corp.*, 459 U.S. 1156 (1983) .......................................9

*In re General Motors Corp. Engine Interchange Litigation*,
    594 F.2d 1106 (7th Cir. 1979), *cert. denied*, 444 U.S. 870 (1979)..............................22, 23, 24

*In re Jamster Mktg. Litig.*,
    MDL No. 1751, 2008 WL 4482307 (S.D. Cal. Sept. 29, 2008) ............................................14

*In re Joint Eastern & Southern Dist. Asbestos Litig.*,
    134 F.R.D. 32 (E.D.N.Y. 1990)..................................................................14

*In re Lease Oil Antitrust Litig.*,
    48 F.Supp.2d 699 (S.D. Tex. 1998) .............................................................12, 13

*In re Managed Care Litig.*,
    236 F.Supp.2d 1336 (S.D. Fla. 2002) ...........................................................13, 14

*In re Municipal Derivatives Antitrust Litig.*,
    252 F.R.D. 184 (S.D.N.Y. 2008) ................................................................4, 5

*In re Municipal Derivatives Antitrust Litig.*,
  560 F.Supp.2d 1386 (J.P.M.L. 2008) ...............................................................................4, 20

*In re PaineWebber Ltd. Partnerships Litig.*,
  No. 94 Civ. 8547 SHS, 1996 WL 374162 (S.D.N.Y. July 1, 1996) ........................................15

*In re Parmalat Securities Litig.*,
  477 F.Supp.2d 602 (S.D.N.Y.2007).........................................................................................29

*In re Prudential Ins. Co. of America Sales Practices Litig.*,
  314 F.3d 99 (3d Cir. 2002)......................................................................................................14

*In re Reserve Fund Sec. & Derivative Litig.*,
  673 F.Supp.2d 182 (S.D.N.Y. 2009).......................................................................................15

*In re School Asbestos Litig.*,
  842 F.2d 671 (3d Cir. 1988)....................................................................................................18

*In re WorldCom, Inc. Sec. Litig.*,
  No. 02 Civ. 3288, 2003 WL 22701241 (S.D.N.Y. Nov.17, 2003) ....................................18, 25

*ITT Community Development Corp.v. Barton*,
  569 F.2d 1351 (5th Cir. 1978) ................................................................................................12

*Jenifer v. Del. Solid Waste Auth.*,
  Nos. CIV. A. 98-270, CIV. A. 98-565, 1999 WL 117762 (D. Del. Feb. 25, 1999) ....19, 26, 27

*Kamm v. California City Development Co.*,
  509 F.2d 205 (9th Cir. 1975) ..................................................................................................24

*Kern v. Siemens Corp.*,
  393 F.3d 120 (2d Cir. 2004) ........................................................................................2, 20, 21

*Keystone Tobacco Co. v. U.S. Tobacco Co.*,
  238 F. Supp. 2d 151 (D.D.C. 2002).........................................................................................17

*Kleiner v. First National Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) .......................................................................17, 18, 19, 25

*Lawrence v. Household Bank (SB), N.A.*,
  343 F.Supp.2d 1094 (M.D. Ala. 2004) ...................................................................................15

*Lincoln Property Co. v. Roche*,
  546 U.S. 81 (2005)...................................................................................................................27

*Oneida Indian Nation of New York v. Madison County, Oneida County, N.Y.*,
  605 F.3d 149 (2d Cir. 2010).....................................................................................................28

*Pacific Gas & Elec. Co. v. County of Stanislaus*,
947 P.2d 291 (1997)..........................................................................................10

*Ralph Oldsmobile, Inc. v. General Motors Corp.*,
No. 99-CV-4567, 2001 WL 1035132 (S.D.N.Y Sept. 7, 2001) ................................17, 19, 27

*Stanich v. Travelers Indemnity Co.*,
249 F.R.D. 506 (N.D. Ohio 2008) ........................................................................24

*State of Cal. ex rel. Harris v. PriceWaterhouseCoopers, LLP*,
141 P.3d 256 (2006)...........................................................................................10

*State of Ill. v. Ampress Brick Co.*,
67 F.R.D. 457 (N.D. Ill. 1975)..............................................................................9

*State of N.J. v. General Motors Corp.*,
MDL No. 65, 1974 WL 958 (N.D. Ill. March 7, 1974) ...........................................9

*State of New York v. Cedar Park Concrete Corp.*,
665 F.Supp. 238 (S.D.N.Y. 1987).........................................................................9

*United States v. New York Telephone Co.*,
434 U.S. 159 (1977)..........................................................................................12

*Waldo v. Lakeshore Estates, Inc.*,
433 F. Supp. 783 (E.D. La. 1977), *appeal dismissed*, 579 F.2d 642 (5th Cir. 1978) .............19

*Westerfield v. Quizno's Franchise Co.*,
No. 06-C-1210, 2007 WL 1062200 (E.D. Wis. Apr. 6, 2007) ...............................19

STATUTES

28 U.S.C. § 1407.............................................................................................4, 20

28 U.S.C. § 1651(a) ..........................................................................................11

Antitrust Criminal Penalty Enforcement & Reform Act of 2004, Pub. L. 108-237, 118
Stat. 665 (2004)..........................................................................................3, 4, 5

OTHER AUTHORITIES

Fed. R. Civ. P. 19.........................................................................................28, 30

Fed. R. Civ. P. 19(a) ....................................................................................27, 29

Fed. R. Civ. P. 19(a)(1)......................................................................................28

Fed. R. Civ. P. 19(a)(1)(B) ...............................................................................29

Fed. R. Civ. P. 19(a)(2) ...........................................................................................28

Fed. R. Civ. P. 19(a)(2)(ii) ......................................................................................29

Fed. R. Civ. P. 23 ............................................................................................. passim

Fed. R. Civ. P. 23(d) ........................................................................................ passim

Fed. R. Civ. P. 23(e) ..........................................................................................22, 25

Fed. R. Civ. P. 23(g) ..........................................................................................16, 17

Fed. R. Civ. P. 23(g)(4) ............................................................................................16

Fed. R. Civ. P. 65 .....................................................................................................18

Federal Judicial Center, *Manual for Complex Litigation* § 21.12 (4th ed. 2004).........16

2 A. Conte & H. Newberg, *Newberg on Class Actions* §4.33( 4th ed. 2010).............24

Benjamin Kaplan, <u>Continuing Work of the Civil Committee: 1966 Amendments of the</u>
<u>Federal Rules of Civil Procedure (I)</u>, 81 Harv. L.Rev. 356 (1967) ........................21

State of Connecticut, Office of the Attorney General, Press Release, *Attorney General*
*Announces National Settlement with Bank of America for Anticompetitive Scheme*
*that Defrauded Municipalities and Nonprofits* (Dec. 7, 2010), *available at*
<u>http://www.ct.gov/ag/cwp/view.asp?Q=469522</u>.....................................................11

State of North Carolina, Department of Justice, Press Release, *Bank of America to pay*
*$3.4 Million for Scheme that Hurt NC Local Goverments, Schools, Non*-Profits (Dec.
7, 2010) *available at* <u>http://www.ncdoj.gov/News-and-Alerts/News-Releases-and-</u>
<u>Advisories/Press-Releases/Bank-of-America-to-pay-$-3-4-million-for-scheme-</u>
<u>tha.aspx</u> ................................................................................................................11

State of Texas, Office of the Attorney General, Press Release, *Texas, 19 States Resolve*
*Antitrust Investigation into Bank of America's Municipal Derivatives* Marketing
(Dec. 7, 2010)*available at* <u>http://www.oag.state.tx.us/oagNews/release.php?id=3561</u> .........11

# I.    INTRODUCTION

Interim Class Counsel for the putative national class hereby submit this brief pursuant to the Court's "Order" (Jan. 10, 2011) (Dkt. No. 252) ("Briefing Order").

On December 7, 2010, Defendant Bank of America Corporation ("BoA")[1] entered into a Settlement Agreement ("State Agreement") with the Attorneys General ("AGs") of 20 (now 21) states (the "Settling States"), attached as Appendix F to the accompanying Declaration of Michael Hausfeld ("Hausfeld Decl.").[2] Notices under the State Agreement could go out to putative class members in MDL No. 1950 potentially as early as March 3, 2011.

The State Agreement is not an individual settlement with BoA by public entities within the confines of the 21 Settling States.  It is a national opt in settlement for the class claims in this case. It competes with the class mechanism presided over by this Court and the case for which this Court appointed Interim Class Counsel. The Settling States have: (a) created a fixed settlement fund; (b) ordered the hiring of a claims administrator;  (c) developed a nationwide written notice procedure with followup available by telephone or through an internet website; (d) established a standardized opt in, claims-made procedure available to class members throughout the United States; (e) provided for a standardized release that includes the class claims in this case; (f) conducted negotiations to offer opt in participation to entities who are known to be within the putative class represented by Interim Class Counsel without their consent; and (g)

---

[1] The Second Consolidated Amended Complaint ("SCAC") names Bank of America, N.A. ("BANA") as a defendant. BANA is a wholly-owned banking subsidiary of BAC. Because the State Agreement operates to release both BAC and BANA with respect to claims by participating counterparties, Interim Class Counsel believe the requested relief in this motion is appropriate.

[2] The participating States are: Alabama, California, Connecticut, Florida, Illinois, Kansas, Maryland, Massachusetts, Michigan, Missouri, Montana, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina and Texas. In a letter dated December 20, 2010 ("NY AG Letter"), the New York AG indicated that an unidentified 21st state had entered into the agreement.

functioned as if they were class counsel by making allocation, eligibility and notice content decisions.

But, of course, the settling parties are *not* class counsel, interim or otherwise. They have *not* filed any judicial action seeking relief under Fed. R. Civ. P. 23 or any other rule or statute, or even notified this Court about this Settlement until Interim Class Counsel brought it to the Court's attention. Instead, their settlement procedure is an administrative one, with no judicial oversight, establishing an opt in class which *are forbidden* under Rule 23. *Kern v. Siemens Corp.*, 393 F.3d 120, 125-26 (2d Cir. 2004) ("*Kern*").

The State Agreement sets aside $62.5 million for a group of participating class members, called counterparties, the ultimate number of which is subject to the complete discretion of the AGs of the Settling States and BoA. Whether and how much a counterparty gets paid depends on the exercise of the discretion of the Settling AGs and BoA. It also does not appear that the proposed notice packet will explain to participating counterparties their option of remaining in the putative class in this case as they decide whether or not to release their claims against BoA. And, as presently contemplated, *only* BoA and the AGs of the Settling States will get to decide what is, or is not, included in any written communications to the class.

The proposed settlement will thus undermine and thwart the authority of this Court and Class Counsel. Further, the proposed settlement with potential opt in class members is based on negotiations not authorized by Class Counsel, but nonetheless will not be subject to any fairness procedures. Furthermore, it is essential that any notice sent to putative class members in connection with the State Agreement fully and accurately disclose and inform class members of all of the information needed to make an informed decision about whether to elect to participate in the settlement.

Pursuant to the All Writs Act and Fed. R. Civ. P. 23, the Court is requested to enjoin BoA and those acting in concert with it from proceeding with the opt in provisions of the State Agreement,  If a such a settlement is permitted, to protect class members' interests and to preserve the jurisdiction of the MDL Court, Class Plaintiffs respectfully request the entry of an order: (1) requiring advance submission to Interim Class Counsel and this Court, and approval by the Court, of written notices and communications to class members, and (2) ordering that the State Settlement be subject to discovery and fairness procedures.  Class Plaintiffs also respectfully request that the AGs of the Settling States be added as necessary parties in MDL No. 1950.

## II.      FACTUAL BACKGROUND

### A.      Early Proceedings

On February 9, 2007, BoA entered into the antitrust corporate leniency program administered by the Department of Justice under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. 108-237, 118 Stat. 665 (2004) ("ACPERA").  On September 12, 2007, Interim Class Counsel entered into a Confidentiality Agreement ("Confidentiality Agreement") (attached as Exhibit A to the accompanying Hausfeld Decl.) with BoA, under which Interim Class Counsel agreed not to seek treble damages against BoA in exchange for information and evidence pertaining to the conspiracy.

The Confidentiality Agreement also imposed obligations upon BoA with respect to the settlement of the claims at issue in MDL No. 1950. Specifically, the parties "agree[d] and acknowledge[d] that they are each entering this Agreement with the intent of working in good faith to attempt to settle and resolve *all potential claims* . . . ." Confidentiality Agreement, p. 1 (emphasis added).  The Confidentiality Agreement further provided that:

> During the course of settlement negotiations with Plaintiffs' Counsel pursuant to this Agreement, and to promote efficiency, economy, and the confidentiality of Settlement Materials, Plaintiffs' Counsel shall coordinate, organize, and manage any and all cooperation with any potential civil plaintiffs . . . . The designation of Plaintiffs' Counsel to be responsible for such coordination, organization, and management *applies to all aspects of any settlement negotiations* regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business while this Agreement is effective . . . .

*Id.* ¶ 10 (emphasis added).

Consistent with these provisions, BoA agreed that, unless and until it terminated any settlement discussions, "it will not convey any settlement materials to any potential civil plaintiff regarding potential claims arising out of the alleged anticompetitive activity in the municipal derivative business that is not represented by Plaintiffs' Counsel." *Id.* Due to the inadequacy of any remedy at law, the plain language of the Agreement states that equitable relief is appropriate in the event of any "threatened or actual violation" of the Agreement. *Id.* ¶ 15.

In March of 2008, the first complaint alleging bid rigging in the derivatives industry was filed in the United States District Court for the District of Columbia on behalf of Fairfax County and a putative class. *Fairfax County, Va. v. Bank of America*, Case No. 1:08-433 (D.D.C. March 12, 2008). More complaints were filed in other districts and on behalf of other municipalities.

On June 16, 2008, the JPML, pursuant to 28 U.S.C. § 1407, transferred all pending and subsequent actions to this District and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings. *In re Municipal Derivatives Antitrust Litig.*, 560 F.Supp.2d 1386 (J.P.M.L. 2008) ("MDL Opn.").

On July 25, 2008 and December 9, 2008, this Court issued orders appointing Interim Co-Lead Class Counsel in this action as "best able to represent the interests of" the plaintiffs. *In re Municipal Derivatives Antitrust Litig.*, 252 F.R.D. 184 (S.D.N.Y. 2008), *amended by* "Order" (Dec. 9, 2008) (Dkt. No. 327). The Court's order discussed Class Counsel's ACPERA

Agreement with BoA and that "the Firms initiated settlement negotiations with BoA, overseen by the Honorable Daniel Weinstein (Ret.), and culminating in the Agreement." 252 F.R.D. at 186.

The Defendants' motion to dismiss the Second Amended Complaint ("SCAC") was denied on March 25, 2010. *Hinds County v. Wachovia Bank, N.A*., 700 F.Supp.2d 378 (S.D.N.Y. 2010).

**B.      Class Negotiations with BoA**

As discussed in greater detail in the Hausfeld Decl., Interim Class Counsel and counsel for BoA have met dozens of times over the course of more than two years to discuss settlement, both before Judge Weinstein and in separate meetings among the attorneys and their experts Hausfeld Decl. ¶9.    Interim Class Counsel obtained enormous amounts of transactional information from BoA and other defendants that was used to construct a database for the purpose of computing a settlement range. *Id.* ¶8. This work was laborious and costly, entailing extensive efforts by Interim Class Counsel and their expert.

[REDACTED]

The State AGs have played no part in the extensive mediation process before Judge Weinstein, despite repeated attempts at inclusion. They have not filed a single enforcement action of their own nor have they, to date, intervened or filed separate judicial actions in the MDL. *Id.* ¶14. Instead, the State AGs have let Interim Class Counsel litigate the viability of the SCAC, which resulted in this Court's March 25, 2010 order denying *in toto* motions to dismiss the complaint. The State AGs were the clear beneficiaries of that work; if this Court had agreed with Defendants' position, the State AGs would have no claims to pursue, let alone settle.

[REDACTED] Both of these settlement documents are available to the Court via *in camera* submission (upon request) provided that such provision shall not constitute a waiver of privilege.

On December 3, 2010, William Isaacson of Boies Schiller & Flexner LLP, one of the Interim Class Counsel in MDL 1950, spoke with representatives of the Florida, Connecticut and other AG offices, in an effort to convince them to work together with Interim Class Counsel in

---

[3] Interim Class Counsel were hopeful that a notice pursuant to this Draft Settlement could be combined with the notice for the class settlement they had already obtained with defendant Morgan Stanley.

an effort to settle the claims against BoA. *Id.* ¶19. The meeting was cordial and, as a result of it, Mr. Isaacson sent a copy of the Draft Settlement provided to BoA to these State AGs.

### C.    BoA's National Opt In Settlement

On December 7, 2010, counsel for Bank of America spoke to Interim Class Counsel and said that BoA had entered into a global settlement of the municipal derivative claims against it with the Internal Revenue Service ("IRS"), the Securities & Exchange Commission ("SEC"), the Federal Reserve Board ("FRB"), the Office of the Comptroller of the Currency ("OCC") and the Settling States. *Id.* ¶20.   In contrast to the narrow agreements with federal regulatory bodies, the State Agreement is more expansive. The State Agreement provides that BoA pay $67 million to settle the claims by the Settling States with respect to BoA's conduct relating to municipal derivatives from 1998 through 2007. State Agreement, p. 11, ¶L; p. 12, ¶3. An amount of $4.5 million is payable within 30 days of December 7 to the AGs of the Settling States to cover their attorneys' fees and costs. *Id.*, p. 17, ¶18. The remaining $62.5 million will be placed in an escrow fund within ten days of execution of a contract with an escrow agent. *Id.*, p. 12, ¶4.

The State Agreement has not been filed in any court of law and has so far not been subjected to any judicial scrutiny. Hausfeld Decl. ¶31.

### 1.    The Opt In Structure of the State Agreement.

The State Agreement at p. 15, ¶¶12-13 contemplates an opt in process by "Eligible Counterparties" and "Additional Eligible Counterparties." The former are municipal bond counterparties who entered into "Covered Derivatives"[4] with BoA. *Id.*, p. 10, ¶F. They will

---

[4] "Covered Derivatives" are defined by the State Agreement in Attachment A thereto at page 26. They consist of bidded or negotiated municipal derivatives where: (a) the transaction occurred between January 1, 1998 and December 31, 2003; (b) BoA was the provider (*i.e.*, in bid instances, where it won the bid); and (c) the AGs of the Settling States determine that the transaction was affected by BoA's misconduct.

receive a notice of the settlement and opportunity to opt in pursuant to a schedule set forth in Attachment B (p. 27) to the State Agreement. "Additional Eligible Counterparties" are those identified by the Settling States in their untrammeled discretion within 120 days after the notice is disseminated. *Id*., p. 11, ¶G.

Participating counterparties will have to sign a release to BoA with respect to: (a) bid-rigging and price-fixing of municipal derivatives (b) engaging in or conspiring with others to engage in unfair and deceptive trade practices with respect to municipal derivatives and (c) "any anticompetitive, deceptive, unfair, or fraudulent conduct" between providers and brokers relating to municipal derivatives during the period between 1998 and December 31, 2007. *Id*., p. 30, ¶C.

It is clear that the State Agreement includes the release of class claims. Paragraph 38 at page 21 of the agreement states that each of the AGs of the Settling States releases BoA "from all civil claims, counterclaims, cross claims, setoffs, causes of action of any type (whether common law, equitable, statutory, regulatory or administrative, class, individual or otherwise in nature, and whether reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured), demands, disputes, damages, restitution, whenever incurred, and liabilities of any nature whatsoever, including, without limitation, costs, fines, debts, expenses, penalties and attorneys' fees, known or unknown, arising out of the Relevant Conduct through December 31, 2007" that could have been asserted in the State's sovereign capacity. (Emphases added). Each "Participating Counterparty" also has to sign its own release. That release (paragraph 1 at pages 30-31) contains expansive language tracking what is quoted above that encompasses class claims.

No allocation methodology is set forth in the State Agreement. Paragraph 10 at page 15 states that payments shall be made "pursuant to a formula developed by the Attorneys General in

consultation with" BoA. But the document goes on to note that "[n]otwithstanding the foregoing, the Attorneys General shall have the right to adopt a formula they deem appropriate for payments from the Fund."

There was a reason why this opt in process for claimants was chosen. The Clayton Act does not permit states to bring representative claims on behalf of other governmental entities. *In re Dynamic Random Access (DRAM) Antitrust Litig*., No. M 02-1486 PJH, 2007 WL 2517851 at *5 (N.D. Cal. Aug. 31, 2007), *recon. denied*, 2007 WL 3034369 (N.D. Cal. Oct. 16, 2007) ("*DRAM*"). Furthermore, in many jurisdictions, State AGs cannot bring claims in on behalf of political subdivisions or need the express consent of such subdivisions before they can sue or release claims pursuant to state laws on their behalf. This is true, for example, in Illinois,[5] Maryland,[6] Massachusetts,[7] New Jersey,[8] New York,[9] and Pennsylvania.[10]

---

[5] *State of Ill. v. Ampress Brick Co*., 67 F.R.D. 457, 460 (N.D. Ill. 1975) (Illinois Attorney General could not represent political subdivisions for claims under Illinois Antitrust Act without "the express authorization of the entity to be joined as a member of the class").

[6] *In re Armored Car Antitrust Litig*., 645 F.2d 488, 493 (5th Cir. 1981) (court looked to whether individual state subdivisions had consented to state's opt-out letter).

[7] *In re Fine Paper Antitrust Litig*., 82 F.R.D. 143, 156-57 (E.D. Pa. 1979), *aff'd*, 685 F.2d 810 (3d Cir. 1982), *cert. denied sub nom. State of Alaska v. Boise Cascade Corp*., 459 U.S. 1156 (1983) (State of Massachusetts was not allowed to proceed as a unitary antitrust plaintiff acting on behalf of its various subdivisions).

[8] *State of N.J. v. General Motors Corp*., MDL No. 65, 1974 WL 958 at *1-*2 (N.D. Ill. March 7, 1974) ("[t]he Attorney General for the State of New Jersey may of course proceed in this Court on behalf of the State of New Jersey and on behalf of any other political subdivisions or agencies of the State which become named plaintiffs and authorize the State Attorney General to represent them").

[9] *State of New York v. Cedar Park Concrete Corp*., 665 F.Supp. 238, 242 (S.D.N.Y. 1987) (holding that the New York Attorney General could not proceed on a representative basis on behalf of state subdivisions under either federal law or New York's Donnelly Act); *DRAM*, 2007 WL 2517851 at *5-*6 (New York Attorney General needed consent of state subdivisions before it could sue on their behalf to recover overcharges under Donnelly Act).

[10] *Commonwealth of Pa. v. Milk Indus. Management Corp*., 812 F.Supp. 500, 507 (E.D. Pa. 1992) (allowing the Pennsylvania Attorney General representation of the Philadelphia School District in light of the fact that the school district had expressly assigned its statutory bid-rigging claims to the state). The California Supreme Court has held that a county in that state may bring antitrust claims on its own behalf under the state's Cartwright Act, even though it was contended that only the California Attorney General could pursue such claims. *Pacific Gas & Elec. Co. v. County of Stanislaus*, 947 P.2d 291, 296 (1997). In a later case, the California Supreme Court held that public entities, such as cities, may not bring qui tam actions on behalf of other governmental agencies under the California

### D. The Proposed "Notice Packet" Under The State Agreement.

Participating counterparties will get a "notice packet" concerning the settlement and an opportunity to opt in, pursuant to a schedule set forth in Attachment B (p. 27) to the State Agreement. The contemplated "notice packet" is described in the State Agreement as including "a notice letter, an election to participate, a release form and a 'question and answer' pamphlet...." *Id.*, p. 14, ¶9.

Claimants can ask further questions of the claims administrator or the AGs of the Settling States. *Id.*, p. 15, ¶9. The "notice packet" and any other written communications to participating counterparties will be subject to the *sole approval* of the AGs of the Settling States or their designates. *Id.* There is *no* indication that any of the materials will mention in any way the existence or status of MDL No. 1950. There is also no indication that the notice will comply with any requirements of Rule 23, or be subject to any judicial review.

At the meet and confer held on January 13, 2011, counsel representing the AGs for the Settling States informed Interim Class Counsel that the mailing of "notice packets" to the Eligible Counterparties would not be delayed until the resolution of this motion. On January 18, 2011, BoA and the AGs of the Settling states did represent that no "notice packets" would be disseminated pursuant to the State Agreement before March 3. *Id.* ¶30.

### E. AG Announcements Concerning the State Agreement.

The State Agreement does *not* compensate participating counterparties for *all* of their claims related to the alleged conspiracy; it is confined only to *certain* claims in connection with municipal derivatives *where BoA was the provider and the participating AGs find that*

---

False Claims Act. *State of Cal. ex rel. Harris v. PriceWaterhouseCoopers, LLP*, 141 P.3d 256, 267, (2006). This Court relied on that decision in dismissing a portion of the City of Oakland's claims. *Hinds County v. Wachovia Bank, N.A.*, Nos. 08-CV-2516, and 08-MDL-1950, 2010 WL 1837823 at *4-*5 (S.D.N.Y. April 26, 2010).

*misconduct occurred,* even though BoA is jointly and severally liable for other municipal

transactions under basic principles of conspiracy law (i.e., cover bids). But certain participating

AGs have issued press releases that characterize the agreement more broadly without disclosing

the express limits on the settlement. For example, the Connecticut AG stated that "[t]he

settlements will *provide full restitution* to state agencies, municipalities and nonprofits

throughout Connecticut and nationwide who were harmed by this scheme."[11] Hausfeld Decl.

¶29.

III.     **ARGUMENT**

    **A. This Court Has Jurisdiction Under the All Writs Act and Rule 23 to Protect the Putative Class and the Jurisdiction of the Court.**

        **1. The Court Has Authority Under the All Writs Act to Protect Its Own Jurisdiction.**

The Court may enjoin BoA and anyone acting in concert with it from proceeding with a

nationwide opt in settlement for the same claims at issue in MDL 1950, pursuant to its inherent

authority under the All Writs Act. The All Writs Act provides that "[t]he Supreme Court and all

courts established by Act of Congress may issue all writs necessary or appropriate in aid of their

respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

---

[11] State of Connecticut, Office of the Attorney General, Press Release, *Attorney General Announces National Settlement with Bank of America for Anticompetitive Scheme that Defrauded Municipalities and Nonprofits* (Dec. 7, 2010), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=469522&A=3869 (emphasis added). The Texas AG similarly stated that "[u]nder the agreement with Texas Attorney General Greg Abbott and 19 other state attorneys general, Bank of America must also *make full restitution to any state, local and not-for-profit entities with which it entered into municipal derivative agreements* between 1998 and 2003.";  State of North Carolina, Department of Justice, Press Release, *Bank of America to pay $3.4 Million for Scheme that Hurt NC Local Governents, Schools, Non*-Profits (Dec. 7, 2010) *available at* http://www.oag.state.tx.us/oagNews/release.php?id=3561 (emphasis added). And the North Carolina AG has stated that "[t]he settlement *resolves allegations* that Bank of America defrauded state agencies, cities and towns, and non-profits that purchased a type of investment through the bank called municipal bond derivatives. Under the settlement, governments and non-profits that were injured by the scheme will get money back."; State of Texas, Office of the Attorney General, Press Release, *Texas, 19 States Resolve Antitrust Investigation into Bank of America's Municipal Derivatives* Marketing (Dec. 7, 2010) *available at* http://www.ncdoj.gov/News-and-Alerts/News-Releases-and-Advisories/Press-Releases/Bank-of-America-to-pay-$3-4-million-for-scheme-tha.aspx (emphasis added).

The Second Circuit recently reconfirmed that a preliminary injunction may be granted based on a showing of either a likelihood of success or "sufficiently serious questions going to the merits to make them fair ground for litigation." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010).

Under the All Writs Act, a court may enjoin not only parties to the action, but non-parties as well. The Supreme Court has stated that "[t]he power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Telephone Co.*, 434 U.S. 159, 174 (1977) ("*New York Telephone*"). *See also ITT Community Development Corp.v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978).

There are many examples of courts using the All Writs Act to enjoin private parties that were obstructing class settlements in consolidated actions. In *In re Lease Oil Antitrust Litig.,* 48 F.Supp.2d 699 (S.D. Tex. 1998) ("*Lease Oil*"), five federal antitrust cases against oil companies were centralized by the JPML in Texas federal court. A separate Alabama court action had been filed that raised many of the same claims against many of the same defendants, whereupon a global settlement was reached therein that would have extinguished the federal claims. The Texas district court enjoined any party before it in the MDL "from entering-collectively or separately-into any settlement agreement which releases or purports to release the federal antitrust claims brought in this litigation, without first notifying this Court of the settlement agreement and without first obtaining the Court's approval of said agreement. " *Id.* at 707. The Court explained its reasoning as follows:

[o]ne commentator has succinctly described the scope of a federal court's powers under the All Writs Act when it has jurisdiction over parties in a federal case and when parallel state court cases threaten to undermine the federal claims: 'Although courts ... normally lack the power to enjoin absent class members (or their attorneys) from bringing suit in another forum, they do have power over the parties before them. This includes the power to enjoin the defendant from entering into a settlement class action with another plaintiff in another forum, at least without notice to the court and its approval.' John C. Coffee, Jr., *Class Actions: Interjurisdictional Warfare,* N.Y.Law J. 5 (1997). Such preventive action is precisely what is needed in the instant MDL litigation.

48 F.Supp.2d at 706.

The decision in *Lease Oil* was followed in *In re Managed Care Litig.*, 236 F.Supp.2d 1336 (S.D. Fla. 2002) ("*Managed Care*"). There, in MDL No. 1334, RICO and ERISA claims against various HMOs were centralized by the JPML in the Southern District of Florida and a nationwide class of providers was certified' the case was, however, "far from settlement." *Id.* at 1342. CIGNA was also a defendant in a separate class action in Illinois state court (the *Kaiser* case) and it settled that suit. The Florida federal court enjoined CIGNA, its attorneys and any party acting "in concert" with it from proceeding with the Illinois settlement, even though, as it acknowledged, it was seeking to *prevent*, rather than *protect*, a settlement. As the court explained (*id.*):

> The *Kaiser* settlement will have the practical effect of limiting and hindering settlement of the encompassing issues before this Court, and of impeding the mediation already ordered by this Court. The *Kaiser* settlement denies Plaintiffs and class members even the possibility of industry-wide, coordinated or comprehensive relief which can be accomplished through multidistrict litigation. This Court is the only forum where Plaintiffs can obtain such relief. Not only might the settlements reached be woefully inadequate because of the *Kaiser* action, but the Court also finds that if it were to let CIGNA proceed in this manner, nothing would stop every other Defendant from following suit. They would each settle their claims in a state or federal court outside this Court's jurisdiction. What then, would be the point of consolidating all of the cases here and certifying a class? It would clearly cause irreparable harm to all Plaintiffs and class members in this litigation.

Id. at 1344-45.[12] The opinion in *Managed Care* has been followed by subsequent courts that have enjoined proceeding with a settlement in another court that involved overlapping claims by putative class members in the first case, including one involving BoA. *In re Bank of America Wage & Hour Employment Litig.*, No. 10-MD-2138 JWL, 2010 WL 3833034 at *8-*9 (D. Kan. Sept. 10, 2010) (court enjoined BoA from proceeding with notice of settlement until JPML could first decide if case in which settlement was obtained should be transferred to MDL court); *In re Jamster Mktg. Litig.*, MDL No. 1751, 2008 WL 4482307 at *8-*9 (S.D. Cal. Sept. 29, 2008) (defendant ejoined from proceeding with proposed settlement in another case to the extent it involved deceptive marketing claims before MDL court).

The situation is not altered by the State AGs being parties to the State Agreement. In an analogous scenario, the Second Circuit, in *In re Baldwin-United Corporation (Single Premium Deferred Annuities Insurance Litig.)*, 770 F.2d 328 (2d Cir. 1985) ("*Baldwin-United*"), upheld a district court injunction enjoining several State AGs from disrupting a class settlement. In *Baldwin-United*, after the parties had reached a settlement, the State AGs had a meeting with the defendants at which they tried to get them to pay more money. *Id.* at 333. When that failed, 22 states objected to final approval of the settlement and some issued subpoenas relevant to the subject matter of the proposed settlement. *Id.* New York also issued a notice to the defendants of its intent to bring a *parens patriae* action for restitution. *Id.* at 332-33.

---

[12] In a number of other decisions from the Third Circuit, state court actions were enjoined that impaired or could impair existing class settlements or the orderly progress in federal MDL proceedings. *See In re Prudential Ins. Co. of America Sales Practices Litig.*, 314 F.3d 99, 105 (3d Cir. 2002); *In re Diet Drugs Prods. Liability Litig.*, 282 F.3d 220, 239, 242 (3d Cir. 2002). *Accord Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 882 (11th Cir. 1989); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1334-35 (5th Cir. 1981).. Courts have also relied on the All-Writs Act to enjoin or stay individual actions. *E.g., In re Joint Eastern & Southern Dist. Asbestos Litig.*, 134 F.R.D. 32, 37 (E.D.N.Y. 1990); *In re Asbestos School Litig.*, No. 83-0268, 1991 WL 61156 at *2 (E.D. Pa. Apr. 16, 1991).

Judge Charles Brieant of the Southern District of New York issued a temporary restraining order and then a preliminary injunction prohibiting the states and "all other persons having actual knowledge of th[e] order" from engaging in "litigation that 'may in any way affect the right of any plaintiff or purported class member in any proceeding under' MDL 581." *Id.* at 334. Following an appeal by 31 states, in upholding the district court's injunction, the Second Circuit explained:

> [t]he existence of multiple and harassing actions by the states could only serve to frustrate the district court's efforts to craft a settlement in the multidistrict litigation before it. . . . Any substantial risk of this prospect would threaten all of the settlement efforts by the district court and destroy the utility of the multidistrict forum otherwise ideally suited to resolving such broad claims.

*Id.* at 337.[13]

The Second Circuit also applied this same reasoning to the eight defendants who were still negotiating settlements:

> We perceive a major threat to the federal court's ability to manage and resolve the actions against the remaining defendants should the states be free to harass the defendants through state court actions designed to influence the defendants' choices in the federal litigation. So long as there is a substantially significant prospect that these 8 defendants will settle in the reasonably near future, we conclude that the injunction entered by the district court is not improper.

770 F.2d at 337. *See Lawrence v. Household Bank (SB), N.A.*, 343 F.Supp.2d 1094, 1099-1100 (M.D. Ala. 2004)` (citing *Baldwin-United* as an example of a decision allowing injunctive relief where the enjoining court had before it "extended settlement negotiations or actual settlements").

The Second Circuit further reasoned that injunctive relief was the only way to bring to closure to the MDL proceedings:

> [a]s a practical matter no defendant in the consolidated federal actions in the present case could reasonably be expected to consummate a settlement of those

---

[13] *See also In re Reserve Fund Sec. & Derivative Litig.*, 673 F.Supp.2d 182, 202-04 (S.D.N.Y. 2009); *In re PaineWebber Ltd. Partnerships Litig.*, No. 94 Civ. 8547 SHS, 1996 WL 374162 at *2-*4 (S.D.N.Y. July 1, 1996).

claims if their claims could be reasserted under state laws, whether by states on behalf of the plaintiffs or by anyone else, seeking recovery of money to be paid to the plaintiffs.

*Id.* at 336.

### 2. Under Rule 23, this Court May Make Appropriate Orders to Protect the Class.

Federal Rule of Civil Procedure 23(d) provides broad authorization for a court to enter appropriate orders in conducting and controlling a class action. The Supreme Court has stressed that "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) ("*Bernard*").

Even before a class is certified, Interim Class Counsel have a fiduciary duty to "fairly and adequately represent the interest of the class." Fed. R. Civ. P. 23(g)(4). The Court has a similar duty to protect the interests of absent class members and to oversee settlement efforts on behalf of the proposed class. As the *Manual for Complex Litigation* explains:

> Once class allegations are made, decisions such as whether to settle and on what terms are no longer wholly within the litigants' control. Rather, the attorneys and named plaintiffs assume responsibilities to represent the class. The court must protect the interests of absent class members, and Rule 23(d) gives the judge broad administrative powers to do so, reflecting the equity origins of class actions.

Federal Judicial Center, *Manual for Complex Litigation* § 21.12 (4th ed. 2004) ("*MCL Fourth*").

Here, the Court appointed Interim Class Counsel pursuant to Fed. R. Civ. P. 23 (g) for the very purpose of organizing efficiently, and managing prosecution of, the litigation and overseeing settlement efforts on behalf of the class. Such "designation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." *MCL Fourth* § 21.12.

A stated purpose of FRCP 23(g) is the appointment of interim class counsel so that a class settlement may be discussed prior to certification. FRCP 23 Advisory Committee Note. Consistent with this, in the order appointing lead counsel, the Court referenced lead counsel's negotiations with the BoA under the supervision of mediator the Hon. Daniel Weinstein.

It is well settled that a district court's power under Rule 23(d) includes protecting putative class members *before* the class is certified. *See, e.g., Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1206 (11th Cir. 1985) ("*Kleiner*") (Rule 23(d) empowered district court to void "opt-outs" by class members that stemmed from defendant's improper communications with putative class members).[14] In *In re Currency Conversation Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y. 2004) ("*Currency Conversion*"), for example, a court in this district invoked its Rule 23(d) power to "regulate communications that threaten the choice of remedies available to class members" by refusing to enforce arbitration agreements purporting to prohibit class actions, including the class action pending before the court, adopted by defendant banks and communicated to class members without the court's consent. *Id.* at 569. The court recognized that a court's supervisory authority under Rule 23 "is particularly apt where a defendant attempts to alter the contours of the litigation or the availability of remedies." *Id.*

An injunction-like order also may be issued by this Court pursuant to Rule 23(d) against BoA and those acting in concert with it, without regard to the requirements for a preliminary injunction under Fed. R. Civ. P. 65. In *Kleiner*, the court upheld just such an order that did not satisfy the requirements of Rule 65:

---

[14] *See also Keystone Tobacco Co. v. U.S. Tobacco Co.*, 238 F. Supp. 2d 151, 154 (D.D.C. 2002) ("the Court rejects defendants' position that it has no authority [under Rule 23(d)] to limit communications between litigants and putative class members prior to class certification."); *Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 115 F.R.D. 506, 512 (E.D. Pa. 1987) (invoking Rule 23(d) to prohibit communications to discourage putative class members from meeting with class counsel); *Ralph Oldsmobile, Inc. v. General Motors Corp.*, No. 99-CV-4567, 2001 WL 1035132, at *2 (S.D.N.Y Sept. 7, 2001) ("*Ralph Oldsmobile*") ("a court's power [under Rule 23(d)] to restrict communications between parties and potential class members appl[ies] even before a class is certified").

> [W]e do not fault the orders for perceived procedural defects under Fed.R.Civ.P. 65(d). Rule 65(d) states that injunctions and restraining orders must set forth the reasons for their issuance and identify, with reasonable detail, the acts to be restrained. The orders at issue, however, are of a different ilk. The lower court correctly characterized the rulings as directives to counsel in their capacity as officers of the court, pursuant to the court's inherent power to manage its cases. See Fed.R.Civ.P. 23(d)(2). The more relaxed prerequisites of Rule 23(d)(2) therefore [are] applied, as the district court noted.

751 F.2d at 1201.

The Court also has discretion under Rule 23 to issue orders governing communications with class members. *Bernard*, 452 U.S. at 100. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) ("[w]e have recognized that a trial court has a substantial interest in communications that are mailed for single actions involving multiple parties"). In applying 23(d), the Third Circuit has emphasized that "[m]isleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *In re School Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) ("*Asbestos*"). As the Third Circuit observed:

> A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class. Certainly communications that seek or threaten to influence the choice of remedies are … within a district court's discretion to regulate.

*Id.* at 683.[15]

"Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could be irreparable." *Kleiner* 751 F.2d

---

[15] *See Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980) ("*Erhardt*") (noting that an important policy of Rule 23 is the protection of class members from "misleading communications from the parties or their counsel"); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2003 WL 22701241, at *8 (S.D.N.Y. Nov.17, 2003) ("*WorldCom*").

at 1203. *see Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 783, 790-91 (E.D. La. 1977), *appeal dismissed*, 579 F.2d 642 (5th Cir. 1978) ("[u]napproved communications to class members that misrepresent the status or effect of the pending action also have an obvious potential for confusion and/or adversely affecting the administration of justice").

The district court presiding over *Currency Conversion* added: "[t]hat same policy concern applies where a party misleads class members by *omitting* critical information from its communications." 361 F. Supp. 2d 237 at 252 (emphasis added). A defendant's failure to mention even an uncertified class action in securing settlements or releases from putative class members may be misleading.[16] As stated in *Friedman v. Intervet Inc.*, No. 3:09-cv-2945, 2010 WL 3087432, at *4 (N.D. Ohio Aug. 6, 2010):

> As in *Westerfield* and the other cases cited above, the defendant has procured settlements and releases without informing putative class members of what they are possibly giving up: participation in the pending putative class action. I find defendant's failure to provide such notice to putative class members before securing settlements or releases misleading, and supported by a "clear record" of such a failure.

Furthermore, a district court's authority under Rule 23(d) is not limited to communications that actually mislead or otherwise threaten to create confusion, but also extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class. *See Cobell v. Norton*, 212 F.R.D. 14, 19 (D.D.C. 2002) (citing *Asbestos*, 842 F.2d at 683). The power conferred by the rule allows a district court to "limit communications with absent class members where the communications were … an improper attempt to undermine Rule 23 by encouraging class members not to join the suit." *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 667 (E.D. Tex. 2003).

---

[16] *See, e.g., Westerfield v. Quizno's Franchise Co.*, No. 06-C-1210, 2007 WL 1062200, at *3 (E.D. Wis. Apr. 6, 2007); *Ralph Oldsmobile,* 2001 WL 1035132, at *5 (S.D.N.Y 2001) ("*Ralph Oldsmobile*"); *Jenifer v. Del. Solid Waste Auth.*, Nos. CIV. A. 98-270, CIV. A. 98-565, 1999 WL 117762, at *7 (D. Del. Feb. 25, 1999) ("*Jenifer*").

**B. This Court Should Protect the Putative Class and the Jurisdiction of the Court from Unauthorized Class Settlement Negotiations, Unfair Class Settlements, and Misleading Communications to the Class.**

**1. The Court Should Protect the Class from the Opt In Settlement Entered Into Without its Authorization.**

The proposed opt in provisions of the State Agreement conflict with the authority of this Court and of interim lead counsel ordered by this Court as well as Rule 23. Without the input or authorization of class counsel, the State Agreement sets aside $62.5 million with respect to a nationwide group of class members who must opt in to receive payment. The approval of claims and the amount distributed to class members is subject to the discretion of the AGs of the Settling States and BoA.

As noted above, the JPML ordered that the various actions alleging bid-rigging in the municipal derivatives market be assigned to this Court for coordinated or consolidated pretrial proceedings. The JPML specifically found that "centralization under section 1407 in the Southern District of New York will serve the convenience of the parties and witnesses and *promote the just and efficient conduct of this litigation.*" 560 F.Supp.2d at 1387. By interfering with Class Plaintiffs' ability to settle its claims with BoA, BoA and the State AGs acting in concert with it are acting in contravention of both the JPML's order and this Court's jurisdiction.

The Second Circuit in *Kern* held that an opt in settlement is not permitted under Rule 23. 393 F.3d at 124-25. In doing so, it relied on the rationale of one commentator:

> [R]equiring the individuals affirmatively to request inclusion in the lawsuit would result in freezing out the claims of people-especially small claims held by small people-who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matters, will simply not take the affirmative step. *The moral justification for treating such people as null quantities is questionable. For them the class action serves something like the function of an administrative proceeding where scattered individual interests are represented by the Government.* In the circumstances delineated in subdivision (b)(3), it seems fair for the silent to be considered as part of the class. Otherwise the (b)(3) type would

become a class action which was not that at all-a prime point of discontent with [the pre-1966 version of Rule 23].

Benjamin Kaplan, <u>Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)</u>, 81 Harv. L.Rev. 356, 397 (1967) (emphases added), *quoted in Kern*, 393 F.3d at 124. Thus, the settlement mechanism chosen by the AGs of the Settling States is one that they could not have obtained under Rule 23.

Oddly, BoA at page 2 of its December 17, 2010 letter to the Court has contended that it is "baseless" to contend that the State Settlement resolves class claims and acts as a class settlement, arguing that the opt in procedure reaches "only additional Attorney Generals." The New York AG has argued likewise. If the State Agreement was not being offered to nonsignatory class members, there would be no need however for the notice and opt in provisions of the agreement. Thus, Paragraph 38 of the State Agreement, as BoA points out, permits every state AG to opt in, and to the extent that such AGs have antitrust claims against BoA, such AGs are class members or are acting for class members. Further, separate from Paragraph 38, the State Agreement establishes a notice and opt in process for BoA counterparties who by definition are class members. State Agreement, p. 15, ¶¶ 12-13. All of these counterparties are by definition members of the putative class because whether a claimant can be a "Participating Counterparty" in the settlement depends on whether it entered into a "Covered Derivative" transaction with BoA. State Agreement, p. 11, ¶ H. A "Covered Derivative" is one that the AGs of the Settling States have identified as being affected by BoA's misconduct. *Id.*, Attachment A, ¶1.C. Likewise, the AGs of the Settling States reserve for themselves the right to identify "Additional Eligible Counterparties" after the initial notice is sent. *Id.*, p. 11, ¶ G.

It is also clear that the State Agreement includes the release of class claims. Hausfeld Decl. ¶26. Paragraph 38 at page 21 of the agreement states that each of the AGs of the Settling

States releases BoA "from all civil claims, counterclaims, cross claims, setoffs, *causes of action of any type* (whether common law, equitable, statutory, regulatory or administrative, *class, individual or otherwise in nature*. . . . known or unknown, arising out of the Relevant Conduct through December 31, 2007." (emphases added). Each "Participating Counterparty" also has to sign its own release. That release (paragraph 1 at pages 30-31) contains expansive language tracking what is quoted above that encompasses class claims.

> ### 2. The Court Should Protect the Class from an Opt In Settlement that Has Not Been Subject to Fairness Procedures.

The proposed opt in provisions of the settlement further conflict with FRCP 23(e) which provides that class claims may be dismissed or compromised only with Court approval following a preliminary and then a final determination after a hearing determining that the settlement is fair, reasonable and adequate both procedurally and substantively. The proposed opt in settlement here provides no procedure for review of its disposition of class member claims and would lead to dismissal of class claims against BoA with no judicial supervision.

The Seventh Circuit in *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979), *cert. denied*, 444 U.S. 870 (1979) ("*GMC*") reviewed a similar settlement entered by State AGs without the involvement or authorization of class counsel. The Court held that it would be an abuse of discretion to deny discovery of the procedures that led to the settlement and expressly warned about the dangers of "unauthorized settlement negotiations" by the state AGs in that case. For example, the Court explained "the exclusion of private counsel from the settlement negotiations should weigh heavily against approval of the settlement." *Id.* at 1126.

The fairness of the State Agreement here is called into question by the manner in which it was negotiated. *GMC* is instructive on this point. There, the AG of Illinois was part of an

Executive Committee in a multidistrict litigation along with private counsel. Without advising other counsel in that case, Illinois and AGs in other states entered into a settlement agreement with General Motors, which the district court approved. The Seventh Circuit reversed and explained:

> *unauthorized settlement negotiations* create the possibility of negotiation from a position of weakness by the attorney who purports to represent the class. In addition, the prestige attendant upon negotiating a large settlement against a corporate defendant and thereby acquiring reputations as consumer advocates may place public attorneys in a situation analogous to private counsel who hope to win large fee awards. The *possibility of such a conflict of interest as a general rule warrants judicial scrutiny of unauthorized settlement negotiations.* Furthermore, settlement negotiations with less than all class counsel weaken the class' tactical position even if the attorney who enters into the negotiations attempts to represent the class' interests vigorously. Finally, unauthorized settlement negotiations deny other class counsel access to information about the negotiations which is helpful in evaluating the fairness of the settlement.

594 F.2d at 1124. (emphases added)

Interim Class Counsel--as well as this Court-- have been denied information about BoA's negotiations with the Settling States that permit any reasonable evaluation of their settlement. As the Seventh Circuit noted in *GMC*:

> If the settlement was not negotiated *by authorized class counsel* in the capacity of class counsel in this action, then it was negotiated in the name of, at best, only one of the named plaintiffs in the federal action, the State of Illinois. This stretches the theory of representation of absentee interests by the named plaintiff to its limit and *warrants searching judicial examination* of the circumstances surrounding and the matters discussed during the settlement negotiations before acceptance of the proposed settlement for possible approval.

*Id*. at 1128. (emphases added)

The New York AG argues that *GMC* is inapposite because one AG in that case who was involved in the unauthorized class settlement talks was also a member of the group of counsel representing the class. This artificial distinction fails to acknowledge the dangers of

unauthorized talks by AGs resolving class claims, here on an opt in basis, while not involving

class counsel as discussed at length in *GMC*.

In its prior letter to the Court, the New York AG relied principally on *Kamm v. California*

*City Development Co*., 509 F.2d 205 (9th Cir. 1975) ("*Kamm*"). There, however, the California

AG had filed a separate judicial action simultaneously with "a stipulation of the parties and a

proposed permanent injunction and final judgment." *Id.* at 207-08. The Ninth Circuit upheld the

denial of class certification because the AG's action resolved all claims. *Id.* at 213. By the New

York AG's own admission, however, that is not true here. Moreover, subsequent courts have

distinguished *Kamm. See, e.g., Stanich v. Travelers Indemnity Co*., 249 F.R.D. 506, 522 (N.D.

Ohio 2008) ("The issues here, however, relate to whether the alleged scheme is fraudulent,

which is not within the exclusive expertise of the DOI [Ohio Department of Insurance]. The

complexity of the issues presented in the present motion alone demonstrates that a court likely is

better suited to determine the manner by which the alleged claims will be resolved. This case

does not relate to whether the prices at issue were reasonable, or even whether Travelers' practice

of offering multiple prices (disclosure issues, which are based on common law principles, aside)

is lawful. This is a fraud case for damages, addressing the manner in which Travelers

implemented its sales, which this Court is best suited to hear").[17]

### 3. The Court Should Supervise Notice to the Class.

The proposed opt in and notice procedures also conflict with FRCP 23(e), which provides

for a critical judicially supervised notice procedure for any proposed settlement. *Erhardt*, 629

---

[17] *See also In re Conseco Life Ins. LifeTrend Ins. Sales & Marketing Litig*., Nos. M 10-02124 SI, C 08-05746 SI, C 10-00652 SI, 2010 WL 3931096 at *11 (N.D. Cal. Oct. 6, 2010) (upheld class certification where "this case will not involve the use of judicial resources on an action which will merely duplicate regulatory proceedings" and because "Plaintiffs should not be forced to defer to a settlement they had no part in negotiating or drafting when they may be entitled to other relief through this class action"). *See* 2 *Newberg on Class Actions* §4.33 at 291 (2010) (describing "deference to an administrative agency," in lieu of class action, as "unusual").

F.2d at 846 (an important policy of Rule 23 is the protection of class members from "misleading communications"). *See Kleiner*, 751 F.2d at 1202; *WorldCom,* 2003 WL 22701241, at *8. "It is the responsibility of the court to direct the 'best notice practicable' to class members ... and to safeguard them from unauthorized, misleading communications from the parties or their counsel." *Erhardt*, 629 F.2d at 846.

Under the State Agreement, as soon as BoA selects a Claims Administrator, the Claims Administrator will have 20 days to provide a draft Notice Packet to BoA and the AGs. Settlement ¶5. Only the AGs "shall approve or amend" the Notice Packet within 14 days of its receipt. *Id*. ¶7. Within 30 days after the approval of the Notice Packet, the Claims Administrator "shall send a Notice Packet" to each eligible municipality (as early as January 27, 2011). *Id*. ¶8. Nowhere in the State Agreement does it provide for this Court to oversee this process in any way.

Rule 23(d) provides ample support for Class Plaintiffs' request that this Court ensure a fair, open and transparent process that protects the interests of all class members by requiring advance submission and approval by the Court to class members of notices and communications related to the State Agreement. Such an order is necessary to protect the interests of class members by providing them with full and accurate information upon which to make informed decisions about electing to participate in the settlement or continuing to pursue vindication of their antitrust claims in the context of the class actions pending before this Court. The AGs of the Settling States cannot be allowed to determine unilaterally what, if any, information should be provided to putative class members.

**4. The Court Should Protect the Class from Misleading Communications.**

The need for an appropriate order under this Court's broad authority under Rule 23(d) to prevent misleading statements or omissions to class members here is clear. Nothing in the State Agreement requires the notice to "Eligible Counterparties" and "Additional Eligible Counterparties"--which include members of the putative class in this MDL--to inform recipients of the class action pending before this Court. Nothing in the State Agreement requires that the notice informs recipients of their rights to participate in the class actions before this Court. Nothing in the State Agreement mandates that the notices explain to recipients that, by entering into the all encompassing releases required to receive any compensation under the settlement fund, class members give up all of their claims in this MDL proceeding with respect to municipal derivative transactions occurring during the relevant timeframe (1998-2003) against BoA. Nothing in the State Agreement mandates disclosure that the Settling AGs have pre-allocated $37 Million of the settlement fund to themselves. *See* Hausfeld Decl. at ¶29, Ex H.

Several examples illustrate how courts have dealt with this problem. In *Jenifer*, plaintiffs sought to enjoin defendants from communicating with putative class members where defendants were attempting to convince putative class members not to participate in litigation and/or settle their claims. 1999 WL 117762 at *2. The court stated in pertinent part:

> While the defendant may seek to settle individual claims prior to certification, the putative class member should know the essence of the claim they would be giving up in response to the solicitation of DSWA. Those who sign the DSWA three-year contract may be completely unaware of this litigation and by signing the contract would waive their right to participate in the class action. Some potential plaintiffs may wish to participate in the action and, therefore, should be given the necessary information and opportunity to choose.

*Id.* The court in *Jenifer* required defendants to properly notify each class member from which it sought a release so that they have sufficient notice of the pendency of the action. *Id.*

Similarly, in *Ralph Oldsmobile*, the class representative plaintiff moved for an order requiring defendant "to seek and desist his practice of obtaining ex parte releases from putative class members," voiding those releases already obtained, and requiring defendant "to send a court-approved corrected notice" that any such releases had been voided. 2001 WL 1035132, at *1. The district court found that the record supported findings of potential abuse and specifically pointed out that the release purported to waive claims, but failed to mention the class action, which resulted in risk that class members may sign a release without knowing what they were releasing. *Id.* The court determined that an unknowing release is abusive and ordered relief in the form of curative notice be given in future settlements and releases. *Id.*

Likewise, in *Burford v. Cargill, Inc.*, No. 05-0283, 2007 WL 81667 (W.D.La. June 9, 2007), the district court was confronted with defendants that admitted to contacting putative class members and soliciting their consent to a general release. The court found "the use of the general receipt and release which is being used by the defendants in regards to putative class members, without notification of the pending putative class action, is misleading as a matter of law." *Id.* at *2. Indeed, by not advising of the pending class litigation, the court found that "such misleading communications are abusive and threaten the proper functioning" of class actions. *Id.*

### C. The Court Should Also Order The AGs of The Settling States To Be Joined In This Action as Necessary Parties Pursuant to Rule 19(a).

In order to effectuate the relief Class Plaintiffs seek, the Court should also order that the AGs of the Settling States and any other State AG who opts into the State Agreement should be made parties to this action. "Rule 19 of the Federal Rules of Civil Procedure provides for the joinder of parties who should or must take part in the litigation to achieve a just adjudication." *Lincoln Property Co. v. Roche*, 546 U.S. 81, 90 (2005) (citing *Provident Tradesman Bank &*

*Trust Co. v. Patterson*, 390 U.S. 102, 118-123 (1968)).  Rule 19(a)(1) provides that an absent party is necessary where:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

Rule 19(a)(2) provides that "[i]f a person has not been joined as required, the court must order that the person be made a party.  A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff."

To be joined as a necessary party under Rule 19, a moving party "must first show that [the absent party] claims an interest relating to the subject of the action." *Oneida Indian Nation of New York v. Madison County, Oneida County, N.Y.,* 605 F.3d 149, 162 (2d Cir. 2010) (citing Fed. R. Civ. P. 19(a)(1)(B)).  Here, there is no question that the State AGs claim an interest relating to the subject of this action.   As noted above, the State Agreement is in purported satisfaction of claims that overlap with those alleged in the SCAC.  And Class Plaintiffs are legitimately concerned that the Settling States will attempt similar settlements outside of this Court's jurisdiction with other defendants in MDL No. 1950.

The State AGs are so situated that disposing of the action in their absence would leave BoA "subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations."  Fed. R. Civ. P. 19(a)(1)(B).  The SCAC defines a class that includes private, as well as governmental, entities. SCAC ¶183.  *See id.* ¶¶140, 143.  There is no indication that state AGs can provide BAC with any release as to those claims.  Moreover, as discussed above, the

28

Statet Agreement only applies to deals in which BoA "won" the rigged bid or was the provider of the municipal bond derivative in a negotiated process. It does not apply to the countless occasions where BoA submitted a courtesy bid and one of its co-conspirator firms then "won" the rigged bid to become the provider of the municipal bond derivative. BoA remains jointly and severally liable for all damages attributable to the alleged conspiracy, not just those arising out of transactions for which it ultimately became the municipal derivatives provider. Accordingly, BoA will likely be subject to double, multiple, or otherwise inconsistent obligations. *See* Fed. R. Civ. P. 19 (a)(2)(ii). *See also Avon Cosmetics* (*FEBO) Ltd. v. New Hampton, Inc.*, No. 90 Civ. 7208 (RLC), 1991 WL 90808, at * 4 (S.D.N.Y. May 22, 1991). *Cf. In re Parmalat Securities Litig.*, 477 F.Supp.2d 602, 614 (S.D.N.Y.2007) (noting regarding motion to join necessary parties that "there appears to be no justifiable basis for exposing BoA to liability to multiple parties for what is essentially the same debt").

There is also a sufficient basis for personal jurisdiction over the AGs of the Settling States in this forum. They have agreed that New York law applies to the State Agreement. State Agreement, ¶32. New York is one of the jurisdictions where BoA consents to be sued for purposes of the enforcement of the agreement. *Id.* Notices required by the agreement have to be sent, *inter alia*, to BoA's Assistant General Counsel and Elinor Hoffman, an Assistant AG of the New York AG's office, both of whom work in this district. *Id.* ¶39. Maria Vullo of the New York AG's office signed the agreement on behalf of the other state AGs. All of this constitutes sufficient purposeful availment of the forum to justify a finding of personal jurisdiction over the AGs of the Settling States that satisfies principles of due process. *See, e.g., World-Wide Volswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (examining whether a party's conduct

and connection with the forum would cause it to reasonably anticipate being haled into court there).

The AGs of the Settling States should be ordered to join this action as necessary plaintiffs pursuant to Rule 19(a). They undeniably claim an interest in this action and if they are allowed to assert their purported interest outside of this Court's jurisdiction, BoA will be subject to substantial risk of double, multiple, or otherwise inconsistent obligations.

## IV.       CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully request the Court to protect the interests of putative class members and preserve its jurisdiction enjoining BoA and those in concert with it from proceeding with the State Agreement. Alternatively, pursuant to Rule 23(d), the Court is requested to subject the State Agreement to a fairness analysis and regulate the content of any notice concerning it by advising Eligible Participants of their option of staying in the putative class. Finally, the Court should order that the AGs of the Settling States be added as necessary parties under Rule 19.

Dated: January 20, 2011                           Respectfully submitted,

                                                  Magda M. Jimenez Train
                                                  BOIES, SCHILLER & FLEXNER LLP
                                                  575 Lexington Avenue, 7th Floor
                                                  New York, NY 10022
                                                  Telephone: (212) 446-2333
                                                  Facsimile: (212) 446-2350

William A. Isaacson
Tanya Chutkan
Jonathan M. Shaw
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

Michael D. Hausfeld
Megan E. Jones
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, DC  20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery St.
Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1909
Facsimile: (415) 358-4980

William C. Carmody
Arun S. Subramanian
Seth D. Ard
SUSMAN GODFREY L.L.P.
654 Madison Avenue, 5th Floor
New York, NY 10065-8440
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

**Plaintiffs' Co-Lead Interim Class Counsel**

4826-3656-1928