# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | **Master Docket No. 08-02516 (VM) (GWG)** |
| THIS DOCUMENT RELATES TO: | |
| *ACTIVE RETIREMENT COMMUNITY, INC., d/b/a JEFFERSON'S FERRY v. BANK OF AMERICA, N.A., et al.* | |

## SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  <u>NATURE OF THE ACTION</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  <u>JURISDICTION AND VENUE</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  <u>PARTIES</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.  <u>Plaintiff</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.  <u>Defendants</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.  <u>Provider Defendants</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.  <u>Broker Defendants</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    C.  <u>Hybrid Broker/Provider Defendants</u>. . . . . . . . . . . . . . . . . . . . . . 34

    D.  <u>Named and Unnamed Co-conspirators</u>. . . . . . . . . . . . . . . . . . . . 38

IV.  <u>OVERVIEW OF MUNICIPAL DERIVATIVES</u>. . . . . . . . . . . . . . . . . . . 50

    A.  <u>Municipal Bond Basics</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    B.  <u>Municipal Derivatives Basics</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        1.  <u>Guaranteed Investment Contracts "GICs"</u>. . . . . . . . . . . . . 55

        2.  <u>Forward Agreements</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        3.  <u>Advanced Refunding Escrow</u>. . . . . . . . . . . . . . . . . . . . . . . 57

        4.  <u>Swaps</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        a.   Basic Swap Valuation - Logic of
"Rational Pricing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    5.   Interest Rate Agreements, Options, And Swaptions. . . . . . . 62

V.   DEFENDANTS' ILLEGAL MANIPULATION OF THE
MUNICIPAL DERIVATIVE MARKET. . . . . . . . . . . . . . . . . . . . . . . . . 64

  A.   Overview Of Defendants' Illegal Conspiracy. . . . . . . . . . . . . . . . 64

    1.   Mechanics Of The Conspiracy . . . . . . . . . . . . . . . . . . . . . . 66

        a.   Bid-Rigging Of Auctions. . . . . . . . . . . . . . . . . . . . . . . . 66

            i.   Pre-Selecting A Particular Provider
Defendant To Win An Auction for a
Municipal Derivative. . . . . . . . . . . . . . . . . . . . . . 69

            ii.   Submitting Courtesy Bids To Help a
Pre-Selected Provider Defendant Win a
Municipal Derivative Auction. . . . . . . . . . . . . . 80

            iii.   Passing to Help a Pre-Selected Provider
Defendant Win a Municipal Derivative
Auction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

            iv.   The Pre-Selected Provider Defendant
Gets A "Last Look" At Other Bids to Ensure
Winning a Municipal Derivative Auction. . . . . . 90

            v.   The Pre-Selected Provider Defendant Gets
Guidance and The Terms Of Other Bids to
Ensure Winning a Municipal Derivative
Auction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

        b.   Manipulation Of Negotiated Deals. . . . . . . . . . . . . . 96

c.    <u>Kickbacks And Other Types Of Unlawful Consideration</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

d.    <u>Defendants' Overt Acts To Prevent Discovery Of Their Conspiratorial Communications</u>. . . . . . . . . 106

2.    <u>"It's nice to have friends": Repeat Appearances By Defendants' Representatives In Different Transactions, Personal Relationships Amongst Them, And Other Factors Encouraging And Enabling The Conspiracy</u>. . . . . . . . . . . . 108

a.    <u>Repeat Appearances In Multiple Transactions</u> . . . . . . 109

b.    <u>Personal Relationships Amongst Defendants' Representatives</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

3.    <u>Industry-Wide Quality And Market-Wide Effect Of Conspiracy</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

B.    <u>Evidence Of The Conspiracy's Operation Through Specific Municipal Derivative Transactions</u>. . . . . . . . . . . . . . . . . . . . . . . 121

1.    <u>Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Identified Through The DOJ's Criminal Indictments And Informations</u>. . . . . . 122

a.    <u>West Virginia Water Development Authority October 2003 Reinvestment Derivatives</u>. . . . . . . . . . 135

b.    <u>The Board Of Port Commissioners Of The City Of Oakland September 2002 Municipal Derivative Transaction</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

c.    <u>Maine State Housing Authority May 2004 Municipal Derivative Transactions</u>. . . . . . . . . . . . . . 141

d.      Missouri Health And Educational Facilities
        Authority September 2002 Municipal Derivative
        Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

e.      State of West Virginia Higher Education Policy
        Commission September 2004 Municipal Derivative
        Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

f.      State of West Virginia School Building Authority
        June 2004 Municipal Derivative Transaction . . . . . . . 147

g.      Tampa Port Authority July 2002 Municipal
        Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . 148

h.      McAlester Public Works Authority June 2002
        Municipal Derivative Transaction . . . . . . . . . . . . . . 149

i.      Two March 2002 State University Municipal
        Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . 153

j.      A January 2002 State Housing And Finance
        Association Municipal Derivative Transaction. . . . . . 155

k.      California Health Facilities Financing Authority
        November 2000 Municipal Derivative Transaction. . 156

l.      A November 2001 State Housing Finance Agency
        Municipal Derivative Transaction. . . . . . . . . . . . . . . 157

m.      A February 2002 State Housing Finance Agency
        Municipal Derivative Transaction. . . . . . . . . . . . . . . 159

n.      A December 2002 State Education Assistance
        Foundation Municipal Derivative Transaction. . . . . . 160

o.      A 2004 State Education Facilities Authority
        Municipal Derivative Transaction. . . . . . . . . . . . . . . 160

p.  A 2004 State Water Pollution Abatement Trust. . . . 161

q.  A 2005 State Housing Finance Agency Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . 162

r.  A 2002 State Development Finance Authority Municipal Derivative Transaction. . . . . . . . . . . . . . . 163

s.  A 2001 State University Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

t.  A 2002 Town Municipal Derivative Transaction. . . . 165

u.  A 2004 Town Municipal Derivative Transaction. . . . 166

3.  Conduct By GE Trinity and FSA Representatives In Certain Transactions Of California Public Entities Is Consistent With DOJ's Descriptions Of Conduct By Their Representatives In Transactions Described In Carollo/Goldberg/Grimm Indictment. . . . . . . . . . . . . . . . . . 167

4.  Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Proffered By Defendant Bank Of America. . . . . . . . . . . . . . . . . . . . . . . . 172

a.  Pennsylvania Intergovernmental Cooperation Authority Forward Purchase Agreement. . . . . . . . . . . 172

b.  Hillcrest Healthcare System (Oklahoma) Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . 173

c.  Guam Power Forward Purchase Agreement. . . . . . . 173

d.  Pennsylvania School Districts and Other Entities Escrows. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

e.  Springfield Township (Pennsylvania) Collateralized Deposit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

f.  Biola University (California) Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

g.  Santa Barbara County (California) Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

h.  Art Center College of Design (California). . . . . . . . 179

i.  Beacon Tradeport Community Development District (Florida) and The Olympic Club (California) Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . 180

j.  University of Tampa (Florida) Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

k.  Puerto Rico Electric Power Authority Escrow Deposit Agreements. . . . . . . . . . . . . . . . . . . . . . . 182

l.  Rhode Island Gross Funded Escrow Agreement. . . . . 183

m.  Williamson County (Tennessee) Escrow Deposit Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . 183

n.  Jackson Lab (Maine) Interest Rate Swaps. . . . . . . . 184

o.  Commonwealth of Massachusetts Forward Purchase Agreement . . . . . . . . . . . . . . . . . . . . . 184

p.  Virgin Islands Debt Service Reserve Fund. . . . . . . . 185

q.  New Jersey Transit Corporation Escrow Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

r.   Tampa (Florida) Port Authority Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

s.   City of Chicago (Illinois) Wastewater Facility Swap. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

t.   2007 Bank of America IRS Settlements. . . . . . . . . . 188

3.   Preliminary Statistical Analysis Of Municipal Derivative Transactions Of California Issuers Reveals Probative Evidence Of Bid-Rigging. . . . . . . . . . . . . . . . . . . . . . . . . . . 190

a.   Evidence Suggesting Courtesy Bids. . . . . . . . . . . . . 190

i.   City of Riverside (California) GIC May 28, 2004 (Row 1). . . . . . . . . . . . . . . . . . 192

ii.   City of Riverside (California) GIC Aug. 1, 2003 (Row 2). . . . . . . . . . . . . . . . . 195

iii.   Los Angeles World Airports (California) GIC March 5, 1998 (Row 3). . . . . . . . . . . . . 197

iv.   City of Riverside (California) GIC February 12, 2004 (Row 4). . . . . . . . . . . . . . 198

v.   City of Riverside (California) GIC July 16, 2003 (Row 5). . . . . . . . . . . . . . . . . 200

vi.   City of Riverside (California) GIC May 15, 2008 (Row 6). . . . . . . . . . . . . . . . . 202

vii.   City of Riverside (California) GIC Nov. 17, 2004 (Row 7). . . . . . . . . . . . . . . . . 204

viii.   City of Los Angeles (California) GIC April 27, 2005 (Row 8). . . . . . . . . . . . . . . . 205

|     |     | ix. | San Mateo County (California) GIC September 6, 2001(Row 9). . . . . . . . . . . . . . . | 207 |
|     |     | x.  | City of Los Angeles (California) GIC March 19, 2002 (Row 10). . . . . . . . . . . . . . . | 209 |
|     | b. | San Mateo County (California) November 14, 2003 Swap Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . | 211 |
| 4.  | Publicized Evidence Of The Conspiracy's Operation In Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . | 216 |
|     | a. | Pacific Matrix - Stifel Transactions. . . . . . . . . . . . . . | 216 |
|     |     | i.   | Oklahoma Turnpike Authority GIC. . . . . . . . . | 217 |
|     |     | ii.  | Pottawatomie County (Oklahoma) Development Authority. . . . . . . . . . . . . . . . . . | 219 |
|     |     | iii. | Oklahoma Turnpike Authority Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . | 219 |
|     |     | iv.  | Sisters of St. Mary's Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . | 220 |
|     | b. | Baum - CDC Funding  Transactions. . . . . . . . . . . . . | 221 |
|     | c. | Baum - Bank of America Transaction (Rural Enterprises of Okla.). . . . . . . . . . . . . . . . . . . . . . . . | 222 |
|     | d. | CDR - Bank of America Transaction (City of Atlanta). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 222 |
|     | e. | CDR - SocGen Transactions (Lease-to-Own And California School Advance Refunding Deals). . . . . . | 223 |

     f.     Oxnard California School District And Delano California Joint High School District . . . . . . . . . . . . 223

     g.     Baum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

     h.     Butler Area School District Swaptions . . . . . . . . . . . 225

     i.     North Carolina University State Student Aid Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

     j.     Jefferson County (Alabama) Sewer Swaps . . . . . . . . 226

     k.     Biola University (California) Swap . . . . . . . . . . . . . 231

VI.    JEFFERSON'S FERRY'S MUNICIPAL DERIVATIVE TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

VII.    DOJ ANTITRUST DIVISION EMPANELS GRAND JURY TO PURSUE INDUSTRY-WIDE CRIMINAL INVESTIGATION - BOFA SEEKS AMNESTY . . . . . . . . . . . . . . . . . . 233

    A.    BofA Admits To Participation In Conspiracy - Enters DOJ Leniency Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

    B.    The DOJ's Indictment Of Defendant CDR And CDR Executives Implicates Other Defendant Providers In Conspiracy . . . . . . . . . . 245

    C.    The DOJ's Criminal Indictment Of Carollo, Goldberg, and Grimm Confirms Defendants GE Trinity And RBC's Role In The Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

    D.    Other Defendants Former Employees Are Under Investigation Related To Their Involvement In The Conspiracy . . . . . . . . . . . . 257

       1.     UBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

       2.     JP Morgan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

3.      <u>Bear Stearns</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

4.      <u>Piper Jaffray</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

5.      <u>Wachovia</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

6.      <u>FSA</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

7.      <u>CDC Funding</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

8.      <u>Morgan Stanley</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

9.      <u>Salomon Smith Barney</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

10.     <u>Goldman Sachs</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

11.     <u>George K. Baum</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

12.     <u>Societe Generale</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

VIII.   <u>ACCRUAL OF CLAIMS, CONTINUING VIOLATION,</u>
        <u>EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT</u>. . . 269

IX.     <u>JEFFERSON'S FERRY'S SUFFERED INJURY</u>
        <u>THROUGH THE CONDUCT OF THE DEFENDANTS</u>. . . . . . . . . . . 279

X.      <u>TRADE AND INTERSTATE COMMERCE</u>. . . . . . . . . . . . . . . . . . . 281

XI.     <u>CLAIMS FOR RELIEF</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

        FIRST CAUSE OF ACTION
                <u>VIOLATION OF SECTION 1 OF THE SHERMAN ACT,</u>
                <u>15 U.S.C. § 1</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

        SECOND CAUSE OF ACTION
                <u>VIOLATIONS OF NEW YORK DONNELLY ACT</u>. . . . . . . . . . 286

x

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

JURY TRIAL DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

Plaintiff, Active Retirement Community, Inc., d/b/a Jefferson's Ferry ("Jefferson's Ferry"), brings this action for damages and injunctive relief against the Defendants (defined *infra*) for violations of the New York antitrust laws (the Donnelly Act, New York Gen. Bus. Law §§ 340, *et. seq*.) and United States antitrust laws (Section 1 of the Sherman Act, 15 U.S.C. § 1).  Jefferson's Ferry complains and alleges upon information and belief except as to those paragraphs that are based on personal knowledge, as follows:

**I.**
**NATURE OF THE ACTION**

1.     Several years ago, Warren E. Buffett warned that derivatives were "**financial weapons of mass destruction, carrying dangers that, while now latent, are potentially lethal**."  Buffett was principally referring to the tendency of derivatives to spread inadequately assessed risk throughout the market. However, it is clear now that for municipalities, such as Jefferson's Ferry, and other public and non-profit entities, a special type of derivatives called "*Municipal Derivatives*" carried another type of risk: collusion among financial institutions that provided the products and brokers that arranged the deals for them.

2.     On October 29, 2009, the United States Department of Justice ("DOJ") announced the indictment of Defendant CDR (defined below) and several

1

of its principals for various violations of federal law, including Section 1 of the Sherman Act, 15 U.S.C. § 1, "for their participation in bid-rigging and fraud conspiracies related to contracts for the investment of municipal bond proceeds and other related municipal finance contracts." As Joseph M. Demarest, Jr., Assistant Director-in-Charge of the FBI in New York put it in the DOJ press release announcing the indictment, "In a climate of economic austerity, the conduct of defendants and co-conspirators seems particularly predatory."

3.      This action arises from that predatory conduct and seeks remedy for the economic injuries it has caused Jefferson's Ferry and its taxpayers.

4.      "Municipal Derivatives" are specialized investment vehicles used by public entities and non-profit in the United States, such as Jefferson's Ferry, to hold and preserve public monies raised from the sale of tax-exempt municipal bonds, hedge the interest rate obligations of those bonds, and achieve other financial goals.  The former reinvestment vehicles are commonly referred to as "guaranteed investment derivatives" or "GICs," the latter interest hedging vehicles are commonly referred to as "swaps."  In short, Municipal Derivatives are specialized financial products that Jefferson's Ferry and other public entities use to stretch scarce public monies.

5.     Defendants' conspiracy involved, but was not limited to, allocating the market for Municipal Derivatives amongst themselves, rigging the process by which the U.S. public and non-profit entities acquire Municipal Derivatives, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements.  These illegal and unlawful acts of the Defendants negatively affected the terms of every Municipal Derivative entered into by Jefferson's Ferry during the period of the alleged conspiracy and thereafter.

6.     In November of 2006, the DOJ Antitrust Division publically announced that it was investigating anti-competitive conduct by the providers and brokers of Municipal Derivatives.  Soon thereafter it was reported that a criminal grand jury had been empaneled in the Southern District of New York ("S.D.N.Y.") to pursue criminal indictments of individuals and companies implicated in this investigation.  Criminal subpoenas were issued to over 25 brokers and providers and the offices of three brokers were raided by the Federal Bureau of Investigation ("FBI").  It soon came to light that both the Internal Revenue Service ("IRS") and the Securities and Exchange Commission ("SEC") were engaged in parallel investigations, and that a consortium of State Attorneys General had initiated a

coordinated investigation of the same conduct against an expanded list of Municipal Derivatives brokers and providers.

7.     On January 3, 2007, soon after the DOJ's investigation was announced, then retiring Field Manager in the IRS' Tax Exempt Bond Office, Charles Anderson described his impression of the DOJ's investigation and what it would likely produce, as follows:

> I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg. . . ***I would not be surprised to see bankers and lawyers go to jail***.

(emphasis added).

8.     Events over the subsequent months suggest that Anderson will likely be proven correct on both points: bankers will be going to jail and it will take time to unwind it all.

9.     In February 2007, Defendant Bank of America publically announced that it had requested entry, and had been accepted, into the Corporate Leniency Program of the DOJ's Antitrust Division, in connection with "industry-wide government investigations concerning the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-

4

exempt bonds."  In so doing, Defendant Bank of America effectively admitted to its criminal involvement in the antitrust conduct under investigation.

10.     In the months that have followed, a growing list of Municipal Derivative brokers and providers, and their current and former employees, have reportedly received further inquiries from the DOJ, notifications in the form of "Target Letters" that they are the target of a criminal investigation by the DOJ, and/or a "Wells notice" from the SEC, informing them that the SEC intends to file civil complaints against them.

11.     The DOJ investigations are still active and ongoing.  Indeed, the DOJ sought a stay of much of the discovery in this proceeding for that reason, and continues to request the issuance of subpoenas from the S.D.N.Y. seeking information for the grand jury to consider.

12.     For example, on July 2, 2009, as part of the DOJ's investigation, a subpoena was issued to the City of Riverside seeking a detailed list of documents concerning the Municipal Derivatives it entered into by the City of Riverside associated with a $110,000,000 bond issuance in 2004, and the transactions by which the City of Riverside entered into the Municipal Derivatives.  The Municipal Derivatives entered into by the City of Riverside in association with this issuance include: a $93,018,253.54 GIC entered into with Defendant GE

Trinity Plus (defined below) on June 10, 2004; a $1,714,913.06 GIC and a

$6,466,290.63 GIC, both entered into with Defendant MBIA (defined below) on

June 10, 2004; a $2,315,561.94 GIC entered into with Defendant FSA (defined

below) on May 14, 2008; and an $82,500,000.00 swap entered into with

Defendant Merrill Lynch (defined below).

13.     At around the same time that Riverside received this subpoena in July

2009, it was reported that Connecticut Attorney General Richard Blumenthal

sought an order from the Connecticut Superior Court in Hartford to compel

Defendant Financial Securities Assurance Inc. (part of FSA defined below) to turn

over 600 hours of audio recordings already released to the SEC and DOJ in

connection with their respective investigations of the Municipal Derivatives

industry.  According to Attorney General Blumenthal, these tapes contain "a rich

source of evidence of potential violations" of state antitrust laws.  To date,

however, he has only been able to gain access to a small portion of them.

14.     On June 30, 2009, the Financial Industry Regulatory Authority

("FINRA"), citing well publicized examples of financial distress being suffered

by municipalities, launched an investigation of the Municipal Derivatives industry.

FINRA announced it would pursue a series of investigations of potential conflicts

and questionable practices involving disclosures and marketing by firms selling

Municipal Derivatives, FINRA sent out a slew of "Targeted Examination Requests" to target firms involved in the Municipal Derivatives market.

15.    In what appears to be the tip of the iceberg, on October 29, 2009 the DOJ announced what it called the "**first**" charges "**to be filed in the Department's ongoing antitrust investigation into the municipal bond industry**."  The DOJ indicted Defendant CDR and CDR's key principals – owner and president David Rubin, vice president Evan Andrew Zarefsky, and the company's former chief financial officer and managing director Zevi Wolmark – for conspiring with certain unidentified financial institutions that  provide Municipal Derivatives, from 1998 through 2006.

16.    The nine-count indictment ("CDR Indictment"), in close parallel with the allegations herein, details multiple violations by CDR and its principals and co-conspirators of Section 1 of the Sherman Act, 15 U.S.C. § 1.  These include: conspiring to illegally pre-select the winners of particular Municipal Derivative auctions (¶ 34-38); soliciting, accepting and submitting "courtesy bids" designed to lose an auction in favor of a pre-selected winner and to give the rigged bidding process the appearance of competitive legitimacy (¶ 34-38); allowing the pre-selected winner of the auction an illegal "last look" at the other submitted bids to ensure that its bid would be just high enough to win (¶ 47); accepting illegal

7

"kickback" payments of illegally and unlawfully gained profits from other

co-conspirators, often disguised as fees charged to issuers in association with swap

transactions (¶ 39(c)); and manipulating the terms that issuers received on

Municipal Derivative transactions through, including but not limited to, allocating

transactions amongst Provider Defendants, coordinating pricing, and giving

falsified pricing verification information to providers (¶ 51).

17.    The CDR Indictment makes clear that the victims of this

conspiratorial conduct were the municipalities, such as Jefferson's Ferry, and other

public and non-profit entities that acquired Municipal Derivatives.  "As a result [of

this conduct], the intended winning provider increased its profits from the

investment agreement(s) by paying interest to the municipality for the duration of

the investment agreement that was artificially low."

18.    In all likelihood, the CDR Indictment is the first of many to come.  As

Christopher "Kit" Taylor, director of the Municipal Securities Rulemaking Board

from 1978-2007, put it a November 2, 2009 *Bond Buyer* article, "This is just the

opening shot."  In the same article, the former IRS Field Manager Charles

Anderson echoed these same sentiments, "I would anticipate a lot more

indictments down the road."

19.     Given the more than 25 criminal subpoenas that have already been issued, the number of individuals that have publically reported receiving target letters from the DOJ, the number of individuals and Defendants that have reported receiving Wells notices from the SEC, the references in the CDR Indictment to at least four other firms who acted as co-conspirators with CDR in its criminal conduct, the entry of Defendant Bank of America into the DOJ's amnesty program (along with a $14.7 million settlement with the IRS), the $700 million settlement on November 4, 2009 reached between the SEC and Defendant J.P. Morgan Securities, Inc. for manipulation of negotiated swap deals, and the dozens of examples of Municipal Derivatives transactions described herein that bear the hallmarks of a consistent pattern of manipulation by Defendants, predictions of further criminal indictments are very likely accurate.

20.     Accordingly, the DOJ has requested and received a stay of formal discovery by civil plaintiffs, which has hampered efforts by Jefferson's Ferry and other municipalities to obtain evidence of the conspiracy alleged herein that is known to exist, including tapes of Defendants' employees engaged in conspiratorial communication.

21.     To overcome these obstacles, Jefferson's Ferry has engaged in its own independent investigation, on which the allegations herein are based. This

investigation has included receiving oral and documentary evidence from

Defendant Bank of America ("BofA"), including an oral proffer of evidence based

on the testimony of a former BofA employee ("Confidential Witness" or "CW"), a

description of the contents of various tape recorded conversations, as well as

emails and transaction files.  It has also involved the gathering and analysis of

publically available information, including the SEC filings of Defendants and

press articles, as well as quantitative and pattern analyses of information regarding

Municipal Derivative transactions entered into by other cities, counties and public

entities.

     22.    This investigation has revealed a far-reaching, industry-wide

conspiracy, through which Municipal Derivative providers, working with

Municipal Derivative brokers, foreswore competition with one another in the

Municipal Derivative transactions of Jefferson's Ferry and others.  Instead, they

manipulated and allocated the Municipal Derivatives market amongst themselves

in ways that included but was not limited to: signaling to each other their intended

bids and whether they were interested in winning a particular transaction;

submitting courtesy bids on transactions they had no intention or desire to win in

order to give transactions an artificial veneer of fairness; refraining from bidding

on transactions to allow another to prevail without competition; lowering their

10

intended bids in response to signals that the transaction could be won by them at terms that would yield higher profits; giving false price verification reports; kicking back money through undisclosed and/or unearned fees; and other actions that depressed the returns that Jefferson's Ferry and other municipal bond issuers earned on municipal derivative transactions and otherwise caused them economic injury, while inflating the profits of Defendants.

23.    The illegal activities described herein occurred in transactions involving all types of Municipal Derivatives, including both GICs and swaps, and were not limited to transactions that purportedly involved formal competitively-bid auctions.  Rather, Jefferson's Ferry has uncovered evidence probative of the conspiracy's operation in <u>negotiated</u> transactions for Municipal Derivatives such as swaps, through means including collusive arrangements affecting market pricing quotations by which the terms of negotiated deals were supposed to be verified.

24.    Moreover, Jefferson's Ferry's investigation has revealed probative evidence that the conspiracy also operated to deny municipal bond issuers competition in the services provided by brokers of Municipal Derivatives and compel them to pay exorbitant fees for such services.

11

25.     Because of the pervasiveness of this conduct and the inter-transactional relationship of Defendants' illegal conduct, the conspiracy has had a market-wide effect on the terms of Municipal Derivative transactions and prices of services associated therewith, depriving Jefferson's Ferry and other municipal bond issuers of the benefits of free competition.  As a result, Jefferson's Ferry suffered harm in several ways, including, but not limited to: (a) receiving rates on Municipal Derivatives that were artificially depressed and uncompetitive; (b) being forced to engage counter-parties to Municipal Derivative transactions that carried increased credit risks that were not reflected in the terms of the transactions; and (c) being forced to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions.

## II.
## JURISDICTION AND VENUE

26.     This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and the costs of suit, including treble damages, injunctive relief, and reasonable attorneys' fees, against Defendants, and each of them, for the injuries sustained by Jefferson's Ferry by reason of the violations, as alleged herein, of Section 1 of the Sherman Act, 15 U.S.C. § 1. This

action is also brought under the Donnelly Act, New York Gen. Bus. Law §§ 340, *et seq*., based on these allegations.

27.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1367 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

28.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 5 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d), because during the conduct alleged herein, the Defendants resided, transacted business, were found, and/or had agents in this District, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and because overt acts in furtherance of the alleged conspiracy were committed in this District.

29.    In addition, Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their business dealings and transactions in this District, by having caused injuries through their acts and omissions throughout the State of New York, and by their violation of  and by their violation of the  Donnelly Act, New York General Business Law §§ 340, *et seq*.

30.    Defendants, and each of them, have sufficient minimum contacts within New York to make the exercise of jurisdiction over each Defendant by New York courts consistent with traditional notions of fair play and substantial justice.

13

Each Defendant participates, or during the relevant period did participate, in the New York market through brokering or providing Municipal Derivatives to New York public and non-profit entities and/or affecting the terms of municipal derivatives acquired by such entities through their participation in the conspiracy alleged herein. Moreover, Defendants, and each of them, do substantial business in the State of New York.

31.     Venue is proper because Plaintiff is located in Suffolk County and Defendants' illegal conduct was directed at and suffered from Suffolk County. Moreover, several of the Defendants are citizens of the State of New York.

## III.
## PARTIES

**A.     Plaintiff**

32.     Plaintiff Active Retirement Community, Inc., d/b/a Jefferson's Ferry ("Jefferson's Ferry") is a not-for-profit corporation, which operates a Continuing Care Retirement Community licensed by the State of New York pursuant to Article 46 of the Public Health Law.  Jefferson's Ferry is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code and is also exempt from state income tax.  Jefferson's Ferry provides residency, supportive services and health services to seniors ages 62 and older. Jefferson's Ferry

14

maintains its principal place of business in South Setauket, New York.  Facilities

at Jefferson's Ferry include 248 independent living units and a 120-unit health

care center.  The independent living units consist of cottages and one- and two

bedroom apartments and various amenities. The Health Center consists of 60

assisted living units and a 60-bed skilled nursing facility. Jefferson's Ferry is

affiliated with Mather Health System.

33.    The Jefferson's Ferry municipal bonds were issued in 1999 to fund

the development and construction of the Jefferson's Ferry retirement community

in South Setauket, New York. On December 7,1999 Active Retirement

Community Inc., the owner and operator of Jefferson's Ferry, entered into a

Combined Funds Master Purchase and Resale Agreement ("Master Agreement")

with First Union National Bank and United States Trust Company of New York

("First National") as Trustee ("Trustee"). The agreement related to the issuance by

the Suffolk County Industrial Development Agency of the following bonds on

behalf of Plaintiff:

•       $50,185,000 Suffolk County Industrial Development Agency Continuing

        Care Retirement Community First Mortgage Fixed Rate Revenue Bonds

        (Jefferson's Ferry Project - Series 1999A);

15

- $6,500,000 Suffolk County Industrial Development Agency Continuing Care Retirement Community First Mortgage Adjustable Rate Revenue Bonds (Jefferson's Ferry Project-Series1999B-l and B-2); and

- $26,000,000 Suffolk County Industrial Development Agency Continuing Care Retirement Community First Mortgage Variable Rate Revenue Bonds (Jefferson's Ferry Project-Series 1999C) (collectively the "1999 Bonds").

34.    Pursuant to the terms of the Master Agreement a portion of the proceeds of the1999 Bonds were deposited with the Trustee and held in various funds. In consideration for the right to invest the monies held in those funds, First Union was to pay to the Trustee on behalf of Plaintiff, amounts based on the Guaranteed Rate. Pursuant to the Master Agreement the Guaranteed Rate referred to the following rates calculated on the basis of a year of 360 days for the actual number of days elapsed: 1) the Project Fund Guaranteed Rate- an interest rate per annum equal to 5.85%; 2) Interest and Expense Account Guaranteed Rate - rate per annum equal to 5.94%; 3) Fixed Rate Reserve Fund Guaranteed Rate - 6.00% per annum; 4) Variable Rate Reserve Fund Guaranteed Rate - interest rate per annum equal to 5.80%; 5) Operating Reserve Fund Guaranteed Rate - interest rate per annum equal to 5.80%.

16

35.     Jefferson's Ferry reinvests significant portions of the proceeds from these issuances in Municipal Derivatives, uses Municipal Derivatives to hedge its interest rate obligations associated with these issuances, and for other financial purposes. One or more of the Defendants participated in some or all of the Municipal Derivatives transactions based on which Jefferson's Ferry hereby sues. The terms that Jefferson's Ferry received on these Municipal Derivatives were subject to and negatively affected by the unlawful acts of the Defendants alleged herein, and Jefferson's Ferry suffered financial injury and was so damaged as a result. Jefferson's Ferry was injured by Defendants' unlawful acts, including but not limited to: receiving rates of return on reinvestment derivatives that were artificially depressed and uncompetitive; receiving terms on other kinds of municipal derivatives that were artificially depressed and uncompetitive; entering into municipal derivative transactions with providers that carried increased credit risks which were not reflected in the terms of the transaction; and paying uncompetitive, inflated or hidden fees and costs associated with the transactions.

**B.     Defendants**

**1.      Provider Defendants**

36.     Provider Defendants are those Defendants that acted as counter-parties in Municipal Derivatives transactions entered into by Jefferson's

17

Ferry and/or other public and/or non-profit entities and/or submitted bids and/or pricing information for such transactions.

37.     Provider Defendant **Bank of America, N.A. ("Bank of America" or "BofA")** is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  As a member of the conspiracy, Bank of America, directly and through its fully owned subsidiary Defendant Merrill Lynch & Co., Inc., was a counter-party to Municipal Derivatives invested in by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

38.     Provider Defendant **Merrill Lynch & Co., Inc**. ("**Merrill Lynch**"), a wholly-owned subsidiary of Defendant Bank of America, is a Delaware corporation with its principal place of business in Charlotte, North Carolina (formerly New York, New York).  Defendant Bank of America acquired Merrill Lynch in January of 2009.  As a member of the conspiracy, Merrill Lynch was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

39.     Provider Defendant **JPMorgan Chase & Co.,  f/k/a Chase Financial, f/k/a Morgan Guaranty Trust Company of New York, f/k/a JP**

18

Morgan Chase (**"JPMorgan Chase"**) is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, JPMorgan, directly and through its fully owned subsidiary Defendant J.P. Morgan Securities, Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

40.     Provider Defendant **J.P. Morgan Securities, Inc., f/k/a Bear Stearns & Co Inc., ("J.P. Morgan Securities")**, a wholly-owned subsidiary of Defendant JPMorgan Chase, is a Delaware corporation with its principal place of business in New York, New York.  In May of 2008, Defendant JP Morgan Chase acquired Bear Stearns & Co., Inc. ("Bear Stearns") and merged Bear Stearns with J.P. Morgan Securities.  As a member of the conspiracy, Bear Stearns and J.P. Morgan Securities were counter-parties to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

41.     Provider Defendants **JPMorgan Chase** and **J.P. Morgan Securities** are referred to collectively herein as "**JP Morgan**."

42.     Provider Defendant **MBIA, Inc. ("MBIA")** is a Connecticut corporation with its principal place of business in Armonk, New York.  As a

19

member of the conspiracy, MBIA was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

43.    Provider Defendant **Citibank, N.A. ("Citibank")**, a subsidiary of Citigroup, Inc., is a nationally-chartered bank, with its headquarters in New York, New York.  As a member of the conspiracy, Citibank was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

44.    Provider Defendant **Citigroup Financial Products Inc. f/k/a Salomon Brothers Holding Company Inc. ("SBHC")**, is a wholly-owned subsidiary of Citigroup, Inc. and a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, SBHC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

45.    Provider Defendant **Citigroup Global Markets Holdings Inc. f/k/a Salomon Smith Barney Holdings Inc. ("SMBHI")** is a wholly-owned subsidiary of Citigroup, Inc. and a New York corporation with its principal place of business in New York, New York.  As a member of the conspiracy, SMBHI, through its

20

predecessor Salomon Smith Barney Holdings Inc., was a counter-party to

Municipal Derivatives entered into by public and non-profit entities and engaged

in the misconduct that led to the harm suffered by Jefferson's Ferry.  SMBHI's

role as counter-party and participant in the misconduct alleged herein included

acting as a guarantor of some or all Municipal Derivatives issued by SBHC.  The

guarantees provided by SMBHI were a necessary pre-condition of SBHC's ability

to serve as a counter-party in some or all of the Municipal Derivative transactions

to which SBHC acted as a counter-party or sought to act as a counter-party.

46.     Provider Defendants **SBHC** and **SMBHI** are collectively referred to

herein as "Salomon Smith Barney."

47.     Provider Defendant **Morgan Stanley ("Morgan Stanley")** is a

Delaware corporation with its principal place of business in New York, New York.

As a member of the conspiracy, Morgan Stanley was a counter-party to Municipal

Derivatives entered into by public and non-profit entities and engaged in the

misconduct that led to the harm suffered by Jefferson's Ferry.

48.     Provider Defendant **Rabobank Group, aka Coöperatieve Centrale

Raiffeisen-Boerenleenbank B.A.,** also trading under the name **Rabobank

International**, **aka Rabobank , National Association**, **("Rabobank")** is a Dutch

cooperative banking institution headquartered in Utrecht, the Netherlands.  As a

21

member of the conspiracy, Rabobank was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

49.     Provider Defendant **Bayerische Landesbank Girozentrale ("BayernLB")** is a German corporation with its principal place of business in Munich, Germany.  As a member of the conspiracy, BayernLB was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

50.     Provider Defendant **Société Générale SA ("SocGen")** is a French corporation with its principal place of business in Paris, France.  As a member of the conspiracy, SocGen was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

51.     Provider Defendant **Wachovia Bank, N.A.**, **f/k/a First Union Corporation ("Wachovia")**, a wholly-owned subsidiary of Wells Fargo & Company, is a nationally chartered banking association with its principal place of business in Charlotte, North Carolina.  In December of 2008, Defendant Wells Fargo & Company acquired Wachovia.  As a member of the conspiracy, Wachovia was a counter-party to Municipal Derivatives entered into by public and non-profit

22

entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

52.     Provider Defendant **Wells Fargo & Company ("Wells Fargo")** is a Delaware corporation with its principal place of business in San Francisco, California.  As a member of the conspiracy, Wells Fargo, directly and through its subsidiary Defendant Wachovia, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.  Wells Fargo also acted as a broker of municipal derivatives to public and non-profit entities and engaged in misconduct in that capacity as well that led to the harm suffered by Jefferson's Ferry.

53.     Provider Defendant **Financial Security Assurance, Inc. ("FSAI")**, a wholly-owned subsidiary of Defendant Assured Guaranty US Holdings, Inc., is a New York stock insurance company with its principal place of business in New York, New York.  During the time period alleged herein, FSAI was a wholly-owned subsidiary of Financial Security Assurance Holdings Ltd. ("FSA Holdings"), which issued GICs and other reinvestment derivatives through its wholly-owned subsidiaries, FSA Capital Management Services, LLC, FSA Capital Markets Services LLC, FSA Asset Management Services, LLC and FSA Capital

23

Markets Services (Caymans) Ltd. (collectively, "FSA GIC Subsidiaries") to
Jefferson's Ferry and other municipalities and non-profit entities. All GICs and
other reinvestment derivatives issued by FSA Holdings through the FSA GIC
Subsidiaries were insured by FSAI. Accordingly, final approval of certain GICs
and other reinvestment transactions entered into by FSA Holdings through the
FSA GIC Subsidiaries were subject to approval by FSAI's Chief Executive
Officer, President, Chief Risk Management Officer and/or other officers of FSAI.
FSAI engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

54. Provider Defendant **Assured Guaranty US Holdings, Inc**. ("Assured
US Holdings"), a wholly-owned subsidiary of Assured Guaranty Ltd., is a
Delaware corporation with its principal place of business in New York, New York.
On July 1, 2009, Assured US Holdings, acquired FSA Holdings from Dexia
Holdings, Inc., including indirectly, FSA Holding's subsidiary FSAI ("July 1,
2009 transaction"). During some or all of the time period of the conspiracy
alleged herein, FSA Holdings issued FSAI-insured GICs and other reinvestment
derivatives through the FSA GIC Subsidiaries and engaged in the misconduct that
led to the harm suffered by Jefferson's Ferry. As part of the July 1, 2009
transaction, (1) FSA Holdings ceased to exist, but Dexia Holdings, Inc. became
the owner of 13.9% of common shares issued by Assured U.S. Holdings' parent,

24

Assured Guaranty Ltd, and by extension owner of 13.9% of Assured US Holdings and its subsidiary FSAI; (2) Assured Guaranty Ltd agreed to certain limitations in its business demanded by Dexia Holdings, Inc.; (3) subject to these limitations, Assured Guaranty Ltd., continued the business of FSA Holdings subsidiaries, including the business, FSAI, and expressly and/or implicitly assumed liabilities thereof.  Assured US Holdings is a mere continuation of FSA Holdings and/or the July 1, 2009 transaction was a *de facto* merger of FSA Holdings with Assured US Holdings.  Assured US Holdings is liable as a successor to FSA Holdings for the harm caused by FSA Holdings to Jefferson's Ferry.

55.     Provider Defendant **Dexia S.A.** is a Belgian financial institution headquartered in Brussels, Belgium.  As part of the transaction by which Assured US Holdings acquired FSA Holdings, ownership of FSA Holdings' financial products group, including the FSA GIC Subsidiaries and FSA Management LLC (the entity which invested funds that FSA Holdings received from the GICs and other reinvestment derivatives issued to Jefferson's Ferry and other issuers by FSA Holdings through the FSA GIC Subsidiaries), was transferred prior to, and in preparation for, the July 1, 2009 transaction to Dexia Holdings and then, on July 1, 2009, was transferred to Dexia S.A.  As part of the July 1, 2009 transaction, Dexia S.A. expressly agreed to assume the liabilities arising from the FSA Holdings'

25

financial products group's business, including GICs and other reinvestment derivatives previously issued by FSA Holdings through the FSA GIC Subsidiaries, and any litigation related thereto.  During some or all of the period of the conspiracy alleged herein, FSA Holdings issued FSAI insured GICs and other reinvestment derivatives through the FSA GIC Subsidiaries to Jefferson's Ferry and other municipalities and non-profits and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.  Dexia S.A. is liable to Jefferson's Ferry for that harm as a successor to FSA Holdings' financial products group and/or the FSA GIC Subsidiaries.

56.     Provider Defendants **FSAI, Assured U.S. Holdings,** and **Dexia S.A.**, are referred to collectively herein as "**FSA**."

57.     Provider Defendant **National Westminster Bank, Plc ("NatWest")**, a subsidiary of Royal Bank of Scotland, is a public limited company with its principal place of business in London, England.  As a member of the conspiracy, NatWest was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

58.     Provider Defendant **The Goldman Sachs Group, Inc.**, ("GS Group") is a Delaware corporation with its principal place of business in New York, New

26

York.  As a member of the conspiracy, Defendant GS Group directly and/or through its subsidiaries Defendant Goldman Sachs Mitsui Marine Derivative Products, L.P. and/or Goldman Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

59.     Provider Defendant **Goldman Sachs Mitsui Marine Derivative Products, L.P.**, is a Delaware limited partnership and a joint venture between Mitsui Marine & Fire Insurance Co. Ltd. and Defendant GS Group.  Defendant GS Group is jointly obligated with Mitsui Marine & Fire Insurance Co. Ltd. to satisfy any obligations of Goldman Sachs Mitsui Marine Derivative Products, L.P., and is responsible for the management of the Goldman Sachs Mitsui Marine Derivative Products, L.P.  As a member of the conspiracy, Goldman Sachs Mitsui Marine Derivative Products, L.P. was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

60.     Provider Defendant **Goldman Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P.**, a wholly-owned subsidiary of Defendant GS Group, is a bank chartered under the laws of the State of New York.  During the

27

time period of conspiracy alleged herein, Goldman Sachs Capital Markets, L.P.
was a counter-party to Municipal Derivatives entered into by public and non-profit
entities and engaged in the misconduct that led to the harm suffered by Jefferson's
Ferry.

61.     On September 21, 2008, Goldman Sachs Capital Markets, L.P., was
merged with and into The Goldman Sachs Trust Company, a limited-purpose trust
chartered under the laws of the State of New York ("GS Trust").  Upon
consummation of the merger, GS Trust changed its name to Goldman Sachs Bank
USA.  Defendant Goldman Sachs Bank USA is liable as a successor to Goldman
Sachs Capital Markets, L.P. for the harm caused by Goldman Sachs Capital
Markets, L.P. to Jefferson's Ferry.

62.     Provider Defendants **GS Group, Goldman Sachs Mitsui Marine
Derivative Products, L.P.** and **Goldman Sachs Bank USA f/k/a Goldman
Sachs Capital Markets, L.P.** are collectively referred to herein as "Goldman
Sachs."

63.     Provider Defendant **General Electric Capital Corporation
("GECC")**, a wholly-owned subsidiary of General Electric Capital Service, Inc.
("GECSI") (which is a wholly-owned subsidiary of General Electric Company), is
a Delaware corporation, with its principal place of business in Fairfield,

Connecticut.  GECC issued Municipal Derivatives to public and non-profit entities

through its group of wholly-owned and sponsored affiliates and/or special purpose

entities, including but not limited to, GE Funding Capital Market Services, Inc.,

Trinity Funding Co., LLC, Trinity Plus Funding Co., LLC., and FGIC Capital

Market Services, Inc., and guaranteed all of the Municipal Derivatives that it

issued through these entities.  GECC and GECSI refer collectively to Defendants

GE Funding Capital Market Services, Trinity Funding Co., LLC, and Trinity Plus

Funding Co., LLC. in GECC's and GECSI's SEC filings and marketing materials

as "Trinity", "Trinity Funding Co.", "Trinity SPEs", "GE Funding CMS", and "GE

Funding Capital Market Services Group."  They are referred to collectively herein

as "GE Trinity Special Purpose Entities" of "GE Trinity SPEs".

      64.    GECC consolidated operations of GE Trinity SPEs into GECC's

financial statements, including guaranteed investment contracts, accounting for the

assets and liabilities of each of GE Trinity SPE as assets and liabilities of GECC.

Accordingly, GECC referred, in its SEC filings, to the guaranteed investment

contracts issued by GE Trinity SPEs as GECC's guaranteed investment contracts,

and liabilities flowing from GE Trinity SPE issued guaranteed investment

contracts as GECC's liabilities.  The GE Trinity SPEs are and were

undercapitalized and could not operate, including providing guaranteed

investment contracts, without financial support and guarantees provided by GECC. The *"guaranteed"* in a guaranteed investment contract provided by a GE Trinity SPE is the guarantee supplied by GECC. GECC conducted the day-to-day operations of all of the GE Trinity SPEs through a single office located in Stamford, CT. Each GE Trinity SPE was acting as an agent and/or alter ego of GECC in actions taken by it relating to, concerning, or connected with, the issuance of a Municipal Derivative to a municipality or non-profit entity. GECC directly and/or through the GE Trinity SPEs engaged in the conduct that led to the harm suffered by Jefferson's Ferry.

65.     Provider Defendant **GE Funding Capital Market Services, Inc. ("GE Funding")**, a wholly-owned subsidiary of GECC (which is a wholly-owned subsidiary of GECSI, which is a wholly-owned subsidiary of General Electric Company), is a Delaware corporation with its principal place of business in New York, NY. GE Funding is a GE Trinity Special Purpose Entity. As a member of the conspiracy, GE Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

66.     Provider Defendant **Trinity Funding Co., LLC ("GE Trinity Funding")**, a wholly-owned subsidiary of GECC (which is a wholly-owned

subsidiary of GECSI, which is a wholly-owned subsidiary of General Electric Company), is a New York limited liability company. GE Trinity Funding is a GE Trinity Special Purpose Entity. As a member of the conspiracy, GE Trinity Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

67.     Provider Defendant **Trinity Plus Funding Co., LLC ("GE Trinity Plus Funding")**, a wholly-owned subsidiary of GECC (which is a wholly-owned subsidiary of GECSI, which is a wholly-owned subsidiary of General Electric Company), is a New York limited liability company. GE Trinity Plus Funding is a GE Trinity Special Purpose Entity. As a member of the conspiracy, GE Trinity Plus Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

68.     Provider Defendants **GECC, GE Funding, GE Trinity Funding, and GE Trinity Plus Funding** are collectively referred to herein as "GE Trinity."

69.     Provider Defendant **Royal Bank of Canada** ("RBC") is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. As a member of the conspiracy, RBC was a counter-party to Municipal Derivatives

31

entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

## 2. <u>Broker Defendants</u>

70.     Broker Defendants constitute those Defendants that acted as brokers for Jefferson's Ferry and/or other public and/or non-profit entities in the acquisition of Municipal Derivatives from the Provider Defendants. The Broker Defendants served key roles in the rigging of Municipal Derivative auctions, orchestrating and facilitating the rigging of particular auctions.

71.     Broker Defendant **CDR Financial Products ("CDR")** is a California corporation with its principal place of business in Beverly Hills, California. As a broker of Municipal Derivatives to public and non-profit entities, CDR acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

72.     Broker Defendant **Winters & Co. Advisors, LLC ("Winters")** is a California limited liability company with its principal place of business in Los Angeles, California. As a broker of Municipal Derivatives to public and non-profit entities, Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

32

73.     Broker Defendant **George K. Baum & Co. ("Baum")** is a Missouri corporation with its principal place of business in Kansas City, Missouri.  As a broker of Municipal Derivatives to public and non-profit entities, Baum acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

74.     Broker Defendant **Sound Capital Management, Inc. ("Sound Capital")** is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota.  As a broker of Municipal Derivatives to public and non-profit entities, Sound Capital acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

75.     Broker Defendant **Investment Management Advisory Group, Inc. ("IMAGE")** is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania.  As a broker of Municipal Derivatives to public and non-profit entities, IMAGE acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

76.     Broker Defendant **First Southwest Company ("First Southwest")** is a corporation with its principal place of business in Dallas, Texas.  As a broker of Municipal Derivatives to public and non-profit entities, First Southwest acted as a

33

member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

77. Broker Defendant **PFM Asset Management LLC ("PFM Asset")** is a Pennsylvania corporation with its principal place of business in Philadelphia, PA. As a broker of Municipal Derivatives to public and non-profit entities, PFM Asset acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

78. Broker Defendant **PFM Investment, LLC.** ("PFM Investment") is a Delaware corporation. As a broker of Municipal Derivatives to public and non-profit entities, PFM Investment, directly and through its wholly-owned subsidiary PFM Asset Management LLC, acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

79. Broker Defendants **PFM Investment** and **PFM Asset** are collectively referred to herein as **"PFM."**

## C.  Hybrid Broker/Provider Defendants

80. Hybrid Broker/Provider Defendants constitute those Defendants that acted as brokers for Jefferson's Ferry and other public entities in the acquisition of Municipal Derivatives from Provider Defendants in certain instances and acted as counterparties in Municipal Derivatives transactions entered into by Jefferson's

Ferry and other public entities and/or submitted bids and pricing information for such transactions in other instances.  All of the Hybrid Broker/Provider Defendants were part of the conspiracy.

81.    Hybrid Broker/Provider Defendant **UBS AG ("UBS AG")** is a Swiss corporation with its principal place of business in New York, New York.  As a member of the conspiracy, UBS AG, directly and/or through its wholly-owned subsidiaries Defendant UBS Securities, LLC and/or Defendant UBS Financial Services, Inc., was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

82.    Hybrid Broker/Provider Defendant **UBS Financial Services, Inc., f/k/a PaineWebber, Inc. ("PaineWebber"),** a wholly-owned subsidiary of Defendant UBS AG, is a Delaware corporation with its principal place of business in New York, New York.  In 2000, UBS AG acquired PaineWebber.  As a member of the conspiracy, PaineWebber, was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

83.    Hybrid Provider/Broker Defendant **UBS Securities, LLC, f/k/a UBS Warburg LLC ("UBS Securities")**, a wholly-owned subsidiary of Defendant

UBS AG, is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, UBS Securities was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

84.     Hybrid Broker/Provider Defendants **UBS AG, PaineWebber,** and **UBS Securities** are referred to collectively herein as "**UBS**."

85.     Hybrid Broker/Provider Defendant **Piper Jaffray & Co. ("Piper Jaffray")** is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. As a member of the conspiracy, Piper Jaffray was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

86.     Hybrid Provider/Broker Defendant **Natixis Funding Corp. f/k/a Ixis Funding Corp. f/k/a CDC Ixis Funding Corp. f/k/a CDC Funding Corp ("CDC Funding"),** a wholly-owned subsidiary of CDC (defined below), is a New York corporation with its principal place of business in New York, NY. As a member of the conspiracy, CDC Funding acted as a counter-party to, and or broker of, Municipal Derivatives entered into by public and non-profit entities and

engaged in the misconduct that led to the harm suffered by Jefferson's Ferry. All guaranteed investment contracts issued by CDC Funding were guaranteed by CDC and its ability to act as a provider of guaranteed investment contracts was contingent upon the guarantee provided by CDC.

87.    Hybrid Broker/Provider  Defendant **Natixis S.A., f/k/a Ixis CIB, f/k/a/ CDC Finance-CDC IXIS, ("CDC")**, is a French corporation with its principal place of business in Paris, France. CDC wholly owns CDC Funding and fully consolidates operations of CDC Funding into CDC's financials. According to its registration documents, CDC only fully consolidates those subsidiaries that CDC controls. CDC and CDC Funding, moreover, have shared certain executives, including Anthony Orastelli, who is currently a CDC Director and in the last five years has occupied a number of executive opinions at CDC and CDC Funding, including but not limited to, President of CDC Funding Corp. and Member of CDC's Executive Board. CDC guaranteed all guaranteed investment contracts issued by CDC Funding. According to court filings, in a case related to the instant case, by an outside counsel for CDC, the guarantees provided by CDC were a necessary pre-condition of CDC Funding's ability to serve as a counter-party all of the Municipal Derivative transactions to which CDC Funding acted as a counter-party or sought to act as a counter-party. CDC Funding was acting as an

37

agent and/or alter ego of CDC in actions taken by it relating to, concerning, or connected with, the issuance of brokering of Municipal Derivatives to municipalities and non-profit entities. CDC directly and/or through the CDC Funding engaged in the conduct that led to the harm suffered by Jefferson's Ferry.

88. Hybrid Provider/Broker Defendants **CDC Funding and CDC** are collectively referred to herein as "CDC."

**D.** **Named and Unnamed Co-conspirators**

89. Provider co-conspirator **AIG Matched Funding Corp. ("AIGMFC")** is a Delaware corporation with its principal place of business in Wilton, CT. As a member of the conspiracy, AIG MFC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

90. Provider co-conspirator **AIG Sunamerica Life Assurance Co. ("AIG Sunamerica")** is an Arizona corporation with its principal place of business in Los Angeles, California. As a member of the conspiracy, AIG Sunamerica was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

38

91.     Provider co-conspirator **AIG Financial Products Corp. ("AIG Financial")** is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, AIG Financial, directly and through its fully owned subsidiary AIG Matched Funding Corp., issued and was the counter-party to Municipal Derivatives invested in by public entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

92.     Provider co-conspirators **AIG MFC, AIG Sunamerica**, and **AIG Financial** are collectively defined herein as "**AIG**."

93.     Provider co-conspirator **AMBAC Financial Group, Inc. ("Ambac")** is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, Ambac was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

94.     Provider co-conspirator **Genworth Financial Investment Management, LLC ("Genworth")** is a Virginia limited liability corporation.  As a member of the conspiracy, Genworth was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

95.     Provider co-conspirator **Lehman Brothers Inc. ("Lehman" or "Lehman Brothers")** is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, Lehman was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

96.     Provider co-conspirator **Transamerica Life Insurance Company, f/k/a Transamerica Occidental Life Insurance Company, aka AEGON Institutional Markets, Inc, aka AEGON N.V., ("Transamerica")** a wholly-owned subsidiary of Transamerica Corporation, is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa.  As a member of the conspiracy, Transamerica was a counter-party to Municipal Derivatives invested in by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

97.     Provider co-conspirator **XL Capital Ltd. ("XL Capital")** is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. XL Capital issued Municipal Derivatives through its wholly-owned subsidiary XL Asset Funding I, LLC, and guaranteed those Municipal Derivatives through its wholly-owned subsidiary XL Capital Assurance Inc.  XL Asset Funding I, LLC

40

and, until at least June 6, 2007, XL Capital Assurance Inc., were business units of XL Capital's Financial Products and Services segment.  Accordingly XL Capital consolidated reporting of the operations XL Asset Funding I, LLC and, until at least June 6, 2007, XL Capital Assurance Inc., including issuance and/or guaranteeing guaranteed investment contracts and funding arrangements, into XL Capital's financial statements.  XL Capital accounted for the assets and liabilities of XL Asset Funding I LLC and XL Capital Assurance Inc. as assets and liabilities of XL Capital.  Accordingly, XL Capital referred, in its SEC filings, to the guaranteed investment contract business of XL Asset Funding I LLC and, until at least June 6, 2007, the guaranteed investment contract guaranteeing business of XL Capital Assurance, Inc., as XL Capital's guaranteed investment contract business, and the liabilities flowing from XL Asset Funding I, LLC issued and, until at least June 6, 2007, XL Capital Assurance, Inc. guaranteed, guaranteed investment contracts, as XL Capital's liabilities.  Accordingly, XL Capital continually monitored the cash flow risks associated with each guaranteed investment contract issued by XL Asset Funding I, LLC and guaranteed by XL Capital Assurance Inc. and established underwriting criteria that XL Capital Assurance, Inc. was required to follow in operation of its business.  The "*guaranteed*" in a guaranteed investment contract issued by XL Asset Funding I,

41

LLC was a guarantee that was provided by XL Capital Assurance, Inc., and at least until June 30, 2008, was underwritten by XL Capital.

98.     At least until June 30, 2008, XL Capital provided XL Capital Assurance Inc. with all of the services necessary for the operation of XL Capital Assurance Inc.'s business, including but not limited to: substantially all of XL Capital Assurance Inc.'s personnel services, as well as office space, furniture and equipment, through XL Capital's wholly-owned subsidiary, XL Financial Administrative Services, Inc.; identification and analysis of business opportunities, assistance in structuring and tailoring products, marketing and communication of various notices, through XL Capital's fully owned subsidiary XL Financial Products Ltd.; advertising services and participation on behalf of XL Capital Assurance Inc. in regulatory mandated associations, through various of XL Capital's fully owned subsidiaries including X.L. America, Inc. (the ultimate U.S. holding company of XL Asset Funding I, LLC and, until July 1, 2006, of XL Capital Assurance Inc.); information technology support, reinsurance and retrocessional consulting and management services, as well as actuarial, finance and internal audit services, through XL Capital's wholly-owned subsidiary X.L. Global Services, Inc.; and investment management services, through XL Capital's fully owned subsidiary XL Investment Management Ltd.

42

99.    XL Capital similarly managed and operated XL Asset Funding I, LLC, through XL Capital's wholly-owned subsidiary, XL Life And Annuity Holding Company, which directly and/or through its designees managed and operated XL Asset Funding I, LLC, and provided XL Asset Funding I, LLC all administrative support necessary for XL Asset Funding I, LLC to operate as a provider of Municipal Derivatives.  In XL Capital's 10-K filing for the year 2008, it lists over one hundred and twenty-five wholly-owned subsidiaries of XL Capital, including XL Asset Funding I, LLC and XL Life And Annuity Holding Company.  An 8-K filing by XL Capital on July 28, 2009 lists XL Asset Funding I, LLC as one of only eight "significant subsidiaries" of XL Capital.

100.    XL Capital undercapitalized XL Asset Funding I, LLC and XL Capital Assurance Inc., and neither XL Asset Funding I, LLC nor XL Capital Assurance Inc., could operate, including providing or guaranteeing guaranteed investment contracts, without financial support and guarantees provided ultimately by XL Capital.  XL Asset Funding I, LLC and XL Capital Assurance Inc., until at least June 30, 2008, acted as an agent and/or alter ego of XL Capital in actions taken by each relating to, concerning, or connected with, the issuance of a Municipal Derivative to a municipality or non-profit entity.  XL Capital, directly and/or through XL Asset Funding I, LLC, XL Life And Annuity Holding

43

Company, and/or, until at least June 30, 2008, XL Capital Assurance Inc. engaged in the conduct that led to the harm suffered by Jefferson's Ferry.

101.   Provider co-conspirator **Syncora Guarantee, Inc., f/k/a XL Capital Assurance Inc. ("XL Capital Assurance")**, a wholly-owned operating company and subsidiary of Syncora Holdings, Ltd., is a financial guaranty insurance company domiciled in New York.  XL Capital Assurance provided financial guarantees of all the Municipal Derivatives to which XL Asset Funding I, LLC was a counter-party.  The guarantees provided by XL Capital Assurance were necessary pre-conditions of XL Asset Funding I, LLC's ability to serve as a counter-party to all of the Municipal Derivatives to which XL Asset Funding I, LLC acted as a counter-party or sought to act as a counter-party.  The "*guaranteed*" of a guaranteed investment contract issued by XL Asset Funding I, LLC was a guarantee from XL Capital Assurance.  XL Capital Assurance was directly involved in the municipal derivatives business activities of XL Asset Funding I, LLC, including but not limited to providing XL Asset Funding I ,LLC with information, identification of business opportunities and other assistance to XL Asset Funding I, LLC in its marketing of municipal derivatives and providing XL Asset Funding I, LLC with surveillance-related information on XL Capital Assurance's existing insured credits.  XL Capital directly and through XL Asset

44

Funding I LLC engaged in the conduct that led to the harm suffered by Jefferson's Ferry.

102.   Provider co-conspirator **Syncora Holdings, Ltd., f/k/a Security Capital Assurance Ltd. ("Syncora")** is a Bermuda corporation with its principal place of business in Hamilton, Bermuda.  On March 17, 2006, XL Capital formed Syncora Holdings, (f/k/a Security Capital Assurance Ltd.), for the purpose of transferring to it ownership of XL Capital Assurance, then a wholly-owned subsidiary and operating business of XL Capital.  On July 1, 2006, XL Capital contributed all of its ownership interests in XL Capital Assurance to Syncora. Between August 4, 2006 and June 6, 2007, XL Capital sold 54% of its voting and ownership interests in Syncora, through a series of initial public offerings.  On December 31, 2007, based on the evaluation of its executives of Syncora's financial health, XL Capital reduced the reported value of its 46% interest in SCA to nil.  On August 5, 2008, XL Capital, Syncora, and various Syncora entities executed a master agreement, which *inter alia* purported to transfer all of XL Capital's residual liabilities resulting from Municipal Derivatives guaranteed to XL Capital Assurance to Syncora.  Syncora is liable as a successor for the conduct engaged in by XL Capital Assurance that led to the harm suffered by Jefferson's Ferry.

45

103.    Provider co-conspirator **XL Asset Funding I, LLC ("XL Asset")**, a wholly-owned subsidiary of XL Capital (through *inter alia* XL Life and Annuity Holding Company), is a Delaware limited liability company with its principal place of business on 20 N. Martingale Rd., Suite 200, Schaumburg, Illinois.  As a member of the conspiracy, XL Asset was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

104.    Provider co-conspirator **XL Life and Annuity Holding Company ("XL Holding")**, a wholly-owned subsidiary of XL Capital Ltd., is a Delaware limited liability company with its principal place of business on 20 N. Martingale Rd., Suite 200, Schaumburg, Illinois.  XL Holding, directly or through its designees,  managed and operated XL Asset, and provided XL Asset with all administrative support necessary for XL Asset to act as counter-party to Municipal Derivatives entered into by public and non-profit entities.  XL Holding through, and as, XL Asset acted as a counter-party to Municipal Derivatives entered into by public and non-profit entities, and directly and/or through XL Asset engaged in the misconduct that led to the harm suffered by Jefferson's Ferry.

105.   Provider co-conspirators **XL Capital**, **XL Capital Assurance, Syncora XL Asset, and XL Holding** and are collectively referred to herein as "**XL**."

106.   Broker co-conspirator **Morgan Keegan & Co. Ltd. ("Morgan Keegan")** is a subsidiary of Regions Financial Corp., a Tennessee corporation with its principal place of business in Memphis, Tennessee.  As a broker of Municipal Derivatives to public and non-profit entities, Morgan Keegan acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

107.   Broker co-conspirator **Kinsell Newcomb & De Dios Inc. ("Kinsell")** is a California corporation with its principal place of business in Carlsbad, California.  As a broker of Municipal Derivatives to public and non-profit entities, Kinsell acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

108.   Broker co-conspirator **PackerKiss Securities ("PackerKiss")** is a Florida corporation with its principal place of business in Delray Beach, Florida. As a broker of Municipal Derivatives to public and non-profit entities, PackerKiss acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

47

109.     Broker co-conspirator **Shockley Financial Corp. ("Shockley")**, a wholly-owned subsidary of NelNet Inc., is a Colorado corporation with its principal place of business in Aurora, Colorado.  As a broker of Municipal Derivatives to public and non-profit entities, Shockley acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

110.     Broker co-conspirator **Blount Parrish & Roton, Inc., f/k/a Blount Parrish Co. Inc ("Blount Parrish")** is an Alabama corporation with its principal place of business in Montgomery, Alabama.  As a broker of Municipal Derivatives to public and non-profit entities, Blount Parrish acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

111.     Broker co-conspirator **Municipal Government Investors Corp. ("MGIC")** is a New York corporation with its principal place of business in Manhasset, New York.  As a broker of Municipal Derivatives to public and non-profit entities, MGIC acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

112.     Broker co-conspirator **Feld Winters Financial LLC ("Feld Winters")** is a California limited liability company with its principal place of

48

business in Sherman Oaks, California. As a broker of Municipal Derivatives to public and non-profit entities, Feld Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

113. Agent co-conspirator **Capital Financial Partners, Inc. ("Capital Financial Partners")** is a Florida corporation with its principal place of business in Ocala, Florida. As an agent for providers and/or brokers of Municipal Derivatives to public and no-profit entities, Capital Financial Partners acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry.

114. Broker co-conspirator **Kane Capital** is a New York corporation with its principal place of business in Great Neck, New York. As a broker of Municipal Derivatives to public and non-profit entities, Kane Capital aced as a member of the conspiracy that caused significant harm to public and non-profit entities, including Jefferson's Ferry

/ / /

/ / /

49

# IV.
# OVERVIEW OF MUNICIPAL DERIVATIVES

## A.     Municipal Bond Basics

115.   Municipal bonds are issued by U.S. states, cities, and counties, or their respective agencies and other government entities to raise funds for various public projects, including, the construction and repair of roads and building public structures such as schools, parks, power plants and mass transit facilities.  Public entities also issue municipal bonds – known as "tax revenue anticipation notes" ("TRANs"), "certificates of participation", "lease revenue bonds", etc. – to raise funds to pay for current expenses while awaiting future revenues.

116.   When a public entity issues bonds, it is generally referred to as an "issuer."  (The same term is used for non-profit entities that issue tax-exempt equivalents to municipal bonds).  This term is also used in Municipal Derivative transactions to refer to the public or non-profit entity that enters into a Municipal Derivative deal with a provider.

117.   Municipal Derivatives are provided by large commercial and investment banks or highly rated insurance companies (collectively referred to herein as "providers").

50

118. When a public or non-profit entity seeks to purchase a Municipal Derivative by entering into Municipal Derivative contract with a provider, they may engage the services of a broker. The legitimate role of the broker is to obtain the best possible price for the Municipal Derivative by arranging competitively bid auctions among multiple potential providers of Municipal Derivatives.

119. Municipal bonds are tax-exempt and as a result, investors are usually willing to accept lower interest rates from municipal bonds than they would accept from other forms of borrowing (assuming comparable risk). This makes issuance of municipal bonds an attractive fiscal option for many public entities, and, as a result, the municipal bond industry is extremely large. According to the Securities Industry and Financial Markets Association, approximately $385 billion worth of municipal bonds were issued in 2006. The total United States municipal bond market is currently valued at approximately $2.6 trillion.

120. Traditionally municipal bonds pay interest to bond holders at either a fixed or variable rate of interest that is pegged to some kind of index such as the London Inter-Bank Offered Rate ("LIBOR") (the standard for quoting interbank lending of Eurodollar deposits), or the Security Industry & Financial Markets Association Index ("SIFMA Index"). The issuer of a municipal bond receives a cash payment at the time of issuance. In return, the issuer agrees to repay the

51

principal and the interest to the bond holders over time. Repayment periods vary and may be as short as a few months but typically lasts for several years, often several decades.

121. In recent years, bond issuers have, in increasing numbers, issued two other types of bonds, variable rate demand bonds ("VRDBs") and auction rate securities ("ARS"). Both VRDBs and ARSs, through slightly different mechanisms, are designed to allow issuers of long-term bonds to take advantage of short-term interest rates by "re-marketing" the bonds on a weekly or monthly basis. Both types of bonds are also frequently associated with swaps, through which an issuer can seek to gain a synthetic fixed rate that would not otherwise be available to the issuer.

122. Proceeds from the issuance of municipal bonds for public projects or construction are typically put into three types of funds. The primary fund is known as the project fund or the construction fund. This fund is used to pay for the actual construction or repair project work. The second fund, which is smaller in nature, is known as the debt service fund, or "sinking fund." This fund is used to make principal and interest payments to bond holders. The third type of fund is known as the debt service reserve fund. This reserve fund is used to pay debt obligations in case of unforeseen contingencies. Because of the revenue-

52

anticipation purpose and shorter term quality of TRANs and other similar kinds of bonds, proceeds from issuances of these bonds are typically placed in similar but different types of funds than traditional bonds.

**B.   Municipal Derivatives Basics**

123.   "Municipal Derivative(s)" refers to a variety of specialized investment vehicles through which issuers of municipal and tax-exempt bonds seek to: (1) earn a return on bond proceeds while those proceeds are unused; (2) hedge the interest rate obligations of underlying bonds; and/or  (3) accomplish other financial goals.  The Municipal Derivatives industry is almost as large as the municipal bond market.  A substantial portion of the $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

124.   All Municipal Derivatives, whatever the purpose they are designed to achieve for the issuer, involve a reciprocal exchange of money between the issuer and a Municipal Derivative provider.  Unless otherwise specified, as used in this Complaint, the term "Municipal Derivatives" generically encompasses all of the transactions described herein.

125.   In the case of Municipal Derivatives used by issuers to earn a return on unused bond proceeds, the issuer gives the provider a lump sum of money (principal) and in exchange receives from the provider periodic payments based on

the lump sum and interest thereon.  From the issuers perspective, the lump sum to periodic payment exchange is much like an annuity.  There are several types of reinvestment derivatives, which vary somewhat in form.  The most common type is a called a "guaranteed investment contract" or "GIC."  The acronym GIC is often used as short hand to refer to various types of reinvestment derivatives.  The term **"reinvestment derivative"** is used herein to refer generally to Municipal Derivatives used by issuers to reinvest bond proceeds.

126.   The most common type Municipal Derivative used by issuers to hedge the interest rate obligations of underlying bonds are interest rate swaps or just "swaps."  In a swap, the issuer makes periodic payments to the provider calculated on a certain rate of interest on a generally amortizing amount of principal, and receives in exchange periodic payments from the provider based on a different rate of interest on the same amount of principal.  The economic calculi of both parties that is supposed to underlie such an exchange is discussed below but is generally referred to as the logic of "rational pricing," based on the comparative advantage of access to different types of credit markets.  The term **"hedging derivative"** is used herein to refer generally to Municipal Derivatives, such as swaps, options, swaptions ceilings, floors and collars, that issuers use, generally, to hedge the interest rate obligations on underlying loans and shift the

54

risk they're on. They are most commonly associated with ARS and VRDB issuances, which have interest rates that set at short-term intervals.

127. A much less common type of Municipal Derivative involves an exchange of periodic payments *from* an issuer *to* a provider for a lump sum payment *from* a provider. These are often referred to a **"forward sales agreements."** However, forward sales agreements can also refer to Municipal Derivatives in which the cash flows mirror those in a reinvestment derivative (a lump sum from the issuer in exchange for periodic payments from the provider).

### 1. Guaranteed Investment Contracts "GICs"

128. A GIC is a contract between a municipal bond issuer and a financial institution by which the financial institution guarantees periodic payments equaling, in total, the amount of bond proceeds invested, plus interest at a rate set by a competitive bidding process. A GIC is a type of annuity available to U.S. public entities that issue municipal bonds. The counter-party to GICs are typically insurance companies and investment banks, which in this role are referred to as "providers" or "counter-parties." These products are intended to provide issuers with guaranteed returns on unused bonds proceeds. "GICs" can refer to unallocated group contracts, investment contracts, funding agreements, guaranteed interest contracts, or other similar financial products in which a provider agrees to

pay a fixed or variable rate of interest or a future payment that is based on an index or similar criteria, such as the LIBOR or the SIFMA Index, that is payable at predetermined dates.

129.   A Repurchase Agreement or a "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return.  This is known as a Collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

130.   An "Unsecured" or "Uncollateralized GIC" does not involve any securities. This type of Municipal Derivative instrument is most similar to other types of annuities: the financial institution guarantees payments at specified points of time.  These agreements may contain terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties if deadlines are not met.

### 2.   Forward Agreements

131.   A forward agreement is often used with debt service funds.  It is an agreement where the buyer and the seller agree to settle their respective obligations at some specified future date based upon the current market price at

the time the contract is executed. A forward agreement may require the delivery of a specified security at a specified future date at fixed yields for the purpose of optimizing the investment of a debt service reserve fund. A forward agreement may also be used to require an issuer to issue, and a company to underwrite, an issuance of bonds on a specified date in the future for the purpose of refunding an outstanding debt issuance.

### 3. <u>Advanced Refunding Escrow</u>

132. Public and non-profit entities can issue bonds to refinance prior bond issuances. An advanced refunding escrow is an arrangement pursuant to which the proceeds of the refunding issue (the new bond issued to refund an outstanding bond) are held in escrow and invested so that the escrow account funds can be used to pay off the principal and interest on the municipal bond issue that is being refunded.

133. GICs, forward agreements, and advanced refunding escrows are collectively included among the Municipal Derivatives collectively referred to herein as **"reinvestment derivatives."**

### 4. <u>Swaps</u>

134. A swap is an exchange of future cash flows (*i.e.*, periodic payments) between an issuer and a provider.

135.    Swaps are generally used by issuers to hedge interest rate obligations on underlying municipal bonds, but can also be used to achieve other financial goals including gaining access to synthetic fixed rates that are not otherwise available to the issuer.

136.    In a swap transaction, the issuer and provider essentially trade or "swap" future cash flows.  Swaps include: (a) floating-for-fixed interest rate swaps, (b) fixed-for-floating rate swaps, and (c) floating-for-floating interest rate swaps, when the two instruments are based off of different indices.

137.    While issuers sometimes enter into swaps and other types of hedging derivatives for investment purposes, issuers usually enter into them to hedge their interest rate obligations related to a particular bond issuances

138.    In recent years, it has become increasingly common for issuers to combine interest rate swaps with VRDB or ARS bond issuances, the interest rates on which are reset on regular short-term bases, such as on weekly or monthly bases.  In the swaps associated with these types of bonds, the issuer receives from the swap provider a floating interest rate that is supposed to approximate the short-term interest rates that the issuer will be obligated to pay holders of the bonds; in exchange, the issuer pays a swap provider a conditioned fixed interest rate.

### a.    Basic Swap Valuation - Logic of "Rational Pricing"

139.   Underpinning a legitimate swap transaction is the logic of "rational pricing."  According to the logic of rational pricing, when an issuer and provider enter into a swap transaction, the present values ("PV") of the exchanged future cash flows should be equal or "netted off" against one another.  (Present value is the value on a given date of a future payment or series of future payments, discounted to reflect the time value of money and other factors such as investment risk.)  Another way to put this is that the net present value ("NPV") of the swap should be zero or "arbitrage free," at the date of its initiation.  In other words, a swap should involve the exchange of future cash flows that have roughly equal values.

140.   In the fixed-for-floating rate example described above, where the issuer pays a fixed rate and the provider pays a floating rate, the PV of future fixed rate payments by the issuer should be equal to the present value of the expected future floating rate payments by the provider.  In other words again, the exchange should be a wash, with the issuer and provider exchanging future cash flows of the same PV.

141.   If, as it should be, the NPV of the swap, as to parties that entered into it, is zero, neither party's motivation for entering the swap should be based on any

belief that they have received a more valuable future cash flow in exchange for a less valuable future cash flow.  Again, the NPV of the cash flows should be zero; on the market, the cash flow is worth the same.  Rather, each party's motivation for entering the swap should be based on each party's respective comparative advantage based on access to different borrowing markets.

142.   In our example, the issuer enters into the swap because it believes that the PV of the floating rate the issuer will receive from the provider will be more than the PV of the floating rate cash flows that the issuer will be obligated to pay bond holders, both calculated over the life of the bond.  In other words, the issuer's access to the ARS and VRDB markets should give it a comparative advantage vis-á-vis the provider as to floating interest rates: the provider has to pay the issuer a higher floating interest rate than the issuer has to pay bond holders.  The provider, in turn, enters into the swap because it believes that the PV of the fixed rate payments that the provider will receive from the issuer is greater than the PV of fixed rate payments  that  the provider would be obligated to pay another lender.  In other words, the provider has a comparative advantage vis-á-vis the issuer as to fixed rates: the issuer has to pay the provider a higher fixed rate than the provider has to pay another lender.

143.   Thus, when the NPV of a swap is not zero, but rather the NPV is significantly greater for the provider than for the issuer and no up-front payment is made by the provider to the issuer, the reasonable conclusion is that the transaction has been manipulated to the advantage of the provider.  Again, the NPV should be zero as between the issuer and the provider.  The financial benefit to providers should be derived from their comparative advantage concerning access to the borrowing markets in question, not cheating the issuers with whom they enter into the swaps.

144.   However, as alleged below, there are several publically reported instances where issuers have lost billions of dollars as a result of unfairly valued swaps in which evidence of price collusion amongst supposed competing providers has been identified.  Moreover, a preliminary analysis of several swap transactions entered into by various cities, counties and government agencies reveals that significant mis-pricing occurred in favor of the swap providers, and there exists probative evidence that the mis-pricing was the result of collusion between swap providers.

145.   Finally, evidence originally uncovered by Jefferson's Ferry and now widely reported, as well as evidence provided by Bank of America, demonstrates how pricing letters prepared by providers to issuers and other means were used by

Defendants to both manipulate the terms of swap deals and provide illegal
kickbacks to one another.

### 5.  Interest Rate Agreements,  Options, And Swaptions

146.  An "interest rate floor agreement" is a financial instrument in which
the buyer of the agreement is protected by receiving a guaranteed minimum
interest rate (the "interest rate floor") that can be paid on the debt.  Guaranteed
payments are made even if the actual interest rate drops below a specified strike
rate (the "floor rate").  Interest rate floor agreements are typically used for bonds
with variable interest rates.  For issuers of municipal bonds, floor agreements are
used to provide greater certainty concerning the interest payments that must be
paid.

147.  An "interest rate ceiling agreement" is a financial instrument in which
the buyer of the agreement is protected by receiving a guaranteed maximum
interest rate (the "interest rate ceiling" or "interest rate cap").  Payments are made
when the actual interest rate rises above a specified strike rate (the "cap rate").
Interest rate ceiling agreements are typically used in bonds with variable interest
rates.  For issuers of municipal bonds, ceiling agreements are used to provide
greater certainty in the interest payments that must be paid.

148.   A "collar agreement" is a financial instrument that combines a floor agreement with a ceiling agreement.  In other words, an issuer can enter a collar agreement to combine an interest rate floor and interest rate ceiling on its variable rate debt.  This agreement ensures that interest payments will be within the range set by the collar.

149.   An "option" is a provision in a bond contract where the provider has the right, on specified dates, after giving required notification, to cancel or terminate the Municipal Derivative.

150.   A "swaption" is a combination of a swap and an option.

151.   Swaps, interest rate agreements, collars, options, and swaptions are collectively referred to herein as "hedging derivatives."

152.   Several qualities of all these types of Municipal Derivatives encouraged and facilitated the Defendants conspiracy to allocate the market for them and depress their terms.  These factors include but are not limited to: the complexity of the their terms, makes them difficult to value and provides opportunities to hide or disguise the results of manipulation; the significant barriers of entry to the market for Municipal Derivatives due to their complexity and the capital requirements that potential providers need to meet in order to have required credit ratings, and applicable regulations; and the fungibility of

63