# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | **MDL No. 1950** |
| | **Master Docket No. 08-02516 (VM) (GWG)** |
| **THIS DOCUMENT RELATES TO:** | |
| *CITY OF RIVERSIDE, THE REDEVELOPMENT AGENCY OF THE CITY OF RIVERSIDE, THE PUBLIC FINANCING AUTHORITY OF THE CITY OF RIVERSIDE v. Bank of America, N.A., et al.* | |



RECEIVED APR 7 1 2011 U.S.D.C. S.D. N.Y. CASHIERS

## SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.   PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.     Provider Defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            2.     Broker Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.    Hybrid Broker/Provider Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      D.    Named and Unnamed Co-conspirators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.   OVERVIEW OF MUNICIPAL DERIVATIVES. . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      A.    Municipal Bond Basics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      B.    Municipal Derivatives Basics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            1.     Guaranteed Investment Contracts "GICs". . . . . . . . . . . . . . . . . . . 41

            2.     Forward Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

            3.     Advanced Refunding Escrow.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

            4.     Swaps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

                 a.     Basic Swap Valuation - Logic of "Rational Pricing" . . . . . . . . . 43

            5.     Interest Rate Agreements,  Options, And Swaptions. . . . . . . . . . . . . . . 46

V.    DEFENDANTS' ILLEGAL MANIPULATION OF THE MUNICIPAL DERIVATIVE MARKET.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A.     Overview Of Defendants' Illegal Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    1.     Mechanics Of The Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

         a.     Bid-Rigging Of Auctions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

             i.     Pre-Selecting A Particular Provider Defendant To Win An Auction for a Municipal Derivative. . . . . . . . . . . . . . . . . . 51

             ii.     Submitting Courtesy Bids To Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction. . . . . . . . 59

             iii.     Passing to Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction. . . . . . . . . . . . . . . . . . . . . 66

             iv.     The Pre-Selected Provider Defendant Gets A "Last Look" At Other Bids to Ensure Winning a Municipal Derivative Auction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

             v.     The Pre-Selected Provider Defendant Gets Guidance and The Terms Of Other Bids to Ensure Winning a Municipal Derivative Auction. . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

         b.     Manipulation Of Negotiated Deals. . . . . . . . . . . . . . . . . . . . . . . . 72

         c.     Kickbacks And Other Types Of Unlawful Consideration. . . . . . . 74

         d.     Defendants' Overt Acts To Prevent Discovery Of Their Conspiratorial Communications. . . . . . . . . . . . . . . . . . . . . . . . . 79

    2.     "It's nice to have friends": Repeat Appearances By Defendants' Representatives In Different Transactions, Personal Relationships Amongst Them, And Other Factors Encouraging And Enabling The Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

         a.     Repeat Appearances In Multiple Transactions . . . . . . . . . . . . . . 81

         b.     Personal Relationships Amongst Defendants' Representatives. . . 82

    3.     Industry-Wide Quality And Market-Wide Effect Of Conspiracy. . . . . . . 88

B.     Evidence Of The Conspiracy's Operation Through Specific Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

1.      Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Identified Through The DOJ's Criminal Indictments And Informations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

     a.      West Virginia Water Development Authority October 2003 Reinvestment Derivatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

     b.      The Board Of Port Commissioners Of The City Of Oakland September 2002 Municipal Derivative Transaction. . . . . . . . . . 103

     c.      Maine State Housing Authority May 2004 Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

     d.      Missouri Health And Educational Facilities Authority September 2002 Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . 106

     e.      State of West Virginia Higher Education Policy Commission September 2004 Municipal Derivative Transaction. . . . . . . . . 108

     f.      State of West Virginia School Building Authority June 2004 Municipal Derivative Transaction . . . . . . . . . . . . . . . . . . . . . . . 109

     g.      Tampa Port Authority July 2002 Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

     h.      McAlester Public Works Authority June 2002 Municipal Derivative Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

     i.      Two March 2002 State University Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

     j.      A January 2002 State Housing And Finance Association Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

     k.      California Health Facilities Financing Authority  November 2000 Municipal Derivative Transaction . . . . . . . . . . . . . . . . . . . . . . . 116

     l.      A November 2001 State Housing Finance Agency Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

     m.      A February 2002 State Housing Finance Agency Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

n.      A December 2002 State Education Assistance Foundation Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . 119

o.      A 2004 State Education Facilities Authority Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

p.      A 2004 State Water Pollution Abatement Trust. . . . . . . . . . . . 120

q.      A 2005 State Housing Finance Agency Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

r.      A 2002 State Development Finance Authority Municipal Derivative Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

s.      A 2001 State University Municipal Derivative Transaction. . . . 123

t.      A 2002 Town Municipal Derivative Transaction. . . . . . . . . . . 123

u.      A 2004 Town Municipal Derivative Transaction. . . . . . . . . . . 124

3.      Conduct By GE Trinity and FSA Representatives In Certain Transactions Of California Public Entities Is Consistent With DOJ's Descriptions Of Conduct By Their Representatives In Transactions Described In Carollo/Goldberg/Grimm Indictment. . . . . . . . . . . . . . . . . . . . . . . . . 125

4.      Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Proffered By Defendant Bank Of America. . . . 129

a.      Pennsylvania Intergovernmental Cooperation Authority Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

b.      Hillcrest Healthcare System (Oklahoma) Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

c.      Guam Power Forward Purchase Agreement. . . . . . . . . . . . . . . 130

d.      Pennsylvania School Districts and Other Entities Escrows. . . . . 130

e.      Springfield Township (Pennsylvania) Collateralized Deposit. . . 132

f.      Biola University (California) Forward Purchase Agreement. . . . 133

g.      Santa Barbara County (California) Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

h.      Art Center College of Design (California). . . . . . . . . . . . . . . . 134

i.      Beacon Tradeport Community Development District (Florida) and The Olympic Club (California) Transactions. . . . . . . . . . . . . . 135

j.      University of Tampa (Florida) Forward Purchase Agreement. . . 136

k.      Puerto Rico Electric Power Authority Escrow Deposit Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

l.      Rhode Island Gross Funded Escrow Agreement. . . . . . . . . . . 137

m.      Williamson County (Tennessee) Escrow Deposit Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

n.      Jackson Lab (Maine) Interest Rate Swaps. . . . . . . . . . . . . . . 138

o.      Commonwealth of Massachusetts Forward Purchase Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

p.      Virgin Islands Debt Service Reserve Fund. . . . . . . . . . . . . . . 139

q.      New Jersey Transit Corporation Escrow Agreement. . . . . . . . . 140

r.      Tampa (Florida) Port Authority Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

s.      City of Chicago (Illinois) Wastewater Facility Swap. . . . . . . . 140

t.      2007 Bank of America IRS Settlements. . . . . . . . . . . . . . . . . 141

3.      Preliminary Statistical Analysis Of Municipal Derivative Transactions Of California Issuers Reveals Probative Evidence Of Bid-Rigging. . . . . . . 142

a.      Evidence Suggesting Courtesy Bids. . . . . . . . . . . . . . . . . . . . 142

i.      City of Riverside (California) GIC May 28, 2004 (Row 1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

ii.     City of Riverside (California) GIC Aug. 1, 2003 (Row 2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

iii.    Los Angeles World Airports (California)GIC March 5, 1998 (Row 3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

iv.     City of Riverside (California) GIC February 12, 2004 (Row 4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

v.      City of Riverside (California) GIC July 16, 2003 (Row 5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

vi.     City of Riverside (California) GIC May 15, 2008 (Row 6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

vii.    City of Riverside (California) GIC Nov. 17, 2004 (Row 7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

viii.   City of Los Angeles (California) GIC April 27, 2005 (Row 8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

ix.     San Mateo County (California) GIC September 6, 2001(Row 9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

x.      City of Los Angeles (California) GIC March 19, 2002 (Row 10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

b.      San Mateo County (California) November 14, 2003 Swap Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

4.  Publicized Evidence Of The Conspiracy's Operation In Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

a.      Pacific Matrix - Stifel Transactions. . . . . . . . . . . . . . . . . . . . . . 162

i.      Oklahoma Turnpike Authority GIC. . . . . . . . . . . . . . . . 163

ii.     Pottawatomie County (Oklahoma) Development Authority 164

iii.    Oklahoma Turnpike Authority Forward Purchase Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

iv.     Sisters of St. Mary's Forward Purchase Agreement. . . . 165

vi

b. Baum - CDC Funding  Transactions. . . . . . . . . . . . . . . . . . . . . . 166

c. Baum - Bank of America Transaction (Rural Enterprises of Okla.)166

d. CDR - Bank of America Transaction (City of Atlanta). . . . . . . 167

e. CDR - SocGen Transactions (Lease-to-Own And California School Advance Refunding Deals). . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

f. Oxnard California School District And Delano California Joint High School District. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

g. Baum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

h. Butler Area School District Swaptions. . . . . . . . . . . . . . . . . . 169

i. North Carolina University State Student Aid Association.. . . . . 170

j. Jefferson County (Alabama) Sewer Swaps. . . . . . . . . . . . . . . 170

k. Biola University (California) Swap. . . . . . . . . . . . . . . . . . . . . 174

VI. RIVERSIDE MUNICIPAL DERIVATIVE TRANSACTIONS. . . . . . . . . . . . . . . . . . 174

A. Reinvestment Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

1. City of Riverside 2006 Lease Revenue Certificates of Participation (Galleria at Tyler Public Improvements) Project Fund GIC. . . . . . . . . . 176

2. City of Riverside 2006 Lease Revenue Certificates of Participation (Galleria at Tyler Public Improvements) Reserve Fund GIC.. . . . . . . . . 177

3. City of Riverside (ARS Mode) Certificates of Participation (Various Capital Improvement Projects) Series 2007 A & B GIC. . . . . . . . . . . . . 178

4. City of Riverside Variable Rate Refunding Certificates of Participation (Riverside Renaissance Projects) Series 2008 Reserve Fund GIC. . . . . 179

5. City of Riverside Variable Rate Refunding Certificates of Participation (Riverside Renaissance Projects) Series 2008 Project Fund GIC. . . . . . 180

6. City of Riverside Electric Revenue Bonds Issue of 2001 - GIC. . . . . . . 181

7.      City of Riverside Electric Revenue Bonds Issue of 2001 - GIC. . . . . . . 181

8.      City of Riverside Electric Revenue Bonds Issue of 2001 - GIC. . . . . . . 182

9.      City of Riverside Electric Refunding Revenue Bonds Issue of 2003
        - GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

10.     City of Riverside Electric Revenue Bonds Issue of 2004A (Fixed Rate
        Bonds) and Issue 2004B (Auction Rate Securities) Construction Fund -
        GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

11.     City of Riverside Electric Revenue Bonds Issue of 2004A (Fixed Rate
        Bonds) Fixed Reserve Fund- GIC. . . . . . . . . . . . . . . . . . . . . . . . . 184

12.     City of Riverside Electric Revenue Bonds Issue of 2004B (Auction Rate
        Securities) Variable Rate Reserve Fund- GIC. . . . . . . . . . . . . . . . . 185

13.     City of Riverside Electric Revenue Bonds Issue of 2004A (Fixed Rate
        Bonds) GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

14.     City of Riverside Electric Refunding/ Revenue Bonds Issue 2005 A
        (Auction Rate Securities) and Issue 2005B (Auction Rate Securities)
        Reserve Fund (Collateralized)- GIC. . . . . . . . . . . . . . . . . . . . . . . . 187

15.     City of Riverside Electric Refunding/ Revenue Bonds Issue 2005 A
        (Auction Rate Securities) and Issue 2005B (Auction Rate Securities)
        Construction Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

16.     City of Riverside Variable Rate Refunding Electric Revenue Bonds Issue
        of 2008A, 2008B, 2008C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

17.     City of Riverside Variable Rate Refunding Electric Revenue Bonds Issue
        of 2008D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

18.     City of Riverside, Water Revenue Bonds 2001 - Reserve and Project Fund
        GICs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

19.     City of Riverside, Water Revenue Bonds 2005 Project and Reserve Fund
        GICs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

20.     City of Riverside, Water Revenue Bonds 2005 - Project Fund GIC. . . . 192

21. City of Riverside, Water Revenue Refunding Bonds 2008 Series A - Reserve Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

22. City of Riverside, Water Revenue Refunding Bonds 2008 Series B - Project Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

23. Multiple Project Area Housing Tax Allocation Bonds 2004 Series A - Reserve and Project Fund GICs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

24. Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series A - Project Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

25. Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series B - Project Fund. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

26. Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series C - Project Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

27. Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series D - Project Fund GIC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

28. Highlander CFD 90-1 Refunding Bonds - Reserve Fund GIC. . . . . . . . 199

29. RPFA Refunding Bonds (CFD 86-1 and CFD 2002-1) - Reserve Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

30. Canyon Springs Assessment District Refunding Series 1989 Limited Obligation Bonds - Reserve Fund GIC. . . . . . . . . . . . . . . . . . . . . . . . 201

31. Public Financing Authority of the City of Riverside Projects 2003. . . . 202

32. California Tower Lease Revenue Bonds - Reserve Fund GIC. . . . . . . . 202

B. Swap Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

1. City of Riverside Electric Revenue Bonds Issue 2004B (Auction Rate Securities); and Electric Revenue Refunding Bonds 2008 Series A - Interest Rate Swap. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

2. City of Riverside Electric Revenue Bonds Issue 2005A (Auction Rate Securities); and Electric Revenue Refunding Bonds 2008 Series B - Interest Rate Swap. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

3.     City of Riverside Electric Revenue Bonds Issue 2005B (Auction Rate Securities); and Electric Revenue Refunding Bonds 2008 Series C - Interest Rate Swap. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

4.     City of Riverside Water Revenue Bonds 2005 and Water Revenue Refunding Bonds 2008 Series A - Interest Rate Swap. . . . . . . . . . . . . 205

5.     Riverside Renaissance Projects 2007 Series A & Series B; and Riverside Renaissance Projects Refunding 2008 - Interest Rate Swap. . . . . . . . . . 205

C.    Debt Service Forward Sale Agreement Transactions. . . . . . . . . . . . . . . . . . . . . 206

1.     The Redevelopment Agency of the City of Riverside Debt Service Reserve Forward Delivery Agreement 1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

2.     City of Riverside Taxable Pension Obligation Bonds 2005 Series A Forward Purchase and Sale Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . 206

D.    Repeat Appearances Of The Same Representatives Of The Same Defendants In Riverside Municipal Derivative Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . 207

1.     The Same Representatives Of Five Provider Defendants Appeared In Four Auctions Together Along With Other Repeat Players. . . . . . . . . . . . . . 207

2.     The Same Representatives Of Seven Provider Defendants Appeared In Three Auctions Together Along With Other Repeat Players.. . . . . . . . . 209

3.     Two Representatives For Two Provider Defendants Engaged In Auction Bidding Involving Three Transactions.. . . . . . . . . . . . . . . . . . . . . . . . . . 210

VII.    DOJ ANTITRUST DIVISION EMPANELS GRAND JURY TO PURSUE INDUSTRY-WIDE CRIMINAL INVESTIGATION - BOFA SEEKS AMNESTY. . . . . . . . . . . . . . 210

A.    BofA Admits To Participation In Conspiracy - Enters DOJ Leniency Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

B.    The DOJ's Indictment Of Defendant CDR And CDR Executives Implicates Other Defendant Providers In Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

C.    The DOJ's Criminal Indictment Of Carollo, Goldberg, and Grimm Confirms Defendants GE Trinity And RBC's Role In The Conspiracy. . . . . . . . . . . . . . . 227

D.     Other Defendants Former Employees Are Under Investigation Related To Their Involvement In The Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

      1.     UBS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

      2.     JP Morgan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

      3.     Bear Stearns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

      4.     Piper Jaffray. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

      5.     Wachovia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

      6.     FSA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

      7.     CDC Funding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

      8.     Morgan Stanley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

      9.     Salomon Smith Barney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

      10.     Goldman Sachs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

      11.     George K. Baum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

      12.     Societe Generale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

VIII.   ACCRUAL OF CLAIMS, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

IX.   RIVERSIDE SUFFERED INJURY THROUGH THE CONDUCT OF THE DEFENDANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

X.   TRADE AND INTERSTATE COMMERCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

XI.   CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

FIRST CAUSE OF ACTION
    VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1. . . . 247

SECOND CAUSE OF ACTION
    VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT
    CAL. BUSINESS AND PROFESSIONS CODE §§ 16700, *ET SEQ.*. . . . . . . 250

PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

JURY TRIAL DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

Plaintiffs, the City of Riverside, the Redevelopment Agency of the City of Riverside, and the Pubic Financing Authority of the City of Riverside (collectively "Riverside"), bring this action for damages and injunctive relief against the Defendants (defined *infra*) for violations of the California antitrust laws (the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et. seq*.) and United States antitrust laws (Section 1 of the Sherman Act, 15 U.S.C. § 1). Riverside complains and alleges upon information and belief except as to those paragraphs that are based on personal knowledge, as follows:

**I.**
**<u>NATURE OF THE ACTION</u>**

1. Several years ago, Warren E. Buffett warned that derivatives were "**financial weapons of mass destruction, carrying dangers that, while now latent, are potentially lethal**." Buffett was principally referring to the tendency of derivatives to spread inadequately assessed risk throughout the market. However, it is clear now that for municipalities, such as Riverside, and other public and non-profit entities, a special type of derivatives called "*Municipal Derivatives*" carried another type of risk: collusion among financial institutions that provided the products and brokers that arranged the deals for them.

2. On October 29, 2009, the United States Department of Justice ("DOJ") announced the indictment of Defendant CDR (defined below) and several of its principals for various violations of federal law, including Section 1 of the Sherman Act, 15 U.S.C. § 1, "for their participation in bid-rigging and fraud conspiracies related to contracts for the investment of municipal bond proceeds and other related municipal finance contracts." As Joseph M. Demarest, Jr., Assistant Director-in-Charge of the FBI in New York put it in the DOJ press

release announcing the indictment, "In a climate of economic austerity, the conduct of defendants and co-conspirators seems particularly predatory."

3.     This action arises from that predatory conduct and seeks remedy for the economic injuries it has caused Riverside and its taxpayers.

4.     "Municipal Derivatives" are specialized investment vehicles used by public entities and non-profit in the United States, such as Riverside, to hold and preserve public monies raised from the sale of tax-exempt municipal bonds, hedge the interest rate obligations of those bonds, and achieve other financial goals. The former reinvestment vehicles are commonly referred to as "guaranteed investment derivatives" or "GICs," the latter interest hedging vehicles are commonly referred to as "swaps." In short, Municipal Derivatives are specialized financial products that Riverside and other public entities use to stretch scarce public monies.

5.     Defendants' conspiracy involved, but was not limited to, allocating the market for Municipal Derivatives amongst themselves, rigging the process by which the U.S. public and non-profit entities acquire Municipal Derivatives, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements. These illegal and unlawful acts of the Defendants negatively affected the terms of every Municipal Derivative entered into by Riverside during the period of the alleged conspiracy and thereafter.

6.     In November of 2006, the DOJ Antitrust Division publically announced that it was investigating anti-competitive conduct by the providers and brokers of Municipal Derivatives. Soon thereafter it was reported that a criminal grand jury had been empaneled in the Southern District of New York ("S.D.N.Y.") to pursue criminal indictments of individuals and companies implicated in this investigation. Criminal subpoenas were issued to over 25 brokers

and providers and the offices of three brokers were raided by the Federal Bureau of Investigation ("FBI"). It soon came to light that both the Internal Revenue Service ("IRS") and the Securities and Exchange Commission ("SEC") were engaged in parallel investigations, and that a consortium of State Attorneys General had initiated a coordinated investigation of the same conduct against an expanded list of Municipal Derivatives brokers and providers.

7.     On January 3, 2007, soon after the DOJ's investigation was announced, then retiring Field Manager in the IRS' Tax Exempt Bond Office, Charles Anderson described his impression of the DOJ's investigation and what it would likely produce, as follows:

> I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg. . .
> ***I would not be surprised to see bankers and lawyers go to jail***.

(emphasis added).

8.     Events over the subsequent months suggest that Anderson will likely be proven correct on both points: bankers will be going to jail and it will take time to unwind it all.

9.     In February 2007, Defendant Bank of America publically announced that it had requested entry, and had been accepted, into the Corporate Leniency Program of the DOJ's Antitrust Division, in connection with "industry-wide government investigations concerning the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds." In so doing, Defendant Bank of America effectively admitted to its criminal involvement in the antitrust conduct under investigation.

10.     In the months that have followed, a growing list of Municipal Derivative brokers and providers, and their current and former employees, have reportedly received further inquiries

from the DOJ, notifications in the form of "Target Letters" that they are the target of a criminal investigation by the DOJ, and/or a "Wells notice" from the SEC, informing them that the SEC intends to file civil complaints against them.

11.     The DOJ investigations are still active and ongoing. Indeed, the DOJ sought a stay of much of the discovery in this proceeding for that reason, and continues to request the issuance of subpoenas from the S.D.N.Y. seeking information for the grand jury to consider.

12.     For example, on July 2, 2009, as part of the DOJ's investigation, a subpoena was issued to the City of Riverside seeking a detailed list of documents concerning the Municipal Derivatives it entered into by the City of Riverside associated with a $110,000,000 bond issuance in 2004, and the transactions by which the City of Riverside entered into the Municipal Derivatives. The Municipal Derivatives entered into by the City of Riverside in association with this issuance include: a $93,018,253.54 GIC entered into with Defendant GE Trinity Plus (defined below) on June 10, 2004; a $1,714,913.06 GIC and a $6,466,290.63 GIC, both entered into with Defendant MBIA (defined below) on June 10, 2004; a $2,315,561.94 GIC entered into with Defendant FSA (defined below) on May 14, 2008; and an $82,500,000.00 swap entered into with Defendant Merrill Lynch (defined below).

13.     At around the same time that Riverside received this subpoena in July 2009, it was reported that Connecticut Attorney General Richard Blumenthal sought an order from the Connecticut Superior Court in Hartford to compel Defendant Financial Securities Assurance Inc. (part of FSA defined below) to turn over 600 hours of audio recordings already released to the SEC and DOJ in connection with their respective investigations of the Municipal Derivatives industry. According to Attorney General Blumenthal, these tapes contain "a rich source of

evidence of potential violations" of state antitrust laws. To date, however, he has only been able to gain access to a small portion of them.

14.     On June 30, 2009, the Financial Industry Regulatory Authority ("FINRA"), citing well publicized examples of financial distress being suffered by municipalities, launched an investigation of the Municipal Derivatives industry. FINRA announced it would pursue a series of investigations of potential conflicts and questionable practices involving disclosures and marketing by firms selling Municipal Derivatives, FINRA sent out a slew of "Targeted Examination Requests" to target firms involved in the Municipal Derivatives market.

15.     In what appears to be the tip of the iceberg, on October 29, 2009 the DOJ announced what it called the "**first**" charges "**to be filed in the Department's ongoing antitrust investigation into the municipal bond industry**." The DOJ indicted Defendant CDR and CDR's key principals – owner and president David Rubin, vice president Evan Andrew Zarefsky, and the company's former chief financial officer and managing director Zevi Wolmark – for conspiring with certain unidentified financial institutions that provide Municipal Derivatives, from 1998 through 2006.

16.     The nine-count indictment ("CDR Indictment"), in close parallel with the allegations herein, details multiple violations by CDR and its principals and co-conspirators of Section 1 of the Sherman Act, 15 U.S.C. § 1. These include: conspiring to illegally pre-select the winners of particular Municipal Derivative auctions (¶ 34-38); soliciting, accepting and submitting "courtesy bids" designed to lose an auction in favor of a pre-selected winner and to give the rigged bidding process the appearance of competitive legitimacy (¶ 34-38); allowing the pre-selected winner of the auction an illegal "last look" at the other submitted bids to ensure that

its bid would be just high enough to win (¶ 47); accepting illegal "kickback" payments of illegally and unlawfully gained profits from other co-conspirators, often disguised as fees charged to issuers in association with swap transactions (¶ 39(c)); and manipulating the terms that issuers received on Municipal Derivative transactions through, including but not limited to, allocating transactions amongst Provider Defendants, coordinating pricing, and giving falsified pricing verification information to providers (¶ 51).

17.     The CDR Indictment makes clear that the victims of this conspiratorial conduct were the municipalities, such as Riverside, and other public and non-profit entities that acquired Municipal Derivatives.  "As a result [of this conduct], the intended winning provider increased its profits from the  investment agreement(s) by paying interest to the municipality for the duration of the investment agreement that was artificially low."

18.     In all likelihood, the CDR Indictment is the first of many to come.  As Christopher "Kit" Taylor, director of the Municipal Securities Rulemaking Board from 1978-2007, put it a November 2, 2009 *Bond Buyer* article, "This is just the opening shot."  In the same article, the former IRS Field Manager Charles Anderson echoed these same sentiments, "I would anticipate a lot more indictments down the road."

19.     Given the more than 25 criminal subpoenas that have already been issued, the number of individuals that have publically reported receiving target letters from the DOJ, the number of individuals and Defendants that have reported receiving Wells notices from the SEC, the references in the CDR Indictment to at least four other firms who acted as co-conspirators with CDR in its criminal conduct, the entry of Defendant Bank of America into the DOJ's amnesty program (along with a $14.7 million settlement with the IRS), the $700 million

settlement on November 4, 2009 reached between the SEC and Defendant J.P. Morgan Securities, Inc. for manipulation of negotiated swap deals, and the dozens of examples of Municipal Derivatives transactions described herein that bear the hallmarks of a consistent pattern of manipulation by Defendants, predictions of further criminal indictments are very likely accurate.

20.     Accordingly, the DOJ has requested and received a stay of formal discovery by civil plaintiffs, which has hampered efforts by Riverside and other municipalities to obtain evidence of the conspiracy alleged herein that is known to exist, including tapes of Defendants' employees engaged in conspiratorial communication.

21.      To overcome these obstacles, Riverside has engaged in its own independent investigation, on which the allegations herein are based.  This investigation has included receiving oral and documentary evidence from Defendant Bank of America ("BofA"), including an oral proffer of evidence based on the testimony of a former BofA employee ("Confidential Witness" or "CW"), a description of the contents of various tape recorded conversations, as well as emails and transaction files.  It has also involved the gathering and analysis of publically available information, including the SEC filings of Defendants and press articles, as well as quantitative and pattern analyses of information regarding Municipal Derivative transactions entered into by other cities, counties and public entities.

22.     This investigation has revealed a far-reaching, industry-wide conspiracy, through which Municipal Derivative providers, working with Municipal Derivative brokers, foreswore competition with one another in the Municipal Derivative transactions of Riverside and others. Instead, they manipulated and allocated the Municipal Derivatives market amongst themselves in

ways that included but was not limited to: signaling to each other their intended bids and whether they were interested in winning a particular transaction; submitting courtesy bids on transactions they had no intention or desire to win in order to give transactions an artificial veneer of fairness; refraining from bidding on transactions to allow another to prevail without competition; lowering their intended bids in response to signals that the transaction could be won by them at terms that would yield higher profits; giving false price verification reports; kicking back money through undisclosed and/or unearned fees; and other actions that depressed the returns that Riverside and other municipal bond issuers earned on municipal derivative transactions and otherwise caused them economic injury, while inflating the profits of Defendants.

23. The illegal activities described herein occurred in transactions involving all types of Municipal Derivatives, including both GICs and swaps, and were not limited to transactions that purportedly involved formal competitively-bid auctions. Rather, Riverside has uncovered evidence probative of the conspiracy's operation in <u>negotiated</u> transactions for Municipal Derivatives such as swaps, through means including collusive arrangements affecting market pricing quotations by which the terms of negotiated deals were supposed to be verified.

24. Moreover, Riverside's investigation has revealed probative evidence that the conspiracy also operated to deny municipal bond issuers competition in the services provided by brokers of Municipal Derivatives and compel them to pay exorbitant fees for such services.

25. Because of the pervasiveness of this conduct and the inter-transactional relationship of Defendants' illegal conduct, the conspiracy has had a market-wide effect on the terms of Municipal Derivative transactions and prices of services associated therewith, depriving Riverside and other municipal bond issuers of the benefits of free competition. As a result,

Riverside suffered harm in several ways, including, but not limited to: (a) receiving rates on Municipal Derivatives that were artificially depressed and uncompetitive; (b) being forced to engage counter-parties to Municipal Derivative transactions that carried increased credit risks that were not reflected in the terms of the transactions; and (c) being forced to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions.

## II.
## JURISDICTION AND VENUE

26.     This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and the costs of suit, including treble damages, injunctive relief, and reasonable attorneys' fees, against Defendants, and each of them, for the injuries sustained by Riverside by reason of the violations, as alleged herein, of Section 1 of the Sherman Act, 15 U.S.C. § 1. This action is also brought under the Cartwright Act, California Business & Professions Code §§ 16700, *et seq*., based on these allegations.

27.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1367 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

28.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d), because during the conduct alleged herein, the Defendants resided, transacted business, were found, and/or had agents in this District, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and because overt acts in furtherance of the alleged conspiracy were committed in this District.

29.     In addition, Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their business dealings and transactions in this District, by having caused injuries through their acts and omissions throughout the State of California, and by their violation of  and by their violation of the Cartwright Act, California Business & Professions Code §§ 16700, *et seq*.

30.     Defendants, and each of them, have sufficient minimum contacts within California to make the exercise of jurisdiction over each Defendant by California courts consistent with traditional notions of fair play and substantial justice.  Each Defendant participates, or during the relevant period did participate, in the California market through brokering or providing Municipal Derivatives to California public and non-profit entities and/or affecting the terms of municipal derivatives acquired by such entities through their participation in the conspiracy alleged herein. Moreover, Defendants, and each of them, do substantial business in the State of California.

31.     Venue is proper because Plaintiffs are located in Riverside County and Defendants' illegal conduct was directed at and suffered from Riverside County.  Moreover, several of the Defendants are citizens of the State of California.

**III.**
**PARTIES**

A.     **Plaintiffs**

32.     **Plaintiff the City of Riverside ("City of Riverside")** is a city and a political subdivision of the State of California. Riverside was incorporated in 1883 and operates under a charter adopted in 1953.  The city is named for the nearby Santa Ana River, and is the birthplace

of the California citrus industry. Riverside encompasses 80 square miles in the western portion of Riverside County, approximately 60 miles east of downtown Los Angeles and 90 miles north of San Diego. With a population of over 300,000, it is the largest city in the Inland Empire region of Southern California and has been hard hit by current economic crisis. Current unemployment rates are close to 15% in the City, and foreclosure rates in the City have been among the highest of anywhere in the country. The City of Riverside issues municipal bonds to bridge gaps between the City's financial needs and revenue collection times to fund public projects, including the Riverside Renaissance, a five-year, $1.68 billion public investment program approved in 2006 by Riverside's city council to dramatically upgrade the City of Riverside's aging water, sewer and electrical infrastructure, improve traffic flows, and expand and improve vital public services. Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives with one or more of the Defendants.

33. **Plaintiff The Redevelopment Agency of The City of Riverside ("Riverside RDA")** was activated in 1969 pursuant to the Community Redevelopment Law, Part 1 of Division 24 of the Health and Safety Code of the State of California. The seven members of the Riverside City Council also serve as members of the Riverside RDA and exercise all rights, power and duties and privileges of the Riverside RDA. Redevelopment is one of the most effective ways to breathe new life into existing communities which are in need of social, physical, environmental or economic assistance and are lacking new investment and private enterprise. Over time, communities without the infusion of these resources may become "blighted." For example, key businesses and jobs move out of the area, residential neighborhoods show signs of age, or social amenities close down along main streets. To meet its

revitalization objectives, the Riverside RDA issues municipal bonds to fund public projects. Significant portions of the proceeds from these issuances have been invested in Municipal Derivatives with one or more of the Defendants.

34.     **Plaintiff The Public Financing Authority of the City of Riverside** ("**Riverside PFA**") was established pursuant to a Joint Exercise of Powers Agreement dated December 15, 1987, by and between the City of Riverside and the Riverside RDA, pursuant to the provisions of Articles 1 through 4 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1 of the Government Code of the State of California.  The Riverside PFA was created for the purpose, among other things, of providing financing for public capital improvements for the Riverside RDA, of making loans to the Riverside RDA to finance such public capital improvements and of purchasing local obligations issued by the Riverside RDA to finance public capital improvements.  To meet its objectives, the Riverside PFA issued municipal bonds to fund public projects and for revenue anticipated purposes.  Significant portions of the proceeds from these issuances have been invested in Municipal Derivatives with one or more of the Defendants.

35.     Plaintiffs **City of Riverside**, **Riverside RDA,** and **Riverside PFA** are referred to collectively herein as "**Riverside.**"

36.     Riverside issues municipal bonds to fund public projects in anticipation of tax and other revenues and for other purposes.  Riverside reinvests significant portions of the proceeds from these issuances in Municipal Derivatives, uses Municipal Derivatives to hedge its interest rate obligations associated with these issuances, and for other financial purposes.  One or more of the Defendants participated in some or all of the Municipal Derivatives transactions based on which Riverside hereby sues.  The terms that Riverside received on these municipal derivatives

were subject to and negatively affected by the unlawful acts of the Defendants alleged herein, and Riverside suffered financial injury and was so damaged as a result. Riverside was injured by Defendants' unlawful acts, including but not limited to: receiving rates of return on reinvestment derivatives that were artificially depressed and uncompetitive, receiving terms on other kinds of municipal derivatives that were artificially depressed and uncompetitive, entering into municipal derivative transactions with providers that carried increased credit risks which were not reflected in the terms of the transaction, and paying uncompetitive, inflated or hidden fees and costs associated with the transactions.

## B.     Defendants

### 1.     Provider Defendants

37.     Provider Defendants are those Defendants that acted as counter-parties in Municipal Derivatives transactions entered into by Riverside and/or other public and/or non-profit entities and/or submitted bids and/or pricing information for such transactions.

38.     Provider Defendant **Bank of America, N.A. ("Bank of America" or "BofA")** is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  As a member of the conspiracy, Bank of America, directly and through its fully owned subsidiary Defendant Merrill Lynch & Co., Inc., was a counter-party to Municipal Derivatives invested in by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

39.     Provider Defendant **Merrill Lynch & Co., Inc**. ("**Merrill Lynch**"), a wholly-owned subsidiary of Defendant Bank of America, is a Delaware corporation with its principal place of business in Charlotte, North Carolina (formerly New York, New York).  Defendant

Bank of America acquired Merrill Lynch in January of 2009. As a member of the conspiracy, Merrill Lynch was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

40.     Provider Defendant **JPMorgan Chase & Co., f/k/a Chase Financial, f/k/a Morgan Guaranty Trust Company of New York, f/k/a JP Morgan Chase ("JPMorgan Chase")** is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, JPMorgan, directly and through its fully owned subsidiary Defendant J.P. Morgan Securities, Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

41.     Provider Defendant **J.P. Morgan Securities, Inc., f/k/a Bear Stearns & Co Inc., ("J.P. Morgan Securities")**, a wholly-owned subsidiary of Defendant JPMorgan Chase, is a Delaware corporation with its principal place of business in New York, New York. In May of 2008, Defendant JP Morgan Chase acquired Bear Stearns & Co., Inc. ("Bear Stearns") and merged Bear Stearns with J.P. Morgan Securities. As a member of the conspiracy, Bear Stearns and J.P. Morgan Securities were counter-parties to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

42.     Provider Defendants **JPMorgan Chase** and **J.P. Morgan Securities** are referred to collectively herein as "**JP Morgan**."

43.     Provider Defendant **MBIA, Inc. ("MBIA")** is a Connecticut corporation with its principal place of business in Armonk, New York. As a member of the conspiracy, MBIA was a

counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

44. Provider Defendant **Citibank, N.A. ("Citibank")**, a subsidiary of Citigroup, Inc., is a nationally-chartered bank, with its headquarters in New York, New York. As a member of the conspiracy, Citibank was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

45. Provider Defendant **Citigroup Financial Products Inc. f/k/a Salomon Brothers Holding Company Inc. ("SBHC")**, is a wholly-owned subsidiary of Citigroup, Inc. and a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, SBHC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

46. Provider Defendant **Citigroup Global Markets Holdings Inc. f/k/a Salomon Smith Barney Holdings Inc. ("SMBHI")** is a wholly-owned subsidiary of Citigroup, Inc. and a New York corporation with its principal place of business in New York, New York. As a member of the conspiracy, SMBHI, through its predecessor Salomon Smith Barney Holdings Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside. SMBHI's role as counter-party and participant in the misconduct alleged herein included acting as a guarantor of some or all Municipal Derivatives issued by SBHC. The guarantees provided by SMBHI were a necessary pre-condition of SBHC's ability to serve as a counter-party in some or all of the Municipal Derivative transactions to which SBHC acted as a counter-party or sought to act as a counter-party.

47.    Provider Defendants **SBHC** and **SMBHI** are collectively referred to herein as "Salomon Smith Barney."

48.    Provider Defendant **Morgan Stanley ("Morgan Stanley")** is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, Morgan Stanley was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

49.    Provider Defendant **Rabobank Group, aka Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.,** also trading under the name **Rabobank International**, **aka Rabobank , National Association**, **("Rabobank")** is a Dutch cooperative banking institution headquartered in Utrecht, the Netherlands.  As a member of the conspiracy, Rabobank was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

50.    Provider Defendant **Bayerische Landesbank Girozentrale ("BayernLB")** is a German corporation with its principal place of business in Munich, Germany.  As a member of the conspiracy, BayernLB was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

51.    Provider Defendant **Société Générale SA ("SocGen")** is a French corporation with its principal place of business in Paris, France.  As a member of the conspiracy, SocGen was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

52.    Provider Defendant **Wachovia Bank, N.A.**, **f/k/a First Union Corporation ("Wachovia")**, a wholly-owned subsidiary of Wells Fargo & Company, is a nationally chartered

banking association with its principal place of business in Charlotte, North Carolina. In December of 2008, Defendant Wells Fargo & Company acquired Wachovia. As a member of the conspiracy, Wachovia was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

53. Provider Defendant **Wells Fargo & Company ("Wells Fargo")** is a Delaware corporation with its principal place of business in San Francisco, California. As a member of the conspiracy, Wells Fargo, directly and through its subsidiary Defendant Wachovia, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside. Wells Fargo also acted as a broker of municipal derivatives to public and non-profit entities and engaged in misconduct in that capacity as well that led to the harm suffered by Riverside.

54. Provider Defendant **Financial Security Assurance, Inc. ("FSAI")**, a wholly-owned subsidiary of Defendant Assured Guaranty US Holdings, Inc., is a New York stock insurance company with its principal place of business in New York, New York. During the time period alleged herein, FSAI was a wholly-owned subsidiary of Financial Security Assurance Holdings Ltd. ("FSA Holdings"), which issued GICs and other reinvestment derivatives through its wholly-owned subsidiaries, FSA Capital Management Services, LLC, FSA Capital Markets Services LLC, FSA Asset Management Services, LLC and FSA Capital Markets Services (Caymans) Ltd. (collectively, "FSA GIC Subsidiaries") to Riverside and other municipalities and non-profit entities. All GICs and other reinvestment derivatives issued by FSA Holdings through the FSA GIC Subsidiaries were insured by FSAI. Accordingly, final approval of certain GICs and other reinvestment transactions entered into by FSA Holdings through the FSA GIC

17

Subsidiaries were subject to approval by FSAI's Chief Executive Officer, President, Chief Risk Management Officer and/or other officers of FSAI. FSAI engaged in the misconduct that led to the harm suffered by Riverside.

55. Provider Defendant **Assured Guaranty US Holdings, Inc**. ("Assured US Holdings"), a wholly-owned subsidiary of Assured Guaranty Ltd., is a Delaware corporation with its principal place of business in New York, New York. On July 1, 2009, Assured US Holdings, acquired FSA Holdings from Dexia Holdings, Inc., including indirectly, FSA Holding's subsidiary FSAI ("July 1, 2009 transaction"). During some or all of the time period of the conspiracy alleged herein, FSA Holdings issued FSAI-insured GICs and other reinvestment derivatives through the FSA GIC Subsidiaries and engaged in the misconduct that led to the harm suffered by Riverside. As part of the July 1, 2009 transaction, (1) FSA Holdings ceased to exist, but Dexia Holdings, Inc. became the owner of 13.9% of common shares issued by Assured U.S. Holdings' parent, Assured Guaranty Ltd, and by extension owner of 13.9% of Assured US Holdings and its subsidiary FSAI; (2) Assured Guaranty Ltd agreed to certain limitations in its business demanded by Dexia Holdings, Inc.; (3) subject to these limitations, Assured Guaranty Ltd., continued the business of FSA Holdings subsidiaries, including the business, FSAI, and expressly and/or implicitly assumed liabilities thereof. Assured US Holdings is a mere continuation of FSA Holdings and/or the July 1, 2009 transaction was a *de facto* merger of FSA Holdings with Assured US Holdings. Assured US Holdings is liable as a successor to FSA Holdings for the harm caused by FSA Holdings to Riverside.

56. Provider Defendant **Dexia S.A.** is a Belgian financial institution headquartered in Brussels, Belgium. As part of the transaction by which Assured US Holdings acquired FSA

Holdings, ownership of FSA Holdings' financial products group, including the FSA GIC Subsidiaries and FSA Management LLC (the entity which invested funds that FSA Holdings received from the GICs and other reinvestment derivatives issued to Riverside and other issuers by FSA Holdings through the FSA GIC Subsidiaries), was transferred prior to, and in preparation for, the July 1, 2009 transaction to Dexia Holdings and then, on July 1, 2009, was transferred to Dexia S.A. As part of the July 1, 2009 transaction, Dexia S.A. expressly agreed to assume the liabilities arising from the FSA Holdings' financial products group's business, including GICs and other reinvestment derivatives previously issued by FSA Holdings through the FSA GIC Subsidiaries, and any litigation related thereto. During some or all of the period of the conspiracy alleged herein, FSA Holdings issued FSAI insured GICs and other reinvestment derivatives through the FSA GIC Subsidiaries to Riverside and other municipalities and non-profits and engaged in the misconduct that led to the harm suffered by Riverside. Dexia S.A. is liable to Riverside for that harm as a successor to FSA Holdings' financial products group and/or the FSA GIC Subsidiaries.

57.     Provider Defendants **FSAI, Assured U.S. Holdings,** and **Dexia S.A.**, are referred to collectively herein as "**FSA**."

58.     Provider Defendant **National Westminster Bank, Plc ("NatWest")**, a subsidiary of Royal Bank of Scotland, is a public limited company with its principal place of business in London, England. As a member of the conspiracy, NatWest was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

59.     Provider Defendant **The Goldman Sachs Group, Inc.**, ("GS Group") is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, Defendant GS Group directly and/or through its subsidiaries Defendant Goldman Sachs Mitsui Marine Derivative Products, L.P. and/or Goldman Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P., was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

60.     Provider Defendant **Goldman Sachs Mitsui Marine Derivative Products, L.P.**, is a Delaware limited partnership and a joint venture between Mitsui Marine & Fire Insurance Co. Ltd. and Defendant GS Group.  Defendant GS Group is jointly obligated with Mitsui Marine & Fire Insurance Co. Ltd. to satisfy any obligations of Goldman Sachs Mitsui Marine Derivative Products, L.P., and is responsible for the management of the Goldman Sachs Mitsui Marine Derivative Products, L.P.  As a member of the conspiracy, Goldman Sachs Mitsui Marine Derivative Products, L.P. was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

61.     Provider Defendant **Goldman Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P.**, a wholly-owned subsidiary of Defendant GS Group, is a bank chartered under the laws of the State of New York.  During the time period of conspiracy alleged herein, Goldman Sachs Capital Markets, L.P. was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

62.     On September 21, 2008, Goldman Sachs Capital Markets, L.P., was merged with and into The Goldman Sachs Trust Company, a limited-purpose trust chartered under the laws of

the State of New York ("GS Trust"). Upon consummation of the merger, GS Trust changed its name to Goldman Sachs Bank USA. Defendant Goldman Sachs Bank USA is liable as a successor to Goldman Sachs Capital Markets, L.P. for the harm caused by Goldman Sachs Capital Markets, L.P. to Riverside.

63. Provider Defendants **GS Group, Goldman Sachs Mitsui Marine Derivative Products, L.P.** and **Goldman Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P.** are collectively referred to herein as "Goldman Sachs."

64. Provider Defendant **General Electric Capital Corporation ("GECC")**, a wholly-owned subsidiary of General Electric Capital Service, Inc. ("GECSI") (which is a wholly-owned subsidiary of General Electric Company), is a Delaware corporation, with its principal place of business in Fairfield, Connecticut. GECC issued Municipal Derivatives to public and non-profit entities through its group of wholly-owned and sponsored affiliates and/or special purpose entities, including but not limited to, GE Funding Capital Market Services, Inc., Trinity Funding Co., LLC, Trinity Plus Funding Co., LLC., and FGIC Capital Market Services, Inc., and guaranteed all of the Municipal Derivatives that it issued through these entities. GECC and GECSI refer collectively to Defendants GE Funding Capital Market Services, Trinity Funding Co., LLC, and Trinity Plus Funding Co., LLC. in GECC's and GECSI's SEC filings and marketing materials as "Trinity", "Trinity Funding Co.", "Trinity SPEs", "GE Funding CMS", and "GE Funding Capital Market Services Group." They are referred to collectively herein as "GE Trinity Special Purpose Entities" of "GE Trinity SPEs".

65. GECC consolidated operations of GE Trinity SPEs into GECC's financial statements, including guaranteed investment contracts, accounting for the assets and liabilities of

each of GE Trinity SPE as assets and liabilities of GECC.  Accordingly, GECC referred, in its

SEC filings, to the guaranteed investment contracts issued by GE Trinity SPEs as GECC's

guaranteed investment contracts, and liabilities flowing from GE Trinity SPE issued guaranteed

investment contracts as GECC's liabilities.  The GE Trinity SPEs are and were undercapitalized

and could not operate, including providing guaranteed investment contracts, without financial

support and guarantees provided by GECC.  The *"guaranteed"* in a guaranteed investment

contract provided by a GE Trinity SPE is the guarantee supplied by GECC.  GECC conducted the

day-to-day operations of all of the GE Trinity SPEs through a single office located in Stamford,

CT.  Each GE Trinity SPE was acting as an agent and/or alter ego of GECC in actions taken by it

relating to, concerning, or connected with, the issuance of a Municipal Derivative to a

municipality or non-profit entity.  GECC directly and/or through the GE Trinity SPEs engaged in

the conduct that led to the harm suffered by Riverside.

66.     Provider Defendant **GE Funding Capital Market Services, Inc. ("GE

Funding")**, a wholly-owned subsidiary of GECC (which is a wholly-owned subsidiary of

GECSI, which is a wholly-owned subsidiary of General Electric Company), is a Delaware

corporation with its principal place of business in New York, NY.  GE Funding is a GE Trinity

Special Purpose Entity. As a member of the conspiracy, GE Funding was a counter-party to

Municipal Derivatives entered into by public and non-profit entities and engaged in the

misconduct that led to the harm suffered by Riverside.

67.     Provider Defendant **Trinity Funding Co., LLC ("GE Trinity Funding")**, a

wholly-owned subsidiary of GECC (which is a wholly-owned subsidiary of GECSI, which is a

wholly-owned subsidiary of General Electric Company), is a New York limited liability

company.  GE Trinity Funding is a GE Trinity Special Purpose Entity.  As a member of the conspiracy, GE Trinity Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

68.     Provider Defendant **Trinity Plus Funding Co., LLC ("GE Trinity Plus Funding")**, a wholly-owned subsidiary of GECC (which is a  wholly-owned subsidiary of GECSI, which is a wholly-owned subsidiary of General Electric Company), is a New York limited liability company.  GE Trinity Plus Funding is a GE Trinity Special Purpose Entity.  As a member of the conspiracy, GE Trinity Plus Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

69.     Provider Defendants **GECC, GE Funding, GE Trinity Funding, and GE Trinity Plus Funding** are collectively referred to herein as "GE Trinity."

70.     Provider Defendant **Royal Bank of Canada** ("RBC") is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada.   As a member of the conspiracy, RBC, directly and/or through RBC Capital Markets, was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

**2.      Broker Defendants**

71.     Broker Defendants constitute those Defendants that acted as brokers for Riverside and other public entities in the acquisition of Municipal Derivatives from the Provider

Defendants. The Broker Defendants served key roles in the rigging of Municipal Derivative auctions, orchestrating and facilitating the rigging of particular auctions.

72.     Broker Defendant **CDR Financial Products ("CDR")** is a California corporation with its principal place of business in Beverly Hills, California. As a broker of Municipal Derivatives to public and non-profit entities, CDR acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

73.     Broker Defendant **Winters & Co. Advisors, LLC ("Winters")** is a California limited liability company with its principal place of business in Los Angeles, California. As a broker of Municipal Derivatives to public and non-profit entities, Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

74.     Broker Defendant **George K. Baum & Co. ("Baum")** is a Missouri corporation with its principal place of business in Kansas City, Missouri. As a broker of Municipal Derivatives to public and non-profit entities, Baum acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

75.     Broker Defendant **Sound Capital Management, Inc. ("Sound Capital")** is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota. As a broker of Municipal Derivatives to public and non-profit entities, Sound Capital acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

76.     Broker Defendant **Investment Management Advisory Group, Inc. ("IMAGE")** is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania. As

a broker of Municipal Derivatives to public and non-profit entities, IMAGE acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

77.     Broker Defendant **First Southwest Company ("First Southwest")** is a corporation with its principal place of business in Dallas, Texas.  As a broker of Municipal Derivatives to public and non-profit entities, First Southwest acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

78.     Broker Defendant **PFM Asset Management LLC ("PFM Asset")** is a Pennsylvania corporation with its principal place of business in Philadelphia, PA.  As a broker of Municipal Derivatives to public and non-profit entities, PFM Asset acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

79.     Broker Defendant **PFM Investment, LLC.** ("PFM Investment") is a Delaware corporation.  As a broker of Municipal Derivatives to public and non-profit entities, PFM Investment, directly and through its wholly-owned subsidiary PFM Asset Management LLC, acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

80.     Broker Defendants **PFM Investment** and **PFM Asset** are collectively referred to herein as **"PFM."**

C.     **Hybrid Broker/Provider Defendants**

81.     Hybrid Broker/Provider Defendants constitute those Defendants that acted as brokers for Riverside and other public entities in the acquisition of Municipal Derivatives from Provider Defendants in certain instances and acted as counterparties in Municipal Derivatives transactions entered into by Riverside and other public entities and/or submitted bids and pricing

information for such transactions in other instances. All of the Hybrid Broker/Provider Defendants were part of the conspiracy.

82. Hybrid Broker/Provider Defendant **UBS AG ("UBS AG")** is a Swiss corporation with its principal place of business in New York, New York. As a member of the conspiracy, UBS AG, directly and/or through its wholly-owned subsidiaries Defendant UBS Securities, LLC and/or Defendant UBS Financial Services, Inc., was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

83. Hybrid Broker/Provider Defendant **UBS Financial Services, Inc., f/k/a PaineWebber, Inc. ("PaineWebber"),** a wholly-owned subsidiary of Defendant UBS AG, is a Delaware corporation with its principal place of business in New York, New York. In 2000, UBS AG acquired PaineWebber. As a member of the conspiracy, PaineWebber, was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

84. Hybrid Provider/Broker Defendant **UBS Securities, LLC, f/k/a UBS Warburg LLC ("UBS Securities")**, a wholly-owned subsidiary of Defendant UBS AG, is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, UBS Securities was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

85. Hybrid Broker/Provider Defendants **UBS AG, PaineWebber,** and **UBS Securities** are referred to collectively herein as "**UBS**."

86.     Hybrid Broker/Provider Defendant **Piper Jaffray & Co. ("Piper Jaffray")** is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. As a member of the conspiracy, Piper Jaffray was a counter-party to, and/or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

87.     Hybrid Provider/Broker Defendant **Natixis Funding Corp. f/k/a Ixis Funding Corp. f/k/a CDC Ixis Funding Corp. f/k/a CDC Funding Corp ("CDC Funding"),** a wholly-owned subsidiary of CDC (defined below), is a New York corporation with its principal place of business in New York, NY. As a member of the conspiracy, CDC Funding acted as a counter-party to, and or broker of, Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside. All guaranteed investment contracts issued by CDC Funding were guaranteed by CDC and its ability to act as a provider of guaranteed investment contracts was contingent upon the guarantee provided by CDC.

88.     Broker/Provider Defendant **Natixis S.A., f/k/a Ixis CIB, f/k/a/ CDC Finance-CDC IXIS, ("CDC")**, is a French corporation with its principal place of business in Paris, France. CDC wholly owns CDC Funding and fully consolidates operations of CDC Funding into CDC's financials. According to its registration documents, CDC only fully consolidates those subsidiaries that CDC controls. CDC and CDC Funding, moreover, have shared certain executives, including Anthony Orastelli, who is currently a CDC Director and in the last five years has occupied a number of executive opinions at CDC and CDC Funding, including but not limited to, President of CDC Funding Corp. and Member of CDC's Executive

27

Board.  CDC guaranteed all guaranteed investment contracts issued by CDC Funding.  According to court filings, in a case related to the instant case, by an outside counsel for CDC, the guarantees provided by CDC were a necessary pre-condition of CDC Funding's ability to serve as a counter-party all of the Municipal Derivative transactions to which CDC Funding acted as a counter-party or sought to act as a counter-party.  CDC Funding was acting as an agent and/or alter ego of CDC in actions taken by it relating to, concerning, or connected with, the issuance of brokering of Municipal Derivatives to municipalities and non-profit entities.  CDC directly and/or through the CDC Funding engaged in the conduct that led to the harm suffered by Riverside.

89.  Hybrid Provider/Broker Defendants **CDC Funding and CDC** are collectively referred to herein as "CDC."

## D.  Named and Unnamed Co-conspirators

90.  Provider co-conspirator **AIG Matched Funding Corp. ("AIGMFC")** is a Delaware corporation with its principal place of business in Wilton, CT.  As a member of the conspiracy, AIG MFC was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

91.  Provider co-conspirator **AIG Sunamerica Life Assurance Co. ("AIG Sunamerica")** is an Arizona corporation with its principal place of business in Los Angeles, California.  As a member of the conspiracy, AIG Sunamerica was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

92.     Provider co-conspirator **AIG Financial Products Corp. ("AIG Financial")** is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, AIG Financial, directly and through its fully owned subsidiary AIG Matched Funding Corp., issued and was the counter-party to Municipal Derivatives invested in by public entities and engaged in the misconduct that led to the harm suffered by Riverside.

93.     Provider co-conspirators **AIG MFC, AIG Sunamerica**, and **AIG Financial** are collectively defined herein as "**AIG**."

94.     Provider co-conspirator **AMBAC Financial Group, Inc. ("Ambac")** is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, Ambac was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

95.     Provider co-conspirator **Genworth Financial Investment Management, LLC ("Genworth")** is a Virginia limited liability corporation.  As a member of the conspiracy, Genworth was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

96.     Provider co-conspirator **Lehman Brothers Inc. ("Lehman" or "Lehman Brothers")** is a Delaware corporation with its principal place of business in New York, NY.  As a member of the conspiracy, Lehman was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

97.     Provider co-conspirator **Transamerica Life Insurance Company, f/k/a Transamerica Occidental Life Insurance Company, aka AEGON Institutional Markets, Inc, aka AEGON N.V., ("Transamerica")** a wholly-owned subsidiary of Transamerica Corporation, is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. As a member of the conspiracy, Transamerica was a counter-party to Municipal Derivatives invested in by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

98.     Provider co-conspirator **XL Capital Ltd. ("XL Capital")** is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. XL Capital issued Municipal Derivatives through its wholly-owned subsidiary XL Asset Funding I, LLC, and guaranteed those Municipal Derivatives through its wholly-owned subsidiary XL Capital Assurance Inc. XL Asset Funding I, LLC and, until at least June 6, 2007, XL Capital Assurance Inc., were business units of XL Capital's Financial Products and Services segment. Accordingly XL Capital consolidated reporting of the operations XL Asset Funding I, LLC and, until at least June 6, 2007, XL Capital Assurance Inc., including issuance and/or guaranteeing guaranteed investment contracts and funding arrangements, into XL Capital's financial statements. XL Capital accounted for the assets and liabilities of XL Asset Funding I LLC and XL Capital Assurance Inc. as assets and liabilities of XL Capital. Accordingly, XL Capital referred, in its SEC filings, to the guaranteed investment contract business of XL Asset Funding I LLC and, until at least June 6, 2007, the guaranteed investment contract guaranteeing business of XL Capital Assurance, Inc., as XL Capital's guaranteed investment contract business, and the liabilities flowing from XL Asset Funding I, LLC issued and, until at least June 6, 2007, XL

Capital Assurance, Inc. guaranteed, guaranteed investment contracts, as XL Capital's liabilities. Accordingly, XL Capital continually monitored the cash flow risks associated with each guaranteed investment contract issued by XL Asset Funding I, LLC and guaranteed by XL Capital Assurance Inc. and established underwriting criteria that XL Capital Assurance, Inc. was required to follow in operation of its business. The "*guaranteed*" in a guaranteed investment contract issued by XL Asset Funding I, LLC was a guarantee that was provided by XL Capital Assurance, Inc., and at least until June 30, 2008, was underwritten by XL Capital.

99.     At least until June 30, 2008, XL Capital provided XL Capital Assurance Inc. with all of the services necessary for the operation of XL Capital Assurance Inc.'s business, including but not limited to: substantially all of XL Capital Assurance Inc.'s personnel services, as well as office space, furniture and equipment, through XL Capital's wholly-owned subsidiary, XL Financial Administrative Services, Inc.; identification and analysis of business opportunities, assistance in structuring and tailoring products, marketing and communication of various notices, through XL Capital's fully owned subsidiary XL Financial Products Ltd.; advertising services and participation on behalf of XL Capital Assurance Inc. in regulatory mandated associations, through various of XL Capital's fully owned subsidiaries including X.L. America, Inc. (the ultimate U.S. holding company of XL Asset Funding I, LLC and, until July 1, 2006, of XL Capital Assurance Inc.); information technology support, reinsurance and retrocessional consulting and management services, as well as actuarial, finance and internal audit services, through XL Capital's wholly-owned subsidiary X.L. Global Services, Inc.; and investment management services, through XL Capital's fully owned subsidiary XL Investment Management Ltd.

100.     XL Capital similarly managed and operated XL Asset Funding I, LLC, through XL Capital's wholly-owned subsidiary, XL Life And Annuity Holding Company, which directly and/or through its designees managed and operated XL Asset Funding I, LLC, and provided XL Asset Funding I, LLC all administrative support necessary for XL Asset Funding I, LLC to operate as a provider of Municipal Derivatives.  In XL Capital's 10-K filing for the year 2008, it lists over one hundred and twenty-five wholly-owned subsidiaries of XL Capital, including XL Asset Funding I, LLC and XL Life And Annuity Holding Company.  An 8-K filing by XL Capital on July 28, 2009 lists XL Asset Funding I, LLC as one of only eight "significant subsidiaries" of XL Capital.

101.     XL Capital undercapitalized XL Asset Funding I, LLC and XL Capital Assurance Inc., and neither XL Asset Funding I, LLC nor XL Capital Assurance Inc., could operate, including providing or guaranteeing guaranteed investment contracts, without financial support and guarantees provided ultimately by XL Capital.  XL Asset Funding I, LLC and XL Capital Assurance Inc., until at least June 30, 2008, acted as an agent and/or alter ego of XL Capital in actions taken by each relating to, concerning, or connected with, the issuance of a Municipal Derivative to a municipality or non-profit entity.  XL Capital, directly and/or through XL Asset Funding I, LLC, XL Life And Annuity Holding Company, and/or, until at least June 30, 2008, XL Capital Assurance Inc. engaged in the conduct that led to the harm suffered by Riverside.

102.     Provider co-conspirator **Syncora Guarantee, Inc., f/k/a XL Capital Assurance Inc. ("XL Capital Assurance")**, a wholly-owned operating company and subsidiary of Syncora Holdings, Ltd., is a financial guaranty insurance company domiciled in New York.  XL Capital Assurance provided financial guarantees of all the Municipal Derivatives to which XL Asset

Funding I, LLC was a counter-party. The guarantees provided by XL Capital Assurance were necessary pre-conditions of XL Asset Funding I, LLC's ability to serve as a counter-party to all of the Municipal Derivatives to which XL Asset Funding I, LLC acted as a counter-party or sought to act as a counter-party. The "*guaranteed*" of a guaranteed investment contract issued by XL Asset Funding I, LLC was a guarantee from XL Capital Assurance. XL Capital Assurance was directly involved in the municipal derivatives business activities of XL Asset Funding I, LLC, including but not limited to providing XL Asset Funding I ,LLC with information, identification of business opportunities and other assistance to XL Asset Funding I, LLC in its marketing of municipal derivatives and providing XL Asset Funding I, LLC with surveillance-related information on XL Capital Assurance's existing insured credits. XL Capital directly and through XL Asset Funding I LLC engaged in the conduct that led to the harm suffered by Riverside.

103.    Provider co-conspirator **Syncora Holdings, Ltd., f/k/a Security Capital Assurance Ltd. ("Syncora")** is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. On March 17, 2006, XL Capital formed Syncora Holdings, (f/k/a Security Capital Assurance Ltd.), for the purpose of transferring to it ownership of XL Capital Assurance, then a wholly-owned subsidiary and operating business of XL Capital. On July 1, 2006, XL Capital contributed all of its ownership interests in XL Capital Assurance to Syncora. Between August 4, 2006 and June 6, 2007, XL Capital sold 54% of its voting and ownership interests in Syncora, through a series of initial public offerings. On December 31, 2007, based on the evaluation of its executives of Syncora's financial health, XL Capital reduced the reported value of its 46% interest in SCA to nil. On August 5, 2008, XL Capital, Syncora, and various Syncora

entities executed a master agreement, which *inter alia* purported to transfer all of XL Capital's residual liabilities resulting from Municipal Derivatives guaranteed to XL Capital Assurance to Syncora. Syncora is liable as a successor for the conduct engaged in by XL Capital Assurance that led to the harm suffered by Riverside.

104. Provider co-conspirator **XL Asset Funding I, LLC ("XL Asset")**, a wholly-owned subsidiary of XL Capital (through *inter alia* XL Life and Annuity Holding Company), is a Delaware limited liability company with its principal place of business on 20 N. Martingale Rd., Suite 200, Schaumburg, Illinois. As a member of the conspiracy, XL Asset was a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the misconduct that led to the harm suffered by Riverside.

105. Provider co-conspirator **XL Life and Annuity Holding Company ("XL Holding")**, a wholly-owned subsidiary of XL Capital Ltd., is a Delaware limited liability company with its principal place of business on 20 N. Martingale Rd., Suite 200, Schaumburg, Illinois. XL Holding, directly or through its designees, managed and operated XL Asset, and provided XL Asset with all administrative support necessary for XL Asset to act as counter-party to Municipal Derivatives entered into by public and non-profit entities. XL Holding through, and as, XL Asset acted as a counter-party to Municipal Derivatives entered into by public and non-profit entities, and directly and/or through XL Asset engaged in the misconduct that led to the harm suffered by Riverside.

106. Provider co-conspirators **XL Capital**, **XL Capital Assurance, Syncora XL Asset, and XL Holding** and are collectively referred to herein as "**XL**."

107. Broker co-conspirator **Morgan Keegan & Co. Ltd. ("Morgan Keegan")** is a subsidiary of Regions Financial Corp., a Tennessee corporation with its principal place of business in Memphis, Tennessee. As a broker of Municipal Derivatives to public and non-profit entities, Morgan Keegan acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

108. Broker co-conspirator **Kinsell Newcomb & De Dios Inc. ("Kinsell")** is a California corporation with its principal place of business in Carlsbad, California. As a broker of Municipal Derivatives to public and non-profit entities, Kinsell acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

109. Broker co-conspirator **PackerKiss Securities ("PackerKiss")** is a Florida corporation with its principal place of business in Delray Beach, Florida. As a broker of Municipal Derivatives to public and non-profit entities, PackerKiss acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

110. Broker co-conspirator **Shockley Financial Corp. ("Shockley")**, a wholly-owned subsidiary of NelNet Inc., is a Colorado corporation with its principal place of business in Aurora, Colorado. As a broker of Municipal Derivatives to public and non-profit entities, Shockley acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

111. Broker co-conspirator **Blount Parrish & Roton, Inc., f/k/a Blount Parrish Co. Inc ("Blount Parrish")** is an Alabama corporation with its principal place of business in Montgomery, Alabama. As a broker of Municipal Derivatives to public and non-profit entities,

Blount Parrish acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

112.    Broker co-conspirator **Municipal Government Investors Corp. ("MGIC")** is a New York corporation with its principal place of business in Manhasset, New York.  As a broker of Municipal Derivatives to public and non-profit entities, MGIC acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

113.    Broker co-conspirator **Feld Winters Financial LLC ("Feld Winters")** is a California limited liability company with its principal place of business in Sherman Oaks, California.  As a broker of Municipal Derivatives to public and non-profit entities, Feld Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

114.    Agent co-conspirator **Capital Financial Partners, Inc. ("Capital Financial Partners")** is a Florida corporation with its principal place of business in Ocala, Florida.  As an agent for providers and/or brokers of Municipal Derivatives to public and no-profit entities, Capital Financial Partners acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside.

115.    Broker co-conspirator **Kane Capital** is a New York corporation with its principal place of business in Great Neck, New York.  As a broker of Municipal Derivatives to public and non-profit entities, Kane Capital aced as a member of the conspiracy that caused significant harm to public and non-profit entities, including Riverside

**IV.**
**OVERVIEW OF MUNICIPAL DERIVATIVES**

A.    **Municipal Bond Basics**

116.    Municipal bonds are issued by U.S. states, cities, and counties, or their respective agencies and other government entities to raise funds for various public projects, including, the construction and repair of roads and building public structures such as schools, parks, power plants and mass transit facilities.  Public entities also issue municipal bonds – known as "tax revenue anticipation notes" ("TRANs"), "certificates of participation", "lease revenue bonds", etc. – to raise funds to pay for current expenses while awaiting future revenues.

117.    When a public entity issues bonds, it is generally referred to as an "issuer."  (The same term is used for non-profit entities that issue tax-exempt equivalents to municipal bonds). This term is also used in Municipal Derivative transactions to refer to the public or non-profit entity that enters into a Municipal Derivative deal with a provider.

118.    Municipal Derivatives are provided by large commercial and investment banks or highly rated insurance companies (collectively referred to herein as "providers").

119.    When a public or non-profit entity seeks to purchase a Municipal Derivative by entering into Municipal Derivative contract with a provider, they may engage the services of a broker.  The legitimate role of the broker is to obtain the best possible price for the Municipal Derivative by arranging competitively bid auctions among multiple potential providers of Municipal Derivatives.

120.    Municipal bonds are tax-exempt and as a result, investors are usually willing to accept lower interest rates from municipal bonds than they would accept from other forms of

borrowing (assuming comparable risk).  This makes issuance of municipal bonds an attractive fiscal option for many public entities, and, as a result, the municipal bond industry is extremely large.  According to the Securities Industry and Financial Markets Association, approximately $385 billion worth of municipal bonds were issued in 2006.  The total United States municipal bond market is currently valued at approximately $2.6 trillion.

121.    Traditionally municipal bonds pay interest to bond holders at either a fixed or variable rate of interest that is pegged to some kind of index such as the London Inter-Bank Offered Rate ("LIBOR") (the standard for quoting interbank lending of Eurodollar deposits), or the Security Industry & Financial Markets Association Index ("SIFMA Index").  The issuer of a municipal bond receives a cash payment at the time of issuance.  In return, the issuer agrees to repay the principal and the interest to the bond holders over time.  Repayment periods vary and may be as short as a few months but typically lasts for several years, often several decades.

122.    In recent years, bond issuers have, in increasing numbers, issued two other types of bonds, variable rate demand bonds ("VRDBs") and auction rate securities ("ARS").  Both VRDBs and ARSs, through slightly different mechanisms, are designed to allow issuers of long-term bonds to take advantage of short-term interest rates by "re-marketing" the bonds on a weekly or monthly basis.  Both types of bonds are also frequently associated with swaps, through which an issuer can seek to gain a synthetic fixed rate that would not otherwise be available to the issuer.

123.    Proceeds from the issuance of municipal bonds for public projects or construction are typically put into three types of funds.  The primary fund is known as the project fund or the construction fund.  This fund is used to pay for the actual construction or repair project work.

The second fund, which is smaller in nature, is known as the debt service fund, or "sinking fund." This fund is used to make principal and interest payments to bond holders. The third type of fund is known as the debt service reserve fund. This reserve fund is used to pay debt obligations in case of unforeseen contingencies. Because of the revenue-anticipation purpose and shorter term quality of TRANs and other similar kinds of bonds, proceeds from issuances of these bonds are typically placed in similar but different types of funds than traditional bonds.

**B.      Municipal Derivatives Basics**

124.    "Municipal Derivative(s)" refers to a variety of specialized investment vehicles through which issuers of municipal and tax-exempt bonds seek to: (1) earn a return on bond proceeds while those proceeds are unused; (2) hedge the interest rate obligations of underlying bonds; and/or  (3) accomplish other financial goals. The Municipal Derivatives industry is almost as large as the municipal bond market. A substantial portion of the $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

125.    All Municipal Derivatives, whatever the purpose they are designed to achieve for the issuer, involve a reciprocal exchange of money between the issuer and a Municipal Derivative provider. Unless otherwise specified, as used in this Complaint, the term "Municipal Derivatives" generically encompasses all of the transactions described herein.

126.    In the case of Municipal Derivatives used by issuers to earn a return on unused bond proceeds, the issuer gives the provider a lump sum of money (principal) and in exchange receives from the provider periodic payments based on the lump sum and interest thereon. From the issuers perspective, the lump sum to periodic payment exchange is much like an annuity. There are several types of reinvestment derivatives, which vary somewhat in form. The most

common type is a called a "guaranteed investment contract" or "GIC." The acronym GIC is often used as short hand to refer to various types of reinvestment derivatives. The term **"reinvestment derivative"** is used herein to refer generally to Municipal Derivatives used by issuers to reinvest bond proceeds.

127. The most common type Municipal Derivative used by issuers to <u>hedge</u> the interest rate obligations of underlying bonds are interest rate swaps or just "swaps." In a swap, the issuer makes periodic payments to the provider calculated on a certain rate of interest on a generally amortizing amount of principal, and receives in exchange periodic payments from the provider based on a different rate of interest on the same amount of principal. The economic calculi of both parties that is supposed to underlie such an exchange is discussed below but is generally referred to as the logic of "rational pricing," based on the comparative advantage of access to different types of credit markets. The term **"hedging derivative"** is used herein to refer generally to Municipal Derivatives, such as swaps, options, swaptions ceilings, floors and collars, that issuers use, generally, to hedge the interest rate obligations on underlying loans and shift the risk they're on. They are most commonly associated with ARS and VRDB issuances, which have interest rates that set at short-term intervals.

128. A much less common type of Municipal Derivative involves an exchange of periodic payments *from* an issuer *to* a provider for a lump sum payment *from* a provider. These are often referred to a **"forward sales agreements."** However, forward sales agreements can also refer to Municipal Derivatives in which the cash flows mirror those in a reinvestment derivative (a lump sum from the issuer in exchange for periodic payments from the provider).

1.    **Guaranteed Investment Contracts "GICs"**

129.    A GIC is a contract between a municipal bond issuer and a financial institution by which the financial institution guarantees periodic payments equaling, in total, the amount of bond proceeds invested, plus interest at a rate set by a competitive bidding process.  A GIC is a type of annuity available to U.S. public entities that issue municipal bonds.  The counter-party to GICs are typically insurance companies and investment banks, which in this role are referred to as "providers" or "counter-parties."  These products are intended to provide issuers with guaranteed returns on unused bonds proceeds.  "GICs" can refer to unallocated group contracts, investment contracts, funding agreements, guaranteed interest contracts, or other similar financial products in which a provider agrees to pay a fixed or variable rate of interest or a future payment that is based on an index or similar criteria, such as the LIBOR or the SIFMA Index, that is payable at predetermined dates.

130.    A Repurchase Agreement or a "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return.  This is known as a Collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

131.    An "Unsecured" or "Uncollateralized GIC" does not involve any securities. This type of Municipal Derivative instrument is most similar to other types of annuities: the financial institution guarantees payments at specified points of time.  These agreements may contain terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties if deadlines are not met.

### 2. **Forward Agreements**

132.     A forward agreement is often used with debt service funds.  It is an agreement where the buyer and the seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed.  A forward agreement may require the delivery of a specified security at a specified future date at fixed yields for the purpose of optimizing the investment of a debt service reserve fund.  A forward agreement may also be used to require an issuer to issue, and a company to underwrite, an issuance of bonds on a specified date in the future for the purpose of refunding an outstanding debt issuance.

### 3. **Advanced Refunding Escrow**

133.     Public and non-profit entities can issue bonds to refinance prior bond issuances. An advanced refunding escrow is an arrangement pursuant to which the proceeds of the refunding issue (the new bond issued to refund an outstanding bond) are held in escrow and invested so that the escrow account funds can be used to pay off the principal and interest on the municipal bond issue that is being refunded.

134.     GICs, forward agreements, and advanced refunding escrows are collectively included among the Municipal Derivatives collectively referred to herein as **"reinvestment derivatives."**

### 4. **Swaps**

135.     A swap is an exchange of future cash flows (*i.e.*, periodic payments) between an issuer and a provider.

136.     Swaps are generally used by issuers to hedge interest rate obligations on underlying municipal bonds, but can also be used to achieve other financial goals including gaining access to synthetic fixed rates that are not otherwise available to the issuer.

137.     In a swap transaction, the issuer and provider essentially trade or "swap" future cash flows.  Swaps include: (a) floating-for-fixed interest rate swaps, (b) fixed-for-floating rate swaps, and (c) floating-for-floating interest rate swaps, when the two instruments are based off of different indices.

138.     While issuers sometimes enter into swaps and other types of hedging derivatives for investment purposes, issuers usually enter into them to hedge their interest rate obligations related to a particular bond issuances

139.     In recent years, it has become increasingly common for issuers to combine interest rate swaps with VRDB or ARS bond issuances, the interest rates on which are reset on regular short-term bases, such as on weekly or monthly bases.  In the swaps associated with these types of bonds, the issuer receives from the swap provider a floating interest rate that is supposed to approximate the short-term interest rates that the issuer will be obligated to pay holders of the bonds; in exchange, the issuer pays a swap provider a conditioned fixed interest rate.

### a.     Basic Swap Valuation - Logic of "Rational Pricing"

140.     Underpinning a legitimate swap transaction is the logic of "rational pricing." According to the logic of rational pricing, when an issuer and provider enter into a swap transaction, the present values ("PV") of the exchanged future cash flows should be equal or "netted off" against one another.  (Present value is the value on a given date of a future payment or series of future payments, discounted to reflect the time value of money and other factors such

as investment risk.) Another way to put this is that the net present value ("NPV") of the swap should be zero or "arbitrage free," at the date of its initiation. In other words, a swap should involve the exchange of future cash flows that have roughly equal values.

141. In the fixed-for-floating rate example described above, where the issuer pays a fixed rate and the provider pays a floating rate, the PV of future fixed rate payments by the issuer should be equal to the present value of the expected future floating rate payments by the provider. In other words again, the exchange should be a wash, with the issuer and provider exchanging future cash flows of the same PV.

142. If, as it should be, the NPV of the swap, as to parties that entered into it, is zero, neither party's motivation for entering the swap should be based on any belief that they have received a more valuable future cash flow in exchange for a less valuable future cash flow. Again, the NPV of the cash flows should be zero; on the market, the cash flow is worth the same. Rather, each party's motivation for entering the swap should be based on each party's respective comparative advantage based on access to different borrowing markets.

143. In our example, the issuer enters into the swap because it believes that the PV of the floating rate the issuer will receive from the provider will be more than the PV of the floating rate cash flows that the issuer will be obligated to pay bond holders, both calculated over the life of the bond. In other words, the issuer's access to the ARS and VRDB markets should give it a comparative advantage vis-á-vis the provider as to floating interest rates: the provider has to pay the issuer a higher floating interest rate than the issuer has to pay bond holders. The provider, in turn, enters into the swap because it believes that the PV of the fixed rate payments that the provider will receive from the issuer is greater than the PV of fixed rate payments that the

provider would be obligated to pay another lender. In other words, the provider has a comparative advantage vis-á-vis the issuer as to fixed rates: the issuer has to pay the provider a higher fixed rate than the provider has to pay another lender.

144. Thus, when the NPV of a swap is not zero, but rather the NPV is significantly greater for the provider than for the issuer and no up-front payment is made by the provider to the issuer, the reasonable conclusion is that the transaction has been manipulated to the advantage of the provider. Again, the NPV should be zero as between the issuer and the provider. The financial benefit to providers should be derived from their comparative advantage concerning access to the borrowing markets in question, not cheating the issuers with whom they enter into the swaps.

145. However, as alleged below, there are several publically reported instances where issuers have lost billions of dollars as a result of unfairly valued swaps in which evidence of price collusion amongst supposed competing providers has been identified. Moreover, a preliminary analysis of several swap transactions entered into by various cities, counties and government agencies reveals that significant mis-pricing occurred in favor of the swap providers, and there exists probative evidence that the mis-pricing was the result of collusion between swap providers.

146. Finally, evidence originally uncovered by Riverside and now widely reported, as well as evidence provided by Bank of America, demonstrates how pricing letters prepared by providers to issuers and other means were used by Defendants to both manipulate the terms of swap deals and provide illegal kickbacks to one another.

## 5. Interest Rate Agreements, Options, And Swaptions

147.    An "interest rate floor agreement" is a financial instrument in which the buyer of the agreement is protected by receiving a guaranteed minimum interest rate (the "interest rate floor") that can be paid on the debt.  Guaranteed payments are made even if the actual interest rate drops below a specified strike rate (the "floor rate").  Interest rate floor agreements are typically used for bonds with variable interest rates.  For issuers of municipal bonds, floor agreements are used to provide greater certainty concerning the interest payments that must be paid.

148.    An "interest rate ceiling agreement" is a financial instrument in which the buyer of the agreement is protected by receiving a guaranteed maximum interest rate (the "interest rate ceiling" or "interest rate cap").  Payments are made when the actual interest rate rises above a specified strike rate (the "cap rate").  Interest rate ceiling agreements are typically used in bonds with variable interest rates.  For issuers of municipal bonds, ceiling agreements are used to provide greater certainty in the interest payments that must be paid.

149.    A "collar agreement" is a financial instrument that combines a floor agreement with a ceiling agreement.  In other words, an issuer can enter a collar agreement to combine an interest rate floor and interest rate ceiling on its variable rate debt.  This agreement ensures that interest payments will be within the range set by the collar.

150.    An "option" is a provision in a bond contract where the provider has the right, on specified dates, after giving required notification, to cancel or terminate the Municipal Derivative.

151.    A "swaption" is a combination of a swap and an option.

152.     Swaps, interest rate agreements, collars, options, and swaptions are collectively referred to herein as "hedging derivatives."

153.     Several qualities of all these types of Municipal Derivatives encouraged and facilitated the Defendants conspiracy to allocate the market for them and depress their terms. These factors include but are not limited to: the complexity of the their terms, makes them difficult to value and provides opportunities to hide or disguise the results of manipulation; the significant barriers of entry to the market for Municipal Derivatives due to their complexity and the capital requirements that potential providers need to meet in order to have required credit ratings, and applicable regulations; and the fungibility of Municipal Derivatives that share the same terms and come from similarly rated providers.

## V.
## DEFENDANTS' ILLEGAL MANIPULATION OF THE MUNICIPAL DERIVATIVE MARKET

### A.     Overview Of Defendants' Illegal Conspiracy

154.     Defendants' illegal conspiracy was based on a web of interlocking relationships between Provider Defendants, Broker Defendants, other co-conspirators, and the people employed by them, who eschewed competition with one another in favor of cooperation that ensured the Defendants made excessive illegal profits, and that issuers, including Riverside, were denied the benefits of competition.

155.     Defendant Bank of America's CW explained that "he learned that his was a business about doing favors, generating referrals for brokers, and getting favors in return."

156.     As the CW more colorfully put it in a conversation with Sam Gruer of Defendant JP Morgan at a Christmas Party held by Broker Defendant IMAGE, at Sparks Steakhouse in New

York City, Provider Defendants, with the assistance of Broker Defendants, worked cooperatively instead of "kicking each other's teeth out."

157.    However, "kicking each other's teeth out" is what legitimate competitors like Defendant JP Morgan and Defendant Bank of America are supposed to do.  Municipal Derivative providers should be competing with one another to offer the best economic deal to Riverside and other issuers on the basis of the Municipal Derivative terms, including interest rates, dates of deposits or payments, fees, credit worthiness, and other factors.  Municipal Derivative brokers, as fiduciaries of the issuers, are supposed to work on behalf of issuers to help facilitate issuers achieve the best economic deal from competing providers, and should be competing with one another in terms of the quality of such services they provide, including the fees they charge, etc.

158.    Defendants' conspiracy denied Riverside and other issuers the benefits of legitimate competition.  Riverside suffered from the effects wrought by the denial of competition and was injured thereby, not only in particular Municipal Derivative transactions in which overt collusion occurred, but all Municipal Derivative transactions into which it entered during the period of the conspiracy and thereafter.  The pervasiveness of the conspiracy, the inter-transactional character of much of the conspiratorial conduct, and the participation in the conspiracy of most if not all the major Municipal Derivative providers and brokers had market-wide effect on the terms of all Municipal Derivative transactions during the period of the conspiracy and afterwards.

1.    **Mechanics Of The Conspiracy**

159.    The Defendants' conspiracy had three major components: (a) rigging auctions for reinvestment and hedging derivatives; (b) manipulation of negotiated deals, particularly for

48

hedging derivatives; and (c) provision of illegal kickbacks and other types of covert consideration to other members of the conspiracy. Unifying its various components was an understanding and agreement that Provider Defendants would, with the assistance of Broker Defendants, cooperate with one another in a *you scratch my back I'll scratch yours* arrangement, whereby Municipal Derivative transactions were allocated amongst Provider Defendants and Provider Defendants were able to win those deals on terms that would not have been possible in a competitive market.

<strong>a.　　Bid-Rigging Of Auctions</strong>

160. One of the principal means by which competition between Municipal Derivative providers is supposed to occur are through Municipal Derivative auctions. These auctions were one of the principal forums for manipulation by Defendants.

161. In a formal Municipal Derivative auction, the issuer, directly, through its broker, or via other means, solicits formal written bids from prospective Municipal Derivative providers. The bids submitted are evaluated by the bidder to determine which bid represents the best economic deal to the issuer, according to the criteria discussed herein.

162. In many instances, the proposed interest rate in the bid is the most important term or component of a bid, representing, for example, in a GIC, the rate of return that the issuer will earn on the principal.

163. Because certain Internal Revenue Service ("IRS") regulations applicable to determining the fair market value for GICs and other types of reinvestment derivatives require that a formal auction be held for certain presumptions to apply, formal auctions are most

commonly held for GICs and other types of reinvestment derivatives. However, formal auctions are also used by issuers to procure swaps and other types of Municipal derivatives.

164. The U.S. Treasury Department ("Treasury") apparently recognized that while these auctions can and should allow issuers to procure Municipal Derivatives on the best possible terms available in the market, the auctions also create a powerful incentive for collusion amongst providers. Accordingly, Treasury enacted rules that effectively require all providers who submit bids in auctions for GIC's and other types of reinvestment-type Municipal Derivatives to represent to issuers that:

> [T]hat the potential provider *did not consult with any other potential provider about its bid*, that the bid *was determined without regard to any other formal or informal agreement* that the potential provider has with the issuer or any other person (whether or not in connection with the bond issue), and that the bid *is not being submitted solely as a courtesy* to the issuer or any other person for purposes of satisfying the requirements of paragraph (d)(6)(iii)(B)(1) or (2) of this section.

26 C.F.R. § 1.148-5(d)(6)(iii)(3) (emphasis added). Riverside, like many issuers, uses a standardized bid solicitation form that requires that such representations be made.

165. However, not withstanding such representations, Defendants knowingly and intentionally conspired with each other to rig bids in Municipal Derivative auctions precisely in many of the ways that Defendant Providers are expressly <u>required</u> to swear they will not.

166. As then IRS Field Manager Charles Anderson, speaking to Bloomberg in 2006 recognized, this bid-rigging caused the terms that Riverside and other issuers to be depressed and, therefore, cost them billions of dollars: *"People were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing*

*the winner to win a sweetheart deal."* A sweetheart deal for the provider is a bad deal for the issuer.

  i.  **Pre-Selecting A Particular Provider Defendant To Win An Auction for a Municipal Derivative**

  167.  Both a means and a principal purpose of the Defendants' conspiracy was the formal and informal pre-selection amongst themselves of the Provider Defendants who would win particular auctions. Through the pre-selection process, Provider Defendants were able to allocate amongst themselves Municipal Derivative transactions and protect profit margins on such transactions that would have been shrunk had the Providers legitimately competed amongst themselves.

  168.  The unlawful pre-selection practice was so prevalent that the CW's supervisor at Defendant Bank of America Phil Murphy would express disappointment with the CW if he did not know who would win a Municipal Derivative auction in advance of bidding.

  169.  Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America and publically available information reveal that numerous Provider Defendants were pre-selected as winners of particular auctions, including but not limited to:

- Defendant Bank of America,

- Defendant UBS,

- Defendant Wachovia,

- Defendant CDC,

- Defendant NatWest,

- Defendant SocGen,

- Defendant JP Morgan,

- Defendant FSA, and

- Defendant GE Trinity.

170.     Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America employees and publically available information reveal that the following Provider Defendants took actions to assist another Provider Defendant win a particular auction:

- Defendant Bank of America,

- Defendant JP Morgan,

- Defendant Merrill Lynch,

- Defendant Morgan Stanley,

- Defendant NatWest,

- Defendant Piper Jaffray,

- Defendant UBS,

- Defendant Wachovia,

- Defendant FSA, and

- Defendant GE Trinity.

171.     As alleged herein, statistical analyses of bidding patterns in eighty-nine (89) reinvestment derivative auctions reveal probative evidence that the following Provider Defendants took actions to assist another Provider Defendant win a particular auction and/or were pre-selected as winners of particular Municipal Derivative auctions:

- Defendant BayernLB,

- Defendant Rabobank,

- Defendant JP Morgan,

- XL,

- Defendant Wells Fargo,

- Defendant MBIA,

- Defendant Bank of America,

- Defendant CDC,

- Defendant SocGen,

- Defendant GE Trinity,

- Transamerica;

- Defendant FSA; and

- Defendant Smith Barney.

172. Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Bank of America employees reveal that Broker Defendants took actions to assist a Provider Defendant win a particular auction, including, but not limited to the following:

- Defendant IMAGE,

- Defendant Piper Jaffray,

- Defendant CDR,

- Defendant Southwest,

- Defendant Sound Capital,

- Defendant George K Baum, and

- Defendant PFM.

173. Actions taken by other Provider Defendants in order to assist another Provider Defendant win a particular auction would include, but was not limited to, submitting a courtesy bid that they knew would not be competitive or deliberately passing on an auction.

174. Broker Defendants assisted in accomplishing the goals of the conspiracy through a variety of means including, but not limited to: acting as the intermediary between Provider Defendants to indicate whether a certain Provider Defendant desired to win a bid and should be selected; indicating to non-selected Provider Defendants at what pricing they could submit and still allow the pre-selected Provider Defendant to prevail; and giving the pre-selected Provider Defendant information regarding the bids of other providers and consulting with the pre-selected Provider Defendant to ensure that it won the auction with the highest possible profit margin.

175. The code words used by Provider Defendants to communicate their desire to each other to be pre-selected as the winner of a particular auction included:

- "We really want this deal."

- "We want to get in on this rate."

- "I can do better, I want this bid."

- "[I] want[] to win."

176. The code word "axe" was commonly used to refer to a Provider Defendant's interest in winning a deal, as in a particular Provider Defendant has an "axe" for the Municipal Derivative being auctioned next Wednesday.

177.     The code word "aggressive" was used to refer to a high bid, and "aggressively" was used to refer to bidding to win an auction through submission of high bids.

178.     When the CW started work at Defendant Bank of America's Municipal Derivative desk, he overheard his supervisors at Defendant BofA, Phil Murphy and Doug Campbell, commonly use this code language during phone calls regarding Municipal Derivative auctions.

179.     Murphy told the CW that in order for Defendant Bank of America to be the pre-selected winner in auctions in which Broker Defendant IMAGE was involved, the CW needed to tell Marty Stallone of Defendant IMAGE that the CW "wanted to win" and "would work with IMAGE."  When the CW conveyed these sentiments to Stallone, Stallone was not surprised and said he would help where and when he could.

180.     Subsequently, CW would tell Stallone of Broker Defendant IMAGE, if there was a particular auction that the CW wanted to win for Defendant Bank of America.  Stallone helped the CW with instructions, including, but not limited to: (a) what he needed to bid for Defendant BofA to win, and (b) whether the CW needed to bid more competitively, (c) that he would get back to him when he had the other bids, (d) whether the CW could lower his bid, and thus increase Defendant BofA's profit, and still win the auction.

181.     As the relationship between Stallone and the CW developed, Stallone would unilaterally call the CW and tell him where other providers saw the market.  On some deals, Stallone would tell CW that another provider wanted to win.  Stallone would tell CW how other providers "saw the market."  CW understood this to mean that he was not to be as competitive, because another Provider Defendant had been pre-selected as the winner of the auction.  It was

understood that in such situations, that Stallone would act as the intermediary between Defendant BofA and the other Provider Defendants.

182.     From approximately 1999 through 2003, the other Provider Defendants that the CW recalls being pre-selected as winners of particular Municipal Derivative auctions in this manner, included Defendant UBS, Provider Defendant Wachovia, Provider Defendant CDC, and Provider Defendant JP Morgan.

183.     The CW also said that there were instances when he knew ahead of time that Defendant Bank of America would win a particular auction, and when another Provider Defendant would win.

184.     The CW indicated that it was helpful if he was able to convince the issuer to engage Defendant IMAGE as the broker for the Municipal Derivative auction.  The CW explained that members of Defendant Bank of America's Municipal Derivative desk did not always have the opportunity to make such a recommendation.

185.     The CW stated that when a Broker Defendant arranged for Defendant BofA to win sufficient numbers of auctions, the relationship with the broker was referred to as "working out."  He said that members of Defendant BofA's Municipal Derivatives desk developed a good sense of which relationships with which Broker Defendants were working out in this way.

186.     Evidence provided by Defendant BofA suggests that Provider Defendant BofA had this type of collusive relationship with Broker Defendants IMAGE, Feld Winters, Sound Capital, and George K Baum and co-conspirator MGIC.

187.     From approximately 1999 through 2003, the members of Provider Defendant Bank of America's Municipal Derivative desk were Phil Murphy, Doug Campbell, Jay Saunders, Dee Bradley (William Dee Bradley), Jeff Klein, and Dean Pinard.

188.     Common code words used by Broker Defendants to communicate to a Provider Defendant that another Provider Defendant desired to be pre-selected as the winner of a particular auction or that the Provider Defendant to whom the communication was made could be pre-selected as the winner, included:

- "I think I can help you here."

- "I will call you when I get the market."

- "x company has been working a long time with the market and they see it here."

- "This one needs to go to JP Morgan."

- "JP Morgan understands that they just won a big transaction and that BofA wants this one."

189.     In situations where a Broker Defendant was not available to act as the intermediary between Provider Defendants, representatives of the Provider Defendants would communicate directly with one another.

190.     For example, the CW described at least three separate conversations with Sam Gruer of Provider Defendant JP Morgan regarding particular Municipal Derivative auctions.  In one such conversation regarding an auction for a specific escrow deal, the CW recalled discussing with Gruer whether Gruer would be bidding in the auction on behalf of Provider Defendant JP Morgan and, if so, how aggressively.  In other words, the conversation was to determine whether this was an auction that JP Morgan intended to bid and win.

191.    In another conversation between the CW and Gruer at the IMAGE Christmas party referenced above, the CW had expressed his happiness to Gruer that they had worked out an arrangement on these types of escrow deals that worked out for both Provider Defendant BofA and Provider Defendant JP Morgan.  He further expressed his happiness that Provider Defendant BofA and Provider Defendant JP Morgan had the opportunity to cooperate in the auctions.

192.    Provider Defendant BofA and Provider Defendant JP Morgan are supposed to be competitors in Municipal Derivative transactions, not cooperators.

193.    Other examples of direct conspiratorial communications between representatives of Provider Defendants found on the tapes from Defendant Bank of America's Municipal Derivatives desk, include a series of conversations between Martin McConnell of Provider Defendant Wachovia and Doug Campbell of Provider Defendant BofA

194.    For example, in a taped conversation between Martin McConnell of Provider Defendant Wachovia and Doug Campbell of Provider Defendant BofA in 2002, Campbell tells McConnell that he told Doug Goldberg of CDR that it was okay if another provider won a deal that CDR brokered and that Defendant PaineWebber won the deal.

195.    In another taped conversation between McConnell of Defendant Wachovia and Campbell of Defendant BofA, Campbell is heard discussing with McConnell including Defendant BofA in an unidentified Municipal Derivative transaction, apparently in some sort of credit support role.  Campbell appears to indicate to McConnell that Defendant Wachovia should agree to the arrangement because Campbell had let Defendant Wachovia win a Municipal Derivative transaction with Defendant Piper Jaffray, with whom Campbell regularly dealt.

196.    There are also recordings of collusive conversations between Phil Murphy and

Doug Campbell, both of Defendant BofA, a Peter at Defendant UBS (likely Peter Ghavami), and

an unidentified person at Provider Defendant JP Morgan regarding certain swap transactions, as

well as between an unidentified representative of Defendant Bank of America and an

unidentified representative of Defendant UBS regarding a certain swap transactions.

197.    In one such conversation, an unidentified representative of Defendant UBS is

heard telling an unidentified representative of Defendant BofA that Defendant UBS was

interested in a swap that IMAGE was handling next day.  The reasonable inference is that

IMAGE was handling an auction for the swap the next day and the representative of Defendant

UBS was telling a representative of one of his supposed competitors in such an auction,

Defendant BofA, that Defendant UBS would like to win the auction and was seeking an

agreement for Defendant BofA to assist Defendant UBS in doing so.

198.    Swap deals were both negotiated and competitively bid at auction.  The

conspiracy involved manipulation of the terms in <u>both</u> situations.  However, the fact that the

representative of Defendant UBS refers to Broker Defendant IMAGE handling the swap the next

day suggests that this particular swap was put to auction; in a negotiated deal a broker would not

be handling the deal on a single date certain; rather, the negotiation would take place over a

period of time.

   **ii.**  **<u>Submitting Courtesy Bids To Help a Pre-Selected Provider</u>**
      **<u>Defendant Win a Municipal Derivative Auction</u>**

199.    Another mechanism of the conspiracy was the submission of a courtesy bid by a

Provider Defendant in an auction for the benefit of another Provider Defendant.  A courtesy bid

is a purposely non-competitive bid that a Defendant Provider submits with no intention of winning the auction but rather to assist another Defendant Provider win the auction.

200.     According to the CW, Provider Defendants submitted courtesy bids both to assist another Provider Defendant win a particular auction as well as to meet IRS safe harbor conditions.  As discussed herein, IRS regulations require that bids be received from at least three providers for a presumption of fair market value to apply.  In either case, the submission of a courtesy bid constituted a collusive manipulation of the auction process that affected the terms for particular Municipal Derivative at auction as well as the market for such Municipal Derivatives.

201.     The practice was so blatant and prevalent that Provider Defendants would bid on deals on which they were not qualified or authorized to bid.

202.     For example, Defendant IMAGE would sometimes ask the CW to bid on deals even if the CW did not have internal credit approval to do so.  Phil Murphy, the CW's supervisor at Defendant BofA, would instruct the CW to bid on those deals with a vague condition in the bid as a safety net, so that Defendant BofA could back out of it if it won.

203.     Similarly, the CW described how Defendant Wachovia and Defendant JP Morgan, as well as Defendant NatWest and co-conspirator Lehman, would submit bids for certain escrow CDs that neither were qualified to provide under applicable state laws.

204.     The CW reported that he would be given a "safe range" by Broker Defendant IMAGE Marty Stallone when Stallone would pass along a request for a courtesy bid from him so that the CW would not inadvertently win a bid he didn't want.

205. The CW specifically identified Defendant JP Morgan, Defendant CDC, Defendant UBS, Defendant NatWest, and Defendant Wachovia and co-conspirator Lehman as providers that he knew submitted courtesy bids.

206. Information provided by the CW and descriptions of the contents of tapes of conversations of employees on Defendant Bank of America's Municipal Derivative desk and publically available information indicate that the following Provider Defendants submitted courtesy bids to assist another Provider Defendant win a particular auction: Defendant Bank of America, Defendant JP Morgan, Defendant NatWest, Defendant Wachovia, Defendant CDC, Defendant Merrill Lynch, and Defendant UBS.

207. The same information reveals that the following Provider Defendants benefitted from the submission of courtesy bids by other Provider Defendants: Defendant Bank of America, Defendant JP Morgan, AIG, and Defendant NatWest.

208. A statistical analysis of bidding patterns in eighty-nine (89) reinvestment derivative auctions reveals evidence probative of submission of courtesy bids by the following Providers: Defendant BayernLB, Defendant Rabobank, Defendant JP Morgan, XL, Defendant Wells Fargo, Defendant MBIA, Defendant Bank of America, and co-conspirator Transamerica.

209. The same analysis reveals evidence probative of the receipt of the benefits of the submission of courtesy bids by the following Provider Defendants: Defendant MBIA, Defendant CDC, Defendant SocGen, Defendant GE Trinity, Defendant FSA, co-conspirator Transamerica, and Defendant Smith Barney.

210.     Broker Defendants and Provider Defendants used code words to facilitate the use of courtesy bids.  Broker Defendants would communicate such information by saying things such as the following:

- "x company has been working a long time with the market and they see it here."

- "I need a bid."

- "Can you give me a bid."

- "I know you usually pass on construction bids, but would you mind pricing it up?"

211.     According to the CW, representatives of Broker Defendant IMAGE would use these phrases as well as others.  For example, on one occasion, the CW would be asked by Peter Loughead or Stallone at IMAGE to just "give them a rate," which CW understood meant that a different Provider Defendant would win the auction.  In such a situation the CW would submit a rate that he knew or assumed would not win.

212.     Sometimes the requests were more direct and blatant.  For example, tapes of members of Defendant Bank of America's Municipal derivatives desk from 2002 reveal a conversation between Jim Towne of Broker Defendant Piper Jaffrey and Provider Defendant BofA's Doug Campbell in which Towne tells Campbell that Provider Defendant JP Morgan wants to win the auction in question.  Campbell then gives the Defendant Bank of America's bid after hearing what Defendant JP Morgan is bidding. Towne asks Campbell to adjust Defendant BofA's bid up closer to Defendant JP Morgan's bid, apparently so that it would not draw attention.  Campbell says that's fine, but that he doesn't want to win the auction.  Towne agrees.

213.     Similarly, according to the CW, Defendant NatWest was not equipped to do many types of Municipal Derivative deals that Defendant BofA could do, but Defendant NatWest

would, nonetheless, submit courtesy bids on auctions for such deals for the benefit of Defendant BofA. Sometime in 1999-2001, Broker Defendant IMAGE's Stallone told the CW to "back off" on a deal because it was one that NatWest could do (apparently in recognition for the similar courtesy bids that Defendant NatWest had submitted for the benefit of Defendant Bank of America).

214.    The CW also recalled instances where Stallone of Broker Defendant IMAGE would tell him regarding Martin McConnell of Defendant Provider Wachovia's municipal derivatives desk: "I can get Martin to get a number on this." This meant that Stallone could get Defendant Wachovia to submit a courtesy bid.

215.    Tapes also reveal a conversation in 2002 between Defendant Bank of America's Murphy and David Schott, possibly of Lasalle Financial asking Murphy to bid on a deal even if Defendant BofA isn't interested in the deal, because another bid is needed.

216.    The tapes also reveal a conversation in 2002 in which Defendant Bank of America's Doug Campbell offers to Doug Goldberg of CDR to submit a bid if it is needed. A Municipal Derivative provider should be submitting a bid because it wants to compete for the Municipal Derivative at auction, not because another Municipal Derivative provider would like to use the bid's existence to win the Municipal Derivative.

217.    The CW also related how Stallone of Broker Defendant IMAGE told him in regards to a deal that Rob Taylor at Lehman didn't want business, but would submit a bid.

218.    The CW also relate how Stallone of Broker Defendant IMAGE told him that he could get Mike Frasco of Broker/Provider Defendant CDC to submit bids. This was significant because CDC did not participate in many Municipal Derivative transactions as a provider. CW

ran into Frasco in 2003 at the Plaza hotel in New York. Frasco told the CW that "CDC does not rig bids, but it did submit bids that it did not expect to win." Frasco indicated that this distinction was purportedly based on the proposition that Defendant CDC would take the business for which it did win.

219. A series of conversations between unidentified Defendant Bank of America employees and employees of Broker Defendants from 2004 reveals further evidence of courtesy bidding by Defendant Bank of America.

220. For example, in a conversation recorded on July 20, 2004, Mike Harris, an employee of Broker Defendant PFM, requested that Dan Epeneter at Defendant BofA put in a bid on the Bridgeport escrow float, because a third bid was needed to meet the IRS's safe harbor conditions.

221. In a conversation recorded on July 26, 2004 between a representative of Defendant Piper Jaffray and an unidentified Municipal Derivatives desk employee of Defendant BofA, the BofA employee is heard saying that he is considering passing on an unnamed deal set later that day. The representative of Piper Jaffray is heard asking in response whether BofA would bid anyway. The BofA employee responds that he is considering bidding on a number of deals.

222. In a conversation recorded on July 28, 2004 between two unidentified employees of Defendant BofA, the employees are heard discussing whether Defendant BofA should submit or pass on a bid requested by Defendant Piper Jaffray. One of the BofA employee tells an employee at the Municipal Derivatives desk of BofA to ask whether Piper Jaffray already has 3 bids, in which case BofA can pass.

223.     In a conversation recorded on July 28, 2004 between a member of Defendant Bank of America's Municipal Derivatives desk and a representative of Defendant Piper Jaffray, the BofA employee is heard telling the Piper Jaffray representative that BofA intends to pass in a particular Municipal Derivative auction.  The broker responds that he needs a bid.  The BofA employee responds that he will call back with a bid.

224.     In a series of conversations recorded on August 18, 2004 between Dan Epeneter, a member of Defendant Bank of America's Municipal Derivative desk and another BofA employee and a representative of Broker Defendant IMAGE, the IMAGE representative asked BofA to submit a $1.5 million escrow bid for an unnamed deal.  Epeneter of BofA asked IMAGE to adjust the bid time so BofA could bid, and the IMAGE representative agreed to adjust the time to accommodate BofA.  The BofA desk employee ultimately provides the bid to Defendant IMAGE after discussing it with other BofA employees.

225.     In a series of conversations recorded on August 21, 2004 between a representative of Broker Defendant Sound Capital and a member of Defendant BofA's Municipal Derivative desk, the BofA employee is heard asking whether Sound Capital needs a bid from BofA and is heard discussing the terms of the bid with the Sound Capital representative.  In a subsequent conversation between the same persons, the BofA employee is heard discussing that the bid submitted by BofA was close to winning, but lost.  The BofA employee expresses his relief that BofA did not win the auction because, if they had won it, BofA would have lost money on the deal.

226. The foregoing are just examples of the recorded conversations between employees of Defendant BofA and other representatives of brokers regarding the submission of courtesy bids in auctions for which a Provider Defendant or Provider had no intention of winning.

### iii. Passing to Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction

227. One of the means by which Provider Defendants would act to assist a pre-selected winner prevail in a particular auction was by passing on an auction that it otherwise would have bid on.

228. Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Defendant Bank of America reveal that the following Provider Defendants fraudulently passed and/or knowingly accepted a fraudulent pass from another Provider Defendant:

- Defendant Bank of America;

- Defendant JP Morgan; and

- Defendant UBS.

229. Evidence provided by Defendant Bank of America based on testimony by the CW and tapes of conversations of employees of Defendant Bank of America reveal that the following Broker Defendants knowingly facilitated and/or encouraged one or more Provider Defendant to pass on a particular auction in order to allow another Provider Defendant to win that auction:

- Defendant IMAGE;

- Defendant CDR;

- Defendant Piper Jaffrey; and

- Defendant First Southwest.

230. In order to advance the conspiracy, Broker Defendants used code words to communicate to Provider Defendants that another Provider Defendant desired it to pass on a particular auction or that another Provider Defendant would be willing to pass on its behalf including:

- "This one needs to go to JP Morgan."

- "JP Morgan understands that they just won a big transaction and that BofA wants this one."

### iv. The Pre-Selected Provider Defendant Gets A "Last Look" At Other Bids to Ensure Winning a Municipal Derivative Auction

231. Another means by which Defendants ensured that the Provider Defendant pre-selected to win a particular Municipal Derivative auction was by giving the pre-selected winner a "last look" at the bids already submitted. This allowed the pre-selected Provider Defendant to submit a bid that would be just enough to win the auction, but no more, thereby increasing its profit margin, and enabled it to police compliance by the other colluding Defendant Providers with whom it had made bidding agreements.

232. The CW described how representatives of Broker Defendants would give representatives of a pre-selected Provider Defendant, including Defendant Bank of America a "last look," whereby the Broker Defendant would tell the pre-selected Provider Defendant what other providers had bid to give the pre-selected Provider Defendant an opportunity to adjust its bid to ensure winning.

233. The CW reported that Stallone of Broker Defendant IMAGE would tell the CW what CW needed to bid in order for Provider Defendant Bank of America to win a deal. Stallone would also tell the CW other providers' bidding information so CW would know what he needed to bid in order for Defendant Bank of America to win. Stallone would also tell the CW that if the CW could do "a couple better," referring usually to basis points, Defendant Bank of America could win the deal.

234. The CW believes that Defendant JP Morgan, Defendant UBS, Provider Defendant Wachovia, Defendant Bear Stearns (in connection with Patrick Marsh who worked in different periods for both Defendant Bear Stearns and Defendant NatWest) received similar types of last looks.

235. Indeed, the practice was so prevalent that persons in the industry reacted with surprise when someone was given a last look and did not take advantage of it.

236. For example, in a recording of a conversation between Jim Towne of Defendant Piper Jaffray and Doug Campbell of Defendant BofA, Towne is heard discussing how he gave a representative of Provider Defendant Morgan Stanley a last look in a particular Municipal Derivative auction and the opportunity to change its bid, but that, in this instance, Defendant Morgan Stanley did not change its bid. Both Towne and Campbell are heard discussing how crazy it was that Defendant Morgan Stanley did not change its bid in this instance.

237. Code words used by Broker Defendants to give last looks or to indicate their willingness to do so included:

- "I think I can help you here."

- "I will call you when I get the market."

### v. The Pre-Selected Provider Defendant Gets Guidance and The Terms Of Other Bids to Ensure Winning a Municipal Derivative Auction

238. Defendants' conspiracy also involved the provision of more detailed bidding guidance by Broker Defendants to Provider Defendants, which not only allowed a particular Provider Defendant to win an auction for a particular Municipal Derivative but also to do so on terms that gave the provider the highest possible profit.

239. Speaking in 2005, before the DOJ had publically announced that it was engaged in an industry-wide investigation into collusion amongst Municipal Derivative brokers and providers, the Director of the IRS' Tax-Exempt Bond Office Mark Scott, described amongst the evidence of probative of bid-rigging in municipal derivative transactions "transactions where the winning bid is the only bid high enough to make the deal work."

240. It is clear now that the result of the bidding process was due to the particularized guidance that Defendants provided one another regarding Municipal Derivative auctions that allowed the pre-selected winner to prevail on terms that were no higher than necessary to win the auction and, thus, achieved the maximum level of profit for the pre-selected Provider Defendant.

241. One of the principal ways Defendants accomplished this was by the submission of pre-bid "indications" by Provider Defendant which would indicate where they intended to bid at auction.

242. For the Provider Defendants who were *not* the pre-selected winner of a particular Municipal Derivative auction, an indication from the pre-selected winner of the auction allowed

the other Provider Defendants to craft their courtesy bids so that they would not win the auction. Similarly, these Provider Defendants could submit their own indications to ensure that their intended courtesy bid would not win the auction but would look sufficiently legitimate to assist the pre-selected winner.

243.    For the Provider Defendant pre-selected as the winner of an auction, the indications submitted by it and other Provider Defendants allowed the pre-selected winner to craft its bid at a level just high enough to win but not higher, maximizing its profit, and depressing the terms that the issuer received.

244.    For example, the CW described a number of instances where he would submit pre-bid indications on behalf of Defendant Bank of America to Martin Stallone of Broker Defendant IMAGE.

245.    The CW explained that he would submit an indication to Stallone prior to the bid being due, and then call Stallone to ask if the indication "was a good fit."  Sometimes Stallone would respond by asking "could you get to this number," indicating that the CW would need to raise the bid for Defendant Bank of America to win the auction, or by saying that indication "looks aggressive," which would signal to CW to re-work the bid to make it more profitable for Defendant BofA.

246.    The CW also described how Stallone of Defendant IMAGE would sometimes signal to him that Defendant BofA could lower its bid by five basis point, and thus gain more profit from the auction, by telling the CW that he could include the brokerage fee in the bid.  The customary brokerage fee on Municipal Derivative transactions was five basis points.

247.     The CW explained how a bid was re-worked to be more profitable for Defendant Bank of America, and would not always involve lowering the rate of the agreement, but could involve the other types of adjustments depending on the particular terms of the Municipal Derivative in question.  Thus, it could raise or lower interest rates, adjust a flat amount, or adjust a date.

248.     If the Municipal Derivative was a straight GIC, the CW would reduce the interest rate, which would result in less interest payments to the issuer.  If the Municipal Derivative was an escrow, which often were bid based on the total dollar amount the issuer is required to pay the provider for escrow, the CW might increase the amount of money demanded from the issuer.  For escrows bid based on date, the later the date, the more beneficial the provider, so the CW would make the date later.  If the Municipal Derivative being auctioned was a swap, the adjustment could take different forms depending on the nature of the swap.  Thus it could involve lowering the value of the cash flow from the Defendant Bank of America to the issuer, raising the value of the cash flow from the issuer to Defendant Bank of America, or both.  How this was done would depend on the nature of the swap.

249.     Tape evidence of conversations involving Defendant Bank of America employees and representatives of other Defendants demonstrate the pervasiveness of the use of indications in Defendants' conspiracy.

250.     For example, the tapes reveal, in the context of a Municipal Derivative transaction involving Santa Barbara County, that Defendant Bank of America's Phil Murphy gave a representative of Broker Co-conspirator Feld Winters an indication of $200,000, which appears to have referred to Defendant BofA's expected profit on the deal.  The representative of Feld

Winters responded by saying that Defendant Bank of America's bid would need to be "a little tighter," only about $150,000. Ultimately, the profit earned by Defendant Bank of America on the deal was around $160,000.

### b. Manipulation Of Negotiated Deals

251.    Defendants' conspiracy was not limited Municipal Derivative transactions for which auctions were competitively bid. Defendants also conspired to manipulate the terms that issuers received on negotiated deals, particularly but not only swap transactions.

252.    Defendants did so through means including but not limited to allocating transactions amongst Provider Defendants, coordinating pricing, and giving falsified pricing verification information to providers.

253.    For example, there are recordings of conversations between Phil Murphy and Doug Campbell, both of Provider Defendant BofA, a Peter at Defendant UBS (likely Peter Ghavami), and an unidentified person at Provider Defendant JP Morgan regarding certain swap transactions, in which these persons discuss splitting the economics and/or pricing of certain swap transactions.

254.    When presented with this information, the CW did not express surprise at the contents of the conversation. Rather, he expressed his lack of surprise that Defendant JP Morgan and Defendant UBS were involved in such discussions, because they were among the largest underwriters at the time.

255.    Underwriters have traditionally had the inside track on swap deals associated with the bonds which they underwrite.

256. Provider Defendants conspired with one another to preserve the advantage that this reaped for one another by providing artificially low price quotes when issuers sought from them pricing verification of terms negotiated with another Provider Defendant.

257. For example, as discussed elsewhere herein, when San Mateo County sought pricing verification for swap terms negotiated with Defendant Salomon Smith Barney and Lehman, which were the underwriters of the associated bonds, representatives of both Defendant UBS and Defendant Piper Jaffray quoted San Mateo a price within a one or two basis points of the negotiated terms. This is despite the fact that a preliminary analysis of the swap terms show that the swap was grossly undervalued as to San Mateo.

258. It is difficult to understand how both Defendant UBS and Defendant Piper Jaffray could both have provided quotes very close to the terms negotiated with Defendant Salomon Smith Barney and Lehman when those terms were so far off a fair market price, unless Defendant UBS and Defendant Piper Jaffray had coordinated the pricing verification quotes with Defendant Salomon Smith Barney and Lehman (and/or co-conspirator AIG Financial which ultimately was substituted for Lehman).

259. This conclusion is bolstered by the arrangement negotiated between San Mateo and Defendant Salomon Smith Barney and co-conspirator AIG Financial and Lehman, which gave these parties a right to beat any better quote offered by another provider. The existence of such an arrangement, if communicated to them, would have given Defendant UBS and Defendant Piper Jaffray an additional incentive to comply with a request from Defendant Salomon Smith Barney, co-conspirator AIG Financial and/or Lehman to provide an artificially low price verification quote.

260.     Moreover, Defendant Bank of America provided evidence, also discussed elsewhere herein, that referrals for providing pricing verification letters were used to compensate members of the conspiracy for other conspiratorial conduct.  It is reasonable to infer that the contents of these letters were also manipulated.

### c.     Kickbacks And Other Types Of Unlawful Consideration

261.     Defendants' conspiracy was greased by way of "kickbacks" and other types of consideration that Provider Defendants would make to other Provider Defendants and Broker Defendants.  This consisted of both making direct payments to some Defendants, as well directing business to other Defendants.  These practices are another manifestation of the *you scratch my back I'll scratch yours* ethic that animated the conspiracy and affected the entire market for Municipal Derivatives.

262.     An email sent in June 28, 2002  by Doug Campbell of Provider Defendant Bank of America to Phil Murphy of Provider Defendant Bank of America that Riverside discovered through its independent investigation at the start of this litigation powerfully evinces the role of kickbacks in the Defendants' conspiracy.

263.     In the email, Defendant Bank of America admits to making kickbacks to Provider Defendants and Broker Defendants, using the proceeds from deals in which those Provider Defendants and Broker Defendants were not even involved but were part Defendants' of conspiracy.

264.     The email states:  **"I believe this list contains all of the situations where BOFA paid an external business contact on a transaction where the external business contact was not involved in some ways in the transaction."**  The email goes on to list a series of payments

to Broker Defendant CDR, Broker Defendant Winters, Defendant Piper Jaffray and Paine Webber, Inc. (part of Defendant UBS), totaling $182,393, along with references to the Municipal Derivative transactions from which the moneys were derived.

—Original Message—
From:       Campbell, Doug L.
Sent:       Friday, June 28, 2002 11:08 AM
To:  Murphy, Phil D.
Subject:       Fees Paid on Unrelated Client Transactions

Phil –

After reviewing NB trades, I have come up with the following list of fees paid to external "broker/banker" on deals where I was the marketer.  I believe this list contains all of the situations where BofA  paid an external business contact on a transaction where the external business contact was not involved in some way in the transaction (e.g., the external business contact was not a broker, investment banker or did not provide the client with market pricing verification).   I found only four firms that we had paid fees to in this manner...CDR, Piper, Winters & Co, and PaineWebber...the Piper / PaineWebber / Winters fees were more one-off events (in Piper's case just saying thanks for all the swap business we had been doing, in PaineWebber case trying to help Mark and Gary  since they were struggling to get their external reinvest business going, Winters case it was the first day Chris opened his new firm).  The CDR fees have been part of the ongoing attempt to develop a better relationship with our major brokers.

CDR - 1/01 - $19, 893 - Brighton/Muskegon swaps - Piper trades. Jim Towne was aware I was paying addit. brokerage to CDR so I am not                               sure if this really belongs on this list..

CDR - 3/01 - $7,500 - Three and Two Baseball (Swap)

CDR - 8/01 - $20,000 - WTVP (Illinois Public TV) (Swap)

CDR - 2/02 - $10,000 - Clinton Community School (QZAB)

PW - 2/02 - $50,000 - Depauw University (swap) – Piper trade. Depauw is also a PW client. Jim Towne was aware I was paying addit.                     brokerage to PW so I am not sure if this belongs on this list...

PW - 3/02 - $25,000 - Grandview (QZAB)

Piper - 1/02- $20,000 - Hendrum and Clinton QZABS – Piper originally showed us this opportunity but then client hired Evenson Dodge

Piper - 4/02 - $20,000 - Bernie (QZAB)

Winters - 4/01 - $10,000 School of the Plains (Swap)

Let me know if I need to do anything else.  I will keep looking as well just to make sure I have not missed one.

265.    Among the interesting elements of the email are the reasons that Campbell gives for making the payments.

266.    Particularly revealing is the statement:  **"The CDR fees have been part of an ongoing attempt to develop a better relationship with our major brokers."**  The "better relationship," which the email states Defendant Bank of America is attempting to develop with

75

CDR has to do with positioning Defendant Bank of America to benefit from CDR's conspiratorial conduct.

267. According to the CW, Campbell was involved in bid rigging of municipal derivative auctions on behalf of Provider Defendant Bank of America with Broker Defendant CDR. The CW recalled a story in which another member of Provider Defendant Bank of America's Municipal Derivative desk asked Campbell about sharing the CDR relationship with him. Campbell told that desk member that "you don't want the responsibility associated with CDR." The CW also recalls Doug Goldberg & Dani Naeh of Provider Defendant CDR saying "can you show me a level," indicating that if the CW could get Defendant BofA's number higher, Defendant BofA could win the Municipal Derivative auction.

268. In a February of 2005 letter, Charles Anderson, Field Manager of the IRS's Tax-Exempt Bond office states: **"We have serious concerns about the relationship between Bank of America and CDR relative to this bond issue."**

269. Provider Defendant SocGen has also come under scrutiny for making what appears to be kickbacks to Broker Defendant CDR. An IRS investigation into CDR's involvement in California school advance refunding escrows and over 20 lease-to-own deals between Provider Defendant SocGen and Broker Defendant CDR revealed evidence of quarterly payments made by Defendant SocGen to Defendant CDR for "unspecified purposes." The investigation is now centered on bid-rigging and price-fixing issues.

270. IRS concerns have also been raised about similar payments made by Defendant SocGen to Defendant CDR in the context of a $27 million bond sold to Pima County, AZ. Defendant FSA was one of four bidders on the deal.

271.     However, as the email reveals, Defendant Bank of America and Defendant PaineWebber did not deal with one another as competitors but rather as co-conspirators, which had a mutual interest in each other's success: Campbell explains that he directed $75,000 to be paid to Defendant PaineWebber in order to assist PaineWebber with the launching of the reinvestment derivative side of PaineWebber's business. It is difficult, if not impossible, to identify how Defendant Bank of America – which was involved in the reinvestment derivative business itself – would have a legitimate interest in providing PaineWebber financial support to help it succeed in this business as well.

272.     The email is also revealing in the inter-linkages between the conspiratorial conduct taken by Defendants in various Municipal Derivative transactions. As the email demonstrates Defendants would often use illegal proceeds from one Municipal Derivative transaction to compensate a co-conspirator for conspiratorial assistance in different transaction.

273.     As discussed elsewhere herein, this was a common practice amongst Defendants and include conduct such as directing business for things such as pricing verification letters in negotiated swap deals to Defendants who had assisted the other Defendant prevail in a separate reinvestment derivative auction.

274.     Another common practice along these lines was that by Provider Defendants recommending specific Broker Defendants for Municipal Derivative brokering work related to bonds that the Provider Defendant played an underwriter role on. The CW makes clear that it was well understood among the members of Provider Defendant Bank of America's municipal derivative desk that such referrals were effective ways to solicit conspiratorial conduct by Broker Defendants for Defendant Bank of America's benefit.

77

275.     Finally, the letter is interesting for what it excludes.  According to Campbell it lists only payments to "an external business contact on a transaction where the external business contact was not involved in some ways in the transaction (e.g. the external business contact was not a broker, investment bank or did not provide the client with market pricing verification)." The import of this is that similar payments were also made from the proceeds of transactions to brokers and investment banks that *were* involved in the transactions from which the moneys came.  It seems further from the email that this is much longer list of payments.

276.     Brokers are supposed to be paid in Municipal Derivative transactions based on a certain percentage of the total amount of the transaction, generally five basis points, and there is no legitimate reason why the winner of a Municipal Derivative transaction would pay another provider that had been involved in it.  Thus, it is difficult to conceive of a reason why Defendant Bank of America would have been paying Broker Defendants and Provider Defendants involved in particular Municipal Derivative transactions that Defendant Bank of America won, except in consideration for their conspiratorial conduct that assisted Defendant Bank of America win.

277.     Along these lines, on November 10, 2006, Broker Defendant Baum, which brokered a number of black box deals worth approximately $2 billion, announced that it had paid an undisclosed penalty to the IRS.  As part of that settlement, it was disclosed that Broker Defendant Baum had engaged in bid rigging in which Defendant Baum assisted certain providers, including Provider Defendant CDC win particular Municipal Derivative transactions. This permitted pre-selected providers, including Defendant CDC Funding, to obtain  "sweetheart deals" on the Municipal Derivative transaction.  There is evidence that these providers then made payments to Defendant Baum in consideration.

278. The IRS has also investigated a 2000 transaction between Defendants Bank of America and Provider Defendant Baum, where Defendant Bank of America provided a GIC on a $100 million issue from the Illinois Development Finance Authority sold by Rural Enterprises of Oklahoma, Inc ("Rural Enterprises"). In July 2003, Rural Enterprises revealed that Defendant Bank of America made "significant" hidden payments to Provider Defendant Baum in connection with the deal.

<b>d. Defendants' Overt Acts To Prevent Discovery Of Their Conspiratorial Communications</b>

279. Some or all of Defendants recorded the phone calls and tracked the email communications of their employees during some or all of the period of the conspiracy. For example, Defendant Bank of America taped the phone conversations of its employees at its Municipal Derivatives desk until the fall of 2004, purportedly to provide clarity in the event of any uncertainty regarding orders. It has also been reported that FSA has provided 600 hours of tapes to the DOJ and SEC in connection with each agency's investigation of the conspiracy.

280. It is clear that Defendants' employees were fully aware that their communications were being recorded and that their conduct was illegal. Accordingly, they took affirmative action to both disguise the meaning of their communications by using commonly understood code words, as alleged herein, and by affirmatively switching to non-recorded means of communication when undertaking conspiratorial discussions.

281. For example, the Cooperating Witness commonly told co-conspirators to call him on his cellular phone so as to avoid having their conversations audiotaped. It was also commonplace for Defendant Bank of America employees to tell their fellow co-conspirator "I'll

call you back later" (i.e. from a secure line) or to ask if they could go off the trading desk when bidding. Campbell of Defendant Bank of America also avoided detection by circumventing the capture of emails sent on his Bank of America Blackberry by directly contacting the Blackberries of co-conspirators, including Towne of Defendant Piper Jaffray, through the use of a Personal Identification Number. The Cooperating Witness also told various co-conspirators to call him on his cell phone so as to avoid detection. Moreover, it was common for Brokers to ask "are you off the desk" when doing a deal, again to avoid having their conversations recorded.

282. What's more, representatives of Defendants would use their personal (as opposed to work) email accounts for conspiratorial communications. For example, Naeh of Broker Defendant CDR would send conspiratorial e-mails to individuals at Provider Defendant Bank of America, including Pinard, through Naeh's personal GoAmerica email account rather than his work account. He did so because he recognized that these communications were illegal and sought to evade their discovery.

**2.   "It's nice to have friends": Repeat Appearances By Defendants' Representatives In Different Transactions, Personal Relationships Amongst Them, And Other Factors Encouraging And Enabling The Conspiracy**

283. It is axiomatic that in order to conspire, co-conspirators needed the opportunity to do so. Or stated somewhat more cynically but infinitely more eloquently by Adam Smith,

***"People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."***

284. The Municipal Derivatives industry is characterized by a number of factors that enabled and encouraged the *you scratch my back I'll scratch yours* ethic that animated the conspiracy. These factors include but are not limited to: the repeated appearances of not just the

80

same Defendants, but also the same representatives of those Defendants in multiple different transactions; the strong personal relationships that developed between such representatives as a result of this and other factors; the manner in which Defendants' representatives were compensated; and the additional opportunities for collusion provided to them.

### a. Repeat Appearances In Multiple Transactions

285.    One of the most critical factors that gave rise to Defendants' conspiracy and enabled it to thrive was that not only did the same Provider Defendants and, to an extent, Broker Defendants show up in multiple Municipal Derivative transactions, the same persons represented the Defendants in those transactions. This enabled a *quid pro quo* of Municipal Derivative transaction allocation that would not otherwise be possible.

286.    Provider Defendants were willing to not only allow another Provider Defendant to win a particular Municipal Derivative transaction, without competition, but to actually assist another Provider Defendant win (through the submission of courtesy bids, etc.) because of the nature of the industry. The same representatives of different Provider Defendants' showed up in multiple transactions, often with the same representatives of Broker Defendants. These representatives developed a sense of trust in one another a sense of sharing the benefits of cooperation versus competition.

287.    The most colorful expression of this sentiment was the CW's statement to Samuel Gruer of Provider Defendant JP Morgan at a Christmas party hosted by IMAGE in which the CW, who worked at Provider Defendant BofA's Municipal Derivatives desk, told Gruer that he was glad that Bank of America and JP Morgan weren't "kicking each other's teeth out" on a

series of deals involving escrows, but were instead working things out so both firms could benefit from the business, a sentiment which Gruer acknowledged sharing.

288. Indeed, according to the CW, Stallone of Provider Defendant Image would often say things to the CW such as "this one needs to go to JP Morgan" and "JP Morgan understands that they just won a big transaction and that BofA wants this one." Sam Gruer was Stallone's contact at JP Morgan.

289. More generally, the CW stated that it was understood that you would win some transactions and that other Provider Defendants would win other. The Defendants' conspiracy depended and thrived on this understand, which is evinced in multiple transactions in which a Provider Defendant defers from competing with another in exchange for a similar courtesy in a subsequent transaction.

### b. Personal Relationships Amongst Defendants' Representatives

290. Developing out of this process was a deep sense among representatives of Defendants of the importance of developing personal relationships with one another.

291. The CW explained that when he started at Provider Defendant BofA, he struggled to win the auctions he bid on. He observed that when his supervisors at Defendant BofA Phil Murphy and Doug Campbell wanted bids, they would say things like "I can do better, I want this bid" to the brokers, and were able to re-bid or adjust bids to brokers.

292. Much of the compensation of employees of Defendant BofA's municipal derivatives desk is based on bonuses that are tied to the amount of profit that the employee generates through the Municipal Derivative transactions that the employee executes. This type of compensation structure appears to be common among Municipal Derivative providers and gives

employees of Municipal Derivative providers a personal incentive to participate in illegal conduct that generates higher profits for the Municipal Derivative provider by whom they are employed.

293. The CW spoke with Murphy, who told CW that IMAGE would be receptive to the same process. Murphy told CW that he needed to say CW "wanted to win" and "would work with IMAGE." The CW conveyed this to Marty Stallone of Broker Defendant IMAGE. According to the CW, Stallone was not surprised when the CW expressed these things to him and said he would help where and when he could.

294. The CW had, in fact, been recommended for the job at Defendant Bank of America to Phil Murphy as well as Doug Campbell by Marty Stallone and Dave Eckhart of Broker Defendant IMAGE, whom the CW knew through prior public-finance related employment contacts. As soon as he started, the CW was assigned to work with Defendant IMAGE because of his personal relationship with Stallone and Eckhart. Broker Defendant IMAGE indicated to the CW, soon after he started, that Provider Defendant BofA would be included on every Municipal Derivative transaction that IMAGE handled, ensuring that Defendant Bank of America would show up in multiple deals with other Provider Defendants such as JP Morgan with whom IMAGE also had a close relationship.

295. The personal relationships that representatives of Provider Defendants had with Broker Defendants played an important role in the conspiracy.

296. At Defendant Bank of America, Doug Campbell worked with Doug Goldberg and Dani Naeh of Broker Defendant CDR, as did Phil Murphy of Defendant Bank of America. Defendant BofA's Campbell also worked closely with Johann Rosenberg of Broker Defendant

Sound Capital. Phil Murphy worked closely with Jeff Kandell and Jeff Feld of Broker Co-conspirator Feld Winters. Various personnel at Defendant Bank of America also had relationships with Ed Steinhauer and David Lail of Broker Defendant Baum.

297. These kinds of relationships between representatives of Provider Defendants and representatives of Broker Defendants ensured Provider Defendants easier access to the bid-rigging means of the conspiracy and pre-selection as winner of a particular auction in which they desired to prevail.

298. As Dani Naeh of Broker Defendant CDR put it to Dean Pinard of Provider Defendant BofA after apparently assisting Pinard prevail in a particular Municipal Derivative Auction, "It's nice to have friends."

299. It was not only the relationships between representatives of Broker Defendants and representatives of Provider Defendants that were important to the conspiracy. It is also clear that the personal relationships that existed between representatives of Provider Defendants was also very important.

300. For example, the CW described how on deals that were being brokered by a broker with whom the CW was not familiar, the CW reached out directly to Gruer of Defendant JP Morgan to discuss how aggressively each intended to bid.

301. It is evident that representatives of Provider Defendants not only had multiple opportunities to conduct conspiratorial communication directly with representatives of Broker Defendants but also with representatives of other Provider Defendants, and they used those opportunities. These opportunities included but were not limited to: direct phone calls between such representatives; social gatherings, such as the IMAGE Christmas party at Sparks discussed

84

herein; industry association meetings; and other opportunities provided by the location of most the Municipal Derivatives desks of most providers in New York.

302.     Another important factor contributing to the personal relationships that existed among representatives of the Provider Defendants and the resulting trust that this engendered among them in a conspiracy that involved *quid pro quo* allocation of transactions, was the incestuousness of hiring practices in the Municipal Derivatives industry.

303.     For example, Doug Campbell who was with Defendant BofA during the period of time during which the CW provided the most information subsequently left Defendant BofA to join Defendant Piper Jaffray.  Prior to joining Defendant Bank of America, Campbell worked at First Union, which merged with Defendant Wachovia in 2001.  Similarly, Phil Murphy left Defendant Bank of America to join Broker Defendant Winters, and was also a former employee of First Union.

304.     Indeed, such a pattern of employment is common amongst the individuals that have received target letters from the DOJ related to their investigation of the Municipal Derivatives industry.  For example, Paul Jay Saunders went from Defendant Bank of America to Defendant Wachovia; Peter Ghavami went from Defendant JP Morgan to Defendant UBS Securities; Patrick Marsh went from Defendant NatWest to Defendant Bear Stearns to Deutsche Bank; Samuel M. Gruer went from Defendant JP Morgan also to Deutsche Bank; and Schlomi Raz went from Defendant JP Morgan to Defendant Goldman Sachs**.**

305.     Steve Goldberg ("S. Goldberg"), who has pled guilty to his involvement in the conspiracy alleged herein, worked for Defendant GE Trinity for several years, and then moved to

Defendant FSA. Numerous examples are described herein where S. Goldberg, on behalf of Defendant FSA, conspired with representatives of his prior employer, Defendant GE Trinity.

306.     Inter-competitor hiring provides communication bridges between companies that would otherwise not exist.  The potential for these lines of communication to facilitate anti-competitive agreements is heightened when the employees involved are long-time, high-level executives responsible for the overall stewardship of the companies they represent.

307.     Further facilitating these collusive relationships has been the intense consolidation that has occurred in the industry, which has dramatically shrunk the number of potential providers and brokers and brought together and condensed individuals in the industry and their webs of connections to others.

308.     These relationships have been made even tighter and further opportunities for conspiratorial communications have been provided by the numerous municipal bond industry associations that exist and the numerous industry conventions that occur.

309.     One of the largest groups is the Securities Industry and Financial Markets Association (SIFMA), whose members include more than a dozen Defendant and Co-conspirator Brokers and Providers, including: UBS; J.P. Morgan; Merrill Lynch; Morgan Stanley; Piper Jaffray; Wachovia; Wells Fargo; CDC Funding; SocGen; Baum; First Southwest; and Morgan Keegan.  In fact, the two top elected officers in SIFMA for 2008 were Blyth Masters, head of global commodities for Provider Defendant J.P. Morgan and G. Douglas Edwards, president and CEO of  Broker co-conspirator Morgan Keegan.

310.     SIFMA, in fact, touts itself  "as a conduit through which the municipal bond industry communicates with regulators, legislators, the media and the public," and holds annual

conferences at resort destinations at which representatives of Defendants regularly meet and participate.

311.    Another industry association is the International Swaps and Derivatives Associations ("ISDA").  The ISDA describes itself as a representative of firms that participate in "the privately negotiated derivatives industry."  Its membership includes the following Provider and Broker Defendants and Co-Conspirators:  Bank of America N.A.; UBS; J.P. Morgan; CDC; Morgan Stanley; Wachovia; Wells Fargo; XL Capital; Genworth; SocGen; and Sound Capital. The ISDA holds Annual General Meetings which representatives of these Defendants regularly meet and participate.

312.    The American Bankers Association is yet another industry organization whose members include Provider Defendants Bank of America, JP Morgan, UBS, and Wachovia and Broker co-conspirator Morgan Keegan.

313.    In addition to these industry associations and the meetings held by them, there are also conferences arranged by third parties which representatives of Defendants commonly meet and participate.  These include municipal finance conferences regularly held by The Information Management Network ("IMN") in California, and similar conferences held by the California Debt and Investment Advisory Commission ("CDIAC").  Moreover, *The Bond Buyer*, a major publication focusing on public financing, holds an Annual California Public Finance Conference which representatives of the Defendants regularly meet and participate.

### 3. Industry-Wide Quality And Market-Wide Effect Of Conspiracy

314. In 2005, then IRS Director Mark Scott explained why the IRS was expanding its investigation into bid-rigging in the Municipal Derivative industry, by describing "tentacles of abuse" that led investigators from one rigged transaction to the next.

315. He explained the process this way: "We are going to continue following up.  To the extent that we're out looking with respect to one particular transaction and we come across evidence that points to two or three or 10 other transactions, we're going to broaden our investigation as well.  That's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse.'  It is hard to say how widespread the problem is, but there is a significant problem out there at this point."

316. Approximately two years later, the DOJ announced the existence of an industry-wide investigation and sent a first round of subpoenas out to over thirty-five brokers and providers of Municipal Derivatives and initiated FBI raids of three others.

317. It is clear now that the problem is industry-wide and the effects of the conspiracy have been felt by every issuer that entered into a Municipal Derivative transaction that occurred during the period of the conspiracy and after.

318. Defendants' conspiracy, by its nature, depended for its operation on cross-transactional conduct, what Scott referred to as "tentacles of abuse."

319. Provider Defendants agreed to allow another Provider Defendant to win a particular auction and, in fact, assisted it in winning the auction, only because they were confident that, in return, they would later be given the same opportunity in a different auction.

320.     Similarly, Provider Defendants agreed to give falsified price verifications of swaps negotiated by other Provider Defendants, because they understood that in subsequent similar situations they would be extended the same courtesy.

321.     And Broker Defendants knew that they assisted Provider Defendants in one transaction they would get compensated through others through kickbacks or referrals.

322.     Provider Defendants collectively understood that by cooperating in this way they could all make tidy profits at the expense of Riverside and other issuers, rather than "kicking each other's teeth in" through needless competition.  And Broker Defendants recognized that they could provide a valuable service to the Provider Defendants by facilitating the conspiracy for which they would be handsomely rewarded.

323.     As a result of this ever expanding web of inter-locking relationships between collusive conduct in different Municipal Derivative transactions, an ever increasing number of Municipal Derivative transactions became directly involved in the conduct.

324.      So pervasive, in fact, was the conspiratorial conduct at the dominant providers of Municipal Derivatives, such as Bank of America, UBS, Wachovia, and JP Morgan, that it became accepted practice for the conduct to occur and industry participants were surprised not when it occurred, but rather when it did not.

325.     As a result of this and other factors, the effect of Defendants' conspiracy was felt in every Municipal Derivative entered into by issuers during the period of the conspiracy and after.

**B.** **Evidence Of The Conspiracy's Operation Through Specific Municipal Derivative Transactions**

326.    Based on its independent investigation, which included, but was not limited to, discussions with Defendant Bank of America, analyses (statistical and otherwise) of bidding patterns and results of various Municipal Derivative transactions entered into by various issuers, and its analysis of information derived from the DOJ's criminal investigation, in the following Municipal Derivative transactions probative evidence of the Defendants' conspiracy has been identified.

327.    However, the following information reflects the restrictions placed by the DOJ on the amount and type of information that Defendant Bank of America has been able to reveal to Riverside, the limitations that the Court has placed on discovery by Riverside, and the strict secrecy that the DOJ has maintained as to the evidence that its ongoing investigation has revealed.  Despite that, the list presents a graphic snapshot of the pervasiveness and consistency of Defendants' conspiratorial conduct in transactions for all types of Municipal Derivatives entered into by issuers from coast-to-coast.

**1.** **Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Identified Through The DOJ's Criminal Indictments And Informations**

328.    The following grand jury indictments and criminal informations (with associated guilty pleas) have been issued so far in connection with the DOJ's criminal investigation of the conspiracy alleged herein.

329.    October 29, 2009: Grand jury indictment for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein between from at

least 1998 until at least November 2006 of: Defendant CDR; David Rubin (founder, president and CEO of Defendant CDR);Evan Andrew Zarefsky (former vice president of Defendant CDR and member of Transamerica's municipal derivatives desk); and Zevi Wolmark (former chief financial officer and managing director of Defendant CDR) ("CDR Indictment").

330.    February 23-24, 2010: Criminal information and plea agreement for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein from at least 1998 through at least November 2006 of Daniel Moshe Naeh a/k/a Dani Naeh (municipal derivatives broker for Defendant CDR from 1991 to 2004) ("Naeh Information").

331.    March 11, 2010: Criminal information and plea agreement for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein from at least early 2001 through at least November 2006 of Matthew Adam Rothman (broker at Defendant CDR) ("Rothman Information").

332.    March 15, 2010: Criminal information and plea agreement for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein from at least 1998 through at least November 2006 of Douglas Alan Goldberg (broker at Defendant CDR from May 1994 through July 2006; and employee of Deutsche Bank July 2006 through December 2009) ("D. Goldberg Information").

333.    May 19, 2010: Criminal information and plea agreement for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein from a at least as early as February 1997 through at least March 2006 of Mark Zaino (broker for Defendant CDR from February 1997 through February 2001 and municipal

derivatives desk employee of Defendant UBS from March 2001 through March 2006) ("Zaino Information").

334. <u>July 27, 2010</u>: Grand jury indictment for violations of federal criminal laws arising out of participation in the conspiracy alleged herein from a at least as early as 1999 through at least 2006 of: Dominick Carollo (business leader at Defendant GE Trinity from 1993 until November 2002; and managing director of Defendant RBC's municipal derivative business from 2003 to 2006); Steven Goldberg (liability analyst at Defendant GE Trinity from 1999 to 2001 and municipal desk employee of Defendant FSA from 2001 to at least 2007); and Peter Grimm (liability manager and vice president at Defendant GE Trinity from February 2000 until November of 2006) ("Carollo/Goldberg/Grimm Indictment").

335. <u>August 12, 2010</u>: Criminal information and plea agreement for violations of federal criminal laws arising out of participation in the conspiracy alleged herein from at least as early as October 2001 until at least November 2006 of Martin Kanefsky (owner and chief executive of broker co-conspirator Kane Capital Strategies) ("Kanefsky Information").

336. <u>September 8, 2010</u>: Criminal information and plea agreement for violations of federal criminal laws arising out of participation in the conspiracy alleged herein from at least as early as September 2001 until at least November 2006 of Adrian Scott-Jones (broker at broker co-conspirator Capital Financial Partners, Inc.) ("Scott-Jones Information").

337. <u>September 9, 2010</u>: Criminal information for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein from a at least as early as 1998 until approximately September 2005 of Douglass Lee Campbell (senior vice

president and marketer of municipal derivatives at Defendant Bank of America) ("Campbell Information").

338.    September 16, 2010:  Criminal complaint for violation of federal criminal laws arising out of participation alleged herein of Peter Ghavami (aka Peter Ghavamilahidji) ("Ghavami Complaint"). Ghavami was arrested at John F. Kennedy Airport on December 1, 2010 and the Ghavami Complaint was unsealed.

339.    November 30, 2010: Criminal information and plea agreement for violations of 15 U.S.C. §1 and other federal criminal laws arising out of participation in the conspiracy alleged herein from a at least as early as 1998 through at least November 2006 of James Hertz (member of municipal derivatives desk of JP Morgan from 1994 through approximately December 2007) ("Hertz Information").

340.    In these indictments, informations, and criminal complaint the following co-conspirators of the charged individuals and entity are identified as follows: Provider A; Marketer A; Provider B; Marketer B-1; Marketer B-2; Financial Institution B; Financial Institution A; Broker A; Company B; Broker B; Broker C; Broker D; Company A; Bank A; Financial Institution C; Broker E; Financial Institution D.

341.    A "Voluntary bill of particulars" created by the DOJ and provided by it to counsel for CDR and others ("CDR Bill of Particulars") provides the identity of Provider A, Provider B, Financial Institution A, Financial Institution B, Marketer A, Marketer B-1, and Marketer B-1. The CDR Bill of Particulars also identifies approximately two hundred municipal derivative transactions based on which the DOJ intends to prosecute those charged in the CDR Indictment.

342.     **Provider A** is described in the CDR Indictment and the Naeh Information as "a group of related financial companies located in Manhattan and owned and controlled by a company headquartered in Manhattan" represented by Marketer A.  Provider A is described in the Rothman Information, the D. Goldberg Information, the Zaino Information, the Kanefsky Information, the Scott-Jones Information as "a group of related financial companies located in New York, New York and owned and controlled by a company headquartered in New York, New York."  Sources cited in a November 18, 2009 Bloomberg article believe that Defendant FSA conspired with CDR to rig auctions on municipal derivatives transactions. The November 18, 2009 article also links FSA's involvement with two CDR-run auctions identified in the indictment.  Provider A is the group of defendants collectively referred to herein as **Defendant FSA**.

343.     **Marketer A** is described in the CDR indictment, Naeh Information, Rothman Information, D. Goldberg Information, Zaino Information as a representative of Provider A. Marketer A is further described in the Naeh Information, Rothman Information, D. Goldberg Information as having "worked at Provider A from approximately August 2001 until at least November 2006."   The Kanefsky Information, Scott-Jones Information state that Marketer A worked for Provider A "from 2001 until at least 2006." Marketer A is  **Steven Goldberg.**

344.     **Provider B** is described in the CDR indictment as "a group of separate financial services entities that were controlled or were part of a company headquartered in Connecticut," represented by "Marketer B-1" and Marketer B-2." The Kanefsky Information, Scott-Jones Information describe Provider B as "a group of separate financial service entities that were owned or controlled by a company in Fairfield, Connecticut."  The Carollo/Goldberg/Grimm

Indictment describes Provider B as "a group of separate financial services companies located in New York, New York [that] was owned or controlled by a company headquartered in Fairfield, Connecticut." The Carollo/Goldberg/Grimm indictment further states that Provider B "sold investment agreements and other municipal finance contracts through its business leaders including Dominick P. Carollo, Steven E. Goldberg and Peter S. Grimm." The Indictment states that Carollo "worked at provider B from approximately 1993 until at least November 2002." Carollo's Finra Report reports that Carollo worked from FGIC from August 1993 through June 2003. The Indictment states that Steven Goldberg "was employed by Provider B from approximately August 1999 until at least May 2001, during which time Goldberg was a "Liability Manager . . . and reported to . . . Carollo." The Indictment states that Peter Grimm was "employed by Provider B from approximately February 2000 until at least November 2006" where Grimm was a "a Liability Manager and Vice President . . . [and], for a period of time, reported to Carrolo." Grimm's Finra Report reports that Grimm worked for GE Capital Corporation from May 1995 through January 2003, Genworth Financial Services Corporation (at the time majority owned by GE Capital Corporation) from January 2003 through January 2007 and GE Capital Corporation again from January 2007 through July 2007. A November 2, 2009 Bond Buyer article and a November 18, 2009 Bloomberg article both cite unidentified sources who say that Provider B is Defendant GE Trinity. Provider B is the entities collectively referred to herein as **Defendant GE Trinity**.

345. **Marketer B-1** is described in the CDR Indictment, Kanefsky Information, Scott-Jones Information as a "representative[] of Provider B from 1999 to 2001." Marketer B-1 is **Steven Goldberg.**

346. **Marketer B-2** is described in the CDR Indictment, Kanefsky Information, Scott-Jones Information as a "representative[] for Provider B . . . from 2000 until at least 2006." Marketer B-1 is **Peter Grimm**.

347. **Financial Institution A** is described in the CDR Indictment, Naeh Information, Rothman Information, Carollo/Goldberg/Grimm Indictment, Hertz Information, the Ghavami Complaint as "a financial institution that was a branch or agency of a foreign bank." The Ghavami Complaint further states that "Financial Institution A was a corporation organized under the laws of Switzerland with its principal place of business in Zurich Switzerland." The Zaino Information describes Financial Institution A as "a financial institution that was an organization operating under Section 26 of 25(a) of the Federal Reserve Act, and a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20." The Zaino Information further states that Financial Institution A "directly or through its subsidiaries" acted as both a provider and broker of municipal derivatives. Information further states that Zaino worked for a "wholly owned subsidiary of Financial Institution A . . . from approximately March 2001 until late 2006, first as a Senior Analyst, then as an Associate Vice President and Assistant Vice President, and finally as a Directors . . . on the municipal bond and derivatives desk." Zaino's FINRA indicates Zaino being employed by Defendant CDR from February 1997 through February 2001, Defendant Paine Webber since March 2001 through January 2006, and Defendant UBS Securities since January 2006 through December 2006. Financial Institution A is the entities collectively referred to herein as **Defendant UBS**.

348. **Cooperating Witness 1** is described in the Ghavami Complaint as having worked on Financial Institution A's municipal bond reinvestment and derivatives desk "from 2001 to

December 2006," where he "reported directly to" Ghavami. Cooperating Witness 1 is **Mark Zaino**.

349.    **Cooperating Witness 3** is described in the Ghavami Complaint as having worked for Defendant CDR "from May 1994 to 2006." Cooperating Witness 3 is **Douglas Goldberg**.

350.    **Financial Institution B** is described in the CDR Indictment as "a financial institution that was a branch or agency of a foreign bank." The Carollo/Goldberg/Grimm Indictment describes Financial Institution B as "a financial institution headquartered in Canada." The Indictment further states that "[f]rom as early as July 2003 until at least November 2006, Dominick P. Carollo was a Managing Director at Financial Institution B . . . Carollo worked at Financial Institution B's offices in New York, New York and was responsible for Financial Institution B's business involving the sale of investment agreements and other finance contracts, and of financial transactions known as swaps to other providers of investment agreements and other municipal finance contracts."   Carollo's Finra Report reports that Carollo employed by RBC Capital Markets Corp. and the Royal Bank of Canada from July 2003 through August of 2007. Financial Institution B is **Defendant RBC**.

351.    **Broker A** is described in the Carollo/Goldberg/Grimm Indictment as a broker "located in Pottstown, Pennsylvania . . . [that] marketed financial products and services, including services as a broker and advisor to various municipal issuers throughout the United States." Broker A, as used in the Carollo/Goldberg/Grimm Indictment is  **Defendant Image**.

352.    **Broker B**/**Broker A** is described in the Carollo/Goldberg/Grimm Indictment as "the North American division of foreign financial services company that had offices in New York, New York , and marketed financial products and services, including services as a broker

and advisor to various municipal issuers throughout the United States."   The Indictment continues "Company B, a company incorporated in Florida, and its agents . . ., marketed financial products and services, including serving as Broker B's bidding agent, to various municipal issuers throughout the United States." The Scott-Jones Information describes Broker A as "the North American division of foreign financial services company that had offices in New York, New York , and marketed financial products and services, including services as a broker and advisor to various municipal issuers throughout the United States."   The Scott-Jones further states that "Company A, a  company located in North Palm Beach and Ocala Florida . . . [that] marketed financial products and services, including Broker A's services as a broker or advisor, to various municipal issuers throughout the United States."   In the Carollo/Goldberg/Grimm Indictment Broker B and its agent, Company B, are collectively referred to as Broker B.   Broker B, as used in the Carollo/Goldberg/Grimm Indictment, and Broker A as used in the Scott-Jones Information are **Defendant CDC Funding**.

353.     **Broker C/Broker A** is described in the Carollo/Goldberg/Grimm Indictment as a broker "located in Great Neck, New York and marketed its services as broker to various municipal issuers throughout the United States." The Kanefsky Information describes Broker A, as "a company located in Great Neck, New York that marketed financial products and services, including services as broker or advisor to various municipal issuers throughout the United States." The Information further states that Kanefsky "was the owner and chief executive of Broker A."  Broker C, as used in the Carollo/Goldberg/Grimm Indictment and Broker A, as used in the Kanefsky Information, is co-conspirator Kane Capital. is co-conspirator **Kane Capital**.

354.    **Broker D** is described in the Carollo/Goldberg/Grimm Indictment as "a financial products and services subsidiary of Financial Institution A located in New York, New York . . . [that] marketed financial products and services, including services as a broker and advisor to various municipal issuers throughout the United States. Broker D is **Defendant PaineWebber**.

355.    **Company A/Company B** is described in the Scott-Jones Information as "a company located in North Palm Beach and Ocala Florida . . . [that] marketed financial products and services, including Broker A's services as a broker or advisor, to various municipal issuers throughout the United States." The Carollo/Goldberg/Grimm Indictment states that "Company B, a company incorporated in Florida, and its agents . . ., marketed financial products and services, including serving as Broker B's bidding agent, to various municipal issuers throughout the United States." A search of the website of the Florida Department of State reveals that Capital Financial Partners, Inc. is located in Oscala, FL and Adrian Scott-Jones is listed as the Title D director of the firm.    Company A as used in the Scott-Jones Information and Company B as used in the the Carollo/Goldberg/Grimm Indictment are co-conspirator **Capital Financial Partners, Inc**.

356.    **Bank A** is described in the Campbell Information as a "national bank . . . [that] was headquartered in Charlotte, North Carolina and marketed financial products and services including services as a provider of investment agreements and other municipal finance contracts to various municipalities located throughout the United States." The Information further states that Doug Campbell, "[f]rom approximately June 1998 through approximately June 2002 . . . worked in Bank A's municipal derivatives group, as a Senior Vice President and marketer of

investment agreements and other finance contracts."    Bank A, as used in the Campbell Indictment, and Financial Institution D  is **Defendant Bank of America**.

357.    **Financial Institution C** is described in the Hertz Information as "a financial holding company headquartered in New York . . . [that] was a member of the Federal Reserve system . . . [and] [d]irectly or through its subsidiaries, Financial Institution C marketed financial products and services to various municipalities throughout the United States, including investment agreements and other municipal finance contracts . . . [and] provided underwriting and investment services to various municipalities through the United States."    The Information further states that James "Hertz worked in the municipal derivatives group of Financial Institution C's wholly owned subsidiary or its predecessors, as a vice president and a marketer of investment agreements and other municipal finances contracts."    Hertz's Finra Report indicates that Hertz worked from Chase Securities, Inc. from 1994 through 1997 and for J.P. Morgan Securities Inc. from 1998 until December 2007. Financial Institution C is **Defendant JPMorgan**.

358.    **Broker E** is described a broker that "was located in Minnesota and marketed its services as a broker to various municipal issuers throughout the United States." Broker E is **Defendant Sound Capital**.

a.    **West Virginia Water Development Authority October 2003 Reinvestment Derivatives**

359.    The CDR and Carollo/Goldberg/Grimm Indictments describes the manipulation of the bidding, on October 23, 2003 for a series of three investment agreement transactions entered into by an unidentified state water development authority, involving Provider A (i.e. Defendant FSA) represented by Marketer A (i.e. Steven Goldberg ("S. Goldberg")), CDR represented by

Wolmark, Financial Institution A (i.e. Defendant UBS), and Financial Institution B (i.e. Defendant RBC). The desired for and achieved results of manipulation was for Defendant FSA to win the bidding for the investment agreements and Defendant FSA to kick-back a certain amount of the illegal profit it earned thereby to CDR via a related swap transaction to which Defendant FSA and Defendant RBC were parties.

360. The CDR Bill of Particulars identifies only the following transaction on October 23, 2003, a transaction by the West Virginia Water Development Authority ("WVWDA") on behalf of the West Virginia Infrastructure and Jobs Development Council and the State of WV that was associated with certain Infrastructure Revenue Bonds, 2000 Series A.

361. A November 18, 2009 *Bloomberg* article reports that Defendant CDR and Defendant FSA were both involved in a transaction with the West Virginia Water Development Authority on October 23, 2003.

362. The following description is drawn from the CDR and Carollo/Goldberg/Grimm Indictments with alias' replaced with the actual names of the particular entities and individuals.

363. On October 23, 2003, approximately 90 minutes before bids on the investment agreements were due, Wolmark of CDR and S. Goldberg discussed a scheme whereby Defendant FSA would pay CDR kickbacks in the form of "hedge fees" tied to on or more swaps with either Defendant UBS or Defendant RBC related to the investment agreements. In exchange for CDR would assist UBS in winning the auctions for the agreements.

364. In a telephone conversation, approximately two hours later and 30 minutes ***after*** the bids were due, Zarefsky of CDR gave S. Goldberg of FSA a "last look" on the bids submitted by other providers and suggested that FSA change the prices that FSA was otherwise prepared to

submit the investment agreements, including lowering the interest rate offered for one of the agreements to a specific number identified by Zarefsky. S. Goldberg of FSA agreed and submitted bids at the amounts or levels suggested by Zarefsky.

365.     On October 23, 2003, after FSA was awarded WVWDA's three investment agreements, S. Goldberg made arrangements for FSA to pay CDR a kickback in the form of a hedge fee connected to a swap between FSA and RBC that was related to one of the manipulated WVWDA investment agreements.

366.     On October 27, 2003, CDR sent an invoice to RBC for a $4,500 hedge fee in connection with the swap.

367.     On October 31, 2003, CDR executed a broker's certificate that, falsely stated: "All bidders had an equal opportunity to bid.  No 'last look' by any bidder was permitted."

368.     That same day, FSA entered into three investment agreements with WVWDA.

369.     On November 3, 2003, CDR received via wire transfer a kickback relating to one of the investment agreements in the form of a $4,500 hedge fee from RBC in connection with the swap between FSA and RBC.

370.     On November 10, 2003, CDR sent another invoice to RBC for a second $4,500 hedge fee in connection with the swap.

371.     Beginning in late November 2003, and continuing until January 3, 2005, FSA made monthly interest payments to the state water development authority that were artificially depressed.

372.    On August 12, 2005, CDR received via wire transfer a kickback relating to one of the investment agreements with the state water development authority in the form of a second $4,500 hedge fee in connection with the swap between FSA and RBC.

### b.    The Board Of Port Commissioners Of The City Of Oakland September 2002 Municipal Derivative Transaction

373.    The CDR and Carollo/Goldberg/Grimm Indictments describe the manipulation of the bidding, on September 26, 2002, for an investment agreement entered into by a municipal port authority, involving Provider A (i.e. Defendant FSA) represented by Marketer A (i.e. Steven Goldberg ("S. Goldberg"), Financial Institution A (i.e. Defendant UBS), and CDR.

374.    The CDR Bill of Particulars identifies only the following transaction on September 26, 2002, a transaction by the Board of Port Commissioners of the City of Oakland ("Oakland Port") that was associated with certain Refunding Revenue Bonds Series N (ATM).

375.    A November 18, 2009 *Bloomberg* article shows that Defendant CDR and Defendant FSA were both involved in a transaction with the Oakland Port on October September 26, 2002, the same date the CDR indictment alleges that the port facility entered the manipulated transaction.

376.    The following description is drawn from the CDR and Carollo/Goldberg/Grimm Indictments with alias' replaced with the actual names of the particular entities and individuals.

377.    On September 26, 2002, approximately an hour before bids were due, S. Goldberg spoke with Wolmark of CDR about arrangements for Defendant FSA to pay CDR kickbacks.  S. Goldberg and CDR discussed arraignments for Defendant FSA to pay CDR kickbacks in the form of hedge fees and to enter into one or more swaps with Defendant UBS.

378.     On September 26, 2002, about the time the bids were due, S. Goldberg obtained information from Wolmark of CDR about the bids submitted by three other providers and they agreed on the rate Defendant FSA would bid and the amount of the kickback CDR would receive in the form of a hedge fee. Based on the information he received from CDR, S. Goldberg submitted an anti-competitive bid and Defendant FSA was awarded the contract at an artificially determined and suppressed rate.  S. Goldberg also agreed on the amount of the kickback CDR would receive.

379.     On September 26, 2002, about an hour before bids on the investment agreement were due, Wolmark of CDR discussed with S. Goldberg, how FSA could pay kickbacks to CDR in the form of hedge fees related to one or more swaps entered into between FSA and UBS.

380.     Approximately an hour later, Wolmark of CDR gave S. Goldberg of FSA information about the bids submitted by three providers and reached an agreement regarding how much FSA should bid and how much FSA should pay CDR as a kickback in the form of a hedge fee.

381.     On September 26, 2002, after FSA had been awarded the investment agreement, S. Goldberg made arrangements to pay CDR a kickback in the form of a hedge fee in connection with a swap between Defendant FSA and a Defendant UBS relating to the investment agreement.

382.     On September 30, 2002, CDR received via wire transfer a kickback in the form of a $25,000 hedge fee in connection with the swap between Defendant FSA and Defendant UBS.

383.     On October 15, 2002, CDR executed a broker's certificate that falsely stated: "All providers were afforded an equal opportunity to bid (*e.g.*, no provider was given a 'last look')."

384.     On October 15, 2002, Defendant FSA  entered into an investment agreement with the Oakland Port at a rate determined through the sham bidding process conducted by CDR.

385.     Beginning in May 2003, and continuing until at least October 2006, Defendant FSA made semiannual interest payments to the Oakland Port at a rate that was artificially determined.

c.     **Maine State Housing Authority May 2004 Municipal Derivative Transactions**

386.     The CDR and the Carollo/Goldberg/Grimm Indictments describe the manipulation of the bidding, on or around May 19, 2004 for an investment agreement entered into by an unknown state housing agency involving CDR and other co-conspirators including Marketer B-2 (i.e. Peter Grimm) and others to assist Provider B (i.e. Defendant GE Trinity) to win a May 2004 Municipal Derivative contract involving a state housing agency at an artificially depressed rate.

387.     The CDR Bill of Particulars identifies three transactions on May 20, 2004, by the Texas Department of Housing and Community Affairs ("TDHCA") that were associated with certain Variable Rate Demand Multifamily Housing Revenue Bonds (Pinnacle Apartments) Series 2004, Variable Rate Demand Multifamily Housing Revenue Bonds (Bristol Apartments) Series 2004, Variable Rate Demand Multifamily Housing Revenue Bonds (Montgomery Pines Apartments) Series 2004.

388.     The CDR Bill of Particulars identifies a single transaction on May 20, 2004, by the Maine State Housing Authority ("MHA") that was associated with certain Cumulative Aggregate Amound of General Housing Draw Down Bonds Series 2004-A (Non-AMT) and Series 2004B (AMT).

389.    The CDR and Carollo/Goldberg/Grimm Indictments refer to a single contract.

390.    The following description is drawn from the CDR and Carollo/Goldberg/Grimm Indictments with alias' replaced with the actual names of the particular entities and individuals.

391.    On May 19, 2004, Rubin of CDR suggested to Grimm, who worked from Defendant GE Trinity's New York office and was a representative of Defendant GE Trinity from 2000 until at least 2006, that he lower the rate Defendant GE Trinity was preparing to quote because the MHA would have to give any money it earned at the higher rate to the IRS on this Municipal Derivative transaction.

392.    On May 20, 2004, the day of the auction, Grimm contacted CDR to confirm that the bid rate Rubin of CDR suggested would be a winning bid, and then submitted a bid in accordance with Rubin's suggestion.

393.    On May 20, 2004, Rubin caused CDR to receive a bid from GE Trinity reflecting a rate in accordance with his suggestion and a certification, that among other things, falsely stated: "CDR Financial Products, Inc. has not provided us any information which induced us to bid a yield lower than the yield induced by the Request for Investment Agreement."

394.    Beginning in July 2004, and continuing until November 2005, Defendant GE Trinity made monthly interest payments to the MHA at an artificially suppressed rate.

d.    **Missouri Health And Educational Facilities Authority September 2002 Municipal Derivative Transaction**

395.    The Naeh and Zaino Information describes the manipulation of the bidding, on August 16, 2002, for an investment agreement transaction entered into by an unidentified state health and educational facilities authority, involving Naeh, Zaino, Marketer A (i.e. Steven

Goldberg "S. Goldberg"), Provider A (i.e. Defendant FSA), Financial Institution A (i.e. Defendant UBS.

396.     The CDR Bill of Particulars identifies only the following two transactions on August 16, 2002, a transaction by Missouri Health and Educational Facilities("MOHEFA") that was associated with certain Missouri Health and Educational Facilities Authority of the State of Missouri, School District Direct Deposit Agreement (Pool 11), and the Allegheny County Airport Authority that was associated with Series 2002 AMT Airport Revenue Refunding Bonds.

397.     The following description is drawn form the Naeh and Zaino Information with alias' replaced with the actual names of the particular entities and individuals.

398.     On August 12, 2002, during a telephone conversation, Naeh and Zaino spoke with S. Goldberg about the upcoming bid for the investment agreement and a swap between Defendant FSA and Defendant UBS, including the amount Defendant FSA would bid for the investment agreement, the rate on the swap, and the amount of the kickback to be paid to CDR in the form of a hedge fee.

399.     On August 16, 2002, during a telephone conversation Naeh, his supervisor, and Zaino discussed and agreed with S. Goldberg the number to bid for Defendant FSA to win the investment agreement, the rate on the swap between Defendant UBS and Defendant FSA, and the amount of the kickback to be paid to CDR in the form of a hedge fee.

400.     On August 16, 2002, after Defendant FSA was awarded the investment agreement, S. Goldberg made arrangements for Defendant FSA to pay CDR a kickback in the form of a purported hedge fee in connection with a swap relating to the investment agreement.

401.     On August 20, 2002, Zaino caused Naeh's employer, CDR, received a kickback from Defendant FSA, in the form of a purported hedge fee in connection with the swap between Defendant FSA and a financial institution related to this investment agreement.

402.     Starting in December 2002 to at least November 2006, Defendant FSA made semi-annual interest payments to MOHEFA on the investment agreement at a rate that was artificially suppressed.

**e.     State of West Virginia Higher Education Policy Commission September 2004 Municipal Derivative Transaction**

403.     The Rothman Information describes the manipulation of the bidding, on September 8, 2004, for an investment agreement transaction entered into by an unidentified higher education policy commission located in a state whose authorities and subdivisions had been previously allocated to Provider A (i.e. Defendant FSA) by the CDR with Rothman's knowledge and assistance.  In addition to Defendant FSA, CDR and Rothman, Marketer A (i.e. S. Goldberg) was also involved in the manipulation of bidding in this transaction.

404.     The CDR Bill of Particulars identifies only the following transaction on September 8, 2004, a transaction by the State of West Virginia Higher Education Policy Commission that was associated with certain Revenue Bonds (Higher Education Facilities) 2004 B.

405.     The following description is drawn from the Rothman Information with alias' replaced with the actual names of the particular entities and individuals.

406.     On September 7, 2004, during a telephone conversation, Rothman solicited S. Goldberg to bid on an investment agreement the following day.

407. On September 8, 2004, the day of the bid, during a telephone conversation, Rothman gave S. Goldberg information about the bid submitted by another provider for S. Goldberg to use in determining Defendant FSA's winning bid.

408. Beginning on approximately April 1, 2005 and continuing until at least November 2006, Defendant FSA made semi-annual interest payments on the investment agreement at a rate that was artificially determined.

**f.    State of West Virginia School Building Authority June 2004 Municipal Derivative Transaction**

409. The Rothman Information describes the manipulation of the bidding, on June 22, 2004, for an investment agreement transaction entered into by a unidentified school building authority located in a state whose authorities and subdivisions had been previously allocated to Provider A (i.e. Defendant FSA) by the CDR with Rothman's knowledge and assistance. Involved in  the bid rigging of the transaction was Rothman, Marketer A (i.e. S. Goldberg), and Financial Institution A (i.e. Defendant UBS), and Provider A (i.e. Defendant FSA).

410. The CDR Bill of Particulars identifies only the following transaction on June 22, 2004, a transaction by the State of West Virginia School Building Authority that was associated with the West Virginia School Building Authority, Lottery Capital Improvement Revenue Bonds, Series 2004.

411. The following description is drawn from the Rothman Information with alias' replaced with the actual names of the particular entities and individuals.

412. On June 21, 2004 during a telephone conversation, Rothman solicited S. Goldberg on an investment agreement the following day.

413.     On June 22, 2004 during a telephone conversation, Rothman's supervisor gave S. Goldberg information about the bid submitted by another provider for S. Goldberg to use in determining Defendant FSA's bid.  S. Goldberg used this information to determine Defendant FSA's winning bid.

414.     On June 29, 2004, after Defendant FSA had been awarded the investment agreement, during a telephone conversation, Rothman discussed making arrangements with S. Goldberg for Defendant FSA to pay CDR a kickback in the form of a purported hedge fee in connection with a swap between Defendant FSA and Defendant UBS.

415.     Beginning on approximately January 1, 2005 and continuing until at least November 2006, Defendant FSA made semi-annual interest payments on the investment agreement at a rate that was artificially suppressed.

### g.     Tampa Port Authority July 2002 Municipal Derivative Transaction

416.      The D. Goldberg Information describes the manipulation of the bidding, on July 2, 2002, for an investment agreement transaction entered into by an unidentified port authority, involving Douglass Goldberg ("D. Goldberg"), Marketer A (i.e. S. Goldberg), Provider A (i.e. Defendant FSA).

417.     The CDR Bill of Particulars identifies only the following transaction on July 2, 2002, a transaction by the Tampa Port Authority (Hillsborough County Port District) ("TPA") that was associated with Series 2002 A & B Tampa Port Authority Project.

418.     The following description is drawn from the D. Goldberg Information with alias' replaced with the actual names of the particular entities and individuals.

419. On July 2, 2002 during a telephone conversation, D. Goldberg gave S. Goldberg information about the bid submitted by another provider. S. Goldberg used this information to determine the winning bid on the investment agreement. D. Goldberg then suggested that S. Goldberg lower the interest rate he was otherwise prepared to bid and still enable Defendant FSA to win the investment agreement. S. Goldberg agreed and submitted the lower bid suggested by D. Goldberg.

420. Beginning on approximately August 1, 2002, Defendant FSA made monthly interest payments to TPA at a rate that was artificially determined and suppressed.

### h. McAlester Public Works Authority June 2002 Municipal Derivative Transaction

421. The Zaino Information describes the manipulation of the bidding, on June 27, 2002, for a series of two investment agreement transaction entered into by an unidentified municipal public works authority, involving Zaino, Marketer A (i.e. S. Goldberg), Financial Institution A (i.e. Defendant UBS), and Provider A (i.e. Defendant FSA). The bids for the first investment agreements were due on June 27, 2002 and the second due on June 28, 2002, for which the bids were in the form of an up-front payment.

422. The CDR Bill of Particulars identifies only the following transactions on June 27, 2002 and June 28, 2002, transactions by the McAlester Public Works Authority (Oklahoma) ("MPAOK") associated with the MPAOK Utility System Revenue Bonds, Series 2002, and a transaction by MPAOK associated with the Utility System Revenue Bonds, Series 2002, respectively.

423. The following description is drawn from the Zaino Information with alias'
replaced with the actual names of the particular entities and individuals.

424. On June 27, 2002, on the day the first bids for the first investment agreement were
due but prior to the bids being submitted, during a telephone conversation S. Goldberg spoke to
Zaino and asked whether Zaino had received information about an investment agreement being
brokered by CDR. S. Goldberg and Zaino then discussed the terms of a swap between Defendant
UBS and Defendant FSA that would be executed after Defendant FSA was awarded the first
investment agreement. S. Goldberg told Zaino that a co-conspirator at CDR would call him
when CDR needed "*__something__*" from Zaino.

425. On June 27, 2002, on the day the bids for the first agreement were due but prior to
the bids being submitted, during a telephone conversation, co-conspirators at CDR and S.
Goldberg discussed the price S. Goldberg intended to bid for the first investment agreement. S.
Goldberg said what price he would bid and then he and the co-conspirators and CDR discussed a
swap transaction that Defendant FSA and Defendant UBS would execute after Defendant FSA
was awarded the investment agreement. S. Goldberg and representatives of CDR then discussed
and agreed on the amount of a kickback CDR would receive in the form of a hedge fee, and
confirmed that S. Goldberg was arranging a swap transaction with Zaino.

426. On June 27, 2002, during a telephone conversation prior to the bids for the first
investment agreement being submitted, S. Goldberg and Zaino discussed the terms of the swap
transaction that Defendant FSA and Defendant UBS would execute after Defendant FSA was
awarded that investment agreement.

427.     On June 27, 2002, during a telephone conversation prior to the bids for the first investment agreement being submitted, Zaino and S. Goldberg finalized the terms of the swap between Defendant FSA and Defendant UBS.  Zaino confirmed with S. Goldberg that he needed "***to bake in something***" for CDR.

428.     On June 27, 2002, during a telephone conversation, S. Goldberg left a co-conspirator at CDR a voice mail message informing the co-conspirator that S. Goldberg had finalized with Zaino the terms of the swap between Defendant FSA and Defendant UBS and that Defendant FSA had arranged to pay CDR a kickback in the form of a hedge fee.

429.     On June 27, 2002, via wire transfer, Zaino caused Defendant UBS to pay CDR a kickback in the form of a hedge fee on behalf of Defendant FSA.

430.     On June 28, 2002, during a telephone conversation that occurred approximately 45 minutes before the final bids were due for the second investment agreement, a co-conspirator from CDR asked S. Goldberg for an "***indication***" regarding the amount Defendant FSA would bid for that agreement.

431.     On June 28, 2002, during a telephone conversation that occurred approximately two minutes before the final bids were due for the second investment agreement, a co-conspirator at CDR and S. Goldberg discussed and agreed what amount Defendant FSA would bid, and also discussed and agreed on an additional kickback that Defendant FSA would pay CDR in the form of a hedge fee.

432.     On June 28, 2002, via facsimile transmission, Zaino submitted to CDR an intentionally losing bid on behalf of Defendant UBS for the second investment agreement.  The

bid form included false representations that the bid complied with applicable Treasury regulations and that Zaino did not consult with CDR or any other bidders about the bid.

433. On June 28, 2002, via wire transfer, Zaino caused Defendant UBS to pay CDR a kickback in the from of a hedge fee on behalf of Defendant FSA.

### i. Two March 2002 State University Municipal Derivative Transactions

434. The Carollo/Goldberg/Grimm Indictment describes the manipulation of the bidding, on March 21, 2002 for investment agreement transactions entered into by an unidentified state university, involving Grimm, S.Goldberg, Provider B (i.e. Defendant GE Trinity) and Broker A (i.e. Defendant IMAGE) who conspired to manipulate two Municipal Derivative Transactions entered into by a state university in 2002.

435. The following description is drawn from the Carollo/Goldberg/ Grimm Indictment with alias' replaced with the actual names of the particular entities and individuals.

436. On March 18, 2002, the day of the bids were due for these transactions, Grimm, of GE Trinity, and a representative of Defendant IMAGE had a conversation during which time, Defendant IMAGE requested and Grimm agreed to "***back off***" his bids on the investment agreement so that S. Goldberg, then employed at Provider A (i.e. Defendant FSA) could win the transaction. In return, Defendant IMAGE promised Grimm that Defendant IMAGE would "***find you another one soon ... where I will ask him not to sharpen his pencil quite so-***."

437. Defendant IMAGE also told Grimm that he "***was hoping we could work something out here***" and that Defendant IMAGE could "***work something with you on something else coming up.***" Defendant IMAGE explained that they would "rather have each of

you make some money alternatively." Grimm agreed, saying "***ok, I mean, if you are asking me to back off, I don't mind***." Defendant IMAGE then provided Grimm with specific rates to bid to give Defendant FSA "***a little breathing room***." Grimm then reduced the rates he was prepared to bid on behalf of GE Trinity so that Defendant FSA would win the transaction.

438.    On March 18, 2002, during a telephone call between Grimm, of GE Trinity, and S. Goldberg, of FSA, Grimm told S. Goldberg that S. Goldberg "***owed him lunch***" because Defendant IMAGE "***asked me to back off my number ... so that you can win both***" transactions.

### j.    A January 2002 State Housing And Finance Association Municipal Derivative Transaction

439.    The Carollo/Goldberg/Grimm Indictment describes the manipulation of the bidding, on January 10, 2002 for an investment agreement transaction entered into by an unidentified state housing and finance association involving Grimm, while acting as an agent for Provider B (i.e. Defendant GE Trinity), conspired with Broker A (i.e. Defendant IMAGE) to suppress the terms of Municipal Derivative Transaction entered into by a state housing and finance association.

440.    The CDR Bill of Particulars identifies only the following transaction on January 10, 2002, a transaction by the Hospitals and Higher Education Facilities Authority of Philadelphia ("HEFA") that was associated with certain Hospital Revenue Bonds (Magee Rehabilitation Hospital Project) Series 2001.

441.    The following description is drawn from the Carollo/Goldberg/ Grimm Indictment with alias' replaced with the actual names of the particular entities and individuals.

442. On January 10, 2002, the day the bids were due, Defendant IMAGE suggested to Grimm that he could lower the rate Grimm was preparing to bid on behalf of Defendant GE Trinity and still win the contract.

443. After his conversation with Defendant IMAGE, Grimm submitted a bid to HEFA at a suppressed rate in accordance with Defendant IMAGE's suggestion and Defendant GE Trinity was awarded the contract.

444. As a result of Grimm and Defendant IMAGE's conduct, Defendant GE Trinity has made scheduled interest payments via interstate wire transmissions to the HEFA at artificially determined and suppressed rates.

**k.** **California Health Facilities Financing Authority November 2000 Municipal Derivative Transaction**

445. The Carollo/Goldberg/Grimm Indictment and the Scott-Jones Information describes the manipulation of the bidding, on November 1, 2000, for an investment agreement transaction entered into by a unidentified state environmental improvement and energy authority involving S. Goldberg of Defendant GE Trinity and Broker B as used in the Carollo/Goldberg/Grimm Indictment and Broker as used in the Scott-Jones Information (i.e. collectively Defendant CDC Funding and co-conspirator Capital Financial Partners, Inc.).

446. The CDR Bill of Particulars identifies only the following transaction on November 1, 2000, a transaction by the California Health Facilities Financing Authority (Lodi Memorial Hospital) ("CHFFA") that was associated with certain Insured Hospital Refunding Revenue Bonds (Lodi Memorial Hospital) 2000 Series A.

447.    The following description is drawn from the Carollo/Goldberg/Grimm Indictment and Scott-Jones Information with alias' replaced with the actual names of the particular entities and individuals.

448.    On or about November 1, 2000, during a telephone call on the day bids were due, Defendant IMAGE told S. Goldberg that he would provide S. Goldberg information about bids submitted by other providers to enable S. Goldberg to submit a winning bid on behalf of Defendant GE Trinity.  Scott-Jones employed by Capital Financial Partners, Inc. but acting as an agent for Defendant CDC Funding, also suggested that S. Goldberg reduce the rates he initially was prepared to bid on two of the three funds being bid.  S. Goldberg agreed to submit a bid at the rates suggested by Defendant CDC Funding and Defendant GE Trinity was awarded the investment agreement.

449.    As a result of S. Goldberg and Defendant CDC Funding's conduct, the CHFFA entered into a Municipal Derivative transaction with Defendant GE Trinity paying artificially determined and suppressed rates.

**l.    A November 2001 State Housing Finance Agency Municipal Derivative Transaction**

450.    The Carollo/Goldberg/Grimm Indictment describes the manipulation of the bidding, on November 20, 2001, for an investment agreement transaction entered into by an unidentified state housing finance agency involving Grimm and co-conspirators, including Provider A (i.e. Defendant FSA) Provider B (i.e. Defendant GE Trinity) and Broker C (i.e. Kane Capital).

451.    The following description is drawn from the Carollo/Goldberg/Grimm Indictment with alias' replaced with the actual names of the particular entities and individuals.

452.    On November 20, 2001, during a telephone call between Grimm, at GE Trinity, and S. Goldberg, at Defendant FSA, Grimm stated that he had heard from Kane Capital that S. Goldberg wanted to "***call in***" a favor that Grimm owed S. Goldberg in connection with a prior bid. Grimm asked S. Goldberg if he was "***calling in his favor***" and offered to "***back off***" the bid rate Grimm was prepared to submit on behalf of Defendant GE Trinity.  S. Goldberg told Grimm he would "let him know" on the day bids were due.

453.    On or about November 26, 2001, the date bids were due, during a telephone call between Grimm and S Goldberg, Grimm again offered to "***back off***," the agreement and S. Goldberg accepted the offer.  Grimm replied that he would "***take it easy today***" on his bid.  In addition, Grimm provided S. Goldberg with Defendant GE Trinity's **exact bid rate** and other information concerning the bid.  Goldberg used this information to determine Defendant FSA's bid.  As a result, Defendant FSA was awarded this Municipal Derivative at an artificially determined and suppressed rate.

m.    **A February 2002 State Housing Finance Agency Municipal Derivative Transaction**

454.    The Carollo/Goldberg/Grimm Indictment and Kanefsky Information  describes the manipulation of the bidding, on February 21, 2002, for an investment agreement transaction entered into by an unidentified state housing finance agency, involving  Grimm and co-conspirators Broker C/Broker A (i.e. Kane Capital), and Provider B (i.e. Defendant GE Trinity).

455.     The following description is drawn from the Carollo/Goldberg/ Grimm Indictment and Kanefsky Information with alias' replaced with the actual names of the particular entities and individuals.

456.     On February 21, 2002, during a telephone call prior to the time bids were due, Kane Capital told Grimm that he could lower the rates Defendant GE Trinity was prepared to bid and still win the contract.

457.     Based on Kane Capital's suggestion, on or about February 21, 2002, Grimm submitted Defendant GE Trinity's bid at an artificially determined and suppressed rate and GE Trinity was awarded the contract.

   **n.     A December 2002 State Education Assistance Foundation Municipal Derivative Transaction**

458.     The Carollo/Goldberg/Grimm Indictment describes the manipulation of the bidding, on December 5, 2002 for an investment agreement transaction entered into by state educational assistance foundation, involving Grimm and other co-conspirators including Broker D (i.e. Defendant PaineWebber) and Provider B (i.e. Defendant GE Trinity).

459.     The following description is drawn from the  Carollo/Goldberg/ Grimm Indictment with alias' replaced with the actual names of particular entities and individuals.

460.     On December 5, 2002, during a telephone call between Grimm and Defendant Paine Webber, Paine Webber told Grimm that he could lower Defendant GE Trinity's rates and still be awarded the contract.

461.    On December 5, 2002, Grimm submitted Defendant GE Trinity's bid in accordance with Defendant Paine Webber's suggestion and Defendant GE Trinity was awarded the contract at an artificially determined and suppressed rate.

**o.    A 2004 State Education Facilities Authority Municipal Derivative Transaction**

462.    The Carollo/Goldberg/Grimm Indictment describes the manipulation of the bidding, on January 20, 2004, for an investment agreement transaction entered into by an unidentified state education facilities authority, involving Goldberg and other co-conspirators including Provider A (i.e. Defendant FSA) and Broker A (i.e. Defendant IMAGE).

463.    The following description is drawn from the Carollo/Goldberg/ Grimm Indictment with alias' replaced with the actual names of particular entities and individuals.

464.    On January 20, 2004, Defendant IMAGE told S. Goldberg that S. Goldberg could lower the rate he was prepared to submit on behalf of Defendant FSA and still win the agreement. S. Goldberg, in accordance with Defendant IMAGE's suggestion, submitted an anti-competitive bid and Defendant FSA was awarded the contract at an artificially determined and suppressed rate.

**p.    A 2004 State Water Pollution Abatement Trust**

465.    The Carollo/Goldberg/Grimm Indictment and Scott-Jones Information describe the manipulation of the bidding, on November 2, 2004, for an investment agreement transaction entered into by an unidentified state water pollution abatement trust, involving Scott-Jones, S. Goldberg and other co-conspirators including Broker B, as used in Carollo/Goldberg/Grimm

Indictment, Broker A, as used in the Scott-Jones Indictment (i.e. collectively Defendant CDC Funding and co-conspirator Capital Financial Partners, Inc.) and Provider A (i.e. Defendant FSA).

466.    The following description is drawn from the  Carollo/Goldberg/ Grimm Indictment and Scott-Jones Information with alias' replaced with the actual names of particular entities and individuals.

467.    On November 2, 2004, during a telephone call before bids were due,  Scott-Jones employed by Capital Financial Partners but acting as an agent for Defendant CDC Funding, told S. Goldberg that he should reduce the rate he was prepared to submit on behalf of Defendant FSA on one of the three funds being bid.  S. Goldberg, in accordance with  Defendant CDC Funding's suggestion, submitted an anti-competitive bid and Defendant FSA was awarded the contract at an artificially determined and suppressed rate.

### q.    A 2005 State Housing Finance Agency Municipal Derivative Transaction

468.    The Carollo/Goldberg/Grimm Indictment and Kanefsky Information describes the manipulation of the bidding, on April 7, 2005 for an investment agreement transaction entered into by an unidentified state housing finance agency, involving Kanefsky, Marketer A (i.e. S. Goldberg) of Defendant FSA and other co-conspirators including Broker C, as used in the Carollo/Goldberg/Grimm Indictment, Broker A, as used in the Kanefsky Information (i.e. Kane Capital) and Provider A (i.e. Defendant FSA).

469.    The following description is drawn from the Carollo/Goldberg/Grimm Indictment and Kanefsky Information with alias' replaced with the actual names of particular entities and individuals.

470.    On April 7, 2005, S. Goldberg of FSA told Kane Capital the rate he planned to bid and asked if his bid was "***too high***."  Kane Capital replied that if S. Goldberg's bid was too high, he would "***shave it a little***."

471.    On April 7, 2005, Kane Capital told S. Goldberg to submit a bid that was lower than the rate that S. Goldberg had previously stated he would submit.  S. Goldberg, in accordance with Kane Capital's suggestion, submitted an anti-competitive bid and Defendant FSA was awarded the contract at an artificially determined and suppressed rate.

> **r.    A 2002 State Development Finance Authority Municipal Derivative Transaction**

472.    The Campbell Information describes the manipulation of the bidding, on April 15, 2002 for an investment agreement transaction entered into by an unidentified state development finance authority, involving Campbell, Bank A (i.e. Defendant Bank of America) and CDR.

473.    The following description is drawn from the Campbell Information with alias' replaced with the actual names of particular entities and individuals.

474.    On April 15, 2002, during a telephone call on the day of the bid, CDR arranged for another provider to submit an intentionally losing bid for the investment agreement.

475.    On April 15, 2002, based on the information received from CDR, Campbell submitted a bid for the investment agreement at a rate lower than he was otherwise prepared to bid and Defendant Bank of America was awarded the contract at an artificially suppressed rate.

Defendant Bank of America made interest payments at a rate that was artificially determined and suppressed.

### s.    A 2001 State University Municipal Derivative Transaction

476.    The Hertz Information describes the manipulation of the bidding, on October 3, 2001, for an investment agreement transaction entered into by an unidentified state university, involving Hertz, Financial Institution C (i.e. Defendant JP Morgan) and Broker E (i.e. Defendant Sound Capital).

477.    The following description is drawn from the Hertz Information with alias' replaced with the actual names of particular entities and individuals.

478.    On October 3, 2001, during a telephone conversation, Hertz quoted a rate and a co-owner of Defendant Sound Capital then signaled Hertz to raise his original rate, which Hertz did.  Defendant JP Morgan was then awarded the municipal finance contract at the rate stated by the co-owner of Defendant Sound Capital and accepted by Hertz.

479.    On February 1, 2006, via facsimile transmission, Defendant JP Morgan sent the state university a statement seeking payment, which was the amount calculated based on the rate set by Hertz and Defendant Sound Capital.

### t.    A 2002 Town Municipal Derivative Transaction

480.    The Hertz Information describes the manipulation of the bidding, on September 18, 2002, for an investment agreement transaction entered into by an unidentified town, involving Hertz, Broker E (i.e. Defendant Sound Capital), Financial Institution C (i.e. Defendant JP Morgan).

481.     The following description is drawn from the Hertz Information  with alias'
replaced with the actual names of particular entities and individuals.

482.     On September 18, 2002, during a telephone conversation, Hertz quoted a price
and asked the representative of Defendant Sound Capital ***"How's that looking?"*** and whether
Sound Capital had any other bids.  The representative of Sound Capital told Hertz that a co-
owner of Sound Capital was on the telephone with other bidders.

483.     On September 18, 2002, approximately one minute later, a co-owner of Sound
Capital called Hertz and signaled that he change his bid to make it more advantageous to
JPMorgan and still win, which Hertz did.  Defendant JP Morgan was then awarded the
investment agreement for that town, for the price suggested by the co-owner of Sound Capital
and submitted by Hertz.

**u.     A 2004 Town Municipal Derivative Transaction**

484.     The Hertz Information describes the manipulation of the bidding, on October 26,
2004, for an investment agreement transaction entered into by an unidentified town, the award of
which was to be made to the provider bidding the earliest date at which, pursuant to the Treasury
regulations, the town would be deemed to have earned the maximum allowable return on its
investment and would then be obligated to transfer its money from the winning provider to the
United States Department of Treasury until the money could be used for its intended purpose.
Involved in the manipulation of the bidding was Hertz, Broker E (i.e. Defendant Sound Capital),
and Financial Institution C (i.e. Defendant JP Morgan).

485.     The following description is drawn from the Hertz Information  with alias'
replaced with the actual names of particular entities and individuals.

124

486.     On October 26, 2004, during a telephone conversation, Defendant Sound Capital gave Hertz information about a competing provider's bid and allowed Hertz to change the bid he had already submitted by extending by one month, from May 15, 2015 to June 15, 2015, the date until which the town would receive interest and Defendant JP Morgan would retain the use of the money invested.  Defendant JP Morgan was then awarded the investment agreement for that duration.

487.     On November 9, 2004, Defendant JP Morgan received payment for the portfolio of securities it had delivered pursuant to the investment agreement it had been awarded.

**3.      Conduct By GE Trinity and FSA Representatives In Certain Transactions Of California Public Entities Is Consistent With DOJ's Descriptions Of Conduct By Their Representatives In Transactions Described In Carollo/Goldberg/Grimm Indictment**

488.     The Carollo/Goldberg/Grimm Indictment describes several instances in which Grimm, then an employee of GE Trinity, and Goldberg, an employee of FSA (who had previously worked at GE Trinity), conspired with one another, both directly and through brokers, to tradeoff between themselves who would win the bidding in particular municipal derivative auctions in which both GE Trinity and FSA were bidders.  This was accomplished by either Grimm or Goldberg agreeing to bid less aggressively on a given transaction, thereby allowing the other to win the selected transaction, an action which would then be reciprocated by the other on a future transaction.

489.     This same pattern by which Grimm and Goldberg appear to tradeoff between themselves who would win on Municipal Derivatives transactions can be seen in the bidding patterns of certain transactions entered into by various California public entities from at least

March 2002 until March 2007.   The bidding patterns in these transactions also suggest that Walter Schemitsch ("Schemitsch"), who has been identified as a target of the DOJ's criminal investigation and was also employed by Defendant FSA, participated in the same kind of auction win allocation with Grimm of Defendant GE Trinity.

490.     On March 5, 2002, both Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf of FSA, submitted bids on a Municipal Derivative transaction entered into by the City of Los Angeles in connection with the Municipal Improvement Corporation of Los Angeles Special Tax Lease Revenue Bonds (Police Emergency Command Control Communications System) Series 2002 F (MICLA Series AO).  Grimm on behalf of GE Trinity won the bidding.

491.     Less than two weeks later, on March 13, 2002, Grimm, on behalf of GE Trinity, and Schemitsch, on behalf of FSA, both submitted bids on a Municipal Derivative transaction entered into by East Bay Municipal Utility District in connection with its Water System Subordinated Revenue Refunding Bonds, Series 2002.  Schemitsch, on behalf of FSA, won the bidding.

492.     Approximately four months later, on July 16, 2003, Grimm, on behalf of GE Trinity, and Schemitsch, on behalf of FSA, submitted bids on a Municipal Derivatives transaction entered into by the City of Riverside in connection with its Electric Refunding Revenue Bonds, Issue of 2003.  Schemitsch, on behalf of FSA, won the bidding.

493.     Just over a week later, on July 24, 2002, both Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf of FSA, submitted bids on a Municipal Derivative transaction entered into by the City of Los Angeles, in connection with its 2002 Tax and Revenue Anticipation Notes. This time, Grimm, on behalf of GE Trinity, won the bidding.

494. Approximately a year later, on August 20, 2003, bids were solicited from both Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf of FSA, on a Municipal Derivative transaction by the City of Riverside in connection with its Electric Revenue Bonds, Issue of 2001. Goldberg, on behalf of FSA, passed on the bidding, Grimm, on behalf of GE Trinity, submitted a bid and won the auction. The transaction was awarded to Peter Grimm on behalf of GE Trinity.

495. On March 30, 2004, both Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf FSA, submitted bids on another Municipal Derivative transaction by the City of Riverside in connection with the same Electric Revenue Bonds, Issue of 2001 issuance. Goldberg, on behalf of FSA, won the bidding on this second transaction.

496. Approximately five months later, September 27, 2004, both Grimm, on behalf of GE Trinity, and Schemitsch, on behalf FSA, submitted bids on four Municipal Derivatives transactions entered into by the City of San Jose in connection with its Airport Revenue Bonds, Series A, B, C & D. Schemitsch, on behalf of FSA, won the bidding on all four transactions.

497. On May 4, 2005, bids were solicited from both Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf of FSA, on three Municipal Derivative transactions entered into by East Bay Municipal Utility District in connection with its Wastewater System Subordinated Revenue Refunding Bonds, Series 2005, and its Water System Subordinated Revenue Bonds, Series 2005A. S. Goldberg, on behalf of FSA, submitted bids for all three transactions and Grimm, on behalf of GE Trinity, passed on all three. S. Goldberg, on behalf of FSA won the bidding on all three transactions.

498.     On October 6, 2005, Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf of FSA, submitted bids on four Municipal Derivative transactions entered into by the City of Riverside in connection with its Electric Refunding/Revenue Bonds, Issue of 2005 A and Issue of 2005 B, and Water Revenue/Refunding Bonds, Issue of 2005. S. Goldberg, on behalf of FSA, won the bidding for two of the four transactions, Grimm, on behalf of GE Trinity, won the bidding on the other two.

499.     On February 15, 2006, both S. Goldberg, on behalf of FSA, and Grimm, on behalf of GE Trinity, submitted bids on another Municipal Derivative transaction entered into by the City of Riverside in connection with its Water Revenue/Refunding Bonds, Issue of 2005. Grimm, on behalf of GE Trinity, won the bidding.

500.     Less than two weeks later, on February 23, 2006, both Grimm, on behalf of GE Trinity, and S. Goldberg, on behalf of FSA, submitted bids on a Municipal Derivative transaction entered into by the City of Redwood Public Financing Authority in connection with its Water Revenue Bonds, Series 2006A.  S. Goldberg, on behalf of FSA, won the bidding.

501.     On March 1, 2007, bids were solicited from both S. Goldberg, on behalf of FSA, and Grimm, on behalf of GE Trinity on two Municipal Derivative transactions entered into by the County of San Diego in connection with its Certificates of Participation (2006 Edgemoor Project and 1991 Regional Communications System Refunding) and Certificates of Participation (2006 Edgemoor Completion Project). Grimm, on behalf of GE Trinity, passed on the bidding of both transactions, while S. Goldberg, on behalf of FSA, submitted bids on both. S. Goldberg. on behalf of FSA, won the bidding on both transactions.

4.     **Examples Of The Conspiracy's Operation In Particular Municipal Derivative Transactions Proffered By Defendant Bank Of America**

a.     **Pennsylvania Intergovernmental Cooperation Authority Forward Purchase Agreement**

502.    Defendant BofA and Chase Manhattan Bank, now part of Defendant JP Morgan**,** manipulated a forward purchase agreement entered into by the Pennsylvania Intergovernmental Cooperation Authority on August 27, 1998.  The terms of the forward purchase agreement were reached through a sham bidding process.  IMAGE brokered and was actively involved in the conspiracy to manipulate this transaction.  During the bidding process IMAGE told BofA that "***this deal had to go to Chase.***"  In furtherance of the conspiracy, BofA passed on the transaction by either withdrawing its bid or not submitting one.  Following completion of the transaction, which JP Morgan won, BofA and JP Morgan entered into a hedging agreement with BofA (a kickback for not entering a legitimate bid) so that BofA would profit from the transaction.  As alleged herein, BofA and JP Morgan commonly conspired to manipulate the municipal derivatives market.

b.     **Hillcrest Healthcare System (Oklahoma) Forward Purchase Agreement**

503.    Defendant BofA and Defendant JP Morgan also colluded to manipulate a forward purchase agreement entered into by the Hillcrest Healthcare System, an Oklahoma public entity, on December 22, 1999.  CDR brokered and was actively involved in the conspiracy to manipulate this transaction.  An email exchange between Murphy of BofA and Bauman of BofA, prior to the completion of the transaction, demonstrates collusion between BofA, JP Morgan and CDR.  In return for completing an unrelated two hundred million dollar swap with JP Morgan,

brokered by CDR, the Hillcrest Healthcare System deal was being "laid up" for BofA by JP Morgan and CDR. In other words, Defendant JP Morgan passed on the deal and BofA got a sweetheart deal as a kickback for prior deals it had manipulated with JP Morgan and CDR.

### c.      Guam Power Forward Purchase Agreement

504.      Defendant BofA and Lehman Brothers manipulated a forward purchase agreement entered into by Guam Power on August 30, 2000. IMAGE brokered and was actively involved in the conspiracy to manipulate this transaction for which it received a fee of $350,395. Prior to the completion of the transaction, Stallone of IMAGE was in contact with both Lehman Brothers and BofA regarding the terms of the transaction. Both BofA and Lehman submitted price indications to Stallone. Stallone told BofA "here's what Lehman is thinking, what are you thinking?" and asked if BofA would split the deal with Lehman Brothers. He also told BofA that it should "move a little" so that the bids would be closer together and Stallone could then suggest that the issuer split the transaction. Taylor of Lehman Brothers was involved on the transaction. When the deal closed it was split between Lehman and BofA just as the conspirators intended.

### d.      Pennsylvania School Districts and Other Entities Escrows

505.      Defendants JP Morgan, BofA, Wachovia, and Lehman Brothers manipulated a series of transactions which included escrow CDs for Pennsylvania school districts and other entities. During these transactions it was common for the Cooperating Witness and Stallone of IMAGE to discuss the bidding rates. In fact, Stallone would advise the Cooperating Witness that Bank of America was being too aggressive so that BofA could manipulate the transaction to its advantage. CW and Stallone also discussed indications prior to entering several of the transactions.

506.     Murphy and Campbell of Defendant Bank of America were fully aware that these transactions were manipulated.  Moreover, Stallone of Defendant IMAGE told the Cooperating Witness that he would elicit courtesy bids from Wachovia, Lehman and JP Morgan.  As was often the case in this conspiracy, these entities had no expectations of winning these transactions.  Defendant JP Morgan was particularly active in manipulating these transactions.  Gruer of Defendant JP Morgan was Stallone's contact.  Gruer reported to MacFaddin of JP Morgan and also worked with Raz and Hertz of JP Morgan who were all involved in advancing the conspiracy.

507.     Defendant Bank of America won the first ten deals, but when it was JP Morgan's turn to win, Stallone of Defendant IMAGE would direct Bank of America to submit a courtesy bid.  As these transactions progressed, Stallone would tell the Cooperating Witness if Defendant JP Morgan or Defendant Bank of America would be the winning bidder.  In several instances, Stallone said that a particular deal "needs to go to JP Morgan."  At one point, Stallone also told the Cooperating Witness that JP Morgan understood that it had just won a big transaction, and that Bank of America wanted this one.  This sort of back and forth was a common way that all parties of the conspiracy advanced their own interest at the expense of the issuers.  The issuers involved in some of these transactions included:

     i.     The North Penn School District;

     ii.     The Cameron School District;

     iii.     The Downington Area School District;

     iv.     The Avonworth School District;

     v.     The Carnegie Borough School District;

vi.     The Tyne-Richland School District;

vii.    The Sto-Rox School District;

viii.   The Milville Area School District;

ix.     The City of Scranton School District;

x.      The Township of Moon;

xi.     The Harbor Creek School District;

xii.    The Slippery Rock School District;

xiii.   The Upper Dauphin School District;

xiv.    The Penns Valley School District;

xv.     The Township of Ross;

xvi.    The County of Luzerne;

xvii.   The Hamburg Area School District;

xviii.  The St. Mary's Area School District; the Springfield Township;

xix.    The Pattiston Area School District;

xx.     The County of Chester;

xxi.    The Springfield Township;

xxii.   The Ulster Tobacco Asset Securitization Corporation; and

xxiii.  Montgomery County Pennsylvania.

**e.     Springfield Township (Pennsylvania) Collateralized Deposit**

508.   Defendant BofA manipulated a collateralized deposit on a debt service fund issued by the Springfield Township, Pennsylvania on May 16, 2001. The terms of this agreement were reached through a sham bidding process. IMAGE brokered and was actively involved in

the conspiracy to manipulate this transaction. Loughead of IMAGE and Pinard of BofA, in a series of emails, discussed the bid amount BofA would submit in order to secure the transaction. Loughead sent Pinard an email which asked, "***what kind of dough re mi we talking about for our friends at Springfield.***" Pinard responded, "I may be able to go as tight as 40k if I need to." Loughead responded, "***don't fall on any swords. I held out 30k as high hopes. Anything above makes me look good, but as you see fit. Did we pick up that much more, or are you working cheap.***" Bid forms show that Saunders of BofA submitted a bid for $31,000, an amount just above Loughead's suggested amount.

### f.     Biola University (California) Forward Purchase Agreement

509.    Defendant BofA manipulated a forward purchase agreement entered into by Biola University on January 7, 2002. IMAGE brokered and was actively involved in the conspiracy to manipulate this transaction. Involved in these deals for Bank of America were Pinard, Murphy, Campbell, Brian Zwerner ("Zwerner"), and/or James Engel. Stallone, Loughead, John Brenner and/or E. Gilbert Carpenter (IMAGE's Managing Director) were involved on behalf of IMAGE. Taylor of Lehman was also involved. As is the case for many of the transactions discussed herein, little information is known about the exact role the Providers and/or Brokers played in manipulating this transaction because the transactions was identified by DOJ as being suspicious and/or is under investigation and therefore was not discussed in detail during the BofA Proffer.

### g.     Santa Barbara County (California) Forward Purchase Agreement

510.    Defendant BofA actively manipulated an auction for a forward purchase agreement entered into by Santa Barbara County on May 6, 2002. Feld Winters brokered and was actively involved in the conspiracy to manipulate this transaction. As was common in

manipulated transactions, prior to entering into the forward purchase agreement BofA pushed

Santa Barbara to select Feld Winters to act as the broker so that BofA could have access to a

broker it knew would assist BofA in rigging the transaction and to provide Feld Winters a

kickback for its assistance in rigging other transactions.  Other bidders in this transaction

included AIG, AMBAC, JP Morgan, Salomon Smith Barney and Wachovia.  Murphy, Campbell,

Zwerner, and/or Johnson, all employees of BofA, were actively aware of and involved in the

manipulating this transaction.  Jeff Feld (founder and CEO of Feld Winters) and Jeff Kandell

(President of Feld Winters) were involved on behalf of Feld Winters.  Prior to entering a bid

Johnson of BofA sent an email to Murphy and Feld Winters asking that Feld Winters prepare a

list of who would be solicited for the bid.  Moreover, there is a taped conversation where Murphy

of BofA sought and received bidding information from Feld Winters.  In fact, Murphy gave Feld

Winters pricing indication on the transaction and Murphy asked about other bidders.  In this

transaction, Murphy gave an $200,000 indication, and Feld Winters responded he would have to

bid a little tighter, only about $150,000.  After the complection of the fraudulent transaction, Feld

Winters received kickbacks of $12,500 and $17,500 for its involvement in the conspiracy.  Taped

conversations relating to this transactions reveal that Providers commonly recorded profit in a

portfolio managed by a different group other than the traders themselves.

      **h.**     **Art Center College of Design (California)**

    511.    Defendant BofA and UBS manipulated a forward purchase agreement and a

related swap transaction entered into by Art Center College of Design located in Sacramento,

California on May 7, 2002.  The terms of the forward purchase agreement were reached through

a sham bidding process.  CDR brokered and was actively involved in the conspiracy to

manipulate this transaction. Zaino of UBS was involved in the in this transaction as well. Tape recorded conversations reveal that Naeh of CDR and Murphy of BofA would discuss outstanding bids and the level BofA would have to bid in order to win the transaction. As alleged herein, taped discussions between Campbell of BofA and Zaino reveal that the two also discussed the pricing terms of and the timing of Bank of America's bid relating to a transaction involving the Commonwealth of Massachusetts.

     **i.**     **Beacon Tradeport Community Development District (Florida) and The Olympic Club (California) Transactions**

512.     A series of transactions involving Defendant BofA and Defendant IMAGE clearly demonstrate the important role that kickbacks and personal relationships played in perpetuating the conspiracy. On March 13, 2002 Beacon Tradeport Community Development District ("Beacon") a Florida public agency, entered into a manipulated transaction with BofA. The terms of the transaction were reached through a sham bidding process. Prior to entering into the transaction, as it had done before, BofA pushed Beacon to hire IMAGE to work as its broker. Prior to submitting its bid to Beacon, BofA was given access to the bid specifications submitted by other Providers. BofA estimates that it made $750,000 in profits from this fraudulent transaction.

513.     As was often the case in this conspiracy, Providers would pay kickbacks to Brokers by selecting them to provide services on unrelated transactions for which they could receive exorbitant fees. In a March 11, 2002 email addressed to Pinard of BofA, Murphy states that Murphy would be requesting a market pricing letter for a transaction involving The Olympic Club in San Francisco, California and said that if IMAGE did not get the brokerage business on

the Beacon deal, "we can find some $ elsewhere." In fact, several weeks after completion of the

Beacon Transaction, IMAGE sent a market pricing letter to Murphy of Bank of America relating

to a negotiated transaction involving the renovation of The Olympic Club. IMAGE received

$50,000 for issuing this letter. The Olympic Club transaction was completed in April 4, 2002.

These transactions demonstrate the central role kickbacks played in advancing the conspiracy.

### j.       University of Tampa (Florida) Forward Purchase Agreement

514.    Defendant  BofA manipulated an auction for a  forward purchase agreement

entered into by the University of Tampa on March 25, 2002. CDR brokered and was actively

involved in the conspiracy to manipulate this transaction. Prior to completion of the transaction,

Pinard of BofA and Naeh of CDR sent each other a series of emails in which the parties reference

their plans to manipulate the auction process. CW said that he gave early indications of this deal

to Naeh & called back to see if indications won deal. At one point Pinard emailed Naeh and told

him to "call me on my cell below when you get a Tampa number." Ultimately, BofA won the

auction, and CDR received a $250,000 fee.

### k.       Puerto Rico Electric Power Authority Escrow Deposit Agreements

515.    Defendant BofA and Defendant UBS colluded to manipulate auctions for a

revenue fund and a defeasance escrow deposit both entered into by the Puerto Rico Electric

Power Authority on June 11, 2002. PackerKiss brokered and was actively involved in the

conspiracy to manipulate these transactions. In a recorded conversation between Zaino and

Campbell, Zaino instructed Campbell on how Bank of America should bid to win the defeasance

escrow. Following the transaction, Campbell of BofA told Murphy of BofA that he wanted to

pay CDR a kickback even though they did not act as a broker in this transaction. The kickback

was likely for the role CDR might have played in working with UBS in facilitating the fraudulent transactions.

### l.     Rhode Island Gross Funded Escrow Agreement

516.     Defendants BofA, JP Morgan, Wachovia, Morgan Stanley, and Broker First Southwest colluded to manipulate two transactions tied to a series of bonds Rhode Island sought to refund on June 20, 2002. The first transaction was an escrow transaction which involved a competitive auction process. During the bidding process, First Southwest sent revised bid information to various Providers including Hertz and MacFaddin of JP Morgan as well as Wachovia and Morgan Stanley. BofA did not bid, a clear "pass" made by BofA. After the sham bidding process was complete, UBS won the auction. A day after UBS won the auction, UBS and BofA entered into a forward purchase whereby UBS transferred its rights and obligations relating to the escrow transaction to BofA. UBS and BofA entered this transaction to generate broker fees, a kickback to the Broker who was involved in the conspiracy.

### m.     Williamson County (Tennessee) Escrow Deposit Agreements

517.     Defendant BofA manipulated two escrow deposit agreements issued by Williamson County, Tennessee on June 24, 2002. Sound Capital brokered and was actively involved in the conspiracy to manipulate this transaction. BofA, Lehman, and Wachovia bid on these transactions. Recorded conversations reveal that Rosenberg of Sound Capital advised Campbell of Bank of America as to the bids levels of other providers. In fact, after hearing Wachovia's bid, Campbell asked Rosenberg if he could change one of BofA's bids. Rosenberg said he would be willing to change the bid, but was reluctant to because he already told

Williamson County the bid results. Campbell responded that it was at least worth asking. BofA was the Provider for this transaction.

### n. **Jackson Lab (Maine) Interest Rate Swaps**

518. Defendant BofA manipulated two interest rate swaps entered into by Jackson Lab, located in Bar Harbor, Maine, on June 28, 2001. Baum brokered the transactions. Recorded conversations between Campbell of BofA and Steinhauer of Baum reveal that the two discussed bids submitted by other Providers including Bear Stearns and Fleet Bank, now part of BofA, as well as the bids BofA would have to submit in order to win the auctions. Prior to submitting a bid Campbell asked Steinhauer who else will be bidding and whether Steinhauer thought pricing will be aggressive. Steinhauer indicated that a lot of providers were bidding, including Bear Stearns & Fleet Bank. Campbell and Steinhauer then discussed pre-bid indications on both trades.

### o. **Commonwealth of Massachusetts Forward Purchase Agreement**

519. Defendants BofA and UBS colluded to manipulate a forward purchase agreement entered into by the Commonwealth of Massachusetts on June 19, 2002. The terms of the transaction were set by an auction process. For this transaction, UBS acted as both the Broker and a Provider and was actively involved in the conspiracy to manipulate this transaction. Taped discussions between Campbell of BofA and Zaino of UBS reveal that the two discussed the pricing terms of the transaction. Moreover, prior to submitting its bid, UBS sent BofA the bid specifications submitted by other Providers. Wachovia ultimately won the transaction. Taped discussions between Campbell and Goldberg of CDR, who did not act as a Broker in the

transaction, recorded after completion of the transaction, reveal that Campbell was upset with Zaino because he did not deliver the deal to BofA.

### p. Virgin Islands Debt Service Reserve Fund

520.     Defendants BofA and Lehman Brothers were actively involved in the manipulation of a debt service agreement entered into by the Virgin Islands on June 19, 2002. In February of 2002, months before completion of the transaction, Stallone of IMAGE sent Pinard of BofA an email which indicated that Stallone would try to arrange for BofA to win the auction. Leading up to the time of auction, Stallone and Pinard discussed a transaction involving the Camden County Municipal Utilities Authority ("Camden"). Based on information contained in various emails between BofA and IMAGE, BofA had arranged to win the Camden transaction, but was unable to win the transaction because Gib Carpenter of IMAGE failed to secure the transaction for BofA. Given IMAGE's failure relating to the Camden transaction, Stallone of IMAGE promised Pinard of BofA, "*I will do my best to make it up on the Virgin Islands Debt Service Reserve Funds.*"

521.     On June 19, 2002, Stallone and Campbell of Defendant BofA discussed what BofA needed to bid to win the Virgin Island transaction. Stallone told Campbell that he would provide a signal to Campbell on what BofA should bid. Stallone also indicated that he would try to get Lehman's bid before BofA submitted their bid. Ultimately, Morgan Stanley won the auction and entered into a deal with the Virgin Islands. Stallone was apologetic and told Campbell that he would discuss why BofA failed to secure the transaction with Pinard. Campbell indicated that Pinard had similar conversations with other brokers that failed to secure bids for BofA including Rosenberg of Sound Capital and Naeh of CDR.

**q.      New Jersey Transit Corporation Escrow Agreement**

522.     Defendants BofA and UBS were actively involved in the manipulation of an auction for the sale of securities entered into by the New Jersey Transit Corporation on June 20, 2002.  CDR brokered and was actively involved in the conspiracy to manipulate this transaction. Taped conversations reveal that Campbell of BofA, Zaino of UBS and Naeh of CDR exchanged bid and pricing information prior to BofA and UBS submitting their respective bids.  As alleged herein, Zaino and Campbell also discussed pricing terms of and the timing of Bank of America's bid related to a transaction involving the Commonwealth of Massachusetts.

**r.      Tampa (Florida) Port Authority Forward Purchase Agreement**

523.     Defendant BofA actively manipulated the sale of a forward purchase agreement entered into by the Tampa Port Authority on July 8, 2002.  CDR brokered and was actively involved in the conspiracy to manipulate this transaction.  Naeh of CDR actively shared information about the bidding process with BofA.  While conspiring to manipulate the transaction, Naeh of CDR sent an email to Pinard of BofA which stated "***Its nice to have friends***. We'll call you in a little bit."  Ultimately, Provider Defendant BofA won the transaction.  This email underscores the fact that personal connections and repeat business were two of the key factors that drove the conspiracy.

**s.      City of Chicago (Illinois) Wastewater Facility Swap**

524.     Defendants BofA, JP Morgan, and Lehman Brothers colluded to manipulate a trigger swap entered into by the City of Chicago Wastewater Facility ("CCWF") in July of 2004. Mesirow brokered the transaction.  Lehman Brothers negotiated the deal with the CCWF and/or Medirow.  Bank of America and JP Morgan were given the opportunity to see the terms of the

pricing submitted by Lehman and adjust their pricing accordingly, so that Lehman got 60% of the

deal and JP Morgan and Bank of America each got 20%. Given the terms of the deal, Mesirow,

the broker on the deal, suggested that this arrangement could be subject to scrutiny. This

transaction again demonstrates that the close relationship BofA and JP Morgan had in

manipulating the municipal derivatives market.

      **t.**      **2007 Bank of America IRS Settlements**

525.     In early 2007, the IRS settled a series of cases with BofA relating to its

manipulation of various municipal derivative transactions. BofA, Baum, and other co-

conspirators were implicated in the manipulation of GICs, debt service reserve funds, and other

transactions involving:

      i.      The Orange County, Florida, Health Facilities Authority;

      ii.      The Louisiana Local Government Environmental Facility & Community

            Development Authority;

      iii.     The Illinois Development & Financial Authority;

      iv.     Oklahoma Rural Enterprises;

      v.      The Western Virginia Hospital Finance Authority; and

      vi.     Henderson County, Kentucky.

526.     Multiple entities were involved in manipulating these transactions. Lail of Baum

was principally involved in each of these transactions. Campbell of Bank of America personally

handled transactions for the Western Virginia Hospital Finance Authority, Oklahoma Rural

Enterprises, Louisiana Local Government Environmental Facility & Community Development

Authority, and Henderson County, and Campbell and Murphy jointly handled the deal for Illinois

Development & Financial Authority. Gruer of JP Morgan submitted courtesy bids for each of these transactions, with the exception of the Oklahoma Rural Enterprises transaction. A non-defendant provider, whose identity is being kept confidential pursuant to agreement with the Bank of America, did likewise with respect to Henderson County. Frasco of CDC submitted sham bids with respect to Henderson County, the Western Virginia Hospital Finance Authority, and Illinois Development & Financial Authority. Campbell of Bank of America deliberately submitted bids that were less than what was needed to cover the debt service, liquidity, and credit enhancement on the bonds with respect to the Orange County, Florida, Health Facilities Authority and the Louisiana Local Government Environmental Facility & Community Development Authority. Bank of America also indicated that Merrill Lynch conspired with Lail of Provider Defendant Baum to submit a courtesy bid to Henderson County.

### 3. Preliminary Statistical Analysis Of Municipal Derivative Transactions Of California Issuers Reveals Probative Evidence Of Bid-Rigging

#### a. Evidence Suggesting Courtesy Bids

527. A preliminary examination of bidding information for eighty-nine reinvestment derivative auctions conducted on behalf of various California cities and counties suggests that courtesy bids in the Municipal Derivatives market were common. In Table 1, below, are nine reinvestment derivative auctions in which bidding patterns suggest that the auction was affected by courtesy bidding.

528. "Courtesy bids" are bids that are too low to be competitive but which are submitted by Provider Defendants to give the appearance of legitimacy to an auction. Courtesy bids are collusive as they are made for the benefit of other Defendant Providers who have been

pre-selected to win a particular auction. In fact, among the requirements for a GIC or a yield restricted defeasance escrow to fall within the "safe harbor" provisions of Treasury Regulations for establishing "fair market value," an issuer must receive at least three (3) bids from potential providers. 26 C.F.R. § 148-5(d)(6)(iii)(B)(1). Submission of courtesy bids ensures that this requirement is met, giving false assurance of fairness to issuers, while insulating the pre-selected winner of the auction from real competition. Or as then IRS Director Mark Scott stated in 2005, these bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value."

529.     IRS Director Scott, in 2005, articulated a rough guideline for determining when a bid submitted in a Municipal Derivative action was likely a courtesy bid: "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."

530.     According to Director Scott, evidence of these types of abuses is frequently perceptible in bidding behaviors by providers in particular auctions. For example, Director Scott stated, "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided." Such bids, Director Scott continued, are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value."

531.     All potential and actual bidders can be assumed to have access to virtually the same information, including market rates. In fact, Treasury Regulations require that, in order for a presumption of fair market value to apply to a reinvestment derivative procured through

auction, that all providers whose bids are solicited for a particular auction be provided with bid specifications that "include all material terms of the bid."

532.     Moreover, all potential bidders have the option of passing if they do not want to compete for a particular contract at auction.

533.     One would expect, therefore, that the range between the lowest and highest bids in a particular auction would be quite narrow.  A preliminary analysis of eighty-nine reinvestment derivative auctions conducted on behalf of various California cities, counties, and government agencies confirms this.  The **median spread** between the highest and lowest bids in these auctions was approximately **25 basis points**, a figure that is moreover likely artificially inflated by the existence of the artificially low courtesy bids described below.

534.     Based on these factors and circumstances specific to particular auctions, the lowest bids in the following auctions, which range from 2.8 to 145 basis points below the winning bid, appear to have been submitted not with the intention of competing for the contract on auction, but rather as courtesy for another bidder, most likely the ultimate winner of the particular auction.

### i.     City of Riverside (California) GIC May 28, 2004 (Row 1)

535.     The greatest difference between the lowest and highest bids found in the eighty-nine California city and county GIC auctions that were analyzed, is a difference of **145 basis points** recorded on Row 1 of Table 1, in the May 28, 2004 GIC auction conducted on behalf of the City of Riverside.  In that auction, Defendant BayernLB submitted a bid of only 3.50% while the winner of the auction, Defendant MBIA represented by Jim Binette, submitted a bid of 4.95%.

144

536.     The **145 basis point** spread between Defendant BayernLB's bid and the winning bid of Defendant MBIA falls well within the range that Director Scott identified as suspect, and for good reason.  A bid that is that far below the winning bid does not reasonably appear to have been submitted with the intention of winning the auction.  This conclusion is reinforced by the facts that: (1) the 145 basis point spread is almost six times the median spread observed in the eighty-nine reinvestment derivative auctions analyzed; (2) the next lowest bid was **55 basis points** above Defendant BayernLB's bid; and (3) the other bids were **at least 100 basis points** above Defendant BayernLB's bid.  It can be reasonably assumed that Defendant BayernLB would have had the same access to information as other bidders, including market rates and, thus, Defendant BayernLB would have known that this bid was woefully below market rates and had no chance of success.

537.     As explained above, Defendant BayernLB was under no legitimate obligation to submit a bid in this auction, the most reasonable conclusion is that the bid was submitted as a courtesy to another bidder, most plausibly Defendant MBIA, which won the auction.  In fact, it is difficult to explain why Defendant BayernLB would have submitted such a bid, except as a courtesy.

538.     This conclusion is supported by the submission of Defendant BayernLB of another apparent courtesy bid approximately five and half months later in another GIC auction conducted on behalf of the City of Riverside, discussed herein, again with the apparent intention of benefitting Defendant MBIA.

539.     Moreover, as also discussed below, Defendant MBIA also appears to have engaged in reciprocal courtesy bid arrangements with co-conspirator Transamerica that affected

at least two auctions conducted on behalf of Los Angeles in 2002 and 2005. Together these events suggest that Defendant MBIA has engaged in a pattern of involvement in bid-rigging that included the submission of courtesy bids by it or other participants in particular auctions. This reinforces the conclusion that unusually low bids that were either submitted by Defendant MBIA, or by another Defendant in an auction in which MBIA won, were in fact courtesy bids.

540. Finally, the conclusion that Defendant BayernLB's unusually low bid in this auction was a courtesy bid is supported by Defendant BayernLB publically reported involvement in a GIC auction conducted on behalf of the University of New Mexico regarding the bidding process for which the DOJ has requested specific information.

541. The other bidding participants in the May 28, 2004 auction were co-conspirator Transamerica, AIG, Defendant CDC, Defendant FSA, Defendant Rabobank, and Defendant SocGen.

542. The providers from whom bids were solicited for this action, but which passed, were Ambac, Defendant Salomon Smith Barney, FGIC, Defendant JP Morgan, RBC, and Defendant GE Trinity.

### ii.    City of Riverside (California) GIC Aug. 1, 2003 (Row 2)

543. Another suspiciously low bid that appears to have been submitted without the hope or intention that bid would be competitive but rather as a courtesy to another bidder is the bid submitted by Defendant Rabobank, represented by John Gallagher in the GIC auction conducted by the City of Riverside on August 1, 2003 (Row 2).

544. In the August 1, 2003 auction, Defendant Rabobank submitted a bid of 3.85%, **136 basis points** below the winning bid of 5.21%, submitted by Defendant CDC, represented by

146

Vincent Bernardeau. Of the eighty-nine auctions analyzed, this was the second largest spread found and was almost five and half times higher than the median spread. Moreover, Defendant Rabobank's bid was **110 basis points** below the next lowest bid. In fact, all of the other bids were tightly concentrated around the 4.95% to 5.21% range, which supports the proposition that participants to the auction all had reasonably equal access to information, including market rates. Thus, given these factors and Defendant Rabobank's ability to have passed if it was not inclined to compete for the contract offered, it seems most plausible that Defendant Rabobank submitted the bid as courtesy, most likely to benefit the auction's ultimate winner, Defendant CDC.

545. This conclusion is reinforced by the facts that: (1) as discussed above, Defendant CDC has been implicated in investigations of bid-rigging of a series municipal derivative auctions involving Defendant Baum; and (2) Defendant CDC's announcement discussed below that one of its employees had received a target letter from the DOJ's antitrust division, informing him that the DOJ intends to seek his criminal prosecution for participating in the conspiracy alleged herein.

546. The other participants who bid in the auction were Defendant FSA represented by Walter Schemitsch and Defendant MBIA represented by Jim Binette.

547. Participants who passed in the auction were AIG represented by Chris Toft, Ambac represented by Jessica Carcaterra. Defendant Bayern LB represented by Frank Postiglione, and FGIC, represented by Peter Grimm.

### iii. Los Angeles World Airports (California)GIC March 5, 1998 (Row 3)

548.     The results of the GIC auction conducted on behalf of Los Angeles World Airports on March 5,1998 (Row 3) suggest that Defendant JP Morgan submitted a courtesy bid for the benefit of WestLB.

549.      Defendant JP Morgan, represented by Peter Ghavami submitted a bid of 3.93%, **89 basis points** below the winning bid of 4.82% submitted by WestLB represented by Peter Chabot.  This is the third largest spread identified in the eighty-nine auctions analyzed and is over three and half times more than the median.

550.     Moreover, the fact that there are just four bids for the auction also suggests that Defendant JP Morgan submitted the bid as a courtesy.  It was a consistent practice amongst co-conspirators to request, receive and submit courtesy bids in order to get the required three bids necessary for the safe harbor provisions of the IRS regulations to apply.  The fact that only four bids were submitted and the fourth was significantly below the winning bid suggests that the submitter of that bid, Defendant JP Morgan, did so not with the intention of prevailing but rather as courtesy.

551.     This conclusion is supported by the evidence discussed elsewhere herein of the submission of courtesy bids in other auctions by JP Morgan, specifically in auctions run by Defendant CDR, which acted as broker in this auction as well.

552.     The other bidding participants in this auction were Defendant SocGen represented by Donald Travis and Defendant NatWest represented by Patrick Marsh.

553. The providers from whom bids were solicited for this action, but which passed, were AIG represented by Heather Singer, Defendant Bank of America and Bank of New York.

### iv.     City of Riverside (California) GIC February 12, 2004 (Row 4)

554. The results of the February 12, 2004 GIC auction conducted on behalf of the City of Riverside suggest that Defendant Rabobank again submitted a courtesy bid, but this time for the benefit of Defendant SocGen.

555. Defendant Rabobank, represented by John Gallagher submitted a bid of 2.65%, **85 basis points** below the winning bid of 3.50% submitted by Defendant SocGen, represented by Donald Travis. This is the fourth largest spread identified in the eighty-nine auctions analyzed and close to three and half times more than the median. Moreover, the spread between Defendant Rabobank's bid of 2.65% and the next lowest bid of 3.20% was **55 basis points**, while all of the other bids are within 1 to 29 basis points of one another. This, again, supports the proposition that all of the bidders to the auction had reasonably equal access to the same information, including market rate, and that Defendant Rabobank did not submit this bid in the reasonable expectation of it being competitive. Thus, given that Defendant Rabobank could have chosen to pass if it was not inclined to competitively bid in this auction, the most plausible explanation is that its bid was submitted as a courtesy, most likely for the benefit of the auction's winner, Defendant SocGen.

556. This conclusion is reinforced by the fact that Defendant SocGen has been implicated in a number of investigations involving bid-rigging of municipal derivative auctions, discussed above.

557. The other bidders in the February 12, 2004 auction were co-conspirator Transamerica, represented by Matt Meaney and Defendant CDC, represented by Vincent Bernardeau.

558. Bidders who passed on the auction were AIG represented by Chris Toft, Ambac represented by Jessica Carcaterra, Defendant Bank of America represented by Jay Saunders, Defendant Bayern LB represented by Frank Postiglione, Defendant FSA represented by Steven Goldberg, Defendant JP Morgan represented by Scott Verch, Defendant MBIA represented by Jim Binette, Defendant Merrill Lynch represented by Michele Gesser, Defendant Morgan Stanley represented by Kevin Schwartz, Defendant Salomon Smith Barney represented by Peter Colquitt, Defendant GE Trinity Plus represented by Peter Grimm, and XL Capital represented by Frank Beardsley.

559. Defendant BofA who was represented in this auction by Paul Jay Saunders, who has reportedly received a target letter from the DOJ, informing him that the DOJ intends to seek his criminal prosecution for involvement in the conspiracy alleged herein.

## v. City of Riverside (California) GIC July 16, 2003 (Row 5)

560. The results of the July 16, 2003 GIC auction conducted on behalf of the City of Riverside suggest that XL Asset submitted a courtesy bid for the benefit of co-conspirator Trinity.

561. Provider co-conspirator XL Asset, represented by K. Brinkman submitted a bid of 3.81%, which was **73 basis points** below the winning bid of 4.55% submitted by Trinity, represented by Peter Grimm. This is the fifth largest spread identified in the eighty-nine reinvestment auctions that were analyzed and is just under three times the median spread. While

the difference between XL Asset's bid and the other non-winning bids is not as stark as in some of the other auctions discussed, the size of the spread between XL Asset's bid and Trinity's winning bid, when compared with the spreads identified in the other auctions between lowest and highest bids, is sufficiently large to make it more plausible that XL Asset submitted the bid as courtesy for another bidder than with the good faith intention to compete for the contract offered. The most likely intended recipient of the courtesy bid was the ultimate winner of the auction, Trinity.

562. This conclusion is reinforced by the fact that Trinity's sister company, GE Funding has, as discussed below, received a Wells Notice from the SEC informing it that the SEC intended to bring a civil action against it related to the SEC's investigation of improprieties in the municipal derivatives market.

563. The other participants in the July 16, 2003 auction include AIG represented by Chris Toft, Defendant Bank of America represented by Jay Saunders, Defendant Bayern LB represented by Frank Postiglione, Defendant CDC represented by Vincent Bernardeau, Defendant FSA represented by Walter Schemitsch, Defendant MBIA represented by Jim Binette, and Defendant Rabobank represented by John Gallagher.

564. Participants who passed on the July 16, 2003 auction were Ambac represented by Jessica Carcaterra, ARMCo represented by D. Burlage, FGIC represented by Peter Grimm, Defendant JP Morgan represented by Scott Verch, Defendant Morgan Stanley represented by Kevin Schwartz and Defendant Salomon Smith Barney represented by Peter Colquitt.

565. Defendant BofA was represented in this again auction by Paul Jay Saunders, who has reportedly received a target letter from the DOJ, informing him that the DOJ intends to seek his criminal prosecution for involvement in the conspiracy alleged herein.

**vi.**     **City of Riverside (California) GIC May 15, 2008 (Row 6)**

566. Manifesting the continuing nature of the conspiracy, the results of the GIC auction conducted on behalf of the City of Riverside on May 15, 2008, suggest that Defendant Wells Fargo submitted a courtesy bid for benefit of Defendant FSA.

567. Defendant Wells Fargo, represented by John Carney submitted a bid of 2.32%, which was **71 basis points** below the winning bid of 3.03% submitted by Defendant FSA represented by Kevin Connolly.  This spread is the sixth largest identified in the preliminary analysis of the eighty-nine reinvestment auctions and close to three times the median spread. Moreover, Wells Fargo's bid was **39 basis points** below the next lowest bid, while all of the rest of the bids are within 15 to 17 basis points of one another.  Given that it is reasonable to assume that Defendant Wells Fargo had access to same information as other bidders, it does not appear that Defendant Wells Fargo submitted this bid with the intention to compete for the contract at auction. Given that Defendant Wells Fargo was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant FSA.

568. This conclusion is supported by Defendant FSA's reported involvement in other publically reported incidents of suspected bid-rigging in municipal derivative auctions and, as described below, the attention Defendant FSA has attracted in government investigations of the conspiracy alleged herein.

569. The other participants in the May 15, 2008 auction were Royal Bank of Canada, represented by Frank Postiglione and Defendant Rabobank, represented by John Gallagher.

570. A Provider who passed on the auction was Trinity Funding Company.

571. Providers that did not reply for the auction include Defendant Bank of America and Defendant JP Morgan.

### vii.     City of Riverside (California) GIC Nov. 17, 2004 (Row 7)

572. As mentioned above, on November 17, 2004, Defendant BayernLB submitted a suspiciously low bid in GIC auction conducted on behalf of the City of Riverside, and Defendant MBIA won the auction, less than six months after Defendant BayernLB had submitted a suspiciously low bid in another GIC auction conducted on behalf of the City of Riverside that Defendant MBIA ultimately won.

573. In the November 17, 2004 auction, Defendant BayernLB, represented by Alfredo Perez submitted a bid of 4.36%, **66 basis points** below the winning bid of 5.02% submitted by Defendant MBIA represented by Jim Binette. This spread is the seventh largest identified in the preliminary analysis of the eighty-nine reinvestment derivative auctions and is more than two and half times the median spread. Given that it is reasonable to assume that Defendant BayernLB had access to the same information as other bidders, it does not appear that Defendant BayernLB submitted this bid with the intention to compete for the contract at auction. Given that Defendant BayernLB was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant MBIA.

574. This conclusion is reinforced by the identification of another plausible courtesy bid submitted by Defendant BayernLB in the May 28, 2004 auction that was also won by Defendant MBIA. Together, these two event suggest ongoing collusion between Defendant BayernLB and Defendant MBIA.

575. As mentioned above, this conclusion is further supported by Defendant BayernLB's involvement in the New Mexico University municipal derivative auction that has drawn the attention of the DOJ's antitrust division.

576. The other participants in the November 17, 2004 auction were AIG represented by Chris Toft, Defendant CDC represented by S. Maisonneuve, Defendant Rabobank represented by John Gallagher, and Defendant GE Trinity Plus represented by Peter Grimm.

577. Participants that passed in the auction were FGIC represented by Peter Grimm and Defendant FSA represented by Steven Goldberg.

### viii.    City of Los Angeles (California) GIC April 27, 2005 (Row 8)

578. The results of the April 27, 2005 GIC auction conducted on behalf of the City of Los Angeles suggest that Defendant MBIA, represented by Maggie Walsh, submitted a courtesy bid for the benefit of co-conspirator Transamerica, represented by Matt Meaney.

579. Defendant MBIA's bid of 3.40% was **62 basis points** below co-conspirator Transamerica's winning bid. This spread is the eighth largest identified in the preliminary analysis of the eighty-nine reinvestment derivative auctions and is just under two and half times the median spread. Given the reasonable assumption that Defendant MBIA had access to the same information as other bidders, including market rates, it does not appear that Defendant MBIA submitted this bid with the intention of competing for the contract at auction. Given that

Defendant MBIA had the freedom to pass if did not want to compete for a particular auction, it therefore appears most plausible that Defendant MBIA submitted this bid as a courtesy, most likely for co-conspirator Transamerica.

580.    Reinforcing this conclusion is the fact that only three bids were submitted.  As mentioned above, Treasury Regulations require that at least three bids be submitted in order for a presumption of fair market value to apply to GIC procured through auction.  Thus, without Defendant MBIA's bid, the auction would not have met the required qualifications, and co-conspirator Transamerica could not have won the contract.  The fact that Defendant MBIA submitted a bid that had no possibility of being competitive but operated to satisfy these IRS Regulations strongly suggests that Defendant MBIA submitted the bid as courtesy to co-conspirator Transamerica.

581.    This conclusion is reinforced by the fact that, as described below, in an auction conducted on behalf of the City of Los Angeles almost exactly three years before, on April 2, 2002, it appears that co-conspirator Transamerica submitted a courtesy bid for the benefit of Defendant MBIA.  In other words, it suggests that in the April 27, 2005 auction Defendant MBIA was *paying back* co-conspirator Transamerica for a similar courtesy done for Defendant MBIA three years before.

582.    The other participant in the April 27, 2005 auction was Defendant CDC/IXIS, represented by Vincent Bernardeau.  The participants who passed in the auction were Defendant FSA, represented by Walter Schemistsch, Defendant Rabobank represented by John Gallagher, and XL Asset represented by K. Brinkman.

583.    The results of the September 6, 2001 GIC auction conducted on behalf of San Mateo County suggest that Defendant BofA submitted a courtesy bid for the benefit of Salomon Smith Barney.

584.    Defendant BofA, who was represented by James B., submitted a bid of 2.64%, which was **57 basis points** below the winning bid of 3.21% submitted by Salomon Smith Barney, who was represented by Peter Colquitt.  This spread is the ninth largest identified in the preliminary analysis of the eighty-nine reinvestment auctions and is over two times the median spread.  Moreover, Defendant BofA's bid was **36 basis points** below the next lowest bid, while all of the rest of the bids are within 1 to 21 basis points of one another.  In fact, the other bids were all concentrated in two tight clusters, one in the 3.00% range and the other in the 3.20% range.  This supports the assumption that all of the potential bidders, including Defendant BofA, had equal access to the same information, including market rates, and, thus that Defendant BofA knew the bid it submitted would not be competitive.  Given that Defendant BofA was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant Salomon Smith Barney.

585.    This conclusion is supported by Defendant BofA's admission that it participated in bid-rigging in municipal derivative auctions and publicized reports of tape recordings of Defendant BofA employees discussing submission of courtesy bids on behalf of other providers.

586.    The other participants in the September 6, 2001 auction were Lehman Brothers represented by Anatoly Zelikoff, First Union, a corporate predecessor of Defendant Wachovia,

Defendant Bear Stearns, represented by Anne Kulicu, and Defendant Morgan Stanley represented by Kevin Schwartz.

x.      <strong>City of Los Angeles (California) GIC March 19, 2002 (Row 10)</strong>

587.     The results of the March 19, 2002 GIC auction conducted on behalf of Los Angeles suggest that co-conspirator Transamerica submitted a courtesy bid for the benefit of Defendant MBIA.

588.     Provider co-conspirator Transamerica represented by Cliff Jenkins submitted a bid of 5.55%, which was **51 basis points** below the winning bid of 6.06% submitted by Defendant MBIA represented by Jacquelyn Hamme.  This spread is the tenth largest identified in the preliminary analysis of the eighty-nine reinvestment auctions and approximately two times the median spread.  Moreover, Defendant BofA's bid was **37 basis points** below the next lowest bid, while all of the rest of the bids are within 1 to 14 basis points of one another.  In fact, the other bids were all concentrated in a tight cluster, in the 5.92% to 6.06% range.  This supports the assumption that all of the potential bidders, including co-conspirator Transamerica, had equal access to the same information, including market rates, and, thus that co-conspirator Transamerica knew the bid it submitted would not be competitive. Given that co-conspirator Transamerica was free to pass in the auction, it therefore appears most probable that its bid was submitted as courtesy bid, most likely for the benefit of the ultimate winner of the auction, Defendant MBIA.

589.     This conclusion is supported by Defendant MBIA's submission of what appears to have been a courtesy bid for the benefit of co-conspirator Transamerica in another GIC auction conducted on behalf of Los Angeles, three years later.  Together, these two events suggest that

157

co-conspirator Transamerica and Defendant MBIA had an agreement whereby each would submit a courtesy bid for the benefit of the other in various GIC auctions, depending on the circumstances. This conclusion is further supported by the descriptions above of two other auctions in which it appears that Defendant MBIA was also the beneficiary of courtesy bids submitted by Defendant BayernLB. Thus, it appears that Defendant MBIA has engaged in a pattern of courtesy bid activity in reinvestment derivative auctions with various other providers.

590. The other participants in the March 19, 2002 auction were Defendant GE Trinity Plus represented by Peter Grimm, AIG represented by Lee Arthurs, Ambac represented by John Tsigakos, Defendant CDC represented by Vincent Bernardeau, and Defendant FSA represented by Steven Goldberg.

### b. San Mateo County (California) November 14, 2003 Swap Transaction

591. On November 17, 2003, San Mateo County through its Joint Powers Financing Authority issued $155,350,000 in auction-rate bonds. San Mateo's ARBs were split into three series, two of which reset on a weekly basis and one of which reset every thirty-five days.

592. San Mateo sought to hedge the interest rate risk involved with these types of issuances while taking advantage of short-term interest rates to which this type of issuance gave it access to by entering into swap transactions that would cover $133,550,000 of the $155,350,000 issuance amount. San Mateo intended to prepay to bond holders the remaining $20,000,000 from a grant.

593. From San Mateo's perspective, the swap would be a fixed to floating rate swap, whereby San Mateo would make payments at specified intervals based on a fixed interest rate on an amortizing amount of principal. In exchange, San Mateo would receive payments at the same

specified intervals based on a floating rate of interest on the same amortizing amount of principal.

594.     Defendant Salomon Smith Barney and co-conspirator Lehman were the underwriters of the underlying bonds.  From this position, Defendant Salomon Smith Barney and Lehman offered to act as the swap providers according to an approximately 70/30 split that mirrored the split between them as to the underwriting of the associated bonds.  Defendant Salomon Smith Barney would act as the counter-party for approximately 70% of the total amount, $93,450,000, and Lehman Brothers would act as the counter-party for the remaining approximately 30% of the total amount, $40,100,000.

595.     Together, Defendant Salomon Smith Barney and Lehman proposed to San Mateo a pricing methodology that would be used at the date set for pricing ("Price Date") to determine the terms of the swap.  This methodology was proposed orally to San Mateo a few weeks before the Price Date.  Included in this proposal were mechanisms by which Defendant Salomon Smith Barney and Lehman represented to San Mateo that it would be able to independently evaluate the proposed swap terms.

596.     San Mateo found the proposed evaluation mechanisms difficult to verify.  It was, therefore, decided that San Mateo would attempt to evaluate the terms of the swap by seeking pricing quotations from personnel at Defendant UBS and Defendant Piper Jaffray.   Defendant Salomon Smith Barney and Lehman were given a right of first refusal, according to which each would be given the opportunity to meet or beat any terms offered by UBS or Piper Jaffray.

597.     A few days prior to the Price Date, a representative of San Mateo contacted an employee at Defendant Piper Jaffray, who gave a rough pricing that turned out to be within a few basis points plus or minus of the terms offered by Salomon Smith Barney and Lehman at closing.

598.     The day before the Price Date, a representative of San Mateo contacted a member of Defendant UBS' swap trading desk, who confirmed that the pricing being offered by Lehman and Defendant Salomon Smith Barney was very close to what his desk was offering.  Ultimately, the specific terms offered by Defendant UBS were within a couple of basis points plus or minus what the terms offered by Lehman and Defendant Salomon Smith Barney at the Price Date.

599.     The final terms at the Price Date were that San Mateo would pay a fixed rate of 3.33% and receive one half of the United States Dollar London Interbank Offered Rate ("LIBOR") plus .29% .

600.     In advance of the Price Date, San Mateo determined that Lehman's stand-alone credit-rating was too low for it to serve as a counter-party in the swap transaction.   In reaction to these concerns, Lehman entered into an arrangement with co-conspirator AIG Financial whereby AIG Financial would replace Lehman as counter-party to the $40,100,000 swap.  Lehman chose AIG Financial Products as its replacement, and San Mateo was not made privy to negotiations between Lehman and AIG Financial Products, or the terms of any deal reached between them. No negotiations occurred between San Mateo and AIG Financial Products.

601.     San Mateo was told by Lehman only that AIG Financial Products was "laying off" the risk to Lehman and being paid for providing the credible counter-party rating.

602.     A preliminary analysis of the terms of the swaps suggests that Defendant Salomon Smith Barney, AIG Financial Products, Defendant UBS, Defendant Piper Jaffray, and co-

conspirator Lehman Brothers colluded to artificially depress the terms of the deal that San Mateo received, while making those terms appear competitive.

603.    The terms of San Mateo's swaps were analyzed using the SWPM analytic command on Bloomberg, a financial data and analysis tool popularly used by investment professionals.  The SWPM command analytic uses LIBOR yield curves as an input to a discounted cash flow model into which various pieces of information are inputted.  Using this command analytic, the value of cash flows San Mateo received under the terms of the swap can be compared with the value of the cash flows San Mateo paid under the swap.

604.    Because the swaps do not involve any significant up front payment by either San Mateo or either of the ultimate swap providers, Defendant Salomon Smith Barney or AIG Financial Products or Lehman, the value of the cash flows received by San Mateo should be equal to the value of the cash flows paid by San Mateo.  As discussed herein, this is based on the logic of rational pricing, which is supposed to underlie swap valuations.  In fact, however, based on this preliminary analysis, which accounted for transaction costs based on bid/ask spreads, the value of cash flows paid by San Mateo to Defendant Citibank, under the terms of the swap, was $2,296,859 more than the value of the cash flow that Defendant Citibank was obligated to pay San Mateo.  This difference equals approximately 2.45% of the principal amount of $23,450,000.

605.    The $40,100,000 portion of the swap deal for which AIG Financial Products was ultimately the counterpart was similarly negatively valued against San Mateo: the value of the cash flows to be paid by San Mateo to AIG Financial Products was worth $982,379 less than the cash flows to be paid by AIG Financial Products to San Mateo.  This difference again equals approximately 2.45% of the principal amount of $40,100,000.  Another way of looking at this is

that San Mateo should have been paid $3,279,309 by Defendants at the initiation of the transactions in order for the swap terms to have been fair. Or to state it differently again, the spread between the swap terms and fair market price was approximately $3.3 million of 245 base points.

606. It is very difficult to understand, therefore, why Defendant UBS and Defendant Piper Jaffray would have given market quotes to San Mateo that were so close to the terms offered by Defendant Citibank or Lehman. Indeed, the most plausible explanation is that Defendant UBS and Defendant Piper Jaffray were made aware of the terms offered by Citibank and Lehman/AIG Financial Products and deliberately quoted terms to San Mateo with the purpose of falsely portraying the terms offered by Citibank and Lehman/AIG Financial Products as fair. Indeed, the economically rational thing for Defendant UBS or Defendant Piper Jaffrey to do would have been to offer San Mateo terms that would have yielded them a lower but still substantial spread.

### 4. Publicized Evidence Of The Conspiracy's Operation In Municipal Derivative Transactions

#### a. Pacific Matrix - Stifel Transactions

607. One of the most detailed publicized examples of bid-rigging in reinvestment derivative auctions come from a series of SEC settlements, cumulating in 2002, arising from claims against multiple participants from all corners of the municipal market. The settlements arose from claims against, including but not limited to, former Stifel, Nicolaus & Co. investment banker Robert Cohran, for bid-rigging involving Pacific Matrix, from which Christopher Winters

left in 1992 to form Broker Co-conspirator Feld Winters, and Stifel, Nicolaus & Company, Inc. ("Pacific Matrix - Stifel Transactions").

608. The Pacific Matrix - Stifel Transactions covered by the SEC settlement involved the rigging of reinvestment derivative auctions conducted on behalf of the Oklahoma Turnpike Authority, the Sisters of St. Mary's Health Care Obligated Group, and the Pottawatomie County Development Authority, in the early 1990s. Information revealed in the SEC settlement of claims related to these transactions powerfully demonstrates how the mechanisms of the conspiracy described above, including the roles played by "**last looks**", "**courtesy bids**", and "**kickbacks**" as well as the important role that **personal relationships** and **repeat business** played in advancing the conspiracy.

### i.    Oklahoma Turnpike Authority GIC

609. In February 1989, the Oklahoma Turnpike Authority ("OTA") issued $568 million in revenue bonds. A portion of the bond proceeds was to be invested in a GIC. Although bond counsel and the OTA required the GIC to be competitively bid, a vice president of Pacific Matrix and employees of Stifel, Nicolaus & Company, Inc. ("Stifel"), a broker, conspired to ensure that AIG (the corporate parent of co-conspirator AIG Financial and AIG Sunamerica) won the auction.

610. According to court filings and press reports, prior to the bidding, Robert Cochran, Stifel's executive vice president, contacted Pacific Matrix and suggested a scheme whereby Pacific Matrix and Cochran would bring in the winning GIC provider and split the fee paid by the provider. The parties contacted AIG and proposed a plan whereby Pacific Matrix and Stifel would provide AIG with a "**last look**" at the bids.

611.    Cochran had prearranged with a Vice President of Pacific Matrix ("VP") to call Pacific Matrix's office once he had learned what the highest submitted bid was and ask for "Wayne" a fictitious name.  The VP, in turn, had prearranged with Pacific Matrix's secretary to forward any calls made to "Wayne" to him and his supervisor.  By asking for Wayne, Cochran was able to contact the VP without raising suspicions.  Cochran then communicated to the VP the amount AIG needed to bid in order to win the auction.  The VP relayed this information to AIG which then submitted the winning bid.

612.    In return for receiving the last look, AIG paid $300,000 to Pacific Matrix.  Pacific Matrix agreed to split this fee with Stifel and paid the company $150,000 for its involvement in the conspiracy.  In order to facilitate this payment, Pacific Matrix entered into a sham "consulting agreement" with Stifel whereby Stifel would educate Pacific Matrix on forward purchase agreements.  Although Stifel did not provide any services to Pacific Matrix, Pacific Matrix paid him $110,000.  During a subsequent transaction, Pacific Matrix paid the remaining $40,000 to Stifel.

### ii.    Pottawatomie County (Oklahoma) Development Authority

613.    In 1990, the Pottawatomie County Development Authority ("PCDA") issued bonds valued at approximately $18 million.  The PCDA decided to use part of the proceeds from the issue to purchase a GIC.  Pacific Matrix, solicited bids for the GIC, and the contract ultimately was awarded to Banque Indosuez.  In return for brokering the deal, Pacific Matrix received a fee of $109,025 from Banque Indosuez. Pacific Matrix then kicked back $87,220 of the $109,025 to Stifel.

### iii. Oklahoma Turnpike Authority Forward Purchase Agreement

614. In May 1992, the OTA issued approximately $608 million in revenue refunding bonds to advance refund most of its outstanding bonds and to fund proposed turnpike projects. In this transaction, Stifel recommended that the OTA purchase a forward purchase agreement. Again, OTA's bond counsel required that the OTA obtain at least three competitive bids for the forward purchase agreement in order to ensure the fairness of the terms of the ultimate deal; however, unbeknownst to the OTA, Pacific Matrix, with the assistance of Cochran of Stifel, rigged the bidding, this time to ensure selection of Sakura Global Capital, Inc. ("Sakura") as the provider.

615. At about 3:00 a.m. Pacific time on the morning of the bidding, Pacific Matrix provided Cochran with names of firms that would be willing to enter **"courtesy bids"** later that day. Cochran directed Pacific Matrix not to contact any other brokers, thereby preventing them from contacting any "first-tier players." Cochran also provided Pacific Matrix with the winning bid information that would be submitted by Sakura. Pacific Matrix relayed this information to the courtesy bidders so they could be assured that their courtesy bids would be below that which would be submitted by Sakura.

616. Following the transaction, the parties engaged in a series of kickbacks. Stifel and Sakura each paid Pacific Matrix $50,000. Sakura also paid an undisclosed brokerage fee of $6.593 million to Stifel in connection with the deal.

### iv. Sisters of St. Mary's Forward Purchase Agreement

617. In November 1992, the Sisters of St. Mary's Health Care Obligated Group ("St. Mary's") was the beneficiary of four simultaneous issues of conduit bonds by four separate

issuers: the Illinois Health Facilities Authority; the Health and Educational Facilities Authority of the State of Missouri; Dillon County, South Carolina; and the Wisconsin Health and Educational Facilities Authority. Stifel was a co-managing underwriter for the transaction. Stifel recommended that St. Mary's enter into a forward purchase agreement. Although bond counsel required that St. Mary's obtain three competitive bids for the forward, Pacific Matrix again assisted Stifel in ensuring Sakura's selection as the provider.

618.    Pacific Matrix and Stifel conspired to obtain two non-competitive **"courtesy bids"**, while Sakura submitted its winning bid directly to Stifel. Sakura paid an undisclosed brokerage fee of $100,000 to Stifel in connection with the forward purchase agreement.

### b.    Baum - CDC Funding  Transactions

619.    On November 10, 2006, Defendant Broker Baum announced that it had paid an undisclosed penalty to the IRS for illegally diverting profits from approximately 20 reinvestment derivative deals worth more than $2 billion, between 1997 and 2001. During the course of the IRS investigation, it was revealed that in several of the deals Defendant Baum rigged the bidding of reinvestment derivative auction so that Defendant CDC Funding, then known as CDC Funding, would win the contract on terms that constituted a "sweetheart deal" for CDC Funding. According to the IRS, in at least one situation, "CDC had the inside track for the contract because three other bids were late or incomplete."

### c.    Baum - Bank of America Transaction (Rural Enterprises of Okla.)

620.    Evidence of bid-rigging has also been revealed in an IRS investigation of a reinvestment derivative transaction involving Broker Defendant Baum and Defendant Bank of America in 2000. The deal involved a GIC on a $100 million issue from the Illinois

166

Development Finance Authority sold by Rural Enterprises of Oklahoma.  In July 2003, the latter

disclosed that Defendant Bank of America made "significant hidden payments" to Defendant

Baum & Co. in connection with the deal.

### d.     CDR - Bank of America Transaction (City of Atlanta)

621.    Bid rigging concerns have also been raised regarding a $453 million GIC entered

into by the city of Atlanta in 2000 with Defendant Bank of America, after it won an auction run

by Defendant CDR.  The IRS has raised questions whether other firms that participated in the

auction submitted courtesy bids that assisted Defendant Bank of America win the GIC on

artificially depressed terms.

622.    An IRS investigation of Defendant Bank of America has uncovered transcripts of

telephone conversations involving a Bank of America employee that indicates that Bank of

America was itself involved in the submission of courtesy bids.  A related February 2005 letter

from Charles Anderson, then Field Manager of the IRS's tax-exempt bond division states:  "We

have serious concerns about the relationship between Bank of America and CDR relative to this

bond issue."

### e.     CDR - SocGen Transactions (Lease-to-Own And California School Advance Refunding Deals)

623.    An IRS investigation into over 20 lease-to-own deals, as well as several California

School Advance Refunding deals, all involving Provider Defendant SocGen and Broker

Defendant CDR has revealed evidence of bid-rigging and secret payments by SocGen to CDR.

According to the IRS, Defendant SocGen made quarterly payments to Defendant CDR for

"unspecified purposes" in connection with some of these deals.  In another, involving a $27

million bond issued by Pima County, AZ, secret payments made by Defendant SocGen to Defendant CDR have been revealed in connection with the bidding on the associated GIC. Defendant FSA has been identified as one of the four bidders in the GIC auction.

### f. Oxnard California School District And Delano California Joint High School District

624.    CDR and Bank of America were also involved in questionable Municipal Derivatives transactions relating to refunding bonds issued by the Oxnard, California, School District and the Delano, California Joint High School District.  Kinsell of Bank America had a hand in these transactions.  These transactions are also being investigated as part of the federal investigation described herein.

### g. Baum

625.     In November of 2006, as part of a settlement with the IRS, it was disclosed that Baum illegally diverted profits on municipal bond deals.  That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001.  The agency found evidence of bid rigging in these deals.  With respect to 20 tax-exempt bond issuers from Arizona to Florida, Baum rigged GIC bids to allow the winning provider, most often CDC, to underpay for the GIC and simultaneously overpay for other investment agreements and remarketing fees, diverting arbitrage profits back to Baum to pay issuance costs.  These unlawful bid-riggings included GICs relating to (in addition to the Orange County, Florida, Health Facilities Authority and the Western Virginia Hospital Finance Authority described herein):

(a)    A $128 million pooled variable-rate bond deal for the Arizona Health Facilities Authority;

(b)     Two hospital revenue bond issues totaling over $300 million for Ohio Hospital Capital, Inc.;

(c)     $250 million in revenue bonds sold by Knox County, Tennessee's Health, Educational & Housing Facility;

(d)     $84 million in pooled variable-rate bonds sold by the Missouri Health & Educational Facilities Authority; and

(e)     $86.5 million in pooled variable-rate bonds sold by the South Georgia Hospital Authority.

626.    Lail was primarily involved for Baum on most of these deals. For all of them, Gruer of JP Morgan submitted courtesy bids to Baum. On all of these transactions, except the Arizona Health Facilities Authority transaction, a non-defendant provider, whose identity is being kept confidential pursuant to an agreement with the Bank of America, submitted courtesy bids as well. CDC won all six of these transactions. As a kickback, CDC paid a large fee directly into Lail's personal account.

627.    The IRS has alleged that JP Morgan, CDC, Merrill Lynch, Baum, and BofA have conspired in manipulating these and/or other derivative transactions.

### h.     Butler Area School District Swaptions

628.    The Butler Area School District and Butler County General Authority have brought suit against JP Morgan for anti-competitive collusion in connection with a 2003 swaption and a Constant Maturity Swap Amendment dated August 22, 2006. Butler has identified Gregory R. Zappala, Nicholas Falgione, and Michael Lena of JP Morgan, and Stallone,

169

David J. Eckhart, Michael Garner and Robert Jones of IMAGE as the individuals who manipulated this transaction.

### i. North Carolina University State Student Aid Association

629.     In August 2004, a Bank of America employee and a Wachovia employee discussed the pricing of a swap transaction for the NC State Student Aid Association that the Defendants were splitting.  This transaction was not bid out.

### j. Jefferson County (Alabama) Sewer Swaps

630.     One of the most publicized recent examples of Defendants' anti-competitive conspiracy is a series of deals facilitated by Defendant CDR involving 18 interest-rate swaps with a combined notional value $5.6 billion entered into by Jefferson County, Alabama with Defendants Bank of America, JP Morgan, Bear Stearns, and co-conspirator Lehman.  Through the deals, Defendants and co-conspirator Lehman earned $120 million in fees – six times the prevailing rate.

631.     In addition, according to filings by the SEC made in connection with its November 4, 2009 settlement with Defendant J.P. Morgan Securities – valued at more than $700 million – and a separate civil complaint filed by the SEC the same day against two former JP Morgan managing directors ("McFaddin and LeCroy Complaint," collectively with documents related to the SEC's settlement with J.P. Morgan Securities, the "SEC Jefferson Filings"), Douglas MacFaddin and Charles LeCroy, Defendant Goldman Sachs received $3 million for its participation in the scheme, co-conspirator Rice Financial received $1.4 million, and co-conspirator Blount Parish received approximately $3 million.

632.     The SEC Jefferson Filings reveal that JP Morgan made the $3 million payment to Goldman Sachs and the $1.4 million payment to Rice Financial in exchange for Goldman's and Rice's agreement not to compete with JP Morgan for a $1.1 billion swap deal associated with the county's 2003-B sewer bonds.  Specifically, the McFaddin and LeCroy Complaint describes how, during the spring of 2003, JP Morgan's MacFaddin and LeCroy were "actively soliciting" the swap deal, while at the same time "Goldman Sachs and . . . Rice Financial were also pitching swap deals with the County."  The Complaint explains that MacFaddin and LeCroy ultimately decide to make payments to Goldman Sachs and Rice Financial "[t]o prevent Goldman Sachs or Rice Financial from executing their own swap transactions with the county and ensure the County selected JPMorgan Chase as the swap provider."  However, "neither firm entered into a swap agreement with the County, or served as an advisor to the County on this transaction."  Thus, there was no legitimate justification for the payments; rather, the payments were part of Defendants' collusive anticompetive conspiracy.  These payments were eventually passed along to the County and its taxpayers in the form of higher interest rate charges in the swaps.

633.     JP Morgan tried to disguise the payment to Goldman Sachs by making the payment "through a swap agreement between Goldman Sachs and JP Morgan Chase Bank created solely as mechanism to make this payment."  According the MacFaddin and LeCroy Complaint, "LeCroy later joked with MacFaddin in another call about JPMorgan's 'philanthropic work' by 'giving a charitable donation to Goldman'  for 'taking no risk.'"

634.     In exchange for this payment, however, JP Morgan received something of real value from Goldman Sachs:  Goldman Sachs' agreement not to compete with JP Morgan in not

only the swap deal associated with the 2003-B sewer bonds, but also subsequent swap

transactions of the County.

635.    In the context of a subsequent $789 million swap transaction associated with the

County's 2003-C sewer bonds, LeCroy indicated to an unidentified associate at JP Morgan that

"Goldman [was] out."  In order to ensure that no other potential competitors would compete for

the deal, JP Morgan paid co-conspirator Blunt Parish $2.6 million.

636.    The MacFaddin and LeCroy Complaint relates the following exchange between

LeCroy and same unidentified JP Morgan associate:

> Associate:      How does [Blount Parish principal Bill Blount] get 15%? for doing
>                 what?
>
> LeCroy:         For, basically, his role in this deal –
>
> Associate:      For not messing with us?
>
> LeCroy:         – not messing with us, and, I said to [Blount], look the only way
>                 I'm willing to even entertain this is if you're successful in **_keeping
>                 every other firm out of this deal_**.  That's right.  I said, so, because
>                 you know, we've got a lot more latitude dealing with him than
>                 Goldman Sachs. And I've got to pay him some on the bonds.  But,
>                 it's a lot of money, but in the end it's worth it on a billion-dollar
>                 deal.

(emphasis added).

637.    In another conversation described in the MacFaddin and LeCroy Complaint,

LeCroy is quoted saying to the associate:

> "'We've cut our deals with the locals as the County has directed us to, that's all
> done.  I got that done up front this time to avoid Goldman Sachs and anybody like
> that coming in.  **_B of A made a run at it yesterday_**, and I was able to get the
> Commissioner [Langford] to cancel the meeting.  **_So I think I can hold them off.
> But that is gonna cost us, from the swap side about, oh - it's gonna cost us - all
> in about $3.5 million, but part of that is coming out of the bonds..._**'"

(emphasis added).

638.    The MacFaddin and LeCroy Complaint continues: "Ultimately, . . . LeCroy and MacFaddin arrange for JP Morgan to pay Blount Parrish $2.6 million. . . for ensuring JP Morgan was selected as underwriter and swap provider." The MacFaddin and LeCroy Complaint indicates elsewhere that in connection with the transaction "a $1.3 million co-underwriting fee [was made] to [Defendant] Bank of America" and that Bank of America made a "payment to a third-party broker-dealer acting as a remarketing agent."

639.    As the director of the SEC's Enforcement Division, Robert Khuzami, put it, "The transactions were complex but the scheme was simple. Senior J. P. Morgan bankers made unlawful payments to win business and earn fees."

640.    Commenting in May 22, 2008 Bloomberg article on the Jefferson County case, Christopher "Kit" Taylor, director of the Municipal Securities Rulemaking Board from 1978-2007, noted the overlap between the DOJ antitrust division's investigation of the municipal derivatives industry and the Jefferson County case: "In Jefferson County's case, the people who were allegedly doing the price fixing were right at the center of the scandal."

641.    JP Morgan's MacFaddin, for example, who was deeply involved in the Jefferson County case, revealed in FINRA filings that he is the target of criminal prosecution by the DOJ in connection with its antitrust division's investigation of anti-competitive conduct in the municipal derivatives industry. As is also described herein, the CW identified MacFaddin among the JP Morgan employees involved in conspiratorial communications related to various municipal derivatives deals; and MacFaddin was the supervisor of the other JP Morgan employees who are repeatedly identified in other such communications by the CW.

642.     Just as the CW's supervisor at Defendant Bank of America, Phil Murphy, would express disappointment with the CW if he did not know who would win a Municipal Derivative auction in advance of bidding, JP Morgan's LeCroy, in response to concerns voiced by the unidentified JP Morgan associate about the payments made to eliminate competition described herein, explained "'That's the deal– *that's the price of doing business*.'" (emphasis added).

### k.     Biola University (California) Swap

643.     A 2007 lawsuit filed by Biola University ("Biola") against Bank of America and BNP Paribas ("BNP"), sheds further light on the collusion between brokers and providers.  In 2002, Defendant Bank of America recommended that Biola University enter into a interest rate swaps with BNP.  Bank of America represented to Biola that the swaps BNP provided would be priced "on market" and that the swap prices were objectively determined by current market rates.  Unbeknownst to Biola, Bank of America and BNP collusively set the interest rate tied to the swaps and included excessive markups which Defendants did not disclose.  After Biola executed the swap agreement, these markups were secretly transferred to Bank of America through an undisclosed mirror swap between it and BNP.  As part of the undisclosed mirror swap, Bank of America would <u>kickback</u> a portion of the fees to BNP.

### VI.
### RIVERSIDE MUNICIPAL DERIVATIVE TRANSACTIONS

644.     A preliminary investigation by Riverside has identified the following Municipal Derivative transactions that occurred during the period on which the DOJ has focused its investigation, discussed herein, and that were affected by the conspiracy alleged herein.

645. In terms of total commerce, Riverside's preliminary investigation has revealed that, during this period, Riverside reinvested over of $876,334,681 of bond proceeds in reinvestment derivatives, entered into interest rate swaps associated with $506,625,000 worth of bond issuances, and entered into a debt service forward sales agreement of $1,962,956.

646. The operation of Defendants' illegal conspiracy depended on personal relationships between representatives of Defendants and the repeated participation of the same representatives in multiple transactions. As the following descriptions show, in the Municipal Derivative transactions of Riverside and other California cities and counties, the same Defendants participated and were represented in the transactions by the same individuals. This allowed Defendants' conspiracy to operate and thrive in Riverside's Municipal Derivative transactions.

647. As a result of the industry-wide and inter-transactional quality of the Defendants' illegal conspiracy, all of the Municipal Derivative transactions entered into by Riverside during the period of the conspiracy, including but not limited to those transactions described bellow, were affected by the conspiracy and Riverside was injured thereby. The injuries suffered by Riverside thereby include but are not limited to: receiving a rates of return on reinvestment derivatives that were artificially depressed and uncompetitive, receiving swap rates that were artificially depressed and uncompetitive, receiving terms on other kinds of municipal derivatives that were artificially depressed and uncompetitive, entering into municipal derivative transactions with providers that carried increased credit risks which were not reflected in the terms of the transaction, engaging brokers for transactions that had conflicts of interest with Riverside, and paying uncompetitive and inflated fees and costs associated with the transactions.

**A.** **Reinvestment Derivative Transactions**

    **1.** **City of Riverside 2006 Lease Revenue Certificates of Participation (Galleria at Tyler Public Improvements) Project Fund GIC**

648.    On September 27, 2006, Riverside entered into a GIC with Defendant FSA for the reinvestment of $16,878,067 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

| | | |
|---|---|---|
| • | Defendant Bank of America | "Pass" |
| • | Defendant FSA | 5.053% |
| • | Defendant MBIA | "Pass" |
| • | Defendant Rabobank | 5.16% |
| • | Transamerica | 4.93% |
| • | Defendant GE Trinity Plus Funding | 4.959% |
| • | Defendant Wells Fargo | 4.971% |
| • | XL Asset | 4.97% |

649.    In the auction for the GIC, Defendant Bank of America was represented by Danielle Lardinais; Defendant FSA was represented by Craig Reckin; Defendant MBIA was represented by James Binette; Defendant Rabobank was represented by John Gallagher; Transamerica was represented by Matt Meaney; Defendant GE Trinity Plus Funding was represented by Alex Lehrer; Defendant Wells Fargo was represented by Chris Borjon; and XL Asset was represented by K. Brinkman.

650.    The broker involved with this GIC transaction was Bond Logistix.  The representative from Bond Logistix involved in this transaction was Rick Hernandez.  After reviewing the terms and conditions of each bid, Riverside selected Defendant FSA to act as the provider.

2. **City of Riverside 2006 Lease Revenue Certificates of Participation (Galleria at Tyler Public Improvements) Reserve Fund GIC**

651. On September 27, 2006, Riverside entered into a GIC with Defendant MBIA for the reinvestment of $1,337,591 in bond proceeds. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

Reserve Fund - 2016:

- Defendant Bank of America    "Pass"
- Defendant FSA    "Pass"
- Defendant MBIA    5.11%
- Defendant Rabobank    4.76%
- Transamerica    4.90%
- Defendant GE Trinity Plus Funding    4.943%
- Defendant Wells Fargo    "Pass"
- XL Asset    4.96%

Reserve Fund- 2036:

- Defendant Bank of America    "Pass"
- Defendant FSA    "Pass"
- Defendant MBIA    4.97%
- Defendant Rabobank    4.81%
- Transamerica    4.80%
- Defendant GE Trinity Plus Funding    4.968%
- Defendant Wells Fargo    "Pass"
- XL Asset    4.80%

652. In the auction for the GIC, Defendant Bank of America was again represented by Danielle Lardinais; Defendant FSA was again represented by Craig Reckin; Defendant MBIA was again represented by James Binette; Defendant Rabobank was again represented by John Gallagher; Transamerica was again represented by Matt Meaney; Defendant GE Trinity Plus

Funding was again represented by Alex Lehrer; Defendant Wells Fargo was again represented by Chris Borjon; and XL Asset was again represented by K. Brinkman.

653. The broker involved with this GIC transaction was Bond Logistix. The representative from Bond Logistix involved in this transaction was Rick Hernandez. After reviewing the terms and conditions of each bid, Riverside selected Defendant MBIA to act as the provider.

**3.** **City of Riverside (ARS Mode) Certificates of Participation (Various Capital Improvement Projects) Series 2007 A & B GIC**

654. On April 5, 2007, Riverside entered into a GIC with Defendant Salomon Smith Barney (then known as Citigroup Financial Products) for the reinvestment of $117,469,111 in bond proceeds. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

| | |
|---|---|
| • Ambac | "Pass" |
| • Transamerica | 4.707% |
| • Defendant Bank of America | "Pass" |
| • Defendant Salomon Smith Barney | 4.871% |
| • Defendant FSA | "Pass" |
| • Defendant JP Morgan | "Pass" |
| • Defendant MBIA | 4.764% |
| • Defendant Rabobank | 4.831% |
| • Defendant Royal Bank of Canada | "Pass" |
| • Defendant UBS | "Pass" |
| • Defendant Wachovia | "Pass" |
| • Defendant Wells Fargo | "Pass" |
| • XL Asset | 4.78% |

655. In the auction for the GIC, Ambac was represented by T. Stevenson; Transamerica was again represented by Matt Meaney; Defendant Bank of America was again represented by Danielle Lardinais; Defendant Salomon Smith Barney (then known as Citigroup Financial

Products) was represented by Peter Colquitt; Defendant FSA was represented by S. Goldberg,

Defendant JP Morgan was represented by James Hertz; Defendant MBIA was represented by

Maggie Walsh; Defendant Rabobank was again represented by John Gallagher; Defendant Royal

Bank of Canada was represented by Frank Postiglione; Defendant UBS was represented by J.

Michaels; Defendant Wachovia was represented by B. Kern; Defendant Wells Fargo was again

represented by Chris Borjon; and XL Asset was again represented by K. Brinkman.

656.    The broker involved with this GIC transaction was Bond Logistix.  The

representative from Bond Logistix involved in this transaction was Amy Kron.  After reviewing

the terms and conditions of each bid, Riverside selected Defendant Salomon Smith Barney (then

known as Citigroup Financial Products) to act as the provider.

**4.      City of Riverside Variable Rate Refunding Certificates of Participation
(Riverside Renaissance Projects) Series 2008 Reserve Fund GIC**

657.    On April 25, 2008, Riverside entered into a GIC with AIGMFC for the

reinvestment of $ 7,422,802 in bond proceeds.  Prior to entering into the GIC, Riverside solicited

bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- Defendant CDC                          4.6700%
- Defendant Rabobank                 4.7100%
- AIGMFC                                     4.7030%
- GE Funding                              4.6130%
- Defendant FSA                          "Pass"
- Defendant Bank of America      "No Reply"
- Defendant JP Morgan               "No Reply"

658.    In the auction for the GIC, Defendant CDC was represented by Vincent

Bernardeau; Defendant Rabobank was represented by D. Ngo; AIGMFC was represented by R.

Feliciano; and GE Funding was represented by Bill Fischer.

659.     The broker involved with this GIC transaction was Bond Logistix.  The representatives from Bond Logistix involved in this transaction were Amy Kron and Derek Johnston.  After reviewing the terms and conditions of each bid, Riverside selected AIGMFC to act as the provider.

### 5.     City of Riverside Variable Rate Refunding Certificates of Participation (Riverside Renaissance Projects) Series 2008 Project Fund GIC

660.     On April 28, 2008, Riverside entered into a GIC with GE Funding for the reinvestment of $27,534,907 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- AIGMFC                            3.0100%
- Defendant CDC                     3.0100%
- Defendant Rabobank                2.7110%
- Defendant GE Funding              3.0370%
- Defendant FSA                     3.0050%
- Defendant Bank of America         "No Reply"
- Defendant JP Morgan               "No Reply"

661.     In the auction for the GIC, AIGMFC was again represented by R. Feliciano; Defendant CDC was again represented by Vincent Bernardeau; Defendant Rabobank was again represented by D. Ngo; Defendant GE Funding was again represented by Bill Fischer; and Defendant FSA was represented by Kevin Connolly.

662.     The broker involved with this GIC transaction was Bond Logistix.  The representatives from Bond Logistix involved in this transaction were Amy Kron and Derek Johnston.  After reviewing the terms and conditions of each bid, Riverside selected GE Funding to act as the provider.

**6.**     **City of Riverside Electric Revenue Bonds Issue of 2001 - GIC**

663.     On August 16, 2001, Riverside entered into a GIC with AIGMFC for the reinvestment of $4,750,000 in bond proceeds. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

- AIGMFC                                 5.241% / 4.841%
- Ambac                                    4.85% / 4.60%
- Defendant CDC                       "Pass" / "Pass"
- Defendant JP Morgan            "Pass" / "Pass"
- Defendant MBIA                    4.82% / 4.70%
- SARCo                                   "Pass" / "Pass"
- Defendant PaineWebber        "Pass" / "Pass"

664.     In the auction for the GIC, AIGMFC was represented by Keith Stein; Ambac was represented by John Tsigakos; Defendant CDC was represented by Vincent Bernardeau; Defendant JP Morgan was represented by Scott Verch; Defendant MBIA was represented by Jacquelyn Hamme; SARCo was represented by Peter Colquitt; and Defendant PaineWebber was represented by Gary Heinz.

665.     The broker involved with this GIC transaction was Bond Logistix. The representative from Bond Logistix involved in this transaction was Amy Kron. After reviewing the terms and conditions of each bid, Riverside selected AIGMFC to act as the provider.

**7.**     **City of Riverside Electric Revenue Bonds Issue of 2001 - GIC**

666.     On September 4, 2003, Riverside entered into a GIC with Defendant GE Trinity Plus Funding for the reinvestment of $4,721,500 in bond proceeds. The interest rate of reinvestment was 6.03%.

**8.    City of Riverside Electric Revenue Bonds Issue of 2001 - GIC**

667.    On October 5, 2006, Riverside entered into a GIC with Defendant FSA for the

reinvestment of $4,392,350 in bond proceeds.  The interest rate of reinvestment was 5.03%.

**9.    City of Riverside Electric Refunding Revenue Bonds Issue of 2003 - GIC**

668.    On July 31, 2003, Riverside entered into a GIC with Defendant GE Trinity Plus

Funding  for the reinvestment of $7,540,500 in bond proceeds.  Prior to entering into the GIC,

Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the

following bids:

| | | |
|---|---|---|
| • | AIGMFC | 4.11% / 4.22% |
| • | Ambac | "Pass" / "Pass" |
| • | ARMCo | "Pass" / "Pass" |
| • | Defendant Bank of America | 4.11% / 4.29% |
| • | Defendant BayernLB | 4.06% / 4.42% |
| • | Defendant CDC | 4.16% / "Pass" |
| • | FGIC | "Pass" / "Pass" |
| • | Defendant FSA | 4.145% / "Pass" |
| • | Defendant JP Morgan | "Pass" / "Pass" |
| • | Defendant MBIA | 4.04% / 4.04% |
| • | Defendant Morgan Stanley | "Pass" / "Pass" |
| • | Defendant Rabobank | 4.17% / "Pass" |
| • | Defendant Salomon Smith Barney | "Pass" / "Pass" |
| • | Defendant GE Trinity Plus Funding | 4.257% / 4.537% |
| • | XL Asset | 3.86% / 3.81% |

669.    In the auction for the GIC, AIGMFC was represented by Chris Toft; Ambac was

represented by Jessica Carcaterra; ARMCo was represented by D. Burlage; Defendant Bank of

America was represented Jay Saunders; Defendant BayernLB was represented by Frank

Postiglione; Defendant CDC was again represented by Vincent Bernardeau; FGIC was

represented by Peter Grimm; Defendant FSA was represented by Walter Schemitsch; Defendant

JP Morgan was again represented by Scott Verch; Defendant MBIA was again represented by

James Binette; Defendant Morgan Stanley was represented by Kevin Schwartz; Defendant Rabobank was again represented by John Gallagher; Defendant Salomon Smith Barney was again represented by Peter Colquitt; GE Trinity Plus Funding was again represented by Peter Grimm; XL Asset was again represented by K. Brinkman. As alleged herein, a preliminary examination of bidding information for this transaction suggests that XL Asset submitted a courtesy bid for the benefit of Defendant GE Trinity Plus Funding.

670. The broker involved with this GIC transaction was Bond Logistix. The representative from Bond Logistix in this transaction was Amy Kron. After reviewing the terms and conditions of each bid, Riverside selected GE Trinity Plus Funding to act as the provider.

**10.** **City of Riverside Electric Revenue Bonds Issue of 2004A (Fixed Rate Bonds) and Issue 2004B (Auction Rate Securities) Construction Fund - GIC**

671. On June 10, 2004, Riverside entered into a GIC with GE Trinity Plus Funding for the reinvestment of $93,018,253 in bond proceeds. As alleged herein, the DOJ has subpoenaed a detailed list of documents relating to this transaction. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

| | |
|---|---|
| • Transamerica | BMA + 15 |
| • AIG | BMA + 6 |
| • Ambac | "Pass" |
| • Defendant BayernLB | BMA + 12 |
| • Defendant CDC | BMA + 21 |
| • Defendant Citigroup | BMA + 2 |
| • FGIC | "Pass" |
| • Defendant FSA | BMA + 15 |
| • Defendant JP Morgan | "Pass" |
| • Defendant MBIA | BMA + 0.0 |
| • Defendant Rabobank | BMA + 26 |
| • Defendant Royal Bank of Canada | "Pass" |

- Defendant SocGen       BMA + 10
- Defendant GE Trinity Plus Funding   BMA + 29

672. In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Peter Grimm; and Defendant MBIA was again represented by James Binette.

673. The broker involved with this GIC transaction was Bond Logistix. After reviewing the terms and conditions of each bid, Riverside selected Defendant GE Trinity Plus Funding to act as the provider.

**11. City of Riverside Electric Revenue Bonds Issue of 2004A (Fixed Rate Bonds) Fixed Reserve Fund- GIC**

674. On June 10, 2004, Riverside entered into a GIC with Defendant MBIA for the reinvestment of $1,714,913 in bond proceeds. As alleged herein, the DOJ has subpoenaed a detailed list of documents relating to this transaction. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

- Transamerica       4.05%
- AIG       4.50%
- Ambac       "Pass"
- Defendant BayernLB       3.50%
- Defendant CDC       4.91%
- Defendant Citigroup       "Pass"
- FGIC       "Pass"
- Defendant FSA       4.945%
- Defendant JP Morgan       "Pass"
- Defendant MBIA       4.945%
- Defendant Rabobank       4.57%
- Defendant Royal Bank of Canada       "Pass"
- Defendant SocGen       4.55%
- Defendant GE Trinity Plus Funding   "Pass"

675.     In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Peter Grimm; and Defendant MBIA was again represented by James Binette.  As alleged herein, a preliminary examination of the bidding information in this transaction suggests that Defendant BayernLB submitted a courtesy bid for the benefit of Defendant MBIA.

676.     The broker involved with this GIC transaction was Bond Logistix.  After reviewing the terms and conditions of each bid, Riverside selected Defendant MBIA to act as the provider.

### 12.     City of Riverside Electric Revenue Bonds Issue of 2004B (Auction Rate Securities) Variable Rate Reserve Fund- GIC

677.     On June 10, 2004,  Riverside entered into a GIC with Defendant MBIA for the reinvestment of $6,466,291 in bond proceeds.  As alleged herein, the DOJ has subpoenaed a detailed list of documents relating to this transaction.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- Transamerica                        BMA +33
- AIG                                  "Pass"
- Ambac                                "Pass"
- Defendant BayernLB                   BMA + 91
- Defendant CDC                        BMA +71
- Defendant Citigroup                  "Pass"
- FGIC                                 "Pass"
- Defendant FSA                        BMA + 70
- Defendant JP Morgan                  "Pass"
- Defendant MBIA                       BMA + 97
- Defendant Rabobank                   BMA + 73
- Defendant Royal Bank of Canada       "Pass"
- Defendant SocGen                     BMA + 70
- Defendant GE Trinity Plus Funding    "Pass"

678.    In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Peter Grimm; and Defendant MBIA was again represented by James Binette.

679.    The broker involved with this GIC transaction was Bond Logistix.  After reviewing the terms and conditions of each bid, Riverside selected Defendant MBIA to act as the provider.

13.    **City of Riverside Electric Revenue Bonds Issue of 2004A (Fixed Rate Bonds) GIC**

680.    On May 14, 2008, Riverside entered into a GIC with Defendant FSA for the reinvestment of $2,315,562 in bond proceeds.  As alleged herein, the DOJ has subpoenaed a detailed list of documents relating to this transaction.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- Defendant MBIA                      3.6250%
- Defendant Rabobank                  3.5100%
- Defendant FSA                       3.8150%
- Defendant Bank of America           "No Reply"
- Defendant JP Morgan                 "No Reply"
- Defendant Wachovia                  "No Reply"
- Defendant Wells Fargo               "No Reply"

681.    In the auction for the GIC, Defendant MBIA was again represented by Maggie Walsh; Defendant Rabobank was again represented by John Gallagher; and Defendant FSA was again represented by Kevin Connolly.

682.    The broker involved with this GIC transaction was Bond Logistix.  The representative from Bond Logistix was Amy Kron and Derek Johnston.  After reviewing the terms and conditions of each bid, Riverside selected Defendant FSA to act as the provider.

**14.** **City of Riverside Electric Refunding/ Revenue Bonds Issue 2005 A (Auction Rate Securities) and Issue 2005B (Auction Rate Securities) Reserve Fund (Collateralized)- GIC**

683.     On October 20, 2005, Riverside entered into a GIC with Defendant FSA for the reinvestment of $9,655,032 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- Transamerica                           "Pass"
- Defendant CDC                        "Pass"
- Defendant FSA                         4.695%
- Defendant MBIA                       "Pass"
- Defendant Rabobank                 "Pass"
- Defendant GE Trinity Plus Funding   4.621%
- XL Asset                                  "Pass"

684.     In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Peter Grimm; and Defendant FSA was again represented by Steve Goldberg.

685.     The broker involved with this GIC transaction was Bond Logistix.  The representative from Bond Logistix involved in this transaction was Amy Kron.  After reviewing the terms and conditions of each bid, Riverside selected Defendant FSA to act as the provider.

**15.** **City of Riverside Electric Refunding/ Revenue Bonds Issue 2005 A (Auction Rate Securities) and Issue 2005B (Auction Rate Securities) Construction Fund GIC**

686.     On October 20, 2005, Riverside entered into a GIC with Defendant GE Trinity Plus Funding for the reinvestment of $59,713,024 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

Construction Fund:

- Transamerica                           4.20%

- Defendant CDC                              "Pass"
- Defendant FSA                              4.15%
- Defendant MBIA                             4.274%
- Defendant Rabobank                         4.29%
- Defendant GE Trinity Plus Funding   4.367%
- XL Asset                                   4.00%

687.    In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Peter Grimm; and Defendant FSA was again represented by Steve Goldberg.

688.    The broker involved with this GIC transaction was Bond Logistix. The representative from Bond Logistix involved in this transaction was Amy Kron. After reviewing the terms and conditions of each bid, Riverside selected GE Trinity Plus Funding to act as the provider.

**16.    City of Riverside Variable Rate Refunding Electric Revenue Bonds Issue of 2008A, 2008B, 2008C**

689.    On May 14, 2008, Riverside entered into a GIC with Defendant GE Trinity Plus Funding for the reinvestment of $15,105,892 in bond proceeds. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

- Defendant GE Trinity Plus Funding   4.6810%
- Defendant Rabobank                         4.6310%
- Defendant MBIA                             "Pass"
- Defendant Bank of America              "No Reply"
- Defendant FSA                              "No Reply"

690.    In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Bill Fischer; and Defendant Rabobank was again represented by John Gallagher.

691.    The broker involved with this GIC transaction was Bond Logistix. The representatives from Bond Logistix involved in this transaction were Amy Kron and Derek

Johnston.  After reviewing the terms and conditions of each bid, Riverside selected GE Trinity Plus Funding to act as the provider.

**17.** **City of Riverside Variable Rate Refunding Electric Revenue Bonds Issue of 2008D**

692.    On May 20, 2008, Riverside entered into a GIC with Defendant GE Trinity Funding for the reinvestment of $210,000,000 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- Transamerica                           3.2000%
- Defendant Royal Bank of Canada        3.1700%
- Defendant FSA                          3.2890%
- Calyon                                 2.8220%
- Defendant GE Trinity Funding           3.3190%
- Defendant Rabobank                     2.8410%
- Defendant Bank of America              "No Reply"
- Defendant JP Morgan                    "No Reply"
- Defendant Wells Fargo                  "No Reply"

693.    In the auction for the GIC, Transamerica was represented by Tracie Meyer; Defendant Royal Bank of Canada was represented by Frank Postiglione; Defendant FSA was again represented by Kevin Connolly; Calyon was represented by Oskar Rogg; Defendant GE Trinity Funding was again represented by Bill Fischer; Defendant Rabobank was again represented by John Gallagher.

694.    The broker involved with this GIC transaction was Bond Logistix.  The representatives from Bond Logistix involved in this transaction were Amy Kron and Derek Johnston.  After reviewing the terms and conditions of each bid, Riverside selected GE Trinity Funding to act as the provider.

**18.** **City of Riverside, Water Revenue Bonds 2001 - Reserve and Project Fund GICs**

695.     On August 16, 2001, Riverside entered into two GICs with AIGMFC for the reinvestments of $1,264,621.26 and $18,153,989.17 in bond proceeds.  Prior to entering into the GICs, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

Project Fund

| | | |
|---|---|---|
| • | AIGMFC | 4.062% |
| • | Ambac | 3.89% |
| • | Defendant MBIA | 3.87% |
| • | Defendant CDC | "Pass" |
| • | Defendant JP Morgan | "Pass" |
| • | SARCo | "Pass" |
| • | Defendant UBS | "Pass" |

Reserve Fund

| | | |
|---|---|---|
| • | AIGMFC | 5.63% |
| • | Defendant MBIA | 5.46% |
| • | Ambac | 5.30% |
| • | Defendant CDC | "Pass" |
| • | Defendant JP Morgan | "Pass" |
| • | SARCo | "Pass" |
| • | Defendant UBS | "Pass" |

696.     In the auction for the GICs, AIGMFC was again represented by Keith Stein; Ambac was again represented by John Tsigakos; Defendant CDC was again  represented by Vincent Bernardeau; Defendant JP Morgan was again represented by Scott Verch; Defendant MBIA was again represented by Jacquelyn Hamme; SARCo was represented by Peter Colquitt; and Defendant UBS was again represented by Gary Heinz.

697.    The broker involved in the GIC transaction was Bond Logistix.  The representative for Bond Logistix who was involved in awarding the bids was Amy Kron.  The bidding process occurred on August 8, 2001 at 8:30 a.m. PDT and the bid was awarded at 9:20 a.m. PDT.

### 19.    City of Riverside, Water Revenue Bonds 2005 Project and Reserve Fund GICs

698.    On October 20, 2005 Riverside entered into a GIC with Defendant FSA for the reinvestment of $4,922,500 in bond proceeds.  Riverside also entered into a GIC with Defendant GE Trinity Plus Funding for the reinvestment of $20,152,200 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

Reserve Fund

- •    Defendant FSA                            4.695%
- •    Defendant GE Trinity Plus Funding  4.601%
- •    Defendant CDC                          "Pass"
- •    Defendant MBIA                         "Pass"
- •    Defendant Rabobank                    "Pass"
- •    XL Asset                                "Pass"

699.    In the auction for this GIC, Defendant FSA was again represented by Steve Goldberg and Defendant GE Trinity Plus Funding was again represented by Peter Grimm.

Construction Fund

- •    Defendant GE Trinity Funding Plus  4.087%
- •    Defendant MBIA                         4.033%
- •    Defendant Rabobank                    4.01%
- •    Defendant FSA                            3.98%
- •    XL Asset                                3.95%
- •    Defendant CDC                          "Pass"

700.    In this auction for the GIC, Defendant FSA was again represented by Steve Goldberg and Defendant GE Trinity Plus Funding was again represented by Peter Grimm.

701.    The broker involved in these GIC transactions was Bond Logistix.  The representative from Bond Logistix was Amy Kron.  The bidding process occurred on October 6, 2005 at 9:15 a.m. PDT and the bid was awarded at 10:30 a.m. PDT.

**20.    City of Riverside, Water Revenue Bonds 2005 - Project Fund GIC**

702.    On March 1, 2006, Riverside entered into a GIC with Defendant GE Trinity Plus Funding for the reinvestment of $9,000,000 in bond proceeds.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivative providers.  Riverside received the following bids:

- Defendant GE Trinity Plus Funding    4.911%
- Defendant FSA                        4.785%
- Defendant Rabobank                   4.76%
- Defendant MBIA                       4.734%
- XL Asset                             4.712%
- Transamerica                         4.62%
- Defendant Bank of America            "Pass"
- Defendant CDC                        "Pass"

703.    In the auction for the GIC, Defendant GE Trinity Plus Funding was again represented by Peter Grimm; Defendant FSA was again represented by Steve Goldberg; Defendant Rabobank was represented by John Gallagher; Defendant MBIA was again represented by Maggie Walsh; XL Asset was again represented by K. Brinkman; Transamerica was again represented by Mike Meaney; Defendant Bank of America was again represented by Danielle Lardinais; and Defendant CDC was again represented by Vincent Bernardeau.

704.     The broker involved in this GIC transaction was Bond Logistix.  The

representative from Bond Logistix was Amy Kron.  The bidding process occurred on February

15, 2006 at 8:45 a.m. PDT and the bid was awarded at 9:15 a.m. PDT.

### 21.     City of Riverside, Water Revenue Refunding Bonds 2008 Series A - Reserve Fund GIC

705.     On May 26, 2008, Riverside entered into a GIC with Defendant FSA for the

reinvestment of $4,418,000 in bond proceeds.  Prior to entering into the GIC, Riverside received

the following bids:

- •     Defendant FSA                          4.607%
- •     Defendant Rabobank                  4.530%
- •     Defendant GE Trinity Plus Funding  4.516%
- •     Defendant Bank of America          "Pass"
- •     Defendant MBIA                        "Pass"

706.     In the auction for the GIC, Defendant FSA was again represented by Kevin

Connolly; Defendant Rabobank was again represented by John Gallagher; and Defendant GE

Trinity Plus Funding was again represented by Bill Fischer.

707.     The broker in this transaction was Bond Logistix.  The representative from Bond

Logistix involved in the bidding process and awarding of the bid were Amy Kron and Derek

Johnston.  The bidding process occurred on May 12, 2008 at 2:00 p.m. EDT.

### 22.     City of Riverside, Water Revenue Refunding Bonds 2008 Series B - Project Fund GIC

708.     On May 28, 2008, Riverside entered into GIC with Defendant FSA for the

reinvestment of $60,000,000 in bond proceeds.  Prior to entering into the GIC, Riverside

received the following bids:

- •     Defendant FSA                          3.031%

- Defendant Royal Bank of Canada     2.863%
- Defendant Rabobank                 2.710%
- Defendant Wells Fargo              2.320%
- Defendant GE Trinity Plus Funding  "Pass"
- Defendant Bank of America          "No reply"
- Defendant JP Morgan                "No reply"

709.     In the auction for the GIC, Defendant FSA was again represented by Kevin Connolly; Defendant Royal Bank of Canada was again represented by Frank Postiglione; Defendant Wells Fargo was represented by John Carney; Defendant Rabobank was again represented by John Gallagher; and Defendant GE Trinity Plus Funding was again represented by Bill Fischer. As alleged herein, a preliminary examination of bidding information for this transaction suggests that Defendant Wells Fargo submitted a courtesy bid for the benefit of Defendant FSA.

710.     The broker in this transaction was Bond Logistix. The representatives from Bond Logistix involved in the bidding process and awarding of the bid were Amy Kron and Derek Johnston. The bidding process occurred on May 15, 2008 at 2:00 p.m. EDT.

### 23.     Multiple Project Area Housing Tax Allocation Bonds 2004 Series A - Reserve and Project Fund GICs

711.     In November 30, 2004, Riverside entered into a GIC with Defendant MBIA for the reinvestment of $1,753,473.15 and on November 30, 2007 Riverside entered into another GIC with Defendant MBIA for the reinvestment of $12,700,000. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers. Riverside received the following bids:

|  |  | Reserve Fund | Project Fund |
|---|---|---|---|
| • | Defendant MBIA | 5.016% | 2.86% |
| • | AIG | 4.902% | 2.80% |

194

| | | | |
|---|---|---|---|
| • | Defendant Rabobank | 4.81% | 2.61% |
| • | Defendant GE Trinity Plus Funding | 4.777% | "Pass" |
| • | Defendant CDC | 4.41% | 2.77% |
| • | Defendant BayernLB | 4.36% | 2.66% |
| • | FGIC | "Pass" | "Pass" |
| • | Defendant FSA | "Pass" | "Pass" |

712.    In the auction for the GIC, Defendant MBIA was again represented by James Binette; AIG was represented by Chris Toft; Defendant Rabobank was again represented by John Gallagher; Defendant GE Trinity Plus Funding was again represented by Peter Grimm; Defendant CDC was represented by S. Maisonneuve; Defendant BayernLB was represented by Alfredo Perez; FGIC was again represented by Peter Grimm; and Defendant FSA was again represented by Steve Goldberg.  As alleged herein, a preliminary examination of bidding information for this transaction suggests that Defendant BayernLB submitted a courtesy bid on the "Project Fund" GIC for the benefit of Defendant MBIA.

713.    The broker involved in this GIC transaction was Bond Logistix.  The representative from Bond Logistix involved in the bidding process and awarding the bid was Amy Kron.  The bidding process occurred on November 17, 2004 at 7:00 a.m. PDT and the bid was awarded at 8:15 a.m. PDT.

## 24.    Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series A - Project Fund GIC

714.    On April 10, 2007, Riverside entered into a GIC with Transamerica for the reinvestment of $8,135,189.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers.  Riverside received the following bids:

- •    Transamerica                          4.774%
- •    Defendant Salomon Smith Barney    4.768%

- Defendant FSA      4.755%
- XL Asset      4.753%
- Defendant Rabobank      4.605%
- Ambac      "Pass"
- Defendant Bank of America      "Pass"
- Defendant JP Morgan      "Pass"
- Defendant MBIA      "Pass"
- Defendant Royal Bank of Canada      "Pass"
- Defendant GE Trinity Plus Funding      "Pass"
- Defendant PaineWebber      "Pass"
- Defendant Wachovia      "Pass"
- Defendant Wells Fargo      "Pass"

715. In auction for the GIC, Transamerica was again represented Matt Meaney; Defendant Salomon Smith Barney was again represented by Peter Colquitt; Defendant FSA again represented by Kevin Connolly; XL Asset was represented by Karen McIntyre; and Defendant Rabobank was again represented by John Gallagher.

716. The broker involved in this GIC transaction was Bond Logistix. The representative from Bond Logistix involved in the bidding process was Amy Kron. The bidding process occurred on March 26, 2007 at 8:45 a.m. PDT and the bid was awarded at 9:36 a.m. PDT.

## 25. Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series B - Project Fund

717. On April 10, 2007, Riverside entered into a GIC with Defendant MBIA for the reinvestment of $10,609,842. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers. Riverside received the following bids:

- Defendant MBIA      4.883%
- XL Asset      4.853%
- Defendant GE Trinity Plus Funding      4.815%
- Transamerica      4.763%
- Defendant Rabobank      4.76%

- • Defendant Salomon Smith Barney    4.748%
- • Ambac    "Pass"
- • Defendant Bank of America    "Pass"
- • Defendant FSA    "Pass"
- • Defendant JP Morgan    "Pass"
- • Defendant Royal Bank of Canada    "Pass"
- • Defendant PaineWebber    "Pass"
- • Defendant Wachovia    "Pass"
- • Defendant Wells Fargo    "Pass"

718.    In auction for the GIC, Defendant MBIA was again represented by Maggie Walsh; XL Asset was again represented by Karen McIntyre; Defendant GE Trinity Plus Funding was again represented by Peter Grimm; Transamerica was again represented by Matt Meaney; Defendant Rabobank was again represented by John Gallagher; and Defendant Salomon Smith Barney was again represented by Peter Colquitt.

719.    The broker involved in this GIC transaction was Bond Logistix.  The representative from Bond Logistix involved in the bidding process was Amy Kron.  The bidding process occurred on March 28, 2007 at 8:45 a.m. PDT and the bid was awarded at 9:20 a.m. PDT.

**26.    Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series C - Project Fund GIC**

720.    On April 10, 2007, Riverside entered into a GIC with Transamerica for the reinvestment of $90,422,958.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers.  Riverside received the following bids:

- • XL Asset    4.957%
- • Defendant Rabobank    4.916%
- • Defendant Salomon Smith Barney    4.894%
- • Defendant MBIA    4.80%
- • Transamerica    4.785%
- • Ambac    "Pass"

- Defendant Bank of America          "Pass"
- Defendant FSA                      "Pass"
- Defendant JP Morgan                "Pass"
- Defendant Royal Bank of Canada     "Pass"
- Defendant GE Trinity Plus Funding  "Pass"
- Defendant PaineWebber              "Pass"
- Defendant Wachovia                 "Pass"
- Defendant Wells Fargo              "Pass"

721.    In auction for the GIC, XL Asset was again represented by Karen McIntyre; Defendant Rabobank was again represented by John Gallagher; Defendant Salomon Smith Barney was again represented by Peter Colquitt; Defendant MBIA was again represented by Maggie Walsh; and Transamerica was again represented Matt Meaney.

722.    The broker involved in this GIC transaction was Bond Logistix.  The representative from Bond Logistix involved in the bidding process was Amy Kron.  The bidding process occurred on March 26, 2007 at 8:45 a.m. PDT and the bid was awarded at 9:36 a.m. PDT.

## 27.    Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series D - Project Fund GIC

723.    On April 10, 2007, Riverside entered into a GIC with XL Asset  for the reinvestment of $34,410,024.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers.  Riverside received the following bids:

- XL Asset                          5.012%
- Defendant Salomon Smith Barney    4.923%
- Defendant Rabobank                4.922%
- Defendant GE Trinity Plus Funding 4.848%
- Transamerica                      4.805%
- Ambac                             "Pass"
- Defendant Bank of America         "Pass"
- Defendant FSA                     "Pass"
- Defendant JP Morgan               "Pass"

| | | |
|---|---|---|
| • | Defendant MBIA | "Pass" |
| • | Defendant Royal Bank of Canada | "Pass" |
| • | Defendant PaineWebber | "Pass" |
| • | Defendant Wachovia | "Pass" |
| • | Defendant Wells Fargo | "Pass" |

724.     In auction for the GIC, XL Asset was again represented by Karen McIntyre; Defendant Salomon Smith Barney was again represented by Peter Colquitt; Defendant Rabobank was again represented by John Gallagher; and  Transamerica was again represented by Matt Meaney.

725.     The broker involved in this GIC transaction was Bond Logistix.  The representative from Bond Logistix involved in the bidding process was Amy Kron.  The bidding process occurred on March 28, 2007 at 8:45 a.m. PDT and the bid was awarded at 9:20 a.m. PDT.

### 28.     Highlander CFD 90-1 Refunding Bonds - Reserve Fund GIC

726.     On August 13, 2003, Riverside entered into a GIC with Defendant CDC for the reinvestment of $1,433,310.  Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers.  Riverside received the following bids:

| | | |
|---|---|---|
| • | Defendant CDC | 5.21% |
| • | Defendant MBIA | 5.00% |
| • | Defendant FSA | 4.95% |
| • | Defendant Rabobank | 4.86% |
| • | AIG | "Pass" |
| • | Ambac | "Pass" |
| • | Defendant BayernLB | "Pass" |
| • | FGIC | "Pass" |

727.     In the auction for the GIC, Defendant CDC was again represented by Vincent Bernardeau; Defendant MBIA was again represented by James Binette; Defendant FSA was

again represented by Walter Schemitsch; and Defendant Rabobank was again represented by John Gallagher; AIG was again represented by Chris Toft; Ambac was again represented by Jessica Carcaterra; Defendant BayernLB was represented by Frank Postiglione; and FGIC was again represented by Peter Grimm. As alleged herein, a preliminary examination of the bidding information in this transaction suggests that Defendant Rabobank submitted a courtesy bid for the benefit of Defendant CDC.

728. The broker involved in this GIC transaction was Bond Logistix. The representative from Bond Logistix involved in awarding the bids was Amy Kron. The bidding process occurred on August 1, 2003 at 8:30 a.m. PDT and was awarded at 9:00 a.m. PDT.

### 29. **RPFA Refunding Bonds (CFD 86-1 and CFD 2002-1) - Reserve Fund GIC**

729. On January 17, 2002, Riverside entered into a GIC with AIGMFC for the reinvestment of $1,830,397.50 in bond proceeds. Prior to entering into the GIC, Riverside solicited bids from multiple Municipal Derivatives providers. Riverside received the following bids:

| | | |
|---|---|---|
| • | AIGMFC | 5.42% |
| • | Defendant CDC | 5.07% |
| • | Ambac | 5.05% |
| • | Defendant MBIA | "Pass" |

730. In the auction for this GIC, AIGMFC was represented by Heather Singer; Defendant CDC was again represented by Vincent Bernardeau; Ambac was again represented by John Tsigakos; and Defendant MBIA was represented by Laura Schneider.

731.    The broker involved in this GIC transaction was Bond Logistix.  The

representative from Bond Logistix involved in awarding the bids was Amy Kron.  The bidding

process occurred on January 7, 2002 at 8:00 a.m. PDT and awarded at 8:40 a.m. PDT.

**30.    Canyon Springs Assessment District Refunding Series 1989 Limited
Obligation Bonds - Reserve Fund GIC**

732.    On March 2, 2004, Riverside entered into a GIC with Defendant SocGen for the

reinvestment of $868,000.  Prior to entering into the GIC, Riverside solicited bids from multiple

Municipal Derivatives providers.  Riverside received the following bids:

- Defendant SocGen                      3.50%
- Defendant CDC                         3.21%
- Transamerica                          3.20%
- Defendant Rabobank                    2.65%
- AIG                                   "Pass"
- Ambac                                 "Pass"
- Defendant Bank of America             "Pass"
- Defendant BayernLB                    "Pass"
- Defendant FSA                         "Pass"
- Defendant JP Morgan                   "Pass"
- Defendant MBIA                        "Pass"
- Defendant Merrill Lynch               "Pass"
- Defendant Morgan Stanley              "Pass"
- Defendant Salomon Smith Barney        "Pass"
- Defendant GE Trinity Plus Funding     "Pass"
- XL Asset                              "Pass"

733.    In the auction for the GIC, Defendant SocGen was represented by Donald Travis;

Defendant CDC was again represented by Vincent Bernardeau; Transamerica was again

represented by Matt Meaney; AIG was again represented by Chris Toft; Ambac was again

represented by Jessica Carcaterra; Defendant Bank of America was again represented by Jay

Saunders; Defendant BayernLB was again represented by Frank Postiglione; Defendant FSA was

again represented by Steve Goldberg; Defendant JP Morgan was again represented by Scott

Verch; Defendant MBIA was again represented by James Binette; Defendant Merrill Lynch was represented by Michelle Gesser; Defendant Morgan Stanley was represented by Kevin Schwartz; Defendant Salomon Smith Barney was again represented by Peter Colquitt; Defendant GE Trinity Plus Funding was again represented by Peter Grimm; and XL Asset was represented by Frank Beardsley. As alleged herein, a preliminary examination of bidding information for this transaction suggests that Defendant Rabobank submitted a courtesy bid for the benefit of Defendant SocGen.

734. The broker involved in this GIC transaction was Bond Logisitix. The bidding process occurred on February 12, 2004 at 11:30 a.m. EST and awarded at 12:15 p.m. EDT.

### 31. Public Financing Authority of the City of Riverside Projects 2003

735. On December 22, 2003, Riverside entered into a GIC with AIGMFC for the reinvestment of $3,512,050 in bond proceeds. The interest rate of reinvestment was 5.13%.

### 32. California Tower Lease Revenue Bonds - Reserve Fund GIC

736. On July 15, 2003, Riverside entered into a GIC with AIGMFC for the reinvestment of $2,712,332 with the interest rate set at 4.65%.

## B. Swap Transactions

### 1. City of Riverside Electric Revenue Bonds Issue 2004B (Auction Rate Securities); and Electric Revenue Refunding Bonds 2008 Series A - Interest Rate Swap

737. On September 16, 2005, Riverside entered into a interest rate swap with Defendant Merrill Lynch with the initial deposit of $82,500,000. As alleged herein, the DOJ has subpoenaed a detailed list of documents relating to this transaction. Prior to entering into the

swap, Riverside solicited bids from multiple Municipal Derivative providers. Riverside received the following bids:

- Defendant Merrill Lynch:

  | | |
  |---|---|
  | Uninsured Swap (Bid #1A): | 4 and 25 tenths basis points |
  | Insured Swap (Bid # 1B): | 3 and 75 tenths basis points |
  | Uninsured Swap (Bid #2A): | 2 and 75 tenths basis points |
  | Insured Swap (Bid #2B): | 3 and 75 tenths basis points |

- Defendant Bank of America:

  | | |
  |---|---|
  | Uninsured Swap (Bid #2A): | 3 and 4 tenths basis points |

- Defendant Bear Stearns:

  | | |
  |---|---|
  | Uninsured Swap (Bid #1A): | 4 and 9 tenths basis points |
  | Insured Swap (Bid # 1B): | 4 and 9 tenths basis points |
  | Uninsured Swap (Bid #2A): | 4 and 9 tenths basis points |
  | Insured Swap (Bid #2B): | 4 and 9 tenths basis points |

738. In the auction for the swap, Defendant Merrill Lynch was represented by Ian Parker and Garth Schulz; Defendant Bear Stearns was represented by Nathaniel Singer.

739. The broker for this transaction was Bond Logistix. The representative from Bond Logistix involved in this transaction was Eric Chu. After reviewing the terms and conditions of each bid, Riverside selected Defendant Merrill Lynch to act as the provider.

740. In this swap agreement, Riverside paid a fixed rate of 3.111% in return for a floating rate of 62.6800% of USD-LIBOR-BBA plus 12 basis points, paid by Defendant Merrill Lynch.

2. **City of Riverside Electric Revenue Bonds Issue 2005A (Auction Rate Securities); and Electric Revenue Refunding Bonds 2008 Series B - Interest Rate Swap**

741.     On September 15, 2005, Riverside negotiated and entered into a interest rate swap with Defendant Bear Stearns.  The interest rate swap with Defendant Bear Stearns was governed by the International Swaps and Derivatives Association, Inc. Master Agreement and a Swap Confirmation.  In this swap agreement, Riverside paid a fixed rate of 3.201% in return for a floating rate of 62.68% of USD-LIBOR-BBA plus 12 basis points, paid by Defendant Bear Stearns.

742.     The effective date of the swap was January 5, 2006 and the initial notional amount was $57,850,000.

743.     In this transaction, Defendant Bear Stearns was represented by Andrew Levenson and Nathaniel Singer.

744.     When Riverside refunded the 2005 Electric Revenue Bonds Series A into the Electric Revenue Refunding Bonds 2008 Series B, the conditions of the swap agreement remained the same.

3. **City of Riverside Electric Revenue Bonds Issue 2005B (Auction Rate Securities); and Electric Revenue Refunding Bonds 2008 Series C - Interest Rate Swap**

745.     On September 15, 2005, Riverside negotiated and entered into a interest rate swap with Defendant Bear Stearns.  The interest rate swap with Defendant Bear Stearns was governed by the International Swaps and Derivatives Association, Inc. Master Agreement and a Swap Confirmation.  In this swap agreement, Riverside paid a fixed rate of 3.204% in return for a

floating rate of 62.68% of USD-LIBOR-BBA plus 12 basis points, paid by Defendant Bear Stearns.

746.    The effective date of the swap was February 6, 2006 and the initial notional amount was $57,875,000.

747.    In this transaction, Defendant Bear Stearns was represented by Andrew Levenson and Nathaniel Singer.

### 4.      City of Riverside Water Revenue Bonds 2005 and Water Revenue Refunding Bonds 2008 Series A - Interest Rate Swap

748.    On September 15, 2005, Riverside negotiated and entered into an interest rate swap agreement with Defendant Bear Stearns Capital Markets Inc.  The interest rate swap with Defendant Bear Stearns Capital Markets Inc., was governed by the International Swaps and Derivatives Association, Inc. Master Agreement and a Swap Confirmation.  In this swap agreement, Riverside paid a fixed rate of 3.20% in return for a floating rate of 62.68% of USD-LIBOR-BBA plus 12 basis point, paid by Defendant Bear Stearns Capital Markets Inc.

749.    The effective date of the swap was October 6, 2005 and the initial notional amount was $61,125,000.

### 5.      Riverside Renaissance Projects 2007 Series A & Series B; and Riverside Renaissance Projects Refunding 2008 - Interest Rate Swap

750.    On March 29, 2007, Riverside negotiated and entered into an interest rate swap with Defendant Bank of America.  The interest rate swap with Defendant Bank of America was governed by the International Swaps and Derivatives Association, Inc. Master Agreement and a Swap Confirmation.  In this swap agreement, Riverside paid a fixed rate of 3.396% in return for a floating rate of 63.00% plus 7 basis point.  The initial deposit was $118,975,000.

751.     This interest rate swap was terminated on April 17, 2008 and was refunded by the

Riverside Renaissance Projects Refunding 2008 swap.  This swap agreement was also with

Defendant Bank of America.  In this swap agreement, Riverside paid a fixed rate of 3.362% in

return for a floating rate of 63.00% plus 7 basis point.  The initial deposit was $128,300,000.

## C.     Debt Service Forward Sale Agreement Transactions

### 1.     The Redevelopment Agency of the City of Riverside Debt Service Reserve Forward Delivery Agreement 1999

752.     On May 26, 1999, Riverside entered into a Debt Service Reserve Forward

Delivery Agreement with Defendant Bank of America (then known as NationsBank).

### 2.     City of Riverside Taxable Pension Obligation Bonds 2005 Series A Forward Purchase and Sale Agreement

753.     On November 1, 2005, Riverside entered into a Forward Purchase and Sale

Agreement with Defendant Wachovia.  The initial deposit of the agreement was $1,962,956.

Prior to entering into the Forward Purchase and Sale Agreement, Riverside solicited bids from

multiple Municipal Derivative providers.  Riverside received the following bids:

- Defendant Bank of America          "Pass" / "Pass"
- Defendant Bear Stearns             4.637% / 4.637%
- Defendant Salomon Smith Barney     4.386% / 4.586%
- Defendant JP Morgan                "Pass" / "Pass"
- Lehman                             "Pass" / "Pass"
- Defendant Merrill Lynch            "Pass" / "Pass"
- Defendant Morgan Stanley           4.635% / 4.635%
- Defendant Wachovia                 4.67% / 4.72%

754.     In the auction for this transaction, Defendant Bank of America was again

represented by Danielle Lardinais; Defendant Bear Stearns was represented by L. Miller;

Defendant Salomon Smith Barney (then known as Citigroup Financial Products) was represented

by Steve Sohn; Defendant JP Morgan was again represented by James Hertz; Lehman was represented by G. Murray; Defendant Merrill Lynch was represented by Thomas Welsh; Defendant Morgan Stanley was again represented by Kevin Schwartz; and Defendant Wachovia was Bryan Kern.

755.     The broker for this transaction was Bond Logistix.  The representative from Bond Logistix involved in this transaction was Rick Hernandez.  After reviewing the terms and conditions of each bid, Riverside selected Defendant Wachovia to act as the provider.

**D.** **Repeat Appearances Of The Same Representatives Of The Same Defendants In Riverside Municipal Derivative Transactions**

756.     Defendants' conspiracy to rig the auctions for Municipal Derivatives involved, but was not limited to, the submission by the Provider Defendants and/or Broker Defendants of a pre-selected winning bid, losing courtesy bids or passes.  Defendants' conspiracy depended on not only the repeat appearances of the same Defendants in multiple Municipal Derivative transactions, but also the repeat appearances of the same representatives of those Defendants in multiple Municipal Derivative transactions.

757.     An analysis of the bid documents from Municipal Derivative auctions conducted on behalf of Riverside shows that the same representatives bid in the same auctions on behalf of the same Provider Defendants for the same providers.

**1.** **The Same Representatives Of Five Provider Defendants Appeared In Four Auctions Together Along With Other Repeat Players**

758.     Riverside solicited bids for four municipal derivative transactions. Representatives of five Defendant providers were involved in the municipal derivatives' bidding process.

759. John Gallagher of Defendant Rabobank, Matt Meaney of Transamerica, and Peter Colquitt of Defendant Salomon Smith Barney submitted bids for the following Riverside municipal derivative transactions:

- Multiple Project Area Housing Tax Allocation Bonds 2007 Series A - Project Fund GICs

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series B - Project Fund GIC

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series C - Project Fund GIC

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series D - Project Fund GIC

760. Along with the above three individuals, Karen McIntyre of XL Asset, submitted bids for three out of the four municipal derivative transactions:

- Multiple Project Area Housing Tax Allocation Bonds 2007 Series A - Project Fund GICs

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series B - Project Fund GIC

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series D - Project Fund GIC

761. Along with the above four individuals, Maggie Walsh of Defendant MBIA submitted bids for two out of the four municipal derivative transactions:

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series B - Project Fund GIC

- Riverside Public Finance Authority Tax Allocation Revenue Bonds, 2007 Series C - Project Fund GIC

### 2. The Same Representatives Of Seven Provider Defendants Appeared In Three Auctions Together Along With Other Repeat Players

762. Riverside solicited bids for three additional municipal derivative transactions. Representatives of seven different Defendant providers were involved in the municipal derivatives' bidding process.

763. Chris Borjon of Defendant Wells Fargo, Danielle Lardinais of Defendant Bank of America, John Gallagher of Defendant Rabobank, and K. Brinkman of XL Asset submitted bids for the following three Riverside municipal derivative transactions:

- Galleria Tyler Public Improvements 2006 - Project GIC

- Galleria Tyler Public Improvements 2006 - Reserve GIC

- COP Series 2007A and B Capital Improvement Projects

764. Craig Renkin of Defendant FSA, James Binette of Defendant MBIA, and Matt Meaney of Transamerica submitted bids for two of the three municipal derivative transactions. Craig Renkin and James Binette submitted bids in the following two transactions:

- Galleria Tyler Public Improvements 2006 - Project GIC

- Galleria Tyler Public Improvements 2006 - Reserve GIC

Whereas Matt Meaney submitted bids for the following two transactions:

- Galleria Tyler Public Improvements 2006 - Project GIC

- COP Series 2007A and B Capital Improvement Projects

**3.      Two Representatives For Two Provider Defendants Engaged In Auction Bidding Involving Three Transactions**

765.     Riverside solicited bids for three other municipal derivative transactions Representatives of two different Defendant providers companies had the opportunity for collusion.

766.     Peter Grimm of FGIC and James Binette of Defendant MBIA submitted bids in the following three Riverside municipal derivative transactions:

- Electric Revenue Bonds 2004A and 2004B

- Electric Revenue Bonds 2004A - Fixed Rate

- Electric Revenue 2004B - Variable Rate

**VII.**
**DOJ ANTITRUST DIVISION EMPANELS GRAND JURY TO PURSUE INDUSTRY-WIDE CRIMINAL INVESTIGATION - BOFA SEEKS AMNESTY**

767.     As alleged herein in the fall of 2006, the Antitrust Division of the DOJ, through its spokeswoman Kathleen Blomquist, announced that it had begun an "investigation of anti-competitive practices in the municipal bond industry."  Soon thereafter it was reported that a criminal grand jury had been empaneled from which subpoenas were issued and served on more than 25 Broker and Provider Defendants and search warrants were issued authorizing FBI raids on November 15, 2006 upon the offices of Broker Defendants CDR, IMAGE and Sound Capital.

768.     According to a proffer provided by Defendant Bank of America to Riverside, Bank of America's outside counsel had discovered evidence suggesting the existence of violations of antitrust laws by members of Bank of America's municipal derivative desk in 2004,

which they brought to the attention of the DOJ.  The DOJ explicitly instructed Bank of America's counsel to keep this information confidential and not to take any actions that would alert other persons at Bank of America or outside Bank of America that this evidence had been discovered.  The DOJ's investigation has apparently been conducted in cooperation with investigations by the IRS and SEC of certain municipal derivative transactions for violations of tax and securities laws.   In the course of these investigations the IRS and SEC has apparently discovered evidence that strongly suggested that participants in such transactions had also violated the criminal antitrust laws, which was brought to the DOJ's attention.  Again, as Charles Anderson of the IRS put it in 2007:

> I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg. . .
> ***I would not be surprised to see bankers and lawyers go to jail***.

(emphasis added).

769.     The following Provider Brokers Defendants and Co-conspirators, either directly or through their corporate parents or subsidiaries, received subpoenas from the DOJ's antitrust division:  BofA; UBS; JP Morgan; Bear Stearns; Piper Jaffray; Wachovia; AIG Financial; AIG Sunamerica; FSA; FGIC; GE Funding; GE Trinity; Genworth; CDC; SocGen; XL; CDR; Feld Winters; Winters; CDC Funding; Baum; Kinsell; Sound Capital; IMAGE; First Southwest; Morgan Keegan; and Shokley.

770.     The subpoenas sought documents, email, notes, tapes or notes of phone conversations from as far back as 1992 regarding: "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified academy bonds [i.e.

reinvestment-type Municipal Derivatives] [, as well as] related transactions involving the

management or transferal of the interest rate risk associate with those bonds [i.e. hedging-type

Municipal Derivatives], including but not limited to guaranteed investment contracts; forward

supply, purchase or delivery agreements; repurchase agreements; swaps; options; and

swapoptions." The subpoena further requested documents (broadly defined) related to

"competitive bidding" for Municipal Derivatives.

771. On the grounds that the investigation is ongoing, the DOJ has rebuffed attempts to

gain access to detailed information regarding the investigation or its results. However, certain

public information, in particular information contained in the SEC filings of certain Defendants

and Financial Industry Regulatory Authority ("FINRA") filings by certain current and former

representatives of Defendants, provide pictures of how the investigation has progressed, at least

as to, certain Defendants. Notable in these pictures is the evolution of the investigation as it

relates to certain Defendants that have provided this information.

772. Furthermore, it is clear that the investigation is ongoing and developing. On July

2, 2009 the City of Riverside received subpoena duces tecum from the DOJ's Antitrust Division

in the S.D.N.Y seeking documents concerning the Municipal Derivatives entered into by the City

of Riverside in association with a $110,000,000 bond issuance in 2004, and the various

transactions by which the City of Riverside entered into the Municipal Derivatives. The

Municipal Derivatives entered into by the City of Riverside in association with this issuance

include: (a) a GIC of $1,714,913.06 entered into with Defendant MBIA on June 10, 2004, on

which Defendant FSA, Defendant Rabobank, Defendant CDC, co-conspirator Transamerica,

Defendant Bayern LB, and Defendant Societe General also bid and on which Defendant GE

Trinity, Defendant Salomon Smith Barney, and Defendant JP Morgan were solicited for bids and passed; (b) a GIC of $6,466,290.63 entered into with Defendant MBIA on June 10, 2004, on which Defendant Bayern LB, Defendant Rabobank, Defendant CDC, Defendant SocGen, Defendant FSA, co-conspirator Transamerica, and Defendant GE Trinity Plus also bid and on which Defendant Salomon Smith Barney and Defendant JP Morgan were solicited for bids and passed; (c) a GIC of $93,018,253.54 entered into with Defendant GE Trinity Plus on June 10, 2004, on which Defendant Rabobank, Defendant CDC, co-conspirator Transamerica, Defendant FSA, Defendant Bayern LB, Defendant SocGen, Defendant Salomon Smith Barney, and Defendant MBIA also bid, and on which Defendant JP Morgan was solicited for a bid and passed; (d) a $82,500,000.00 swap entered into with Defendant Merrill Lynch on September 16, 2005, on which Defendant Bank of America  and Defendant Bear Stearns also submitted bids; and (e) a $2,315,561.94 GIC entered into with Defendant FSA on May 14, 2008, and on which Defendant MBIA and Defendant Rabobank submitted bids and on which bids were solicited from Defendant BofA, Defendant JP Morgan, Defendant Wachovia, and Defendant Wells Fargo, none of whom replied to the solicitation.

773.    Moreover, as alleged herein, the Connecticut Attorney General Richard Blumenthal has gone to the Connecticut Superior Court in Hartford to compel Defendant FSA to turn over 600 hours of audio recordings already released to the SEC and DOJ in connection with their investigation of the municipal derivatives industry.  According to the Attorney General Blumenthal, these tapes contain "a rich source of evidence of potential violations" of state antitrust laws.  These efforts underscore the fact that discovery in this matter is ongoing and that the allegations contained herein relate to just a portion of the market wide conspiracy.

774. The most dramatic evolution, of course, can be seen in Defendant BofA. Approximately one and half months after the DOJ's announcement of its investigation, Defendant BofA announced that it sought and received entry into the DOJ's leniency program under ACPERA, effectively publically admitted to its participation in the illegal activities being investigated by the grand jury.

775. The fact that Defendant BOA announced its entry into the DOJ's leniency program soon after the DOJ publically announced the existence of its investigation and is apparently the only Defendant so far that has been admitted into the program does not, in any way, indicate that Defendant BofA is the only Defendant that violated federal criminal antitrust laws or even that they Defendant BofA faces the greatest potential criminal liability. Rather, it means that Defendant BofA was quickest on the draw. In fact, according to representatives of Defendant BofA, BofA entry into the leniency program in 2004. BofA's representatives at the time were specifically told by the DOJ to keep its entry confidential and not take acts, such as interviewing BofA representatives, that could alert persons of the DOJ's investigation

776. The leniency program under ACPERA is primarily a *first-through-the-door* program. Only the first member of a conspiracy to admit their participation in an illegal anti-competitive conspiracy and provide adequate cooperation is given amnesty from criminal prosecution. Other members of the conspiracy can only receive reductions of their sentences if they admit to their participation in the conspiracy and only to an extent that their cooperation provides the DOJ information beyond that which the original amnesty applicant has already provided.

777.    The scope of the subpoenas, both as to the number of companies that received them, over 25, and the subject matter of information sought "competitive bidding" for Municipal Derivatives, makes clear that the DOJ's investigation is not as to single-firm conduct, but rather the conduct of a very significant number of participants in the industry.  Indeed, according the descriptions of the investigation contained in many Defendants' SEC filings, the investigation is "industry-wide."

778.    Moreover, the fact that a ***criminal*** grand jury was empaneled by the DOJ supports this conclusion.  According to the DOJ's *Antitrust Division Manuel*, Chap. III.C.5, "In general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price-fixing, bid rigging and horizontal customer and territorial allocations."

779.    Thus, again, that fact that Defendant BofA applied for and gained entry into the leniency primarily indicates two things: (1) Defendant BofA participated in a criminal anti-competitive conspiracy related to Municipal Derivatives market; and (2) Defendant BofA was the first conspirator to get through the DOJ's door.

780.    As the description above of particular Municipal Derivative transactions in which there can be seen plausible evidence of the conspiracy shows and information proffered by BofA demonstrates, the conspiracy involved far more than just Defendant BofA.  The descriptions below of the progress of the investigation of the conspiracy taken from the SEC and FINRA filings of Defendants and their current and former representatives reinforce this conclusion.

781.    These description show how the DOJ after its initial demands for documents has followed up with subsequent demands, which strongly indicates that the production that

Defendants made in response contained evidence that was at least suggestive of the Defendants' participation in the conspiracy and justified further inquiry.

782.    The descriptions also reveal that certain current and former representatives of certain Defendants have received "target letters" from the DOJ.  It is the DOJ policy to classify representatives from whom information is sought into two categories "targets" and  "subjects."  In some U.S. Attorney Offices a third category, "witnesses," is also used.  A "subject" of a grand jury investigation is an representative whose conduct is within the scope of the grand jury's investigation, but against whom there is not yet substantial evidence suggesting or refuting that they committed a crime.  A "target" is an representative against whom the prosecutor or grand jury has substantial evidence to link to a crime, and who, in the judgment of the prosecutor, is likely to be indicted.  A "witness," if the classification is used, is an representative whom the evidence suggests has not committed a crime but who may have evidence of a crime's commission by another person.  The DOJ notifies representatives that they are "targets," so that the representative can be advised of and made aware of his or her due process rights before he or she gives testimony before a grand jury.  Accordingly, the DOJ almost never unilaterally notifies an representative of his or her status on the hierarchy of its investigation unless and until it notifies him or her that he or she is a target.  Thus, the fact that the current and former representatives of these Defendants have received target letters is strongly suggestive that while working as representatives of Defendants these representatives violated criminal antitrust laws for which these Defendants would be liable.

783.    As a March 3, 2008 *Bond Buyer* article noted:

Market participants said Friday that the individuals and firms known to have been subpoenaed or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicly disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but banks and investment advisory firms are not subject to the same disclosure requirements.

\* \* \*

"Usually by the time an individual gets a target letter, the investigation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms,"said John F. Markey, a partner at Mintz Levin Cohn Ferris Glovsky & Popeo PC in Boston, and former federal and state prosecutor. Markey said that in a target letter, "The Department of Justice is informing an individual or his attorney that it already has **substantial evidence** of the commission of a federal crime. It usually is a ***sign that the individual is going to be indicted*** and it may ***prompt an attempt at a plea bargain or cooperation deal*** with the government."

(Emphasis added).

784. Finally, the descriptions also reveal that several Defendants or their current or former representatives have received Wells Notices from the SEC related to its parallel investigation. A Wells Notice is similar to a target letter by the DOJ but reflects the civil as opposed to criminal orientation of most SEC investigations. A Wells Notice indicates that the SEC staff has determined it may bring a civil action against an representative or firm, and provides the representative or firm with the opportunity to provide information as to why the enforcement action should not be brought. The important distinction between Wells Notices and target letters for our purposes is, as the foregoing description indicates, that Wells Notices are sent to both representatives and entities. Given the significant overlap between the SEC and DOJ

investigations, it is reasonable to assume that the DOJ has substantial evidence against any Defendant that has received a Wells Notice.

A.    **BofA Admits To Participation In Conspiracy - Enters DOJ Leniency Program**

785.    On January 11, 2007, Defendant Bank of America effectively admitted to the existence of  the conspiracy alleged herein and its participation in it:  seeking entry and gaining acceptance into the DOJ Antitrust Division's Corporate Leniency program, whereby it will gain certain immunities and leniencies in exchange for cooperating with government agencies and private plaintiffs.  Its SEC Form 10-K for fiscal year 2007 states:

> Municipal Derivatives Matters
>
> The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA [Defendant Bank of America] from the early 1990s to date.  The activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds.  The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS.  On February 4, 2008, BANA received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice.  An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.
>
> On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ.  Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ.  Civil actions may be filed.

786.     The leniency that Bank of America has conditionally received from the DOJ does not extend to its current or former employees.  These individuals are still subject to criminal prosecution.  The following former employees of Bank of America have received target letter from the Antitrust Division of the DOJ, informing them of the DOJ's intention to seek their criminal indictment related to the DOJ's investigation of the conspiracy alleged herein: Douglas Campbell, a former Sales Team Manager at Bank of America, who was also formerly employed by Provider Defendant Piper Jaffray and the corporate predecessor of Defendants Wachovia and Wells Fargo; Dean Pinard, former Manager of the Derivatives Department of Bank of America; Phil Murphy, former Head Managing Director of the Derivatives Department of Bank of America; and Jay Saunders, a former member of Bank of America municipal derivatives desk and Defendant Wachovia's Derivatives Marketing Department.

787.     Reports have indicated that a number of key derivatives officials at Bank of America were placed on "administrative leave," including Dean Pinard, who managed the bank's derivatives department.

788.     Bank of America has received a Wells notice from the SEC, informing Bank of America that the SEC intended to bring a civil action against Bank of America related to the conspiracy alleged herein.  Bank of America has also received subpoenas and/or formal investigatory demands from State Attorneys General investigating the conspiracy alleged herein.

**B.      The DOJ's Indictment Of Defendant CDR And CDR Executives Implicates Other Defendant Providers In Conspiracy**

789.     As part of its continuing investigation into the conspiracy alleged herein, on October 29, 2009, the DOJ indicted Defendant CDR, CDR's owner and president David Rubin,

CDR's vice president Evan Andrew Zarefsky, and the company's former chief financial officer and managing director Zevi Wolmark for conspiring with certain unidentified provider co-conspirators to rig Municipal Derivatives transactions between 1998 and 2006.

790.    The nine-count CDR Indictment details multiple violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and describes a web of illegal collusion amongst and between CDR and "various other persons and entities."

791.    Among those various entities, the CDR indictment describes examples of conspiratorial conduct by four specific entities, identified as "Provider A," "Provider B", "Financial Institution A", and "Financial Institution B."   As discussed herein, Riverside has been able to identify these and other entities and individuals referred to by aliases in the CDR Indictment as well as many of the transactions referred to therein. The CDR Indictment makes clear that the transactions described a small subset of those affected by the conspiracy.

792.    Provider A is identified as  "a group of related financial services companies located in Manhattan and owned and controlled by a company headquartered in Manhattan."

793.    Provider B is identified by the CDR Indictment as "a group of separate financial services entities that were controlled by or were part of a company headquartered in Connecticut."

794.    Financial Institution A is identified by the CDR Indictment as "a financial institution that was a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20."

795.    Financial Institution B is also identified by the CDR Indictment as "a financial institution that was a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20."

796.    CDR and its co-conspirators actions are strikingly consistent with the illicit conspiratorial conduct of Defendant BofA and other co-conspirators alleged herein and re-confirm the breadth of this far-reaching conspiracy.

797.    The indictment refers to "numerous occasions," where illegal conduct occurred that is very similar to that described elsewhere herein, including the following:

- A provider acting as an underwriter on a bond deal recommended to the issuer that it hire CDR as the broker for associated municipal derivatives, so that in exchange CDR could help the investment bank win the municipal derivative contract;

- A provider would be pre-selected as the winner of a particular auction;

- The pre-selected winner of an auction would be given a last look at the bids of other providers, so that the pre-selected winner could submit a bid just high enough to win, and no more;

- Providers not pre-selected to win a particular auction would submit a courtesy bid, which had no chance of winning; and

- Providers would arrange to give CDR a kickback of a portion of their illegally won profits through unearned or inflated fee associated with a swap transaction that was not disclosed to issuers.

798.    According to the CDR Indictment:

[CDR] attempted to increase the number and profitability investment agreements and other municipal finance contracts awarded to Provider A by controlling which other providers were solicited for bids and ***securing the agreement of other providers to submit intentionally losing bids***, where possible, and by ***arranging for Marketer A [a representative of Provider A] to submit Provider A's bid last***. Before Marketer A actually decided what price to bid, [CDR] received and reviewed bids from other providers and ***gave Marketer A information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid***. Marketer A then ***used that information to determine Provider A's bid***. On some occasions, [CDR] told Marketer A that he could ***lower Provider A's bid*** and still win the contracts and, further, suggested ***the exact amount by or to which the bid could be reduced***. Marketer A followed these suggestions. <u>As a result</u> of information [CDR] gave Marketer A about the bids from other providers, Provider A was awarded and has performed and is scheduled to perform investment agreements and other municipal finance contracts at ***<u>artificially determined levels that deprived and will continue to deprive municipalities of money</u>***.

(emphasis added).

799.     In an apparent *quid pro quo* that also gave the process an appearance

of legitimacy, "[f]rom time to time, [CDR] asked Marketer A to submit ***intentionally losing bids***

for investment agreements or other municipal finance contracts" that would be won by another

provider. (emphasis added).

800.     Other financial institutions were also involved in the mechanisms by which

Provider A would kickback some of its illegally earned profits to CDR. The indictment explains:

[T]he kickbacks were disguised as fees ("hedge fees") that purported to compensate CDR for acting as a broker in arranging financial transactions known as swaps between Provider A and either Financial Institution A or B, ***but those fees were, in fact, unearned or inflated***. The ***rates of Provider A's swaps with Financial Institution A and B were adjusted to include the hedge fees*** Provider A wanted to pay CDR, and Financial Institution A and B then paid the hedge fees to CDR***. Neither CDR nor Provider A disclosed to the issuers [the municipalities] that Provider A had agreed to pay CDR hedge fees*** in connection with the award and execution of investment agreements or other municipal finance contracts. In some cases, ***<u>these kickbacks reduced the amount of money</u>***

***municipalities received and continue to receive*** pursuant to investment agreements or other municipal finance contracts awarded to Provider A.

(emphasis added).

801.    The CDR Indictment also describes how CDR, Provider B, and "[v]arious other persons and entities, not made defendants herein, [who] participated as co-conspirators," on numerous occasions, from as early as August 1999 until at least November 2006, employed almost the exact same tactics to manipulate the bidding process for Municipal Derivative auctions so that Provider B would win the auctions at the lowest possible interest rate. In exchange, Provider B would kickback a portion of its resulting illegally inflated profits to CDR and would submit intentionally losing bids in other transactions, using the same mechanisms employed by Provider A for these purposes

802.    The CDR indictment states:

[CDR] attempted to increase the number and profitability investment agreements and other municipal finance contracts awarded to Provider B by ***arranging for Marketer B-1 or B-2 [representatives of Provider B] to submit Provider B's bid last***.  Before Marketer B-1 or B-2 actually decided what price to bid, [CDR] received and reviewed bids from other providers and ***gave Marketer B-1 or B-2 information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid***.  Marketer B-1 or B-2 then ***used that information to determine Provider B's bid***.  On some occasions, [CDR] told Marketer B-1 or B-2 that he could ***lower Provider B's bid*** and still win the contracts and, further, suggested ***the exact amount by or to which the bid could be reduced***.  Marketers B-1 and B-2 followed these suggestions.  <u>As a result</u> of information [CDR] gave Marketers B-1 and B-2 about the bids from other providers, Provider B was awarded and has performed and is scheduled to perform investment agreements and other municipal finance contracts at ***<u>artificially determined levels that deprived and will continue to deprive municipalities of money</u>***.

(emphasis added).

223

803.     In an apparent *quid pro quo* that also gave the process an appearance of legitimacy, "[i]n exchange for controlling and manipulating the bidding for investment agreements and other municipal finance contracts in order to increase the number that and profitability of the agreements and contracts that Provider B won, [CDR] asked Marketer B-1 or B-2 to ***submit intentionally losing bids*** for investment agreements or other municipal finance contracts" that would be won by another provider. (emphasis added).

804.     Other financial institutions were also involved in the mechanisms by which Provider B would kickback some of its illegally earned profits to CDR.  The CDR indictment explains:

> In exchange for controlling and manipulating the bidding for investment agreements and other municipal finance contracts in order to increase the number and profitability of the agreements and contracts that Provider B won, [CDR] also requested that Provider B pay ***kickbacks***, and Provider B did in fact pay kickbacks to CDR.  The kickbacks were disguised as fees ("hedge fees") that purported to compensate CDR for acting as a broker in arranging financial transactions known as swaps between Provider B and other financial institutions, ***but those fees were, in fact, unearned or inflated***.

(emphasis added).

805.     The CDR Indictment also describes multiple occurrences of wire fraud, in violation of 18 U.S.C. § 1343, and a series of fraudulent bank transactions, in violation of 18 U.S.C. § 1005.  These allegations underscore the broad scope of the conspiracy and further show the web of collusion that drove this far reaching conspiracy.  The following examples of wire fraud and bank fraud are illustrative:

- On September 30, 2002, Defendant CDR, received a kickback in the form of $25,000 hedge fee from Financial Institution A, generated from a swap transaction between Financial Institution A and Provider A.

- On June 30, 2005, via wire transfer from New York City to Salt Lake City, Defendant CDR, caused Provider B to make an interest payment of approximately $264,977.20 to a state housing corporation. The interest payment was artificially and illegally suppressed because, at the time of the bidding, CDR gave a representative of Provider B information about bids from other providers which the representative used to lower the rates he was otherwise prepared to submit.

- On August 12, 2005, via wire transfer from New York City to Beverly Hills, Defendant CDR received a kickback in the form of a $4,500 hedge fee from Provider A in return for rigging certain Municipal Derivative contracts for the benefit of Provider A.

- On May 31, 2006, via wire transfer from New York City to Kansas City, Missouri, Defendant CDR caused Provider A to make an artificially determined interest payment of approximately $442,341.39 to a state program. The interest payment was arctically determined because a Marketer A agreed to pay a $475,000 kickback to CDR.

806. The CDR Indictment, also consistently with the allegations herein, details various ways in which municipalities and other public entities and non-profits were harmed by the Defendants' wrongful conduct. These actions resulted in, including but not limited to, the

following economic injuries caused to municipalities and other public entities and non-profits that participated in the municipal derivatives market:

- "[C]ausing municipalities to be paid artificially determined or suppressed yields for the duration of certain investment agreements or other municipal finance contracts, thereby increasing the profitability of those agreements or contracts for the winning co-conspirator providers for their duration"; and

- "[C]ausing municipal issuers to enter into investment agreements and other municipal finance contracts . . . at artificially determined or suppressed price levels through the control and manipulation of the bidding for those agreements and contracts." (¶34)

807. The CDR Indictment also details efforts by CDR and its executives to fraudulently conceal the existence and scope of Defendant's conspiracy by, *inter alia*, repeatedly falsely certifying that the bidding process of various Municipal Derivative auctions complied with relevant Treasury regulations; and making false, fictitious, and fraudulent statements and representations to agents of the Federal Bureau of Investigation and the IRS.

808. For example, the CDR Indictment describes how on May 20, 2004, Rubin of CDR caused Defendant CDR to receive a bid from a provider reflecting a rate in accordance with his suggestion and a certification that, falsely stated: "CDR Financial Products, Inc. has not provided us any information which induced us to bid a yield lower than the yield induced by the Request for Investment Agreement."

809. The CDR Indictment also describes on June 1, 2004, Rubin of CDR caused Defendant CDR submitted a fraudulent broker's certificate that, among other things, falsely

stated: "The winning bid was the highest yielding bona fide bid (determined net of any bidding agent's fees) which met the requirements of the bid solicitation[.]"

810. The CDR Indictment makes clear that Defendants's illegal conspiratorial conduct began as early as 1998 and continued at least until November 2006.

## C. The DOJ's Criminal Indictment Of Carollo, Goldberg, and Grimm Confirms Defendants GE Trinity And RBC's Role In The Conspiracy

811. As discussed herein the Carollo/Goldberg/Grimm Indictment like the CDR Indictment describes numerous Municipal Derivative transactions in which Defendant GE Trinity and/or Defendant RBC engaged in conduct in furtherance of the conspiracy alleged herein. The Carrolo/Goldberg/Grimm Indictment makes clear that these transactions are but a small subset of those affect by the conspiracy alleged herein.

812. More generally the indictment describes how these and other Defendants and co-conspirators engaged in a "scheme to deprive municipal issuers of money by causing them to award investment agreements and other municipal finance contracts at artificially determined or suppressed rates ..." The indictment further describes how these Defendants and other Defendants and co-conspirators conspired to "control and manipulat[e] . . . investment agreements and other municipal finance contracts."

813. The indictment states further that these Defendants and other Defendants and co-conspirators furthered the conspiracy condut, including but not limited to:

- discussing and agreeing which of providers should and should not be solicited to submit bids for a particular investment agreement or other municipal finance contract;

- obtaining co-conspirators information about the prices, price levels, rates, conditions or other information related to competing providers' bids, including, in some instances, the exact price, price level or rate of competing providers' bids;

- determining bids after obtaining information co-conspirators  about the prices, price levels, rates, conditions, or other information related to competing providers' bids;

- submitting and arranging to be submitted, intentionally losing bids for certain investment agreements or other municipal finance contracts;

- agreeing to pay and arranging for kickback payments to be made to co-conspirators;

- arranging inflated swap fees relative to the services performed and failing to disclose these fees to the municipal issuers or to the IRS;

- misrepresenting to municipal issuers or bond counsel that the bidding process was bona fide and in compliance with Treasury regulations or was otherwise competitive; and

- certifying, causing to be certified, and forwarding certifications to municipal issuers or bond counsel stating that the bidding process for certain investment agreements or other municipal finance contracts was *bona fide* and in compliance with Treasury regulations or was otherwise competitive, when, in fact, it was not.

**D.** **Other Defendants Former Employees Are Under Investigation Related To Their Involvement In The Conspiracy**

814.    The DOJ's decision to grant Defendant Bank of America entry into the leniency program and the CDR Indictment provide clear evidence that the DOJ believes that antitrust violations occurred in the Municipal Derivatives Industry and that at least Defendant Bank of America, CDR, and four other entities were involved in these violations.

815.    The allegations herein related to particular auctions and kickbacks make it clear that Defendants conspiracy was far broader.

816.    Public filings by other Defendants and their employees, as well as other publically available information, indicate strongly that the DOJ, the SEC, and a consortium of State Attorneys General that are investigating the conspiracy, also believe that the other named Defendants also participated in the conspiracy.

**1.** **UBS**

817.    UBS and its employees have been facing intensifying scrutiny from investigators regarding their involvement in the conspiracy.  In its Fourth Quarter 2006 Report, the company reported that it was under investigation for its role as a provider:

> In November 2006, UBS received subpoenas from the U.S. Department of Justice, Antitrust Division, and the U.S. Securities and Exchange Commission. These subpoenas concern UBS's conduct relating to derivative transactions entered into with municipal bond issuers, and to the investment of proceeds of municipal bond issuances.

818.    Peter Ghavami, an employee at UBS from 1999 to December 2007, has been implicated in the DOJ's investigation.  A November 30, 2007 FINRA report states in part that:

> After Mr. Ghavami's resignation [from UBS], UBS was advised by his counsel that Mr. Ghavami received a letter from the Antitrust Division, Department of

Justice, notifying him that he is a target of a grand jury investigation concerning antitrust and other violations involving contracts related to municipal bonds.

819.     Ghavami was recently arrested at John F. Kennedy Airport for his involvement in the conspiracy alleged herein.

820.     Mark Zaino, a long time UBS employee, has pled guilty to charges arising from involvement in the conspiracy alleged herein.

821.     On February 4, 2008, UBS received a Wells Notice advising it that the SEC was considering bringing a civil action against UBS in connection with its bidding of various financial instruments associated with municipal securities.

822.     The CDR Bill of Particulars identifies at least three other former UBS employees that were involved in the conspiracy alleged herein.

   2.   **JP Morgan**

823.     JP Morgan and its employees have also been targeted by investigators. JP Morgan, in a 2007 10-K, acknowledged that the firm had produced documents and other information relating to parallel investigations by the SEC and the antitrust division of the DOJ relating to possible antitrust and securities violations in connection with the bidding or sale of guaranteed investment contracts and derivatives to municipal issuers.

824.     On March 18, 2008, the Philadelphia Office of the SEC sent JP Morgan Securities a Wells Notice stating that it intended to bring civil charges against the company in connection with its investigations.  According to JP Morgan's 2008 10-K, JP Morgan Securities responded to that Wells Notice and also responded to a separate Wells Notice the SEC provided to Bear

Stearns & Co., Inc. (now known as JP Morgan Securities Inc.) on February 1, 2008. The investigation of Bear Stearns is described separately below.

825.    On April 21, 2009, the SEC advised JP Morgan that the Commission had authorized the filing of an enforcement action against the firm alleging violations of the federal securities laws and rules promulgated by the Municipal Securities Rulemaking Board.

826.    Several former JP Morgan employees have also been the target of SEC and DOJ investigations.

- In a November 30, 2007 FINRA report, Samuel Michael Gruer, an employee with JP Morgan from 2000 to 2006, acknowledged that he was the target of the grand jury investigation being conducted in the S.D.N.Y. concerning antitrust and other violations involving contracts related to municipal bonds. Four months later, in a March 18, 2008 FINRA report, Gruer acknowledged that he received notice that the SEC was considering bringing a civil injunctive action, and/or instituting administrative proceedings against him in connection with its investigation.

- A December 1, 2007 FINRA report noted that Shlomi Raz was the target of a grand jury investigation concerning possible antitrust and other violations involving contracts related to municipal bonds. Raz was an employee at Defendant JP Morgan from 1998 to 2003 and an employee with Defendant Goldman Sachs from 2003-2007.

- A December 12, 2007 FINRA report noted that James Leonard Hertz had been advised that he is a target of a grand jury investigation regarding municipal securities business. Hertz had been with the JP Morgan from 1998 until his

employment was terminated in December of 2007. Hertz recently plead guilty to his involvement in the conspiracy alleged herein.

- Several months later, a March 11, 2008 FINRA report noted that Douglas Willis MacFaddin received notice from the DOJ that he was the target of a grand jury investigation regarding municipal securities.  MacFaddin had been with the JP Morgan from 1998 until his employment was terminated in March of 2008.

- Ghavami, who was recently arrested for his involvement in the conspiracy alleged herein, was employed by JP Morgan from January 1997 to April 1999.

- The CDR Bill of Particulars identifies at least an additional three former employees of JPMorgan that participated in the conspiracy alleged herein.

### 3.  <u>Bear Stearns</u>

827.    Bear Stearns and its employees have been the target of a systematic investigation by the Antitrust Division of the DOJ and the SEC.

828.    In a November 30, 2007 FINRA report, Patrick Lyons Marsh, a Bear Stearns employee from 2000-2005, stated that he had been notified that he was a target of the grand jury investigation being conducted in the S.D.N.Y. concerning antitrust and other violations involving contracts related to municipal bonds.

829.    The SEC investigation of Mr. Marsh and Bear Stearns appears to be bearing fruit. In a February 2, 2007 FINRA report, Marsh noted that he had been advised that the staff of the SEC was considering recommending that the Commission bring a civil injunctive action and/or institute administrative proceedings against him alleging that he violated section 17(A) of the

Securities Act, Section 10(B) of the Exchange Act and Rule 10B-5 thereunder in connection with the bidding of various financial instruments associated with municipal securities.

830.     In a January 8, 2008 FINRA notice, it was reported that Stephen Andrew Salvadore, a Bear Stearns employee from 1999 to June 2008, received a letter stating that he was a target of a grand jury investigation being conducted by the US Department of Justice in the Southern District of New York concerning antitrust and other violations involving contracts related to municipal bonds.

831.     In Bear Stearns' February 2008 10-Q, the company acknowledged that the Antitrust Division of the DOJ and the SEC were investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including Bear Stearns, from the early 1990's to date. The company noted that the activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities, and other issuers of tax-exempt bonds.

832.     On February 1, 2008, Bear Stearns received a Wells Notice advising it that the SEC was considering bringing a civil injunctive action and/or an administrative proceeding in connection with the company's bidding for various financial instruments associated with municipal securities.

833.     In its 2008 10-Q, Bear Stearns reported that a group of State Attorneys General and the Office of the Comptroller of the Currency ("OCC") had also opened investigations into the bidding process for municipal derivatives. Bear Stearns acknowledged that it produced documents and other information to those investigators.

834.    The CDR Bill of Particulars identifies at least two former employees of Bear

Sterns that were involved in the conspiracy alleged herein.

**4.    <u>Piper Jaffray</u>**

835.    Piper Jaffray's 2007 10-K describes the breadth of the government's investigation

into it and other providers' behavior:

> We have received subpoenas and requests for information from, and we are
> responding to, the SEC and the U.S. Department of Justice ("DOJ") Antitrust
> Division, which are conducting **broad**, **industry-wide investigations** of
> anticompetitive and other practices relating to the marketing, providing or
> brokering of contracts involving the investment or reinvestment of proceeds of
> certain tax-exempt bond issues, including guaranteed investment contracts,
> derivatives and other investment securities.  In December 2007, the DOJ notified
> one of our employees, whose employment subsequently was terminated, that he is
> regarded as a target of the investigation.

(Emphasis added).

836.    The targeted employee was likely James Herbert Towne, an employee with the

company from 1996 to January 2008, who, according to a December 5, 2007 FINRA notice, was

tied to "potential antitrust and other violations involving contracts related to municipal bonds."

**5.    <u>Wachovia</u>**

837.    In its 2007 10-K, Wachovia reported that:

The Department of Justice ("DOJ") and the SEC, beginning in November 2006,
have been requesting information from a number of financial institutions,
including Wachovia Bank, N.A.'s municipal derivatives group, generally with
regard to competitive bid practices in the municipal derivative markets.  In
connection with these inquiries, Wachovia Bank, N.A. has received subpoenas
from both the DOJ and SEC seeking documents and information.  The DOJ and
the SEC have advised Wachovia Bank, N.A. that they believe certain of its
employees engaged in improper conduct in conjunction with certain competitively
bid transactions and, in November 2007, the DOJ notified two Wachovia Bank,
N.A. employees, both of whom are on administrative leave, that they are regarded
as targets of the DOJ's investigation.

838.     A November 30, 2007 FINRA report identified Martin McConell, an employee at Wachovia from 2005-2008, as a target of DOJ's criminal investigation of the conspiracy allegation.  The report stated that, "Mr. McConnell has been notified in writing that he is regarded as a target of a grand jury investigation being conducted in the Southern District of New York concerning antitrust and other violations involving contracts related to municipal bonds."

839.     The government's investigation of Wachovia did not stop with subpoenas and target letters.  In its June 2008 10-Q, Wachovia reported that in connection with the bidding of various financial instruments associated with municipal securities, the SEC was considering recommending the institution of civil and/or administrative proceedings against the company.

840.     Defendant Wells Fargo, in the company's annual 2008 report, noted these developments and added that the two Wachovia employees who had received target letters from the DOJ had been terminated.

841.     The CDR Bill of Particulars identifies at least two former employees of Wachovia that were involved in the conspiracy alleged herein.

**6.     FSA**

842.     On November 15, 2006, FSA Holdings received a subpoena from the Antitrust Division of DOJ issued in connection with an ongoing criminal investigation of bid rigging of awards of municipal GICs.  On November 16, 2006, FSAI received a subpoena from the SEC related to an ongoing industry-wide civil investigation of brokers and providers of municipal GICs.  The subpoenas requested that the company furnish to the DOJ and SEC records and other information with respect to the company's municipal GIC business.

843.     In its 2006 10-K, FSA Holdings acknowledged that it is at risk that information provided pursuant to the subpoenas or otherwise provided to the government in the course of its investigation would lead to indictments of the company and/or its employees, with the potential for convictions or settlements providing for the payment of fines, restrictions on future business activities and, in the case of individual employees, imprisonment.

844.     Following these subpoenas, on February 4, 2008, the SEC's Philadelphia Regional Office sent FSA Holdings a Wells Notice concerning the company's bidding of municipal GICs. The Wells Notice indicated that the SEC was considering recommending that the SEC authorize the staff to bring a civil injunction action and/or institute administrative proceedings against the company, alleging violations of Section 10(b) of the Exchange Act and Rule 10-b-5 thereunder and Section 17(a) of the Securities Act.

845.     On August 26, 2009, it was reported that the Connecticut Attorney General Richard Blumental had gone to the Connecticut Superior Court to compel FSAI to turn over 600 hours of audio recordings that FSAI had already released to the DOJ and SEC that Attorney General Blumenthal believed contained "a rich source of evidence of potential violations" of antitrust laws.

**7.     CDC Funding**

846.     In its 2008 Registration Document filed with the French Financial Markets Authority on April 7, 2009, CDC (now known as Natixis S.A.) reported that an unidentified current employee of CDC Funding (now known as Natixis Funding Corp.) received a target letter from the DOJ's Antitrust Division indicating that he was a target of the DOJ's criminal investigation of the conduct alleged herein.

**8.**     **Morgan Stanley**

847.     Former Morgan Stanley employees have been the target of the Antitrust Division of the DOJ and the SEC.

848.     A March 2, 2008 FINRA report noted that James Leonard Hertz had been advised that he is a target of a grand jury investigation regarding municipal securities business.  Hertz was employed by Morgan Stanley from September 1988 to April 1993.

849.     The CDR Bill of Particulars identifies at least two former employees of Morgan Stanley that were involved in the conspiracy alleged herein.

**9.**     **Salomon Smith Barney**

850.     Former Salomon Smith Barney Holdings, Inc. employees have been the target of the Antitrust Division of the DOJ.

**10.**     **Goldman Sachs**

851.     Former Goldman Sachs employees have been the targeted by the Antitrust Division of the DOJ.

**11.**     **George K. Baum**

852.     Former Baum employees have been targeted by the Antitrust Division of the DOJ.

**12.**     **Societe Generale**

853.     Former Societe Generale employees have been the target of the Antitrust Division of the DOJ and the SEC

# VIII.
## ACCRUAL OF CLAIMS, CONTINUING VIOLATION,
## EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

854. Riverside repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

855. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Riverside.

856. Riverside did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were engaging in the illegal and unlawful conduct as alleged herein until shortly before this litigation was commenced. Nor could Riverside have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing. Even as late as December 2006, Riverside lacked the ability to confirm the true nature of the alleged conspiracy from publically available information. Moreover, only a short time before the date of filing of this complaint, has Riverside been able to uncover facts sufficient on which to state the claims made herein against all of the Defendants named herein.

857. This is confirmed by *inter alia* public statements made at the time of the disclosure of subpoenas issued by the DOJ in late 2006. For example, in a *Bond Buyer* article dated December 22, 2006, Carol Lew, president of the National Association of Bond Lawyers, was quoted as saying "[r]ight now, there is a lack of public information. . .We don't know if any of these allegations are true or what the facts are and that tempers everything."

858.     Moreover, prior to the disclosure of subpoenas issued by the DOJ in late 2006,

any publically available information regarding manipulated municipal derivative transactions

focused on certain manipulated transactions.  Until the announcement of the DOJ subpoenas and

the industry-wide scope of the investigation of which they were a part, Riverside was ignorant of

the Defendants' conspiracy.  The first complaint alleging violations of antitrust laws based on the

conduct described herein on behalf of a putative class of which Riverside is a member was filed

March 12, 2008.

859.     Moreover, as discussed herein, pursuant to IRS regulations, Provider Defendants

were required to certify that they had not consulted with other Providers, that their bid was not a

courtesy bid, and that the bid was independently determined without regard to an agreement with

another issuer or other person.  These certifications were repeatedly made to Riverside who

relied on them and, in so relying, did not undertake further inquiry as to whether such

certifications were legitimate.  With respect to negotiated transactions, Defendants supplied false

market prices and Riverside relied on these false certifications.

860.     Broker Defendants also falsely assured Riverside that they were acting as their

fiduciary agents and were soliciting bids for Municipal Derivatives that were competitively

priced and in compliance with IRS rules and regulations that require at least three commercially

reasonable bids.  Such assurances were repeatedly made to Riverside who relied on them and, in

so relying, did not undertake further inquiry as to whether such agreements had occurred.

861.     Statements made at the time of DOJ issued subpoenas in late 2006, support this

conclusion.  In a December 22, 2006 *Bond Buyer*, Patrick Born ("Born"), Chief Financial Officer

of the city of Minneapolis and head of the debt committee of the Governmental Finance Officers

Association, noted that "[w]e've been relying on certifications that bids have been competitive. Are we going to discover that people are simply not doing what they said they were doing, or is it something else?" In a Bloomberg article dated December 7, 2006, Born noted that "[t]he way these folks providers and brokers have operated, largely by telephone and largely out of public view, are [sic] not as transparent as they might be...."

862.    In fact, Riverside took extraordinary specific measures to ensure that Defendants were not engaged in conspiratorial conduct, demanding, for example, that affirmations to that effect be submitted by Defendants that bid in Municipal Derivative auctions conducted on behalf of Riverside. Issuers like Riverside commonly used bid forms with the following or similar language:

> "Bidder's Representation: Submission of a bid is a representation that the potential Provider did not consult with any other potential Provider about its bid, that the bid was determined without regard to any other formal or informal agreement that the potential Provider has with the Issuer or any other person (whether or not in connection with the Bonds), and that the bid is not being submitted solely as a courtesy to the Issuer or any other person for purposes of satisfying applicable statutory or regulatory requirements."

863.    In concealment of the alleged conspiracy, Defendants falsely made these representations to Riverside and other issuers. These representations caused Riverside to believe that the bids they received were the result of a complete and fair competitive process.

864.    Defendants engaged in a successful and unlawful scheme to defraud issuers of municipal bonds, primarily local and municipal government entities, that they affirmatively concealed, in the following respects:

a. By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

b. By engaging in secret meetings and telephone calls in order to further their unlawful and illegal scheme to fix the bidding process for Municipal Derivatives and allocate amongst themselves the market therefor;

c. By designing corrupted auctions to appear facially legitimate under relevant regulations and practices;

d. Signing bid submission documents in which they explicitly represented that they had not colluded with any other provider or broker in submission of the bid;

e. Through covert sharing of profits or other secret compensation paid to losing bidders;

f. By paying kickbacks to Broker co-conspirators; and

g. By submitting fraudulent courtesy bids and agreements not to bid to create the false impression of a competitive bidding process.

865. In addition to those described above, Defendants took many steps to conceal their conduct. For instance, in one transaction Rosenberg of Sound Capital intended to send an e-mail to a Provider Defendant giving it a "last look," he mistakenly hit the "Reply All" key, causing the secret e-mail to be sent to the attorney for the issuer. When that attorney called Rosenberg to inquire, Rosenberg lied about the purpose of the e-mail. As another example, Naeh of CDR would send conspiratorial e-mails to representatives at Bank of America, including Pinard, through his personal GoAmerica email account rather than his business account.

866.     Defendants' representatives also took substantial steps to conceal their wrongdoing.  For example, the CW commonly told co-conspirators to call him on his cellular phone so as to avoid having their conversations audiotaped.  It was also commonplace for Defendants' representatives to tell a co-conspirator "I'll call you back later" i.e. from a secure line or to ask if they could go off the trading desk when bidding.  Campbell of Bank of America also avoided detection by circumventing the capture of emails sent on his Bank of America Blackberry by directly contacting the Blackberries of co-conspirators, including Towne of Piper Jaffray, through the use of a Personal Identification Number.

867.     Defendants concealed the conspiracy by failing to apprise Riverside of the existence of audiotapes that revealed their collusive conduct by reusing and overwriting evidence contained on such tapes.  By reusing and overwriting these tapes, evidence relevant to Riverside's claims may have become inaccessible.  Once the existence of these tapes was discovered by investigators, they were seized by the DOJ and Riverside was denied access to them.

868.     The Defendants also took steps to conceal their activity by making misleading statements to the press at or near the time subpoenas were being handed down by investigators. For example, a November 17, 2006 report on the subpoenas in the *Bond Buyer* indicated that: Sound Capital claimed that it was unaware of any charges against it and that its business continued "uninterrupted";  FSA also indicated that it had no awareness of chargers involving its practices; CDR asserted that it had acted "appropriately"; and CDC asserted that it was "simply a fact witness" and that investigators "just want to know what our involvement in the industry is."

869. Also, JP Morgan, in a May 18, 2007 Bloomberg news report, indicated that it was not a target of the DOJ probe and was merely contacted by the DOJ and SEC about bidding and "related matters in public finance." In that article, Charles Youtz, a Vice-President of Baum, assured the public that "[w]e do not anticipate any impact on the reputation of [sic] financial viability of the firm." Riverside reasonably relied on these misleading statements and were mislead as to the existence, scope of, and participants in the alleged conspiracy.

870. Furthermore, while Defendant Bank of America's outside counsel discovered evidence of Violations of Antitrust laws as early as 2004, such counsel was specifically instructed by the DOJ not to reveal that information so as not to hinder the DOJ's investigation of the violations.

871. Defendants have also committed continuing violations of antitrust laws resulting in monetary injury to Riverside. These violations constitute injurious acts which restart the applicable statute of limitations. Acts in furtherance of the conspiracy have occurred since the first complaint alleging violations of antitrust laws based on the conduct described herein was filed March 12, 2008. These acts include, among others, the submission of courtesy bids, the collusive exchange of pricing information on municipal derivative transactions, and direct discussions among the conspirators regarding the pricing of Municipal Derivatives

872. Additionally, Bank of America's 2009 SEC filing tellingly states that governmental investigations into the conspiracy cover the period from the early 1990s "to date." And the CDR Indictment describes conduct that lasted "until at least November 2006."

873. Moreover, many of the representatives targeted by the DOJ did not leave their employment until 2006-2008. These include: Towne of Piper Jaffray (January of 2008); Zaino of

UBS (2007); Salvadore of Bear Stearns (July of 2008); MacFaddin of JP Morgan (March of 2008); Pinard of Bank of America (February of 2007); Hertz of JP Morgan (December of 2007); Ghavami of UBS (December of 2007); Saunders of Wachovia (July of 2008); Gruer of JP Morgan (June of 2006); and Goldberg of CDR (September of 2006). McConnell of Wachovia worked at Wachovia from 2005 to July of 2008. Accordingly, it can be inferred that their anti-competitive practices have continued to at least the time of their respective departures. Stallone of IMAGE, Rosenberg of Sound Capital, Frasco of CDC, and Murphy, formerly of Bank of America and now at Winters, are still currently employed by a Defendant.

874.     Moreover, the co-conspirators, with the potential exception of Bank of America, have not effectively withdrawn from the conspiracy. Their refusal acknowledge their misconduct are ongoing acts in furtherance of the conspiracy.

875.     Many of the Municipal Derivatives transactions entered into are ongoing. The negative effects Riverside is experiencing from them are ongoing as well and constitute a continuing violation of the law.

876.     Because the conspiracy was both self-concealing and affirmatively concealed by Defendants and their con-conspirators, Riverside had no knowledge of the conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed, until shortly before the initial complaint was filed in this matter. As a result of Defendants' fraudulent concealment of their conspiracy, Riverside asserts the tolling of any applicable statute of limitations affecting the rights of action of Riverside.

# IX.
## RIVERSIDE SUFFERED INJURY
## THROUGH THE CONDUCT OF THE DEFENDANTS

877.     Riverside repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

878.     Through their unlawful acts, the Defendants acted to the detriment of Riverside, leading to the reaping of unlawful profits by the Defendants from the manipulation of the Municipal Derivatives market.

879.     By engaging in the unlawful and illegal conspiracy alleged herein, including rigging bids in auctions for Municipal Derivatives and allocating the market amongst themselves, the Defendants acted to the detriment of Riverside.  The Defendants engaged in unlawful conduct in furtherance of the conspiracy that included but was not limited to:

    a.      conspiring to pre-select the winners in particular Municipal Derivative auctions;

    b.      submitting courtesy bids designed to lose in favor of the pre-selected bid winner but give the bidding process the appearance of legitimacy;

    c.      declining to submit a bid in favor of the pre-selected winner;

    d.      submitting deliberately losing bids that were unreasonable and unrealistic;

    e.      engaging in inappropriate last look arrangements, whereby the pre-selected winner of the auction was given a last look at submitted bids to ensure that the bid that it submitted would be just high enough to win and to police the other participants in the conspiracy;

f.      agreeing to make and making illegal payments of illegally and unlawfully gained profits to other Defendants as part of the conspiracy;

g.      manipulating the terms that issuers received on negotiated deals, through, including but not limit to, allocating transactions amongst Provider Defendants, coordinating pricing, and giving falsified pricing verification information to providers;

h.      enforcing the conspiracy by ensuring that all of the Defendants would abide by the conspiratorial agreement.

880.    In so doing, Defendants have committed unlawful acts that allowed them to illegally and improperly obtain public monies of Riverside.

881.    The nature of the Defendants' unlawful acts has caused serious harm to Riverside. As a direct result of the conduct of the Defendants, Riverside has received, *inter alia*, lower rates of return for Municipal Derivatives than they would have in a competitive market, paid higher fees and other costs in acquiring Municipal Derivatives than they would have in a competitive market, and been subjected to uncompensated, higher credit risks of counter-parties to Municipal Derivatives than they would have in a competitive market.  Thus, as a direct and proximate result of the illegal and unlawful acts of the Defendants, Riverside has been injured and financially damaged in its business and property in an amount to be determined according to proof.

## X.
## TRADE AND INTERSTATE COMMERCE

882.    The activities of Defendants, and each of them, and their named and unnamed co-conspirators, as alleged herein, were within the flow of and substantially affected interstate commerce.

883.    During all times alleged herein, Defendants, and each of them, and their named and unnamed co-conspirators, issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to Riverside located in all states across the nation.

884.    The conspiracy in which Defendants, and each of them, and their named and unnamed co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## XI.
## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

885.    Riverside repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

886.    Defendants, and each of them, and their named and unnamed co-conspirators, engaged in an agreement, contract, combination, trust and/or conspiracy to manipulate the market for Municipal Derivatives by, *inter alia*, engaging in conduct to maintain or stabilize the price of Municipal Derivatives, allocating customers and markets for Municipal Derivatives, rigging the bidding process by which municipal bond issuers acquire Municipal Derivatives, and/or

conspiring to manipulate the terms that issuers received on Municipal Derivatives entered into through a negotiation process in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

887. Defendants, and each of them, and their named and unnamed co-conspirators, agreed to, and did in fact, restrain trade or commerce in violation of the Sherman Act by engaging in conduct, including, but not limited to, the allocation of the market for Municipal Derivatives amongst themselves, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements.

888. In formulating and effectuating their agreement, contract, combination, trust and/or conspiracy, Defendants, and each of them, and their named and unnamed co-conspirators, engaged in anticompetitive activities including, but not limited to, the making of illegal agreements among themselves to reduce competition and thereby reduce the returns that U.S. public and non-profit entities, including Riverside, earned on Municipal Derivatives and to allocate the market for Municipal Derivatives amongst themselves.  This scheme involved means, including but not limited to, the following activities:

    a.      conspiring to pre-select the winners in particular Municipal Derivative auctions;

    b.      submitting courtesy bids designed to lose in favor of the pre-selected bid winner but give the bidding process the appearance of legitimacy;

    c.      declining to submit a bid in favor of the pre-selected winner;

    d.      submitting deliberately losing bids that were unreasonable and unrealistic;

    e.      engaging in inappropriate last look arrangements, whereby the pre-selected winner of the auction was given a last look at submitted bids to ensure that

the bid that it submitted would be just high enough to win and to police the other participants in the conspiracy;

f.     agreeing to make and making illegal payments of illegally and unlawfully gained profits to other Defendants as part of the conspiracy;

g.     manipulating the terms that issuers received on negotiated deals, through, including but not limit to, allocating transactions amongst providers, coordinating pricing, and giving falsified pricing verification information to providers;

h.     enforcing the conspiracy by ensuring that all of the Defendants would abide by the conspiratorial agreement.

889.    The combination and conspiracy alleged herein had the following effects, among others:

(a)     Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated and U.S. public and non-profit entities, including Riverside, received, *inter alia*, lower returns for Municipal Derivatives than they would have received in a competitive market;

(b)     Bids charged by Defendants and their named and unnamed co-conspirators for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels, forcing U.S. public and non-profit entities, including Riverside, to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions;

(c)     Customers and markets of Municipal Derivatives were allocated among Defendants and their named and unnamed co-conspirators, forcing U.S. public and non-profit entities, including Riverside, to accept less competitive terms of Municipal Derivatives;

(d)     Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated for U.S. public and non-profit entities, including Riverside.

890.    As a direct and proximate result of Defendants' illegal agreement, contract, combination, trust and/or conspiracy, Riverside has been injured and damaged in their business and property in an amount to be determined according to proof.

891.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Riverside seeks to recover treble damages and costs of this suit, including reasonable attorneys' fees, against Defendants, and each of them, for the injuries sustained by Riverside by reason of the violations alleged herein.

892.    WHEREFORE, Riverside prays for judgment against Defendants, and each of them, as set forth below.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT**
**CAL. BUSINESS AND PROFESSIONS CODE §§ 16700, *ET SEQ.***

893.    Riverside repeats and realleges each of the foregoing paragraphs of this complaint and incorporates them by reference as though set forth in full herein.

894.    Defendants, and each of them, and their named and unnamed co-conspirators, engaged in an agreement, contract, combination, trust and/or conspiracy to manipulate the market for Municipal Derivatives by, *inter alia*, engaging in conduct to maintain or stabilize the price of

Municipal Derivatives, allocating customers and markets for Municipal Derivatives, rigging the bidding process by which municipal bond issuers acquire Municipal Derivatives, and/or conspiring to manipulate the terms that issuers received on Municipal Derivatives entered into through a negotiation process in violation of California Business and Professions Code section 16700, *et seq.* (the "Cartwright Act").

895. Defendants, and each of them, and their named and unnamed co-conspirators, agreed to, and did in fact, restrain trade or commerce in violation of the Cartwright Act by engaging in conduct, including, but not limited to, the allocation of the market for Municipal Derivatives amongst themselves, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements.

896. In formulating and effectuating their agreement, contract, combination, trust and/or conspiracy, Defendants, and each of them, and their named and unnamed co-conspirators, engaged in anticompetitive activities including, but not limited to, the making of illegal agreements among themselves to reduce competition and thereby reduce the returns that U.S. public and non-profit entities, including Riverside, earned on Municipal Derivatives and to allocate the market for Municipal Derivatives amongst themselves. This scheme involved means, including but not limited to, the following activities:

    a.    conspiring to pre-select the winners in particular Municipal Derivative auctions;

    b.    submitting courtesy bids designed to lose in favor of the pre-selected bid winner but give the bidding process the appearance of legitimacy;

    c.    declining to submit a bid in favor of the pre-selected winner;

d.  submitting deliberately losing bids that were unreasonable and unrealistic;

e.  engaging in inappropriate last look arrangements, whereby the pre-selected winner of the auction was given a last look at submitted bids to ensure that the bid that it submitted would be just high enough to win and to police the other participants in the conspiracy;

f.  agreeing to make and making illegal payments of illegally and unlawfully gained profits to other Defendants as part of the conspiracy;

g.  manipulating the terms that issuers received on negotiated deals, through, including but not limit to, allocating transactions amongst providers, coordinating pricing, and giving falsified pricing verification information to providers;

h.  enforcing the conspiracy by ensuring that all of the Defendants would abide by the conspiratorial agreement.

897.  The combination and conspiracy alleged herein had the following effects, among others:

a.  Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated and U.S. public and non-profit entities, including Riverside, received, *inter alia*, lower returns for Municipal Derivatives than they would have received in a competitive market;

b.  Bids charged by Defendants and their named and unnamed co-conspirators for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels, forcing U.S. public and non-profit entities, including

Riverside, to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions;

c.      Customers and markets of Municipal Derivatives were allocated among Defendants and their named and unnamed co-conspirators, forcing U.S. public and non-profit entities, including  Riverside, to accept less competitive terms of Municipal Derivatives;

d.      Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated for U.S. public and non-profit entities, including  Riverside.

898.    As a direct and proximate result of Defendants' illegal agreement, contract, combination, trust and/or conspiracy, Riverside has been injured and damaged in their business and property in an amount to be determined according to proof.  These injuries have caused, and will continue to cause, damages to Riverside.

899.    As a direct and legal result of the acts of Defendants and their unnamed co-conspirators,  Riverside was required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which they seek recovery according to proof.

900.    Pursuant to the Cartwright Act,  Riverside is authorized to recover three times the damages they sustained plus interest and reasonable attorneys' fees, costs and expenses.

901.    WHEREFORE,  Riverside prays for judgment against Defendants, and each of them, as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Riverside prays that:

A.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy and the acts done in furtherance thereof by Defendants and their unnamed co-conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Cartwright Act, Business and Professions Code §§ 16700, *et seq.*;

B.     Judgment be entered against Defendants, jointly and severally, and in favor of Riverside for treble damages as allowed by law as determined to have been sustained by them;

C.     Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein;

D.     The Court award Riverside 's fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

E.     The Court award Riverside such other and further relief as may be necessary and appropriate.

Dated: April 11, 2011          **COTCHETT, PITRE & McCARTHY, LLP**

By: *Nanci E Nishimura*

Joseph W. Cotchett
jcotchett@cpmlegal.com
Nanci E. Nishimura
nnishimura@cpmlegal.com

Daniel R. Sterrett
dsterrett@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Imtiaz A. Siddiqui
isiddiqui@cpmlegal.com
COTCHETT, PITRE& McCARTHY
One Liberty Plaza, 23rd Floor
New York, NY 10006
Telephone: (212) 201-6820
Facsimile: (646) 219-6678

Gregory P. Priamos, City Attorney
gpriamos@riversideca.gov
CITY OF RIVERSIDE
3900 Main Street
Riverside, CA 92522
Telephone: (951) 826-5567
Facsimile: (951) 826-5540

*Attorneys for Plaintiffs*
*CITY OF RIVERSIDE, THE REDEVELOPMENT*
*AGENCY OF THE CITY OF RIVERSIDE, AND*
*THE PUBIC FINANCING AUTHORITY OF THE*
*CITY OF RIVERSIDE*

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: April 11, 2011

**COTCHETT, PITRE & McCARTHY, LLP**

By: *Nanci E Nishimura*

Joseph W. Cotchett
jcotchett@cpmlegal.com
Nanci E. Nishimura
nnishimura@cpmlegal.com
Daniel R. Sterrett
dsterrett@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Imtiaz A. Siddiqui
isiddiqui@cpmlegal.com
COTCHETT, PITRE& McCARTHY, LLP
One Liberty Plaza, 23rd Floor
New York, NY 10006
Telephone: (212) 201-6820
Facsimile: (646) 219-6678

Gregory P. Priamos, City Attorney
gpriamos@riversideca.gov
CITY OF RIVERSIDE
3900 Main Street
Riverside, CA 92522
Telephone: (951) 826-5567
Facsimile: (951) 826-5540

*Attorneys for Plaintiffs*
*CITY OF RIVERSIDE, THE REDEVELOPMENT*
*AGENCY OF THE CITY OF RIVERSIDE, AND*
*THE PUBIC FINANCING AUTHORITY OF THE*
*CITY OF RIVERSIDE*

## CERTIFICATE OF SERVICE

I am employed in San Mateo County. I am over the age of 18 and not a party to the within action. My business address is Cotchett, Pitre & McCarthy, LLP San Francisco Airport Office Center 840 Malcolm Road Burlingame, CA 94010. I am readily familiar with Cotchett, Pitre & McCarthy, LLP's practices for the service of documents.

On April 11, 2011, I served or caused to be served a true copy of the following document in the manner listed below:

**PLAINTIFFS CITY OF RIVERSIDE, THE REDEVELOPMENT AGENCY OF THE CITY OF RIVERSIDE, AND THE PUBIC FINANCING AUTHORITY OF THE CITY OF RIVERSIDE'S SECOND AMENDED COMPLAINT**

**X**    **BY CM/ECF:** All parties registered for CM/ECF in Case Number 1:08-cv-2516-VM-GWG will receive a copy of the document once it has been entered into the docket. All parties in this action, except the party listed below, are registered for CM/ECF and service upon those parties will be accomplished by receipt of a Notice of Electronic Filing email in accordance with Rule 13.2(g) of the Court's Electronic Case Filing Rules and Instructions.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Burlingame, CA, on April 11, 2011.

_____
DANIEL R. STERRETT