```
                                    ┌─────────────────────────────┐
UNITED STATES DISTRICT COURT        │ USDC SDNY                   │
SOUTHERN DISTRICT OF NEW YORK        │ DOCUMENT                    │
                                    │ ELECTRONICALLY FILED        │
--------------------------------X    │ DOC #: _____    │
HINDS COUNTY, MISSISSIPPI,      :    │ DATE FILED: 4/28/11         │
                                :    └─────────────────────────────┘
                   Plaintiff,   :
                                :
     - against -                :
                                :    08 Civ. 2516
                                :
WACHOVIA BANK N.A. et al.,      :
                                :
                   Defendants.  :
--------------------------------X
IN RE MUNICIPAL DERIVATIVES     :
ANTITRUST LITIGATION            :    08 MDL No. 1950
                                :
THIS DOCUMENT RELATES TO:       :    DECISION AND ORDER
                                :
STATE OF WEST VIRGINIA ex rel.  :
DARELL V. MCGRAW, JR.,          :
ATTORNEY GENERAL   v.           :
BANK OF AMERICA, N.A., et al.   :
--------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

The action addressed in this decision is part of the consolidated pretrial proceedings of the multidistrict litigation ("MDL") In re Municipal Derivatives Antitrust Litigation, 08 MDL No. 1950. Plaintiff State of West Virginia's ("West Virginia") first amended complaint (the "WV Complaint") alleges federal and state antitrust violations arising out of an alleged unlawful conspiracy on the part of twenty-five corporate defendants (collectively, "WV Defendants") and others to illegally rig bids, fix prices and manipulate the market for investment instruments known as municipal derivatives. Five defendants, namely

Transamerica Life Insurance Company ("Transamerica"), Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank"),[1] Financial Guaranty Insurance Company ("FGIC"), GE Funding Capital Market Services, Inc. ("GE Funding"), and Royal Bank of Canada ("RBC"), now move individually to dismiss the WV Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). Two additional defendants, AIG Financial Products Corp. and AIG Matched Funding Corp. (together, "AIG"), move jointly to dismiss the WV Complaint pursuant to Rule 12(b)(6).

For the reasons set forth below, the motions of Transamerica, FGIC, AIG and GE Funding are GRANTED, and the motions of Rabobank and RBC are DENIED.

## I. BACKGROUND

### A. PARTIES

Plaintiff West Virginia asserts that WV Defendants and others illegally rigged bids, fixed prices and manipulated the market for municipal derivatives, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("§ 1"), and West Virginia's Antitrust Act, W. Va. Code §§ 47-18-3(a), 47-18-3(b)(1)(A) and (C), and 47-18-3(b)(2)(A) and (B) (the "WV Antitrust Act").

---

[1] Rabobank was named improperly in the WV Complaint as the "Rabobank Group."

WV Defendants as named in the WV Complaint are: Bank of America, N.A. ("BoA"); Merrill Lynch & Co., Inc. ("Merrill Lynch"); UBS Financial Services, Inc., UBS Securities, LLC, and UBS AG (collectively, "UBS"); JP Morgan Chase & Co. and JP Morgan Securities, Inc. (together, "JP Morgan"); MBIA Inc. ("MBIA"); Morgan Stanley; Rabobank; Bayerishe Landesbank Girozentale ("BLG"); Transamerica; AIG; Financial Security Assurance, Inc. ("FSAI"); Assured Guaranty US Holdings, Inc. ("Assured"); Dexia S.A ("Dexia"); FGIC; GE Funding; Natixis Funding Corp. and Natixis S.A. (together, "Natixis"); RBC; CDR Financial Products, Inc. ("CDR"); George K. Baum & Co. ("Baum"); and Investment Management Advisory Group, Inc. ("Investment Management Advisory").

Defendants Transamerica, Rabobank, FGIC, GE Funding, AIG and RBC move separately to dismiss the WV Complaint pursuant to Rule 12(b)(6).

**B.   PROCEDURAL BACKGROUND**

### 1.   <u>Multidistrict Litigation</u>

In January 2007, BoA entered into the antitrust corporate leniency program administered by the United States Department of Justice, Antitrust Division (the "Antitrust Division") under the Antitrust Criminal Penalty Enhancement and Reform act of 2004 ("ACPERA"). <u>See</u> Pub. L.

No. 108-237, tit. II, §§ 201-221, 118 Stat. 661, 665-69. BoA's action was prompted by the Antitrust Division's investigation into transactions of certain financial institutions involved in the municipal derivatives market. Multiple civil antitrust actions against various defendants were subsequently filed by various municipalities and other entities across the country alleging violations of § 1 arising from bidding on municipal derivatives offerings. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on MDL transferred all pending and subsequent related actions to this District on June 16, 2008, see In re Municipal Derivatives Antitrust Litig., 560 F. Supp. 2d 1386 (Jud. Pan. Mult. Lit. June 16, 2008), and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings (the "MDL Order"). In accordance with the MDL Order, thirty-three cases have thus far been transferred and consolidated with the designated lead case.

## 2. Class Action

Interim lead class counsel ("Class Counsel") filed the original consolidated amended complaint ("Class Complaint") in this action on August 22, 2008 against more than forty corporate defendants (collectively, "Class Defendants").[2]

---

[2] The defendants as named in the Class Complaint were: BoA; Wachovia Bank, N.A. ("Wachovia"); AIG; Bear Stearns & Co. ("Bear Sterns"); Financial Security Assurance Holdings, Ltd. ("FSA

The Class Complaint alleged that Class Defendants conspired to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, municipal derivatives in violation of § 1.   All Class Defendants except for BoA, Feld Winters and MGIC filed a joint motion to dismiss the Class Complaint.   By Decision and Order dated April 29, 2009, the Court granted Class Defendants' joint motion with leave to replead.[3]

Class Counsel filed a second consolidated amended complaint ("Second Class Complaint") on June 18, 2009, again alleging a § 1 claim against sixteen corporate defendants.   The Second Class Complaint plaintiffs ("SCAC Plaintiffs") purport to represent a class (the "SCAC Class") consisting of:

> All state, local and municipal government entities, independent government agencies and private entities

---

Holdings"); FSAI; FGIC; GE Funding; Genworth Financial Investment Management, LLC ("Genworth"); Feld Winters Financial LLC ("Feld Winters"); Natixis; JP Morgan; Piper Jaffray & Co. ("Piper Jaffray"); Société Générale SA ("SocGen"); AIG SunAmerica Life Assurance Co.; UBS AG; XL Capital, Ltd., XL Asset Funding Co. I, LLC and XL Life Insurance & Annuity Inc. (collectively "XL Defendants"); Merrill Lynch; Morgan Stanley; National Westminster Bank PLC ("NatWest"); Investment Management Advisory; CDR; Winters & Co. ("Winters"); First Southwest Company ("First Southwest"); Baum; Kinsell Newcomb & De Dios Inc.; PackerKiss Securities, Inc.; Shockley Financial Corp.; Sound Capital Management Inc. ("Sound Capital"); Cain Brothers & Co., LLC; Morgan Keegan & Co., Inc.; Trinity Funding Co. LLC; and Municipal Government Investors Corp. ("MGIC").

[3] The April 29, 2009 Decision and Order is reported as Hinds Cnty., Miss. v. Wachovia Bank, N.A., 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ("Hinds Cnty. I").

that purchased by competitive bidding or auction
[m]unicipal [d]erivatives directly from a [p]rovider
[d]efendant, at any time from January 1, 1992 through
the present in the United States and its territories or
for delivery in the United States and its territories.

(Second Class Compl. ¶ 183.)   Defendants as named in the

Second Class Complaint are BoA; Bear Stearns; JP Morgan;

Morgan Stanley; NatWest; Piper Jaffray; SocGen; UBS;

Wachovia; Wells Fargo; Natixis Funding Corp.; Investment

Management Advisory; CDR; Winters; Baum; and Sound Capital

(collectively "SCAC Defendants").

All SCAC Defendants except BoA filed a joint motion to

dismiss the Second Class Complaint, dated September 18,

2009.   By Decision and Order dated March 25, 2010, the

Court denied SCAC Defendants' joint motion to dismiss and

found that SCAC Plainitffs had alleged plausible § 1

claims.[4]

In addition, four California municipalities filed a

separate joint second amended complaint on December 15,

2009 (the "Joint Complaint") alleging § 1 and California

State antitrust act ("Cartwright Act") claims on behalf of

themselves and a class of municipalities against SCAC

Defendants.   By Decision and Order dated April 26, 2010,

---

[4] The March 25, 2010 Decision and Order is reported as <u>Hinds
Cnty., Miss. v. Wachovia Bank N.A.</u>, 700 F. Supp. 2d 378 (S.D.N.Y.
2010) ("<u>Hinds Cnty. II</u>").

the Court granted in part and denied in part the Joint Complaint defendants' motion to dismiss.[5]

Finally, between September and December 2009, a separate group of eleven California municipalities brought a series of complaints (collectively, the "California Complaints") alleging § 1 and Cartwright Act claims against more than forty corporate defendants (the "California Defendants"). By Decision and Order dated April 26, 2010, the Court granted in part and denied in part the joint motion to dismiss of certain of the California Defendants; granted the motion to dismiss of California Defendants Syncora Guarantee, Inc. and Syncora Holdings, Ltd. (together, "Syncora"); and denied the motion to dismiss of California Defendants The Goldman Sachs Group, Inc., Goldman Sachs Mitsui Marine Derivatives Products, L.P., and Goldman Sachs Bank USA (collectively, "Goldman Sachs").[6]

---

[5] The April 26, 2010 Decision and Order relating to the Joint Complaint is reported as Hinds Cnty., Miss. v. Wachovia Bank N.A., No. 08 Civ. 2516, 2010 WL 1837823 (S.D.N.Y. Apr. 26, 2010) ("Hinds Cnty. III").

[6] The April 26, 2010 Decision and Order relating to the California Complaints is reported as Hinds Cnty., Miss. v. Wachovia Bank N.A., 708 F. Supp. 2d 348 (S.D.N.Y. 2010) ("Hinds Cnty. IV").

C.   **FACTUAL ALLEGATIONS**[7]

The facts of this case are set forth in <u>Hinds Cnty. I</u> and <u>Hinds Cnty. III</u>, familiarity with which is assumed. Here the Court will briefly review the facts relevant to this motion to dismiss.

The WV Complaint was filed on June 21, 2010 and asserts § 1 claims similar to those alleged in the Second Class Complaint, the Joint Complaint and the California Complaints, as well as a claim under the WV Antitrust Act. West Virginia brings its claims against defendants named in the Class Complaint, Second Class Complaint or the California Complaints and several new defendants who have not previously been named in this MDL.  West Virginia alleges that "Defendants' conspiracy involved, but was not limited to, allocating the market for [m]unicipal [d]erivatives among themselves, rigging the process by which U.S. public and non-profit entities acquired [m]unicipal [d]erivatives, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements."  (WV Complaint ¶ 3.)

---

[7] The facts below are taken from the WV Complaint and documents referenced therein, which the Court accepts as true for the purpose of ruling on a motion to dismiss.  <u>See</u> <u>Spool v. World Child Int'l Adoption Agency</u>, 520 F.3d 178, 180 (2d Cir. 2008); <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002).  Except where specifically referenced, no further citation to these sources will be made.

The WV Complaint relies on factual allegations which are similar, if not identical, to those asserted in the Second Class Complaint, the Joint Complaint and the California Complaints. Like those pleadings, the WV Complaint alleges that individuals employed by Defendants acted as conduits for communication of pricing and bidding information among Defendants; that Defendants falsely certified that bidding was competitive and in compliance with United States Treasury Department regulations; that Defendants submitted intentionally losing courtesy bids to assist other co-conspirators to win particular municipal derivative transactions; and that Defendants paid kickbacks to manipulate the market for municipal derivatives. West Virginia relies largely on the same sources of information relied upon in the Second Class Complaint, the Joint Complaint and the California Complaints, including the same BoA confidential witness, as well as the investigations undertaken by the Antitrust Division, the Internal Revenue Service ("IRS"), and approximately two dozen state attorneys general.

West Virginia also relies on an indictment filed by the Antitrust Division against CDR and others on October 29, 2009 (the "CDR Indictment"), see Indictment, United States v. Rubin/Chambers, Dunhill Ins. Servs., et al., No.

09 Cr. 1058 (S.D.N.Y. Oct. 29, 2009) ("United States v. CDR"), and a bill of particulars ("Bill of Particulars") dated December 18, 2009 and filed by the Antitrust Division in United States v. CDR. See Voluntary Bill of Particulars, United States v. CDR, No. 09 Cr. 1058 (Docket No. 45-3 (sealed)). West Virginia relies as well on an indictment returned against former RBC trader Dominick Carollo ("Carollo") and others (the "Carollo Indictment"), see Indictment, United States v. Dominick P. Carollo, et. al., No. 10 Cr. 654 (S.D.N.Y. July 27, 2010), and several criminal informations filed against former traders who have pleaded guilty to antitrust violations, including an information (the "Rothman Information") filed against former CDR employee Matthew Adam Rothman ("Rothman"). See Information, United States v. Matthew Adam Rothman, No. 10 Cr. 200 (S.D.N.Y. Mar. 11, 2010).

West Virginia supplements those allegations shared with the Second Class Complaint, Joint Complaint and California Complaints with new allegations specific to certain West Virginia municipal derivatives transactions.

## II.    DISCUSSION

### A.    LEGAL STANDARD

In assessing a motion to dismiss under Rule 12(b)(6), dismissal of a complaint is appropriate if the plaintiff

has failed to offer sufficient factual allegations making the asserted claim plausible on its face. See Ashcroft v. Iqbal, 129 S. Ct. 193, 1949 (2009). A Court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The task of the Court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Pub. Offering Secs. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (quotation marks omitted). The Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See Chambers, 282 F.3d at 152.

Section One prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restrain of [interstate] trade or commerce." 15 U.S.C. § 1. The Supreme Court's decision in Twombly addressed the pleading standards for a § 1 claim to survive a motion to dismiss. See 550 U.S. at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at

1949.  It is clear from Twombly that allegations in support of a § 1 claim "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557.

Regardless of whether parallel conduct is alleged, "it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'" In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 556).  In other words, the complaint must contain enough factual matter "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 545.

Where there is no direct conflict between the statutes, the WV Antitrust Act applies federal law interpreting § 1.  See Gray v. Marshall Cnty. Bd. of Educ., 367 S.E.2d 751, 751 (W. Va. 1988) ("[C]ourts of this state are directed by the legislature ... to apply the federal decisional law interpreting the Sherman Act, 15 U.S.C. § 1, to our own parallel antitrust statute, [the WV Antitrust Act].");  Kessel v. Monongalia Cnty. Gen. Hosp. Co., 648

S.E.2d 366, 374 (W. Va. 2007) ("[I]n determining the scope of the [WV Antitrust Act]" federal law need not be applied "where the federal and state provisions are not 'comparable.'" (quoting State ex rel. Palumbo v. Graley's Body Shop, Inc. 425 S.E.2d 177, 183 (W. Va. 1992)). None of the parties contend that such a conflict exists with respect to the Rule 12(b)(6) pleading requirement. Therefore, West Virginia's WV Antitrust Act claim will survive or fail along with its § 1 claim.

**B.   PLAUSIBILITY ANALYSIS**

As noted above, the 131-page WV Complaint largely reiterates the allegations set forth in the Second Class Complaint and the California Complaints, and the Court incorporates by reference the legal analysis, reasoning and conclusions in Hinds Cnty. II and Hinds Cnty. IV. Only those paragraphs that describe the alleged illegal conduct taken by the WV Defendants in connection with West Virginia municipal derivative transactions present new allegations germane to the instant analysis.

A complaint that enumerates "basically every type of conspiratorial activity that one could imagine" and that lists "in entirely general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities,

13

which one could postulate without knowing any facts
whatsoever." Elevator Antitrust Litig., 502 F.3d at 50-51.
"The plausibility standard applicable is not akin to a
'probability requirement,' but it asks for more than a
sheer possibility that a defendant has acted unlawfully."
Iqbal, 129 S. Ct. at 1949.

A § 1 complaint must adequately allege the plausible
involvement of each defendant and put defendants on notice
of the claims against them, but it need not be detailed
with overt acts by each defendant. See, e.g., In re Nasdaq
Market-Makers Antitrust Litig., 894 F. Supp. 703, 712
(S.D.N.Y. 1995). "Nonetheless, [i]t is not ... proper to
assume that the [plaintiff] can prove facts that it has not
alleged or that the defendants have violated the antitrust
laws in ways that have not been alleged." George Haug Co.
v. Rolls Royce Motor Cars, Inc., 148 F.3d 136, 139 (2d Cir.
1998) (quotation marks omitted); see also Hinds Cnty. I,
620 F. Supp 2d at 512 ("[A]llegations [that] merely aver
that ... Defendants were involved in the sale of municipal
derivatives" are not sufficient to plead a conspiracy.).

In its plausibility analysis, the Court will also
consider the WV Complaint in light of recent developments
in state and federal investigations into the municipal
derivatives industry, as well as the documents identified

14

in the WV Complaint and submitted in the actions <u>United
States v. CDR</u>, <u>United States v. Carollo</u> and <u>United States
v. Rothman</u>. See <u>Chambers</u>, 282 F.3d at 152-53. Although
pending government investigations may not, standing alone,
satisfy an antitrust plaintiff's pleading burden,
government investigations may be used to bolster the
plausibility of § 1 claims. See <u>Starr v. Sony BMG Music
Entm't</u>, 592 F.3d 314, 324-25 (2d Cir. 2010) (finding that
investigations by New York State Attorney General and the
Antitrust Division into defendants' price-fixing support
plausibility of § 1 claim); <u>In re Tableware Antitrust
Litig.</u>, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A
plaintiff may surely rely on governmental investigations,
but must also ... undertake his own reasonable inquiry and
frame his complaint with allegations of his own design.").
Evidence of guilty pleas, <u>e.g.</u>, the Rothman Information,
may be somewhat more persuasive in supporting the
plausibility of conspiratorial activity, but even these
cannot replace entirely a plaintiff's independent proffer
of facts which would tend to support the illegal conduct
alleged. See <u>In re Packaged Ice Antitrust Litig.</u>, 723 F.
Supp. 2d 987, 1011 (E.D. Mich. 2010) ("[G]uilty pleas
[relating to anticompetitive conduct] in one market are
suggestive of the plausibility of a conspiracy to commit

the same illegal acts in another market ... [even if]
standing alone the guilty pleas ... might not enhance the
plausibility analysis."). It follows logically that the
persuasive weight accorded to allegations contained in
outstanding criminal indictments should fall somewhere in
between a government investigation and a guilty plea.

Finally, with respect to allegations in the WV
Complaint that employ statistical analysis of trades as a
proxy for sham bidding and other collusive practices, the
Court applies the same standard already accepted in Hinds
Cnty. IV. Namely, where a municipal derivative transaction
involved a spread between low and high bids that was
greater than 100 basis points, statistical analysis raises
a plausible inference that the entities that submitted
those low and high bids participated in the alleged
conspiracy. See Hinds Cnty. IV, 708 F. Supp. 2d at 60.

### 1.   **Transamerica**

West Virginia alleges that Transamerica conspired with
CDR, FSA and others in at least five transactions
identified by the CDR Indictment, the Bill of Particulars
and/or the Rothman Information as being tainted by illegal
or anti-competitive bidding processes. Specifically, the
WV Complaint alleges that Transamerica submitted losing
bids in connection with West Virginia municipal derivatives

16

transactions brokered by CDR in October 2003, January 2004, June 2004, August 2004, and September 2004.  While the WV Complaint states that Transamerica's bid in connection with the October 2003 transaction was eighty basis points below winner FSA's original bid, it provides no spread information for the other transactions identified.  The WV Complaint also alleges that, in exchange for Transamerica's participation in the conspiracy, Transamerica was rewarded by being permitted to win at least ten bids on West Virginia transactions brokered by CDR through its representatives Rothman and David Rubin ("Rubin").  Rothman has pled guilty to fixing bids and violating antitrust laws, and Rubin is under indictment along with CDR in United States v. CDR.  The WV Complaint alleges, on information and belief, that Rothman and Rubin fixed bidding in order to permit Transamerica to win.

These allegations fail to state a claim against Transamerica.  First, as noted above, an allegation that Transamerica lost the October 2003 transaction with a bid eighty basis points below the winning bid, standing alone, does not support an inference that Transamerica engaged in collusive activity in that transaction.  Second, even if the five transactions identified in the WV Complaint were fixed by CDR brokers, the WV Complaint still provides no

17

basis for concluding that Transamerica knew of or participated in that conspiracy.

Similarly, Transamerica's successful bids in transactions brokered by CDR employees accused of conspiring in respect to other, unrelated transactions do not, without more, render more than speculative the WV Complaint's conclusory assertion that the transactions Transamerica won were tainted by conspiracy. Such an allegation, ascribing guilt based on association, cannot "nudge [a plaintiff's] claims across the line from conceivable to plausible." Elevator Antitrust Litig., 502 F.3d at 52 (quoting Twombly, 127 S. Ct. at 1974). As this Court stated in Hinds Cnty. I, "the mere fact that [a defendant is] involved in an industry that is purportedly rife with antitrust violations is not, without more, enough to state a § 1 claim." 620 F. Supp. 2d at 515. This guiding principle finds particular salience here, since, had the Antitrust Division possessed evidence sufficient to connect its charged defendants and named co-conspirators to transactions and misdeeds other than those identified by the CDR Indictment, the Bill of Particulars, and various other indictments and criminal informations, it presumably would have done so.

18

In order to advance to discovery, the WV Complaint must plead facts which, taken as true, would tend to show not only that a transaction in question was fixed, but also that Transamerica knew of and participated in the malfeasance. The absence of any such specific factual allegations here is fatal to the West Virginia's claim. Therefore, the WV Complaint fails to state § 1 or WV Antitrust Act claims against Transamerica.[8]

### 2. Rabobank

The WV Complaint alleges three types of conspiratorial conduct with respect to Rabobank.

First, the WV Complaint alleges that Rabobank submitted losing bids in two other West Virginia transactions brokered by CDR. These were: (1) a June 2004 transaction brokered by CDR and Rothman that was identified in the Rothman Information as being affected by the conspiracy, but for which the WV Complaint sets forth no information as to the spread on Rabobank's losing bid; and (2) a second transaction not identified as fixed in any of the related criminal proceedings, for which Rabobank submitted a bid forty-seven basis points below the winner.

---

[8] Because the Court finds that the WV Complaint has failed to state a claim against Transamerica, it need not consider Transamerica's separate argument that the WV Complaint's allegations against it are barred by the applicable statute of limitations.

19

Second, the WV Complaint asserts that Rabobank declined to submit a bid in a separate transaction brokered by CDR and won by FSA.

For the reasons already discussed above, these two sets of allegations fall flat. It is not sufficient for West Virginia to allege simply that Rabobank submitted a bid in a tainted transaction; it must also allege facts demonstrating that Rabobank knowingly participated in the conspiratorial activities. The WV Complaint states no such facts with regard to the June 2004 transaction, and its statistical analysis of the second transaction does not provide a basis for finding collusion. Lastly, given that mere participation in a tainted transaction is insufficient to support a § 1 claim, the WV Complaint's allegation that Rabobank failed to bid, i.e., did not participate, in a third transaction fares even less well.

The WV Complaint's third set of allegations against Rabobank merits closer attention. West Virginia alleges that Rabobank colluded with CDR and FSA by lowering its bid in an October 2003 transaction in order to permit FSA to lower its own bid and still win the auction. The transaction in question is alleged by the CDR Indictment to have involved anticompetitive communications between CDR and FSA, whereby CDR permitted FSA to have a "last look" in

the auction and suggested a specific price at which FSA
might lower its bid and still win.  The WV Complaint also
alleges that bidding documents with respect to this
transaction demonstrate that Rabobank lowered its own bid
in this auction from 4.71% to 4.51%, which the WV Complaint
suggests demonstrates that Rabobank was in on the fix.

Rabobank argues that the CDR Indictment and Rothman
Information contradict the WV Complaint's allegations
because, although they charge that FSA received a last look
and lowered its October 2003 auction bid, those documents
provide no support for West Virginia's contention that
Rabobank lowered its bid as part of the conspiracy.  Yet
the CDR Indictment and Rothman Information do not preclude
such a finding, either.  This allegation, that Rabobank
lowered its own bid by twenty basis points in a transaction
in which the winner received a last look, arouses suspicion
and thus approaches the level of plausibility required
under Iqbal and by previous decisions in this MDL.
Standing alone, it might still provide an insufficient
basis upon which to conclude that Rabobank's suspicious
conduct occurred as a result of an illicit agreement with
CDR and FSA and in order to permit FSA to win.  However,
the Court must also view this allegation against the
background of allegations made throughout the entire MDL.

See Hinds Cnty. IV, 708 F. Supp. 2d at 364 ("[T]he Court declines to view [defendant]'s alleged conduct in isolation. Instead, the Court considers the voluminous allegations of bid-rigging in the California Complaints, the [Second Class Complaint], and the [Joint Complaint] in finding that [defendant]'s conduct here was plausibly in furtherance of the alleged conspiracy."). In that regard, the Court notes that the California Complaint alleged that Rabobank submitted a courtesy bid in an August 2003 transaction that was 136 basis points below the winning bid. See id. at 360. Taking into account that plausible allegation of collusion by Rabobank in an auction just two months prior to the transaction at issue here, the Court finds the WV Complaint's allegations with respect to Rabobank's potentially collusive conduct in the October 2003 transaction at issue here "raise[s West Virginia's] right to relief above the speculative level." Twombly, 550 U.S. at 555.

The Court therefore finds Rabobank's participation in the alleged conspiracy involving the October 2003 transaction to be sufficiently pled for the purposes of a motion to dismiss.

### 3.  FGIC

The WV Complaint's allegations concerning FGIC's alleged illegal conduct are limited to a single paragraph. In essence, West Virginia asserts that FGIC was the parent company of a separate entity, FGIC Capital Market Services, Inc. ("FGIC Capital"), at the time that FGIC Capital engaged in certain alleged anticompetitive transactions. FGIC Capital and its former employee Steven Goldberg ("Goldberg") are identified in the Bill of Particulars as having participated in the bid-rigging conspiracy with CDR.

The WV Complaint fails, however, to allege any illegal conduct specifically attributable to FGIC, nor does it allege veil-piercing or alter ego fact patterns sufficient to permit FGIC to be held liable for its former subsidiary's alleged transgressions. See Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996) ("[A] corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances."). Further, the Court notes that it dismissed the Class Complaint's claims against FGIC in Hinds Cnty. I, and that FGIC was thereafter voluntarily dismissed from the Joint Complaint and left out of the Second Class Complaint and the California Complaints. Consequently, FGIC's motion to dismiss the WV Complaint is granted.

23

Furthermore, <u>Hinds Cnty. I</u> should have placed West Virginia on notice of the deficiency in other plaintiffs' allegations against FGIC.   Nonetheless, West Virginia persisted in naming FGIC as a defendant in the WV Complaint, and did so without adding any new allegations linking FGIC, even remotely, to the conspiracy alleged.   In light of this disregard for the requirements of good faith pleading, West Virginia's claims against FGIC are dismissed with prejudice.

### 4.   GE Funding

The WV Complaint also asserts allegations against GE Funding, which is a successor entity to FGIC Capital, notwithstanding that the Court has twice dismissed similar allegations by other plaintiffs against GE Funding.   <u>See</u> <u>Hinds Cnty. I</u>, 620 F. Supp. 2d at 515-16; <u>Hinds Cnty. IV</u>, 708 F. Supp. 2d at 361.   West Virginia argues that its allegations concerning misconduct by GE Funding are more robust than those contained in either the Second Class Complaint or the California Complaints.   In particular, West Virginia points to allegations contained in the WV Complaint that FGIC Capital and its former employee Goldberg are named as co-conspirators in the Bill of Particulars.   The Court is not persuaded.

24

The WV Complaint's sole allegations with respect to GE Funding are: (1) FGIC Capital passed on bidding in an October 2003 auction brokered by CDR and identified by DOJ as subject to the antitrust conspiracy; and (2) FGIC Capital won a bid, submitted by Goldberg, for another West Virginia municipal derivative transaction. The WV Complaint alleges that in the latter transaction, Bear Stearns, which was identified by the Bill of Particulars as a co-conspirator in connection with other transactions, submitted a losing bid thirty-one basis points below FGIC Capital's winning bid.

As discussed above, West Virginia's allegation that GE Funding did not participate in a tainted transaction cannot survive dismissal. Similarly, FGIC Capital's success in a transaction in which a competitor submitted a bid thirty-one basis points lower does not support an inference of collusion. Finally, that Goldberg and Bear Stearns may have conspired in other transactions does not elevate beyond speculative West Virginia's conclusory assertion that the transaction in question was fixed.

Therefore, the WV Complaint fails to state a claim with regard to GE Funding.[9]

---

[9] Because the Court finds that the WV Complaint has failed to state a claim against GE Funding, it need not consider GE

25

### 5.   AIG

In Hinds Cnty. I and Hinds Cnty. IV, the Court dismissed plaintiffs' claims against AIG. Although the WV Complaint repeats verbatim many of the allegations raised by the Class Complaint and California Complaints, West Virginia again argues that it has alleged additional information permitting its claims to survive the instant motion. Again, the Court disagrees.

The new allegations contained in the WV Complaint boil down to: (1) AIG Matched Funding Corp. ("AIG Matched Funding") submitted "purposefully losing" bids in three transactions identified in the CDR Indictment and Rothman Information as being subject to the antitrust conspiracy (WV Compl. ¶ 334); (2) AIG Matched Funding won a single 1998 West Virginia municipal derivative transaction in which another WV Defendant, SocGen, submitted a bid 50 basis points below AIG Matched Funding and other WV Defendants did not participate; and (3) unidentified documents produced pursuant to a subpoena show that AIG Matched Funding (a) "worked closely" with Rothman with respect to bids on other West Virginia transactions and (b)

_____

Funding's separate argument that the WV Complaint's allegations against it are barred by the applicable statute of limitations.

won a 2002 auction in which "[i]t is believed that [the] bidding was fixed." (WV Compl. ¶ 336.)

For reasons already discussed, these allegations fail as a matter of law. The WV Complaint provides no factual basis for its conclusory assertion that AIG Matched Funding purposefully submitted low bids in connection with the tainted West Virginia transactions, nor does it suggest that such intentionally low bids were the result of any specific communications or collusion with CDR or others. See Twombly, 550 U.S. at 557 ("[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory."). Similarly, that AIG Matched Funding had close ties to Rothman is insufficient to support a showing that AIG Matched Funding conspired on a particular transaction. See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 545 (2d Cir. 1993) ("[M]ere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.") Finally, the bidding spread in the 1998 auction does not support an inference of collusion by AIG Matched Funding.

Therefore, the WV Complaint's claims against AIG must be dismissed.

6.   **RBC**

Lastly, the Court considers West Virginia's claims against RBC, which has not been named in any of the other cases filed in this MDL.   Many of West Virginia's allegations against RBC suggest little more than RBC's mere participation in the municipal derivatives industry and involve no particular facts that could plausibly support a conclusion of anticompetitive behavior on the part of RBC. Two particular allegations do require closer examination, however.

First, RBC alleges that, in connection with a 2006 transaction, CDR's Rothman sent an email to RBC employee Carollo noting that RBC had not been bidding in recent transactions.   In response, RBC alleges that Carollo, who has also been indicted on wire fraud and conspiracy charges unrelated to this particular 2006 transaction, submitted an intentionally losing bid that was thirty-three basis points below the winner.   As the Court has already discussed above, the Antitrust Division's charges against Carollo may bolster and corroborate the WV Complaint's allegations, but they cannot relieve West Virginia of its obligation to "frame [its] complaint with allegations of [its] own design."   Tableware Antitrust Litig., 363 F. Supp. 2d at 1205.   In this transaction, Rothman's email to Carollo,

28

which is equally consistent with RBC's lawful participation
in the municipal derivatives industry, may have afforded
RBC an opportunity to conspire, however such an opportunity
"does not by itself plausibly support an inference of ...
participation in the alleged conspiracy." See Hinds Cnty.
IV, 708 F. Supp. 2d at 359 (citing Capital Imaging Assocs.,
996 F.2d at 545). West Virginia's statistical analysis of
this transaction does not support such an inference,
either.

    Second, and more significantly, the WV Complaint
alleges that RBC participated in a scheme along with CDR
and FSA to serve as a conduit for FSA to pay undisclosed
kickbacks to CDR in exchange for FSA being permitted to win
a particular 2003 transaction.  As a mechanism for this
kickback, according to the WV Complaint, RBC entered into a
related swap agreement with FSA in which FSA paid an
inflated hedge fee that was channeled to CDR as
consideration for fixing the auction in favor of FSA.  The
particulars of this alleged conspiracy are laid out in the
CDR Indictment, and RBC is identified by the Bill of
Particulars as a co-conspirator.

    RBC argues that the WV Complaint fails to include
details regarding RBC's knowledge of the secret deal
between CDR and FSA.   RBC also contends that its

participation in such a scheme is implausible, since public documents show that RBC was not in the municipal derivatives business in 2003 and thus RBC would have had nothing to gain from conspiring. Even if the Court could consider such information on a motion to dismiss, however, it must also view the WV Complaint's allegations in light of the vast antitrust conspiracy alleged to be at the heart of this MDL, which often provided conspiracy participants with quid pro quo benefits in future auctions. In that regard, the Court notes that irrespective of whether RBC was in the municipal derivatives business in 2003, RBC admits that it entered the business the following year, and the WV Complaint contains allegations sufficient to support a plausible conclusion that RBC was actively participating in -- and winning -- municipal derivatives auctions in 2005 and 2006. At the pleading stage, it suffices that the WV Complaint has plausibly alleged RBC's knowing involvement in this particular kickback scheme and has placed RBC on notice of the claims against it. See Nasdaq Market-Makers Antitrust Litig., 894 F. Supp. at 712. Consequently, West Virginia's allegations with respect to RBC's collusion in this 2003 transaction are sufficient to survive a Rule 12(b)(6) motion.

### III.   ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 1120) of defendant Transamerica Life Insurance Company ("Transamerica") to dismiss the first amended complaint ("WV Complaint") of plaintiff the State of West Virginia ("West Virginia") is GRANTED subject to reinstatement of the claims upon a sufficient showing by West Virginia during the course of discovery of facts supporting a plausible inference that Transamerica participated in the alleged conspiracy; and it is further

**ORDERED** that the motion (Docket No. 1101) of defendant Rabobank Group a/k/a Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. to dismiss the WV Complaint is DENIED; and it is further

**ORDERED** that the motion (Docket No. 1096) of defendant Financial Guaranty Insurance Company to dismiss the WV Complaint is GRANTED with prejudice; and it is further

**ORDERED** that the motion (Docket No. 1114) of defendant GE Funding Capital Market Services, Inc. ("GE Funding") to dismiss the WV Complaint is GRANTED subject to reinstatement of the claims upon a sufficient showing by West Virginia during the course of discovery of facts

31

supporting   a   plausible   inference   that   GE   Funding
participated in the alleged conspiracy; and it is further

    **ORDERED**   that   the   motion   (Docket   No.   1112)   of
defendants   AIG   financial   Products   Corp.   and   AIG   Matched
Funding  Corp.  (together,  "AIG")  to  dismiss  the  WV  Complaint
is  GRANTED  subject  to  reinstatement  of  the  claims  upon  a
sufficient  showing  by  West  Virginia  during  the  course  of
discovery  of  facts  supporting  a  plausible  inference  that
AIG  participated  in  the  alleged  conspiracy;  and  it  is
further

    **ORDERED** that the motion (Docket No. 1104) of defendant
Royal  Bank  of  Canada  to  dismiss  the  WV  Complaint  is  DENIED;
and it is finally

    **ORDERED**  that  the  parties  are  directed  to  confer  and
propose  an  agreed  upon  Case  Management  Plan  in  the  form
provided  on  the  Court's  website,  such  proposal  to  be
submitted  to  Magistrate  Judge  Gabriel  W.  Gorenstein  for
approval.

**SO ORDERED**
Dated:  New York, New York
       28 April 2011

                                          Victor Marrero
                                           U.S.D.J.