## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | : <br> : <br> : <br> : |
| THIS DOCUMENT RELATES TO: | : Case No. 08-cv-02516 (VM) (JCF) <br> : (ECF CASE) <br> : |
| *UTAH HOUSING CORPORATION v.* *CDR FINANCIAL PRODUCTS, INC.*, et al., consolidated with *Hinds County, Miss. v. Wachovia Bank, N.A.*, et al. | : 08 MDL No. 1950 <br> : <br> : <br> : <br> : <br> : |

## FIRST AMENDED COMPLAINT

Plaintiff Utah Housing Corporation ("UHC"), by and through its undersigned counsel, hereby alleges and complains against CDR Financial Products, Inc. ("CDR"); Investment Management Advisory Group, Inc. ("IMAGE"); FGIC Capital Market Services, Inc. ("FGIC"); Trinity Plus Funding Company, LLC ("Trinity"); Natixis Funding Corp. ("Natixis"); Bayerische Landesbank Girozentrale ("BayerLB"); AIG Financial Products Corp. ("AIG"); Transamerica Life Insurance Company ("Transamerica Life"); Transamerica Life Insurance and Annuity Company ("TLIAC"); and Westdeutsche Landesbank ("WestLB") (collectively "Defendants") as follows:

### PARTIES, JURISDICTION and VENUE

1.    Plaintiff Utah Housing Corporation ("Plaintiff" or "UHC") is an independent body politic and corporate, constituting a public corporation created by Utah Code § 9-4-904. UHC has purchased Guaranteed Investment Contracts ("GICs") in connection with the issuance of bonds which finance affordable housing for first-time homebuyers with low to moderate incomes.

2.      Defendant CDR is a California corporation with its principal place of business in Beverly Hills, California.  CDR was formerly known as Chambers, Dunhill, Rubin & Co., which was a California corporation with its principal place of business in California.  CDR acted as a GIC broker for UHC.

3.      Defendant IMAGE is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania.  IMAGE acted as a GIC broker for UHC.

4.      Defendant FGIC is a Delaware corporation with its principal place of business in New York.  FGIC is a wholly-owned subsidiary of General Electric Capital Corporation, which is a wholly-owned subsidiary of General Electric Capital Service, Inc., which is a wholly owned subsidiary of General Electric Company ("GE").  FGIC submitted one or more bids to provide GICs to UHC.

5.      Defendant Trinity is a New York limited liability company with its principal place of business in New York.  Trinity is a wholly-owned subsidiary of General Electric Capital Corporation, which is a wholly-owned subsidiary of General Electric Capital Service, Inc., which is a wholly owned subsidiary of GE.  Trinity submitted one or more bids on behalf of FGIC to provide GICs to UHC.

6.      Defendant Natixis, formerly known as IXIS Funding Corp., and formerly known as CDC Funding Corp., is a New York corporation with its principal place of business in New York.  Natixis submitted one or more bids to provide GICs to UHC.

7.      Defendant BayerLB is a German company with its principal place of business in Munich, Germany. BayerLB maintains a United States branch office in New York.  BayerLB submitted one or more bids to provide GICs to UHC.

976559.5

8.      Defendant AIG is a Delaware corporation with its principal place of business in New York.  AIG submitted one or more bids to provide GICs to UHC.

9.      Defendant Transamerica Life is an Iowa corporation with its principal place of business in Iowa.  Transamerica submitted one or more bids to provide GICs to UHC.

10.      Defendant TLIAC was an Iowa corporation which merged into its affiliate, Transamerica Life.  TLIAC submitted one or more bids to provide GICs to UHC.  (Transamerica Life and TLIAC are referred to collectively as "Transamerica".)

11.      Defendant WestLB is a German company with its principal place of business in Dusseldorf, Germany.  WestLB maintains a United States branch office in New York.  WestLB submitted one or more bids to provide GICs to UHC.

12.      Jurisdiction is proper in the U.S. District Court for the District of Utah pursuant to 28 U.S.C. §§1331, 1337, 1367 and 15 U.S.C. §§ 15(a), 26.

13.      Venue is proper in this District of Utah pursuant to 28 U.S.C. §1391(b) and 15 U.S.C. §§ 15, 22, 26.

## BACKGROUND INFORMATION

14.      Bonds are issued by states, counties, municipalities, and other public entities to raise funds to finance their activities.  In the industry, these are often referred to as "municipal bonds".

15.      UHC issues bonds to raise funds to finance its housing programs pursuant to Utah Code Section 9-4-913.

16.      Because of the tax-exempt status of most municipal bonds, investors usually accept lower interest rates than on taxable investments.  Because the interest rate available in the

tax-free municipal bond market is often lower than other types of financing, the issuance of bonds is an attractive source of financing to public entities.

17.     The issuer of a municipal bond receives cash at the time of issuance in exchange for a promise to repay the purchasers of the bonds (the bondholders) over the specified time. Repayment periods can vary from short term to 30 or more years.

18.     In order for municipal bonds to maintain their tax-exempt status, regulations of the Internal Revenue Service ("IRS") generally require, with certain exceptions, that all money raised by a bond sale to be spent within three to five years of issuance.

19.     The cash proceeds from the issuance of municipal bonds that are not spent immediately are invested to earn interest until they are needed.  Several accounts with respect to each bond issue will be established, with different purposes and therefore different time frames, including accounts for the purchase of mortgages, for the payment of the costs of issuing the bonds and for interest reserves.  In addition, an account will be established to hold revenues received from borrowers until they are needed to make the semi-annual payments to bondholders during the term of the bonds.  Each such account needs to be invested.

20.     Bond proceeds can be deposited in money market funds or they can be used to purchase GICs, repurchase agreements, forward purchase agreements, swaps, options or other investment products, generally known in the industry as municipal investment agreements, or municipal reinvestment agreements, or municipal derivatives (collectively referred to herein as "Municipal Investment Agreements").

21.     A GIC is an agreement that guarantees a fixed interest rate on an investment for a predetermined period of time.  A GIC generally allows a bond issuer to earn a higher interest rate than a traditional savings or money market account.  A GIC is considered a safe and reliable

976559.5

investment vehicle.  While a GIC is in the form of a bilateral agreement between a party wanting
to earn interest on an investment and a party willing to pay interest on that investment, the parties
will sometimes refer to the transaction as involving the "purchase" of a GIC.

22.     When a government entity, like UHC, desires to purchase a GIC, IRS regulations
require that it conduct an auction with at least three bidders in order to obtain the highest
possible interest rate.

23.     In a competitive market, providers would expect to compete against each other for
the business of issuers on the basis of the highest interest rate on the GICs.

24.     From at least 1999 through 2003, UHC purchased GICs through auctions in
which Defendants acted as brokers or submitted bids.

25.     During that time, unbeknownst to UHC, the Defendants and others were engaged
in a conspiracy to rig bids and fix prices in the municipal derivatives markets, generally, and in
the UHC GIC auctions.

26.     Because of the Defendants anticompetitive conduct, UHC was injured by losing
the better interest rate it would have received in competitive auctions.

## GENERAL ALLEGATIONS

### CONCEALMENT OF BID-RIGGING ACTIVITIES

27.     In 2009, UHC learned that the Antitrust Division of the U.S. Department of
Justice ("DOJ") and other federal agencies were investigating anti-competitive bid-rigging
activities among brokers and providers of GICs and other Municipal Investment Agreements
involving, among other things, auctions to provide GICs to UHC.

28.     CDR, one of the targets of the DOJ investigation, served as the broker for UHC
auctions at various times from 1999 through 2003.  IMAGE also brokered auctions for UHC
during that time.

976559.5

29.    Until it learned of the federal investigation, UHC had no knowledge of or reason to investigate any bid-rigging activities in the purchase of GICs, despite the exercise of due diligence.

30.    The Defendants actively concealed their wrongdoing in relation to UHC's GIC auctions.

31.    For example, in connection with each of the UHC GIC auctions, auction participants certified that they were not engaged in improper conduct, stating, among other things: all bidders had an equal opportunity to bid, participants had not consulted with other participants about their bids, bids were determined without regard to any other formal agreement with the issuer or any other person, and/or bids were not submitted solely as a courtesy to the issuer or any other person.

32.    However, as publicly revealed in court proceedings and media reports, from 1999 through 2003, when Defendants were participating in UHC auctions, Defendants had entered agreements not to compete and engaged in acts of bid-rigging in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and other state and federal laws.

## RELATED CRIMINAL AND CIVIL ACTIONS

33.    The bid-rigging and price fixing conspiracy in the municipal derivatives market involved many brokers and providers, including the Defendants, and extended to numerous bond issuers, including UHC.

34.    UHC obtained information regarding bid-rigging and price fixing in the municipal derivatives markets from indictments, guilty pleas and civil actions filed and consolidated in the U.S. District Court for the Southern District of New York.

976559.5

35.    Criminal charges have been filed in the U.S. District Court for the Southern District of New York and in relation to bid-rigging and conspiracy in the municipals derivatives market.  The following individuals have entered guilty pleas:

    a.    Douglas Goldberg of CDR pled guilty to: one count of violating 15 U.S.C. § 1, in connection with the conspiracy to allocate and rig bids for investment agreements or other municipal finance contracts, from at least as early as 1998 until at least November 2006; one count of violating 18 U.S.C. § 371 in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as August 2001 until at least November 2006; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

    b.    Brian Scott Zwerner of Banc of America Securities pled guilty to: one count of violating 18 U.S.C. § 371 in connection with a conspiracy to make false entries in the books and reports of a national bank from at least as early as January 1999 until at least May 2002.

    c.    James Hertz of JP Morgan Chase & Co. pled guilty to one count of violating 15 U.S.C. § 1 in connection with the conspiracy to allocate and rig bids for investment agreements or other municipal finance contracts from at least as early as October 2001 until at least November 2006; one count of violating 18 U.S.C. § 371 in connection with a conspiracy to defraud municipal issuers, among others from at least as early as 1998 until at least November 2006; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

    d.  Daniel Moshe Naeh of CDR pled guilty to one count of violating 15 U.S.C. § 1 in connection with the conspiracy to allocate and rig bids for investment agreements or other municipal finance contracts from at least as early as 1998 until at least November 2006; one count of violating 18 U.S.C. § 371 in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as August 2001 until at least November 2006; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

    e.  Matthew Adam Rothman of CDR pled guilty to one count of violating 15 U.S.C. § 1 in connection with the conspiracy to allocate and rig bids for investment agreements or other municipal finance contracts from at least as early as 1998 until at least November 2006; one count of violating 18 U.S.C. § 371 in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as August 2001 until at least November 2006; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

    f.  Mark Zaino of CDR and UBS Financial Services pled guilty to one count of violating 15 U.S.C. § 1 in connection with the conspiracy to allocate and rig bids for investment agreements or other municipal finance contracts from at least October 2001 until at least November 2006; one count of violating 18 U.S.C. § 371 in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as August 2001 until at least March 2006; and one count of

976559.5

violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

g.  Martin Kanefsky of Kane Capital pled guilty to two counts of violating 18 U.S.C. § 371, each in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as August 1999 until at least November 2006; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

h.  Adrian Scott-Jones of Capital Financial Partners pled guilty of two counts of violating 18 U.S.C. § 371 each in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as August 1999 until at least November 2006; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

i.  Douglas L. Campbell of Bank of America pled guilty to one count of violating 15 U.S.C. § 1 in connection with the conspiracy to allocate and rig bids for investment agreements or other municipal finance contracts from as early as 1998 until at least September 2005; one count of violating 18 U.S.C. § 371 in connection with a conspiracy to defraud municipal issuers, among others, from at least as early as 1998 until at least September 2005; and one count of violating 18 U.S.C. § 1343 in connection with using a wire transfer in furtherance of a scheme to defraud municipal issuers.

36.    In addition to the persons identified in the preceding paragraph, grand juries have indicted the following in relation to the bid-rigging and conspiracy in the municipals derivatives market:  CDR, David Rubin of CDR, Evan Zarefsky of CDR, Zevi Stewart Wolmark of CDR,

Dominick Carollo of FGIC and Royal Bank of Canada, Steven Goldberg of FGIC and Financial Securities Assurance Holdings, Peter Grimm of FGIC and Trinity, and Peter Ghavami of UBS.

37.    On June 18, 2009, municipalities and other purchasers of municipal derivatives filed a second amended class action complaint alleging facts of illegally rigged bids and price fixing in the municipal derivatives market supporting claims in violation of § 1 of the Sherman Act against Natixis, IMAGE, CDR and others.  The court denied motions to dismiss these defendants on March 25, 2010.[1]

38.    The pleas, indictments and class action allegations demonstrate a broad ranging bid rigging and price fixing conspiracy in the Municipal Investment Agreements market which not only affected UHC as a direct victim of bid rigging and price fixing, but also had wide spread effect on the market by eliminating or reducing competition for Municipal Investment Agreements.

### BID-RIGGING IN UHC'S AUCTIONS

39.    In at least one UHC Auction, CDR provided suggested bids to FGIC and Trinity, and FGIC and Trinity altered their bids in accordance with CDR's suggestion, as follows:

    a.    CDR conducted the GIC auction involving UHC's Single Family Mortgage Bonds, 2001 Series D.

    b.    In conversations recorded by the Department of Justice, Evan Zarefsky ("Zarefsky"), on behalf of CDR, contacted five potential bidders about the deadline to submit bids for the 2001 Series D auction.

---

[1] Plaintiff incorporates by reference the general allegations set forth in the Second Amended Complaint, Case No. 1:08-cv-02516-VM, 08 MDL No. 1950 (S.D.N.Y. filed February 23, 2011) (the "Class Complaint"), including, but not limited to, paragraphs 15-19, 86-88, 153-249, 262-76, 281-312, 343, 351, 385, 390-93, 433-66, 487-500, 525, 534-41, 571-81, 586-611, 618-26, 667-68, 689-91, and 724.

    c.   One of Zarefsky's calls was to the contact person for FGIC and Trinity, Peter Grimm ("Grimm").

    d.   Zarefsky told Grimm: "I can actually probably save you a couple bucks here."

    e.   Grimm initially submitted bids for the 2001 Series D auction of 3.51% for the acquisition fund and 5.25% for the float fund.

    f.   Zarefsky told Grimm that he could lower the bid rates by "a dime" – ten basis points or 0.1%.

    g.   Grimm then submitted final bids of 3.41% for the acquisition fund and 5.15% for the float fund.

    h.   The UHC 2001 Series D bonds were awarded to FGIC and Trinity.

40.    In a number of UHC GIC auctions, Defendants submitted bid amounts in UHC auctions with a spread between low and high bids of 100 basis points or more.

41.    Where the spread between low and high bids is 100 basis points or more, statistical analysis raises a plausible inference that the entities that submitted these low and high bids were engaged in bid-rigging.

42.    The following UHC auctions involved spreads of 100 basis points or more:

    a.   On or about December 7, 2000, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2000 Series G. FGIC and Trinity, bidding jointly, submitted the high bid of 5.85% through their agent Peter Grimm ("Grimm"). BayerLB submitted the low bid of 4.00%. The spread between the low and high bids was 185 basis points.

    b.   On or about February 6, 2001, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2001 Series A. Grimm submitted the high

bid of 5.37% on behalf of FGIC and Trinity.  Bayer LB submitted the low bid of 3.50% through its agent, Frank Postiglione ("Postiglione").  The spread between the low and high bids was 187 basis points.  In addition, Cliff Jenkins ("Jenkins") submitted a bid of 3.75% on behalf of Transamerica and AMBAC Financial Group, Inc. ("AMBAC") which was 162 basis points below the winning bid.

c.  On or about May 3, 2001, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2001 Series B.  Grimm submitted the high bid of 5.40% on behalf of FGIC and Trinity.  Postiglione submitted the low bid of 3.00% on behalf of BayerLB.   The spread between the high and low bids was 240 basis points.

d.  On or about June 21, 2001, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2001 Series C.  Grimm submitted the high bid of 5.4% on behalf of FGIC.  Jenkins submitted a bid of 3.46% on behalf of Occidental, which was 194 basis points below the high bid.  Postiglione submitted the low bid of 3.00% on behalf of BayerLB.  The spread between the high and low bids was 240 basis points.

e.  On or about August 7, 2001, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2001 Series D.  Grimm submitted the high bid of 5.15% on behalf of FGIC and Trinity.  Postiglione submitted the low bid of 3.16% on behalf of BayerLB.   The spread between the high and low bids was 199 basis points.

f.  On or about September 20, 2001, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2001 Series E.  Grimm submitted the

12

high bid of 5.05% on behalf of FGIC and Trinity.  Postiglione submitted the low

bid of 2.50% on behalf of BayerLB.   The spread between the high and low bids

was 255 basis points.

g.  On or about November 7, 2001, CDR completed an auction as the broker for

UHC on its Single Family Mortgage Bonds, 2001 Series F.  Grimm submitted the

high bid of 4.05% on behalf of FGIC and Trinity.  Jenkins submitted the low bid

of 3.05% on behalf of Transamerica and AMBAC.   The spread between the high

and low bids was 100 basis points.

h.  On or about January 17, 2002, CDR completed an auction as the broker for UHC

on its Single Family Mortgage Bonds, 2002 Series A.  Grimm submitted the high

bid of 4.60% on behalf of FGIC and Trinity.  Postiglione submitted the low bid of

2.00% on behalf of BayerLB.   The spread between the high and low bids was 260

basis points.

i.  On or about March 14, 2002, CDR completed an auction as the broker for UHC

on its Single Family Mortgage Bonds, 2002 Series B.  Grimm submitted the high

bid of 5.15% on behalf of FGIC and Trinity.  Postiglione submitted the low bid of

2.00% on behalf of BayerLB.   The spread between the high and low bids was 315

basis points.

j.  On or about May 2, 2002, CDR completed an auction as the broker for UHC on

its Single Family Mortgage Bonds, 2002 Series C.  The successful bidder was

FGIC.  Natixis submitted the high bid through its agent, Vincent Bernardeau

("Bernardeau"), in the amount of 4.31%.  Postiglione submitted the low bid of

2.10% on behalf of BayerLB.   The spread between the high and low bids was 221 basis points.

k.   On or about August 2, 2002, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2002 Series E.  Grimm submitted the winning bid of 4.35% on behalf of FGIC and Trinity.  Bernardeau, on behalf of Natixis, submitted a bid of 3.20% – 115 basis points below the winning bid.  Postiglione, on behalf of BayerLB, submitted a bid of 1.95%.  The spread between the high and low bids was 235 basis points.

l.   On or about September 19, 2002, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2002 Series F.  Bernardeau, on behalf of Natixis, submitted a winning bid of 3.21%.  Grimm submitted a bid of 2.75% on behalf of FGIC and Trinity.  Postiglione submitted a bid of 1.26%.  The spread below the high and low bids was 195 basis points.

m.   On or about January 24, 2003, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2003 Series A.  The successful bidder was FGIC.  Grimm submitted the winning bid of 3.25% on behalf of FGIC.  Jenkins submitted the low bid of 2.25% on behalf of Transamerica and AMBAC.  The spread between the high and low bids was 100 basis points.

n.   On or about March 11, 2003, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2003 Series B.  Grimm submitted a high bid of 2.50% on behalf of FGIC.  Postiglione submitted the low bid of 1.50% on behalf of BayerLB.  The spread between the high and low bids was 100 basis points.

o.  On or about May 1, 2003, CDR completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2003 Series C. Grimm submitted the high bid of 2.50% on behalf of FGIC. Postiglione submitted the low bid of 1.50% on behalf of BayerLB. The spread between the high and low bids was 100 basis points.

43.  As identified in paragraph 33, Defendants submitting bids in UHC's GIC auctions with a spread of 100 basis points or more include: BayerLB, Natixis, FGIC, Trinity, Transamerica, Occidental and AMBAC.

44.  In addition to the auctions identified in preceding paragraphs, the DOJ has identified the following UHC GIC auctions as part of its criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

a.  On or about December 20, 1999, CDR completed an auction as the broker for UHC on its 1999 Series 3 and Series 4 bonds. Bidders included AIG, BayerLB, Natixis, FGIC/Trinity, Transamerica, and WestLB. The successful bidders were FGIC and Trinity.

b.  On or about December 19, 2000, CDR completed an auction as the broker for UHC on its Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds. Bidders included BayerLB, Natixis, FGIC/Trinity, and Transamerica. The successful bidders were FGIC and Trinity.

c.  On or about December 19, 2000, CDR completed an auction as the broker for UHC on its Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds. Bidders included BayerLB, Natixis, FGIC/Trinity, and Transamerica. The successful bidders were FGIC and Trinity.

976559.5

d.  On or about June 12, 2002, CDR completed an auction as the broker for UHC on
its Single Family Mortgage Variable Rate Bonds, 2002 Series 1 Term Bonds.
Bidders included BayerLB, Natixis, FSA and Monumental.  The successful bidder
was BayerLB.

e.  On or about June 12, 2002, CDR completed an auction as the broker for UHC on
its Single Family Mortgage Variable Rate Bonds, 2002 Series 2 Term Bonds.
Bidders included BayerLB, Natixis, FSA and Monumental.  The successful bidder
was BayerLB.

f.  On or about September 10, 2003, CDR completed an auction as the broker for
UHC on its Single Family Mortgage Variable Rate Bonds, 2003 Series F.
Bidders included BayerLB, Natixis, FGIC, Rabobank, and Transamerica.  The
successful bidder was Transamerica.

45.    As part of the criminal actions related to bid-rigging in the municipal derivatives
markets, the DOJ has identified the following wire transfer from FGIC and Trinity to UHC:  On
June 30, 2005, Trinity conveyed $1,724,509.87 to UHC by wire transfer.  The payment consisted
of the following: a $1,430,000 principal draw on the 2001 Series D float fund GIC; $264,977.20
of interest on the 2001 Series D float fund GIC; and $29,532.67 of interest on the 2001 Series D
reserve fund GIC.

46.    As a result of the Defendants' unlawful bid-rigging and conspiratorial activities in
the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an
amount to be shown at trial.

## SUMMARY OF ALLEGATIONS INVOLVING CDR

47.     The following agents and/or employees of CDR have pleaded guilty or been indicted in relation to unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry:

       a.     Douglas Goldberg of CDR pled guilty to three criminal counts;

       b.     Daniel Moshe Naeh of CDR pled guilty to three criminal counts;

       c.     Matthew Adam Rothman of CDR pled guilty to three criminal counts;

       d.     Mark Zaino of CDR and UBS Financial Services pled guilty to three criminal counts;

       e.     David Rubin of CDR has been indicted;

       f.     Evan Zarefsky of CDR has been indicted; and

       g.     Zevi Stewart Wolmark of CDR has been indicted.

48.     In addition, CDR has been indicted for unlawful bid-rigging and conspiratorial activities.

49.     In the following UHC auctions where CDR acted as the broker, providers submitted bids with a spread of 100 basis points or more:

       a.     UHC's Single Family Mortgage Bonds, 2000 Series G;

       b.     UHC's Single Family Mortgage Bonds, 2001 Series A;

       c.     UHC's Single Family Mortgage Bonds, 2001 Series B;

       d.     UHC's Single Family Mortgage Bonds, 2001 Series C;

       e.     UHC's Single Family Mortgage Bonds, 2001 Series D;

       f.     UHC's Single Family Mortgage Bonds, 2001 Series E;

       g.     UHC's Single Family Mortgage Bonds, 2001 Series F;

       h.     UHC's Single Family Mortgage Bonds, 2002 Series A;

     i.  UHC's Single Family Mortgage Bonds, 2002 Series B;

     j.  UHC's Single Family Mortgage Bonds, 2002 Series C;

     k.  UHC's Single Family Mortgage Bonds, 2002 Series E;

     l.  UHC's Single Family Mortgage Bonds, 2002 Series F;

     m.  UHC's Single Family Mortgage Bonds, 2003 Series A;

     n.  UHC's Single Family Mortgage Bonds, 2003 Series B; and

     o.  UHC's Single Family Mortgage Bonds, 2003 Series C.

50.    In addition to the auctions identified in the preceding paragraph, the DOJ has identified the following UHC GIC auctions brokered by CDR in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

     a.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds;

     b.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds;

     c.  UHC's Single Family Mortgage Variable Rate Bonds, 2002 Series 1 Term Bonds;

     d.  UHC's Single Family Mortgage Variable Rate Bonds, 2002 Series 2 Term Bonds; and

     e.  UHC's Single Family Mortgage Variable Rate Bonds, 2003 Series F.

51.    As set forth in paragraphs 15-19, 171, 193-215, 228, 262-72, 281-88, 294-301, 620-23, and 667-88, among others, of the Class Complaint, CDR was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low, receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.

976559.5

52.    The Class Complaint has raised a plausible inference of CDR's liability in connection with unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry.

53.    As a result of CDR's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

<u>SUMMARY OF ALLEGATIONS INVOLVING IMAGE</u>

54.    IMAGE acted as a GIC broker for UHC.

55.    DOJ has identified the following UHC GIC auctions brokered by IMAGE in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

a.    On January 19, 2000, IMAGE completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2000 Issue A.

b.    On or about November 21, 2003, IMAGE completed an auction as the broker for UHC on its Single Family Mortgage Bonds, 2003 Series G.

56.    As set forth in paragraphs 153-249, 284-312, 433-48, and 461-63, among others, of the Class Complaint, IMAGE was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low, receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.

57.    The Class Complaint has raised a plausible inference of IMAGE's liability in connection with unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry.

19

58.     As a result of IMAGE's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

976559.5

<u>SUMMARY OF ALLEGATIONS INVOLVING FGIC</u>

59.    The following agents and/or employees of FGIC have been indicted in relation to unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry:

      a.    Dominick Carollo;

      b.    Steven Goldberg; and

      c.    Peter Grimm.

60.    In a recorded telephone conversation, CDR suggested to FGIC and Trinity that they reduce the bid on UHC's Single Family Mortgage Bonds, 2001 Series D, by ten basis points.  As a result of this conversation, FGIC and Trinity reduced their bid from 3.51% for the acquisition fund and 5.25% for the float fund to 3.41% for the acquisition fund and 5.15% for the float fund.  The UHC 2001 Series D bonds were awarded to FGIC and Trinity at the reduced bid amount.

61.    In the following UHC auctions, FGIC submitted a bid with a spread of 100 basis points or more from the high or low bid:

      a.  UHC's Single Family Mortgage Bonds, 2000 Series G;

      b.  UHC's Single Family Mortgage Bonds, 2001 Series A;

      c.  UHC's Single Family Mortgage Bonds, 2001 Series B;

      d.  UHC's Single Family Mortgage Bonds, 2001 Series C;

      e.  UHC's Single Family Mortgage Bonds, 2001 Series D;

      f.  UHC's Single Family Mortgage Bonds, 2001 Series E;

      g.  UHC's Single Family Mortgage Bonds, 2001 Series F;

      h.  UHC's Single Family Mortgage Bonds, 2002 Series A;

      i.  UHC's Single Family Mortgage Bonds, 2002 Series B;

      j.  UHC's Single Family Mortgage Bonds, 2002 Series C;

     k.  UHC's Single Family Mortgage Bonds, 2003 Series A;

     l.  UHC's Single Family Mortgage Bonds, 2003 Series B;

     m.  UHC's Single Family Mortgage Bonds, 2003 Series C;

     n.  UHC's Single Family Mortgage Bonds, 2002 Series E; and

     o.  UHC's Single Family Mortgage Bonds, 2002 Series F.

62.    In addition to the auctions identified in the preceding paragraph, the DOJ has identified the following UHC GIC auctions, in which FGIC participated as a bidder, in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

     a.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds;

     b.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds; and

     c.  UHC's Single Family Mortgage Variable Rate Bonds, 2003 Series F.

63.    As a result of FGIC's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

### SUMMARY OF ALLEGATIONS INVOLVING TRINITY

64.    The following agents and/or employees of Trinity have been indicted in relation to unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry: Peter Grimm.

65.    In a recorded telephone conversation, CDR suggested to FGIC and Trinity that they reduce the bid on UHC's Single Family Mortgage Bonds, 2001 Series D, by ten basis points. As a result of this conversation, FGIC and Trinity reduced their bid from 3.51% for the acquisition fund and 5.25% for the float fund to 3.41% for the acquisition fund and 5.15% for the

float fund.  The UHC 2001 Series D bonds were awarded to FGIC and Trinity at the reduced bid amount.

66.    In the following UHC auctions, Trinity and/or agents of Trinity submitted a bid with a spread of 100 basis points or more from the high or low bid:

a.  UHC's Single Family Mortgage Bonds, 2000 Series G;

b.  UHC's Single Family Mortgage Bonds, 2001 Series A;

c.  UHC's Single Family Mortgage Bonds, 2001 Series B;

d.  UHC's Single Family Mortgage Bonds, 2001 Series C;

e.  UHC's Single Family Mortgage Bonds, 2001 Series D;

f.  UHC's Single Family Mortgage Bonds, 2001 Series E;

g.  UHC's Single Family Mortgage Bonds, 2001 Series F;

h.  UHC's Single Family Mortgage Bonds, 2002 Series A;

i.  UHC's Single Family Mortgage Bonds, 2002 Series B;

j.  UHC's Single Family Mortgage Bonds, 2002 Series E;

k.  UHC's Single Family Mortgage Bonds, 2002 Series F;

l.  UHC's Single Family Mortgage Bonds, 2003 Series A;

m.  UHC's Single Family Mortgage Bonds, 2003 Series B; and

n.  UHC's Single Family Mortgage Bonds, 2003 Series C.

67.    In addition to the auctions identified in the preceding paragraph, the DOJ has identified the following UHC GIC auctions, in which Trinity participated as a bidder, in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

a.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds; and

976559.5

      b.   UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds.

68.    As set forth in paragraphs 168-70, 207-08, 343, 385, 390-93, 433-60, 487-500, and 689-91, among others, of the Class Complaint, Trinity was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low, receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.

69.    As a result of Trinity's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

## SUMMARY OF ALLEGATIONS INVOLVING NATIXIS

70.    In the following UHC auctions Natixis submitted a bid with a spread of 100 basis points or more from the high or low bid:

      a.   UHC's Single Family Mortgage Bonds, 2002 Series C;

      b.   UHC's Single Family Mortgage Bonds, 2002 Series E;

      c.   UHC's Single Family Mortgage Bonds, 2002 Series F;

      d.   UHC's Single Family Mortgage Bonds, 2003 Series A;

      e.   UHC's Single Family Mortgage Bonds, 2003 Series B; and

      f.   UHC's Single Family Mortgage Bonds, 2003 Series C.

71.    In addition to the auctions identified in preceding paragraphs, the DOJ has identified the following UHC GIC auctions, in which Natixis participated as a bidder, in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

      a.   UHC's 1999 Series 3 and Series 4 bonds;

      b.   UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds;

     c.   UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds;

     d.   UHC's Single Family Mortgage Variable Rate Bonds, 2002 Series 1 Term Bonds;

     e.   UHC's Single Family Mortgage Variable Rate Bonds, 2002 Series 2 Term Bonds; and

     f.   UHC's Single Family Mortgage Variable Rate Bonds, 2003 Series F.

72.     As set forth in paragraphs 86-88, 167-70, 181, 204-08, 217, 276, 351, 447-48, 464-66, 525, 618, 624-26, and 724, among others, of the Class Complaint, Natixis was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low, receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.

73.     The Class Complaint has raised a plausible inference of Natixis' liability in connection with unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry.

74.     As a result of Natixis' unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

### SUMMARY OF ALLEGATIONS INVOLVING BAYERLB

75.     In the following UHC GIC auctions, BayerLB submitted a bid with a spread of 100 basis points or more from the high or low bid:

     a.   UHC's Single Family Mortgage Bonds, 2000 Series G;

     b.   UHC's Single Family Mortgage Bonds, 2001 Series A;

     c.   UHC's Single Family Mortgage Bonds, 2001 Series B;

     d.   UHC's Single Family Mortgage Bonds, 2001 Series C;

    e.   UHC's Single Family Mortgage Bonds, 2001 Series D;

    f.   UHC's Single Family Mortgage Bonds, 2001 Series E;

    g.   UHC's Single Family Mortgage Bonds, 2002 Series A;

    h.   UHC's Single Family Mortgage Bonds, 2002 Series B;

    i.   UHC's Single Family Mortgage Bonds, 2002 Series C;

    j.   UHC's Single Family Mortgage Bonds, 2002 Series E;

    k.   UHC's Single Family Mortgage Bonds, 2003 Series B; and

    l.   UHC's Single Family Mortgage Bonds, 2003 Series C.

76.    In addition to the auctions identified in preceding paragraphs, the DOJ has identified the following UHC GIC auctions, in which BayerLB participated as a bidder, in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

    a.   UHC's 1999 Series 3 and Series 4 bonds;

    b.   UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds;

    c.   UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds;

    d.   UHC's Single Family Mortgage Variable Rate Bonds, 2002 Series 1 Term Bonds;

    e.   UHC's Single Family Mortgage Variable Rate Bonds, 2002 Series 2 Term Bonds; and

    f.   UHC's Single Family Mortgage Variable Rate Bonds, 2003 Series F;

77.    As set forth in paragraphs 170, 207, 534-41, 571-76, and 588, among others, of the Class Complaint, BayerLB was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low,

receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.

78.     The complaints of the City of Los Angeles, City of Riverside, City of Stockton, Contra Costa County, County of San Diego, County of San Mateo, County of Tullare, Los Angeles World Airports, The Redevelopment Agency of Stockton, Sacramento Municipal Utility District, and Sacramento Suburban Water District have raised a plausible inference of BayerLB's liability in connection with unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry.

79.     As a result of BayerLB's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

SUMMARY OF ALLEGATIONS INVOLVING AIG

80.     DOJ has identified the following UHC GIC auctions, in which AIG participated as a bidder, in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

    a.     UHC's 1999 Series 3 bonds; and

    b.     UHC's 1999 Series 4 bonds.

81.     As set forth in paragraphs 205-06, 590-605, and 608-611, among others, of the Class Complaint, AIG was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low, receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.  As a result of AIG's unlawful bid-rigging and conspiratorial activities in the municipal

27

derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

<u>SUMMARY OF ALLEGATIONS INVOLVING TRANSAMERICA</u>

82.    Transamerica was involved in the following UHC auctions involved spreads of 100 basis points or more:

     a.  UHC's Single Family Mortgage Bonds, 2001 Series A;

     b.  UHC's Single Family Mortgage Bonds, 2001 Series C;

     c.  UHC's Single Family Mortgage Bonds, 2001 Series F; and

     d.  UHC's Single Family Mortgage Bonds, 2003 Series A.

83.    In addition to the auctions identified in preceding paragraphs, the DOJ has identified the following UHC GIC auctions as part of its criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:

     a.  UHC's 1999 Series 3 and Series 4 bonds;

     b.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 3 Term Bonds;

     c.  UHC's Single Family Mortgage Variable Rate Bonds, 2000 Series 4 Term Bonds; and

     d.  UHC's Single Family Mortgage Variable Rate Bonds, 2003 Series F.

84.    As set forth in paragraphs 170, 207-09, 538-41, 577-81, and 586-89, among others, of the Class Complaint, Transamerica was intimately involved in the conspiracy to illegally manipulate the municipal derivative market by, among other things, soliciting false bids, disclosing confidential bid information to competing bidders to ensure bid prices were artificially low, receiving and arranging for illegal kickbacks to be paid, and encouraging and arranging anti-competitive behavior.

976559.5

85.     As a result of Transamerica's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

**S**UMMARY OF **A**LLEGATIONS **I**NVOLVING **W**EST**LB**

86.     DOJ has identified the following UHC GIC auctions, in which WestLB participated as a bidder, in criminal actions related to bid-rigging and anticompetitive conduct in the municipal derivatives markets:  UHC's 1999 Series 3 and Series 4 bonds.

87.     As a result of WestLB's unlawful bid-rigging and conspiratorial activities in the municipal derivatives industry and in the UHC GIC auctions, UHC has been injured in an amount to be shown at trial.

**FIRST CLAIM FOR RELIEF**<br>**15 U.S.C. § 1**

88.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

89.     Defendants participated in a conspiracy to fix the price, to rig bids, to allocate customers, and to allocate markets for Municipal Investment Agreements sold in the United States and its territories in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

90.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

91.     Defendants and their co-conspirators issued and/or sold Municipal Investment Agreements in a continuous and uninterrupted flow of interstate commerce to Utah and other states.

92.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

93.    The combination and conspiracy alleged herein has had the following effects, among others:

      a.   Price competition in the sale of Municipal Investment Agreements has been restrained, suppressed and/or eliminated in the United States;

      b.   Bids charged by Defendants and their co-conspirators to Plaintiff for Municipal Investment Agreements were fixed at non-competitive levels;

      c.   Customers and markets of Municipal Investment Agreements were allocated among Defendants and their co-conspirators;

      d.   Plaintiff received lesser interest rates on Municipal Investment Agreements than it would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities; and

      e.   Competition in the sale of Municipal Investment Agreements was restrained, suppressed and eliminated.

94.    As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff has been injured and financially damaged, in amounts to be determined.

95.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Plaintiff seeks to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by reason of the violations alleged herein.

### SECOND CLAIM FOR RELIEF
### UTAH ANTITRUST ACT, UTAH CODE §§ 76-10-911 TO 76-10-926

96.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

976559.5

97.     As set forth in paragraphs 24 through 43, among other things, Defendants' formed a contract, combination or conspiracy in restraint of trade or commerce in violation of the Utah Antitrust Act, Utah Code § 76-10-914(1).

98.     As a result of Defendants' anticompetitive conduct, Plaintiff has been damaged in an amount to be shown at trial.

99.     Accordingly, Plaintiff is entitled to judgment against Defendant and an award of damages, including treble damages, and costs of suit and attorneys' fees as provided by Utah Code § 76-10-919(1)(b) and as otherwise provided by law.

## THIRD CLAIM FOR RELIEF
## UTAH UNFAIR PRACTICES ACT, UTAH CODE §§ 13-5-1 TO 13-5-18

100.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

101.     Defendants' conduct, as set forth in paragraphs 24 through 43, among other things, amounts to unfair methods of competition in commerce or trade in violation of the Utah Unfair Practices Act, Utah Code §§ 13-5-1 to -18.

102.     As a result of Defendants' unfair practices, Plaintiff has been damaged in an amount to be shown at trial.

103.     Accordingly, Plaintiff is entitled to judgment against Defendant and an award of damages, including treble damages, and costs of suit as provided by Utah Code § 13-5-13 and as otherwise provided by law.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

1.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a *per se* violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1 and in violation of the Utah Antitrust Act and the

Utah Unfair Practices Act;

2.      That judgment be entered for Plaintiff and against Defendants for treble damages

as allowed by law, together with the costs of this action, including reasonable attorneys' fees, as

well as pre-judgment and post-judgment interest at the highest legal rate provided by law; and

3.      That Plaintiff be awarded such other and further relief as the Court deems just and

proper.

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

DATED this 26th day of May, 2011.


JONES, WALDO, HOLBROOK & MCDONOUGH PC


By: /s/ Billie J. Siddoway
    Timothy C. Houpt (USB #1543)
    Andrew G. Deiss (USB # 7184)
    Billie J. Siddoway (USB #9710)
    JONES, WALDO, HOLBROOK & McDONOUGH PC
    170 South Main Street, Suite 1500
    Salt Lake City, Utah  84101
    Telephone:  (801) 521-3200
    Fax: (801) 328-0537
    *Attorneys for Plaintiff Utah Housing Corporation*

976559.5

CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on the 26th day of May, 2011, I caused a true and correct copy of the foregoing FIRST AMENDED COMPLAINT to be delivered by Federal Express Standard Overnight Delivery, to the following:

Richard William Beckler
Bracewell & Giuliani
2000 K Street NW, Suite 500
Washington, DC 20006-1872

Anthony David Gill
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020

James Drew Miller
Anthony Mathias
Alejandra De Urioste
Clifford Chance US, LLP
31 West 52nd Street
New York, NY 10019

Robert J. Mathias
Quincy M. Crawford
DLA Piper US LLP
6225 Smith Ave.
Baltimore, MD 21209-3600

Peggy Senyie Chen
Paul Francis Corcoran
Bruce Martin Ginsberg
Davis & Gilbert LLP
1740 Broadway
New York, NY 10019

Joseph L. Sorkin
Christopher Michael Egleson
Akin Gump Strauss Hauer & Feld
One Bryant Park
New York, NY 10036

Gustavo Manuel Gonzalez
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

Mark Robert Hellerer
Anne Catharine Lefever
Pillsbury Winthrop Shaw Pittman, LLP
1540 Broadway
New York, NY 10036

Douglas L. Wald
John Arak Freedman
Sonia Kuester Pfaffenroth
Laura Cofer Taylor
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004

Timothy E. Hoeffner
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102

Craig A. Stewart
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022

                                 /s/ Billie J. Siddoway
                                 Billie J. Siddoway