UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES<br>ANTITRUST LITIGATION | ) MDL No. 1950 |
| | ) |
| THIS DOCUMENT RELATES TO: | ) Master Docket No. 08-02516 (VM) |
| | ) |
| STATE OF WEST VIRGINIA *ex rel.* | ) (GWG) |
| PATRICK MORRISEY,<br>ATTORNEY GENERAL | ) |
| | ) ECF Case |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| BANK OF AMERICA, N.A., | ) |
| | ) |
| MERRILL LYNCH & CO., INC., | ) |
| | ) |
| UBS FINANCIAL SERVICES, INC., | ) |
| | ) |
| UBS SECURITIES, LLC, | ) |
| | ) |
| UBS AG, | ) |
| | ) |
| JPMORGAN CHASE & CO., | ) |
| | ) |
| JPMORGAN SECURITIES, INC., | ) |
| | ) |
| MBIA INC., | ) |
| | ) |
| MORGAN STANLEY, | ) |
| | ) |
| BAYERISCHE LANDESBANK<br>GIROZENTRALE | ) |
| | ) |
| FINANCIAL SECURITY ASSURANCE, INC., | ) |
| | ) |
| ASSURED GUARANTY US HOLDINGS, INC., | ) |
| | ) |
| DEXIA S.A., | ) |
| | ) |
| GE FUNDING CAPITAL MARKET | ) |

RECEIVED
AUG 08 2013
U.S.D.C. S.D. N.Y.
CASHIERS

SERVICES, INC.,                                          )
                                                         )
TRINITY PLUS FUNDING CO., LLC                            )
                                                         )
TRINITY FUNDING CO., LLC                                 )
                                                         )
NATIXIS FUNDING CORP.,                                   )
                                                         )
NATIXIS S.A.,                                            )
                                                         )
CDR FINANCIALPRODUCTS, INC.,                             )
                                                         )
GEORGE K. BAUM & CO., and                                )
                                                         )
INVESTMENT MANAGEMENT ADVISORY                           )
GROUP, INC.                                              )
                                                         )
          Defendants                                     )
_____          )

### SECOND AMENDED COMPLAINT

Plaintiff, the State of West Virginia ("West Virginia"), by and through Patrick Morrisey, the duly elected and current Attorney General, brings this action for damages and injunctive relief against the Defendants for violations of the West Virginia Antitrust Act, W.Va. Code § 47-18-1, *et seq.*, and the Sherman Act, 15 U.S.C. § 1. West Virginia complains and alleges upon information and belief, except as to those paragraphs that are based on personal knowledge, as follows:

## I.    NATURE OF THE ACTION

1.    This action arises from the illegal and unlawful acts of the Defendants, who conspired to manipulate, and did manipulate, the terms that U.S. public and non-profit entities, including West Virginia public and non-profit entities, received on specialized investment vehicles known as Municipal Derivatives, as well as the costs and fees associated with Municipal Derivative transactions.

2.    This Complaint incorporates all of the allegations against defendants named in the First Amended Complaint that the Court sustained in its April 29, 2011 Order (ECF 1315). The present complaint differs from the First Amended Complaint in that it adds various GE entities as named defendants, who were previously dismissed in the Court's April 29, 2011 Order; includes additional changes to allegations in reference to criminal prosecutions by the United States; and deletes as defendants certain entities previously dismissed by order, settlement or agreement. These additions are based in part on informations or indictments, guilty pleas, pleadings, communications, and trial transcripts in criminal cases that postdate the First Amended Complaint. These criminal cases include, *inter alia*: (a) *United States v. Rubin/Chambers, Dunhill Ins. Servs., Inc.*, No. 09 cr 1058 (S.D.N.Y.); (b) *United States v. Carollo, et al.*, No. 10 cr. 00654 (S.D.N.Y.); (c) *United States v. Ghavami, et al.*, No. 10 cr 1217 (S.D.N.Y.); (d) *United States v. Naeh*, No. 10 cr. 139 (S.D.N.Y.); (e) *United States v. Rothman*, No. 10 cr. 200 (S.D.N.Y.); (f) *United States v. Goldberg*, No. 10 cr.

209 (S.D.N.Y.); (g) *United States v. Zaino*, No. 10 cr. 454 (S.D.N.Y.); (h) *United States v. Kanefsky*, No. 10 cr. 721 (S.D.N.Y.); (i) *United States v. Scott-Jones*, No. 10 cr. 794 (S.D.N.Y.); (j) *United States v. Campbell*, No. Cr. 802 (S.D.N.Y.); (k) *United States v. Hertz*, No. 10 cr. 1178 (S.D.N.Y.); and (l) the settlement agreement entered into on December 23, 2011 between GE Funding Capital Market Services, Inc. and the Attorneys General of various states.

3.      Municipal Derivatives are specialized investment vehicles used by U.S. public and non-profit entities, such as those in West Virginia, to hold and preserve the public monies raised from the sale of municipal bonds, hedge the interest rate obligations of those bonds, and achieve other financial goals. The former are commonly referred to as "guaranteed investment contracts" or "GICs," while the latter are commonly referred to as "swaps." Both types are discussed in more detail below. In short, Municipal Derivatives are specialized financial products that West Virginia public and non-profit entities use to stretch scarce public monies.

4.      Defendants' conspiracy involved, but was not limited to, allocating the market for Municipal Derivatives among themselves, rigging the process by which U.S. public and nonprofit entities acquired Municipal Derivatives, sharing their illegal gains through kickbacks to one another, and making other secret, undisclosed arrangements. These illegal and unlawful acts negatively affected the terms of every Municipal Derivative entered into by West Virginia public and non-profit entities during the period of the alleged conspiracy.

5.      In November of 2006, the United States Department of Justice ("DOJ") Antitrust Division publically announced that it was investigating anticompetitive conduct by the providers and brokers of Municipal Derivatives. Soon thereafter it was reported that a criminal grand jury had been impaneled in the Southern District of New York ("S.D.N.Y.") to pursue criminal indictments of

individuals and companies implicated in this investigation. Criminal subpoenas were issued to more than 25 brokers and providers and the offices of at least three brokers were raided by the Federal Bureau of Investigation ("FBI"). It soon came to light that both the Internal Revenue Service ("IRS") and the Securities and Exchange Commission ("SEC") were engaged in parallel investigations, and a consortium of State Attorneys General initiated a coordinated investigation of the same conduct against an expanded list of Municipal Derivatives brokers and providers.

6.      On January 3, 2007, soon after the DOJ's investigation was announced, then-retiring Field Manager in the IRS Tax Exempt Bond Office, Charles Anderson, described his impression of the DOJ's investigation and what it would likely produce as follows: "I have listened to tape recordings of bankers talking to each other saying, 'This law firm or lawyer will go along, they know what's going on, they'll give us an opinion.' It might take a little time to unwind it all, but I think we've only seen the tip of the iceberg . . . I would not be surprised to see bankers and lawyers go to jail."

7.      In February 2007, Defendant Bank of America publically announced that it had requested entry, and had been accepted, into the Corporate Leniency Program of the DOJ's Antitrust Division, in connection with "industry-wide government investigations concerning the bidding process for Municipal Derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds." In so doing, Defendant Bank of America effectively admitted to its criminal and felonious involvement in the antitrust conduct under investigation.

8.      In the months that have followed, a growing list of Municipal Derivative brokers and providers, and their current and former employees, have received further inquiries from the DOJ, notifications in the form of "Target Letters" that they are the target of criminal investigation by the

DOJ, and/or "Wells notices" from the SEC informing them that the SEC intends to file civil complaints against them.

9.     The DOJ investigations are still active and ongoing. Indeed, the DOJ sought a stay of much of the discovery in this proceeding for that reason.

10.     On April 13, 2009, the DOJ issued a subpoena to the West Virginia Water Development Authority seeking information relating to the October 23, 2003 bidding on two Municipal Derivatives relating to the West Virginia Water Development Authority, Infrastructure Revenue Bonds Series 2000A and 2003A. In addition, the DOJ issued a subpoena to the West Virginia Economic Development Authority relating to Municipal Derivatives for the Lease Revenue Bonds (Correctional, Juvenile and Public Safety) Facilities, Series 2003 A. On May 1, 2009, the DOJ also issued a subpoena to the West Virginia School Building Authority relating to Municipal Derivatives for the Lottery Capital Improvement Revenue Bonds Series 2004. West Virginia now knows that these subpoenas were directed to West Virginia public entities that were victims of illegal and anticompetitive bidding practices that were part of a conspiracy involving 30 co-conspirator companies and individuals to fix bids, allocate markets and customers throughout the U.S., and including West Virginia, relating to the pricing of Municipal Derivatives.

11.     Defendant CDR Financial Products, Inc., its CEO, David Rubin, and Zevi Wolmark, Evan Andrew Zarefsky, Dani Naeh, Matthew Rothman, and Douglas Goldberg, all CDR employees, have already pleaded guilty to this illegal conduct.

12.     In addition to the CDR defendants, the following individuals have pleaded guilty to this illegal conduct: Mark Zaino of UBS, and formerly CDR; Martin Kanefsky of Kane Capital; Adrian Scott-Jones of Capital Financial Partners, Inc.; James Hertz of JPMorgan; Alex Wright of

JPMorgan; and Douglas Campbell of Bank of America. The following individuals have been found guilty of this illegal conduct: Dominick Carollo of Royal Bank of Canada, and formerly of Trinity Funding Co., LLC ("GE Trinity"), Trinity Plus Funding, Co., LLC ("GE Trinity Plus"), and GE Funding Capital Market Services, Inc. ("GE Funding"); Steven Goldberg of FSA, and formerly of GE Trinity, GE Trinity Plus, and GE Funding; Peter Grimm of GE Trinity, GE Trinity Plus, and GE Funding; and Peter Ghavami, Gary Heinz, and Michael Welty of UBS.

13.     The West Virginia Attorney General has been unable to gain access to evidence that he knows to be in the possession of the DOJ, other federal authorities, and co-conspirator Defendants. The West Virginia Attorney General has sought information about the conspiracies through more than ten (10) administrative subpoenas issued pursuant to West Virginia Code § 47-18-7(1) relating to the investigation of possible violations of the federal and state antitrust laws, and contracts, combinations or conspiracies in restraint of trade related to Municipal Derivatives, and other applicable state and federal laws. Subsequent to the filing of West Virginia's First Amended Complaint, extensive documentary discovery was produced by the defendants; however, plaintiffs have not been permitted to take depositions about conspiratorial conduct.

14.     The allegations herein are based on the West Virginia Attorney General's investigation. This investigation has included the review of documents and information produced in response to administrative subpoenas; the review of publicly available summaries and accounts of information provided by a confidential cooperating witness who is a former Municipal Derivatives Marketing Desk employee of Defendant Bank of America and who is cooperating with the DOJ in its antitrust investigation (hereafter the "CW"); the review of publicly available descriptions of proffers relating to anticompetitive behavior made by Bank of America to other claimants; the

review of emails and deal files; the review of transcripts and filings from the *Carollo*, *Ghavami*, and other criminal proceedings; the review of documents produced to date by defendants in this action; and the analysis of bid documents and patterns of bidding.  Bank of America's Answer to the Second Consolidated Amended Class Action Complaint admits that it has cooperated with the DOJ and that it has made proffers to other claimants disclosing information from the CW relating to possible illegal and anticompetitive conduct.  Bank of America Answer to Second Amended Consolidated Class Action Complaint at 2–3 ("Preliminary Statement") (Docket No. 781).

15.     This investigation has revealed a far-reaching, industry-wide conspiracy, through which Municipal Derivative providers, working with Municipal Derivative brokers, deprived West Virginia public and non-profit entities of the benefit of competition in their Municipal Derivatives transactions. The Municipal Derivative providers and brokers worked together to allocate Municipal Derivative transactions among themselves in the following manner: they signaled to each other their intended bids, and whether they were interested in winning a particular transaction or not; submitted courtesy bids on transactions they had no intention or desire to win in order to give transactions an artificial veneer of fairness; refrained from bidding on transactions to allow another to prevail without competition; lowered their intended bids in response to signals that the transaction could be won by them at terms that would yield higher profits; and took other actions that depressed the returns that West Virginia and other municipal bond issuers earned on Municipal Derivative transactions.

16.     These and similar illegal activities occurred in transactions involving all types of derivatives, including both GICs and swaps, and were not limited to transactions that purportedly involved formal competitively-bid auctions.

17.     West Virginia's investigation has revealed probative evidence that the conspiracy operated to deny West Virginia municipal bond issuers competition in the services provided by brokers of Municipal Derivatives, and to compel West Virginia issuers to pay excessive fees for such services.

18.     Because of the pervasiveness of this conduct and the inter-transactional relationship of Defendants' illegal conduct, the conspiracy has had a market-wide effect on the terms of Municipal Derivative transactions and prices of services associated therewith, depriving West Virginia and other municipal bond issuers of the benefits of free competition.  As a result, West Virginia public and non-profit entities suffered harm in several ways: (a) receiving rates on Municipal Derivatives that were artificially depressed and uncompetitive; (b) being forced to engage counter-parties to Municipal Derivative transactions that carried increased credit risks that were not reflected in the terms of the transactions; and (c) being forced to pay uncompetitive, inflated fees and costs in Municipal Derivative transactions.

## II.     JURISDICTION AND VENUE

19.     This action is brought pursuant to (1) the West Virginia Antitrust Act, W.Va. Code § 47-18-1, *et seq.*, and (2) Section 1 of the Sherman Act, 15 U.S.C. § 1. West Virginia seeks to recover damages and the costs of suit, including treble damages, injunctive relief, and reasonable attorney fees, against Defendants, and each of them, for the injuries sustained by West Virginia and its public and non-profit entities by reason of the violations, as alleged herein.

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and the Edge Act, 12 U.S.C. § 632.

21.     Venue is proper in the Southern District of West Virginia pursuant to Sections 4, 12,

and 16 of the Clayton Act, 5 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d), because during the time periods alleged herein, the Defendants resided, transacted business, were found, and/or had agents in the Southern District of West Virginia, because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in the Southern District of West Virginia, and because overt acts in furtherance of the alleged conspiracy were committed in the Southern District of West Virginia.

22.     In addition, Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their business dealings and transactions in the Southern District of West Virginia, by having caused injuries through their acts and omissions throughout West Virginia, and by their violation of the West Virginia Antitrust Act.

23.     Defendants, and each of them, have sufficient minimum contacts within West Virginia to make the exercise of jurisdiction over each Defendant under the West Virginia Antitrust Act consistent with traditional notions of fair play and substantial justice.   Each Defendant participates, or during the relevant period did participate, in the West Virginia market through brokering, bidding on, or providing Municipal Derivatives to West Virginia public and non-profit entities and/or affecting the terms of Municipal Derivatives acquired by such entities through their participation in the conspiracy alleged herein.   Moreover, Defendants, and each of them, do substantial business in West Virginia.

## III.  PARTIES

### A.  Plaintiff

24.     The Plaintiff, the State of West Virginia, by and through Patrick Morrisey, the duly elected and current Attorney General, is authorized to bring this action to recover damages suffered

by West Virginia public and non-profit entities and residents pursuant to the West Virginia Antitrust Act, W.Va. Code § 47-18-1, *et seq.* The term "West Virginia" shall mean and include the State of West Virginia and its public and non-profit entities.

### B.   Defendants

#### 1.   Provider Defendants

25.   Provider Defendants are those Defendants that acted as counter-parties in Municipal Derivative transactions entered into by West Virginia public and non-profit entities and/or submitted bids and pricing information in such transactions. All of the Provider Defendants were part of the conspiracy. The term provider is commonly used in the Municipal Derivatives industry to refer to those entities that are counter-parties to issuers, such as West Virginia public and non-profit entities, in Municipal Derivative transactions, as opposed to brokers of Municipal Derivatives, discussed below.

26.   Provider Defendant Bank of America, N.A. ("Bank of America") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. As a member of the conspiracy, Bank of America, directly and through its wholly owned subsidiary Defendant Merrill Lynch & Co., Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and was engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

27.   Provider Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch"), a wholly owned subsidiary of Defendant Bank of America, is a Delaware corporation with its principal place of business in Charlotte, North Carolina (formerly New York, New York). Defendant Bank of America acquired Merrill Lynch in January of 2009. As a member of the conspiracy, Merrill Lynch was a

counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

28.     Provider Defendant UBS Financial Services, Inc. ("UBS Financial") f/k/a Paine Webber, Inc. ("Paine Webber") is a wholly owned subsidiary of UBS AG and is a Delaware corporation with its principal place of business in New York, New York. UBS AG acquired Paine Webber in 2000.  As a member of the conspiracy, UBS Financial was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that led to the harm suffered by West Virginia and its public and non-profit entities.  UBS Financial also participated in financial transactions for the purpose of paying kickbacks to Municipal Derivative brokers relating to the bid fixing, and market and customer allocation alleged herein.

29.     Provider Defendant UBS Securities, LLC ("UBS Securities") is a wholly owned subsidiary of UBS AG and is a Delaware corporation with its principal place of business in New York, New York. UBS AG acquired Paine Webber in 2000.  As a member of the conspiracy, UBS Financial was a counter-party to Municipal Derivatives entered into by public and nonprofit entities, and engaged in the illegal conduct that led to the harm suffered by West Virginia and its public and non-profit entities.

30.     Provider Defendant UBS AG ("UBS AG") is a Swiss corporation with its principal place of business in New York, New York.  As a member of the conspiracy, UBS AG, directly and/or through its wholly owned subsidiaries Defendant UBS Securities, LLC and/or Defendant UBS Financial, was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that led to the harm suffered by West Virginia and its

public and non-profit entities; and participated in financial transactions for the purpose of paying kickbacks to Municipal Derivative brokers relating to the bid fixing, and market and customer allocation alleged herein.

31.     UBS AG controlled UBS Securities and UBS Financial and approved the illegal conduct by them relating to the fixing of bids, allocating of markets and customers, and participation in transactions for the purpose of paying undisclosed kickbacks to conspiracy participants. UBS AG, UBS Securities and UBS Financial shall hereafter collectively be referred to as "UBS."

32.     Provider Defendant JPMorgan Chase & Co. ("JPMorgan") f/k/a Chase Financial, f/k/a Morgan Guaranty Trust Company of New York, f/k/a JPMorgan Chase J.P. is a Delaware corporation with its principal place of business in New York, New York. JPMorgan is the successor in interest to Chase Financial, Morgan Guaranty Trust Company of New York and JPMorgan Chase. As a member of the conspiracy, JPMorgan, directly and through its wholly owned subsidiaries, including Defendant JPMorgan Securities, Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.   Claims are asserted against JPMorgan by the Plaintiff on behalf of those West Virginia entities that opted out of the class settlements to date.

33.     Provider Defendant JPMorgan Securities Inc. ("JPMorgan Securities"), f/k/a Bear, Stearns & Co., Inc., ("Bear Stearns"), a wholly owned subsidiary of Defendant JPMorgan, is a Delaware corporation with its principal place of business in New York, New York.  In May of 2008, Defendant JPMorgan acquired Bear Stearns.  As a member of the conspiracy, JPMorgan Securities and Bear Stearns were counter-parties to Municipal Derivatives entered into by public and non-profit

entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

34.     Provider Defendant MBIA Inc. ("MBIA") is a Connecticut corporation with its principal place of business in Armonk, New York.  As a member of the conspiracy, MBIA was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

35.     Provider Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its principal place of business in New York, New York.  As a member of the conspiracy, Morgan Stanley was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.  Claims are asserted against Morgan Stanley by the Plaintiff on behalf of those West Virginia entities that opted out of the class settlements to date.

36.     Provider Defendant Bayerische Landesbank Girozentrale ("Bayerische") is a German corporation with its principal place of business in Munich, Germany.  As a member of the conspiracy, Bayerische was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

37.     Provider Defendant Financial Security Assurance, Inc. ("FSAI"), a wholly owned subsidiary of Defendant Assured Guaranty US Holdings, Inc., is a New York stock insurance company with its principal place of business in New York, New York. During the time period alleged herein, FSAI was a wholly owned subsidiary of Financial Security Assurance Holdings, Ltd.

("FSA Holdings"), which issued Municipal Derivatives through its wholly owned subsidiaries, FSA Capital Management Services LLC ("FSA-CMS"), FSA Capital Markets Services LLC, and FSA Capital Markets Services (Caymans) Ltd. (collectively the "FSA GIC Subsidiaries") to West Virginia public and non-profit entities and other entities. All Municipal Derivatives issued by FSA Holdings through the FSA GIC Subsidiaries were insured by FSAI. Municipal Derivatives issued by FSA Holdings through the FSA GIC Subsidiaries were subject to final approval by FSAI. FSAI engaged in illegal conduct that led to the harm and damages suffered by West Virginia and its public and non-profit entities.

38.     Provider Defendant Assured Guaranty US Holdings, Inc. ("Assured US Holdings"), a wholly owned subsidiary of Assured Guaranty Ltd., is a Delaware corporation with its principal place of business in New York, New York. On or about July 1, 2009, Assured US Holdings acquired FSA Holdings from Dexia Holdings, Inc., specifically including, FSA Holding's subsidiary FSAI ("July 1, 2009 transaction"). During some or all of the time period of the conspiracy alleged herein, FSA Holdings issued FSAI insured Municipal Derivatives through the FSA GIC Subsidiaries and engaged in the illegal conduct that harmed and damaged West Virginia and its public and non-profit entities. As part of the July 1, 2009 transaction: (1) FSA Holdings ceased to exist, but Dexia Holdings, Inc. became the owner of 13.9% of Assured Holdings and its subsidiary FSAI; (2) Assured Guaranty Ltd. agreed to certain limitations in its business demanded by Dexia Holdings, Inc.; and (3) subject to these limitations, Assured Guaranty Ltd., continued the business of FSA Holdings' subsidiaries, including FSAI, and expressly and/or implicitly assumed liabilities thereof. Assured US Holdings is a mere continuation of FSA Holdings and/or the July 1, 2009 transaction was a *de facto* merger of FSA Holdings with Assured US Holdings. Assured US Holdings is liable as a

-13-

successor to FSA Holdings for the harm and damages caused by FSA Holdings to West Virginia and its public and non-profit entities.

39.      Provider Defendant Dexia S.A. is a Belgian financial institution headquartered in Brussels, Belgium.  As part of the transaction by which Assured US Holdings acquired FSA Holdings, ownership of FSA Holdings' financial products group, including the FSA GIC Subsidiaries and FSA Management LLC (the entity which invested funds that FSA Holdings received from the GICs and other reinvestment derivatives issued to public and non-profit entities), was transferred prior to, and in preparation for, the July 1, 2009 transaction to Dexia Holdings.  On July 1, 2009, the ownership of FSA Holdings' financial products group was transferred to Dexia S.A. As part of the July 1, 2009 transaction, Dexia S.A. expressly agreed to assume the liabilities arising from the FSA Holdings' financial products group's business, including GICs and other reinvestment derivatives previously issued by FSA Holdings through the FSA GIC Subsidiaries, and any litigation related thereto.  During some or all of the period of the conspiracy alleged herein, FSA Holdings issued FSAI insured GICs and other reinvestment derivatives through the FSA GIC Subsidiaries to West Virginia public and non-profit entities and other municipalities and non-profits and engaged in the illegal conduct that led to the harm and damages suffered by West Virginia public and non-profit entities.  Dexia S.A. is liable to West Virginia and its public and non-profit entities for such harm and damages as a successor to FSA Holdings' financial products group and/or the FSA GIC Subsidiaries.

40.      Provider Defendants FSAI, Assured U.S. Holdings, and Dexia S.A., are referred to collectively herein as "FSA."

41.      Provider Defendant GE Funding Capital Market Services, Inc. ("GE Funding") f/k/a

FGIC Capital Market Services, Inc. ("FGIC Capital"), a wholly owned subsidiary of General Electric Capital Corporation and a member of the GE Funding Capital Market Services Group ("GE Funding CMS"), is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, GE Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

42.       Provider Defendant Trinity Plus Funding Co., LLC ("Trinity Plus Funding"), a wholly owned subsidiary of General Electric Capital Corporation and member of the GE Funding CMS, is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, Trinity Plus Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

43.       Provider Defendant Trinity Funding Co., LLC ("Trinity Funding"), a wholly owned subsidiary of General Electric Capital Corporation and member of the GE Funding CMS, is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, Trinity Funding was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

44.       Provider Defendants GE Funding, FGIC Capital, Trinity Plus Funding, and Trinity Funding are referred to collectively herein as "GE Entities."

45.       Provider Defendant Natixis Funding Corp. f/k/a Ixis Funding Corp. f/k/a CDC Ixis Funding Corp. f/k/a CDC Funding Corp ("CDC Funding"), a wholly-owned subsidiary of CDC

(defined below), is a New York corporation with its principal place of business in New York, New York.  As a member of the conspiracy, CDC Funding acted as a counter-party to Municipal Derivatives entered into by public and non-profit entities and engaged in the illegal conduct that led to the harm and damages suffered by West Virginia and its public and non-profit entities.  CDC Funding also functioned in some transactions as a broker.  All guaranteed investment contracts issued by CDC Funding were guaranteed by CDC and its ability to act as a provider of guaranteed investment contracts was contingent upon the guarantee provided by CDC.

46.     Provider Defendant Natixis S.A., f/k/a Ixis CIB, f/k/a CDC Finance-CDC IXIS, ("CDC"), is a French corporation with its principal place of business in Paris, France.  CDC wholly owns CDC Funding and fully consolidates operations of CDC Funding into CDC's financials.  According to its registration documents, CDC only fully consolidates those subsidiaries that CDC controls. CDC and CDC Funding, moreover, have shared certain executives, including Anthony Orastelli, who is currently a CDC Director.  In the last five years, Orastelli has occupied a number of executive positions at CDC and CDC Funding, including but not limited to, President of CDC Funding and Member of CDC's Executive Board.  CDC guaranteed all guaranteed investment contracts issued by CDC Funding.  According to court filings in a case related to the instant case by an outside counsel for CDC, the guarantees provided by CDC were a necessary precondition of CDC Funding's ability to serve as a counter-party to all of the Municipal Derivative transactions to which CDC Funding acted as a counter-party or sought to act as a counter-party.  CDC Funding was acting as an agent and/or alter ego of CDC in actions taken by it relating to, concerning, or connected with, the issuance of Municipal Derivatives to municipalities and non-profit entities.  CDC Funding directly and/or through the CDC Funding engaged in the conduct that led to the harm suffered by

-16-

West Virginia and its public and non-profit entities.

### 2.    Broker Defendants

47.    Broker Defendants constitute those Defendants that acted as brokers for West Virginia public and non-profit entities in the acquisition of Municipal Derivatives from the Provider Defendants.    The Broker Defendants served key roles in the rigging of Municipal Derivative auctions, and orchestrating and facilitating the rigging of particular auctions.

48.    Broker Defendant CDR Financial Products, Inc. ("CDR") is a California corporation with its principal place of business in Beverly Hills, California.    As a broker of Municipal Derivatives to public and non-profit entities, CDR acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

49.    Broker Defendant George K. Baum & Co. ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri.    As a broker of Municipal Derivatives to public and non-profit entities, Baum acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

50.    Broker Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania.    As a broker of Municipal Derivatives to public and non-profit entities, IMAGE acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

### 3.    Unnamed Co-Conspirators

51.    Provider co-conspirator AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation with its principal place of business in New York, New York.    As a member

of the conspiracy, AIG Financial, directly and through its wholly owned subsidiary AIG Matched Funding Corp., issued and was the counter-party to Municipal Derivatives invested in by public and non-profit entities, and was engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

52. Provider co-conspirator AIG Sunamerica Life Insurance Co. ("AIG Sunamerica") is an Arizona corporation with its principal place of business in Los Angeles, California. As a member of the conspiracy, AIG Sunamerica was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and was engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

53. Provider co-conspirator Ambac Financial Group, Inc. ("Ambac") is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, Ambac and/or its subsidiaries were counter-parties to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

54. Provider co-conspirator Wachovia Bank, N.A. ("Wachovia") was a national chartered banking association with its principal place of business in Charlotte, North Carolina. Wachovia was the successor entity to, and merged with, First Union Corporation and its subsidiary First Union National Bank ("First Union"). In December of 2008, co-conspirator Wells Fargo & Company acquired Wachovia. As a member of the conspiracy, Wachovia was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and was engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

55. Provider co-conspirator Lehman Brothers Inc. ("Lehman Brothers") is a Delaware

-18-

corporation with its principal place of business in New York, New York.  As a member of the conspiracy, Lehman Brothers was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and was engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

56.     Provider co-conspirator Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business in San Francisco, California.  Wells Fargo is the successor in interest to Wachovia and First Union, through which it was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and was engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

57.     Provider co-conspirator National Westminster Bank, plc ("NatWest"), a subsidiary of Royal Bank of Scotland, is a public limited company with its principal place of business in London, England.  As a member of the conspiracy, NatWest was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

58.     Provider co-conspirator Citigroup, Inc. ("Citigroup") is the parent company of Citigroup Financial Products Inc. f/k/a Salomon Brothers Holding Company Inc., and Citigroup Global Markets Holdings Inc. f/k/a Salomon Smith Barney Holdings, Inc. and Citigroup Global Markets, Inc. Citigroup is a Delaware corporation with its principal place of business in New York, New York. As a member of the conspiracy, Citigroup through Citigroup Global Markets Holdings, Inc., Citigroup Global Markets, Inc. and predecessors Salomon Brothers Holding Company Inc., and Salomon Smith Barney Holdings, Inc., was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages

-19-

to West Virginia and its public and non-profit entities.

59.     Provider co-conspirators Société Générale SA ("SocGen") is a French corporation with its principal place of business in Paris, France.  As a member of the conspiracy, SocGen was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

60.     Provider co-conspirator Citibank, N.A. ("Citibank") is a nationally-chartered Bank, with its headquarters in New York, New York.  As a member of the conspiracy, Citibank was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

61.     Provider co-conspirator XL Capital Ltd. (f/k/a Security Capital Assurance Ltd.) ("XL Capital") is a Bermuda corporation with its principal place of business in Hamilton, Bermuda.  As a member of the conspiracy, XL Capital, d/b/a Security Capital, directly and/or through its subsidiaries co-conspirator XL Asset Funding I, LLC and/or co-conspirator XL Life Insurance & Annuity Company, was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.

62.     Provider co-conspirator XL Asset Funding I, LLC ("XL Asset"), a wholly owned subsidiary of XL Capital, is a limited liability company with its principal place of business in Schaumburg, Illinois.  As a member of the conspiracy, XL Asset was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that

caused harm and damages to West Virginia and its public and non-profit entities. XL Asset's provision of Guaranteed Investment Contracts was guaranteed by XL Capital Assurance Inc.

63. Provider co-conspirator Syncora Guarantee, Inc. f/k/a XL Capital Assurance Inc. ("XL Capital Assurance"), a wholly owned operating company and subsidiary of Syncora Holdings, Ltd., is a New York stock insurance company with its principal place of business in New York, New York. As a member of the conspiracy, XL Capital Assurance, together with its affiliate XL Asset, was a counter-party to Municipal Derivatives entered into by public and nonprofit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities. XL Capital Assurance's role as a counter-party and participant in the illegal conduct alleged herein included acting as a guarantor of some or all Municipal Derivatives issued by XL Asset. The guarantees provided by XL Capital Assurance were a necessary precondition of XL Asset's ability to serve as a counter-party in some or all of the Municipal Derivative transactions to which XL Asset acted as a counter-party or sought to act as a counter-party.

64. Provider co-conspirators XL Capital, XL Asset and XL Capital Assurance are collectively referred to herein as "XL."

65. Broker co-conspirator PFM Group, Inc. ("PFM Group") f/k/a Evensen Dodge Investment Advisors, Inc is a Pennsylvania corporation with its principal place of business in Abington, Pennsylvania. As a broker of Municipal Derivatives to public and non-profit entities, PFM Group, directly and through its wholly owned subsidiary PFM Asset Management LLC, acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

66. Broker co-conspirator PFM Asset Management LLC ("PFM Asset") is a Pennsylvania

corporation with its principal place of business in Philadelphia, Pennsylvania.  As a broker of Municipal Derivatives to public and non-profit entities, PFM Asset acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

67.    Broker co-conspirator PFM Group and PFM Asset are collectively referred to herein as "PFM."

68.    Broker co-conspirator Morgan Keegan & Co. Ltd. ("Morgan Keegan") is a subsidiary of Regions Financial Corp., a Tennessee corporation with its principal place of business in Memphis, Tennessee.  As a broker of Municipal Derivatives to public and non-profit entities, Morgan Keegan acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

69.    Broker co-conspirator Kinsell Newcomb & De Dios Inc. ("Kinsell") is a California corporation with its principal place of business in Carlsbad, California.  As a broker of Municipal Derivatives to public and non-profit entities, Kinsell acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

70.    Broker co-conspirator PackerKiss Securities ("PackerKiss") is a Florida corporation with its principal place of business in Delray Beach, Florida.  As a broker of Municipal Derivatives to public and non-profit entities, PackerKiss acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

71.    Broker co-conspirator Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business in Los Angeles, California.  As a broker of Municipal Derivatives to public and non-profit entities, Winters acted as a member of the

conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

72.     Broker co-conspirator Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  As a member of the conspiracy, Piper Jaffray was a counter-party to Municipal Derivatives entered into by public and non-profit entities, and engaged in the illegal conduct that caused harm and damages to West Virginia and its public and non-profit entities.  Piper Jaffray also acted as a broker of Municipal Derivatives to public and non-profit entities, and engaged in illegal conduct in that capacity as well that led to the harm and damages suffered by West Virginia and its public and non-profit entities.

73.     Broker co-conspirator Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business in Sherman Oaks, California. As a broker of Municipal Derivatives to public and non-profit entities, Feld Winters acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

74.     Broker co-conspirator Sound Capital Management, Inc. ("Sound Capital") is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota. As a broker of Municipal Derivatives to public and non-profit entities, Sound Capital acted as a member of the conspiracy that caused significant harm to public and non-profit entities, including those in West Virginia.

75.     Broker co-conspirator First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas.  As a broker of Municipal Derivatives to public and non-profit entities, First Southwest acted as a member of the conspiracy that caused significant

harm to public and non-profit entities, including those in West Virginia.

## IV.   OVERVIEW OF MUNICIPAL DERIVATIVES

### A.   Municipal Bond Basics

76.   Municipal bonds are issued by states, cities, and counties, their respective agencies, other government entities, and non-profit corporations, to raise funds for various public projects, including the construction and repair of roads and building public structures such as schools, parks, power plants and mass transit facilities.   Public and non-profit entities also issue municipal bonds—known as "tax revenue anticipation notes" ("TRANs"), "certificates of participation", "lease revenue bonds", etc.—to raise funds to pay for current expenses while awaiting future revenues.

77.   When a public entity issues bonds, it is generally referred to as an "issuer." (The same term is used for non-profit entities that issue tax-exempt equivalents to municipal bonds).  This term is also used in Municipal Derivative transactions to refer to the public or non-profit entity that enters into a Municipal Derivative transaction with a provider.

78.   Municipal Derivatives are provided by large commercial and investment banks or highly rated insurance companies (collectively referred to herein as "providers").

79.   When a public or non-profit entity seeks to purchase a Municipal Derivative by entering into a Municipal Derivative contract with a provider, it may engage the services of a broker. The legitimate role of the broker is to obtain the best possible price for the Municipal Derivative by arranging competitively bid auctions among multiple potential providers of Municipal Derivatives.

80.   Municipal bonds are tax-exempt and as a result, investors are usually willing to accept lower interest rates from municipal bonds than they would accept from other forms of borrowing (assuming comparable risk).  This makes issuance of municipal bonds an attractive fiscal option for

many public and non-profit entities, and, as a result, the municipal bond industry is extremely large. The total United States municipal bond market is currently valued at approximately $2.6 trillion. At any time, public and non-profit entities in West Virginia have numerous bond issuances with hundreds of millions of dollars outstanding.

81.     Traditionally municipal bonds pay interest to bond holders at either a fixed or variable rate of interest that is pegged to some kind of index such as the London Inter-Bank Offered Rate ("LIBOR") (the standard for quoting interbank lending of Eurodollar deposits), or the Security Industry & Financial Markets Association Index ("SIFMA Index"). The issuer of a municipal bond receives a cash payment at the time of issuance. In return, the issuer agrees to repay the principal and the interest to the bond holders over time. Repayment periods vary and may be as short as a few months but typically last for several years, often several decades.

82.     In recent years, bond issuers have, in increasing numbers, issued two other types of bonds, variable rate demand bonds ("VRDBs") and auction rate securities ("ARSs"). Both VRDBs and ARSs, through slightly different mechanisms, are designed to allow issuers of long term bonds to take advantage of short-term interest rates by "re-marketing" the bonds on a weekly or monthly basis. Both types of bonds are also frequently associated with swaps, through which an issuer can seek to gain a synthetic fixed rate that would not otherwise be available to the issuer.

83.     Proceeds from the issuance of municipal bonds for public projects or construction are typically placed into three types of funds. The primary fund is known as the project fund or the construction fund. This fund is used to pay for the actual construction or repair project work. The second fund, which is smaller, is known as the debt service fund, or "sinking fund." This fund is used to make principal and interest payments to bond holders. The third type of fund is known as

the debt service reserve fund. This reserve fund is used to pay debt obligations in case of unforeseen contingencies. Because of the revenue-anticipation purpose and shorter term quality of TRANs and other similar kinds of bonds, proceeds from issuances of these types of bonds are typically placed in similar but different types of funds than traditional bonds.

**B.    Municipal Derivatives Basics**

84.    "Municipal Derivatives" refers to a variety of specialized investment vehicles through which issuers of municipal and tax-exempt bonds seek to: (1) earn a return on bond proceeds while those proceeds are unused; (2) hedge the interest rate obligations of underlying bonds; and/or (3) accomplish other financial goals. The Municipal Derivatives industry is almost as large as the municipal bond market.

85.    All Municipal Derivatives involve a reciprocal exchange of money between the issuer and a Municipal Derivative provider. Unless otherwise specified, as used in this Complaint, the term "Municipal Derivatives" generically encompasses all of the transactions described herein.

86.    In the case of Municipal Derivatives used by issuers to earn a return on unused bond proceeds, the issuer gives the provider a lump sum of money (principal) and in exchange receives from the provider periodic payments based on the lump sum and interest thereon. From the issuers' perspective, the lump sum to periodic payment exchange is much like an annuity. There are several types of reinvestment derivatives, which vary somewhat in form. The most common type is a called a "guaranteed investment contract" or "GIC." The acronym GIC is often used as short hand to refer to various types of reinvestment derivatives. The term "reinvestment derivative" is used herein to refer generally to Municipal Derivatives used by issuers to reinvest bond proceeds.

87.    The most common type of Municipal Derivative used by issuers to hedge the interest

-26-

rate obligations of underlying bonds are interest rate swaps or just "swaps." In a swap, the issuer makes periodic payments to the provider calculated on a certain rate of interest on a generally amortizing amount of principal, and receives in exchange periodic payments from the provider based on a different rate of interest on the same amount of principal. The economic calculi of both parties that are supposed to underlie such an exchange are discussed below, but are generally referred to as the logic of "rational pricing," and are based on the comparative advantage of access to different types of credit markets. The term "hedging derivative" is used herein to refer generally to Municipal Derivatives, such as swaps, options, swaptions, ceilings, floors and collars that issuers use, generally, to hedge the interest rate obligations on underlying loans and shift the risk thereon. These types of Municipal Derivatives are most commonly associated with ARS and VRDB issuances, which have interest rates that are set at short-term intervals.

88.     A much less common type of Municipal Derivative involves an exchange of periodic payments from an issuer to a provider for a lump sum payment from a provider. These are often referred to as "forward sales agreements." However, forward sales agreements can also refer to Municipal Derivatives in which the cash flows mirror those in a reinvestment derivative (a lump sum from the issuer in exchange for periodic payments from the provider).

### 1.     Guaranteed Investment Contracts "GICs"

89.     A GIC is a contract between a municipal bond issuer and a financial institution by which the financial institution guarantees periodic payments equaling, in total, the amount of bond proceeds invested, plus interest at a rate set by a competitive bidding process. A GIC is a type of annuity available to U.S. public and non-profit entities that issue municipal bonds. The counter-parties to GICs are typically insurance companies and investment banks, which in this role are

referred to as "providers" or "counter-parties." These products are intended to provide issuers with guaranteed returns on unused bond proceeds. "GICs" can refer to unallocated group contracts, investment contracts, funding agreements, guaranteed interest contracts, or other similar financial products in which a provider agrees to pay a fixed or variable rate of interest or a future payment that is based on an index or similar criteria, such as the LIBOR or the SIFMA Index, that is payable at predetermined dates.

90.     A Repurchase Agreement or a "Collateralized GIC" is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of ret urn. This is known as a Collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

91.     An "Unsecured" or "Uncollateralized GIC" does not involve any securities. This type of Municipal Derivative instrument is most similar to other types of annuities: the financial institution guarantees payments at specified points of time. These agreements may contain terms addressing flexibility issues regarding, for example, requirements to pay or not to pay penalties if deadlines are not met.

## 2.     Forward Agreements

92.     A forward agreement is often used with debt service funds. It is an agreement where the buyer and the seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. A forward agreement may require the delivery of a specified security at a specified future date at fixed yields for the purpose of optimizing the investment of a debt service reserve fund. A forward agreement may also be used

to require an issuer to issue, and a company to underwrite, an issuance of bonds on a specified date in the future for the purpose of refunding an outstanding debt issuance.

### 3.   Advanced Refunding Escrow

93.   Public and non-profit entities can issue bonds to refinance prior bond issuances. An advanced refunding escrow is an arrangement pursuant to which the proceeds of the refunding issue (the new bond issued to refund an outstanding bond) are held in escrow and invested so that the escrow account funds can be used to pay off the principal and interest on the municipal bond issue that is being refunded.

94.   GICs, forward agreements, and advanced refunding escrows are collectively referred to herein as "reinvestment derivatives."

### 4.   Swaps

95.   A swap is an exchange of future cash flows (i.e., periodic payments) between an issuer and a provider.

96.   Swaps are generally used by issuers to hedge interest rate obligations on underlying municipal bonds, but can also be used to achieve other financial goals including gaining access to synthetic fixed interest rates that are not otherwise available to the issuer.

97.   In a swap transaction, the issuer and provider essentially trade or "swap" future cash flows. Swaps include: (a) floating-for-fixed interest rate swaps, (b) fixed-for-floating interest rate swaps, and (c) floating-for-floating interest rate swaps, when the two instruments are based off on different indices.

98.   While issuers sometimes enter into swaps and other types of hedging derivatives for investment purposes, issuers usually enter into them to hedge their interest rate obligations related

to a particular bond issuance.

99.     In recent years, it has become increasingly common for issuers to combine interest rate swaps with VRDB or ARS bond issuances, the interest rates on which are reset on regular short-term bases, such as on weekly or monthly bases.  In the swaps associated with these types of bonds, the issuer receives from the swap provider a floating interest rate that is supposed to approximate the short-term interest rate that the issuer will be obligated to pay holders of the bonds; in exchange, the issuer pays a swap provider a conditioned fixed interest rate.

100.     Underpinning a legitimate swap transaction is the logic of "rational pricing." According to the logic of rational pricing, when an issuer and provider enter into a swap transaction, the present values ("PV") of the exchanged future cash flows should be equal or "netted off" against one another.  (Present value is the value on a given date of a future payment or series of future payments, discounted to reflect the time value of money and other factors such as investment risk.) Another way to put this is that the net present value ("NPV") of the swap should be zero or "arbitrage free," at the date of its initiation.  In other words, a swap should involve the exchange of future cash flows that have roughly equal values.

101.     In the fixed-for-floating rate example described above, where the issuer pays a fixed rate and the provider pays a floating rate, the PV of future fixed rate payments by the issuer should be equal to the present value of the expected future floating rate payments by the provider.  In other words again, the exchange should be a wash, with the issuer and provider exchanging future cash flows of the same PV.

102.     If, as it should be, the NPV of the swap, as to parties that entered into it, is zero, neither party's motivation for entering the swap should be based on any belief that they have

received a more valuable future cash flow in exchange for a less valuable future cash flow. Again, the NPV of the cash flows should be zero; on the market, the cash flow is worth the same. Rather, each party's motivation for entering the swap should be based on each party's respective comparative advantage based on access to different borrowing markets.

### 5.   Interest Rate Agreements, Options, And Swaptions

103.    An "interest rate floor agreement" is a financial instrument in which the buyer of the agreement is protected by receiving a guaranteed minimum interest rate (the "interest rate floor") that can be paid on the debt. Guaranteed payments are made even if the actual interest rate drops below a specified strike rate (the "floor rate"). Interest rate floor agreements are typically used for bonds with variable interest rates. For issuers of municipal bonds, floor agreements are used to provide greater certainty concerning the interest payments that must be paid.

104.    An "interest rate ceiling agreement" is a financial instrument in which the buyer of the agreement is protected by receiving a guaranteed maximum interest rate (the "interest rate ceiling" or "interest rate cap"). Payments are made when the actual interest rate rises above a specified strike rate (the "cap rate"). Interest rate ceiling agreements are typically used in bonds with variable interest rates. For issuers of municipal bonds, ceiling agreements are used to provide greater certainty in the interest payments that must be paid.

105.    A "collar agreement" is a financial instrument that combines a floor agreement with a ceiling agreement. In other words, an issuer can enter a collar agreement to combine an interest rate floor and interest rate ceiling on its variable rate debt. This agreement ensures that interest payments will be within the range set by the collar.

106.    An "option" is a provision in a bond contract where the provider has the right, on

specified dates, after giving required notification, to cancel or terminate the Municipal Derivative.

107.    A "swaption" is a combination of a swap and an option.

108.    Swaps, interest rate agreements, collars, options, and swaptions are collectively referred to herein as "hedging derivatives."

109.    Several qualities of all these types of Municipal Derivatives encouraged and facilitated the Defendants' conspiracy to allocate the market for them and depress their terms. These factors include but are not limited to: the significant barriers to entry in the market for Municipal Derivatives due to their complexity and the capital requirements that potential providers must meet to have required credit ratings; necessity of compliance with applicable regulations; the lack of transparency in the Municipal Derivatives market; and the fungibility of Municipal Derivatives that share the same terms and come from similarly rated providers.

## V.    DEFENDANTS' ILLEGAL MANIPULATION OF THE MUNICIPAL DERIVATIVE MARKET

### A.    Overview Of Defendants' Illegal Conspiracy

110.    Defendants' illegal conspiracy was based on a web of interlocking relationships between Provider Defendants, Broker Defendants, and the people employed by them, who eschewed competition with one another in favor of cooperation that ensured the Defendants made excessive illegal profits, and that issuers, including West Virginia, were denied the benefits of competition.

111.    West Virginia has information and belief that Defendant Bank of America's CW has explained that "he learned that his was a business about doing favors, generating referrals for brokers, and getting favors in return."

112.    The CW stated to Sam Gruer of Defendant JPMorgan at a Christmas Party held by

Broker Defendant IMAGE that Provider Defendants, with the assistance of Broker Defendants, worked cooperatively instead of "kicking each other's teeth out." Bank of America's Answer to the Second Consolidated Amended Class Action Complaint admits that the CW has provided proffers relating to this Christmas Party discussion. Bank of America Answer at ¶ 146 (Docket 781).

113.    However, "kicking each other's teeth out" is what competitors like Defendant JPMorgan and Defendant Bank of America are supposed to do.  Municipal Derivative providers should be competing with one another to offer the best economic deal to West Virginia and other issuers on the basis of the Municipal Derivative terms, including interest rates, dates of deposits or payments, fees, credit worthiness, and other factors.

114.    Municipal Derivative brokers, as fiduciaries of the issuers, are supposed to work on behalf of issuers to help facilitate issuers to achieve the best economic deal from competing providers, and should be competing with one another in terms of the quality of such services they provide, including the fees they charge, etc.

115.    Defendants' conspiracy denied West Virginia and other issuers the benefits of competition.  West Virginia suffered from the effects wrought by the denial of competition and was injured thereby, not only in particular Municipal Derivative transactions in which overt collusion occurred, but all Municipal Derivative transactions into which it entered during the period of the conspiracy and thereafter.  The pervasiveness of the conspiracy, the intertransactional character of much of the conspiratorial conduct, and the participation in the conspiracy of most if not all the major Municipal Derivative providers and brokers had marketwide effect on the terms of all Municipal Derivative transactions during the period of the conspiracy and afterwards.

1.    **Mechanics Of The Conspiracy**

-33-

116.    The Defendants' conspiracy had three major components: (a) rigging of bid auctions for reinvestment and hedging derivatives; (b) manipulation of negotiated deals, particularly for hedging derivatives; and (c) provision of illegal and undisclosed kickbacks and other types of covert consideration to other members of the conspiracy.   Unifying its various components was an understanding and agreement that Provider Defendants would, with the assistance of Broker Defendants, cooperate with one another in a "you scratch my back I'll scratch yours" arrangement, whereby Municipal Derivative transactions were allocated among Provider Defendants and Provider Defendants were able to win those deals on terms that would not have been possible in a competitive market.

### a.    Bid-Rigging Of Auctions

117.    One of the principal means by which competition between Municipal Derivative providers is supposed to occur is through Municipal Derivative auctions.   These auctions were one of the principal forums for manipulation by Defendants.

118.    In a formal Municipal Derivative auction, the issuer, directly, through its broker, or via other means, solicits formal written bids from prospective Municipal Derivative providers.   The bids submitted are evaluated by the bidder to determine which bid represents the best economic deal to the issuer, according to the criteria discussed herein.

119.    In most instances, the proposed interest rate in the bid is the most important term or component of a bid, representing, for example, in a GIC, the rate of return that the issuer will earn on the principal.

120.    Because certain Internal Revenue Service ("IRS") regulations applicable to determining the fair market value for GICs and other types of reinvestment derivatives require that

a formal auction be held for certain presumptions to apply, formal auctions are most commonly held for GICs and other types of reinvestment derivatives.  However, formal auctions are also used by issuers to procure swaps and other types of Municipal Derivatives.

121.    The U.S. Treasury Department ("Treasury") apparently recognized that while these auctions can and should allow issuers to procure Municipal Derivatives on the best possible terms available in the market, the auctions also create a powerful incentive for collusion among providers. Accordingly, Treasury enacted rules that effectively require all providers who submit bids in auctions for GICs and other types of reinvestment-type Municipal Derivatives to represent to issuers that: the potential provider did not consult with any other potential provider about its bid; that the bid was determined without regard to any other formal or informal agreement that the potential provider has with the issuer or any other person (whether or not in connection with the bond issue); and that the bid was not being submitted solely as a courtesy to the issuer or any other person for purposes of satisfying the requirements of the regulation. 26 C.F.R. § 1.148-5(d)(6)(iii)(3).  West Virginia public and non-profit entities required that Brokers and Providers make the above representations.

122.    However, notwithstanding such representations, Defendants knowingly and intentionally conspired with each other to rig bids in Municipal Derivative auctions precisely in many of the ways that Provider Defendants are expressly required to swear they will not.

123.    As then IRS Field Manager Charles Anderson recognized in 2006, this bid-rigging caused the yield that West Virginia and other issuers receive to be depressed and, therefore, cost them billions of dollars: "People were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal."  A sweetheart deal for the provider is bad deal for the issuer.

-35-

i.    **Pre-Selecting A Particular Provider Defendant To Win An Auction for a Municipal Derivative**

124.    Both a means and a principal purpose of the Defendants' conspiracy was the formal and informal pre-selection among themselves of the Provider Defendants who would win particular auctions.   Through the pre-selection process, Provider Defendants were able to allocate among themselves Municipal Derivative transactions and protect profit margins on such transactions that would have been shrunk had the Provider Defendants legitimately competed among themselves.

125.    West Virginia has information and belief as to information provided by the CW, reported proffers from Bank of America to other claimants, trial transcripts and pleadings in the DOJ criminal cases, recent guilty pleas and indictments, and other publicly available information, that are referenced throughout this Second Amended Complaint.

126.    The unlawful pre-selection practice was so prevalent that the CW's supervisor at Defendant Bank of America, Phil Murphy, would express disappointment with the CW if he did not know who would win a Municipal Derivative auction in advance of bidding.

127.    Evidence provided by Defendant Bank of America based on information from the CW and tapes of conversations of employees of Bank of America and publically available information reveal that the following Provider Defendants and Unnamed Co-Conspirators were pre-selected as winners of particular auctions: Bank of America, UBS, Wachovia, CDC Funding, NatWest, SocGen, JPMorgan, and AIG.

128.    Doug Campbell, formerly of Bank of America and Piper Jaffray, testified during the *Ghavami* trial that the following entities took actions to assist another Provider Defendant to win a particular auction: Defendant Bank of America, Defendant JPMorgan, Defendant UBS, co-

conspirator Lehman Brothers, Defendant Bear Stearns, and co-conspirator Wachovia. Evidence provided by Defendant Bank of America based on information from the CW and tapes of conversations of employees of Bank of America and publically available information also reveal the following entities took the same actions: Defendant Merrill Lynch, Defendant Morgan Stanley, co-conspirator NatWest, and co-conspirator Piper Jaffray.

129.    Evidence provided by Defendant Bank of America based on information from the CW and tapes of conversations of employees of Bank of America employees reveal that Broker Defendants and co-conspirators took actions to assist a Provider Defendant to win a particular auction, including, but not limited to the following: Defendant IMAGE, co-conspirator Piper Jaffray, Defendant CDR, co-conspirator Southwest, co-conspirator Feld Winters, co-conspirator Sound Capital, Defendant George K Baum, and co-conspirator PFM.

130.    Actions by other Provider Defendants in order to assist another Provider Defendant to win a particular auction would include, but were not limited to, submitting a courtesy bid that they knew would not be competitive, or deliberately passing on an auction.

131.    Broker Defendants assisted in accomplishing the goals of the conspiracy through a variety of means including, but not limited to: acting as the intermediary between Provider Defendants to indicate whether a certain Provider Defendant desired to win a bid and should be selected; indicating to non-selected Provider Defendants at what pricing they could submit and still allow the pre-selected Provider Defendant to prevail; and giving the pre-selected Provider Defendant information regarding the bids of other providers and consulting with the pre-selected Provider Defendant to ensure that it won the auction with the highest possible profit margin.

132.    The code words used by Provider Defendants to communicate their desire to each

-37-

other to be pre-selected as the winner of a particular auction included: "We really want this deal;" "We want to get in on this rate;" "I can do better, I want this bid;" "[I] want[] to win."

133.    The code word "axe" was commonly used to refer to a Provider Defendant's interest in winning a deal.

134.    The code word "aggressive" was used to refer to a high bid, and "aggressively" was used to refer to bidding to win an auction through submission of high bids.

135.    When the CW started work at Defendant Bank of America's Municipal Derivative desk, he overheard his supervisors at Defendant Bank of America, Phil Murphy and Doug Campbell, commonly use this code language during phone calls regarding Municipal Derivative auctions.

136.    Murphy told the CW that in order for Defendant Bank of America to be the preselected winner in auctions in which Broker Defendant IMAGE was involved, the CW needed to tell Marty Stallone of Defendant IMAGE that the CW "wanted to win" and "would work with IMAGE." When the CW conveyed these sentiments to Stallone, Stallone was not surprised and said he would help where and when he could.

137.    Subsequently, CW would tell Stallone of Broker Defendant IMAGE when there was a particular auction that the CW wanted to win for Defendant Bank of America. Stallone helped the CW with instructions, including, but not limited to: (a) what he needed to bid for Defendant Bank of America to win; (b) whether the CW needed to bid more competitively; (c) that Stallone would get back to the CW when Stallone had the other bids; and (d) whether the CW could lower his bid, and thus increase Defendant Bank of America's profit, and still win the auction.

138.    As the relationship between Stallone and the CW developed, Stallone would unilaterally call the CW and tell him where other providers "saw the market." On some deals,

Stallone would tell CW that another provider wanted to win. CW understood this to mean that he was not to be as competitive, because another Provider Defendant had been pre-selected as the winner of the auction. It was understood that in such situations, Stallone would act as the intermediary between Defendant Bank of America and the other Provider Defendants.

139. From approximately 1999 through 2003, the other Provider Defendants that the CW recalls being pre-selected as winners of particular Municipal Derivative auctions in this manner, included Provider Defendants UBS, Wachovia, CDC Funding, and JPMorgan.

140. The CW also said that there were instances when he knew ahead of time that Defendant Bank of America would win a particular auction, and when another Provider Defendant would win.

141. The CW indicated that it was helpful if he was able to convince the issuer to engage Defendant IMAGE as the broker for the Municipal Derivative auction. The CW explained that members of Defendant Bank of America's Municipal Derivative desk did not always have the opportunity to make such a recommendation.

142. The CW stated that when a Broker Defendant arranged for Defendant Bank of America to win sufficient numbers of auctions, the relationship with the broker was referred to as "working out." He said that members of Defendant Bank of America's Municipal Derivative desk developed a good sense of which relationships with which Broker Defendants were working out in this way.

143. Evidence provided by Defendant Bank of America and contained in DOJ filings show that Defendant Bank of America had this type of collusive relationship with Broker Defendants IMAGE, CDR, and Baum, and co-conspirators Feld Winters, MGIC, and Sound Capital.

-39-

144.    From approximately 1999 through 2003, the members of Provider Defendant Bank of America's Municipal Derivative desk were Phil Murphy, Doug Campbell, Jay Saunders, Dee Bradley (William Dee Bradley), Jeff Klein, and Dean Pinard.

145.    Common code words used by Broker Defendants to communicate to a Provider Defendant that another Provider Defendant desired to be pre-selected as the winner of a particular auction or that the Provider Defendant to whom the communication was made could be pre-selected as the winner, included: "I think I can help you here;" "I will call you when I get the market;" "x company has been working a long time with the market and they see it here;" "This one needs to go to JPMorgan;" and "JPMorgan understands that they just won a big transaction and that Bank of America wants this one."

146.    In situations where a Broker Defendant was not available to act as the intermediary between Provider Defendants, representatives of the Provider Defendants would communicate directly with one another.

147.    For example, the CW described at least three separate conversations with Sam Gruer of Provider Defendant JPMorgan regarding particular Municipal Derivative auctions.  In one such conversation regarding an auction for a specific escrow deal, the CW recalled discussing with Gruer whether Gruer would be bidding in the auction on behalf of Provider Defendant JPMorgan and, if so, how aggressively.  In other words, the conversation was to determine whether this was an auction that JPMorgan intended to bid and win.

148.    In another conversation between the CW and Gruer at the IMAGE Christmas party referenced above, the CW had expressed his happiness to Gruer that they had worked out an arrangement on these types of escrow deals that worked out for both Provider Defendant Bank of

America and Provider Defendant JPMorgan.  He further expressed his happiness that Provider Defendant Bank of America and Provider Defendant JPMorgan had cooperated in the auctions.

149.  Other examples of direct conspiratorial communications between representatives of Provider Defendants found on the tapes from Defendant Bank of America's Municipal Derivative desk, include a series of conversations between Martin McConnell of Provider co-conspirator Wachovia and Doug Campbell of Provider Defendant Bank of America.

150.  For example, in a taped conversation between Martin McConnell of Provider coconspirator Wachovia and Doug Campbell of Provider Defendant Bank of America in 2002, Campbell told McConnell that he told Doug Goldberg of CDR that it was okay if another provider won a deal that CDR brokered and that Paine Webber won the deal.

151.  In another taped conversation between McConnell and Campbell, Campbell is heard discussing with McConnell the participation of Defendant Bank of America in an unidentified Municipal Derivative transaction, apparently in some sort of credit support role.  Campbell appears to indicate to McConnell that co-conspirator Wachovia should agree to the arrangement because Campbell had let co-conspirator Wachovia win a Municipal Derivative transaction with Broker co-conspirator Piper Jaffray, with which Campbell regularly dealt.

152.  There are also recordings of collusive conversations between Phil Murphy and Doug Campbell, both of Provider Defendant Bank of America, a "Peter" at Provider Defendant UBS, and an unidentified person at Provider Defendant JPMorgan regarding certain swap transactions.

153.  In one such conversation, an unidentified representative of Defendant UBS is heard telling an unidentified representative of Defendant Bank of America that Defendant UBS was interested in a swap that IMAGE was handling the next day.  The reasonable inference is that

IMAGE was handling an auction for the swap the next day and the representative of Defendant UBS was telling a representative of one of his supposed competitors in such an auction, Defendant Bank of America, that Defendant UBS would like to win the auction and was seeking an agreement for Defendant Bank of America to assist Defendant UBS in doing so.

154.   Swap deals were both negotiated and competitively bid at auction.  The conspiracy involved manipulation of the terms in both situations.  However, the fact that the representative of Defendant UBS refers to Broker Defendant IMAGE handling the swap the next day suggests that this particular swap was put to auction.  In a negotiated deal, a broker would not be handling the deal on a single date certain; rather, the negotiation would take place over a period of time.

ii.      **Submitting Courtesy Bids To Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction**

155.   Another mechanism of the conspiracy was the submission of a courtesy bid by a Provider Defendant in an auction for the benefit of another Provider Defendant.  A courtesy bid is a purposely non-competitive bid that a Provider Defendant submits with no intention of winning the auction but rather to assist another Provider Defendant to win the auction.

156.   According to the CW, Provider Defendants submitted courtesy bids both to assist another Provider Defendant to win a particular auction as well as to meet IRS safe harbor conditions.  As discussed herein, IRS regulations require that bids be received from at least three providers for a presumption of fair market value to apply.  In either case, the submission of a courtesy bid constituted a collusive manipulation of the auction process that affected the terms for a particular Municipal Derivative at auction as well as the market for such Municipal Derivatives.

157.   The practice was so blatant and prevalent that Provider Defendants would bid on

-42-

deals on which they were not qualified or authorized to bid.

158.    For example, Defendant IMAGE would sometimes ask the CW to bid on deals even if the CW did not have internal credit approval to do so.  Phil Murphy, the CW's supervisor at Defendant Bank of America, would instruct the CW to bid on those deals with a vague condition in the bid as a safety net, so that Defendant Bank of America could back out of it if it won.

159.    Similarly, the CW described how co-conspirator Wachovia and Defendant JPMorgan, as well as co-conspirators NatWest and Lehman, would submit bids for certain escrow CDs that none were qualified to provide under applicable state laws.

160.    The CW reported that he would be given a "safe range" by Broker Defendant IMAGE employee Marty Stallone, when Stallone would pass along a request for a courtesy bid from him so that the CW would not inadvertently win a bid he didn't want.

161.    The CW specifically identified Defendants JPMorgan, CDC Funding, UBS, NatWest, and Wachovia and co-conspirator Lehman as providers that he knew submitted courtesy bids.

162.    Information provided by the CW and reported descriptions of the contents of tapes of conversations of employees on Defendant Bank of America's Municipal Derivative desk, and publically available information indicate that the following Provider Defendants submitted courtesy bids to assist another Provider Defendant win a particular auction: Bank of America, JPMorgan, NatWest, Wachovia, CDC Funding, NatWest, Merrill Lynch, and UBS.

163.    The same information reveals that the following Provider Defendants and Unnamed Co-Conspirators benefitted from the submission of courtesy bids by other Provider Defendants: Bank of America, JPMorgan, AIG, and NatWest.

-43-

164.     Broker Defendants and Provider Defendants used code words to facilitate the use of courtesy bids. Broker Defendants would communicate such information by saying things such as the following: "x company has been working a long time with the market and they see it here;" "I need a bid;" "Can you give me a bid;" and "I know you usually pass on construction bids, but would you mind pricing it up?"

165.     According to the CW, representatives of Broker Defendant IMAGE would use these above phrases as well as others.  For example, on occasion, the CW would be asked by Peter Loughead or Stallone at IMAGE to just "give them a rate," which CW understood meant that a different Provider Defendant would win the auction.  In such situation the CW would submit a rate that he knew or assumed would not win.

166.     Sometimes the requests were more direct and blatant.  For example, tapes of members of Defendant Bank of America's Municipal Derivative desk from 2002 reveal a conversation between Jim Towne of broker co-conspirator Piper Jaffrey and Provider Defendant Bank of America's Doug Campbell in which Towne tells Campbell that Provider Defendant JPMorgan wants to win the auction in question.  Campbell then gives the Defendant Bank of America's bid after hearing what Defendant JPMorgan is bidding.  Towne asks Campbell to adjust Defendant Bank of America's bid up closer to Defendant JPMorgan's bid, apparently so that it would not draw attention. Campbell says that's fine, but that he doesn't want to win the auction.  Towne agrees.

167.     Similarly, according to the CW, co-conspirator NatWest was not equipped to do many types of Municipal Derivative deals that Defendant Bank of America could do, but coconspirator NatWest would, nonetheless, submit courtesy bids on auctions for such deals for the benefit of Defendant Bank of America. Sometime in 1999–2001, Broker Defendant IMAGE's Stallone told

-44-

the CW to "back off" on a deal because it was one that NatWest could do (apparently in recognition for the similar courtesy bids that co-conspirator NatWest had submitted for the benefit of Defendant Bank of America).

168.    The tapes also reveal a conversation in 2002 in which Defendant Bank of America's Doug Campbell offers to Doug Goldberg of CDR to submit a bid if needed.  A Municipal Derivative provider should be submitting a bid because it wants to compete for the Municipal Derivative at auction, not because another Municipal Derivative provider would like to use the bid's existence to win the Municipal Derivative.

169.    A series of conversations between unidentified Defendant Bank of America employees and employees of Broker Defendants from 2004 reveals further evidence of courtesy bidding by Defendant Bank of America.

170.    In a series of conversations recorded on August 21, 2004 between a representative of Broker co-conspirator Sound Capital and a member of Defendant Bank of America's Municipal Derivative desk, the Bank of America employee is heard asking whether Sound Capital needs a bid from Bank of America and is heard discussing the terms of the bid with the Sound Capital representative.  In a subsequent conversation between the same persons, the Bank of America employee is heard discussing that the bid submitted by Bank of America was close to winning, but lost.  The Bank of America employees expresses his relief that Bank of America did not win the auction because, if they had won it, Bank of America would have lost money on the deal.

171.    The foregoing are just examples of the recorded conversations between employees of Defendant Bank of America and other representatives of brokers regarding the submission of courtesy bids in auctions for which a Provider Defendant or other providers had no intention of

winning.

### iii.   Passing to Help a Pre-Selected Provider Defendant Win a Municipal Derivative Auction

172.   One of the means by which Provider Defendants would act to assist a pre-selected winner to prevail in a particular auction was by passing on an auction that it otherwise would have bid on.

173.   Evidence provided by Defendant Bank of America based on information from the CW and tapes of Bank of America employee conversations reveal that the following Provider Defendants colluded to pass and/or knowingly benefitted from a colluded pass from another Provider Defendant: Bank of America; JPMorgan; and UBS.

174.   Evidence provided by Defendant Bank of America based on information from the CW and tapes of conversations of employees of Bank of America reveal that the following brokers knowingly facilitated and/or encouraged one or more Provider Defendant to pass on a particular auction in order to allow another Provider Defendant to win that auction: Defendant IMAGE; Defendant CDR; co-conspirator Piper Jaffray; and co-conspirator First Southwest.

175.   In order to advance the conspiracy, Broker Defendants used code words to communicate to Provider Defendants that another Provider Defendant desired it to pass on a particular auction or that another Provider Defendant would be willing to pass on its behalf including: "This one needs to go to JPMorgan;" "JPMorgan understands that they just won a big transaction and that Bank of America wants this one."

### iv.   The Pre-Selected Provider Defendant Gets A "Last Look" At Other Bids to Ensure Winning a Municipal Derivative Auction

176.    Another means by which Defendants ensured that the Provider Defendant preselected to win a particular Municipal Derivative auction was by giving the pre-selected winner a "last look" at the bids already submitted.  This allowed the pre-selected Provider Defendant to submit a bid that would be just enough to win the auction, but no more.  This allowed the Provider Defendant to maximize its profit margin, and enabled it to police compliance by the other colluding Provider Defendants with whom it had made bidding agreements.

177.    The CW described how representatives of Broker Defendants would give representatives of a pre-selected Provider Defendant, including Defendant Bank of America a "last look," whereby the Broker Defendant would tell the pre-selected Provider Defendant what other providers had bid to give the pre-selected Provider Defendant an opportunity to adjust its bid to ensure winning.

178.    The CW reported that Stallone of Broker Defendant IMAGE would tell the CW what CW needed to bid in order for Provider Defendant Bank of America to win a deal.  Stallone would also tell the CW that if the CW could do "a couple better," referring usually to basis points, Defendant Bank of America could win the deal.

179.    The CW believes that Provider Defendants JPMorgan, UBS, Wachovia, and Bear Stearns (in connection with Patrick Marsh who worked in different periods for both Defendant Bear Stearns and co-conspirator NatWest) received similar types of last looks.

180.    Indeed, the practice was so prevalent that persons in the industry reacted with surprise when someone was given a last look and did not take advantage of it.

181.    For example, in recording of a conversation between Jim Towne of Broker co-conspirator Piper Jaffray and Doug Campbell of Defendant Bank of America, Towne is heard

discussing how he gave a representative of Provider Defendant Morgan Stanley a last look in a particular Municipal Derivative auction and the opportunity to change its bid, but that, in this instance, Defendant Morgan Stanley did not change its bid.  Both Towne and Campbell are heard discussing how crazy it was that Defendant Morgan Stanley did not change its bid in this instance.

182.    Code words used by Broker Defendants to give last looks or to indicate their willingness to do so included: "I think I can help you here."  "I will call you when I get the market."

### v.    The Pre-Selected Provider Defendant Gets Guidance and The Terms Of Other Bids to Ensure Winning a Municipal Derivative Auction

183.    Defendants' conspiracy also involved the provision of more detailed bidding guidance by Broker Defendants to Provider Defendants, which not only allowed a particular Provider Defendant to win an auction for a particular Municipal Derivative but also to do so on terms that gave the provider the highest possible profit.

184.    Speaking in 2005, before the DOJ had publically announced that it was engaged in an industry-wide investigation into collusion among Municipal Derivative brokers and providers, the Director of the IRS' Tax-Exempt Bond Office Mark Scott, described among the evidence of probative of bid-rigging in Municipal Derivative transactions "transactions where the winning bid is the only bid high enough to make the deal work."

185.    It is clear now that the result of the bidding process was due to the particularized guidance that Defendants provided one another regarding Municipal Derivative auctions that allowed the pre-selected winner to prevail on terms that were no higher than necessary to win the auction and, thus, achieved the maximum level of profit for the pre-selected Provider Defendant.

186.    One of the principal ways Defendants accomplished this was by the submission by

Provider Defendants of pre-bid "indications," which would indicate where they intended to bid at auction.

187.    For the Provider Defendants who were not the pre-selected winner of a particular Municipal Derivative auction, an indication from the pre-selected winner of the auction allowed the other Provider Defendants to craft their courtesy bids so that they would not win the auction. Similarly, these Provider Defendants could submit their own indications to ensure that their intended courtesy bid would not win the auction but would look sufficiently legitimate to assist the pre-selected winner.

188.    For the Provider Defendant pre-selected as the winner of an auction, the indications submitted by it and other Provider Defendants allowed the pre-selected winner to craft its bid at a level just high enough to win but no higher, maximizing its profit, and depressing the terms that the issuer received.

189.    For example, the CW described a number of instances where he would submit pre-bid indications on behalf of Defendant Bank of America to Martin Stallone of Broker Defendant IMAGE.

190.    The CW explained that he would submit an indication to Stallone prior to the bid being due, and then call Stallone to ask if the indication "was a good fit." Sometimes Stallone would respond by asking "could you get to this number," indicating that the CW would need to raise the bid for Defendant Bank of America to win the auction, or by saying that indication "looks aggressive," which would signal to CW to re-work the bid to make it more profitable for Defendant Bank of America.

191.    The CW also described how Stallone of Defendant IMAGE would sometimes signal

to him that Defendant Bank of America could lower its bid by five basis points, and thus gain more profit from the auction, by telling the CW that he could include the brokerage fee in the bid. The customary brokerage fee on Municipal Derivative transactions was five basis points.

192.    The CW explained how a bid was re-worked to be more profitable for Defendant Bank of America, and would not always involve lowering the rate of the agreement, but could involve the other types of adjustments depending on the particular terms of the Municipal Derivative in question. Thus, it could raise or lower interest rates, adjust a flat amount, or adjust a date.

193.    If the Municipal Derivative was a straight GIC, the CW would reduce the interest rate, which would result in less interest payments to the issuer. If the Municipal Derivative was an escrow, which often were bid based on the total dollar amount the issuer is required to pay the provider for escrow, the CW might increase the amount of money demanded from the issuer. For escrow bids based on date, the later the date, the more beneficial to the provider, so the CW would make the date later. If the Municipal Derivative being auctioned was a swap, the adjustment could take different forms depending on the nature of the swap. Thus it could involve lowering the value of the cash flow from the Defendant Bank of America to the issuer, raising the value of the cash flow from the issuer to Defendant Bank of America, or both. How this was done would depend on the nature of the swap.

194.    Tape evidence of conversations involving Defendant Bank of America employees and representatives of other Defendants demonstrate the pervasiveness of the use of indications in Defendants' conspiracy.

### b.    Manipulation Of Negotiated Deals

195.    Defendants' conspiracy was not limited to Municipal Derivative transactions for

which auctions were competitively bid. Defendants also conspired to manipulate the terms that issuers received on negotiated deals, particularly, but not only, swap transactions.

196.   Defendants did so through means including, but not limited to, allocating transactions among Provider Defendants, coordinating pricing, and giving falsified pricing verification information to providers.

197.   For example, there are recordings of conversations between Phil Murphy and Doug Campbell, both of Provider Defendant Bank of America, a Peter at Provider Defendant UBS, and an unidentified person at Provider Defendant JPMorgan regarding certain swap transactions, in which these persons discuss splitting the economics and/or pricing of certain swap transactions.

198.   Underwriters have traditionally had the inside track on swap deals associated with the bonds that they underwrite.

199.   Provider Defendants conspired with one another to preserve the advantage that this reaped for one another by providing artificially low price quotes when issuers sought from them pricing verification of terms negotiated with another Provider Defendant.

### c.   Kickbacks And Other Types Of Unlawful Consideration

200.   Defendants' conspiracy was furthered by way of undisclosed "kickbacks" and other types of consideration that Provider Defendants would make to other Provider Defendants and Broker Defendants. This consisted of both making direct payments to some Defendants, as well as directing business to other Defendants. These practices were another manifestation of the "you scratch my back I'll scratch yours" modus of the conspiracy and affected the entire market for Municipal Derivatives.

201.   An email sent on June 28, 2002 by Doug Campbell of Provider Defendant Bank of

America to Phil Murphy of Provider Defendant Bank of America powerfully demonstrates the role of undisclosed kickbacks in the Defendants' conspiracy.

202.    In the email, Defendant Bank of America admits to making undisclosed kickbacks to Provider Defendants and Broker Defendants, using the proceeds from deals in which those Provider Defendants and Broker Defendants were not even involved, but were part of Defendants' conspiracy.

203.    The email states: "I believe this list contains all of the situations where BOFA [Defendant Bank of America] paid an external business contact on a transaction where the external business contact was not involved in some ways in the transaction." The email goes on to list a series of payments to Broker Defendant CDR, Broker co-conspirator Winters, Provider/Broker co-conspirator Piper Jaffray and Paine Webber, Inc. (part of Provider Defendant UBS), totaling $182,393, along with references to the Municipal Derivative transactions from which the moneys were derived.

204.    Among the interesting elements of the email are the reasons that Campbell gives for making the payments. Particularly revealing is the statement: "The CDR fees have been part of an ongoing attempt to develop a better relationship with our major brokers." The "better relationship" which the email states Defendant Bank of America is attempting to develop with CDR has to do with positioning Defendant Bank of America to benefit from CDR's conspiratorial conduct.

205.    According to the CW, Campbell was involved in bid rigging of Municipal Derivative auctions on behalf of Provider Defendant Bank of America with Broker Defendant CDR. The CW recalled a story in which another member of Provider Defendant Bank of America's Municipal Derivative desk asked Campbell about sharing the CDR relationship with him. Campbell told that

desk member that "you don't want the responsibility associated with CDR." The CW also recalls Doug Goldberg and Dani Naeh of Provider Defendant CDR saying "can you show me a level," indicating that if the CW could get Defendant Bank of America's number higher, Defendant Bank of America could win the Municipal Derivative auction.

206.   In a February of 2005 letter, Charles Anderson, Field Manager of the IRS's Tax-Exempt Bond office states: "We have serious concerns about the relationship between Bank of America and CDR relative to [a particular] bond issue."

207.   The explanation Campbell gives in the email for the payments to Paine Webber is also revealing. Paine Webber was a provider of Municipal Derivatives, as was Defendant Bank of America. Thus, Defendant Bank of America and Paine Webber should have been competitors. However, as the email reveals, Defendant Bank of America and Paine Webber did not deal with one another as competitors but rather as co-conspirators having a mutual interest in the other's success. Therefore, Campbell explains that he directed $75,000 to be paid to Paine Webber because Paine Webber was in the process of launching the reinvestment derivative side of their business. It is difficult, if not impossible, to identify a legitimate reason why Defendant Bank of America would have an interest in seeing Paine Webber succeed in this effort.

208.   The email is also revealing in the inter-linkages between the conspiratorial conduct taken by Defendants in various Municipal Derivative transactions. As the email demonstrates, Defendants would often use illegal proceeds from one Municipal Derivative transaction to compensate a co-conspirator for assistance in different transactions.

209.   As discussed elsewhere herein, this was a common practice among Defendants and included conduct such as directing business for things such as pricing verification letters in

negotiated swap deals to Defendants who had assisted other Defendants to prevail in a separate reinvestment derivative auction.

210.    Another common practice along these lines was Provider Defendants recommending specific Broker Defendants for Municipal Derivative brokering work related to bonds on which the Provider Defendants had played an underwriter role.   The CW makes clear that it was well understood among the members of Provider Defendant Bank of America's Municipal Derivative desk that such referrals were effective ways to solicit conspiratorial conduct by Broker Defendants for Defendant Bank of America's benefit.

211.    Finally, the email is interesting for what it excludes.   According to Campbell, it lists only payments to "an external business contact on a transaction where the external business contact was not involved in some way in the transaction (e.g. the external business contact was not a broker, investment bank, or did not provide the client with market pricing verification)."   The implicit import of this is that similar payments were also made from the proceeds of transactions to brokers and investment banks that were involved in the transactions from which the moneys came.

212.    Brokers are supposed to be paid in Municipal Derivative transactions based on a certain percentage of the total amount of the transaction, generally five basis points, and there is no apparent legitimate reason why the winner of a Municipal Derivative transaction would pay another provider that had been involved in it.   There is no apparent legitimate reason why Defendant Bank of America would pay Broker Defendants and Provider Defendants involved in particular Municipal Derivative transactions that Defendant Bank of America won, except in consideration for their conspiratorial conduct that assisted Defendant Bank of America to win.

213.    Along these lines, on November 10, 2006, Broker Defendant Baum, which brokered

a number of deals worth approximately $2 billion, announced that it had paid an undisclosed penalty to the IRS. As part of that settlement, it was disclosed that Broker Defendant Baum had engaged in bid rigging in which Baum assisted certain providers, including Provider Defendant CDC Funding, to win particular Municipal Derivative transactions. This permitted pre-selected providers, including Defendant CDC Funding, to obtain "sweetheart deals" on the Municipal Derivative transaction. There is evidence that these providers then made payments to Defendant Baum in consideration.

214.    The IRS has also investigated a transaction in 2000 between Defendants Bank of America and Provider Defendant Baum, where Bank of America provided a GIC on a $100 million issue from the Illinois Development Finance Authority sold by Rural Enterprises of Oklahoma, Inc ("Rural Enterprises"). Defendant Bank of America reportedly made "significant" hidden payments to Provider Defendant Baum in connection with the deal.

### d.    Defendants' Overt Acts To Prevent Discovery Of Their Conspiratorial Communications

215.    Some or all of Defendants recorded the phone calls and tracked the email communications of their employees during some or all of the period of the conspiracy. For example, Defendant Bank of America taped the phone conversations of its employees at its Municipal Derivative desk until the fall of 2004, purportedly to provide clarity in the event of any uncertainty regarding orders. It has also been reported that FSA has provided 600 hours of tapes to the DOJ and SEC in connection with each investigation of the conspiracy.

216.    It is clear that Defendants' employees were fully aware that their communications were being recorded and that their conduct was illegal. Accordingly, they took affirmative action to both disguise the meaning of their communications by using commonly understood code words,

-55-

as alleged herein, and by affirmatively switching to non-recorded means of communication when undertaking conspiratorial discussions.

217.    For example, the CW commonly told co-conspirators to call him on his cellular phone so as to avoid having their conversations audiotaped.  It was also commonplace for Bank of America employees to tell their fellow co-conspirator "I'll call you back later" (i.e. from a secure line) or to ask if they could go off the trading desk when bidding.  Campbell of Bank of America also avoided detection by circumventing the capture of emails sent on his Bank of America Blackberry by directly contacting the Blackberries of co-conspirators, including Towne of Piper Jaffray.  The CW also told various co-conspirators to call him on his cell phone so as to avoid detection.  Moreover, it was common for Brokers to ask "are you off the desk" when doing a deal, again to avoid having their conversations recorded.

218.    Representatives of Defendants also used their personal (as opposed to work) email accounts for conspiratorial communications.  For example, Naeh of Broker Defendant CDR would send conspiratorial e-mails to individuals at Provider Defendant Bank of America, including Pinard, through Naeh's personal GoAmerica email account rather than his work account.  He did so because he recognized that these communications were illegal and sought to evade their discovery.

### 2.    Repeat Appearances By Defendants' Representatives In Different Transactions, Personal Relationships Among Them, And Other Factors Encouraging And Enabling The Conspiracy

#### a.    Repeat Appearances In Multiple Transactions

219.    One of the most critical factors that gave rise to Defendants' conspiracy and enabled it to thrive was that not only did the same Provider Defendants and, to an extent, Broker Defendants show up in multiple Municipal Derivative transactions, the same persons represented the Defendants

in those transactions.  This enabled a *quid pro quo* of Municipal Derivative transaction allocation that would not otherwise be possible.

220.    Provider Defendants were willing to not only allow another Provider Defendant to win a particular Municipal Derivative transaction, without competition, but to actually assist another Provider Defendant win (through the submission of courtesy bids, etc.) because of the nature of the industry.  The same representatives of different Provider Defendants showed up in multiple transactions, often with the same representatives of Broker Defendants.  These representatives developed a sense of trust in one another, and a sense of sharing the benefits of cooperation versus competition.

### b.    Personal Relationships Among Defendants' Representatives

221.    Developing out of this process was a deep sense among representatives of Defendants of the importance of developing personal relationships with one another.

222.    The CW explained that when he started at Provider Defendant Bank of America, he struggled to win the auctions he bid on.  The CW observed that when his supervisors at Defendant Bank of America, Phil Murphy and Doug Campbell, wanted bids, they would say things like "I can do better, I want this bid" to the brokers, and were able to re-bid or adjust bids to brokers.

223.    Much of the compensation to employees of Defendant Bank of America's Municipal Derivative desk was based on bonuses tied to the amount of profit that the employee generates through the Municipal Derivative transactions that the employee executes.  This type of compensation structure appears to be common among Municipal Derivative providers and gives employees of Municipal Derivative providers a personal incentive to participate in illegal conduct that generates higher profits.

224.   The CW had, in fact, been recommended for his position at Defendant Bank of America to Phil Murphy and Doug Campbell by Marty Stallone and Dave Eckhart of Broker Defendant IMAGE, whom the CW knew through prior public-finance related employment contacts. As soon as he started, the CW was assigned to work with IMAGE because of his personal relationship with Stallone and Eckhart. Broker Defendant IMAGE indicated to the CW, soon after he started, that Provider Defendant Bank of America would be included on every Municipal Derivative transaction that IMAGE handled, ensuring that Defendant Bank of America would show up in multiple deals with other Provider Defendants such as JPMorgan with whom IMAGE also had a close relationship.

225.   The personal relationships that representatives of Provider Defendants had with Broker Defendants played an important role in the conspiracy.

226.   Doug Campbell and Phil Murphy of Bank of America worked closely with Doug Goldberg and Dani Naeh of Broker Defendant CDR.  Defendant Bank of America's Campbell also worked closely with Johann Rosenberg of Broker co-conspirator Sound Capital.  Various personnel at Defendant Bank of America also had relationships with Ed Steinhauer and David Lail of Broker Defendant Baum.

227.   These close relationships between representatives of Provider Defendants and representatives of Broker Defendants enabled the conspiracy to operate more effectively and profitably.

228.   As Dani Naeh of Broker Defendant CDR put it to Dean Pinard of Provider Defendant Bank of America after apparently assisting Pinard to prevail in a particular Municipal Derivative Auction, "It's nice to have friends."

-58-